No. 19-15128

# In the United States Court of Appeal for the Ninth Circuit

STEVE WILSON BRIGGS

*Appellant/Petitioner,*

*v.*

ARI EMANUEL, MATT DAMON, BEN AFFLECK, MRC, NEILL BLOMKAMP, NBCUNIVERSAL, ASIF SATCHU, BILL BLOCK, SONY PICTURES ENT, MORDECAI WICZYK, DANA BRUNETTI

*Appellees/Respondents.*

_____

On Appeal from the U.S. District Court for Northern District of California
CASE NO. 3:18-CV-4952-VC
THE HONORABLE VINCE CHHABRIA

**APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 2 of 7
[PAGES 5 - 256]**

*Stephen G. Larson (SBN 145225)
Jonathan E. Phillips (SBN 233965)
A. Alexander Lowder (SBN 269362)
**Larson O'Brien LLP**
555 S. Flower Street, 44th Floor
Los Angeles, California 90071
Telephone:     (213) 436-4888
Facsimile:     (213) 623-2000
Email: Slarson@larsonobrienlaw.com

*Counsel For Appellee* Trigger Street
Productions, Inc.

Kelli L. Sager (SBN 120162)
Rochelle L. Wilcox (SBN 197790)
Brendan N. Charney (SBN 293378)
**Davis Wright Tremaine LLP**
865 S. Figueroa Street, Suite 2400
Los Angeles, California  90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899
Email:  Kellisager @dwt.com

*Counsel For Appellee* NBCUniversal Media, LLC

Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
Kate Mangels (SBN 301811)
**Kinsella Weitzman Iser Kump & Aldisert LLP**
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California  90401
Telephone: (310) 566-9800
Email:  Mkump@kwikalaw.com

*Counsel For Appellee* MRC II Distribution Company,
LP, Mordecai Wiczyk, Asif Satchu, Sony Pictures
Entertainment, Inc., and Ariel Emanuel

# TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|---|---|---|---|
| 01/22/19 | [Dkt. 94] Order Denying (92) Motion for Leave to File Motion for Reconsideration, Motion to Alter Judgement filed by Plaintiff Steve Kenyatta Wilson Briggs | 1 | ER 1 |
| 12/22/18 | [Dkt. 91] Judgment Signed by Judge Vince Chhabria | 1 | ER 2 |
| 12/22/18 | [Dkt. 90] Order Granting Motions to Dismiss (Dkts. 27, 48, and 51) and Denying Motion to Declare Plaintiff a Vexatious Litigant | 1 | ER 3 |
| 01/22/19 | [Dkt. 95] Notice of Appeal to the 9th Circuit Court of Appeals filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 5 |
| 01/14/19 | [Dkt. 92] Motion for Leave to File Motion for Reconsideration, Motion to Alter Judgment filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 12 |
| 12/17/18 | [Dkt. 89] Errata by Plaintiff Steve Kenyatta Wilson Briggs (Certificate of Service) | 2 | ER 67 |
| 11/30/18 | [Dkt. 79] Reply re (51) Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk | 2 | ER 71 |
| 11/30/18 | [Dkt. 78] Reply re (48) Motion to Dismiss filed by NBCUniversal Media, LLC | 2 | ER 79 |
| 11/23/18 | [Dkt. 68] Opposition/Response re (48) NBCU Motion to Dismiss filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 94 |
| 11/21/18 | [Dkt. 67] Opposition/Response re (51) MRC Defendants' Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 106 |
| 11/20/18 | [Dkt. 66] Reply re (27) Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) filed by Trigger Street Productions | 2 | ER 118 |

# TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 11/19/18 | [Dkt. 63] Opposition/Response re (27) Trigger Street Productions' Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and/or 9(B) filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 129 |
| 11/14/18 | [Dkt. 62] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Declaration of Zena Briggs, concerning the refusal of service of process by Defs. Spacey and Brunettis agency for service of process) (Altman, Greenfield & Selvaggi) | 2 | ER 159 |
| 11/14/18 | [Dkt. 61] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service by certified mail, with return receipt and Acknowledgment of Receipt of Summons, Declaration of Cecile Lusby) | 2 | ER 162 |
| 11/13/18 | [Dkt. 60] Status Report (Addendum) regarding Service of Process developments concerning Defs. Spacey and Brunetti, and their agents final efforts to evade and refuse service by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 165 |
| 11/12/18 | [Dkt. 59] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Defs. Damon and Affleck, Declaration of Melvin Jackson) | 2 | ER 172 |
| 11/12/18 | [Dkt. 58] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service, Declaration of Nexus Asson, Re service of Defs. MRC, Satchu, Wiczyk) | 2 | ER 175 |
| 11/09/18 | [Dkt. 53] Declaration of Gregory Korn in Support of (51) Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk (358 pgs) (Part 1) ER 182-ER 256 | 2 | ER 182 |
| 11/09/18 | [Dkt. 53] Declaration of Gregory Korn in Support of (51) Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk (358 pgs) (Part 2) ER 257-ER 539 | 3 | ER 257 |

## TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 11/09/18 | [Dkt. 52] Request for Judicial Notice in Support of Defendants' Motion to Dismiss First Amended Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk | 4 | ER 540 |
| 11/09/18 | [Dkt. 51] Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk | 4 | ER 542 |
| 11/09/18 | [Dkt. 49] Request for Judicial Notice re (48) Motion to Dismiss filed by NBCUniversal Media, LLC | 4 | ER 562 |
| 11/09/18 | [Dkt. 48] Motion to Dismiss filed by NBCUniversal Media, LLC | 4 | ER 722 |
| 11/09/18 | [Dkt. 46] Order by Judge Vince Chhabria denying (39) Motion for Service by Publication, and Motion for Extension of Service Deadline | 4 | ER 749 |
| 11/08/18 | [Dkt. 45] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (temporary "illustrative" service statements) | 4 | ER 750 |
| 11/08/18 | [Dkt. 44] Second Motion for Service by Publication for Defs Spacey and Brunetti filed by Plaintiff Steve Kenyatta Wilson Briggs | 4 | ER 765 |
| 11/05/18 | [Dkt. 41] Clerk's Declination of Default as to Kevin Spacey and Dana Brunetti. (Plaintiff has not submitted evidence satisfactory to the court establishing actual delivery to the persons to be served per CA CCP Section 417.20) | 4 | ER 785 |
| 11/05/18 | [Dkt. 40] Request for Judicial Notice filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 786 |
| 11/05/18 | [Dkt. 39] Motion for Service by Publication filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 886 |

## TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 11/05/18 | [Dkt. 38] Status Report Regarding Service of Process on All Defendants by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 893 |
| 11/05/18 | [Dkt. 37] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Service of Process of Summons and Complaint by U.S. mail, C. Lusby) | 5 | ER 903 |
| 11/05/18 | [Dkt. 36] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Service of Process of Summons and Complaint by U.S. mail 9/27/18) | 5 | ER 906 |
| 11/05/18 | [Dkt. 35] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Service of Process of Summons and Complaint by U.S. mail) | 5 | ER 909 |
| 11/05/18 | [Dkt. 34] Notice of Voluntary Dismissal of Sound Point Capital Management by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 912 |
| 10/31/18 | [Dkt. 33] Fourth Motion for Default Judgment by the Clerk as to Request for Entry of Default filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 914 |
| 10/31/18 | [Dkt. 32] Certificate of Service (correction) by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 946 |
| 10/31/18 | [Dkt. 31] Clerk's Declination of Default | 5 | ER 949 |
| 10/31/18 | [Dkt. 29] Joinder re (27) Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) by Sound Point Capital Management, LC | 5 | ER 950 |
| 10/29/18 | [Dkt. 28] Motion for Default Judgment by the Clerk as to Request for Entry of Default against Defs. Trigger Street Productions, and Sound Point filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 953 |
| 10/29/18 | [Dkt. 27] Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) filed by Trigger Street Productions (Part 1) ER 982- ER 1019 | 5 | ER 982 |

iv

# TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 10/29/18 | [Dkt. 27] Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) filed by Trigger Street Productions (Part 2) ER 1020-ER 1190 | 6 | ER 1020 |
| 10/29/18 | [Dkt. 26] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs re (17) Certificate of Service, (16) Certificate of Service (Supplemental) proof of signed return receipts received for Defs. Trigger Street Productions, Inc. and Sound Point Capital Management, LC (09/17/18); and for Kevin Spacey, Dana Brunetti, (09/27/18) | 6 | ER 1191 |
| 10/26/18 | [Dkt. 25] Clerk's Declination of Default | 6 | ER 1212 |
| 10/25/18 | [Dkt. 24] Second Motion for Default Judgment by the Clerk as filed by Plaintiff Steve Kenyatta Wilson Briggs | 6 | ER 1213 |
| 10/22/18 | [Dkt. 23] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Declaration re service of process of Defs MRC, Satchu, and Wiczyk) | 6 | ER 1224 |
| 10/22/18 | [Dkt. 22] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Def. Sony Picture Entertainment, Inc.) | 6 | ER 1227 |
| 10/22/18 | [Dkt. 21] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Def. NBCUniversal) | 6 | ER 1230 |
| 10/22/18 | [Dkt. 20] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Defs. Ari Emanuel, Neill Blomkamp, Matt Damon, and Ben Affleck) | 6 | ER 1232 |
| 10/22/18 | [Dkt. 19] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Declaration re service of Spacey, Brunetti, and Trigger Street Productions) | 6 | ER 1235 |

## TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 10/22/18 | [Dkt. 18] Request for Entry of Default Against Defendants Kevin Spacey, Dana Brunetti, and Trigger Street productions, Inc. filed by Plaintiff Steve Kenyatta Wilson Briggs | 6 | ER 1237 |
| 10/09/18 | [Dkt. 17] (Second) Proof of Service of Summons and Complaint; Declaration of Dr. Morgan Marchbanks by Plaintiff Steve Wilson Briggs | 6 | ER 1242 |
| 10/09/18 | [Dkt. 16] (First Proof of Service of Summons and Complaint; Declaration of Dr. Morgan Marchbanks by Steve Willson Briggs | 6 | ER 1245 |
| 10/04/18 | [Dkt. 11] Notice of Service of Process Issues by Steve Wilson Briggs | 6 | ER 1248 |
| 08/15/18 | [Dkt. 3] Summons Issued as to Ben Affleck, William Block, Neill Blomkamp, Dana Brunetti, Matt Damon, Ari Emanuel, MRC, NBCUniversal Media, LLC, Asif Satchu, Sony Pictures Ent., Inc., Sound Point Capital Management, LC, Kevin Spacey, Trigger Street Productions, Mordecai Wiczyk | 7 | ER 1287 |
| 08/15/18 | [Dkt. 1] Complaint against Ben Affleck, William Blcok, Neill Blomkamp, Dana Brunetti, Matt Damon, Ari Emanuel, MRC, NBCUniversal Media, LLC, Asif Satchu, Sony Pictures Ent., Inc., Sound Point Capital Management, LC, Kevin Spacey, Trigger Street Productions, Mordecai Wiczyk filed by Steve Wilson Briggs | 7 | ER 1288 |
| | Court Docket | 7 | ER 1528 |

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
   snc.steve@gmail.com
4  PLAINTIFF In Propria Persona

**FILED**

**JAN 22 2019**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

5

6

7

8              **UNITED STATES DISTRICT COURT**
9             **NORTHERN DISTRICT OF CALIFORNIA**
                **SAN FRANCISCO DIVISION**

10  STEVE WILSON BRIGGS,                    Civ No: 18-cv-04952-VC
11            Plaintiff,
12            vs                      **1.  NOTICE OF APPEAL;**
    KEVIN SPACEY, ARI EMANUEL,                       **AND**
13  MATT DAMON, BEN AFFLECK,
    NEILL BLOMKAMP; NBCUNIVERSAL    **2.  REPRESENTATION STATEMENT**
14  MORDECAI (MODI) WICZYK; ASIF
15  SATCHU; MRC (MEDIA RIGHTS        **(PLAINTIFF'S NOTICE OF APPEAL**
    CAPITAL;DANA BRUNETTI;          **TO THE UNITED STATES COURT OF**
16  SONY PICTURES ENTERTAINMENT;    **APPEALS FOR THE NINTH CIRCUIT;**
17  TRIGGER STREET PRODUCTIONS, INC;   **AND REPRESENTATION**
             Defendants.                     **STATEMENT)**
18

19                        **NOTICE OF APPEAL**

20         Notice is hereby given that Steve Wilson Briggs, Plaintiff in the above referenced

21  case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the

22  District Court's December 22, 2018 **Order** (Docket No. 90), and the District Court's

23  December 22, 2018 **Judgment** (Docket No. 91), in favor of the Defendants' various

24  motions to dismiss.  This case (18-cv-04952-VC) was initiated on August 15, 2018, in the

25  United States District Court of the Northern District Of California, San Francisco Division.

26    Dated: January 22, 2019      Respectfully submitted,

27                                      By.

28                                           Steve Wilson Briggs
                                             Plaintiff, In Propria Persona

                                          1
                        NOTICE OF APPEAL & REPRESENTATION STATEMENT

ER 5

1                 **REPRESENTATION STATEMENT**

2        The undersigned represents himself, and is the plaintiff and appellant is this matter.

3  The following is a list of all parties in this action and the information regarding their

4  counsel.

5                         **APPELLANT:**

6               **Plaintiff Steve Wilson Briggs**

7                  In Propria Persona
       4322 Chico Ave., Santa Rosa, California 95407

8               Phone: 510 200 3763

9             Email: snc.steve@gmail.com.

10                      **APPELLEES:**

11       **Defendant MRC II Distribution Company LP**

12            Michael J. Kump (SBN 100983)
          Gregory P. Korn (SBN 205306)

13            Kate Mangels (SBN 301811)
  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

14          808 Wilshire Boulevard, 3rd Floor

15         Santa Monica, California 90401
        Telephone: 310.566.9800

16          Facsimile: 310.566.9850

17           mkump@kwikalaw.com
          gkorn@kwikalaw.com

18          kmangels@kwikalaw.com

19

20            **Defendant Mordecai Wiczyk;**
          Michael J. Kump (SBN 100983)

21            Gregory P. Korn (SBN 205306)
          Kate Mangels (SBN 301811)

22    KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

23          808 Wilshire Boulevard, 3rd Floor
       Santa Monica, California 90401

24          Telephone: 310.566.9800

25          Facsimile: 310.566.9850
         mkump@kwikalaw.com

26           gkorn@kwikalaw.com

27          kmangels@kwikalaw.com

28

ER 6

| | |
|---|---|
| 1 | **Defendant Asif Satchu;** |
| 2 | Michael J. Kump (SBN 100983) |
| | Gregory P. Korn (SBN 205306) |
| 3 | Kate Mangels (SBN 301811) |
| 4 | KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP |
| | 808 Wilshire Boulevard, 3rd Floor |
| 5 | Santa Monica, California 90401 |
| 6 | Telephone: 310.566.9800 |
| | Facsimile: 310.566.9850 |
| 7 | mkump@kwikalaw.com |
| | gkorn@kwikalaw.com |
| 8 | kmangels@kwikalaw.com |

**Defendant Asif Satchu;**
Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
Kate Mangels (SBN 301811)
KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850
mkump@kwikalaw.com
gkorn@kwikalaw.com
kmangels@kwikalaw.com

**Defendant Sony Pictures Entertainment Inc.**
Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
Kate Mangels (SBN 301811)
KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850
mkump@kwikalaw.com
gkorn@kwikalaw.com
kmangels@kwikalaw.com

**Defendant Ariel Emanuel**
Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
Kate Mangels (SBN 301811)
KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850
mkump@kwikalaw.com
gkorn@kwikalaw.com
kmangels@kwikalaw.com

**Defendant NBCUniversal**
Kelli L. Sager (State Bar No. 120162)
Rochelle L. Wilcox (State Bar No. 197790)

3
NOTICE OF APPEAL & REPRESENTATION STATEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brendan N. Charney (State Bar No. 293378)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street,
Suite 2400 Los Angeles, California 90017
Telephone: (213) 633-6800
Facsimile: (213) 633-6899
kellisager@dwt.com
rochellewilcox@dwt.com
brendancharney@dwt.com

**Defendant Trigger Street Productions, Inc.,**
**Stephen G. Larson** (SBN 145225)
**Jonathan E. Phillips** (SBN 233965)
**A. Alexander Lowder** (SBN 269362)
LARSON O'BRIEN LLP
555 South Flower Street
Suite 4400 Los Angeles, CA 90071
\Telephone: 213.436.4888
Facsimile: 213.623.2000
slarson@larsonobrienlaw.com
jphillips@larsonobrienlaw.com
alowder@larsonobrienlaw.com

**Defendant Kevin Spacey**

Defendants did not respond to proper service of process; thus, Plaintiff (Appellant) moved for a default judgment against the Defendant. The Appellee's contact information on file with the CA Sec of State is:

% Frank Selvaggi
200 Park Avenue South, 8th Floor
New York, New York, 10003

**Defendant Matt Damon**

Defendants was duly served to his registered agent, but  did not respond; thus, Plaintiff (Appellant) moved for a default judgment against the Defendant. His contact information on file with the CA Sec of State is:

% Gary Kress,
3401 Main St.,
Santa Monica, CA, 90405.

4
NOTICE OF APPEAL & REPRESENTATION STATEMENT

**Defendant Ben Affleck**

Defendant was duly served to his registered agent, but did not respond; thus, Plaintiff (Appellant) moved for a default judgment against the Defendant. The Appelle's contact information on file with the CA Sec of State is:

% Gary Kress,
3401 Main St.,
Santa Monica, CA, 90405.

**Defendant Dana Brunetti**

Defendant did not respond to proper service of process; thus, Plaintiff (Appellant) moved for a default judgment against the Defendant (Appellee). The Appellee's contact information on file with the CA Sec of State is:

% Altman, Greenfield, Selvaggi
10960 Wilshire Blvd,
Los Angeles, CA 90024.

**Defendant Neill Blomkamp**

Defendant was served through his talent agent, Defendant Ariel Emanuel. This Defendant's address is unknown. He is not a citizen of the U.S.A.

**Defendant William (Bill) Block**

Defendant was NOT duly served, and was therefore dismissed from this action.

**Defendant Sound Point Capital Management**

Plaintiff (Appellant) voluntarily dismissed the Defendant. Defendant is no longer a party to this action.

Dated: January 22, 2019        Respectfully submitted,

By,

Steve Wilson Briggs
Plaintiff, In Propria Persona

5
NOTICE OF APPEAL & REPRESENTATION STATEMENT

ER 9

## CERTIFICATE OF SERVICE

I hereby certify that I submitted to the Clerk of the Court for the United States District Court, Northern District Of California, San Francisco Division, the foregoing documents, captioned: **"1. Notice Of Appeal; & 2. Representation Statement (Plaintiff Steve Wilson Briggs' Notice Of Appeal To The United States Court Of Appeals For The Ninth Circuit, And Representation Statement)"**. Thus, all counsel of record will be notified of such by the CM/ECF system. Additionally, I have served the foregoing on all counsel of record by electronic mail (email), and have served same on all counsel of record by conventional first class USPS mail.

Dated: January 22, 2019.                    Signed: _____

                                                     Steve Wilson Briggs
                                                     Plaintiff, In Propria Persona

```
Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611139806
Cashier ID: sprinka
Transaction Date: 01/22/2019
Payer Name: steve wilson briggs
----------------------------------
NOTICE OF APPEAL/DOCKETING FEE
 For: steve wilson briggs
 Case/Party: D-CAN-3-18-CV-004952-001
 Amount:      $505.00
----------------------------------
CASH
 Amt Tendered:  $505.00
----------------------------------
Total Due:      $505.00
Total Tendered: $505.00
Change Amt:       $0.00

vc

Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it  was drawn.
```

ER 11

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
   snc.steve@gmail.com
4  PLAINTIFF In Propria Persona
5
6
7
8              **UNITED STATES DISTRICT COURT**
9            **NORTHERN DISTRICT OF CALIFORNIA**

10 | STEVE WILSON BRIGGS,          | Civ No: 18-cv-04952-VC |
11 | Plaintiff,                    | **PLAINTIFF'S NOTICE OF MOTION** |
   | vs                            | **AND MOTION FOR LEAVE TO FILE** |
12 | KEVIN SPACEY;  ARI EMANUEL;   | **MOTION FOR RECONSIDERATION** |
13 | MATT DAMON;  BEN AFFLECK, et al; | Complaint filed August 15, 2018 |
   | Defendants                    |                        |
14

15              **NOTICE OF MOTION AND MOTION**

16      ALL PARTIES AND THEIR ATTORNEYS OF RECORD: YOU ARE HEREBY

17 NOTIFIED THAT the Plaintiff hereby moves this Court for leave to file a **Motion for**

18 **Reconsideration** of this Court's December 22, 2018 Order/Judgment granting the

19 Defendants' motions to dismiss (Dkt # 90 & 91). This motion is based on this Notice and

20 Motion, the subsequent Memorandum of Points and Authorities, and the prospective Motion

21 For Consideration (**attached as Exhibit C**), and the proposed order (attached).

22      This motion is made pursuant to Rule 59(e), invokable in cases like this, when: **1.**

23 necessary to prevent manifest injustice; **2**. necessary to correct manifest errors of law or fact

24 upon which the judgment rests, or; **3.** necessary to present newly discovered evidence.  This

25 motion is also made pursuant to Local Rules (**LR**) 7-9(2), which allows such motion with

26 "The emergence of new material facts…"; and pursuant to LR 7-9(b)(3), which permits

27 such motions when  there is a "manifest failure by the Court to consider material facts or

28 dispositive legal arguments which were presented to the Court…"

                                    i

| | |
|---|---|
| 1 | **TABLE OF CONTENTS** |
| 2 | |

NOTICE OF MOTION AND MOTION: ……………………………………………… i

TABLE OF CONTENTS………………………………………………………... ii

TABLE OF AUTHORITIES ………………………………………………..……. iii

MEMORANDUM OF POINTS AND AUTHORITIES: …………………………..... 1

   I.   Motion Is Necessary To Prevent Manifest Injustice (Arg #1): ……………...…… 1

   II.   Manifest Failure To Consider Material Facts Or Dispositive:

         Arguments Which Were Presented To The Court (Arg #2): …………..……... 3

   III.   The  Motion Is Necessary To Correct Manifest Errors Of Law

         Or Fact Upon Which The Judgment Rests (Arg #3): …………….…..…… 6

   IV.  Motion Is Necessary To Prevent Manifest Injustice And Errors

         Of Law Or Fact Upon Which The Judgment Rests (Arg #4): ……….…... 8

   V.   Motion Is Necessary To Prevent Manifest Injustice (Arg #5): ……………..…. 9

   VI.   Motion Is Necessary To Prevent Manifest Injustice (Arg #6): ………...……... 10

   VII.  Motion Is Necessary To Prevent Manifest Injustice (Arg #7): ………….…... 11

   VIII. Motion Is Necessary To Prevent Manifest Injustice (Arg #8)............................ 13

   IX.   Motion Is Necessary To Present New Evidence (Arg #9): ………...………….. 14

Note: ……………………………………………………………………………. 14

CONCLUSION: ………………………………………………………………..... 14

<div align="center">ii</div>

MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

ER 13

| 1 | **TABLE OF AUTHORITIES** |
|---|---|
| 2 | |

3  **CASES:**

4  *Briggs v Blomkamp* (2013, US Cert Denied, 2018) …..………………....……. 8, 10

5  *Briggs v Universal* (2017) ……………………………………..……….. 4, 9, 10

6  *Briggs v Spacey* (2018) …………………………………………….…. 4, 5, 9

7  *Moore v Lightstorm Ent.*, (2013)....................................................................... 13

8

9  **STATUTES:**

10  **Federal Rules of Civil Procedure (FRCP)**

11     FRCP Rule 59(e) ………………………………………….…….…….. i, 1

12     FRCP Rule 60((b)(1)(2) or (3)) …..……………………………….. i, 1, 9, 13

13     FRCP Rule 6 ……………………………………………………….. 1

14     FRCP Rule 7.1 …………………………………………………. 3, 5

15  **Northern District Of California Local Rules**

16     LR 7-9(b)(3) ………………………………………………………….. i, 1

17     LR 7-9(c) ……………………………………………………….….. i

18  **Cal Business and Professions Code**

19     §17000, et seq………………………………………………………. 13

20

21

22

23

24

25

26

27

28

<div align="center">iii</div>

MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff respectfully seeks Court leave to file a Motion For Reconsideration (attached), pursuant to Rule 59(e), and LR 7-9(b)(2) and (3). The bases for leave and motion follow.

**I.      MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #1):**

● 12/22/2018, the Court Issued An Unprecedented & Unsound "*Saturday*" Judgment.

● Two days later, 12/24/2018, Defendant Spacey Used The Judgment to Intimidate And Further Abuse His Sexual Assault Victim(s), In A Cryptic Youtube Video.

● Spacey's 12/24/2018 Video Remarks Create The Impression That The Court's Saturday Judgment Was Timed And Coordinated to Benefit Spacey's Criminal Case.

● The Fact That Defendant Ari Emanuel is President Donald Trump's Talent Agent Undermines The Validity And Prudence Of The Judgment/Order.

● The Order Uses No Argument Made In The Def's **13** Attorneys' **3** Motions To Dismiss

In this suit, with potentially over $1 billion at stake, **Saturday**, Dec 22, 2018, the Court entered its Judgment/Order against the Plaintiff.  According to FRCP Rule 6 (and other FRCP Rules) Saturdays and Sundays are considered **legal holidays**. Beyond the questionable appearance of issuing the Judgment/Order on a Saturday; beyond the fact that the Saturday issuance unfairly impacted the Plaintiff (who was therefore delayed in receiving the Order); beyond the Order's legal and factual problems, the timing of the Judgment permits the unsettling suggestion that the Order was timed to assist Defendant Kevin Spacey's criminal case, and gives the unnerving appearance that the Judgment was a *quid pro quo* to Defendant Ari Emanuel (who represents President Donald Trump), for future appellate consideration.

On Christmas Eve, only 48 hours after the Court issued its unexpectedly brief Saturday Judgment, Defendant (**Def**) Spacey released a now notorious Youtube video, uniformly described as *bizarre* throughout the news media. (**See Exhibit A**, an article concerning Spacey's video from ***Forbes Magazine***).  Pleased and excited with the Court's ruling, Spacey concludes this video by growling, "**If I didn't pay the price for the things we both know I did do, I'm certainly not going to pay the price for the things I didn't do**."

1

MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

1    **In plain sight, Spacey used this Court's Saturday Judgment to send a thuggish**

2    **message to the alleged victim in his criminal sexual assault case, pending in Nantucket,**

3    **Massachusetts.** One comes to this conclusion when one considers the known facts of this case

4    concerning Spacey. These facts are:

5    1. Spacey created the Trigger Street social network (**TS**) in 2002, (@ TriggerStreet.com);.

6    2. November 2014, Spacey destroyed TS (to destroy evidence against the Defendants);

7    3. Spacey lured members to TS by claiming TS was intended solely for use in the USA;

8    4. Yet Spacey travelled to England (2002) and Spain (2009) to recruit new TS members;

9    5. In Spain (2009), Spacey boasted TS had over 400,000 members _around the world_.

10   These fact confirm Plaintiff's claim of _Breach of Contract_ and _Infringement_.

11   Yet, against these damning facts, the Court's Order cleared Spacey of all charges. Thus, the

12   subtext of Spacey's video message to his victim was: _**If the Court lacked the will to make him**_

13   _**(Spacey) pay on these civil causes, with overwhelming evidence of guilt, then no criminal**_

14   _**court would make him pay for the murkier charges that plague sexual assault cases.**_

15   Again, in plain sight, Def Spacey used the Court's eleventh hour, Saturday Judgment,

16   intent to intimidate and bully his victim(s) into withdrawing criminal charges against the actor.

17   The Court's Saturday Judgment has the unfortunate appearance of being timed to assist

18   Spacey's criminal case, because if the judgment had come later, Spacey could not have sent his

19   video message to his victim(s), as his criminal arraignment was scheduled for January 7, 2019.

20   But most troubling, the Judgment is manifestly unjust and ill-advised due to the unique

21   relationship that central Defendant Ari Emanuel has with President Donald Trump (Emanuel is

22   Trump's personal talent agent, and the man who blocked any further viewing of Def NBCU's

23   notorious _Access Hollywood_ tapes). Because of this relationship, this ruling threatens to

24   undermine the credibility of The Court. Currently, there are six judicial vacancies on the 9th

25   Circuit, each can only be filled by Presidential appointment. Thus, if after this ruling, the

26   honorable Judge Chhabria were to receive an appellate appointment, many might see this

27   ruling as the improper _quid pro quo_.  Where strong and direct connections exist between a

28   litigant and a sitting US President, the Court should deny dispositive motions.

| | |
|---|---|
| 1 | **II.    MANIFEST FAILURE TO CONSIDER MATERIAL FACTS OR DISPOSITIVE** |
| 2 | **ARGUMENTS PRESENTED TO THE COURT (Arg #2):** |
| 3 | ● Nine days Before The Scheduled 12/13/2018 Motion & ICMC Hearing, Plaintiff |
| 4 | Moved For Default Judgments Against Spacey, Damon, Affleck, Blomkamp & |
| 5 | Brunetti, For Refusing/Failing To Respond To Summons. Plaintiff Also Repeatedly |
| 6 | Informed The Court That Spacey Was In Hiding—To Avoid Service Of Summons. |
| 7 | ● The Court Consistently Failed To Act On Plaintiff's Dispositive Motions. |
| 8 | ● The Court Should Have Defaulted Defs, Long Before Hearing Motions To Dismiss; |
| 9 | ● 48 hours After The Court's Judgment, Spacey Came Out Of Hiding —In A $6 Million |
| 10 | Baltimore House, Secretly Purchased In The Name Of A Trust. |
| 11 | ● Plaintiff Also Moved The Court To Strike Trigger Street Productions' (**TSP**) Motion To |
| 12 | Dismiss, As It Lacked A Corporate Disclosure (Required Upon First Filing Under |
| 13 | FRCP Rule 7.1); The Court Inexplicably Opted Not To Strike And Default TSP. |
| 14 | December 24, 2018, when Spacey released his notorious Youtube video just |
| 15 | before his arraignment for sexual assault charges, some observers believed Spacey was |
| 16 | attempting to win back public support, to lever his popularity to keep the Massachusetts court |
| 17 | from requiring the star to attend his own arraignment. But the Massachusetts court was |
| 18 | unlikely to allow Spacey to skip the arraignment when his whereabouts were still uncertain. |
| 19 | Spacey had not been seen in over a year, since October 29, 2017—the day actor Anthony Rapp |
| 20 | accused Spacey of sexually assaulting Rapp, when Rapp was only 14 years old.  Soon many |
| 21 | other young men came forward with similar accusations. Spacey immediately entered a rehab |
| 22 | program. Two weeks later, behind the walls of a rehab center, would be the last public sighting |
| 23 | of Spacey. (**See Exhibit B**, from **DailyMail.com**, Nov 17 2018). The article explains: |
| 24 | Nothing has been seen or heard of the double Oscar-winning actor since the |
| 25 | first allegations emerged over a year ago in October 2017. |
| | On both sides of the Atlantic, where Spacey owns multi-million-pound |
| 26 | homes, the question is being asked with growing urgency: where is Kevin |
| | Spacey? 'He's become a total recluse,' one friend told The Mail on Sunday. |
| 27 | 'No one has heard from him. He's vanished. It's almost unbelievable that |
| 28 | someone of his stature can pull it off in a world where everyone has a cell |
| | phone.'… |

3

MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

| 1 | ...His downfall began on October 29, 2017, when Star Trek actor Anthony |
|---|---|
| 2 | Rapp accused Spacey of sexually assaulting him in the star's New York apartment in 1986 when Rapp was just 14... |
| 3 | ...But unlike Weinstein – who has been photographed going about his daily |
| 4 | business, visiting his lawyers' offices and picking his children up from school – there has been no sign of Spacey anywhere... |
| 5 | ...Spacey's vanishing act may be his best coup de théâtre so far... |
| 6 | ....The last known pictures of the actor are fuzzy paparazzi shots taken at the £25,000-a-month rehab facility in November last year. |
| 7 | There, Spacey was supposed to undergo a 45-day sex addiction 'detox' |
| 8 | but, we can reveal, checked out after only 21 days. |

9    While Defendant Spacey was in rehab, on November 13, 2017, the Plaintiff quietly

10  filed a lawsuit against Spacey and the other Defendants (referred to as *Briggs v Universal et al*,

11  2017). This lawsuit (which later became this suit, *Briggs v Spacey*, 2018) is the reason Spacey

12  remained out of sight.

13    In response to the Plaintiff's suit, the Defendants' strategy was simple: Hide Spacey, so

14  the Plaintiff could not serve him, then the lawsuit would be dismissed.  The strategy worked.

15  In the Spring of 2018, wherever the Plaintiff tried to serve Spacey, his agents and lawyers

16  refused to accept service.  The Plaintiff informed the Court that Spacey was hiding and had

17  revoked his attorneys' and agents' authority to accept service. The Court took no action. Thus,

18  *Briggs v Universal* was dismissed, without prejudice, April 25, 2018.

19    Since the Court dismissed *Briggs v Universal* <u>without prejudice</u>, Spacey's attorney's

20  guessed the Plaintiff would likely re-file the case. Thus, Spacey remained out-of-sight.

21    The Plaintiff re-filed his case on August 15, 2018; now titled ***Briggs v Spacey, et al***.

22    This time, just as before, Spacey remained in hiding.  But through detailed declarations

23  from his process servers, the Plaintiff methodically informed the Court of the strange and

24  sometimes threatening antics Defendants Emanuel, Damon, Affleck and Blomkamp's agents

25  employed to avoid service.   But none of the agents were more evasive or bizarre than

26  Defendant Spacey's and Brunetti's agents: Frank Selvaggi, and *Altman, Greenfield & Selvaggi*.

27    As the Plaintiff's servers' reports mounted, the Court took no action; exposing the

28  process server(s) to increasing risk. Then, after three attempts to default Spacey through the

1    Court Clerk (for failure to respond), Plaintiff submitted two **Service of Process Status**
2    **Reports** and a **Request for Judicial Notice**, hoping the Court might finally act.  But the Court
3    did nothing, and the Defendants' agents' antics continued.

4         Dec 4, 2018, after Spacey's agent returned the Plaintiff's service documents (by mail)
5    marked "**Refused**" (a defaultable infraction), Plaintiff submitted a Motion for Default
6    Judgment against Spacey, and also moved to default Defendants Matt Damon, Ben Affleck,
7    Neill Blomkamp and Dana Brunetti for failure to respond. All of the motions were proper, with
8    all supporting papers.  The Defendants should have been defaulted.  The Court took no action.

9         However, almost three weeks later, **Saturday**, December 22, 2018, the Court granted
10   the Defendants' three (3) motions to dismiss—despite the Plaintiff defeating every argument in
11   each motion. Oddly, the brief Order omitted the Plaintiff's central claims, and offered no
12   discussion of the motion points or opposition counterpoints: simply an arbitrary ruling.

13        **Two days after the Court's Judgment**, after more than a year in hiding, **Spacey**
14   **emerged back in the public spotlight**, with a bizarre Youtube video, expertly designed to
15   both rally his fans to support his return to his role in *House of Cards*, and to intimidate his
16   sexual assault victims.  With *Briggs v Spacey* dismissed, so eager was Spacey to get back in the
17   spotlight that a week later, on New Year's Eve, Spacey went out and personally purchased and
18   delivered pizza to the paparazzi stationed outside of his home.

19        In light of the many failings with the Court's Saturday Judgment/Order, it should also
20   be observed that the Court chose not to act on the Plaintiff's motion to strike TSP's motion to
21   dismiss (based on TSP's failure to attach a corporate disclosure to its motion, as required by
22   Rule 7.1).  TSP submitted its disclosure 11 days late.

23        Finally, the Order arbitrarily declared the Plaintiff's claims *implausible*. But against this
24   opinion, in the Plaintiff's opposition to TSP's motion to dismiss, the Plaintiff attached letters
25   from executives of *LexShares* and *Easy Lawsuit Funds* expressing interest in financing this
26   suit.  Such investment is not made until an analytics team deems that a case has at least a 60%
27   likelihood of prevailing.  This confirms the soundness and plausibility of the Plaintiff's claims.
28        These facts show a manifest Court failure to consider facts and dispositive arguments.

| | |
|---|---|
| 1 | **III.    THE  MOTION IS NECESSARY TO CORRECT MANIFEST ERRORS OF** |
| 2 | **LAW OR FACT UPON WHICH THE JUDGMENT RESTS (Arg #3):** |
| 3 | ● The Court Improperly Omitted Central And Conclusive Facts And Claims. |
| 4 | The Court's Order denied the *Breach* and *Infringemen*t claims by omitting and |
| 5 | falsely citing TS *Terms* as stating that materials posted on TS "*may be used by [Trigger Street]* |
| 6 | *throughout the world in perpetuity for any purpose whatsoever, including, but not limited to,* |
| 7 | *reproduction, disclosure, transmission, publication, broadcast, posting and sublicensing.*" |
| 8 | But the <u>full</u> clause <u>makes a clear exemption for screenplays</u>. The full clause reads: |
| 9 | "**Any material (other than the <u>Material</u> [as defined and more fully addressed in** |
| 10 | **the Triggerstreet <u>Screenplay</u> Forum Participation Agreement]) that you** |
| 11 | **transmit to us or post anywhere on the Site or through the Services, including,** |
| 12 | **without limitation, the Shorts**, may be used by TSCI throughout the world in perpetuity for any purpose whatsoever, including, but not limited to, reproduction..." |
| 13 | The Court's Order also omitted and grossly misstated the Plaintiff's *Breach* and |
| 14 | *Infringement* claims.  On page 2 of the Complaint the Plaintiff wrote: |
| 15 | "TS's Terms Of Use stated the site was solely for use in the USA, yet, in fact, the |
| 16 | site operated around the world. Further, secretly and without consent from U.S. members, <u>Defs **Spacey and Brunetti** went to **London** (2002), and **Spain** (2009)</u> |
| 17 | <u>to recruit new members, touting TS's "400,000 *members around the world*."</u>" |
| 18 | The Complaint included claims and news reports of Spacey's travels to Spain and |
| 19 | England to recruit new TS members, in violation of *Terms*. But the Order omits this, to opine: |
| 20 | "Briggs cites to the section titled "International Use" as a promise on the |
| 21 | website's behalf to not make the site available to people outside the United States. [citation omitted]. No reasonable reading of that section |
| 22 | could give rise to that obligation." |
| 23 | In making this statement, the Court improperly posited a verifiably false argument in |
| 24 | favor of the Defendants—particularly troubling as this argument was not raised by the |
| 25 | Defendants' 13 attorneys.  Worse, the statement reveals the Court did not understand that |
| 26 | universal **ccTLD**'s (internet protocols) made it effortless for TS to identify (then restrict or |
| 27 | block) foreign accessors.  Worse yet, the Order misconstrues and mischaracterizes Plaintiff's |
| 28 | claims and TS's *International Use* clause. The "International Use" clause clearly stated: |

1    **International Use**:  "Unless otherwise specified, **the materials on the Site and in the**
2    **Services are presented solely for the purpose of promoting the entertainment,**
     **information, and community resources and services available in, and other uses in,**
3    **the <u>United States of America</u>**." We control and operate the Site and the Services from
     within the **United States**. <u>We make no representation that materials on the Site or the</u>
4    <u>Services are appropriate or available for use in locations outside the **United States**</u>, and
5    accessing them from territories where their contents are illegal is prohibited. <u>Those who</u>
     <u>choose to access the Site from other locations do so on their own initiative</u>…"
6

7         This clause confirms TS was intended solely for **USA** use (**membership**). The clause

8    was intended to assure **US** users of the site's safety; otherwise it is meaningless. **Any jury**

9    would agree the clause <u>prohibits foreign **membership**</u>; yet, the Court states, "No reasonable

10   reading of that section could give rise to that obligation," without explaining what the clause

11   could possibly mean otherwise, or why then the clause exclusively addresses USA use?

12        The Complaint also explained that TS's *Security* clause stated:

13        **Security**: When you submit information via the Site, **your information is**
          **is protected using secure data networks protected by <u>industry standard</u>**
14        **firewall and <u>password protection systems</u>**.

15        But this security clause, like the International Use clause, is omitted from the order.

16   Plaintiff understood that ccTLD protocols made it effortless for TS to identify, then block or

17   restrict foreign accessors, <u>as the screenwriting website InkTip.com did</u> (this is also omitted

18   from the Order).  Plaintiff did not simply take the *International Use* clause "as a promise on

19   the website's behalf to not make the site available to people outside the United States," as the

20   Court opined. Plaintiff is concerned that the Order appears drafted without basic IP knowledge.

21   But **<u>chief</u>** among the Order's many problems is that the following facts cannot be reconciled:

22   1.  TS's terms state TS is solely for use in the US; prohibiting international membership.

23   2.  Spacey and Brunetti travelled overseas to recruit new members.

24        These two facts constitute a willful *Breach*, as the Defendants cannot post a clause

25   restricting international use, then travel to Spain and London to recruit foreign members. These

26   facts also confirm that Defendants willfully exported the Plaintiff's work, then improperly

27   went abroad to recruit foreign members to access the works.  This is Infringing Exportation.

28        This motion is necessary to correct these manifest errors of fact.

**IV.     MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE AND ERRORS OF LAW OR FACT UPON WHICH THE JUDGMENT RESTS (Arg #4):**

- The Court's Order Omits And Ignores Any Mention —And All Supporting Facts— Concerning Conspiracy, Fraud, Deceit, Concealment, Negligence and Spoliation.

On Page 2 and 3 of the Complaint, the Plaintiff provided nine (9) bullet-points of his case's most important causes and claims. However, the Court omitted any mention of eight (8) of these central and imperative facts, causes and claims. The Order only mentioned the fourth bullet-point. Consider the following omission examples:

**Item #1**: The first bullet introduced the Willful Spoliation (destruction of evidence) claim. This claim was presented first because of its resounding significance.  Under this bullet the Plaintiff explained that six days after *Briggs v Blomkamp* went to appeals, Defendant Spacey destroyed the Trigger Street social network, in a conspiracy to destroy incriminating evidence against Defendants Ari Emanuel and the other MRC and *Briggs v Blomkamp* Defendants —in the event that the 9th Circuit remanded *Briggs v Blomkamp* for trial. But somehow the Court's Order omitted any mention of any aspect of this claim.

**Item #2**: On page 3 of the Complaint, the third bullet addressed the fact that the Defendants deceitfully hired, as their *Expert* Witness in *Briggs v Blomkamp*,  Jeff Rovin —a self-confessed "**fixer**," who went on FOX News (2016) to boast that for 6 years he worked as a *fixer* for President Bill Clinton's administration, where he was paid to write false smear stories. Plaintiff moved to have Rovin's Report *excluded* for fraud. These facts supported Conspiracy, Fraud, Negligence and Willful Suppression.  The Order omitted all of these facts.

**Item #3:** The Order fails to give a complete telling of the Breach claim (bullet #2, p 2).

**Item #4:** The <u>first</u> Cause of Action listed on the Complaint's caption page is **Civil Conspiracy**, yet the Judgment omits any mention of this claim.

**Item #5:** The Order also omits any and all mention of Fraud, Concealment, Deceit, Negligence and Gross Negligence, and all such supporting facts.

These omissions are a manifestly unjust, and amount to conceding, but permitting, that the Defendants willfully conspired to destroy evidence and commit Fraud and Negligence.

1    **V.    MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #5):**

2    ● Plaintiff Defeated All Arguments Raised By In Defendants' **13 Attorneys**' Motions.

3    Using prevailing case law and guidelines, the Plaintiff's oppositions defeated

4    every argument raised in the Defendants' three (3) motions to dismiss.  NBCU's Defense Team

5    was reduced to misrepresenting *discussion* passages as *conclusions*, making unethical leaps of

6    logic, and improperly designating cases (to obfuscate their misrepresentations). MRC's

7    Defense Team's motion was so unsound that they resorted to filing an unqualified and doomed

8    *Vexatious Litigant* motion. TSP's Defense Team neglected to even submit a corporate

9    disclosure (**a disqualifying failure**).  Yet, the Court granted all of their deficient motions, in a

10   Judgment that (1) omitted swaths of facts and claims central to the Plaintiff's case; (2) lacked

11   any presentation or analysis of motion and opposition points and counterpoints.

12   The absolute meritoriousness of the Plaintiff's claims is confirmed by simply

13   observing that the Defense Counsel first responded to the Complaint with a huge team of seven

14   (7) attorneys —but a month later, **the Defense had grown to a staggering and**

15   **unprecedented team of at least thirteen (13) attorneys**.  Any suggestion that Plaintiff's

16   claims are unsound, wilts in the face of these facts.

17   Additional anecdotal evidence of the meritoriousness of the Plaintiff's claims, are:

18   1.  Three months after Plaintiff filed this action (*Briggs v Universal*, Nov 2017), which

19       exposed MRC's negligent business practices, the disgraced mega-million dollar

20       company was absorbed into *Valence Media* (under Eldridge Industries), Feb 2018.

21       No new MRC projects have been announced beyond 2018.

22   2.  December 13, 2018, (the same day this Court scheduled motion hearings), WME

23       (Defendant Emanuel's premiere corporation) hired its first president (Ari Greenburg),

24       to give the impression the beleaguered Emanuel was removed from daily operations.

25   3.  Since the day the Plaintiff filed *Briggs v Universal* (Nov 2017) until two days after

26       *Briggs v Spacey* was dismissed (Saturday, 12/ 22/2018), Defendant Spacey was not

27       seen in public anywhere on the planet.*

28   *A defendant doesn't hide inside, in an unknown location—for over a year—unless a lawsuit has
     extraordinary merit.

9

MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

1  **VI.   MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #6):**

2   ● The Judgment Improperly Ruled (Without Evidentiary Support) That This Suit Is A

3   Relitigation Of *Briggs v Blomkamp*, Against Conclusive Opposing Evidence.

4   ● FRCP Rule 60(b)(1)(2) and (3) Entitle Plaintiffs To Relief From A Previous Judgment,

5   And Authorize Courts To Grant Such Relief And Reconsideration, If The Previous

6   Judgment Involves A Mistake, New Evidence, Or Fraud, As In This Case.

7   In his oppositions, Plaintiff showed this action is not a relitigation of *Briggs v*

8  *Blomkamp* (2013, US Cert Denied, 2018). The 38-page *Briggs v Blomkamp* complaint

9  primarily just compares two contested screenplays. This suit stems from the fact that two years

10  after *Briggs v Blomkamp* went to appeals, the Plaintiff learned the following three (3) facts:

11   1. Six days after *Briggs v Blomkamp* went to appeals, the Defendants took the extreme

12   action of closing and destroying the TS social network (to destroy evidence).

13   2. Plaintiff then found multiple news articles documenting Defendant Spacey's travels to

14   foreign countries to recruit new members to TS, in violation of the TS *Terms*.

15   3. In 2016, the Defendants' expert witness in *Briggs v Blomkamp* went on FOX News to

16   admit he was a professional "*fixer*," paid to write false *smear* stories.

17   When there is newly discovered evidence (see above), or evidence that a party

18  prevailed by fraud or a mistake, FRCP Rule 60 allows a party relief from that judgment.  Any

19  mention of *Briggs v Blomkamp* in the Complaint, was not to relitigate, but to provide facts and

20  evidence showing that the Defendants won the previous judgment by Fraud, per Rule 60(b)(3).

21   But perhaps the most conclusive evidence that this case is not a relitigation, is the fact

22  that in <u>*Briggs v Universal*</u> (the first filing of this current case, 2017) **this** Court saw virtually

23  the same Complaint, and the same *relitigation* claims in the Defendants' motions to dismiss.

24  But this Court did not opine that the Complaint was a relitigation of *Briggs v Blomkamp*. If the

25  Court believed *then* that this case was a relitigation, it had a duty to stop the suit and save the

26  Defendants' legal fees, and keep an unnecessary suit out of our courts. But the Court did not

27   This case is not a *relitigation*.  Rather, per Rule 60, this case is an effort to correct a

28  prior judgment, won by fraud. Thus, this motion is necessary to prevent a  manifest injustice.

MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

ER 24

**VII.     MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #7):**

- The Court Took No Action To Ensure A Safe And Reasonable Legal Process When Informed By The Plaintiff And His Process Servers That:

    1. The Defendants' Agents Intimidated/Threatened Plaintiff's Process Server;

    2. The Defendants Were Taking Extraordinary Measures To Evade Service.

- The Court Ignored And Took No Corrective Action Against The Defendants' Misconduct (Which Included Lying To Court, And Submitting Falsified And Fraudulent Business Statements To The California Secretary Of State).

- In Refusing To Act, The Court Exposed The Plaintiff, His Process Servers, And The State Of California To Continued Risk.

- The Court failed to hold the Plaintiff and Defendants to an even standard;

As soon as the Plaintiff's process servers attempted to serve the Defendants, the Defendants and their agents' bizarre, unethical, and intimidating antics began. The Plaintiff and his process servers informed the Court of this conduct, through various filings (e.g., declarations, service of process status reports, request for judicial notice, motions to serve by publication, etc), but the Court took no interest and took no action; thereby, tacitly condoning Defendants Emanuel's and MRC's thuggish culture.

By taking no action, the Court fostered a hostile atmosphere, and engendered a double standard—permitting the Defendants to behave hostilely and dishonestly, seemingly assured that the Court would take no action. Conversely, if the Plaintiff had so little character as to behave in kind, he would certainly have faced disciplinary action.

Plaintiff *also* informed the Court of the following events (which the Court *also* ignored):

1. After MRC failed to respond to service, Plaintiff checked MRC's California Secretary of State business entity statements and discovered that MRC (MRC II Distribution Company, LP) was not located in the MRC building at 9665 Wilshire, Los Angeles, as reported in their corporate disclosure and elsewhere. Rather, their headquarters were reported as being in William Morris Endeavor's (WME) headquarters, at 9601 Wilshire, in a room that did not exist (room 610).  At the WME headquarters, one of

1     WME's agents attempted to intimidate the server.

2  2. Plaintiff reported three newly discovered instances of attorney Michael J Kump
3     willfully submitting fraudulent and falsified documents to the court, in 3 separate
4     corporate disclosure statements for MRC. These statements conflicted with each other,
5     and with their California Secretary Of State business records, as Kump had:

6         a.  declared Media Rights Capital II LP the parent of MRC II Distribution Co, LP;
7         b.  declared MRC II Distribution Company, LP had no parent company;
8         c.  declared a false address for MRC II Distribution Company.

9  3. After serving Def Emanuel at WME, the Plaintiff's process server attempted to serve
10    MRC at 9665 Wilshire Blvd, Los Angeles. The process server reported there were
11    construction barriers around the MRC building, but he observed no workers. The
12    security guard would not allow the process server into the building, but the server
13    observed office workers entering and exiting, and sitting and eating in benches outside
14    of the building. The guard told the server that MRC had moved to 1800 Century Park
15    East for the duration of the construction project.

16 4. The process server then attempted to serve MRC at the address on file for Scott Tenley
17    (the agent for service of process listed in MRC's California Secretary of State business
18    entity statement): 1800 Century Park East.  But at this address, the server found no one
19    connected to MRC; no office for Scott Tenley; no one there had heard of Scott Tenley.
20    The office manager said MRC was no longer at that location and directed the process
21    server back to the previous address (9665 Wilshire).

22 5. The process server attempted to serve Kevin Spacey through his agent, Frank Selvaggi,
23    at the address on Trigger Street Productions' CA Sec of State business entity statement.
24    There, the process server was told that Sevaggi's company (Altman, Greenfield &
25    Selvaggi) moved out 5 years prior, and the office had been vacant ever since (5 years).

26 6. In a chaotic scene, the Plaintiff's server attempted to serve Spacey at the office of
27    Altman, Greenfield & Selvaggi, at 10960 Wilshire Blvd, Los Angeles. There two of the
28    company's executives squabbled over whether they were authorized to accept service

1    for Spacey, or not.  In the end, they would not accept the documents.

2    7.  MRC's CA State business statements were 10 to 13 years out of date, and falsified.

3    8.  Trigger Street Productions' business statements were 15 years out of date, and falsified.

4    9.  Defs Matt Damon and Ben Affleck's business statements were 13 years out of date.

5    These new facts supported the Complaint's Fraud and Negligence claims,

6    AND created new Fraud and Negligence claims. According to Rule 60, Fraud is a basis for

7    relief from a prior judgment.  The Court's failure to act suggests the Court does not hold

8    corporations and the rich accountable, and exposes all Californians to risk of further injury.

9    These aforementioned failures are a manifestly unjust. Thus, this motion is necessary.

10   **VIII.    MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #8):**

11   ●  The Court Failed To Inform The Attorney General Of California Of The Defendants'

12   Certifiably Fraudulent, Negligent, And Conspiratorial Civil Infractions.

13   The Plaintiff's Complaint documents (with news articles, etc.) such facts as:

14   1.  Defendants Emanuel and Block were in an illegal business relationships with Sony

15   Pictures' (then) CEO Michael Lynton, as co-owners of Screenbid (in violation of Cal

16   Business and Professions Code §17000, et seq). Thus, the Defendants profited as

17   business owners, AND as secret business subcontractors.

18   2.  The Defendants hired a fixer, Jeff Rovin, to fix the *Briggs v Blomkamp* expert report

19   (this same *fixer* was used by James Cameron in *Moore v Lightstorm Ent.*, (2013)). This

20   required submitting a falsified and fraudulent central document to the Court.

21   3.  Defendants destroyed the TS social network to destroy evidence against themselves.

22   4.  Defendant Ari Emanuel is documented bullying film distribution partners into offering

23   more money for films; when they refuse(d), he takes/took the film(s) to NBCUniversal.

24   Even if the Court denies Plaintiff's personal injury claims, these are very

25   serious offenses, documented in the Complaint—with evidentiary exhibit substantiation. These

26   offenses require legal attention. Yet the Court failed to inform the Attorney General of

27   California—an inaction that exposes all Californians, perhaps all Americans, to continued risk.

28   This is a manifest injustice to the Plaintiff, Californians and all Americans.

### IX.   MOTION IS NECESSARY TO PRESENT NEW EVIDENCE (Arg #9):

Plaintiff stated in his *Declaration In Support of Complaint*, Dkt #88, filed 12/17/2018, that he was hopeful to submit an Amended Complaint, because he had recently found Spacey's and Brunetti's **US Patent Application** (granted) for a special email system. Plaintiff attached the patent to his declaration. This patent is for the email system used for the TS social network, and explains it functionality. The patent explains how the TS's email system was able to *mask* (hide) the identity of select ("*whitelisted*") users. *Masked* whitelisted users could then secretly view _any_ of TS's screenplays, freely, without detection. This same patented system also allowed the Defendants to *unmask*—reveal the identity of—any users. This patent confirms key details of the Complaint (page 6-7). If the Defendants have not destroyed the TS servers and files, a computer forensic expert can unmask the masked TS users' activity, and show (as the Plaintiff alleges) that Def Blomkamp accessed his work, as did Def Emanuel. The Plaintiff also predicts such an unmasking will reveal that film director James Cameron also accessed his work. However, currently it appears the Defendants have totally destroyed the TS servers and files, to protect themselves. But one does not destroy a massive social network that is earning millions from sponsors like Budweiser, unless there is very incriminating evidence to hide.

This motion is necessary to present this newly discovered evidence (the patent).

**Note:**

LR 7-9(c) requires that no opposition argument is repeated herein.  Arg #2 is based on 7-9(b)(3) **"**manifest failure by the Court to consider material **facts** or dispositive legal **arguments**."  Thus, for Arg #2, by demand, Plaintiff reviewed facts and arguments **not considered** by the Court.  Plaintiff also revisited the *relitigation* issue (on page 10), but used all new facts and arguments. Otherwise, no arguments were made from previous oppositions.

**CONCLUSION**

For all of the foregoing reasons, the Court should grant the Plaintiff leave to file the attached Motion For Reconsideration.

Date: January 14, 2019                    Signed:  /s/ Steve Wilson Briggs
                                                        Steve Wilson Briggs
                                                        Plaintiff, In Persona Propria

# Exhibit

# A

6,955 views | Dec 28, 2018, 06:07pm

# Why Is That Kevin Spacey Video So Unsettling? It's Not Just What He Says.



**David Alm** Contributor ⓘ
Arts
*I write about film, the arts, and design.*

---



Let Me Be Frank

In the four days since Kevin Spacey posted that icky video of him, in his character from *House of Cards* Frank Underwood, making what reads as an oblique denial that he sexually assaulted an 18-year-old man on Nantucket in 2016, the video has been viewed more than 8 million times.

Surely, the vast majority of those who've watched the 3-minute video, titled "Let Me Be Frank," have done so much like one might have tuned in to see Ted Bundy's final interview before he was executed, or Martin Shkreli's live webcasts. Not out of fandom, but fascination with the grotesque and the outer limits of ego.

Spacey, who was fired from *House of Cards* last year amid accusations that he had made sexual advances on a 14-year-old boy in 1988, will be arraigned on the new felony charge on January 7th in a Massachusetts court. And, while he makes no direct reference to that charge in the video, the parallels between it and President Underwood's sociopathic behavior allow for plenty of innuendo.

"You wouldn't believe the worst without evidence, would you?" he says, steely eyed, into the camera. "You wouldn't rush to judgements without facts, would you?" A few seconds later, he growls, "If I didn't pay the price for the things we both know I did do, I'm certainly not going to pay the price for the things I didn't do."

The video is remarkable not just for its content, but for its form too, raising the question: Who on Earth would have been complicit in this farce? As they say, let's go to the tape.

For an A-list actor, presumably with access to the best film technicians in Hollywood, Spacey made a video that looks like an undergraduate short. The camera remains in one stationary spot, panning only a handful of times as Spacey moves to and fro cooking dinner in a Santa-clad apron. The faint sounds of a television waft in the background, as if from another room -- not quite loud enough to suggest it was intentional, to invoke domestic veracity, but rather quiet enough that it was likely an oversight. When he exits the frame, at the end of the video, it's easy to imagine him circling around to the back of the camera to push "Stop," and then editing that part out in post.

**YOU MAY ALSO LIKE**

This isn't to suggest that Spacey himself shot the video -- the panning alone would indicate at least one other body in the room -- but whoever he solicited to help him with this bizarre project does not appear to be among the industry's best. Which is fine, of course -- particularly if that person (or persons) is, in fact,

an undergraduate film student. They have to learn somehow, even if they would never list the credit on their resume.

But I'd posit that the video's amateur quality lends considerably to its creepiness. What does a pariah do when he tries, however misguidedly, to be heard? From the evidence, it would appear that he gets someone -- anyone -- to come over and follow a few simple commands while he orates from across the counter. It makes Spacey look that much more desperate and isolated, as well as delusional, paranoid, and grasping. It's reminiscent of another aging man, not unlike Frank Underwood in more ways than one, who resorts to self-publishing every time he feels cornered, stripped of power, disrespected and increasingly irrelevant.

The outer limits of ego appear to be a very lonely place indeed. And yet, when those who reside there beg for us to listen, even long after they've lost any credibility, we still can't help but tune in. And that, more than anything Spacey says in those three minutes, might be the most disquieting message of all.

*I am a Brooklyn-based writer, editor, and professor. I have covered contemporary art and film since the late 1990s, and have taught journalism and film courses at the college level since 2004.*

58,255 views  |  Dec 20, 2018, 11:30am

# Where Are They Now? San Antonio To Graduation: A College Signing Day Story

 **Merone Hailemeskel** Brand Contributor
**Civic Nation** BRANDVOICE

There are moments in your life that you play over and over again. You remember every little detail—how you were feeling, the people surrounding you, the things you heard that struck a chord—and continue to play in your head to this day.

# Exhibit

# B

Feedback   👍 Like 15.6M                                    Thursday, Jan 10th 2019    5-Day Forecast

# Daily **Mail**
.com

| Home | U.K. | News | Sports | U.S. Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Columnists | DailyMailTV |

Latest Headlines   Royal Family   News   World News   Arts   Headlines   Pictures   Most read   Wires   Games                  Login

ADVERTISEMENT




# How Kevin Spacey vanished off the face of the earth: Shamed star, 59, has not been seen for a YEAR amid claims he's on a Pacific island, in France or wearing disguises

◉ Site ○ Web   Enter your search

ADVERTISEMENT

- Since the allegations emerged nothing has been seen of the Oscar winning actor
- In 2017 Star Trek actor Anthony Rapp accused Spacey of sexually assaulting him
- Last known pictures of Spacey are fuzzy shots taken at a rehab facility last year

By CAROLINE GRAHAM FOR THE MAIL ON SUNDAY
PUBLISHED: 17:15 EST, 17 November 2018 | UPDATED: 20:13 EST, 17 November 2018

**13k**
shares

**348**
View comments

When the new series of US political drama **House Of Cards** was screened earlier this month, it received an unusually lacklustre reception.

The much-acclaimed show, now in its sixth season, had been a cornerstone of **Netflix**'s annual schedule, with tens of millions around the world gripped by the malevolent scheming of its central character, President Frank Underwood, portrayed to eerie perfection by actor **Kevin Spacey**.

But this time, there is a gaping hole – Spacey is missing, his iconic character killed off by uneasy producers and script writers following sexual assault and harassment allegations made against the actor by a string of young men last year.

Like          +1
Daily Mail    Daily Mail

Follow        Follow
@DailyMail     Daily Mail

Follow        **Follow**
@dailymailuk   **Daily Mail**

The show limps on regardless, with a female president in the form of Frank's equally ruthless wife Claire, icily played by Robin Wright.

FEMAIL TODAY



Following the sexual assault allegations that emerged against Kevin Spacey in 2017 nothing has been seen or heard of the double Oscar-winning actor. He was last spotted exercising at the Meadows Rehab Centre in Wickenburg, Arizona, last year

But the real drama lies elsewhere. For despite being one of Hollywood's most recognisable stars, Spacey has apparently disappeared off-screen as well as on it.

Nothing has been seen or heard of the double Oscar-winning actor since the first allegations emerged over a year ago in October 2017.

On both sides of the Atlantic, where Spacey owns multi-million-pound homes, the question is being asked with growing urgency: where is Kevin Spacey? 'He's become a total recluse,' one friend told The Mail on Sunday.

'No one has heard from him. He's vanished. It's almost unbelievable that someone of his stature can pull it off in a world where everyone has a cell phone.'

One producer described Spacey as having 'one of the most recognisable faces on the planet' and added: 'I was with him when he walked into a restaurant in Beverly Hills and the whole place applauded.'

It may be a long time before he garners applause again.

▶ Amazon CEO Jeff Bezos 'announced split with wife of 25 years because compromising photographs of him with married former TV anchor, 49, were about to made public'



▶ Kendall Jenner strips down while modeling TWO teeny bikinis on Instagram as beau Ben Simmons comments 'come here' on the post



▶ Kate Mara 'is expecting her first child' with husband Jamie Bell... after showing off hint of a baby bump at Golden Globes



▶ Christina El Moussa 'soaks up the last few hours' of her honeymoon to Bora Bora with new husband Ant Anstead
Posted pics online



▶ Teresa Giudice's daughter Gia flips her mom the bird during 18th birthday party ... which included a three-tiered bejeweled cake
Caught on tape



▶ From Roswell and chemtrails to the moon landing and JFK's assassination, the conspiracy theories obsessing Americans
SPONSORED



▶ Southern Charm's Thomas Ravenel now accuses ex Kathryn Dennis of consuming drugs and alcohol while pregnant with their son and daughter

▶ EXCLUSIVE: Kevin Spacey 'aggressively touched a man who was celebrating his 21st birthday with his parents at the same bar the actor groped a teen' claims eyewitness

▶ Oscars to have NO host for the first time in nearly 30 years: Academy announces plan to have a variety of A-list presenters instead of one name

▶ America's lost sweetheart? Ivanka Trump reveals she turned down the chance to star on The Bachelorette in resurfaced 2007

interview

▶ Courtney Stodden
shares side-by-side
image with Khloe
Kardashian as she says
she's happy to be
compared to the
'stunning' star

ADVERTISEMENT

His downfall began on October 29, 2017, when Star Trek actor Anthony Rapp
accused Spacey of sexually assaulting him in the star's New York apartment in 1986
when Rapp was just 14, triggering a string of similar complaints.

+4

**As the new series of the US political drama House Of Cards was screened earlier this month
there was a gaping hole. President Frank Underwood, portrayed by actor Kevin Spacey was
killed off by uneasy producers and script writers following sexual assault and harassment
allegations made against the actor last year**

To date, 30 men have made public allegations about the actor. While no formal
charges have been filed, police in LA and London are investigating allegations of
sexual assault, including rape.

In the UK, there are six active investigations. The Old Vic theatre in London, where
Spacey was artistic director for 11 years until 2015, said it had received 20 complaints
of inappropriate behaviour during his tenure.

Spacey issued a swift and contrite apology, ended years of rumours about his
sexuality by 'coming out' as gay and checked into sex rehab clinic The Meadows in
Arizona alongside disgraced Hollywood producer Harvey Weinstein.

But unlike Weinstein – who has been photographed going about his daily business,
visiting his lawyers' offices and picking his children up from school – there has been
no sign of Spacey anywhere.

The Mail on Sunday has spoken to – or attempted to speak to – dozens of Spacey's
friends, colleagues and acquaintances in the UK and the US in an attempt to piece
together his movements.

▶ From the hometown
hustler and the local
princess to the
Godmutha and the
South Shore charmer,
meet the stars of MTV:
Made in Staten Island
SPONSORED

▶ EXCLUSIVE: Father of
Gigi and Bella Hadid
vows to complete Bel
Air mega-mansion
despite order to tear
down illegal third floor
amid foreclosure
threats

▶ Justin Bieber and
Hailey Baldwin enjoy
casual lunch in West
Hollywood after
'pushing back' the date
of their wedding

Paris Hilton, 37, looks
ultra glam in a red semi-
sheer gown as she
cosies up to model
Jordan Barrett, 22, after
calling off engagement
to ex-fiancé

Kevin Spacey has apologised over sexual advance claim.

SHARE THIS





MORE VIDEOS


Wedding proposal on freeway
was meant to be something…


Eric Trump hosts star-studded
foundation event at in Florida

  

G'day mate! One Direction show off their Aussie accents

More Black Friday MADNESS captured in Tesco Extra

   0:47 / 1:08    

**SHARE THIS ARTICLE**

**RELATED ARTICLES**

 Final season of House of Cards gets middling reviews as...

 'It brought the #MeToo movement very close to home': Tom...

▸ Billion dollar makeover! How Jeff and MacKenzie Bezos went from geek to chic as they became one of Silicon Valley's most glamorous couples

▸ A museum in DC, a 30,000-acre ranch in Texas, and THREE Manhattan apartments: The massive property portfolio of Jeff Bezos at center of $140B divorce

▸ Ryan Phillippe ordered by judge to pay $790 penalty to ex Elsie Hewitt in ongoing $1M assault case
He missed a deadline to hand over text messages

▸ Kristen Stewart is casual chic in pink jacket and black leggings as she enjoys a hike with new girlfriend Sara Dinkin

▸ Newlywed Miley Cyrus flaunts her gorgeous gams in Miami as singer dons brightly colored blouse over Daisy Dukes

▸ Natalie Portman is casual in purple sweater and blue jeans as she steps out in Los Angeles with a friend for breakfast

But it is clear that Spacey's vanishing act may be his best coup de théâtre so far.

The last known pictures of the actor are fuzzy paparazzi shots taken at the £25,000-a-month rehab facility in November last year.

There, Spacey was supposed to undergo a 45-day sex addiction 'detox' but, we can reveal, checked out after only 21 days.

'He left early,' said one friend, on condition of anonymity. 'He only stuck it out for three weeks.'

Where he went after that remains unclear – although there are plenty of associates who claim to know where he is.

One well-connected British socialite who knew Spacey during his Old Vic days insists that he is living in seclusion in the Cook Islands, a string of 15 tiny islands in the middle of the South Pacific.

'He's living as a hermit in the Cook Islands,' she said authoritatively. 'He's keeping his head down until this blows over.'

'He did it for many other people': Jason Isaacs on Anthony Rapp



ADVERTISEMENT

    0:00 / 0:00     

# Exhibit

# C

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  STEVE WILSON BRIGGS, | Civ No: 18-cv-04952-VC |
| 11        Plaintiff, | **PLAINTIFF'S NOTICE OF MOTION** |
| 12           vs | **AND MOTION FOR** |
|     KEVIN SPACEY;  ARI EMANUEL; | **RECONSIDERATION** |
| 13  MATT DAMON;  BEN AFFLECK, et al; | |
| 14           Defendants | Complaint filed August 15, 2018 |

15                  **NOTICE OF MOTION AND MOTION**

16          ALL PARTIES AND THEIR ATTORNEYS OF RECORD: YOU ARE HEREBY

17  NOTIFIED THAT the Plaintiff hereby moves this Court **for Reconsideration** of the Court's

18  December 22, 2018 Order/Judgment granting the Defendants' motions to dismiss (Dkt # 90

19  & 91). This motion is based on this Notice and Motion, the subsequent Memorandum of

20  Points and Authorities.

21          This motion is made pursuant to Rule 59(e), invokable in cases like this, when:

22  **1.** necessary to prevent manifest injustice; **2**. necessary to correct manifest errors of law or

23  fact upon which the judgment rests, or; **3.** necessary to present newly discovered evidence.

24  This motion is also made pursuant to Local Rules (**LR**) 7-9(2), which allows such motion

25  with "The emergence of new material facts…"; and pursuant to LR 7-9(b)(3), which permits

26  such motions when  there is a "manifest failure by the Court to consider material facts or

27  dispositive legal arguments which were presented to the Court…"

28

                                    i

                         MOTION FOR RECONSIDERATION

| | |
|---|---|
| 1 | **TABLE OF CONTENTS** |
| 2 | |

NOTICE OF MOTION AND MOTION: ……………………………………………… i

TABLE OF CONTENTS…………………………………………………………….. ii

TABLE OF AUTHORITIES ………………………………………………....…….. iii

MEMORANDUM OF POINTS AND AUTHORITIES: ………………………….... 1

   I.    Motion Is Necessary To Prevent Manifest Injustice (Arg #1): ……………...…… 1

   II.   Manifest Failure To Consider Material Facts Or Dispositive:

         Arguments Which Were Presented To The Court (Arg #2): ………..……... 3

   III.  The  Motion Is Necessary To Correct Manifest Errors Of Law

         Or Fact Upon Which The Judgment Rests (Arg #3): ………….…..……. 6

   IV.  Motion Is Necessary To Prevent Manifest Injustice And Errors

         Of Law Or Fact Upon Which The Judgment Rests (Arg #4): ………..…... 8

   V.    Motion Is Necessary To Prevent Manifest Injustice (Arg #5): ………….……. 9

   VI.  Motion Is Necessary To Prevent Manifest Injustice (Arg #6): ………...…….. 10

   VII. Motion Is Necessary To Prevent Manifest Injustice (Arg #7): ………….….. 11

   VIII. Motion Is Necessary To Prevent Manifest Injustice (Arg #8)............................ 13

   IX.  Motion Is Necessary To Present New Evidence (Arg #9): ……...…………… 14

Note: …………………………………………………………………………….. 14

CONCLUSION: …………………………………………………………….….... 14

| | |
|---|---|
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

ii

MOTION FOR RECONSIDERATION

| | |
|---|---|
| 1 | <div align="center">**TABLE OF AUTHORITIES**</div> |
| 2 | |
| 3 | **CASES:** |
| 4 | *Briggs v Blomkamp* (2013) …………………………………………..… 8, 10 |
| 5 | *Briggs v Universal* (2017) …………………………………………..……. 4, 9, 10 |
| 6 | *Briggs v Spacey* (2018) ……………………………………………………. 4, 5, 9 |
| 7 | *Moore v Lightstorm Ent.*, (2013)........................................................................ 13 |
| 8 | |
| 9 | **STATUTES:** |
| 10 | **Federal Rules of Civil Procedure (FRCP)** |
| 11 | FRCP Rule 59(e) ……………………………………………….…….. i, 1 |
| 12 | FRCP Rule 60((b)(1)(2) or (3)) ………………………………….…... i, 1, 9, 13 |
| 13 | FRCP Rule 6 ……………………………………………………… 1 |
| 14 | FRCP Rule 7.1 …………………………………………………… 3, 5 |
| 15 | **Northern District Of California Local Rules** |
| 16 | LR 7-9(b)(3) …………………………………………………….. i, 1 |
| 17 | LR 7-9(c) …………………………………………………….... i |
| 18 | **Cal Business and Professions Code** |
| 19 | §17000, et seq.………………………………………………….. 13 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| | <div align="center">iii</div> |

MOTION FOR RECONSIDERATION

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Plaintiff respectfully submits this Motion For Reconsideration, pursuant to Rule 59(e), and LR 7-9(b)(2) and (3). The bases for leave and motion follow.

**I.   MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #1):**

- 12/22/2018, the Court Issued An Unprecedented & Unsound "*Saturday*" Judgment.
- Two days later, 12/24/2018, Defendant Spacey Used The Judgment to Intimidate And Further Abuse His Sexual Assault Victim(s), In A Cryptic Youtube Video.
- Spacey's 12/24/2018 Video Remarks Create The Impression That The Court's Saturday Judgment Was Timed And Coordinated to Benefit Spacey's Criminal Case.
- The Fact That Defendant Ari Emanuel is President Donald Trump's Talent Agent Undermines The Validity And Prudence Of The Judgment/Order.
- The Order Uses No Argument Made In The Def's **13** Attorneys' **3** Motions To Dismiss

In this suit, with potentially over $1 billion at stake, **Saturday**, Dec 22, 2018, the Court entered its Judgment/Order against the Plaintiff.  According to FRCP Rule 6 (and other FRCP Rules) Saturdays and Sundays are considered **legal holidays**. Beyond the questionable appearance of issuing the Judgment/Order on a Saturday; beyond the fact that the Saturday issuance unfairly impacted the Plaintiff (who was therefore delayed in receiving the Order); beyond the Order's legal and factual problems, the timing of the Judgment permits the unsettling suggestion that the Order was timed to assist Defendant Kevin Spacey's criminal case, and gives the unnerving appearance that the Judgment was a *quid pro quo* to Defendant Ari Emanuel (who represents President Donald Trump), for future appellate consideration.

On Christmas Eve, only 48 hours after the Court issued its unexpectedly brief Saturday Judgment, Defendant (**Def**) Spacey released a now notorious Youtube video, uniformly described as *bizarre* throughout the news media. (**See Exhibit A**, an article concerning Spacey's video from ***Forbes Magazine***).  Pleased and excited with the Court's ruling, Spacey concludes the video by growling, "<u>**If I didn't pay the price for the things we both know I did do, I'm certainly not going to pay the price for the things I didn't do**</u>."

1     **In plain sight, Spacey used this Court's Saturday Judgment to send a thuggish**

2 **message to the alleged victim in his criminal sexual assault case, pending in Nantucket,**

3 **Massachusetts.** One comes to this conclusion when one considers the known facts of this case

4 concerning Spacey. These facts are:

5     1.  Spacey created the Trigger Street social network (**TS**) in 2002, (@ TriggerStreet.com);.

6     2.  November 2014, Spacey destroyed TS (to destroy evidence against the Defendants);

7     3.  Spacey lured members to TS by claiming TS was intended solely for use in the USA;

8     4.  Yet Spacey travelled to England (2002) and Spain (2009) to recruit new TS members;

9     5.  In Spain (2009), Spacey boasted TS had over 400,000 members *around the world*.

10     These fact confirm Plaintiff's claim of *Breach of Contract* and *Infringement*.

11 Yet, against these damning facts, the Court's Order cleared Spacey of all charges. Thus, the

12 subtext of Spacey's video message to his victim was: ***If the Court lacked the will to make him***

13 ***(Spacey) pay on these civil causes, with overwhelming evidence of guilt, then no criminal***

14 ***court would make him pay for the murkier charges that plague sexual assault cases.***

15     Again, in plain sight, Def Spacey used the Court's eleventh hour, Saturday Judgment,

16 intent to intimidate and bully his victim(s) into withdrawing criminal charges against the actor.

17     The Court's Saturday Judgment has the unfortunate appearance of being timed to assist

18 Spacey's criminal case, because if the judgment had come later, Spacey could not have sent his

19 video message to his victim(s), as his criminal arraignment was scheduled for January 7, 2019.

20     But most troubling, the Judgment is manifestly unjust and ill-advised due to the unique

21 relationship that central Defendant Ari Emanuel has with President Donald Trump (Emanuel is

22 Trump's personal talent agent, and the man who blocked any further viewing of Def NBCU's

23 notorious *Access Hollywood* tapes). Because of this relationship, this ruling threatens to

24 undermine the credibility of The Court. Currently, there are six judicial vacancies on the 9th

25 Circuit, each can only be filled by Presidential appointment. Thus, if after this ruling, the

26 honorable Judge Chhabria were to receive an appellate appointment, many might see this

27 ruling as the improper *quid pro quo*.  Where strong and direct connections exist between a

28 litigant and a sitting US President, the Court should deny dispositive motions.

| 1 | **II.    MANIFEST FAILURE TO CONSIDER MATERIAL FACTS OR DISPOSITIVE** |
| 2 | **ARGUMENTS PRESENTED TO THE COURT (Arg #2):** |
| 3 | ● Nine days Before The Scheduled 12/13/2018 Motion & ICMC Hearing, Plaintiff |
| 4 | Moved For Default Judgments Against Spacey, Damon, Affleck, Blomkamp & |
| 5 | Brunetti, For Refusing/Failing To Respond To Summons. Plaintiff Also Repeatedly |
| 6 | Informed The Court That Spacey Was In Hiding—To Avoid Service Of Summons. |
| 7 | ● The Court Consistently Failed To Act On Plaintiff's Dispositive Motions. |
| 8 | ● The Court Should Have Defaulted Defs, Long Before Hearing Motions To Dismiss; |
| 9 | ● 48 hours After The Court's Judgment, Spacey Came Out Of Hiding —In A $6 Million |
| 10 | Baltimore House, Secretly Purchased In The Name Of A Trust. |
| 11 | ● Plaintiff Also Moved The Court To Strike Trigger Street Productions' (**TSP**) Motion To |
| 12 | Dismiss, As It Lacked A Corporate Disclosure (Required Upon First Filing Under |
| 13 | FRCP Rule 7.1); The Court Inexplicably Opted Not To Strike And Default TSP. |
| 14 | December 24, 2018, when Spacey released his notorious Youtube video just |
| 15 | before his arraignment for sexual assault charges, some observers believed Spacey was |
| 16 | attempting to win back public support, to lever his popularity to keep the Massachusetts court |
| 17 | from requiring the star to attend his own arraignment. But the Massachusetts court was |
| 18 | unlikely to allow Spacey to skip the arraignment when his whereabouts were still uncertain. |
| 19 | Spacey had not been seen in over a year, since October 29, 2017—the day actor Anthony Rapp |
| 20 | accused Spacey of sexually assaulting Rapp, when Rapp was only 14 years old.  Soon many |
| 21 | other young men came forward with similar accusations. Spacey immediately entered a rehab |
| 22 | program. Two weeks later, behind the walls of a rehab center, would be the last public sighting |
| 23 | of Spacey. (**See Exhibit B**, from **DailyMail.com**, Nov 17 2018). The article explains: |
| 24 | Nothing has been seen or heard of the double Oscar-winning actor since the first allegations emerged over a year ago in October 2017. |
| 25 | On both sides of the Atlantic, where Spacey owns multi-million-pound homes, the question is being asked with growing urgency: where is Kevin |
| 26 | Spacey? 'He's become a total recluse,' one friend told The Mail on Sunday. |
| 27 | 'No one has heard from him. He's vanished. It's almost unbelievable that someone of his stature can pull it off in a world where everyone has a cell |
| 28 | phone.'... |

3

MOTION FOR RECONSIDERATION

| | |
|---|---|
| 1 | ...His downfall began on October 29, 2017, when Star Trek actor Anthony |
| 2 | Rapp accused Spacey of sexually assaulting him in the star's New York apartment in 1986 when Rapp was just 14... |
| 3 | ...But unlike Weinstein – who has been photographed going about his daily |
| 4 | business, visiting his lawyers' offices and picking his children up from school – there has been no sign of Spacey anywhere... |
| 5 | ...Spacey's vanishing act may be his best coup de théâtre so far... |
| 6 | ....The last known pictures of the actor are fuzzy paparazzi shots taken at the £25,000-a-month rehab facility in November last year. |
| 7 | There, Spacey was supposed to undergo a 45-day sex addiction 'detox' |
| 8 | but, we can reveal, checked out after only 21 days. |

9    While Defendant Spacey was in rehab, on November 13, 2017, the Plaintiff quietly

10   filed a lawsuit against Spacey and the other Defendants (referred to as *Briggs v Universal et al*,

11   2017). This lawsuit (which later became this suit, *Briggs v Spacey*, 2018) is the reason Spacey

12   remained out of sight.

13       In response to the Plaintiff's suit, the Defendants' strategy was simple: Hide Spacey, so

14   the Plaintiff could not serve him, then the lawsuit would be dismissed.  The strategy worked.

15   In the Spring of 2018, wherever the Plaintiff tried to serve Spacey, his agents and lawyers

16   refused to accept service.  The Plaintiff informed the Court that Spacey was hiding and had

17   revoked his attorneys' and agents' authority to accept service. The Court took no action. Thus,

18   *Briggs v Universal* was dismissed, without prejudice, April 25, 2018.

19       Since the Court dismissed *Briggs v Universal* <u>without prejudice</u>, Spacey's attorney's

20   guessed the Plaintiff would likely re-file the case. Thus, Spacey remained out-of-sight.

21       The Plaintiff re-filed his case on August 15, 2018; now titled **Briggs v Spacey, et al**.

22       This time, just as before, Spacey remained in hiding.  But through detailed declarations

23   from his process servers, the Plaintiff methodically informed the Court of the strange and

24   sometimes threatening antics Defendants Emanuel, Damon, Affleck and Blomkamp's agents

25   employed to avoid service.   But none of the agents were more evasive or bizarre than

26   Defendant Spacey's and Brunetti's agents: Frank Selvaggi, and *Altman, Greenfield & Selvaggi*.

27       As the Plaintiff's servers' reports mounted, the Court took no action; exposing the

28   process server(s) to increasing risk. Then, after three attempts to default Spacey through the

1    Court Clerk (for failure to respond), Plaintiff submitted two **Service of Process Status**
2    **Reports** and a **Request for Judicial Notice**, hoping the Court might finally act.  But the Court
3    did nothing, and the Defendants' agents' strange antics continued.

4          Dec 4, 2018, after Spacey's agent returned the Plaintiff's service documents (by mail)
5    marked "**Refused**" (a defaultable infraction), Plaintiff submitted a Motion for Default
6    Judgment against Spacey, and also moved to default Defendants Matt Damon, Ben Affleck,
7    Neill Blomkamp and Dana Brunetti for failure to respond. All of the motions were proper, with
8    all supporting papers.  The Defendants should have been defaulted.  The Court took no action.

9          However, almost three weeks later, **Saturday**, December 22, 2018, the Court granted
10   the Defendants' three (3) motions to dismiss—despite the Plaintiff defeating every argument in
11   each motion. Oddly, the brief Order omitted the Plaintiff's central claims, and offered no
12   discussion of the motion points or opposition counterpoints: simply an arbitrary ruling.

13         **Two days after the Court's Judgment**, after more than a year in hiding, **Spacey**
14   **emerged back in the public spotlight**, with a bizarre Youtube video, expertly designed to
15   both rally his fans to support his return to his role in *House of Cards*, and to intimidate his
16   sexual assault victims.  With *Briggs v Spacey* dismissed, so eager was Spacey to get back in the
17   spotlight that a week later, on New Year's Eve, Spacey went out and personally purchased and
18   delivered pizza to the paparazzi stationed outside of his home.

19         In light of the many failings with the Court's Saturday Judgment/Order, it should also
20   be observed that the Court chose **not** to act on the Plaintiff's motion to strike TSP's motion to
21   dismiss (based on TSP's failure to attach a corporate disclosure to its motion, as required by
22   Rule 7.1).  TSP submitted its disclosure 11 days late.

23         Finally, the Order arbitrarily declared the Plaintiff's claims *implausible*. But against this
24   opinion, in the Plaintiff's opposition to TSP's motion to dismiss, the Plaintiff attached letters
25   from executives of *LexShares* and *Easy Lawsuit Funds* expressing interest in financing this
26   suit.  Such investment is not made until an analytics team deems that a case has at least a 60%
27   likelihood of prevailing.  This confirms the soundness and plausibility of the Plaintiff's claims.

28         These facts show a manifest Court failure to consider facts and dispositive arguments.

| 1 | **III.     THE  MOTION IS NECESSARY TO CORRECT MANIFEST ERRORS OF** |
|---|---|
| 2 | **LAW OR FACT UPON WHICH THE JUDGMENT RESTS (Arg #3):** |

3    ● The Court Improperly Omitted Essential, Conclusive And Central Facts And Claims.

4        The Court's Order denied the *Breach* and *Infringemen*t claims by omitting and

5 falsely citing TS *Terms* as stating that materials posted on TS "*may be used by [Trigger Street]*

6 *throughout the world in perpetuity for any purpose whatsoever, including, but not limited to,*

7 *reproduction, disclosure, transmission, publication, broadcast, posting and sublicensing.*"

8        But the <u>full</u> clause <u>makes a clear exemption for screenplays</u>. The full clause reads:

9     "**Any material (other than the <u>Material</u> [as defined and more fully addressed in**

10     **the Triggerstreet <u>Screenplay</u> Forum Participation Agreement]) that you**

    **transmit to us or post anywhere on the Site or through the Services, including,**

11     **without limitation, the Shorts**, may be used by TSCI throughout the world in

12     perpetuity for any purpose whatsoever, including, but not limited to, reproduction...**"**

13        The Court's Order also omitted and grossly misstated the Plaintiff's *Breach* and

14 *Infringement* claims.  On page 2 of the Complaint the Plaintiff wrote:

15     "TS's Terms Of Use stated the site was solely for use in the USA, yet, in fact, the

    site operated around the world. Further, secretly and without consent from U.S.

16     members, <u>Defs **Spacey and Brunetti went to London** (2002), and **Spain** (2009)</u>

17     <u>to recruit new members, touting TS's "400,000 *members around the world*.</u>""

18        The Complaint included claims and news reports of Spacey's travels to Spain and

19 England to recruit new TS members, in violation of *Terms*. But the Order omits this, to opine:

20       "Briggs cites to the section titled "International Use" as a promise on the

      website's behalf to not make the site available to people outside the

21       United States. [citation omitted]. No reasonable reading of that section

22       could give rise to that obligation."

23        In making this statement, the Court improperly posited a verifiably false argument in

24 favor of the Defendants—particularly troubling as this argument was not raised by the

25 Defendants' 13 attorneys.  Worse, the statement reveals the Court did not understand that

26 universal **ccTLD**'s (internet protocols) made it effortless for TS to identify (then restrict or

27 block) foreign accessors.  Worse yet, the Order misconstrues and mischaracterizes Plaintiff's

28 claims and TS's *International Use* clause. The "International Use" clause clearly stated:

1   **International Use**:  "Unless otherwise specified, **the materials on the Site and in the**
2   **Services are presented solely for the purpose of promoting the entertainment,**
    **information, and community resources and services available in, and other uses in,**
3   **the <u>United States of America</u>**." We control and operate the Site and the Services from
    within the **United States**. <u>We make no representation that materials on the Site or the</u>
4   <u>Services are appropriate or available for use in locations outside the **United States**</u>, and
5   accessing them from territories where their contents are illegal is prohibited. <u>Those who</u>
    <u>choose to access the Site from other locations do so on their own initiative</u>…"
6

7       This clause confirms TS was intended solely for **USA** use (**membership**). The clause

8   was intended to assure **US** users of the site's safety; otherwise it is meaningless. **Any jury**

9   would agree the clause <u>prohibits foreign **membership**</u>; yet, the Court states, "No reasonable

10  reading of that section could give rise to that obligation," without explaining what the clause

11  could possibly mean otherwise, or why then the clause exclusively addresses USA use?

12      The Complaint also explained that TS's *Security* clause stated:

13  **Security**: When you submit information via the Site, **your information is**
    **is protected using secure data networks protected by <u>industry standard</u>**
14  **firewall and <u>password protection systems</u>**.

15      But this security clause, like the International Use clause, is omitted from the order.

16  Plaintiff understood that ccTLD protocols made it effortless for TS to identify, then block or

17  restrict foreign accessors, <u>as the screenwriting website InkTip.com did</u> (this is also omitted

18  from the Order).  Plaintiff did not simply take the *International Use* clause "as a promise on

19  the website's behalf to not make the site available to people outside the United States," as the

20  Court opined. Plaintiff is concerned that the Order appears drafted without basic IP knowledge.

21  But **<u>chief</u>** among the Order's many problems is that the following facts cannot be reconciled:

22      1.  TS's terms state TS is solely for use in the US; prohibiting international membership.

23      2.  Spacey and Brunetti travelled overseas to recruit new members.

24      These two facts constitute a willful *Breach*, as the Defendants cannot post a clause

25  restricting international use, then travel to Spain and London to recruit foreign members. These

26  facts also confirm that Defendants willfully exported the Plaintiff's work, then improperly

27  went abroad to recruit foreign members to access the works.  This is Infringing Exportation.

28      This motion is necessary to correct these manifest errors of fact.

**IV.    MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE AND ERRORS OF LAW OR FACT UPON WHICH THE JUDGMENT RESTS (Arg #4):**

● The Court's Order Omits And Ignores Any Mention —And All Supporting Facts— Concerning Conspiracy, Fraud, Deceit, Concealment, Negligence and Spoliation.

On Page 2 and 3 of the Complaint, the Plaintiff provided nine (9) bullet-points of his case's most important causes and claims. However, the Court omitted any mention of eight (8) of these central and imperative facts, causes and claims. The Order only mentioned the fourth bullet-point. Consider the following omission examples:

**Item #1**: The first bullet introduced the Willful Spoliation (destruction of evidence) claim. This claim was presented first because of its resounding significance.  Under this bullet the Plaintiff explained that six days after *Briggs v Blomkamp* went to appeals, Defendant Spacey destroyed the Trigger Street social network, in a conspiracy to destroy incriminating evidence against Defendants Ari Emanuel and the other MRC and *Briggs v Blomkamp* Defendants —in the event that the 9th Circuit remanded *Briggs v Blomkamp* for trial. But somehow the Court's Order omitted any mention of any aspect of this claim.

**Item #2**: On page 3 of the Complaint, the third bullet addressed the fact that the Defendants deceitfully hired, as their *Expert* Witness in *Briggs v Blomkamp*,  Jeff Rovin —a self-confessed "**fixer,**" who went on FOX News (2016) to boast that for 6 years he worked as a *fixer* for President Bill Clinton's administration, where he was paid to write false smear stories. Plaintiff moved to have Rovin's Report *excluded* for fraud. These facts supported Conspiracy, Fraud, Negligence and Willful Suppression.  The Order omitted all of these facts.

**Item #3:** The Order fails to give a complete telling of the Breach claim (bullet #2, p 2).

**Item #4:** The <u>first</u> Cause of Action listed on the Complaint's caption page is **Civil Conspiracy**, yet the Judgment omits any mention of this claim.

**Item #5:** The Order also omits any and all mention of Fraud, Concealment, Deceit, Negligence and Gross Negligence, and all such supporting facts.

These omissions are a manifestly unjust, and amount to conceding, but permitting, that the Defendants willfully conspired to destroy evidence and commit Fraud and Negligence.

1    **V.    MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #5):**

2    ● Plaintiff Defeated All Arguments Raised By In Defendants' **13 Attorneys'** Motions.

3    Using prevailing case law and guidelines, the Plaintiff's oppositions defeated

4    every argument raised in the Defendants' three (3) motions to dismiss.  NBCU's Defense Team

5    was reduced to misrepresenting *discussion* passages as *conclusions*, making unethical leaps of

6    logic, and improperly designating cases (to obfuscate their misrepresentations). MRC's

7    Defense Team's motion was so unsound that they resorted to filing an unqualified and doomed

8    *Vexatious Litigant* motion. TSP's Defense Team neglected to even submit a corporate

9    disclosure (**a disqualifying failure**).  Yet, the Court granted all of their deficient motions, in a

10    Judgment that (1) omitted swaths of facts and claims central to the Plaintiff's case; (2) lacked

11    any presentation or analysis of motion and opposition points and counterpoints.

12    The absolute meritoriousness of the Plaintiff's claims is confirmed by simply

13    observing that the Defense Counsel first responded to the Complaint with a huge team of seven

14    (7) attorneys —but a month later, **the Defense had grown to a staggering and**

15    **unprecedented team of at least thirteen (13) attorneys**.  Any suggestion that Plaintiff's

16    claims are unsound, wilts in the face of these facts.

17    Additional anecdotal evidence of the meritoriousness of the Plaintiff's claims, are:

18    1.  Three months after Plaintiff filed this action (*Briggs v Universal*, Nov 2017), which

19    exposed MRC's negligent business practices, the disgraced mega-million dollar

20    company was absorbed into *Valence Media* (under Eldridge Industries), Feb 2018.

21    No new MRC projects have been announced beyond 2018.

22    2.  December 13, 2018, (the same day this Court scheduled motion hearings), WME

23    (Defendant Emanuel's premiere corporation) hired its first president (Ari Greenburg),

24    to give the impression the beleaguered Emanuel was removed from daily operations.

25    3.  Since the day the Plaintiff filed *Briggs v Universal* (Nov 2017) until two days after

26    *Briggs v Spacey* was dismissed (Saturday, 12/ 22/2018), Defendant Spacey was not

27    seen in public anywhere on the planet.*

28    *A defendant doesn't hide inside, in an unknown location—for over a year—unless a lawsuit has
extraordinary merit.

1  **VI.    MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #6):**

2  ● The Judgment Improperly Ruled (Without Evidentiary Support) That This Suit Is A

3     Relitigation Of *Briggs v Blomkamp*, Against Conclusive Opposing Evidence.

4  ● FRCP Rule 60(b)(1)(2) and (3) Entitle Plaintiffs To Relief From A Previous Judgment,

5     And Authorize Courts To Grant Such Relief And Reconsideration, If The Previous

6     Judgment Involves A Mistake, New Evidence, Or Fraud, As In This Case.

7          In his oppositions, Plaintiff showed this action is not a relitigation of *Briggs v*

8  *Blomkamp* (2013, US Cert Denied, 2018). The 38-page *Briggs v Blomkamp* complaint

9  primarily just compares two contested screenplays. This suit stems from the fact that two years

10 after *Briggs v Blomkamp* went to appeals, the Plaintiff learned the following three (3) facts:

11 1.  Six days after *Briggs v Blomkamp* went to appeals, the Defendants took the extreme

12     action of closing and destroying the TS social network (to destroy evidence).

13 2.  Plaintiff then found multiple news articles documenting Defendant Spacey's travels to

14     foreign countries to recruit new members to TS, in violation of the TS *Terms*.

15 3.  In 2016, the Defendants' expert witness in *Briggs v Blomkamp* went on FOX News to

16     admit he was a professional "*fixer*," paid to write false *smear* stories.

17          When there is newly discovered evidence (see above), or evidence that a party

18 prevailed by fraud or a mistake, FRCP Rule 60 allows a party relief from that judgment.  Any

19 mention of *Briggs v Blomkamp* in the Complaint, was not to relitigate, but to provide facts and

20 evidence showing that the Defendants won the previous judgment by Fraud, per Rule 60(b)(3).

21          But perhaps the most conclusive evidence that this case is not a relitigation, is the fact

22 that in <u>*Briggs v Universal*</u> (the first filing of this current case, 2017) **this** Court saw virtually

23 the same Complaint, and the same *relitigation* claims in the Defendants' motions to dismiss.

24 But this Court did not opine that the Complaint was a relitigation of *Briggs v Blomkamp*. If the

25 Court believed *then* that this case was a relitigation, it had a duty to stop the suit and save the

26 Defendants' legal fees, and keep an unnecessary suit out of our courts. But the Court did not

27          This case is not a *relitigation*.  Rather, per Rule 60, this case is an effort to correct a

28 prior judgment, won by fraud. Thus, this motion is necessary to prevent a  manifest injustice.

| | |
|---|---|
| 1 | **VII.     MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #7):** |
| 2 | ● The Court Took No Action To Ensure A Safe And Reasonable Legal Process When |
| 3 | Informed By The Plaintiff And His Process Servers That: |
| 4 | 1. The Defendants' Agents Intimidated/Threatened Plaintiff's Process Server; |
| 5 | 2. The Defendants Were Taking Extraordinary Measures To Evade Service. |
| 6 | ● The Court Ignored And Took No Corrective Action Against The Defendants' |
| 7 | Misconduct (Which Included Lying To Court, And Submitting Falsified And |
| 8 | Fraudulent Business Statements To The California Secretary Of State). |
| 9 | ● In Refusing To Act, The Court Exposed The Plaintiff, His Process Servers, And The |
| 10 | State Of California To Continued Risk. |
| 11 | ● **The Court failed to hold the Plaintiff and Defendants to an even standard;** |
| 12 | As soon as the Plaintiff's process servers attempted to serve the Defendants, the |
| 13 | Defendants and their agents' bizarre, unethical, and intimidating antics began. The Plaintiff |
| 14 | and his process servers informed the Court of this conduct, through various filings (e.g., |
| 15 | declarations, service of process status reports, request for judicial notice, motions to serve by |
| 16 | publication, etc), but the Court took no interest and took no action; thereby, tacitly condoning |
| 17 | Defendants Emanuel's and MRC's thuggish culture. |
| 18 | By taking no action, the Court fostered a hostile atmosphere, and engendered a double |
| 19 | standard—permitting the Defendants to behave hostilely and dishonestly, seemingly assured |
| 20 | that the Court would take no action. Conversely, if the Plaintiff had so little character as to |
| 21 | behave in kind, he would certainly have faced disciplinary action. |
| 22 | Plaintiff *also* informed the Court of the following events (which the Court *also* ignored): |
| 23 | 1. After MRC failed to respond to service, Plaintiff checked MRC's California Secretary |
| 24 | of State business entity statements and discovered that MRC (MRC II Distribution |
| 25 | Company, LP) was not located in the MRC building at 9665 Wilshire, Los Angeles, as |
| 26 | reported in their corporate disclosure and elsewhere. Rather, their headquarters were |
| 27 | reported as being in William Morris Endeavor's (WME) headquarters, at 9601 |
| 28 | Wilshire, in a room that did not exist (room 610). At the WME headquarters, one of |

1    WME's agents attempted to intimidate the server.

2    2.   Plaintiff reported three newly discovered instances of attorney Michael J Kump

3    willfully submitting fraudulent and falsified documents to the court, in 3 separate

4    corporate disclosure statements for MRC. These statements conflicted with each other,

5    and with their California Secretary Of State business records, as Kump had:

6    a.   declared Media Rights Capital II LP the parent of MRC II Distribution Co, LP;

7    b.   declared MRC II Distribution Company, LP had no parent company;

8    c.   declared a false address for MRC II Distribution Company.

9    3.   After serving Def Emanuel at WME, the Plaintiff's process server attempted to serve

10   MRC at 9665 Wilshire Blvd, Los Angeles. The process server reported there were

11   construction barriers around the MRC building, but he observed no workers. The

12   security guard would not allow the process server into the building, but the server

13   observed office workers entering and exiting, and sitting and eating in benches outside

14   of the building. The guard told the server that MRC had moved to 1800 Century Park

15   East for the duration of the construction project.

16   4.   The process server then attempted to serve MRC at the address on file for Scott Tenley

17   (the agent for service of process listed in MRC's California Secretary of State business

18   entity statement): 1800 Century Park East.  But at this address, the server found no one

19   connected to MRC; no office for Scott Tenley; no one there had heard of Scott Tenley.

20   The office manager said MRC was no longer at that location and directed the process

21   server back to the previous address (9665 Wilshire).

22   5.   The process server attempted to serve Kevin Spacey through his agent, Frank Selvaggi,

23   at the address on Trigger Street Productions' CA Sec of State business entity statement.

24   There, the process server was told that Sevaggi's company (Altman, Greenfield &

25   Selvaggi) moved out 5 years prior, and the office had been vacant ever since (5 years).

26   6.   In a chaotic scene, the Plaintiff's server attempted to serve Spacey at the office of

27   Altman, Greenfield & Selvaggi, at 10960 Wilshire Blvd, Los Angeles. There two of the

28   company's executives squabbled over whether they were authorized to accept service

1    for Spacey, or not.  In the end, they would not accept the documents.

2    7.   MRC's CA State business statements were 10 to 13 years out of date, and falsified.

3    8.   Trigger Street Productions' business statements were 15 years out of date, and falsified.

4    9.   Defs Matt Damon and Ben Affleck's business statements were 13 years out of date.

5    These new facts supported the Complaint's Fraud and Negligence claims,

6    AND created new Fraud and Negligence claims. According to Rule 60, Fraud is a basis for

7    relief from a prior judgment.  The Court's failure to act suggests the Court does not hold

8    corporations and the rich accountable, and exposes all Californians to risk of further injury.

9    These aforementioned failures are a manifestly unjust. Thus, this motion is necessary.

10   **VIII.     MOTION IS NECESSARY TO PREVENT MANIFEST INJUSTICE (Arg #8):**

11   ●   The Court Failed To Inform The Attorney General Of California Of The Defendants'

12   Certifiably Fraudulent, Negligent, And Conspiratorial Civil Infractions.

13   The Plaintiff's Complaint documents (with news articles, etc.) such facts as:

14   1.   Defendants Emanuel and Block were in an illegal business relationships with Sony

15   Pictures' (then) CEO Michael Lynton, as co-owners of Screenbid (in violation of Cal

16   Business and Professions Code §17000, et seq). Thus, the Defendants profited as

17   business owners, AND as secret business subcontractors.

18   2.   The Defendants hired a fixer, Jeff Rovin, to fix the *Briggs v Blomkamp* expert report

19   (this same *fixer* was used by James Cameron in *Moore v Lightstorm Ent.*, (2013)). This

20   required submitting a falsified and fraudulent central document to the Court.

21   3.   Defendants destroyed the TS social network to destroy evidence against themselves.

22   4.   Defendant Ari Emanuel is documented bullying film distribution partners into offering

23   more money for films; when they refuse(d), he takes/took the film(s) to NBCUniversal.

24   Even if the Court denies Plaintiff's personal injury claims, these are very

25   serious offenses, documented in the Complaint—with evidentiary exhibit substantiation. These

26   offenses require legal attention. Yet the Court failed to inform the Attorney General of

27   California—an inaction that exposes all Californians, perhaps all Americans, to continued risk.

28   This is a manifest injustice to the Plaintiff, Californians and all Americans.

## IX.     MOTION IS NECESSARY TO PRESENT NEW EVIDENCE (Arg #9):

Plaintiff stated in his *Declaration In Support of Complaint*, Dkt #88, filed 12/17/2018, that he was hopeful to submit an Amended Complaint, because he had recently found Spacey's and Brunetti's **US Patent Application** (granted) for a special email system. Plaintiff attached the patent to his declaration. This patent is for the email system used for the TS social network, and explains it functionality. The patent explains how the TS's email system was able to *mask* (hide) the identity of select ("*whitelisted*") users. *Masked* whitelisted users could then secretly view <u>any</u> of TS's screenplays, freely, without detection. This same patented system also allowed the Defendants to *unmask*—reveal the identity of—any users. This patent confirms key details of the Complaint (page 6-7). If the Defendants have not destroyed the TS servers and files, a computer forensic expert can unmask the masked TS users' activity, and show (as the Plaintiff alleges) that Def Blomkamp accessed his work, as did Def Emanuel. The Plaintiff also predicts such an unmasking will reveal that film director James Cameron also accessed his work. However, currently it appears the Defendants have totally destroyed the TS servers and files, to protect themselves. <u>But one does not destroy a massive social network that is earning millions from sponsors like Budweiser, unless there is very incriminating evidence to hide</u>.

This motion is necessary to present this newly discovered evidence (the patent).

**Note:**

LR 7-9(c) requires that no opposition argument is repeated herein.  Arg #2 is based on 7-9(b)(3) **"**manifest failure by the Court to consider material **facts** or dispositive legal **arguments**."  Thus, for Arg #2, by demand, Plaintiff reviewed facts and arguments **not considered** by the Court.  Plaintiff also revisited the *relitigation* issue (on page 10), but used all new facts and arguments. Otherwise, no arguments were made from previous oppositions.

### CONCLUSION

For the foregoing reasons, the Court should grant this Motion For Reconsideration.

Date:_ January 14, 2019 _                    Signed:_ /s/ Steve Wilson Briggs   _
                                                          Steve Wilson Briggs
                                                          Plaintiff, In Persona Propria

# Exhibit

# A

6,955 views  |  Dec 28, 2018, 06:07pm

# Why Is That Kevin Spacey Video So Unsettling? It's Not Just What He Says.



**David Alm** Contributor ⓘ
Arts
*I write about film, the arts, and design.*



In the four days since Kevin Spacey posted that icky video of him, in his character from *House of Cards* Frank Underwood, making what reads as an oblique denial that he sexually assaulted an 18-year-old man on Nantucket in 2016, the video has been viewed more than 8 million times.

Surely, the vast majority of those who've watched the 3-minute video, titled "Let Me Be Frank," have done so much like one might have tuned in to see Ted Bundy's final interview before he was executed, or Martin Shkreli's live webcasts. Not out of fandom, but fascination with the grotesque and the outer limits of ego.

Spacey, who was fired from *House of Cards* last year amid accusations that he had made sexual advances on a 14-year-old boy in 1988, will be arraigned on the new felony charge on January 7th in a Massachusetts court. And, while he makes no direct reference to that charge in the video, the parallels between it and President Underwood's sociopathic behavior allow for plenty of innuendo.

"You wouldn't believe the worst without evidence, would you?" he says, steely eyed, into the camera. "You wouldn't rush to judgements without facts, would you?" A few seconds later, he growls, "If I didn't pay the price for the things we both know I did do, I'm certainly not going to pay the price for the things I didn't do."

The video is remarkable not just for its content, but for its form too, raising the question: Who on Earth would have been complicit in this farce? As they say, let's go to the tape.

For an A-list actor, presumably with access to the best film technicians in Hollywood, Spacey made a video that looks like an undergraduate short. The camera remains in one stationary spot, panning only a handful of times as Spacey moves to and fro cooking dinner in a Santa-clad apron. The faint sounds of a television waft in the background, as if from another room -- not quite loud enough to suggest it was intentional, to invoke domestic veracity, but rather quiet enough that it was likely an oversight. When he exits the frame, at the end of the video, it's easy to imagine him circling around to the back of the camera to push "Stop," and then editing that part out in post.

**YOU MAY ALSO LIKE**

This isn't to suggest that Spacey himself shot the video -- the panning alone would indicate at least one other body in the room -- but whoever he solicited to help him with this bizarre project does not appear to be among the industry's best. Which is fine, of course -- particularly if that person (or persons) is, in fact,

an undergraduate film student. They have to learn somehow, even if they would never list the credit on their resume.

But I'd posit that the video's amateur quality lends considerably to its creepiness. What does a pariah do when he tries, however misguidedly, to be heard? From the evidence, it would appear that he gets someone -- anyone -- to come over and follow a few simple commands while he orates from across the counter. It makes Spacey look that much more desperate and isolated, as well as delusional, paranoid, and grasping. It's reminiscent of another aging man, not unlike Frank Underwood in more ways than one, who resorts to self-publishing every time he feels cornered, stripped of power, disrespected and increasingly irrelevant.

The outer limits of ego appear to be a very lonely place indeed. And yet, when those who reside there beg for us to listen, even long after they've lost any credibility, we still can't help but tune in. And that, more than anything Spacey says in those three minutes, might be the most disquieting message of all.

*I am a Brooklyn-based writer, editor, and professor. I have covered contemporary art and film since the late 1990s, and have taught journalism and film courses at the college level since 2004.*

58,255 views | Dec 20, 2018, 11:30am

# Where Are They Now? San Antonio To Graduation: A College Signing Day Story



**Merone Hailemeskel** Brand Contributor
**Civic Nation** BRANDVOICE

There are moments in your life that you play over and over again. You remember every little detail—how you were feeling, the people surrounding you, the things you heard that struck a chord—and continue to play in your head to this day.

# Exhibit

# B

Feedback   👍 Like 15.6M

Thursday, Jan 10th 2019    5-Day Forecast

# Daily **Mail**
.com

| Home | U.K. | News | Sports | U.S. | Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Columnists | DailyMailTV |

Latest Headlines   Royal Family   News   World News   Arts   Headlines   Pictures   Most read   Wires   Games          Login

ADVERTISEMENT




AdChoices ▷

## How Kevin Spacey vanished off the face of the earth: Shamed star, 59, has not been seen for a YEAR amid claims he's on a Pacific island, in France or wearing disguises

- Since the allegations emerged nothing has been seen of the Oscar winning actor
- In 2017 Star Trek actor Anthony Rapp accused Spacey of sexually assaulting him
- Last known pictures of Spacey are fuzzy shots taken at a rehab facility last year

By CAROLINE GRAHAM FOR THE MAIL ON SUNDAY
PUBLISHED: 17:15 EST, 17 November 2018 | UPDATED: 20:13 EST, 17 November 2018

**13k**
shares

**348**
View comments

◉ Site ○ Web   Enter your search

ADVERTISEMENT

When the new series of US political drama **House Of Cards** was screened earlier this month, it received an unusually lacklustre reception.

The much-acclaimed show, now in its sixth season, had been a cornerstone of **Netflix**'s annual schedule, with tens of millions around the world gripped by the malevolent scheming of its central character, President Frank Underwood, portrayed to eerie perfection by actor **Kevin Spacey**.

But this time, there is a gaping hole – Spacey is missing, his iconic character killed off by uneasy producers and script writers following sexual assault and harassment allegations made against the actor by a string of young men last year.

Like
Daily Mail

+1
Daily Mail

Follow
@DailyMail

Follow
Daily Mail

Follow
@dailymailuk

**Follow
Daily Mail**

The show limps on regardless, with a female president in the form of Frank's equally ruthless wife Claire, icily played by Robin Wright.



**Following the sexual assault allegations that emerged against Kevin Spacey in 2017 nothing has been seen or heard of the double Oscar-winning actor. He was last spotted exercising at the Meadows Rehab Centre in Wickenburg, Arizona, last year**

But the real drama lies elsewhere. For despite being one of Hollywood's most recognisable stars, Spacey has apparently disappeared off-screen as well as on it.

Nothing has been seen or heard of the double Oscar-winning actor since the first allegations emerged over a year ago in October 2017.

On both sides of the Atlantic, where Spacey owns multi-million-pound homes, the question is being asked with growing urgency: where is Kevin Spacey? 'He's become a total recluse,' one friend told The Mail on Sunday.

'No one has heard from him. He's vanished. It's almost unbelievable that someone of his stature can pull it off in a world where everyone has a cell phone.'

One producer described Spacey as having 'one of the most recognisable faces on the planet' and added: 'I was with him when he walked into a restaurant in Beverly Hills and the whole place applauded.'

It may be a long time before he garners applause again.

**FEMAIL TODAY**

▶ **Amazon CEO Jeff Bezos 'announcedsplit with wife of 25 years because compromising photographs of him with married former TV anchor, 49, were about to made public'**



▶ **Kendall Jenner strips down while modeling TWO teeny bikinis on Instagram as beau Ben Simmons comments 'come here' on the post**



▶ **Kate Mara 'is expecting her first child' with husband Jamie Bell... after showing off hint of a baby bump at Golden Globes**



▶ **Christina El Moussa 'soaks up the last few hours' of her honeymoon to Bora Bora with new husband Ant Anstead** Posted pics online



▶ **Teresa Giudice's daughter Gia flips her mom the bird during 18th birthday party ... which included a three-tiered bejeweled cake** Caught on tape



▶ **From Roswell and chemtrails to the moon landing and JFK's assassination, the conspiracy theories obsessing Americans** SPONSORED

▶ **Southern Charm's Thomas Ravenel now accuses ex Kathryn Dennis of consuming drugs and alcohol while pregnant with their son and daughter**

▶ **EXCLUSIVE: Kevin Spacey 'aggressively touched a man who was celebrating his 21st birthday with his parents at the same bar the actor groped a teen' claims eyewitness**

▶ **Oscars to have NO host for the first time in nearly 30 years: Academy announces plan to have a variety of A-list presenters instead of one name**

▶ **America's lost sweetheart? Ivanka Trump reveals she turned down the chance to star on The Bachelorette in resurfaced 2007**

His downfall began on October 29, 2017, when Star Trek actor Anthony Rapp accused Spacey of sexually assaulting him in the star's New York apartment in 1986 when Rapp was just 14, triggering a string of similar complaints.

interview

▶ Courtney Stodden
shares side-by-side
image with Khloe
Kardashian as she says
she's happy to be
compared to the
'stunning' star

ADVERTISEMENT

+4

**As the new series of the US political drama House Of Cards was screened earlier this month there was a gaping hole. President Frank Underwood, portrayed by actor Kevin Spacey was killed off by uneasy producers and script writers following sexual assault and harassment allegations made against the actor last year**

To date, 30 men have made public allegations about the actor. While no formal charges have been filed, police in LA and London are investigating allegations of sexual assault, including rape.

In the UK, there are six active investigations. The Old Vic theatre in London, where Spacey was artistic director for 11 years until 2015, said it had received 20 complaints of inappropriate behaviour during his tenure.

Spacey issued a swift and contrite apology, ended years of rumours about his sexuality by 'coming out' as gay and checked into sex rehab clinic The Meadows in Arizona alongside disgraced Hollywood producer Harvey Weinstein.

But unlike Weinstein – who has been photographed going about his daily business, visiting his lawyers' offices and picking his children up from school – there has been no sign of Spacey anywhere.

The Mail on Sunday has spoken to – or attempted to speak to – dozens of Spacey's friends, colleagues and acquaintances in the UK and the US in an attempt to piece together his movements.

▶ From the hometown
hustler and the local
princess to the
Godmutha and the
South Shore charmer,
meet the stars of MTV:
Made in Staten Island
SPONSORED

▶ EXCLUSIVE: Father of
Gigi and Bella Hadid
vows to complete Bel
Air mega-mansion
despite order to tear
down illegal third floor
amid foreclosure
threats

▶ Justin Bieber and
Hailey Baldwin enjoy
casual lunch in West
Hollywood after
'pushing back' the date
of their wedding

Paris Hilton, 37, looks
ultra glam in a red semi-
sheer gown as she
cosies up to model
Jordan Barrett, 22, after
calling off engagement
to ex-fiancé

Kevin Spacey has apologised over sexual advance claim.

SHARE THIS

 



MORE VIDEOS

 

Wedding proposal on freeway    Eric Trump hosts star-studded
was meant to be something...    foundation event at in Florida





G'day mate! One Direction show off their Aussie accents

More Black Friday MADNESS captured in Tesco Extra

   0:47 / 1:08    

**SHARE THIS ARTICLE**

**RELATED ARTICLES**

 Final season of House of Cards gets middling reviews as...

 'It brought the #MeToo movement very close to home': Tom...

But it is clear that Spacey's vanishing act may be his best coup de théâtre so far.

The last known pictures of the actor are fuzzy paparazzi shots taken at the £25,000-a-month rehab facility in November last year.

There, Spacey was supposed to undergo a 45-day sex addiction 'detox' but, we can reveal, checked out after only 21 days.

'He left early,' said one friend, on condition of anonymity. 'He only stuck it out for three weeks.'

Where he went after that remains unclear – although there are plenty of associates who claim to know where he is.

One well-connected British socialite who knew Spacey during his Old Vic days insists that he is living in seclusion in the Cook Islands, a string of 15 tiny islands in the middle of the South Pacific.

'He's living as a hermit in the Cook Islands,' she said authoritatively. 'He's keeping his head down until this blows over.'

'He did it for many other people': Jason Isaacs on Anthony Rapp



▶ Billion dollar makeover! How Jeff and MacKenzie Bezos went from geek to chic as they became one of Silicon Valley's most glamorous couples

▶ A museum in DC, a 30,000-acre ranch in Texas, and THREE Manhattan apartments: The massive property portfolio of Jeff Bezos at center of $140B divorce

▶ Ryan Phillippe ordered by judge to pay $790 penalty to ex Elsie Hewitt in ongoing $1M assault case
He missed a deadline to hand over text messages

▶ Kristen Stewart is casual chic in pink jacket and black leggings as she enjoys a hike with new girlfriend Sara Dinkin

▶ Newlywed Miley Cyrus flaunts her gorgeous gams in Miami as singer dons brightly colored blouse over Daisy Dukes

▶ Natalie Portman is casual in purple sweater and blue jeans as she steps out in Los Angeles with a friend for breakfast

ADVERTISEMENT

    0:00 / 0:00      

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                  **NORTHERN DISTRICT OF CALIFORNIA**
10  STEVE WILSON BRIGGS,
11          Plaintiff,                    Civ No: 18-cv-04952-VC
12              vs                        **[PROPOSED] ORDER**
13  KEVIN SPACEY et al,
14          Defendants.
15
16
17      Having considered "PLAINTIFF'S NOTICE OF MOTION AND MOTION LEAVE
18  TO FILE MOTION FOR RECONSIDERATION" and finding just and sufficient bases for
19  the motion, **IT IS HEREBY ORDERED:**
20     1.  Plaintiff's filing captioned "PLAINTIFF'S NOTICE OF MOTION AND MOTION
21         LEAVE TO FILE MOTION FOR RECONSIDERATION" is **GRANTED**.
22     2.  Plaintiff's filing captioned "PLAINTIFF'S NOTICE OF MOTION AND MOTION
23         FOR RECONSIDERATION" is **GRANTED**.
24     3.  The matter will be rescheduled for ICMC and other relevant jury trial scheduling.
25
26  Dated:_____      Signed:_____
27                                  The Honorable Vince Chhabria
28

1
[PROPOSED] ORDER

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing documents, captioned **"PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION," and "PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FOR RECONSIDERATION,"** by filing same with the Clerk of the Court for the United States District Court, Northern District Of California, San Francisco Division, by using the District's Pacer system on January 14, 2019.

Dated: January 14, 2019.          Signed:   /s/   Steve Wilson Briggs

                                              STEVE WILSON BRIGGS
                                              Plaintiff, In Propria Persona

Steve Wilson Briggs
4322 Chico Ave.,
Santa Rosa, CA 95407
510 200 3763
snc.steve@gmail.com
PLAINTIFF In Propria Persona

**UNITED STATES DISTRICT COURT,**

**NORTHERN DISTRICT OF CALIFORNIA,**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| STEVE WILSON BRIGGS<br><br>Plaintiff,<br><br>vs<br><br>KEVIN SPACEY;  et al | Civ No: 18-cv-04952-VC<br><br><br>**ERRATA** |

**ERRATA**

Having discovered errors in several of his recently filed oppositions and motions, the Plaintiff submits this Errata to correct and/or clarify the following mistakes:

1.  In the Plaintiff's Opposition captioned "**PLAINTIFF'S OPPOSITION TO DEFENDANT TRIGGER STREET PRODUCTIONS INC'S MOTION TO DISMISS,**" filed 11/19/2018, on page 17, line 12, the Plaintiff wrote: "Willful Suppression of Evidence and Spoliation are longer independent torts in California."

This statement should read: **"Willful Suppression of Evidence and Spoliation are <u>no</u> longer independent torts in California."**

2.  In the Plaintiff's Opposition captioned "**PLAINTIFF'S OPPOSITION TO MRC II DISTRIBUTION COMPANY LP'S, MORDECAI WICZYK'S, ASIF**

1  SATCHU'S,  SONY  PICTURES  ENTERTAINMENT  INC'S,  AND  ARIEL

2  EMANUEL'S MOTION TO DISMISS COMPLAINT," filed on 11/21/2018, on page 4,

3  line 8, it reads: "This argument is false and is not applicable to the Plaintiff's **surrent**

4  Action."

5          This line should read: "This argument is false and is not applicable to the

6  Plaintiff's **<u>current</u>** Action."

7

8          3.  In the aforementioned filing, page 4, line 11, in bold print, it states: "...**seek**

9  **to misguide the court the Court that no facts or evidence should be included in a**

10 **Complaint…"**  The words "the Court" appear twice sequentially and redundantly.

11          This line should be corrected to read: **"seek to misguide the Court that no**

12 **facts or evidence should be included in a Complaint…"**

13

14          4.  In the Plaintiff's Motion to Strike, captioned, "**PLAINTIFF'S MOTION**

15 **TO STRIKE DEFENDANT TRIGGER STREET PRODUCTIONS' MOTION TO**

16 **DISMISS PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND**

17 **AUTHORITIES**," filed on November 6, 2018, on page 4, line 13, it reads "But regardless

18 of these contentions, the writer's of Rule 7.1 unstood that—without such a law—most

19 corporate defendants (particularly those with secrets to hide) would ignore this law, then

20 claim ignorance, or harmless oversight."

21          This line should read: "But regardless of these contentions, the writer's of

21 Rule 7.1 <u>understood</u> that—without such a law—most corporate defendants (particularly

22 those with secrets to hide) **would not voluntarily make this reasonable, and minimal,**

23 **disclosure**."

24

25          5.  In the Plaintiff's Motion to Strike, captioned, "**PLAINTIFF'S NOTICE OF**

26 **MOTION AND MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS**

27 **SPACEY, BRUNETTI, DAMON, AFFLECK AND BLOMKAMP**," filed on December

28 4, 2018, on page 3, line 26, it reads: "It is also interesting to notice that the Defendant paid

1   $26.25 to send the refused package Express mail back to Plaintiff ( See Exhibit B ,

2   photo/scan of Refused Summons and Complaint)."

3           However, upon closer examination of the package and the stamp, it appears

4   that this stamp was placed on the envelope by the Plaintiff's **process server**. The package

5   was also not sent "*Express*" mail, but *Priority* mail.

6       ● This does not change the fact that Defendant Spacey refused the package, and

7   should therefore be defaulted. It just means the Defendants did not, themselves, pay to have

8   the package returned to the Plaintiff.

9

10   Dated:_____12/17/2018_____     Signed:_/s/_Steve Wilson Briggs_____
                                    Steve Wilson Briggs
11                                  Plaintiff, In Propria Persona

12

13

14

15

16

17

18

19

20

21

21

22

23

24

25

26

27

28

3
ERRATA

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing document, captioned **"ERRATA,"** by filing same with the Clerk of the Court for the United States District Court, Northern District Of California, San Francisco Division, by using the District's Pacer system on December 17, 2018.

Dated: December 17, 2018.              Signed:   /s/   Steve Wilson Briggs              
                                                             STEVE WILSON BRIGGS
                                                             Plaintiff, In Propria Persona

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
MICHAEL J. KUMP (SBN 100983)
  mkump@kwikalaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikalaw.com
KATE MANGELS (SBN 301811)
  kmangels@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Defendants
MRC II DISTRIBUTION COMPANY LP;
MORDECAI WICZYK; ASIF SATCHU;
SONY PICTURES ENTERTAINMENT INC.;
and ARIEL EMANUEL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE WILSON BRIGGS, | Case No. 3:18-cv-04952-VC |
| Plaintiff, | [Hon. Vince Chhabria] |
| vs. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) AND/OR 12(b)(1)** |
| KEVIN SPACEY; et al., | |
| Defendants. | Date:      December 13, 2018<br>Time:      10:00 a.m.<br>Crtrm.:   4 |

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**I.     INTRODUCTION**

In his opposition to the Motion to Dismiss, Plaintiff Steve Wilson Briggs ("Plaintiff") affirms a central argument of the opening motion, that his current action is an attempt to re-litigate his baseless claims which were denied in *Steve Wilson Briggs v. Neill Blomkamp, et al.,* N.D. Cal. Case No. 13-cv-4679-PJH (the "Infringement Action"). While Plaintiff places different labels on his causes of action, they are plainly improper attacks on the judgment in the Infringement Action that are barred by the collateral attack and res judicata doctrines. Notably, Plaintiff does not even try to deny that the only harm alleged in his Complaint is the infringement of his screenplay and the adverse ruling in the Infringement Action.  Plaintiff's claims should likewise be dismissed as he fails to address, much less rebut, the many deficiencies in the pleading of his claims. For the reasons discussed in the moving papers and below, Defendants MRC II Distribution Company LP ("MRC"); Mordecai Wiczyk; Asif Satchu; Sony Pictures Entertainment Inc; and Ariel Emanuel (collectively, the "Defendants") respectfully request that the claims against them—the First, Third through Eight, and Eleventh Causes of Action of the Complaint—be dismissed with prejudice.

**II.    ARGUMENT**

    **A.     The Collateral Attack Doctrine Applies**

Plaintiff contends that the collateral attack doctrine does not apply because his "Causes of Action" were not addressed in the Infringement Action. Plaintiff's assertions assume that the doctrine would only apply if the causes of action in the Infringement Action were identical to those asserted here. That is not the case.

Courts have upheld the collateral attack doctrine in cases such as this, which attack the judgment of a prior action through challenges to admitted evidence or testimony. In *Rinegard-Guirma v. Ocwen Loan Servicing, LLC*, 2016 WL 4257765 at *2, cited in Defendants' moving papers, the court dismissed plaintiff's complaint, noting that "any challenge to the admissibility of certain evidence" in a prior proceeding could not be raised.  In *Advocare Intern., L.P. v. Scheckenbach*, 2010 WL 2196449 at *2 (W.D. Wash. May 27, 2010), also cited in Defendants' moving papers, the court dismissed a claim alleging that "false testimony led to a fraudulent verdict." The causes of action in these cases were not identical to the causes of action litigated in

REPLY ISO MOTION TO DISMISS COMPLAINT

1    the prior underlying cases. Rather, they were designed to attack the merits of the prior

2    proceedings. But, the collateral attack doctrine applied.

3          Here too, Plaintiff's Complaint, as well as his opposition to the motion, is replete with

4    attacks directed at Defendants' discovery conduct in the Infringement Action and at allegations of

5    false testimony. For example, Plaintiff continues to challenge Defendants' supposed suppression

6    of evidence related to the development of *Elysium* and the supposed use of fraudulent testimony

7    from defense expert Jeff Rovin. *See, e.g.*, Plaintiff's Opposition ("Opp.") p. 5 (listing alleged

8    conspiracies to "commit Willful Suppression of Evidence" and to "make Intentional

9    Misrepresentations to the Court and to Plaintiff"); p. 7 (alleging that Defendants "hired a 'fixer'

10   *expert* to deceive the Court"); p. 8 (alleging Defendants made false representations "regarding the

11   reliability of their expert witness"). Thus, even in the course of opposing this motion and denying

12   that this case is a collateral attack, Plaintiff cannot help but concede that supposed wrongdoing in

13   the Infringement Action forms the basis for his claims.

14         Moreover, Plaintiff's citation to *Rein v. Providian Fin. Corp.*, 270 F.3d 895 (9th Cir. 2001)

15   is misplaced.  In *Rein*, the court found that the collateral attack doctrine did not apply to a

16   defendant when he had signed and filed an agreement, but it was "unaccompanied by any court

17   order." *Id.* at 900. In contrast, Plaintiff's claims in the Infringement Action have been finally

18   adjudicated against him.

19         In short, although Plaintiff attempts to repackage his claims under causes of action with

20   different labels, the fact is that Plaintiff is attempting a "horizontal appeal" from the ruling of

21   another district court, which is plainly barred by the collateral attack doctrine.

22         **B.     The Doctrine of Res Judicata Applies**

23         Plaintiff argues that res judicita does not apply because the parties are not identical, there

24   has been no judgment on the merits, and the "claims are not the same." Opp. p. 3-4. Again, that is

25   not the case.

26         There is indisputably a final judgment on the Infringement Action. The requirement of a

27   final judgment "is satisfied by a summary judgment dismissal which is considered a decision on

28   the merits for res judicata purposes." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 988 (9th

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1 Cir. 2005).

2       Plaintiff states that parties are not identical, but res judicata requires *privity* between the

3 parties, not *identicality*. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning*

4 *Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003). "Even when the parties are not identical, privity

5 may exist if there is substantial identity between parties, that is, when there is sufficient

6 commonality of interest." *Id*. at 1081 (internal quotations and citation omitted). As in the

7 Infringement Action, Plaintiff is again suing MRC, Sony Pictures and Blomkamp. Two of the

8 moving Defendants not named in the Infringement Action, Modi Wiczyk and Asif Satchu, are the

9 principals of MRC. *See* Complaint  ¶¶ 16-17. They are therefore in privity with MRC, a party to

10 the Infringement Action. The final moving Defendant, Ari Emanuel, is perhaps not in privity with

11 any of the defendants named in the Infringement Action, but the doctrine of "nonmutual collateral

12 estoppel" would apply in the alternative to preclude Plaintiff from re-litigating his failed copyright

13 claim against Mr. Emanuel. *See Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1078 (9th

14 Cir. 2007) (holding that for "nonmutual issue preclusion," it need only be shown that "the party

15 against whom issue preclusion is asserted was a party or in privity with a party to the prior

16 action").

17       While Plaintiff argues that the causes of action are new, the labels he attaches to his causes

18 of action are irrelevant. Res judicata applies where a plaintiff asserts "new" causes of action

19 which effectively seek to relitigate claims that were pursued and lost in prior proceedings. *See*

20 *Mpoyo*, 430 F.3d at 988. The "identity of claims" element of res judicata does not require that the

21 claims in the two cases at issue be styled identically and courts instead look at four criteria to

22 determine whether the same causes of action are being asserted. *Id.* These factors are: whether the

23 cases arise out of the "same transactional nucleus of facts"; whether rights established in the prior

24 judgment would be destroyed or impaired by the second action; whether the cases involve

25 infringement of the same right; and whether the cases would involve substantially the same

26 evidence. *Id*. For the reasons set forth in the moving papers, each of these factors demonstrates an

27 identity of claims.

28       The identity of claims is further illustrated in Plaintiff's opposition. Despite Plaintiff's

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1  claim that "the facts of this matter are entirely new and unrelated," (Opp. p. 3) *nearly every* fact

2  cited in the opposition relates to the Infringement Action. For example, three of the five alleged

3  conspiracies (Opp. p. 5), all instances of alleged fraud (Opp. p. 7), two of the four alleged false

4  representations (Opp. p. 8), and all examples of alleged spoliation (Opp. p. 9) relate to Defendants'

5  alleged conduct in the Infringement Action.

6       Lastly, Plaintiff's claim that this action is permissible under Federal Rule of Civil

7  Procedure 60 is clearly erroneous. A request to modify a judgment under Rule 60 would need to

8  be made with the court that heard the Infringement Action.  Fed. R. Civ. P. 60(b).  Further, any

9  such motion must be made within one year of the judgment, and is thus time-barred. Fed. R. Civ.

10  P. 60(c)(1). Of course, the fact that Plaintiff attempts to rely upon Rule 60, which allows one to

11  seek relief "from a final judgment, order, or proceeding," is yet further evidence that Plaintiff is

12  collaterally attacking the result in the Infringement Action through the filing of this case.

13      **C.**    **Plaintiff's Claims Are Inadequately Pled**

14       Defendants' moving papers demonstrated that the Complaint fails to state a claim under

15  the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v.*

16  *Iqbal*, 556 U.S. 662 (2009). Plaintiff's opposition fails to show otherwise.

17       To start, Plaintiff misconstrues Defendants' argument, stating that Defendants' "seek to

18  misguide the court . . . that no facts or evidence should be included in a Complaint." Opp. at 4.

19  Obviously, Defendants do *not* argue that dismissal is warranted because Plaintiff has violated Rule

20  8(a) by including too many facts. Rather, Defendants argue for dismissal on the basis that Plaintiff

21  has failed to set forth any facts that are *salient*, and which, if true, would establish Defendants'

22  liability for the causes of action alleged.

23       Plaintiff makes arguments in support of his Second, Ninth, and Tenth Causes of Action.

24  Opp. at 5-6, 9. Because these are not pled against Defendants, Defendants do not address them

25  here.[1] To the extent that Plaintiff attempts to tether these Causes of Action to his Conspiracy

26  

27      [1] Plaintiff failed to address Defendants' arguments for dismissal of his Eleventh Cause of
Action for an accounting, and therefore, that claim is not addressed here.

28  

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

4      3:18-cv-04952-VC

REPLY ISO MOTION TO DISMISS COMPLAINT

1   Cause of Action, "bare assertion[s] of a conspiracy will not suffice," *Twombly*, 550 U.S. at 556,

2   nor will a "conclusory allegation of agreement at some unidentified point." *Id.* at 557.

3       **1.    The First Cause Of Action For Civil Conspiracy**

4           As shown in Defendants' moving papers, a claim for conspiracy is not an independent

5   cause of action, which Plaintiff concedes. Opp. p. 5. Additionally, Plaintiff fails to cite any facts

6   which support a plausible claim that the moving Defendants were involved in any conspiracy

7   related to triggerstreet.com. In fact, Plaintiff concedes several times in his opposition that he

8   cannot prove the role of moving Defendants in relation to his triggerstreet.com allegations. *See*

9   Opp. p. 6, 9.

10          Plaintiff demonstrates that his conspiracy claim is an attempt to attack the adverse

11  judgment in the Infringement Action. *See* Opp. p. 5 (alleging conspiracies to commit willful

12  suppression of evidence; make intentional misrepresentations to the court and the plaintiff; and to

13  commit spoliation of evidence). Moreover, Plaintiff fails to explain what harm he is seeking to

14  remedy other than harm stemming from the adverse judgment in the Infringement Action.

15      **2.    The Third Through Fifth Causes Of Action For Fraud, Fraudulent**

16              **Deceit, And Fraudulent Concealment**

17          Regarding the third through fifth cases of action for fraud, deceit, and concealment,

18  Plaintiff's opposition does not rebut the failure to plead fraud with the particularity required under

19  Fed. R. Civ. P. 9(b). Plaintiff further fails to allege any facts to support that Plaintiff suffered harm

20  apart from being damaged by an adverse judgment in the Infringement Action. Plaintiff repeatedly

21  points to Defendants' alleged hiring of an expert to make false testimony and other alleged

22  discovery abuses in the Infringement Action. *See* Opp. p. 7-8. This provides further support for

23  Defendants' argument in the moving papers that Plaintiff's fraud claims must fail under the

24  collateral attack and res judicata doctrines.  *See Advocare*, 2010 WL 2196449 at *2 (A claim that

25  "false testimony led to a fraudulent verdict is an attack on the merits of the prior proceeding.").

26          Plaintiff's opposition provides no support for the claim that moving Defendants made any

27  false statements *to him*. His general reliance on alleged false representations "to the Court and/or

28  to the public" do not suffice to allege any duty owed to him by Defendants.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1

2

### 3.   The Sixth and Seventh Causes Of Action For Negligence And Gross Negligence

3   On the sixth and seventh causes of action for negligence, the opposition does not address,

4   let alone rebut, that the Complaint failed to plead facts supporting that Defendants owed a duty to

5   Plaintiff or breached that duty. Nor does Plaintiff state any cognizable harm these alleged breaches

6   of duty caused him. Rather, Plaintiff merely restates his allegations that Defendants engaged in

7   negligent actions related to their business and creation of *Elysium*.

8

9

### 4.   The Eighth Cause Of Action For Willful Suppression Of Evidence/ Spoliation Of Evidence

10   Plaintiff's eighth claim must fail because there is *no* civil cause of action for spoliation of

11   evidence. In *Cedars-Sinai Medical Center v. Superior Court*, 18 Cal.4th 1, 11 (1998), the

12   California Supreme Court declined to recognize an independent remedy for the intentional

13   spoliation of evidence, in part to uphold the "prohibition against attacking adjudications on the

14   ground that evidence was falsified or destroyed." Plaintiff's opposition makes clear that his

15   Complaint is just the sort of attack the Supreme Court sought to prevent. Each of the examples of

16   alleged spoliation set forth by Plaintiff concern actions allegedly taken by Defendants in the

17   Infringement Action. Opp. at 9.

18   Plaintiff's reliance on CACI No. 204 is misplaced. *Cedars-Sinai* addresses the jury

19   instruction as an example of one of the existing "nontort remedies that seek to punish and deter the

20   intentional spoliation of evidence," noting a "strong policy favoring use of nontort remedies rather

21   than derivative tort causes of action to punish and correct litigation misconduct." 18 Cal.4th at 11-

22   12.

23   Finally, even if this cause of action was cognizable, which it is not, Plaintiff fails to cite

24   any facts in the Complaint which support a plausible claim that Defendants engaged in spoliation.

25   Particularly in relation to Plaintiff's claims of spoliation regarding triggerstreet.com, there are no

26   facts pled whatsoever to support that Defendants had anything to do with the website. Plaintiff's

27   "naked assertions" of a conspiracy involving all defendants do not suffice. *Iqbal*, 556 U.S. at 678.

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**III.**   **CONCLUSION**

For all the reasons set forth above and in the moving papers, Defendants respectfully request that the Court grant their Motion and dismiss the Complaint in its entirety.

DATED: November 30, 2018          KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

By:    _/s/ Gregory Korn_
        Gregory Korn
        Attorneys for Defendants MRC II DISTRIBUTION
        COMPANY LP; MORDECAI WICZYK; ASIF
        SATCHU; SONY PICTURES ENTERTAINMENT
        INC.; and ARIEL EMANUEL

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  KELLI L. SAGER (State Bar No. 120162)
   kellisager@dwt.com
2  ROCHELLE L. WILCOX (State Bar No. 197790)
   rochellewilcox@dwt.com
3  BRENDAN N. CHARNEY (State Bar No. 293378)
   brendancharney@dwt.com
4  DAVIS WRIGHT TREMAINE LLP
   865 South Figueroa Street, Suite 2400
5  Los Angeles, California 90017
   Telephone:   (213) 633-6800
6  Facsimile:   (213) 633-6899

7  Attorneys for Defendant
   NBCUNIVERSAL MEDIA, LLC

8

9

              IN THE UNITED STATES DISTRICT COURT

10

            THE NORTHERN DISTRICT OF CALIFORNIA

11

                SAN FRANCISCO DIVISION

12

13

14  STEVE WILSON BRIGGS,                           Case No. 18-cv-4952

           Plaintiff,                       [Hon. Vince Chhabria]
15
      v.                                        **REPLY MEMORANDUM OF POINTS**
16                                                 **AND AUTHORITIES IN SUPPORT OF**
   KEVIN SPACEY; ARI (ARIEL) EMANUEL;            **NBCUNIVERSAL MEDIA, LLC'S**
17  MATT DAMON; BEN AFFLECK;                       **MOTION TO DISMISS COMPLAINT**
   NBCUNIVERSAL MEDIA, LLC; SONY
18  PICTURES ENT. INC.; TRIGGER STREET            Date:     December 20, 2018
   PRODUCTIONS; NEILL BLOMKAMP; ASIF             Time:    10:00 a.m.
19  SATCHU; MORDECAI (MODI) WICZYK;               Crtrm:    4
   WILLIAM (BILL) BLOCK; DANA
20  BRUNETTI; SOUND POINT CAPITAL
   MANAGEMENT, LC; MRC (and all MRC
21  entities and subs.),
22
           Defendants.
23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................... 1

II. THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 8(A). .................................... 2

III. PLAINTIFF CANNOT REVIVE HIS PRIOR LAWSUIT BY STYLING THE
    SAME REQUEST FOR RELIEF FOR CLAIMED INFRINGEMENT AS "NEW
    CAUSES OF ACTION" FOR CONSPIRACY AND NEGLIGENCE. ............................. 3

IV. ALL OF THE PURPORTED CAUSES OF ACTION AGAINST NBCU SHOULD
    BE DISMISSED UNDER RULE 12(B)(6). .................................................................. 5

    A.    Plaintiff Cannot Satisfy The <u>Twombly</u> And <u>Iqbal</u> Requirements. ........................... 5

    B.    The Complaint Is Time Barred as Against NBCU..................................................... 7

    C.    Plaintiff Concedes That Conspiracy Is Not A Cause of Action, And
        Eviscerates The Factual Basis For The Alleged Conspiracy. .................................. 9

    D.    Because Plaintiff Cannot Demonstrate Entitlement To Relief, No
        Accounting Is Warranted. ........................................................................................ 10

V. CONCLUSION ..................................................................................................... 10

i

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

Ashcroft v. Iqbal,
5
    556 U.S. 662 (2009) .................................................................................. 7

6

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) ............................................................................... 5, 7

7

Briggs v. Blomkamp,
8
    70 F. Supp. 3d 1155 (N.D. Cal. 2014) ................................................... 1

9

Buckey v. County of Los Angeles,
10
    968 F.2d 791 (9th Cir. 1992).................................................................. 7

11

Cedars-Sinai Med. Ctr. v. Superior Court,
    18 Cal. 4th 1 (1998)................................................................................ 9

12

Daskalakis v. FBI,
13
    No. 4:10-CV-221-BLW, 2011 WL 1900439 (D. Idaho Apr. 28, 2011) ................................. 7

14

Dydzak v. United States,
15
    No. 17-cv-04360-EMC, 2017 WL 4922450 (N.D. Cal. Oct. 31, 2017).................................... 4

16

Harper v. City of Monterey,
    No. 11-cv-02903-LHK, 2012 U.S. Dist. Lexis 7712 (N.D. Cal. Jan. 23, 2012) ..................... 5

17

Jolley v. Chase Home Fin., LLC,
18
    213 Cal. App. 4th 872 (2013).............................................................. 10

19

Labonte v. Governor of California,
    No. EDCV 13-1204-VAP (MAN), 2014 WL 1512229 (C.D. Cal. Apr. 14,
20
    2014)........................................................................................................ 7

21

Mitchell v. Routh Crabtree Olsen, P.S.,
22
    No. C 11-03577 JSW, 2012 WL 2792360 (N.D. Cal. July 9, 2012)........................................ 7

23

Nevijel v. North Coast Life Ins. Co.,
    651 F.2d 671 (9th Cir. 1981)................................................................. 2

24

Norgart v. Upjohn Co.,
25
    21 Cal. 4th 383 (1999)............................................................................ 8

26

Rein v. Providian Fin. Corp.,
27
    270 F.3d 895 (9th Cir. 2001)............................................................. 4, 5

28

DAVIS WRIGHT TREMAINE LLP

ii

Rinegard-Guirma v. Ocwen Loan Servicing, LLC,
    No. 3:16-cv-01036-HZ, 2016 WL 4257765 (D. Or. Aug. 10, 2016) ....................................... 5

Snow v. A. H. Robins Co.,
    165 Cal. App. 3d 120 (1985) ................................................................................................. 8

State of Cal. ex rel. Metz v. CCC Info. Svcs., Inc.,
    149 Cal. App. 4th 402 (2007) ................................................................................................ 6

Stewart v. U. S. Bancorp,
    297 F.3d 953 (9th Cir. 2002) ................................................................................................. 5

Temple Cmty. Hosp. v. Superior Court,
    20 Cal. 4th 464 (1999) ..................................................................................................... 9, 10

Uptergrove v. United States,
    No. 1:08-CV-01800-OWW-SMS, 2009 WL 1035231 (E.D. Cal. Apr. 17,
    2009) ..................................................................................................................................... 4

Woodrum v. Woodward County,
    866 F.2d 1121 (9th Cir. 1989) ............................................................................................... 7

**Rules**

Federal Rule of Civil Procedure
    8 ........................................................................................................................................... 2
    8(a) ....................................................................................................................................... 2
    8(a)(2) ................................................................................................................................... 2
    8(e) ....................................................................................................................................... 2
    12(b)(6) ................................................................................................................................. 1
    41(b) ..................................................................................................................................... 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAVIS WRIGHT TREMAINE LLP

REPLY ISO MOTION TO DISMISS
Case No. 17-cv-4952-VC
4845-7117-9393v 9 0020040-000144

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Plaintiff's Opposition to NBCUniversal Media, LLC ("NBCU")'s Motion to Dismiss does little to clarify the Complaint's bizarre allegations, but it does eliminate any doubt that this lawsuit aims to resurrect the claims and request for relief rejected in Briggs v. Blomkamp, 70 F. Supp. 3d 1155 (N.D. Cal. 2014).  Indeed, Plaintiff admits that his claims against other defendants sound in "[i]nfringement" and evidentiary "[s]uppression" — all while disclaiming that any of these causes are brought against NBCU.  Opp. at 7.  In this respect, the self-contradictory Opposition underscores the reasons the Motion to Dismiss should be granted.

First, the Complaint must be dismissed for failure to intelligibly assert any wrongful conduct as to NBCU.  Plaintiff has not identified a single allegedly negligent act by NBCU that could possibly give rise to a claim.  Section II, infra.

Second, dismissal also is compelled because Plaintiff did not — and cannot — explain how this lawsuit is anything other than an improper horizontal appeal of the dismissal of his claims in prior lawsuits.  Section III, infra.

Third, the Opposition does not present any factual or legal grounds to save the Complaint from dismissal under Rule 12(b)(6) for failure to state a claim.  The outlandish theory that Plaintiff purports to explain in his Opposition — which has nothing to do with NBCU — is premised on rank speculation and unfounded conclusions, which do not meet the requisite plausibility standard.  Section IV.A, infra.  While this central defect dooms the Complaint, the Opposition also fails to remedy the Complaint's other flaws.  Specifically, while Plaintiff defends the timeliness of the Complaint by arguing delayed discovery of the claimed wrong, the Complaint's specific allegations make clear that Plaintiff knew or should have known of his claims well before the applicable two-year period prior to filing the Complaint.  Section IV.B, infra.  Plaintiff does not even attempt to respond to authority holding that the conspiracy claim is precluded by the Copyright Act, instead disclaiming any alleged infringement by NBCU, which again underscores that NBCU is not even alleged to have done anything wrongful.  Section IV.C,

DAVIS WRIGHT TREMAINE LLP

1

1    infra.  Finally, Plaintiff cannot salvage his defective claim for an accounting by emphasizing the

2    "complex[ity]" of his pleading.  The remedy of an accounting requires a right to relief, which

3    Plaintiff has failed to establish, given the Complaint's failure to intelligibly and plausibly allege

4    that NBCU did anything wrong.  Section IV.D, infra.

5         Because Plaintiff did not and cannot allege any facts to support any claim against NBCU

6    — and because he already has had three opportunities to try — his lawsuit against NBCU should

7    be dismissed in its entirety, without leave to amend.

8                                              **II.**

9              **THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 8(A).**

10        As NBCU explains in its Motion To Dismiss, Plaintiff's Complaint violates the

11   requirement under Federal Rule of Civil Procedure 8 that his complaint contain a "short and

12   plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.

13   8(a)(2).  It is undisputed that a "complaint which fails to comply with rules 8(a) and 8(e) may be

14   dismissed with prejudice pursuant to rule 41(b)."  See ECF No. 48 ("Mot.") at 5, citing Nevijel v.

15   North Coast Life Ins. Co., 651 F.2d 671, 673 (9th Cir. 1981).

16        Plaintiff's response to this argument is to simply cut and paste portions of the Complaint

17   and insist that these excerpts show that NBCU somehow acted negligently.  Opp. at 2-3.  The

18   excerpts, however, allege nothing beyond the facts that NBCU hired Mordecai Wiczyk in 2000;

19   has worked with well-known talent agent Ari Emmanuel; distributed motion pictures starring

20   Kevin Spacey almost two decades ago; and distributed the hit film Fifty Shades of Grey.  Id.

21   From these benign facts, unrelated in any way to the relief Plaintiff seeks, he makes attenuated

22   claims about an unexplained "conspiracy," without ever identifying a single wrongful act

23   purportedly committed by NBCU.

24        Indeed, in purporting to elucidate his claims, Plaintiff contradicts himself, dragging the

25   parties and the Court ever deeper through the looking glass.  Most significantly, Plaintiff

26   advances contradictory and inconsistent theories, alleging in one section of the Opposition that

27   the alleged conspiracy was intended to "misappropriate screenplays … using [NBCU] as the

28   distributor" (Opp. at 3) and in another section insisting that the Complaint makes "no Copyright

DAVIS WRIGHT TREMAINE LLP

2

1   Infringement claims against NBCU" and that [n]owhere in the Complaint is [v]icarious (or

2   [c]ontributory) liability or infringement contemplated." Opp. at 7 (original emphasis omitted).

3   Moreover, Plaintiff's attempt to explain NBCU's role in the purported conspiracy only muddles

4   his theory; for instance, Plaintiff posits that one defendant was both a malfeasor and victim of the

5   alleged conspiracy, contending that "Defendants" (which includes Defendant Sony Pictures)

6   "used Universal Pictures to mislead even their business partner, Sony Pictures." This absurdity

7   encapsulates the incoherency of the Complaint.

8       At bottom, Plaintiff does not explain, because he cannot, how NBCU's alleged

9   negligence in hiring and business relationships, or its production or distribution of unrelated

10  films, could have resulted in the alleged harms of infringement of Plaintiff's screenplay or

11  frustration of his prior lawsuit.[1]  Plaintiff has now had three opportunities to advance an

12  intelligible theory of cognizable legal wrong; he has thrice failed to do so. His Complaint should

13  be dismissed with prejudice.

**III.**
**PLAINTIFF CANNOT REVIVE HIS PRIOR LAWSUIT BY STYLING THE SAME**
**REQUEST FOR RELIEF FOR CLAIMED INFRINGEMENT AS "NEW CAUSES OF**
**ACTION" FOR CONSPIRACY AND NEGLIGENCE.**

17      Plaintiff admits that the Complaint asserts (against defendants other than NBCU) the

18  same claims for infringement that Plaintiff brought in the Prior Universal Action (Opp. at 3, 7)

19  — which in turn merely rehash the same relief Plaintiff sought in the Prior Blomkamp Action

20  (see Mot. at 4).  Indeed, Plaintiff states that the alleged conspiracy was aimed "to create a

21  screenwriter/filmmaker social network — TriggerStreet.com … to misappropriate screenplays …

22  using [NBCU] as the distributor." Opp. at 3.  Plaintiff also admits that the Complaint's

23  conspiracy claim seeks to recover damages for the "willful suppression of evidence" in

24  connection with the Prior Blomkamp Action (Opp. at 7; see also Complaint at ¶¶ 24-25).

25      Attempting to evade the conclusion that these copyright and spoliation claims seek to

---

[1] Indeed, Plaintiff's effective concession that NBCU is alleged to have acted only negligently (or grossly so), Opp. at 3-4, makes clear that NBCU could not have conspired to commit intentional acts of infringement or spoliation, see id. at 7.

REPLY ISO MOTION TO DISMISS
Case No. 17-cv-4952-VC
4845-7117-9393v 9 0020040-000144

DAVIS WRIGHT TREMAINE LLP

1    revive his prior lawsuit, Plaintiff argues that the current lawsuit includes "causes of action" that

2    "were not addressed" in a prior judgment, citing to Rein v. Providian Fin. Corp., which held that

3    the collateral attack doctrine does not apply when a party's claims "were never addressed by a

4    prior order or judgment."  Opp. at 4 (citing 270 F.3d 895, 902 (9th Cir. 2001)). But Rein is

5    inapposite here.  In that case, five different bankruptcy debtors joined together to sue a creditor

6    for previously seeking to recover a debt in their respective bankruptcy proceedings.  Id. at 897-

7    98.  One debtor had settled after receiving the creditor's demand – before the creditor pursued

8    adversary proceedings – by an agreement that was not court-approved; the others were sued and

9    then entered into court-approved settlements with the creditor.  Id. at 898.  The court held that

10   the claims by the debtors whose settlements had received court approval were barred by res

11   judicata because those claims could have been raised in the adversary proceedings.  Rein, 270

12   F.3d at 898-99, 902-04.  The passage cited by Plaintiff, however, concerned the remaining party.

13   He had settled the matter early and "as a consequence, no adverse proceeding ever was instituted

14   against him."  Id. at 898-99, 901-02.[2]  It is for that reason that his claims "were never addressed

15   by a prior order or judgment."  Id.  In other words, Plaintiff could invoke the cited language from

16   Rein only if he had never brought the prior action.  However, he did, and cannot relitigate it now.

17          In addition to the "infringement" and "spoliation" claim that Plaintiff concedes[3] underlay

18   his claims against other defendants, the "new" causes of action alleged against NBCU (i.e.,

19   negligence and gross negligence) still seek to recover for the same purported damages sought in

20   the prior action.  See Complaint at ¶¶ 239, 244 (alleging that, as a result of Defendants' alleged

21   negligent conduct, "Plaintiff's judicial process was subverted and denied" and seeking damages

22   for this claimed injury).  None of these claims avoid collateral estoppel.  Allegations of litigation

23   misconduct must be raised through the "normal appellate process," not a horizontal appeal.

24   Dydzak v. United States, No. 17-cv-04360-EMC, 2017 WL 4922450, at *7 (N.D. Cal. Oct. 31,

25   _____

26   [2] Plaintiff ignores the other cases cited in the Motion, including a case that is virtually on
     all fours with the case at hand.  Uptergrove v. United States, No. 1:08-CV-01800-OWW-SMS,
27   2009 WL 1035231, at *1, *2 (E.D. Cal. Apr. 17, 2009) (dismissing case as improper "horizontal
     appeal" where plaintiff sought to invalidate adverse ruling in prior case by arguing that opposing
28   litigants "intentionally omitted [and] excluded ... evidence ..." in the prior case).

     [3] Compare Opp. at 3 with Opp. at 7.

4

DAVIS WRIGHT TREMAINE LLP

1   2017).  And a district court is "without authority to revisit issues that were previously decided in

2   another district court case," i.e., the outcome of Plaintiff's copyright claims in the prior action,

3   and the discovery and evidentiary issues involved in those proceedings.  Rinegard-Guirma v.

4   Ocwen Loan Servicing, LLC, No. 3:16-cv-01036-HZ, 2016 WL 4257765 at *3 (D. Or. Aug. 10,

5   2016).  Plaintiff cannot evade these basic principles by embellishing his previously-dismissed

6   copyright claim with a fantastical conspiracy theory involving "new" parties that have nothing to

7   do with the underlying conduct or any of the claims being asserted.[4]  Plaintiff's transparent

8   attempt to revive the Prior Blomkamp Action — after the Ninth Circuit and the U.S. Supreme

9   Court affirmed its dismissal — must be rejected.

**IV.**
**ALL OF THE PURPORTED CAUSES OF ACTION AGAINST NBCU**
**SHOULD BE DISMISSED UNDER RULE 12(B)(6).**

12      Plaintiff's Opposition provides no basis for any of the claims alleged against NBCU to

13   proceed.  Instead, Plaintiff merely restates the federal pleading standard requiring plausibility

14   without explaining how the Complaint's ludicrous allegations could ever meet this standard.

15   Plaintiff also contradicts the allegations of his very own Complaint in arguing his claims are

16   timely; pulls the rug out from under his conspiracy, negligence, and accounting claim by

17   conceding that NBCU did nothing to infringe his screenplay or to frustrate the Prior Universal

18   Action (Opp. at 8); and misstates the law that applies to his conspiracy and spoliation claims.

19      **A.      Plaintiff Cannot Satisfy The Twombly And Iqbal Requirements.**

20      Attempting to defend the plausibility of the Complaint, Plaintiff merely restates the

21   federal pleading standard, and concludes, correctly, that the Court may decide whether the claims

22   are plausible or not.  Opp. at 5.  Under this standard, Plaintiff's claims are manifestly

---

23      [4] In fact, principles of claim preclusion (which inform the broader doctrine of collateral
24   attack), apply to "'any claims that were raised or could have been raised' in a prior action."
     Stewart v. U. S. Bancorp, 297 F.3d 953, 956 (9th Cir. 2002) (emphasis added).  Thus, res
25   judicata generally will apply when the second suit involves "infringement of the same right" and
     "arises out of the same transaction or nucleus of facts."  Rein, 270 F.3d at 903.  A disappointed
26   litigant may not avoid preclusion merely by randomly naming new parties in the second suit – as
     Plaintiff seeks to do here – because "under California claim preclusion rules, the only identity of
27   parties required is the identity of the party against whom preclusion is sought."  Harper v. City of
     Monterey, No. 11-cv-02903-LHK, 2012 U.S. Dist. Lexis 7712, at *14 (N.D. Cal. Jan. 23, 2012)
28   (emphasis added).  That is Plaintiff – not any of the Defendants.

5

DAVIS WRIGHT TREMAINE LLP

1   implausible, even if extraordinary generosity is accorded to the Complaint and the Opposition's

2   attempt to crystalize its allegations.  See Opp. at 2-4.  Plaintiff's theory of liability against

3   NBCU consists of the following disjointed chain of events, which Plaintiff attempts to connect

4   with pure surmise and circular reasoning:

5       • Universal Pictures allegedly hired Mordecai Wiczyk in 2000;

6       • Wiczyk was then allegedly "stole[n]" away by Ari Emanuel;

7       • Universal Pictures supposedly produced the film KPAX starring Kevin Spacey[5];

8       • Universal Pictures produced the film The Life of David Gale starring Kevin Spacey;

9       • Universal Pictures purportedly "likely" wouldn't distribute another film starring

10         Kevin Spacey;

11       • Universal Pictures allegedly worked with Media Rights Capital to distribute films;

12       • Universal Pictures distributed the film Fifty Shades of Grey, produced by Dana

13         Brunetti;

14       • Universal Pictures distributed the film Steve Jobs; and

15       • Universal Pictures was discussed in the press as a potential distributor for the film

16         Elysium (but did not end up distributing the film).

17   Opp. at 3-4.  But none of these facts provide even conjectural support for Plaintiff's absurd

18   theory that the Defendants conspired to misappropriate Plaintiff's (and others') screenplays and

19   frustrate the Prior Blomkamp Action.  Olympic-record-sized leaps of inference (paired with

20   conclusory references to all "defendants" without any attempt to identify conduct by NBCU), fail

21   to meet the standard for pleading a conspiracy.

22         To impose liability for an underlying tort based on a theory of conspiracy in California,

23   the plaintiff "must allege the formation and operation of the conspiracy, the wrongful act or acts

24   done pursuant to it, and the damage resulting from such acts.  In making such allegations bare

25   legal conclusions, inferences, generalities, presumptions, and conclusions are insufficient."

26   State of Cal. ex rel. Metz v. CCC Info. Svcs., Inc., 149 Cal. App. 4th 402, 419 (2007) (emphasis

27

DAVIS WRIGHT TREMAINE LLP

28   [5] Contrary to Plaintiff's claims, NBCU did not produce K-PAX.  See K-PAX, Company Credits, available at http://www.imdb.com/title/tt0272152/companycredits?ref_=tt_dt_co.

1   added) (internal citations omitted) (allegations that parties "conspired to conceal their improper

2   loss valuations" amounted to "bare legal conclusions"; affirming grant of demurrer); see also

3   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) ("a conclusory allegation of agreement at

4   some unidentified point" does not establish conspiracy); Buckey v. County of Los Angeles, 968

5   F.2d 791, 794 (9th Cir. 1992) (complaint must "allege specific facts to support the existence of a

6   conspiracy among the defendants"); Woodrum v. Woodward County, 866 F.2d 1121, 1126 (9th

7   Cir. 1989) ("allegations of conspiracy must be supported by material facts, not merely

8   conclusory statements").

9          Faced with such outlandish claims, this Court may "draw on its judicial experience and

10   common sense" to dismiss them as inherently implausible.  Ashcroft v. Iqbal, 556 U.S. 662, 679

11   (2009); see also, e.g., Labonte v. Governor of California, No. EDCV 13-1204-VAP (MAN),

12   2014 WL 1512229, at *6 (C.D. Cal. Apr. 14, 2014) (allegations that multiple law enforcement

13   officers and public officials conspired to fabricate speeding tickets against plaintiff were

14   "inherently implausible"); Mitchell v. Routh Crabtree Olsen, P.S., No. C 11-03577 JSW, 2012

15   WL 2792360, at *3 (N.D. Cal. July 9, 2012) ("[a]lthough Plaintiff uses the proper words in an

16   effort to create such a conspiracy, the Court finds that the allegations are merely conclusory legal

17   allegations and are inherently implausible"); Daskalakis v. FBI, No. 4:10-CV-221-BLW, 2011

18   WL 1900439, at *2, *5, *6 *7  (D. Idaho Apr. 28, 2011) ("speculative" and "outlandish"

19   allegations of conspiracy "do not meet Iqbal 's standard of plausibility"), report and

20   recommendation adopted, No. 4:10-CV-221-BLW, 2011 WL 1990661 (D. Idaho May 19, 2011).

21          Plaintiff's allegations are conclusory, outlandish, and implausible.  For all of these

22   reasons, Plaintiff's latest attempt to elucidate his claims fails to clear the Iqbal hurdle.

23      **B.      The Complaint Is Time Barred as Against NBCU.**

24          Plaintiff attempts to rescue his negligence claim[6] by arguing that "virtually all" of the

25

26          [6] The Opposition also defends the timeliness of breach-of-contract, fraud, infringement,
   and spoliation claims (Opp. at 6-7), but none of these claims are alleged against NBCU and so
27   they are not addressed here.  Because Plaintiff has clarified that the conspiracy claim against
   NBCU sounds only in negligence, not infringement or spoliation (Opp. at 7-8), NBCU addresses
28   only the timeliness of a negligence claim.

7

DAVIS WRIGHT TREMAINE LLP

1  claim was "unearthed" between March and November of 2017 — i.e., when Plaintiff filed the

2  Complaint in the Prior Universal Action, see 17-cv-6552, ECF No. 1 — and that the claim did

3  not accrue until Plaintiff felt he had "learn[ed]" of the allegedly negligent conduct.  Opp. at 6.[7]

4  Under the discovery rule, however, a claim accrues not when the plaintiff subjectively discerns

5  the allegedly wrongful conduct, but when the plaintiff has "notice or information of

6  circumstances to put a reasonable person on inquiry," i.e., when the plaintiff "at least suspects a

7  factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof —

8  when, simply put, he at least 'suspects ... that someone has done something wrong' to him."

9  Norgart v. Upjohn Co., 21 Cal. 4th 383, 397 (1999).  Here — although it is difficult to

10  understand the chain of facts that supposedly make up Plaintiff's negligence claim — Plaintiff's

11  allegations show that he discovered the purported factual basis for his negligence theory well

12  before the two-year period prior to the filing of the Complaint.  Therefore, the claims are outside

13  Section 339's two-year statute of limitations (which Plaintiff concedes applies).  Specifically:

14  - The only actions by NBCU that are alleged to have been negligent were well-known

15    entertainment business transactions entered into between 2000-2011, and distribution

16    of films that were widely publicized and released no later than 2015.  Opp at 2-3.

17  - Plaintiff discovered the allegedly negligent hiring of Jeff Rovin — the expert witness

18    in the Prior Blomkamp Action — no later than June 12, 2014, the date that Plaintiff

19    admits he "moved the court to exclude Rovin's expert report," on the purported

20    grounds that "Rovin had falsified citations and fabricated evidence to substantiate his

___

21  [7] While the Opposition does not explicitly assert fraudulent concealment as a ground to

22  find the negligence claim against NBCU timely (Opp. at 6), to the extent references to fraudulent
concealment in other sections of the Opposition could be read to apply to the claims against

23  NBCU, the claims still are untimely because fraudulent concealment tolls concealed claims only
"until the discovery of facts constituting fraud."  Snow v. A. H. Robins Co., 165 Cal. App. 3d

24  120, 125, 134 (1985) (holding that fraud claim was tolled only until "reports of alleged fraud
became public").  In particular, Plaintiff claims that the last act in the claimed conspiracy was to

25  "clos[e] and destroy[ ] the [TriggerStreet] social network" in November of 2014 in order to
conceal breaches of contract.  But any fraudulent concealment ended, at the latest, when Plaintiff

26  "first learned of [TriggerStreet.com]'s closure around March of 2016," Complaint at ¶ 24, 238.F-
H — or perhaps as early as the publication of public reports of TriggerStreet's closing in the fall

27  of 2014, see Complaint Exh. D.  Because Plaintiff failed to bring the negligence claims within

28  two years after learning of the allegedly concealed negligence, the claims are barred.

8

DAVIS WRIGHT TREMAINE LLP

1    own claims."  Complaint ¶¶ 182, 238.C, Exh. HH.

2    • Plaintiff asked TriggerStreet.com for records of individuals who accessed his work on

3      April 15, 2014, and received a response disclosing TriggerStreet's deletion of access

4      records on the same day.  Complaint at ¶ 30, Exhs. E, F.

5    • Plaintiff first learned of [TriggerStreet.com]'s closure around March of 2016" — the

6      same time he became "alarmed that Spacey had gone to Spain to discuss

7      [TriggerStreet.com], as this was a violation of [TriggerStreet.com]'s Terms of Use."

8      Complaint at ¶ 24, 238.F-H.

9    Because the very allegations of and exhibits to the Complaint make clear that Plaintiff

10   discovered the alleged facts underlying his negligence cause of action more than two years

11   before he filed suit on August 15, 2018, the discovery rule will not save the negligence claim.

12   **C.       Plaintiff Concedes That Conspiracy Is Not A Cause of Action, And**

13   **Eviscerates The Factual Basis For The Alleged Conspiracy.**

14   Plaintiff concedes, as he must, that California does not recognize civil conspiracy as an

15   independent cause of action.  Opp. at 8.  The conspiracy claim must be dismissed for that reason.

16   Moreover, the Opposition hollows out the factual basis of any conspiracy theory

17   concerning NBCU, making clear that Plaintiff does not allege any wrongful conduct that — even

18   if true — could justify relief against NBCU.  As discussed above, in attempting to clarify the

19   allegations of the Complaint, Plaintiff focuses on well-known — and benign — transactions and

20   business relationships in Hollywood.  See Opp. at 2-3.  None of Plaintiff's attempts to clarify his

21   allegations relate to anything that could be deemed wrongful.  Specifically, **Plaintiff has**

22   **confirmed that none of the allegations against NBCU relate to alleged spoliation in the**

23   **Prior Blomkamp Action** (see Opp. at 2-4),[8] and also that "[f]raud and [s]uppression have been

24

25   [8] Because Plaintiff has not alleged a spoliation claim against NBCU, NBCU need not
     address Plaintiff's misplaced argument that the decision in Cedars-Sinai Med. Ctr. v. Superior
     Court, 18 Cal. 4th 1, 17 (1998), left open the availability of a tort remedy for "third party"

26   spoliation.  Opp. at 9-10.  In any event, Plaintiff ignores the California Supreme Court's
     subsequent decision, Temple Cmty. Hosp. v. Superior Court, 20 Cal. 4th 464 (1999), in which it

27   held that "no tort cause of action will lie for intentional third party spoliation of evidence."  Id. at
     466.[8]  In so holding, the Court identified "many of the same considerations" that led to its

28   decision in Cedars Sinai, including the Court's concern that "the same endless spiral of lawsuits

9

DAVIS WRIGHT TREMAINE LLP

1   alleged only against certain of the Defendants" not including NBCU (see Complaint at ¶¶ 245-

2   251). This concession is a rare moment of sense in Plaintiff's submissions, given that NBCU

3   had nothing to do with the Prior Blomkamp Action. See, e.g., Judgment, Briggs v. Blomkamp,

4   N.D. Cal. No 13-cv-04679 (October 3, 2014) (ECF No. 87) (Exh. A to NBCU's RJN In Support

5   of Motion to Dismiss). Moreover, in addressing NBCU's copyright preemption argument,

6   Plaintiff **disclaims any claims against NBCU that sound in infringement**. Opp. at 7. This,

7   coupled with the omission of any other allegations of wrongdoing by NBCU, confirms there can

8   be no basis for awarding Plaintiff the relief he seeks from NBCU, such as any damages from

9   alleged "misappropriation" or "profits from the film Elysium." Complaint at ¶ 22, Prayer for

10   Relief.

11       Because the Opposition makes clear that NBCU did not "conspire" to do anything

12   wrongful, the conspiracy claim must be dismissed.

13       **D.**    **Because Plaintiff Cannot Demonstrate Entitlement To Relief,**

14           **No Accounting Is Warranted.**

15       Plaintiff cites authority permitting an accounting where no fiduciary relationship exists,

16   but misses the point: to justify an accounting, there must be a showing that "some balance is due

17   the plaintiff." Opp. at 9 (quoting Jolley v. Chase Home Fin., LLC, 213 Cal. App. 4th 872, 910

18   (2013). Here, as discussed above, Plaintiff has not alleged that NBCU had any interactions with

19   him, owed or breached any duty to him, or misappropriated anything belonging to him. In these

20   circumstances, there can be no justification for the remedy of an accounting.

21                            **V.**

22                **CONCLUSION**

23       Plaintiff's attempt to re-plead his case through his Opposition brief simply demonstrates

24   that his claims are fatally flawed. Because he already has had an opportunity to amend his

25   Complaint, and cannot cure the defects, the Complaint should be dismissed against NBCU

26   without leave to amend.

27   

28   over litigation-related misconduct could ensue were we to recognize a tort cause of action for
third party spoliation." Id. at 473.

DAVIS WRIGHT TREMAINE LLP

10

REPLY ISO MOTION TO DISMISS
Case No. 17-cv-4952-VC
4845-7117-9393v 9 0020040-000144



DATED: November 30, 2018

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ROCHELLE L. WILCOX
BRENDAN N. CHARNEY

By: */s/ Rochelle L. Wilcox*
Rochelle L. Wilcox
Attorneys for Defendant
NBCUNIVERSAL MEDIA, LLC

DAVIS WRIGHT TREMAINE LLP

11

REPLY ISO MOTION TO DISMISS
Case No. 17-cv-4952-VC
4845-7117-9393v 9 0020040-000144

ER 93

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
   snc.steve@gmail.com
4  PLAINTIFF In Propria Persona
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10  STEVE WILSON BRIGGS,
11              Plaintiff,
                  vs                    Civ No: 18-cv-04952-VC
12  KEVIN SPACEY;  ARI EMANUEL; MATT
    DAMON;  BEN AFFLECK;              **PLAINTIFF'S OPPOSITION TO**
13  NBCUNIVERSAL MEDIA, LLC;          **DEFENDANT NBCUNIVERSAL**
    SONY PICTURES ENT INC.; TRIGGER   **MEDIA, LLC'S MOTION TO DISMISS**
14  STREET PRODUCTIONS; NEILL          **COMPLAINT**
15  BLOMKAMP;  ASIF SATCHU;
    MORDECAI WICZYK; BILL BLOCK;      Date:        December 20, 2018
16  DANA BRUNETTI;  MRC (and all MRC  Courtroom:  4
17  Entities and subs.),              Time:        10:00 a.m.
                Defendants.           Judge:       Hon. Vince Chhabria
18

19         **PLAINTIFF'S OPPOSITION TO DEF NBCUNIVERSAL MEDIA, LLC'S**

20                     **MOTION TO DISMISS COMPLAINT**

21         On August 15, 2018, Plaintiff submitted to this Court a persuasive and reliable

21  Complaint, alleging that Defendant (**Def**) NBCUniversal Media, LLC (**NBCU**) knowingly

22  participated in a *Conspiracy* to create and engage in a culture of corporate *Negligence*, to

23  enrich themselves.  NBCU has responded with a motion to dismiss, scheduled to be heard

24  by this Court at 10AM, December 20, 2018.  NBCU is the parent company of **Universal**

25  **Pictures** (the corporation alleged herein to have transgressed the Plaintiff rights).

26         This filing represents the Plaintiff's Opposition Response to NBCU's motion.

27         This Opposition is based on the following *Memorandum of Points and Authorities*,

28  and *Proposed Order*.

| | |
|---|---|
| 1 | **MEMORANDUM OF POINTS AND AUTHORITIES** |
| 2 | **LEGAL STANDARD:** |
| 3 | DISMISSAL |
| 4 | ● *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004), requires that a Rule 12(b)(1) |
| 5 | motion may be either "facial, confining the inquiry to the allegations in the complaint, or |
| 6 | factual, permitting the court to look beyond the complaint." If a court elects to resolve a |
| 7 | fact-based Rule 12(b)(1) motion without an evidentiary hearing, it must accept the factual |
| 8 | allegations of the complaint as true. McLachlan v. Bell, 261 F.3d 908, 909 (9th Cir. 2001). |
| 9 | |
| 10 | **PLAINTIFF'S OPPOSITION RESPONSE** |
| 11 | NBCU's first argument, and the fourth component ("D") of their third argument are |
| 12 | essentially the same argument, and both require substantial evidentiary support; therefore, to |
| 13 | respect the Court's time, the Plaintiff has combined these questions in his first Response. |
| 14 | ● **I.** Plaintiff's Opposition To NBCU's First Argument That "**The Complaint Fails** |
| 15 | **To Provide Notice Of The Basis For Plaintiff's Claims Against NBCU,**" And To The "D" Portion Of NBCU's Third Argument, That "**The Complaint Fails To** |
| 16 | **Allege Any Negligent Conduct By NBCU,**" Is As Follows: |
| 17 | These arguments are transparently false. |
| 18 | The Complaint provides NBCU generous notice of the basis for the claims for relief, |
| 19 | and provides copious allegations of NBCU's *Negligent* conduct, as verified by the following |
| 20 | paragraphs from the <u>Complaint</u> (paragraph numbers **bold**; truncated by ellipses for brevity): |
| 21 | **68**. And January of 2000, Bronfman and <u>Universal Pictures</u> made Wiczyk their |
| 21 | vice President of Productions… Just as Wyzyk's memo predicted— "whichever studio was suffering at the time would probably break ranks in |
| 22 | the name of short-term self-preservation" —<u>Universal</u> was suffering, so |
| 23 | <u>Universal</u> broke ranks and hired Wiczyk. |
| 23 | ●**69.** But Wiczyk had been Vice President of productionsat Summit |
| 24 | Entertainment, AND Vice President of productions at <u>Universal Pictures</u>. |
| 25 | Wiczyk was a producer . Why would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel was going into the |
| 26 | production business with MRC and <u>Universal Pictures</u>. |
| 27 | **70.** When Def Ari Emanuel stole Wiczyk away from <u>Universal Pictures</u> there |
| | were no hard feelings between Emanuel, Bronfman, and <u>Universal</u> |
| 28 | <u>Pictures</u>, and nothing changed in their arrangement. Def Emanuel |

PLAINTIFF'S OPPOSITION TO DEF NBCUNIVERSAL'S MOTION TO DISMISS

continued to provide the talent and producorial services for both MRC and Universal Pictures. Thus, in 2011, MRC would sign its first mega deal with Universal Pictures. And although Bronfman left Universal in 2001…

Paragraphs 71 through 73 (omitted for concision) then explain the Defendants' conspiracy: to create a screenwriter/filmmaker social network—TriggerStreet.com (**TS**)—to misappropriate screenplays, then use the best of these screenplays to produce into films to market around the world, using Def Universal Pictures as the distributor. The Complaint's direct allegations against Universal Pictures (NBCU) then continue on paragraph 98:

- **98.** KPAX was released Oct 2001. It would be the first time Universal Pictures ever cast Kevin Spacey in a leading role (in fact, Universal…
- **108.** Within just three (3) months of TS's launch (Nov 2002), Spacey received three ( 3 ) huge payments from Defs Emanuel and Universal Pictures... :
  1. In February 2003 , 3 months after TS launched, Universal Pictures distributed Spacey's film " The Life of David Gale" . This would be the last time Universal Pictures would be involved in a Spacey film.
  2. ...losing millions, bringing in only \$344,000. Likely, Universal Pictures wouldn't distribute the film, because after two bad years, Universal was back in 5th place (second to last)...
  3. That same month, February 2003 , it was announced that production...
- **119.** May 2010, "Deadline Hollywood" reported Universal Pictures and Def MRC announced a 20 picture, 5-year production and distribution deal… Thus, MRC's first mega-deal would be with Universal Pictures .
- **126.** In 2015, Dana Brunetti produced his first solo effort… 50 Shades of Grey. 50 Shades of Grey was, of course, distributed by Universal Pictures.

Then, paragraphs 132 through 148 show precisely how the Defendants used Universal Pictures to mislead even their business partner, Sony Pictures, and drive up bidding on Defendant Emanuel's and MRC's films (with the irrefutable evidence of the words of the Defendants). And, when those efforts failed, the Complaint shows that the Defendants simply took their film back to Universal Pictures (NBCU):

- **132.** Through the Sony Pictures' hacked emails, we see the Steve Jobs film negotiation go on for about 8 months, then it begins to fall apart…
- **140**. ...The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:
  2014-11-14 22:57:02 From: aemanuel@wmeentertainment.com To: pascal, amy
  ARI EMANUEL:
  "Is business affairs calling me so I can take this to Fox Searchlight officially?"

3
PLAINTIFF'S OPPOSITION TO DEF NBCUNIVERSAL'S MOTION TO DISMISS

| | |
|---|---|
| 1 | **141.** ...Def Emanuel was bluffing that Fox Searchlight had agreed to take the |
| 2 | film. He never had a deal with Searchlight. He was just playing hardball; |
| | trying to get Sony to offer more money, and keep them clueless about his |
| 3 | relationship with <u>Universal Pictures</u>. |
| | **146.** In the end, Fox Searchlight never touched "Steve Jobs," of course. |
| 4 | **147.** Def Ari Emanuel had just been playing the ace up his sleeve; trying to |
| 5 | push the price of the film above market value, to increase his profit |
| | margin. He didn't need Sony Pictures to give him standard market value |
| 6 | for "Steve Jobs", he could get standard value from <u>Universal Pictures</u>... |
| 7 | **148**. On September 5th, 2015, 10 months after Sony Pictures declined on |
| 8 | "Steve Jobs", after so much posturing and tumult, "Steve Jobs" was |
| | distributed by <u>Universal Pictures</u>. |
| 9 | **184.** <u>Universal Pictures</u> was originally expected to be the studio to distribute |
| 10 | Elysium… |

Then, in the *Claims For Relief* section, <u>Plaintiff re-alleged and incorporated all preceding allegations and claims</u>, and re-stated some of Universal Pictures' (NBCU) actions, under the Claims For Relief for *Civil Conspiracy, Negligence, Gross Negligence*; <u>careful that each claim showed every element required for each Cause of Action</u>.

For the foregoing reasons, NBCU's assertions that "The Complaint Fails To Provide Notice Of The Basis For Plaintiff's Claims Against NBCU," and that "The Complaint Fails To Allege Any Negligent Conduct By NBCU," are wholly false.

- **II**. Plaintiff's Opposition To NBCU's Second Argument That
"**THE COMPLAINT IS AN IMPROPER COLLATERAL ATTACK ON THE DISMISSAL OF THE PRIOR BLOMKAMP ACTION**," Is The Following:

NBCU's second argument is entirely false.

This Action cannot be a collateral attack as <u>this Action's *Causes of Action*</u> were not addressed in the Prior Action's (*Briggs v Blomkamp*) judgment. Cornell Law's *Wex Legal Dictionary* defines *Collateral Attack* as an "<u>Attack on a prior judgment in a new case (i.e., not by direct appeal). Also called an indirect attack</u>. "

The essential element of a <u>prior judgment</u> is not present. *Rein v. Providian Fin. Corp.,* 270 F.3d 895, 902 (9th Cir. 2001), explains, "the collateral attack doctrine does not apply to Frenette because his claims were never addressed by a prior order or judgment."

NBCU's' argument that the Complaint is an improper Collateral Attack is false.

PLAINTIFF'S OPPOSITION TO DEF NBCUNIVERSAL'S MOTION TO DISMISS

1        ● **III.** "**The Complaint Fails To State A Claim**.
2   ● **A**. Plaintiff's Opposition To The "A" Portion Of NBCU's Argument That "**The Complaint Fails To State A Plausible Claim Against NBCU**" Follows:
3

4        This argument is without merit. The Complaint states clear, factually supported,
5   plausible claims against NBCU.

6        Attorney Paul Ferrer, Senior Attorney for the *National Legal Research Group* wrote
7   the article "*CIVIL PROCEDURE: Pleading a "Plausible" Claim in Federal Court: The*
8   *Proper Application of the Plausibility Requirement*." In the article Ferrer explains:

9       Plaintiffs looking to survive an early motion to dismiss under Federal Rule of
10      Civil Procedure 12(b)(6) must file a complaint that contains "sufficient
        factual matter, accepted as true, to 'state a claim to relief that is plausible on
11      its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.
        Corp. v. Twombly, 550 U.S. 544, 570 (2007)).   A claim has "facial
12      plausibility" when the plaintiff pleads **"factual content that allows the
13      court to draw the reasonable inference that the defendant is liable for
        the misconduct alleged."** Id. **This "plausibility" standard is "not akin to
14      a 'probability requirement,' but it asks for more than a sheer possibility
        that a defendant has acted unlawfully."** Id.
15
16          The   Supreme   Court   has   specifically   indicated   that   determining
        whether a complaint states a plausible claim for relief under this standard is
17      **"a context-specific task that requires the reviewing court to draw on its
        judicial experience and common sense."** Id. at 679.
18

19      Thus, it is not for NBCU, but for the Court to decide an action's plausibility.

20      NBCU's argument is false. The Complaint makes plausible claims against NBCU.

21

21        ● **B**. Plaintiff's Opposition To The  "B" Portion Of NBCU's Argument That
                      "**The Complaint Is Time-barred**," Is As Follows
22                                              :

23      This argument is false. None of the Plaintiff's claims for relief are time barred, and
24   ALL are protected by  1) CCP codes specifying statutory limits and accrual delays, and/or
25   2) the Delayed Discovery Rule, and/or 3) "Fraudulent concealment" tolling rules.

26                    The Breach Of Contract Claim Is Not Time Barred
27      Plaintiff learned of the Defs' Breaches in February of 2016. Breach has a four year
28   statute of limitations in California. Thus, Plaintiff has until February of 2020 to file suit.

5
PLAINTIFF'S OPPOSITION TO DEF NBCUNIVERSAL'S MOTION TO DISMISS

1   Breach is also protected by the Delayed Discovery Rule; thus, time does not accrue until

2   Plaintiff discovers the Breach, per *California Civil Jury Instructions* (2017) No 338:

3   • "[T]he **discovery rule** may be applied to breaches [of contract] which can

4   be, and are, committed in secret and, moreover, where the harm flowing from
    those breaches will not be reasonably discoverable by plaintiffs until a future

5   time."(Gryczman v. 4550 Pico Partners, Ltd. (2003) 107 Cal.App.4th 1, 4–5

6   <u>The Fraud Claims Are Not Barred</u>

7   Fraud has a three year statute of limitations in California.  The Plaintiff learned of

8   the Defs' fraudulent actions, between February of 2016 and October 2017. Therefore, the

9   Plaintiff has until between February of 2019 and October of 2020 to bring an Action against

10  the Defendants.  California Code of Civil Procedure § 338(d) states: "<u>Within three years</u>:

11  "(d) An action for relief on the ground of fraud or mistake. The cause of

12  action in that case is not deemed to have accrued **until the discovery,
    by the aggrieved party**, of the facts constituting the fraud or mistake."

13

14  Significantly, if *Fraudulent **Concealment*** is at play, as in this case, all causes are

15  tolled to the discovery, confirmed by *California Civil Jury Instructions (2017) No 1925*:

16  • "One [exception to the limitations period] is the doctrine of fraudulent

17  concealment, which tolls the statute of limitations if a defendant's deceptive
    conduct 'has caused a claim to grow stale.' " (*Fuller v. First Franklin*

18  Financial Corp. (2013) 216 Cal.App.4th 955, 962 [163 Cal.Rptr.3d 44].)

19  <u>The Negligence Claims Are Not Time Barred</u>

20  The California *Negligence* statute of limitations is two years. Virtually all of the

21  Plaintiff's *Negligence* claims where unearthed between March of 2017 and late November

21  2017.  Therefore, the Plaintiff has until February and/or November of 2019 to file suit.

22  In California time does NOT accrue from when the Def commits the last negligent

23  act, but from when the plaintiff learns of the negligent conduct, confirmed by the following

24  citation from **California Civil Jury Instructions** (2017) No. 455 (Statute of Limitations):

25  "A limitation period does not begin until a cause of action accrues, i.e., all

26  essential elements are present and a claim becomes legally actionable.
    Developed to mitigate the harsh results produced by strict definitions of

27  accrual, the common law discovery rule postpones accrual until a plaintiff
    discovers or has reason to discover the cause of action." (Glue-Fold, Inc.,

28  supra, 82 Cal.App.4th at p. 1029, internal citations omitted.)

1  <u>The Copyright Infringement Claims Are Not Time Barred</u>

2      For *Copyright Infringement*, time accrues when the Plaintiff learns of a violation.

3  [See *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994)]. As this Court may

4  recall, the Plaintiff discovered the *Infringement* Causes of Action (circa December 2017)

5  only after he mistakenly cited numerous FRCP *criminal* Causes in his original *Briggs v*

6  *Universal* complaint. Finding himself with no federal cause, the Plaintiff amended to cure

7  the issue. Thus, Plaintiff has until December 2020 to act on the Infringement claims.

8  <u>The Conspiracy & Suppression/Spoliation Claims Are Not Time Barred</u>

9      For *Conspiracy*, in California, like the federal courts, time accrues from the last

10  known act of the *Conspiracy*. The time limit is determined by the associated cause of action.

11      In this matter, currently, the last known act in the Defs' *Conspiracy* was the closing

12  and destroying of the TS social network, November of 2014. This was done to *conceal* one

13  or more *breaches of contract*. Therefore, the statute of limitations to take action expires in

14  November 2018. The Plaintiff filed suit in August, 2018, several months before the

15  deadline.

16      <u>However</u>, the act of destroying TS was also an act of *Concealment* and *Willful*

17  *Suppression of Evidence*; in both of these Causes, time accrues from when the Plaintiff

18  learns of the infraction (*Cedars-Sinai Med. Ctr. v Superior Court*); in this case, circa March

19  of 2016. Thus the Plaintiff has until 2020 to take action on the *Conspiracy* Cause.

20      For the proceeding reasons, the argument that the Complaint is time-barred is false.

21

21  ● **C**. Plaintiff's Opposition To The "C" Portion Of NBCU's Argument, "**California**

    **Law Does Not Recognize A Claim For Conspiracy, Which Would Be Preempted**

22          **By The Copyright Act In Any Event,**" Is As Follows:

23      NBCU's argument is false, contemptible, incoherent, and not a basis for dismissal.

24      The second clause of the argument, that the *Conspiracy* claim *would be preempted*

25  *by the Copyright Act*, is a *Hail Mary* defense that relies on deceit and strategic confusion, as

26  it seeks to create conflict between the state *Conspiracy* Cause and the federal *Infringement*

27  Cause —<u>when the Plaintiff has made no Copyright Infringement claims against NBCU</u>.

28  But amid the Motion's murky leaps of logic and legal sleight of hand, on page 12, line 15,

1    we find the central legal, logical and ethical failure of this ruse, as NBCU states, **"...to the**
2    **extent that Plaintiff's disjointed conspiracy claim seeks to impose** <u>vicarious liability</u> **on**
3    **NBCU for alleged copyright infringement by other defendants."** Then on page 13, line
4    16, NBCU advances this ploy again, writing: **"...it is clear that he seeks to hold NBCU**
5    <u>**vicariously liable**</u> **for "misappropriat[ing]" his screenplay."**

6          With those two statements, <u>and no evidence</u>, NBCU stretches reason and decency to
7    suggest the Plaintiff has alleged infringement against the <u>*other*</u> Defendants, *in order to*
8    *<u>vicariously</u> make those same claims against NBCU.*  Beyond the absurdity of it, any first
9    year IP attorney knows that if this were the Plaintiff's intent, he would have simply sued for
10   the federal Causes of *Vicarious* and/or *Contributory Copyright Infringement*.

11         The Plaintiff is a responsible, conscientious litigant.  He has only made allegations
12   against parties with clear evidence against them. Once he determined that Sound Point
13   Capital was not involved in the wrongdoing, he dismissed them. *Breach* and *Infringement*
14   have only been alleged against Defs Spacey, Brunetti, and Trigger Street Productions; and
15   *Fraud* and *Suppression* have only been alleged only against certain of the Defendants.

16         Plaintiff seeks to hold each Defendant to account for *their own* actions.  Thus, he has
17   made claims for *Negligence, Gross Negligence* and *Conspiracy* against NBCU.  Nowhere in
18   the Complaint is *Vicarious* (or *Contributory*) liability or infringement contemplated.

19         As far as NBCU's claim that California does not recognize a claim for *Conspiracy*...
20   California <u>does</u> recognize *Civil Conspiracy*, but not as an independent Cause of Action.  In
21   California, a claim for *Civil Conspiracy* can only be made in conjunction with one or more
21   independent Causes of Action, as in this matter (i.e., a Plaintiff must allege that two or more
22   Defendants *conspired* to commit fraud, or conspired to commit some other infraction).

23         For the foregoing reasons NBCU's argument is false, and is not a basis for dismissal.

24
25         ● **E.  "The Complaint Fails To State A Cause Of Action For Accounting"**

26         ● Plaintiff's Opposition To The First Portion Of NBCU's **"E"** Argument, That
             **"1.  The Purported Claim For Accounting Requests A Remedy Unsupported**
27                    **By Any Underlying Claim**s," Is As Follows:

28         This argument is false. California's 1st District Court of Appeals decisively ruled on

1   this in *Jolley v. Chase Home Fin.*, LLC, 213 Cal. App. 4th 872, 910 (2013), writing:

2   "(17) An action for an accounting may be brought to compel the defendant to
3   account to the plaintiff for money or property (1) where a fiduciary
3   relationship exists between the parties, **or (2) where, even though no**
4   **fiduciary relationship exists, the accounts are so complicated that an**
4   **ordinary legal action demanding a fixed sum is impracticable.** (5 Witkin,
5   Cal. Procedure, *supra,* Pleading, § 819, p. 236.) "A cause of action for an
6   accounting requires a showing that a relationship exists between the plaintiff
6   and defendant that requires an accounting, and that **some balance is due the**
7   **plaintiff that can only be ascertained by an accounting."** (*Teselle v.*
8   *McLoughlin* (2009) 173 Cal.App.4th 156, 179 [92 Cal.Rptr.3d 696].)

9   *Jolley* verifies the need for an *Accounting* in complex cases, such as this, when no

10  fiduciary relationship exists, but <u>the accounts are so complicated that an ordinary legal</u>

11  <u>action demanding a fixed sum is impracticable;</u> and when some relationship exist, as in this

12  case, and "some balance is due the plaintiff that can only be ascertained by an accounting."

13      For the foregoing reasons, NBCU's argument against an Accounting is false.

14

15  ● Plaintiff's Opposition To The Second Portion Of NBCU's **"E"** Argument, That
15  **"2.  No Damages Are Cognizable Concerning The Prior Blomkamp Lawsuit,"**
16                                           Is As Follows:

17      NBCU's final argument is false on every level, and reveals how far the Defendant's

18  counsel is willing to mislead the Court to secure a favorable ruling for NBCU.

19      To support their manufactured argument, on page 16, line 9, the Defense Counsel

20  wrote: "In *Temple Cmty. Hosp.*, the California Supreme Court rejected a claim for alleged

21  spoliation by a third party."   The Defense Counsel was alluding to *Temple Community*

21  *Hospital v. Superior Court* (Ramos) (1999), in which California simply maintained the

22  current standard that Plaintiffs should have <u>no greater right</u> to a <u>separate</u> tort cause of action

23  for **third** party spoliation than Plaintiffs currently have for **first** party spoliation. Thus,

24  leaving *Cedars-Sinai* untouched as the current California standard.

25      NBCU's motion concludes with an improper citation of *Cedars-Sinai Med. Ctr. v.*

26  *Superior Court*, taken from the Opinion's *discussion* section, having nothing to do with the

27  actual *Conclusion*.   In fact, ***Cedars-Sinai* ONLY ruled that there is no tort for spoliation**

28  **when the victim <u>knows</u> or <u>should have known</u> of the alleged spoliation <u>before</u> trial or a**

1  **decision on the merits,** as stated in the final paragraph of the *Cedars-Sinai* Conclusion:

2     "Accordingly, we hold that there is no tort remedy for the intentional
3     spoliation of evidence by **a party** to the cause of action to which the spoliated
      evidence is relevant, <u>in cases in which, as here, the spoliation victim knows or
4     should have known of the alleged spoliation before the trial or other</u> **[18 Cal.
      4th 18]** <u>decision on the merits of the underlying action.</u>"

5

6     *Cedars-Sinai* allows a tort cause for first **or <u>third</u>** party spoliation, in cases such as

7  *this*, when the <u>victim does NOT learn of the spoliation until after a decision on the merits.</u>

8        Finally, in fact, California **does** acknowledge *Willful Suppression* / *Spoliation* claims.

9  In the *Cedars-Sinai* case, the Court ruled that <u>California Courts were free to adapt standard</u>

10 <u>jury instructions for *suppression*, to fit the circumstances of the case.</u> This is included in the

11 *California Civil Jury Instruction* (2017) No 204 (Suppression):

12    "In Cedars-Sinai Medical Center v. Superior Court (1998) 18 Cal.4th 1, 12
      [74 Cal.Rptr.2d 248, 954 P.2d 511], a case concerning the tort of intentional
13    spoliation of evidence, **the Supreme Court observed that trial courts are
      free to adapt standard jury instructions on <u>willful suppression</u> to fit the
14    circumstances of the case**, "including the egregiousness of the spoliation..."

15

16    For the foregoing reasons the Defendant's argument is false.

17

18                                **Amending**

19     Should the Court find any merit to NBCU's motion, Plaintiff will happily seek leave

20 to amend, to cure. If such leave is required, Plaintiff is hopeful the Court will continue leave

21 until all Defs' motions to dismiss have been heard, to circumvent the need for further leave.

21                              **<u>CONCLUSION</u>**

22

23     For all of the foregoing reasons NBCU's motion to dismiss should be denied.

24

25 Dated: 11/23/2018                    Signed: /s/  Steve Wilson Briggs
                                              Steve Wilson Briggs
26                                            Plaintiff, In Propria Persona

27

28

                                      10
           PLAINTIFF'S OPPOSITION TO DEF NBCUNIVERSAL'S MOTION TO DISMISS

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
   snc.steve@gmail.com
4  PLAINTIFF In Propria Persona
5
6
7
8              **UNITED STATES DISTRICT COURT**
9            **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  STEVE WILSON BRIGGS, | Civ No: 18-cv-04952-VC |
| 11  Plaintiff, | **[PROPOSED] ORDER** |
| 12  vs | |
| 13  KEVIN SPACEY et al, | Date:      December 20, 2018 |
| 14  Defendants. | Courtroom:  4 |
| 15  | Time:       10:00 a.m. |
| | Judge:      Hon. Vince Chhabria |

16
17      Having considered the Defendant NBCUniversal Media, LLC's motion to dismiss,
18  captioned "Motion To Dismiss Complaint; Memorandum Of Points And Authorities" and
19  finding insufficient bases for such a motion, **IT IS HEREBY ORDERED:**
20      1.  Defendants NBCUniversal Media, LLC's motion to dismiss plaintiff's Complaint,
21          entitled "Motion To Dismiss Complaint; Memorandum Of Points And Authorities"
21          is **DENIED**.
22
23  Dated:_____        Signed:_____
24                                  The Honorable Vince Chhabria
25
26
27
28

1
[PROPOSED] ORDER

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing document, captioned **"PLAINTIFF'S OPPOSITION TO DEFENDANT NBCUNIVERSAL MEDIA, LLC'S MOTION TO DISMISS COMPLAINT"** and "**[PROPOSED] ORDER**" by filing same with the Clerk of the Court for the United States District Court, Northern District Of California, San Francisco Division, by using the District's Pacer system on November 19, 2018.


Dated: November 23, 2018.            Signed:   /s/   Steve Wilson Briggs           
                                     STEVE WILSON BRIGGS
                                     Plaintiff, In Propria Persona

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF, In Propria Persona
5
6
7
8           UNITED STATES DISTRICT COURT
9          NORTHERN DISTRICT OF CALIFORNIA

| 10  STEVE WILSON BRIGGS, | Civ No: 18-cv-04952-VC |
|---|---|
| 11  Plaintiff, | **PLAINTIFF'S OPPOSITION TO MRC** |
|     vs | **II DISTRIBUTION COMPANY LP'S,** |
| 12  KEVIN SPACEY;  ARI EMANUEL; MATT | **MORDECAI WICZYK'S, ASIF** |
| 13  DAMON;  BEN AFFLECK; | **SATCHU'S,  SONY PICTURES** |
|     NBCUNIVERSAL MEDIA, LLC; | **ENTERTAINMENT INC'S, AND** |
| 14  SONY PICTURES ENT INC.; TRIGGER | **ARIEL EMANUEL'S MOTION TO** |
| 15  STREET PRODUCTIONS; NEILL | **DISMISS COMPLAINT** |
|     BLOMKAMP;  ASIF SATCHU; | Date:       December 20, 2018 |
| 16  MORDECAI WICZYK; BILL BLOCK; | Courtroom:  4 |
| 17  DANA BRUNETTI;  MRC (and all MRC | Time:        10:00 a.m. |
|     Entities and subs.), | Judge:      Hon. Vince Chhabria |
| 18  Defendants. | |

19      **PLAINTIFF'S OPPOSITION TO MRC II DISTRIBUTION COMPANY LP'S,**

20   **MORDECAI WICZYK'S, ASIF SATCHU'S,  SONY PICTURES ENTERTAINMENT**

21      **INC'S, AND ARIEL EMANUEL'S MOTION TO DISMISS COMPLAINT**

21          On August 15, 2018, the Plaintiff submitted to this Court a Complaint comprised of

22   countless indisputable facts and exhibits. Incapable of defending these facts with a

23   conventional Answer, on November 9, 2018, Defendants MRC II Distribution Company LP,

24   Mordecai Wiczyk, Asif Satchu, Sony Pictures Entertainment Inc, and Ariel Emanuel

25   responded with a motion to dismiss, based on FRCP Rule 12(b)(6) and/or 12(b)(1).

26          This filing represents Plaintiff's opposition to the Defendants' motion to Dismiss.

27          This Opposition is based on the following Memorandum of Points and Authorities,

28   and the attached Proposed Order.

<div align="center">

**MEMORANDUM OF POINTS AND AUTHORITIES**

**LEGAL STANDARD**

DISMISSAL

</div>

1
2
3
4   ● The FRCP 12(b)(6) instructs the court must "accept factual allegations in the
5      complaint as true and construe the pleadings in the light most favorable to the
6      non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d
7      1025, 1031 (9th Cir. 2008).

8
9   **PLAINTIFF'S OPPOSITION RESPONSE**

10         **I.      Opposition to Defendants' Argument "A"**

11         Plaintiff's Opposition to Argument "A" of the Defendant's motion to dismiss, that
12   **"The Complaint Is Barred By The "Collateral Attack" Doctrine,"** is the following:

13         The Defendants' opening argument, "The Complaint Is Barred By The "Collateral
14   Attack" Doctrine," is baseless and false from the foundation.

15         The Plaintiff's action cannot be a collateral attack as its Causes of Action were not
16   addressed in the Prior Action's (*Briggs v Blomkamp*) judgment. Cornell Law's *Wex Legal*
17   *Dictionary* defines *Collateral Attack* as an "attack on a prior judgment in a new case (i.e.,
18   not by direct appeal)."

19         This essential element is not satisfied between the Prior Action and the current
20   action. *Rein v. Providian Fin. Corp.,* 270 F.3d 895, 902 (9th Cir. 2001), explains:

21         **"**The collateral attack doctrine precludes litigants from collaterally attacking
21         the judgments of other courts.  See *Celotex Corp. v. Edwards*, 514 U.S. 300,
22         313, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) ("We have made clear that [i]t
           is for the court of first instance to determine the question of the validity of
23         the law, and until its decision is reversed for error by orderly review, either
           by itself or by a higher court, its orders based on its decisions are to be
24         respected.") (internal quotation marks omitted) (alteration in original).
           **Here, the collateral attack doctrine does not apply to Frenette because**
25         **his claims were never addressed by a prior order or judgment."**
26
27         Again, the Defendants' argument is false, as this Action's Causes of Action have
28   NOT been addressed in a prior order or judgment.

<div align="center">

2

PLAINTIFF'S OPPOSITION TO MRC, EMANUEL, WICZYK, SATCHU MOTION TO DISMISS

</div>

| | |
|---|---|
| 1 | **II.    Opposition to Defendants' Argument "B"** |
| 2 | Plaintiff's Opposition to Argument "B" of the Defendant's motion to dismiss, which |
| 3 | states "**The Complaint Is Barred By The Doctrine Of Res Judicata,**" is the following: |
| 4 | This Defendants' argument is fundamentally false, as the conditions for raising a Res |
| 5 | Judicata defense are NOT present in this case. Cornell Law School's Wex Legal Dictionary |
| 6 | provides the following definition **and examples** for Res Judicata: |
| 7 | Generally, *res judicata* is the principle that a <u>cause of action</u> may not be |
| 8 | relitigated once it has been judged on the merits. "Finality" is the term which refers to when a court renders a final judgment on the merits. |
| 9 | *Res judicata* is also frequently referred to as "claim preclusion," and the two are used interchangeably throughout this article. |
| 10 | **Breaking Down the Concept** |
| 11 | Claim preclusion can be best understood by breaking it down into two sub-categories: |
| 12 | 1.    **Bar** - a losing plaintiff cannot re-sue a winning defendant on the same |
| 13 | cause of action . |
| 14 | Example: Plaintiff P sues Defendant D on Cause of Action C, but loses. P may not try for better luck by initiating a new lawsuit against D on C. |
| 15 | 2.    **Merger** - a winning plaintiff cannot re-sue a losing defendant on the same cause of action |
| 16 | Example: Plaintiff P successfully sues Defendant D on Cause of Action C. |
| 17 | P may not again sue D on C to try to recover more Damages. |
| 18 | Again, the conditions for a Res Judicata defense are not present or satisfied in this |
| 19 | matter, as the facts of this matter are entirely new and unrelated, as are the Causes of Action, |
| 20 | and this matter involves ten new Defendants (**Defs**). <u>*Rein v. Providian Fin. Corp.*, 270 F.3d</u> |
| 21 | <u>895, 902 (9th Cir. 2001)</u>, clarifies: |
| 21 | Res judicata, or claim preclusion, provides that a final judgment on the |
| 22 | meritsof an action precludes the parties from relitigating all issues connected with the action that were or could have been raised in that action.    See In re |
| 23 | *Baker*, 74 F.3d 906, 910 (9th Cir.1996).   Claim preclusion is appropriate |
| 24 | where:  (1) **the parties are identical or in privity**; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) **there was** |
| 25 | **a final judgment on the merits**; and (4) **the same claim or cause of action** |
| 26 | **was involved in both suits.**   *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir.2001); *Siegel v. Federal Home Loan Mortgage Corp.*, |
| 27 | 143 F.3d 525, 528-29 (9th Cir.1998). |
| 28 | The conditions for a Res Judicata defense are not satisfied: 1) the parties are not |

1   identical; 2) there has been no judgment on the merits; 3) the claims are not the same.

2       For the foregoing reasons the Defendants argument for dismissal is false.

3

4   **III.   Opposition to Defendants' Argument "C"**

5       Plaintiff's Opposition to Argument "C" of the Defendant's motion to dismiss, that

6   **"The Complaint Should Further Be Dismissed On The Basis That It Fails To State A**

7   **Claim For Relief Against Defendants,"** is the following:

8       This argument is false and is not applicable to the Plaintiff's surrent Action.

9       The Defendants, like thousand of Defendants since *Bell Atlantic Corp. v. Twombly*

10  (which established a more strict "plausibility" standard), and since *Ashcroft v. Iqbal* (which

11  introduced the "short and plain statement of the claim" language), **seek to misguide the**

12  **court the Court that no facts or evidence should be included in a Complaint**, because,

13  they reason, facts and evidence violate Iqbal's "short and plain statement" guideline.

14      Attorney James M. Beck wrote what may be the definitive article on Iqbal, "<u>In</u>

15  <u>Praise Of "Short And Plain" Pleadings After Twombly And Iqbal</u>." Beck explains:

16      "The relevant language – "short and plain" – says nothing about dispensing

17      with factual support for the relevant allegations. **How can a plaintiff be "entitled to relief" if no facts support the allegations?**...

18          "...Iqbal involved a prison inmate's allegations that certain government

19      defendants, entitled to qualified immunity from suit, deprived him of

20      constitutional rights by discriminating against him on religious grounds. ll the plaintiff alleged was that the defendants "knew of, condoned, and willfully and maliciously agreed to subject [him] to harsh conditions of

21      confinement as a matter of policy, solely on account of [his] religion, race,

21      and/or national origin and for no legitimate penological interest." 2009 WL

22      1361536, at *14. That allegation was, the majority concluded, "nothing more than a formulaic recitation of the elements of a constitutional discrimination

23      claim." <u>Id.</u>(quotation marks omitted). Conclusory allegations don't cut the mustard any longer – not in antitrust, and not anywhere else."

24

25      The Complaint bears no similarity to Iqbal; no formulaic recitation of the elements.

26      The Complaint features five types of Causes of Action: 1. Breach of Contract;

27  2.  Fraud; 3.  Negligence; 4.  Infringement; 5.  Doctrinal (Civil Conspiracy and

28  Suppression/Spoliation).  Let's examine the content and structure of these Causes.

1    **Civil Conspiracy**

2    In California, a claim against defendants for Civil Conspiracy can only be made in

3    conjunction with one or more independent Causes of Action, as is the case in this matter.

4    For example, in California a defendant must be accused of *conspiring* to commit fraud, or

5    conspiring to commit some other infraction, but not for Conspiracy alone.

6    The Complaint's *Conspiracy* Claim for Relief advises that *California Civil Jury*

7    *Instructions No. 3600* instructs that **a conspiracy may be inferred from circumstances,**

8    **including the nature of the acts done, the relationships between the parties, and the**

9    **interests of the alleged co-conspirators.** IT IS NOT REQUIRED TO PROVE THAT A

10   PARTICULAR DEFENDANT PERSONALLY COMMITTED A WRONGFUL ACT OR

11   THAT HE/SHE KNEW ALL THE DETAILS OF THE AGREEMENT OR THE

12   IDENTITIES OF ALL THE OTHER PARTICIPANTS.

13   The Complaint's "Claims For Relief" section dedicates a lengthy section (page 41 to

14   46) to cover the *Conspiracy* claims, and explain the Defendants engaged in one overarching

15   conspiracy, comprised of 5 smaller conspiracies. The plaintiff then cited no less than 25

16   overt acts committed by the Defendants in the commission of this/these conspiracy(s).

17   The Defendants first conspiracy was to commit fraud.

18   The second conspiracy was to commit fraudulent concealment.

19   The third conspiracy was to commit Willful Suppression of Evidence.

20   The fourth conspiracy was to make Intentional Misrepresentations to the Court and

21   to Plaintiff, and to commit spoliation of evidence.

21   The fifth conspiracy was to engage in negligent enterprises.

22   After re-alleging all preceding paragraphs and incorporating them by reference into

23   the Claim For Relief, the requirements of *Twombly, Iqbal* and *Boschma v. Home Loan*

24   *Center, Inc* are met for pleading *Conspiracy* in California.

25   **Breach**

26   To prevail on a cause of action for breach of contract, the plaintiff must prove

27   (1) the contract, (2) the plaintiff's performance of the contract or excuse for
     nonperformance, (3) the defendant's breach, and (4) the resulting damage to

28   The plaintiff." (*Richman v. Hartley* (2014)).

1    The Complaint explains that the Defendants, in violation of the social network

2  TriggerStreet.com's (**TS**) *Terms of Use* agreement, secretly advertised TS on international

3  websites like Bud.TV and other international media outlets. Budweiser has been a partner of

4  all businesses owned and directed by Defendant Ari Emanuel. The Complaint then shows

5  how in 2011, after MRC closed a $100,000,000 deal with Netflix, Defendant MRC

6  partnered with Trigger Street Productions to co-produce HBO's *House of Cards,* and Spacey

7  and Brunetti moved TS (the social network) to labs.triggerstreet.com and began to use the

8  web address "triggerstreet.com" as their production company's website.

9    The Plaintiff cannot, with certainty, prove the role that the Defs (MRC, Emanuel,

10  Wiczyk, Satchu, Sony Pictures) played with Defs Spacey and Brunetti in the breach of

11  contract. However, the the doctrine of Conspiracy does NOT require that the Plaintiff prove

12  this. As CACI 3600 explains "**a conspiracy may be inferred from circumstances,**

13  **including the nature of the acts done, the relationships between the parties, and the**

14  **interests of the alleged co-conspirators."**

15    After re-alleging all preceding paragraphs and incorporating them by reference into

16  the Claim For Relief, all requirements of *Twombly, Iqbal* and *Richman v. Hartley* are

17  satisfied in the Plaintiff's pleading for Breach of Contract.

18    **Fraud**

19    *Stansfield v. Starkey* (1990) 220 Cal. App. 3d 59, 72-73, establishes that **Fraud**

20  (Intentional Misrepresentations) pleadings consist of five (5) elements: 1) a representation,

21  usually of fact, which is false; 2) knowledge of its falsity; 3) intent to defraud; 4) justifiable

21  reliance upon the misrepresentation; 5) damage resulting from that justifiable reliance.

22    These are the same requirements for Fraudulent Deceit.

23    In addition to the elements required to plead Fraud, California also requires that the

24  facts constituting each element be alleged with particularity.

25    The Plaintiff's Complaint easily meets all of these demands.

26    In the Complaint's *Statement of Facts and Allegation*s, the Plaintiff gives specific

27  examples of Fraud, and explains what actions Defs MRC, Emanuel, Wiczyk, and Satchu

28  took, and how these actions violated the law and/or the Plaintiff's rights. For example, the

1  Statement of Facts and Allegations explains **1)** the Defs hired a "fixer" *expert* to deceive the

2  Court; **2)** the Defs made false statements in their interrogatory answers, claiming Simon

3  Kinberg merely "polished" Blomkamp's script, when—as revealed by the WikiLeaks Sony

4  Pictures hack—Kinberg made exhaustive changes to the script; **3)** the Defs made false

5  statements about editing, then refused to make the final editor available for interrogatories.

6       After re-alleging all preceding paragraphs and incorporating them by reference into

7  the Claim For Relief, all of the elements required by *Twombly, Iqbal* and *Stansfield v.*

8  *Starkey* are satisfied for pleading Fraud and Fraudulent Deceit in California.

9       The requirements for pleading **Concealment Fraud** in California are slightly

10  different. As established by such cases as *Boschma v. Home Loan Center, Inc.* (2011); and

11  *Mosier v. Southern California Physicians Ins. Exchange* (1995), Concealment Fraud

12  requires each of the following elements be proved: 1) Defendant must have concealed or

13  suppressed a material fact; 2) Defendant must have been under a duty to disclose the fact to

14  the plaintiff; 3) Defendant must have intentionally concealed or suppressed the fact with the

15  intent to defraud the plaintiff; 4) Plaintiff must have been unaware of the fact and would not

16  have acted as he did if he had known of the concealed or suppressed fact; 5) Plaintiff must

17  have sustained damage as a result of the concealment.

18       The Complaint gives specific examples of how the Defendants engaged in

19  Fraudulent Concealment. For example, the Plaintiff explained that in *Briggs v Blomkamp*,

20  MRC, and Sony Pictures knowingly hired a a self-confessed "fixer" named Jeff Rovin, to

21  pass himself off as an expert witness to the Court. Rovin later explained on FOX News'

21  *Sean Hannity Show* that he was deployed as a "fixer" to lie and write smear stories.

22       After re-alleging all preceding paragraphs and incorporating them by reference in the

23  Claim For Relief, the requirements of *Twombly, Iqbal* and *Boschma v. Home Loan Center,*

24  *Inc* were met for pleading Concealment.

25       Regarding **Duty to Disclose**: Defendant Trigger Street Productions Inc has suggested

26  the Defendant(s) were under no duty to disclose. However, California Civil Jury Instructions

27  (2017 Edition) directive for *Concealment* orders:

28

1   '[T]he rule has long been settled in this state that although one may be under
2   no duty to speak as to a matter, "if he undertakes to do so, either voluntarily
    or in response to inquiries, he is bound not only to state truly what he tells
3   but  also not to suppress or conceal any facts within his knowledge which
    materially qualify those stated. If he speaks at all he must make a full and fair
4   disclosure." ' " (***Marketing West, Inc. v. Sanyo Fisher*** (USA) Corp. (1992) 6
5   Cal.App.4th 603, 613 [7 Cal.Rptr.2d 859].)

6       Therefore, since the Defendants made false representations to the Court and/or to the

7   public (**1.** regarding the reliability of their expert witness, Jeff Rovin; **2.** regarding the the

8   role Simon Kinberg played in rewriting the film Elysium, **3.** regarding who edited the film,

9   and failing to make this central party availability to answer interrogatories; **4.** regarding

10  TiggerStreet.com's 400,000 members around the world), the Defendants had a duty to

11  disclose ALL of the facts regarding these matters to the Plaintiff.

12      <u>**Negligence**</u>

13      The elements of a cause of action for negligence are well established. They are: (a) a

14  legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the

15  proximate or legal cause of the resulting injury." (*Ladd v. County of San Mateo* (1996))

16      In the Complaint's *Statement of Facts and Allegations* and in the *Claims for Relief*

17  sections, the Plaintiff explains that the Defendants (Sony Pictures Entertainment Inc, MRC,

18  Satchu, Emanuel, Wiczyk) engaged in such negligent actions as:

19      1.  In 2000, MRC hired Def Wiczyk, to implement the unethical business structure

20          contemplated in his "memo."

21      2.  After repeated news reports of Def MRC's unlawful and unethical practices, Def

21          Sony Pictures repeatedly engaged in business with Def MRC.

22      3.  The Defendants conspired to commit to invest over $100,000,000 to make the film

23          Elysium, without reading a script.

24      4.  The Defendants staged attractive film concept art, proximate to the screenplay, to

25          entice Sony Pictures to buy the film rights **without reading the script**.

26      After re-alleging all preceding paragraphs and incorporating them by reference into

27  the Claim for Relief, all requirements of *Twombly, Iqbal* and *Ladd v. County of San Mateo*

28  are met for pleading Negligence and Gross Negligence in California.

1      **Infringement**

2      The Complaint's *Statement of Facts and Allegations* makes detailed *Infringement*

3 claims; then the Plaintiff re-alleged all preceding paragraphs and incorporated them by

4 reference into the Claims For Relief, with the proper elements for pleading an infringement

5 Cause of Action, and in compliance with *Twombly* and *Iqbal*. (Plaintiff's possession of a

6 valid copyright registration is a matter of record, *Briggs v Blomkamp*).

7      The Complaint shows Defs Spacey, Brunetti and Trigger Street Productions

8 infringed on the Plaintiff's work. Although the Plaintiff cannot show the exact role that the

9 MRC Defs played in the Infringement,  per *CACI 3600*: a conspiracy may be inferred from

10 circumstances, the nature of the acts done, and the interests of the alleged co-conspirators.

11      **Willful Suppression / Spoliation**

12      In California, the doctrine of *Willful Suppression of Evidence* (and/or Spoliation) can

13 only be applied in association with independent cause of action, as it is in this matter.

14 *California Civil Jury Instructions No. 204* states: "**You may consider whether one party**

15 **intentionally concealed or destroyed evidence. If you decide that a party did so, you**

16 **may decide that the evidence would have been unfavorable to that party**." CACI 204

17 and *Cedars-Sinai Medical Center v. Superior Court* (1998) establish:

18      "a case concerning the tort of intentional spoliation of evidence, the Supreme
19      Court observed that trial courts are free to adapt standard jury instructions on
      willful suppression to fit the circumstances of the case, "**including the**
20      **egregiousness of the spoliation and the strength and nature of the**
      **inference arising from the spoliation**.""
21

21      The Complaint explains that:

22    1. The Defendants destroyed evidence (the TS social network) to secure and protect a

23       favorable copyright infringement ruling in *Briggs v Blomkamp* (in case the Ninth

24       Circuit remanded the case for trial, all access evidence would be destroyed).

25    2. The Defendants suppressed evidence, by **1)** submitting a false statement that Simon

26       Kinberg only gave the Elysium screenplay as "polish"; **2)** failing to make the film's

27       final editor available to answer interrogatories; **3)** hiring a "fixer".

28      After re-alleging and incorporating into the Claims for Relief, the requirements of

PLAINTIFF'S OPPOSITION TO MRC, EMANUEL, WICZYK, SATCHU MOTION TO DISMISS

1   *Twombly* and *Iqbal* are met in the pleading for Willful Suppression and Spoliation.

2                **Regarding "Re-litigation" Claim**

3       The Defs conclude their motion by calling this action an a re-litigation of *Briggs v*

4   *Blomkamp*.  Plaintiff maintains this is a new action, with new Defendants and new Causes.

5   However, this action does, also, concern **newly discovered evidence** (e.g., the Defendants

6   hiring of a self-proclaimed "fixer") and previously unknown **fraud** and **misconduct** that the

7   Defendants engaged in during *Briggs v Blomkamp*.  In these exact circumstances, FRCP

8   **Rule 60(b)(2)** and **(3)** and **(4)** allow Plaintiffs to take independent action.

9       "Rule 60. Relief from a Judgment or Order

10     "...(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative

11     from a final judgment, order, or proceeding for the following reasons:

12     "...**(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)**;

13     **(3) fraud** (whether previously called intrinsic or extrinsic), **misrepresentation, or misconduct by an opposing party**;...

14     "...**(6) any other reason that justifies relief**."

15

16      In 2007 The Advisory Committee re-affirmed that under Rule 60(b) "Relief

17   continues to be available only as provided in the Civil Rules or by independent action."

18                   **Amending**

19      Although he Plaintiff believes his Complaint properly pleads all of the Causes for

20   Action and Claims for Relief, he is very willing to amend if the Court deems it necessary or

21   helpful.  If the Court deems amending necessary, the Plaintiff is hopeful that the Court will

21   grant Plaintiff leave—with a continuance until all of the Defendants' motions have been

22   heard, to circumvent the possibility that the Plaintiff might need to seek such leave again.

23

24                 **<u>CONCLUSION</u>**

25      For the foregoing reason the Defendants' motion to dismiss should be denied.

26

27   Dated:_ 11/21/2018___          Signed:_ /s/  Steve Wilson Briggs____

28                            Plaintiff, In Propria Persona

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5
6
7
8                   **UNITED STATES DISTRICT COURT**
9               **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10   STEVE WILSON BRIGGS, | Civ No: 18-cv-04952-VC |
| 11        Plaintiff, | **[PROPOSED] ORDER** |
| 12             vs | |
| 13   KEVIN SPACEY et al, | Date:      December 20, 2018 |
| 14        Defendants. | Courtroom: 4<br>Time:      10:00 a.m. |
| 15 | Judge:     Hon. Vince Chhabria |

16
17        Having considered the Defendants motion to dismiss, entitled "Defendants' Notice
18   Of Motion And Motion To Dismiss Complaint Pursuant To Fed. R. Civ. P. 12(B)(6) And/Or
19   12(B)(1); Memorandum Of Points And Authorities In Support Thereof" and finding
20   insufficient bases for such a motion, **IT IS HEREBY ORDERED:**
21        1.   Defendants MRC II Distribution Company LP's, Mordecai Wiczyk's, Asif Satchu's,
21             Sony Pictures Entertainment Inc's, and Ariel Emanuel's Motion To Dismiss
22             Complaint, entitled "Defendants' Notice Of Motion And Motion To Dismiss
23             Complaint Pursuant To Fed. R. Civ. P. 12(B)(6) And/Or 12(B)(1); Memorandum Of
24             Points And Authorities In Support Thereof" is **DENIED**.
25
26   Dated:_____        Signed:_____
27                                     The Honorable Vince Chhabria
28

<div align="center">

1

[PROPOSED] ORDER

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing document, captioned **"PLAINTIFF'S OPPOSITION TO MRC II DISTRIBUTION COMPANY LP'S, MORDECAI WICZYK'S, ASIF SATCHU'S, SONY PICTURES ENTERTAINMENT INC'S, AND ARIEL EMANUEL'S MOTION TO DISMISS COMPLAINT"** and "[**PROPOSED] ORDER**" by filing same with the Clerk of the Court for the United States District Court, Northern District Of California, San Francisco Division, by using the District's Pacer system on November 19, 2018.

Dated: November 21, 2018.        Signed:  _/s/  Steve Wilson Briggs_____
                                          STEVE WILSON BRIGGS
                                          Plaintiff, In Propria Persona

Stephen G. Larson (SBN 145225)
*slarson@larsonobrienlaw.com*
Jonathan E. Phillips (SBN 233965)
*jphillips@larsonobrienlaw.com*
A. Alexander Lowder (SBN 269362)
*alowder@larsonobrienlaw.com*
**LARSON O'BRIEN LLP**
555 South Flower Street, Suite 4400
Los Angeles, CA  90071
Telephone:  213.436.4888
Facsimile:   213.623.2000

Attorneys for TRIGGER STREET
PRODUCTIONS, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE WILSON BRIGGS,<br><br>                    Plaintiffs,<br><br>        v.<br><br>KEVIN SPACEY; ARI (ARIEL); EMANUEL; MATT DAMON; BEN AFFLECK; NBC UNIVERSAL MEDIA, LLC; SONY PICTURES ENT INC.; TRIGGER STREET PRODUCTIONS; NEILL BLOMKAMP; ASIF SATCHU; MORDECAI (MODI) WICZYK; WILLIAM (BILL) BLOCK; DANA BURNETTI; SOUND POINT CAPITAL MANAGEMENT, LC; MRC (and all MRC entities and subs.),<br><br>                    Defendants. | Case No: 3:18-cv-04952-VC<br> Related Case No. 3:17-CV-6552-VC<br><br>[Hon. Vince Chhabria]<br><br>**DEFENDANT TRIGGER STREET PRODUCTIONS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6) AND/OR 9(B)**<br><br>Date: December 6, 2018<br>Time: 10:00 a.m.<br>Crtrm.: 4 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................ 1

II.   LEGAL ARGUMENT ............................................................................... 1

      A.    Briggs's Claims are Stale ............................................................ 1

      B.    The Doctrine of Collateral Estoppel Applies ............................ 5

      C.    Briggs Fails to Properly Plead His Fraud Claims...................... 6

      D.    The Negligence Claims Fail to Allege a Valid Duty ................ 6

      E.    Briggs Infringement Claims Fail ................................................ 7

      F.    Briggs Concedes Spoliation Is Not an Independent Tort......... 7

      G.    Briggs's Conspiracy Arguments Fail ......................................... 8

      H.    Briggs Cannot Cure His Complaint's Defects........................... 8

III.  CONCLUSION .......................................................................................... 9

## I.   **INTRODUCTION**

Plaintiff Steve Wilson Briggs's ("Briggs") Complaint is incurably flawed and should be dismissed without leave to amend.  It is no surprise, then, that Briggs's untimely Opposition brief fails to refute the challenges raised in Defendant Trigger Street Productions, Inc.'s ("Trigger Street") motion to dismiss, and also fails to justify his request for leave to amend his pleading.

With regards to Trigger Street's statute of limitations defense, Briggs cannot cure this fatal defect in his pleading.  Briggs avers that tolling revives his stale claims, arguing that he did not discover his claims until 2016.  In fact, his complaint in *Briggs I* proves Briggs discovered the instant claims at least as of the date of that complaint, October 2013.  That date is almost five years before Briggs filed the instant lawsuit, and well outside the applicable statutes of limitations.  Briggs's remaining arguments also fail and should be disregarded.  Briggs argues that the doctrine of collateral estopped does not apply.  However, he does not, and cannot, dispute that the issue of infringement was decided against him.  Thus, Briggs cannot prove any of the damages alleged in his Complaint.  As for the remaining defenses, Briggs's Opposition fails to identify factual allegations from the Complaint, or marshal any case law, to defeat Trigger Street's Motion.  In several instances, Briggs fails to even address the crux of the issue.

Accordingly, because each and every claim for relief in the Complaint fails to state a claim, and Briggs fails to show that amendment would cure any of these defects, Trigger Street respectfully requests that the Complaint be dismissed without leave to amend.

## II.   **LEGAL ARGUMENT**

### A.   **Briggs's Claims are Stale**

Briggs filed the instant Complaint well after the statute of limitations ran on each and every claim for relief.  Briggs's claims are all based on conduct that was four years old at the earliest when Briggs filed the Complaint.  In an attempt to

1    avoid dismissal, Briggs argues that his claims are timely under either the discovery

2    rule or the doctrine of fraudulent concealment.  (Opp. at 4-8.)  Both arguments are

3    unpersuasive.  Briggs's prior pleadings prove that he was aware of his claims by

4    October 2013 at the latest.

5         As a threshold matter, Briggs's arguments in his Opposition cannot do the

6    duty of well pled facts in the Complaint.  To toll the statute of limitations, both

7    California and federal law require Briggs to plead the relevant facts in his

8    Complaint.  Indeed, "federal courts have repeatedly held that plaintiffs seeking to

9    toll the statute of limitations on various grounds must have included the allegation

10   in their pleadings." *Wasco Products, Inc. v. Southwall Technologies, Inc.*, 435

11   F.3d 989, 991 (9th Cir. 2006).  Under California law, "[i]n order to rely on the

12   discovery rule for delayed accrual of a cause of action, a plaintiff whose complaint

13   shows on its face that his claim would be barred without the benefit of the

14   discovery rule must specifically plead facts to show (1) the time and manner of

15   discovery and (2) the inability to have made earlier discovery despite reasonable

16   diligence." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005).  With

17   regards to the doctrine of fraudulent concealment, "[u]nder either California or

18   federal authority, the plaintiff must plead with particularity the facts which give

19   rise to the claim of fraudulent concealment." *Conerly v. Westinghouse Elec. Corp.*,

20   623 F.2d 117, 120 (9th Cir. 1980).  Here, the Complaint fails to make the required

21   factual showing.

22        To the contrary, it is clear from the face of the Complaint that all of Briggs's

23   claims are stale.  (See Mot. at 5-10.)  While Briggs argues that tolling saved his

24   claims, he fails to cite to any allegations in the Complaint to support his arguments.

25   Thus, because the Complaint fails to plead facts to show that the statute of

26   limitations should be tolled for any of Briggs's claims, each and every claim

27   should be dismissed as time-barred.

28        Moreover, the dismissal should be with prejudice because, based on the

1   arguments and facts asserted in Briggs's Opposition, amendment would be futile.

2   Briggs's attempt to toll the statute of limitations fails for two primary reasons.

3   First, Briggs cannot invoke the discovery rule.  Briggs was aware of the factual

4   basis for his claims by October 2013 at the latest—when he filed his complaint in

5   *Briggs I*—and his claims are based on information in the public record.  Second,

6   the doctrine of fraudulent concealment does not apply because Briggs cannot

7   identify any conduct by Trigger Street that caused his claims to grow stale.

8       While Briggs argues in his Opposition that he did not discover his claims

9   against Trigger Street until February 2016, his complaint in *Briggs I* rebuts any

10  such argument.  Under the discovery rule, "[a] plaintiff is held to her actual

11  knowledge as well as knowledge that could reasonably be discovered through

12  investigation of sources open to her."  *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103,

13  1109 (1988).  Thus, "[s]o long as a suspicion exists, it is clear that the plaintiff

14  must go find the facts; she cannot wait for the facts to find her."  *Id.* at 1111.

15  Moreover, it is "the general rule that ignorance of the identity of the defendant

16  does not affect the statute of limitations."  *Id.* at 1114.

17      Each and every claim for relief asserted in the Complaint arises from the

18  same meritless allegation—that the film *Elysium* infringed on Briggs's screenplay

19  *Butterfly Driver*.  In October 2013, Briggs filed a lawsuit for copyright

20  infringement based on precisely this allegation.  (Lowder Decl. Ex. 2.)  Notably, in

21  that lawsuit, Briggs alleged that he "posted the entire 'Butterfly Driver' script on . .

22  . 'Trigger Street'".  (*Id.* at ¶ 14.)  In that complaint, Briggs further alleged that

23  TriggerStreet.com "was the only website the Plaintiff ever posted his screenplay"

24  and that "**TriggerStreet is where the Defendants had access to the Plaintiff's**

25  **script.**"  (*Id.*) (emphasis in original).  Thus, five years before filing the instant

26  lawsuit, Briggs alleged the factual basis for each of the claims asserted in his

27  Complaint.  It is of no moment that Briggs chose not to name Trigger Street in

28  *Briggs I*, or that he may not have suspected Trigger Street of wrongdoing at that

- 3 -

1   time.  The law is clear that, once Briggs knew of his injury—the alleged

2   infringement of his screenplay—he had a duty to investigate.  Thus, Briggs cannot

3   claim that he "discovered" his claims in 2016.

4          Furthermore, Briggs cannot invoke the discovery rule in this matter.

5   "[W]here the factual basis for the claim is a matter of public record [the case] does

6   not invoke the rationale applying the discovery rule."  *See Shively v. Bozanich,* 31

7   Cal.4th 1230, 1253 (2003).  Here, the information Briggs cites in support of his

8   claims is information that was publicly available—Spacey's 2009 comments and

9   the *Terms of Use*.  Moreover, the Opposition perfectly captures why the discovery

10  rule does not apply to claims based on public information.  Briggs sued several

11  defendants in 2013, but argues that he did not discovery Trigger Street's

12  wrongdoing until 2016—after conducting discovery in *Briggs I*, after losing on

13  summary judgment, and while that case was pending on appeal to the Ninth

14  Circuit.  (Opp. at 2.)  According to Briggs, 15 months after *Briggs I* went up on

15  appeal, he discovered a public statement made by Spacy and published by the BBC

16  in 2009.  (*Id.*)  Briggs's discovery of Spacey's 2009 public statement supposedly

17  caused Briggs to review the Terms of Use, and this led him to file *Briggs II*.  (*Id.*)

18         The truth is, nothing prevented Briggs from conducting a review of the

19  Terms of Use in 2013.  Similarly, there is no apparent reason why Briggs could not

20  have found Spacey's 2009 public comment in 2013—it was published by the BBC,

21  an internationally known news outlet.  Thus, the information Briggs cites in his

22  Opposition—Spacey's 2009 statement and TriggerStreet.com's Terms of Use—are

23  pieces of information that were readily available to Briggs in 2013, or sooner.

24  That Briggs elected not to investigate Trigger Street or Spacey, at a time when he

25  was pursuing a lawsuit in which he directly discussed TriggerStreet.com's role in

26  the alleged copyright infringement, is an insufficient basis to invoke the discovery

27  rule. *See also Fox*, 35 Cal. 4th at 807 (holding that a plaintiff must plead "the

28  inability to have made earlier discovery despite reasonable diligence").

- 4 –

1    Finally, with regards to the doctrine of fraudulent concealment, Briggs fails

2 to marshal any facts to support his argument.  Rather, in his Opposition, he merely

3 cites to authority stating the rule.  (Opp. at 6-7.)  Furthermore, as with the

4 discovery rule, the fact that Briggs attributes his "discovery" to sources that were

5 available to him years before defeats any claim that the statute of limitations

6 should be tolled on account of any alleged fraudulent concealment.

7    Accordingly, because Briggs fails to identify any facts or law that would

8 allow him to revive his stale claims, Trigger Street requests that the motion to

9 dismiss be granted without leave to amend.

10    **B.    <u>The Doctrine of Collateral Estoppel Applies</u>**

11    Briggs argues, in error, that the doctrine of collateral estoppel does not bar

12 his claims.  (Opp. at 9.)  In its Motion, Trigger Street established that Briggs is

13 collaterally estopped from proving each and every one of his claims because the

14 issue of infringement was decided against him in *Briggs I*.  (Mot. at 10-12.)  Briggs

15 counters that "none of this matter's causes of action were either addressed or

16 resolved in" *Briggs I*.  (Opp. at 9.)  In support of this meritless argument, Briggs

17 directs the court to a chart of the parties and claims involved in his lawsuits.  (*Id.* at

18 10.)  Briggs's reliance on the parties and claims from the prior suit misses the

19 point, as it is not the names of the causes of actions or the names of the parties that

20 is relevant for this analysis.

21    Rather, the key point is that facts and issues resolved against Briggs in

22 *Briggs I* prevent him from proving his claims in this lawsuit.  Specifically, in

23 *Briggs I*, he alleged that TriggerStreet.com was where the defendants obtained his

24 copyrighted work.  Because Briggs's infringement claim in *Briggs I* was disposed

25 of on summary judgement, he is precluded from relitigating infringement here.

26 And, as discussed in the Motion, this precludes him from establishing the element

27 of damages for all of the causes of action alleged in the Complaint.  Failure to

28 prove that essential element is fatal to each and every one his claims—and Briggs

1    fails to show how any amendment can cure this fatal defect.

2          Accordingly, the doctrine of collateral estoppel is an independent basis to

3    grant the motion to dismiss without leave to amend.

4          **C.**     **Briggs Fails to Properly Plead His Fraud Claims**

5          With regards to his fraud claims, Briggs again fails to address Trigger

6    Street's argument.  Trigger Street challenged Briggs's fraud claims on the basis

7    that the Complaint fails to properly differentiate between the various defendants.

8    (Mot. at 12-13.)  A plaintiff must comply with Rule 9(b) when alleging fraud.  *See*

9    *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).  "Rule 9(b) does not allow

10   a complaint to lump multiple defendants together but requires plaintiffs to

11   differentiate their allegations when suing more than one defendant."  *Id.* (citations

12   omitted).  In his Opposition, Briggs ironically attempts to defend his Complaint by

13   simply quoting the defective allegations.  (*See* Opp. at 11-14.)  But the paragraphs

14   cited in the Opposition each reflect the flaw addressed in Trigger Street's

15   Motion—they all merely refer to "Defendants" as an undifferentiated whole.  (*Id.*)

16   Furthermore, Briggs's argument that Spacey and Brunetti should be charged with

17   knowledge of the Terms of Use is inapposite.  (*See* Opp. at 14.)  Spacey and

18   Brunetti's status as Trigger Street executives does not address—let alone resolve—

19   the Complaint's failure to differentiate between the various defendants.

20         Because neither the Complaint nor the Opposition makes an effort to

21   distinguish or differentiate between the various defendants named in the

22   Complaint, Briggs's fraud claims (the Third, Fourth, and Fifth Claims for Relief)

23   must be dismissed for failure to comply with Rule 9 (b)'s pleading requirements.

24         **D.**     **The Negligence Claims Fail to Allege a Valid Duty**

25         Briggs's negligence claim must be dismissed because the Opposition does

26   not address the critical flaw in this claim for relief.  Briggs relies on California

27   Civil Code Section 1714(a) for the proposition that people must employ ordinary

28   care.  (Opp. at 14-16.)  While that may be an accurate assertion of the law, that

1    general statement does not speak to the facts of this case.  Briggs does not identify,

2    in his Complaint or in his Opposition, what specific duty of care Trigger Street

3    owed to him or how the breach of any alleged duty harmed him.  Briggs's failure

4    to plead the breach of a duty owed to him is fatal to his negligence claims.

5    Accordingly, the Sixth and Seventh Claims for Relief must be dismissed.

6              E.    **Briggs Infringement Claims Fail**

7              Briggs's Opposition appears to suggest that his infringement claims are

8    based on the allegation that his copyrighted work, *Butterfly Driver*, could be

9    viewed around the world.  (Opp. at 16-17.)  This clarification, however, does not

10   cure the defects in Briggs's claim.  Briggs cannot state a claim for copyright

11   infringement against Trigger Street based on Briggs's choice to post his

12   copyrighted work on the worldwide web—www.triggerstreet.com or

13   www.labs.triggerstreet.com.  (*See* Compl., ¶ 116; Ex. E.)  Furthermore, Trigger

14   Street's *Terms of Use* expressly advised members that the website's content could

15   be accessed from locations outside the United States, and informed members that it

16   was their obligation to ensure their use of the site complied with local laws.

17   (Compl., Ex. A at 28.)  Thus, because Briggs knowingly posted his work on the

18   web and agreed to TriggerStreet.com's *Terms of Use*, his infringement claim

19   against Trigger Street is meritless and must be dismissed.

20             F.    **Briggs Concedes Spoliation Is Not an Independent Tort**

21             Briggs concedes that his claim for spoliation of evidence is not actually an

22   independent tort.  (*See* Opp. at 17 ("Willful Suppression of Evidence and

23   Spoliation are [no] longer independent torts in California.").)  Accordingly, the

24   Eighth Claim for Relief must be dismissed because, under California law, "there is

25   no tort remedy for the intentional spoliation of evidence by a party to the cause of

26   action to which the spoliated evidence is relevant."  *Forbes v. Cty. of San*

27   *Bernardino*, 101 Cal. App. 4th 48, 55, 123 Cal. Rptr. 2d 721, 725 (2002) (citing

28   *Cedars-Sinai Medical Center v. Superior Court*, 18 Cal.4th 1, 5, 954 P.2d 511

1   (1998)).

2   **G.    Briggs's Conspiracy Arguments Fail**

3      Briggs's civil conspiracy claim must be dismissed because he fails to plead

4   any wrongful conduct by Trigger Street or an agreement to commit a wrongful act.

5   Briggs argues that the Complaint identified five separate conspiracies and the

6   related theories of relief.  (Opp. at 18.)  Briggs is mistaken.  First, contrary to

7   Briggs's argument, the charging allegations of the Fifth Claim for Relief do not

8   purport to identify the theory underlying each of the alleged conspiracies.  (*See*

9   Compl. ¶¶ 192-201.)  Second, the haphazard allegations contained in the Fifth

10  Claim for relief do not entitle Briggs to relief of any kind.  The allegations are little

11  more than a series of protests untethered to any actionable theory of relief.  Indeed,

12  three of the five "conspiracies" discussed in the Opposition—willful suppression

13  of evidence, spoliation of evidence, and engaging in negligent enterprises—are not

14  cognizable claims for relief.  (*See* Mot. at 14.)

15     Setting aside the labels Briggs cited in his Opposition, the civil conspiracy

16  claim also fails because each of the claims for relief alleged in the Complaint is

17  time-barred, barred by the doctrine of collateral estoppel, or fatally deficient in

18  some other respect—all as addressed above.  Briggs's Opposition did nothing to

19  address these fatal defects.  Thus, in the absence of any viable claims, Briggs's

20  civil conspiracy claim must be dismissed.

21  **H.    Briggs Cannot Cure His Complaint's Defects**

22     Finally, Briggs argues that he should be granted leave to amend because two

23  litigation financers supposedly approached Briggs regarding funding for his

24  lawsuit.  (Opp. at 19.)  While Briggs refers to these inquiries as "analysis," the

25  attached exhibits do not contain or refer to any evaluation of the merits of Briggs's

26  claims.  More to the point, Briggs does not offer any authority for the proposition

27  that leave to amend should be granted when litigation financers respond to a

28  plaintiff's request for litigation financing.

1       Briggs has had multiple opportunities to plead claims for relief based on his

2   allegation that the film *Elysium* infringed on his screenplay.  Briggs lost on the

3   merits in *Briggs I*, and based on the allegations in *Briggs II* and in the instant

4   Complaint, it is clear that Briggs cannot plead a valid claim for relief.

5   Accordingly, any amendment to the instant Complaint would be futile and thus

6   should be refused.  "[C]ourts have discretion to deny leave to amend a complaint

7   for 'futility,' and futility includes the inevitability of a claim's defeat on summary

8   judgment." *Roth v. Garcia Marquez*, 942 F.2d 617, 628 (9th Cir. 1991) (quoting

9   *Johnson v. American Airlines, Inc.,* 834 F.2d 721, 724 (9th Cir. 1987).

10  **III.**   **CONCLUSION**

11      For the foregoing reasons, Defendant Trigger Street Productions, Inc.

12  respectfully requests that the Court dismiss all claims against it in Plaintiff's

13  Complaint without leave to amend.

14

15  Dated:  November 20, 2018        LARSON O'BRIEN LLP

16

17          By:  */s/* Jonathan E. Phillips

18          Stephen G. Larson
    Jonathan E. Phillips

19          A. Alexander Lowder
    Attorneys for TRIGGER STREET

20          PRODUCTIONS, INC.

21

22

23

24

25

26

27

28

| 1 | Steve Wilson Briggs |
| 2 | 4322 Chico Ave., |
|   | Santa Rosa, CA 95407 |
| 3 | 510 200 3763 |
| 4 | snc.steve@gmail.com |
|   | PLAINTIFF In Propria Persona |
| 5 | |
| 6 | |
| 7 | |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| | Civ No: 18-cv-04952-VC |
| STEVE WILSON BRIGGS, | **PLAINTIFF'S OPPOSITION TO** |
| Plaintiff, | **DEFENDANT TRIGGER STREET** |
| | **PRODUCTIONS INC'S** |
| vs | **MOTION TO DISMISS** |
| KEVIN SPACEY et al, | Date:        December 06, 2018 |
| Defendants. | Courtroom:  4 |
| | Time:        10:00 a.m. |
| | Judge:       Hon. Vince Chhabria |

**PLAINTIFF'S OPPOSITION TO DEFENDANT**
**TRIGGER STREET PRODUCTIONS INC'S MOTION TO DISMISS**

On August 15, 2018, the Plaintiff submitted a Complaint, comprised of indisputable facts and incontestable exhibits. On October 29, 2018 Defendant (**Def**) Trigger Street Productions Inc (**TSP**) responded with a delinquent Motion to Dismiss and failed to provide a Corporate Disclosure Statement. Rather than making a single meritorious argument, the motion pursues a scattergun strategy—arguing as many bases for dismissal as possible, hoping the Court finds one of the arguments meritorious.  It should be noted that, as the Plaintiff understands the law, several of TSP's arguments do not comply with the bases for a FRCP Rule 12 motion. Nonetheless, the Plaintiff will oppose all of the Def's arguments.

11 days after filing their motion to dismiss, TSP submitted a corporate disclosure.

This Opposition is based on the Memorandum of Points and Authorities, attached herein, and on the attached "Proposed Order".

i

| 1 | **TABLE OF CONTENTS** |
|---|---|

2

3  I. CAPTION PAGE/INTRODUCTION……………………………………………  i

4  II. TABLE OF CONTENTS….......……………………………………………..  ii

5  III. TABLE OF AUTHORITIES…………………………………………………  iii

6  IV. **MEMORANDUM OF POINTS AND AUTHORITIES**…………………………  1

7    V. LEGAL STANDARD……………….…………………………………..…....  1

8    VI. STATEMENT OF FACTS……………………………………………………  1

9         Prior Unrelated Action *Briggs v Blomkamp*……………..………………....  1

10        Prior Related Action, *Briggs v Universal Pictures, et al*……………….....  1

11        Current Action……………………………………………………………....  2

12   VII. **PLAINTIFF'S OPPOSITION RESPONSE**……….……………………  4

13     A.  Opposition to Argument "A" of TSP's motion to dismiss,

14        that "Each and Every Claim for Relief Is Time Barred".........................  4

15     B.  Opposition to Argument "B" of TSP's motion to dismiss:

16        that "The Doctrine of Collateral Estoppel Bars Each

17        and Every Claim For Relief"....................................................................  9

18     C.  Opposition to Argument "C" of TSP's motion to dismiss:

19        That "Briggs Failed to Properly Plead His Fraud Claims**"**......................  11

20     D.  Opposition to Argument "D" of TSP's motion to dismiss:

21        that "The Negligence Claims Fail to Allege a Valid Duty"

21        The Plaintiff did not fail to allege a valid duty…………………………  14

22     E.  Opposition to Argument "E" of TSP's motion to dismiss:

23        that "Briggs Failed to Properly Plead His Infringement Claims"............  16

24     F.  Opposition to Argument "F" of TSP's motion to dismiss:

25        that  "Spoliation of Evidence Is Not a Valid Cause of Action"................  17

26     G.  Opposition to Argument "G" of TSP's motion to dismiss:

27        that "Civil Conspiracy Is Not an Independent Cause of Action".............  17

28        ii

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

1    H.  Opposition to Argument "H" of TSP's motion to dismiss:

2    that "Briggs Cannot Cure His Complaint's Defects"................................  18

3    VIII. IN Objective Analysis………………………………………..……………………  19

4    IV. CONCLUSION………………………………………………………………...  20

5    <u>**TABLE OF AUTHORITIES**</u>

6    **CASES**

7    *Angeles Chem. Co.  v. Spencer & Jones* (1996)

8    44 Cal.App.4th 112, 119 [51 Cal.Rptr.2d 594]...........................................................5

9    *Ashe v. Swenson* 397 U.S. 436 (1970).................................................................9

10   *Benton v. Maryland* 395 U.S. 784……………………………………………………….. 9

11   *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248………………….....13

12   *Briggs v Blomkamp*………………………………………………....1, 2, 9, 10, 14, 16

13   *Briggs v Space*y et al, 18-cv-04952-VC……………………………………………....1, 10

14   *Briggs v Universal*……………………………………………………………..…1, 3

15   *Burns v. Neiman Marcus Group, Inc.* (2009)

16   173 Cal.App.4th 479, 488, fn. 8 [93 Cal.Rptr.3d 130]...........................................15

17   *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764 (Cal. 2011)......................................16

18   *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.,* 911 F.2d 242, 247 (9th Cir. 1990)...........1

19   Fuller v. First Franklin Financial Corp. (2013)

20   216 Cal.App.4th 955, 962 [163 Cal.Rptr.3d 44]...........................................................6

21   *Glue-Fold, Inc.*, supra, 82 Cal.App.4th at p. 1029…………………………………………….7

21   *Gryczman v. 4550 Pico Partners, Ltd.* (2003) …………………………………………........5

22   *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110…………………………………………4

23   *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005)...........................................1

24   *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)...............1

25   *Mosier v. Southern California Physicians Ins. Exchange* (1995)

26   63 Cal.App.4th 1022, 1045)...........................................................13

27   *NBCUniversal Media, LLC v. Superior Court* (2014) 225

28   Cal.App.4th 1222, 1232 [171 Cal.Rptr.3d 1]...........................................8

iii

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

*Norgart v. Upjohn Co.* (1999) 21 Cal.4th……………………………………….....7

*Okun v. Superior Court* (1981)
29 Cal.3d 442,454 [175 Cal.Rptr. 157, 629 P.2d 1369……………………...……..18

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 705–06 (9th Cir. 2004).....................8

*Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994).....................................8

*Snow v. A.H. Robins Co.* (1985)........................................................................7

*Stansfield v. Starkey* (1990) 220 Cal. App. 3d 59, 72-73…………………………………..11

*Tarmann v. State Farm Mutual Automobile Insurance Co.* (1991)
2 Cal.App.4th 153, 157………………………………………………………….......14

*Wood v. Santa Barbara Chambers of Commerce, Inc.,*
507 F.Supp. 1128, 1135 (D.Nev.1980)........................................................................8

**STATUTES:**

Federal Rules of Civil Procedure (FRCP)

 Rule 12……………………………………………………………..…i, 1, 16

 17 U.S.C. § 501…………………………………………………………....17

California Code of Civil Procedure (CCP)

 § 338(d)..............................................................................................6

 § 1709…………………………………………………………………12, 13

 § 1710…………………………………………………………………12, 13

 § 1714(a)...............................................................................................15

**OTHER SOURCES AND AUTHORITIES:**

Judicial Council of California Civil Jury Instructions (CACI) (2017 edition).......................5

 No. 204………………………………………………………………….16

 No. 400………………………………………………………………….15

 No. 455…………………………………………………………………...7

 No 1901……………………………………………………………...….14

 No. 1925……………………………………………………………….…6

 No. 3600…………………………………………………………...…….17

Cornell Law's Wex Legal Dictionary………………………………………….......9

iv

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

| | |
|---|---|
| 1 | **<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>** |
| 2 | **LEGAL STANDARD** |
| 3 | DISMISSAL |
| 4 | ● The FRCP 12(b)(6) instructs the court must "accept factual allegations in the |
| 5 | complaint as true and construe the pleadings in the light most favorable to the |
| 6 | <u>non</u>moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, |
| 7 | 1031 (9th Cir. 2008). |
| 8 | ● The court must: "read the complaint generously and draw all reasonable inferences |
| 9 | in favor of the plaintiff." *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005). |
| 10 | ● If motion to dismiss is granted, a court should grant leave to amend unless it |
| 11 | determines the pleading could not possibly be cured by allegations of other facts. |
| 12 | *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.,* 911 F.2d 242, 247 (9th Cir. 1990). |
| 13 | |
| 14 | **STATEMENT OF FACTS** |
| 15 | This matter is connected to the Prior Action *Briggs v Blomkamp*, et al, CV134679-PJH. |
| 16 | **Prior <u>Un</u>related Action *Briggs v Blomkamp*:** |
| 17 | ● The Complaint explained that in May of 2013, the Plaintiff walked into a movie |
| 18 | theater and saw a trailer of a soon-to-be-released film that looked almost identical to |
| 19 | the Plaintiff's screenplay. |
| 20 | ● Plaintiff sued for one (1) Cause of Action: Copyright Infringement. |
| 21 | ● The Plaintiff lost on summary judgment. |
| 21 | ● The Ninth Circuit Court of Appeals affirmed the District Court decision in an |
| 22 | unpublished ruling. |
| 23 | ● Plaintiff petitioned for a Writ of Certiorari to the U.S. Supreme Court. The Court |
| 24 | denied the Plaintiff's petition. |
| 25 | **Prior Related Action, *Briggs v Universal Pictures, et al*:** |
| 26 | ● On November 13, 2017 the Plaintiff filed a suit which was very similar to the current |
| 27 | action (essentially the same causes). This suit was dismissed without prejudice, due |
| 28 | to the Plaintiff's failure to properly serve Defs Spacey and Brunetti. |

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

| | |
|---|---|
| 1 | **Current Action** |
| 2 | On August 15, 2018, the Plaintiff re-wrote his Complaint and re-filed this lawsuit |
| 3 | with the United States District Court of the Northern District of California. Some of the |
| 4 | more important case facts are as follows: |
| 5 | ● In late February, 2016, 15 months after the Prior Action went to appeals, the Plaintiff |
| 6 | found a BBC article in which Kevin Spacey stated at a convention in Barcelona, |
| 7 | Spain, that TriggerStreet.com had "over 400,000 members around the world." |
| 8 | ● The time frame that the Plaintiff discovered Spacey's statement is incontestable, |
| 9 | because Plaintiff immediately filed an "**Errata**" with the Ninth Circuit Court of |
| 10 | Appeals February 29, 2016 (re Briggs v Blomkamp). Plaintiff filed this Errata, |
| 11 | because in the Plaintiff's Appellate Brief the Plaintiff stated that at the time that the |
| 12 | Defendants accessed his screenplay (2007), TS had only 100,000 members. The new |
| 13 | figure of 400,000 dramatically enhanced Plaintiff's widespread dissemination claim. |
| 14 | ● Although the Plaintiff was happy to have proof of TS's true membership size to |
| 15 | report to the Appellate Court, the Plaintiff was distraught to learn that Spacey had |
| 16 | gone to Spain to recruit members (and to admit that TS had member "around the |
| 17 | world"). The Plaintiff was distraught because: |
| 18 |    a.  TS's Terms of Use contract stated that TS was solely for use in the USA. |
| 19 |    b.  The Plaintiff would have never placed his screenplay on a website intended |
| 20 |        for use around the world, particularly because it is nigh impossible for |
| 21 |        common American copyright holders to protect and enforce their copyrights |
| 21 |        overseas. |
| 22 | ● The Plaintiff then went back to the TS website (where he had been a member since |
| 23 | 2006). The Plaintiff discovered (approximately early March of 2016) that TS closed |
| 24 | almost a year and a half earlier, **only 6 days after** the Plaintiff filed Notice of Appeal |
| 25 | to the Ninth Circuit. |
| 26 | ● Upon discovering that TS closed 6 days after the Plaintiff filed Notice of Appeal, the |
| 27 | Plaintiff became suspicious that Spacey, Brunetti and other then unidentified actors |
| 28 | had been complicit in the access and infringement of the Plaintiff's work, as well as |

2

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

1 | complicit in suppressing and destroying evidence snd providing false testimony to
2 | the Court, etc.

3 | ● As the Plaintiff continued to review the various contract pages he found other
4 | instances of fraud and deceit; furthering the Fraud cause, and establishing other
5 | causes, such as Deceit.

6 | ● Although the Plaintiff was certain of Spacey's and Brunetti's Breach and Fraud by
7 | March of 2016, the Plaintiff was not certain of a larger conspiracy, or of a proveable
8 | negligent culture—until January or February of 2017, when the Plaintiff discovered
9 | that in 2016, Jeff Rovin, the man the Defendants hired as their "expert" witness in
10 | Brigg v Blomkamp, went on national TV (FOX News' Sean Hannity Show) to tell
11 | the world that he (Rovin) worked for years for President Bill Clinton's
12 | administration as a "fixer" (someone paid to write false "smear" stories for tabloid
13 | news outlets about Clinton critics).  The Plaintiff then realized that the Defendants
14 | had hired Rovin to "fix" (falsify) his report to the Court, to help the Defendants
15 | prevail in *Briggs v Blomkamp*.

16 | ● Upon discovering this catalytic fact (juxtaposed against the new facts that Spacey
17 | and Brunetti had deceived all American TS users and travelled abroad to recruit
18 | members, and the fact that the TS social network was destroyed 6 days after the
19 | Plaintiff filed Notice of Appeal) the Plaintiff was certain the Defendants had acted,
20 | in conspiracy, to commit engage in the causes of action of Breach, Negligence,
21 | Willful Suppression (and Spoliation) of Evidence. The Plaintiff resolved to take
21 | legal action (this was about March of 2017).

22 | ● The Plaintiff then began to write and research for his Complaint, which was filed
23 | November, 2017.

24 | ● Shortly after initiating the *Briggs v Universal* lawsuit (2017), Plaintiff realized that
25 | Spacey and Brunetti's efforts to make TS available in foreign markets and recruit
26 | new members around the world, and made the Plaintiff's work available around the
27 | world —without the Plaintiff's consent— was a new violation of the Plaintiff's
28 | exclusive copyright to distribute his work.

<center>3</center>

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

| | |
|---|---|
| 1 | **PLAINTIFF'S OPPOSITION RESPONSE** |
| 2 | To Trigger Street Productions Inc' Motion To Dismiss: |
| 3 | |
| 4 | Opposition to Argument "A" of TSP's motion to dismiss: |
| 5 | **A.** Defendant Trigger Street Productions argues that "Each and Every Claim for Relief |
| 6 | Is Time Barred" |
| 7 | None of the Plaintiff's claims for relief are time barred, and ALL are protected by: |
| 8 | 1. Specific rulings and codes for each cause of action providing that accrual begins |
| 9 | when the plaintiff learns of the infraction; |
| 10 | 2. the **Delayed Discovery Rule**; |
| 11 | "Under the [delayed] discovery rule, the statute of limitations begins to run |
| 12 | when the plaintiff suspects or should suspect that [his or] her injury was caused by wrongdoing, that someone has done something wrong to [him |
| 13 | or] her" (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110). |
| 14 | 3. "Fraudulent concealment" tolling rules. |
| 15 | The Plaintiff's Complaints features five types of causes of action: 1. Breach of |
| 16 | Contract; 2. Fraud; 3. Negligence; 4. Copyright Infringement; 5. The Doctrinal (Conspiracy |
| 17 | and Suppression/Spoliation, whic are not independent causes). |
| 18 | Before explaining why each of these causes of action is not, and cannot be, time |
| 19 | barred, cartain facts should be reviewed. |
| 20 | 1. The Plaintiff learned of Kevin Spacey traveling to Barcelona, Spain, to boast of |
| 21 | TriggerStreet.com's "400,000 members around the world," **in late February of** |
| 21 | **2016.** This fact is known to the Court because on February 29, 2018, the Plaintiff |
| 22 | filed an "Errata" to the Ninth Circuit Court of Appeals to inform them that TS had |
| 23 | over 400,000 members in 2009. This information fortified the Plaintiff's argument |
| 24 | for *widespread dissemination*, as the Plaintiff's appellate brief stated there were only |
| 25 | 100,000 members (from a 2004 TIME magazine article). |
| 26 | 2. Between February and March of 2016, the Plaintiff learned that the Defendants |
| 27 | closed and destroyed TriggerStreet.com (back in November of 2014). |
| 28 | 3. Late February of 2017, the Plaintiff learned that Jeff Rovin (the Defendants' expert |

1     witness in Briggs v Blomkamp) went on FOX News' *Sean Hannity Show* (October

2     24, 2016) to admit he (Rovin) was a professional *fixer* for President Clinton. This

3     became the final, and catalytic event that caused the Plaintiff to bring this action.

4     4.  Virtually ALL other factual discoveries (except those events occurring during Briggs

5     v Blomkamp) were discovered in or after March of 2017.

6     5.  The Plaintiff filed the Briggs v Universal Complaint on November 13, 2017.

7

8     **The Breach Of Contract Claim Is Not Time Barred**

9     The Plaintiff learned of the Defendants' Breaches of Contract in February of 2016.

10    Breach of Contract has a four year statute of limitations in California. Therefore, the

11  Plaintiff has until February of 2020 to file suit.

12    Additionally, Breach of Contract is protected by the Delayed Discovery Rule, thus

13  time does not accrue until the Plaintiff learns of the Breach.

14    The Defense Counsel, as if to deliberately mislead the Court, argues that time

15  accrual begins when Spacey went to Barcelona to recruit new TS members, in 2009, or

16  when TS last operated, in 2014.

17    But, in fact, the **Judicial Council of California Civil Jury Instructions** (2017

18  edition) provides the following two legal citations, which establish that time accrual on

19  Breach of Contract claims are delayed until the Plaintiff learns of the breach:

20    • "The claim accrues **when the plaintiff discovers**, or could have discovered

21    through reasonable diligence, the injury and its cause." (Angeles Chem. Co. v.
Spencer & Jones (1996) 44 Cal.App.4th 112, 119 [51 Cal.Rptr.2d 594].)

21

22    • "[T]he **discovery rule** may be applied to breaches [of contract] which can
be, and are, committed in secret and, moreover, where the harm flowing from

23    those breaches will not be reasonably discoverable by plaintiffs until a future
time."(Gryczman v. 4550 Pico Partners, Ltd. (2003) 107 Cal.App.4th 1, 4–5

24    [1311530079 Cal.Rptr.2d 680].)

25

26    No reasonable person could have guessed that the Defendants (Spacey, Brunetti,

27  TriggerStreet) were engaged in routine breaches of contract. Otherwise, dozens, hundreds,

28  or thousands of their TS members would have withdrawn their screenplays or filed suit.

1    Additionally, the Breach of Contract claims are protected by delayed accrual because

2    of the *fraudulent concealment*, and *fraudulent deceit* causes of action present in this case.

3

4                        **The Fraud Claims Are Not Barred**

5    The Plaintiff learned of the Defendants' various fraudulent actions, between

6    February of 2016, and October 2017.

7    Fraud has a three year statute of limitations in California.

8    Therefore, the Plaintiff has until between February of 2019 and October of 2020 to

9    file suit against the Defendants.

10   The Defense Counsel, again, seems intent to misinform the Court as to the rules of

11   statute of limitations and time accrual related to fraud, contending that time accrues from the

12   first or last fraudulent event.

13   That is not the case.

14   California Code of Civil Procedure § 338(d) states:

15      338. Within three years:
16      (d) An action for relief on the ground of fraud or mistake. The cause of
        action in that case is not deemed to have accrued **until the discovery, by**
17      **the aggrieved party**, of the facts constituting the fraud or mistake.

18   But the California rules protecting the rights of the aggrieved go even further in the

19   case of the more egregious types of fraud. If fraudulent concealment is suspected to be at

20   play, as it is in this case, the statute of limitations is tolled, as made clear in several case

21   citations included in the Judicial Council of California Civil Jury Instructions (2017 edition)

21   (CACI No. 1925, Affirmative Defense—Statute of Limitations—Fraud or Mistake):

22      • "One [exception to the limitations period] is the doctrine of fraudulent
        concealment, which tolls the statute of limitations if a defendant's deceptive
23      conduct 'has caused a claim to grow stale.' " (Fuller v. First Franklin
24      Financial Corp. (2013) 216 Cal.App.4th 955, 962 [163 Cal.Rptr.3d 44].)

25      • "'Technical rules as to when a cause of action accrues apply therefore only
        in those cases which are free from fraud committed by the defendant. Said
26      section 338, subdivision 4, . . . recognizes the nonapplicability of those
27      technical rules where the fraud of the defendant may be so concealed that in

28

1  the absence of circumstances imposing greater diligence on the plaintiff, the
2  cause of action is deemed not to accrue until the fraud is discovered.
   Otherwise, in such cases, the defendant by concealing his fraud, would
3  effectively block recovery by the plaintiff because of the intervention of the
   statute of limitations.' " (Snow v. A.H. Robins Co. (1985) 165 C
4

5       From *Snow v Robins*, one might conclude that the elements of Fraudulent Deceit and

6  Fraudulent Concealment, herein, would further, redundantly, cause all claims to toll.

7

8                    **The Negligence Claims Are Not Time Barred**

9       Virtually all of the Plaintiff's Negligence claims where unearthed between March of

10 2017 and late November 2017.

11      The California *negligence* statute of limitations is two years.

12      Therefore, the Plaintiff has until February and/or November of 2019 to file suit.

13      In California time does NOT accrue from when the Defendant commits the last

14 negligent act.

15      Rather, time accrues from when the plaintiff learns of the negligent conduct,

16 confirmed by the following cases taken from the Judicial Council of California Civil Jury

17 Instructions (2017 edition) (CACI No. 455. Statute of Limitations—Delayed Discovery, re

18 Negligence)

19      "An exception to the general rule for defining the accrual of a cause of
20      action—indeed, the 'most important' one—is the discovery rule. . . . It
        postpones accrual of a cause of action until the plaintiff discovers, or has
21      reason to discover, the cause of action. (Norgart v. Upjohn Co. (1999) 21
21      Cal.4th 383, 397–398 [87 Cal.Rptr.2d 453, 981 P.2d 79]

22      "A limitation period does not begin until a cause of action accrues, i.e., all
23      essential elements are present and a claim becomes legally actionable.
24      Developed to mitigate the harsh results produced by strict definitions of
        accrual, the common law discovery rule postpones accrual until a plaintiff
25      discovers or has reason to discover the cause of action." (Glue-Fold, Inc.,
26      supra, 82 Cal.App.4th at p. 1029, internal citations omitted.)

27      "A plaintiff's inability to discover a cause of action may occur 'when it is
28      particularly difficult for the plaintiff to observe or understand the breach of duty,

                                         7
         PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

| | |
|---|---|
| 1 | or when the injury itself (or its cause) is hidden or beyond what the ordinary |
| 2 | person could be expected to understand.' " (NBCUniversal Media, LLC v. |
| 3 | Superior Court (2014) 225 Cal.App.4th 1222, 1232 [171 Cal.Rptr.3d 1].) |
| 4 | **The Copyright Infringement Claims Are Not Time Barred** |
| 5 | As the Court may recall, the Plaintiff realized the Copyright Infringement causes of |
| 6 | action in this matter, only after the Plaintiff amended his original complaint (circa December |
| 7 | 2017). |
| 8 | Therefore, the Plaintiff has until December 2020 to file suit against the Defendants. |
| 9 | Against the Defense Counsel's insistence otherwise, for Copyright Infringement time |
| 10 | accrues when the Plaintiff learns of a violation. [See *Wood v. Santa Barbara Chambers of* |
| 11 | *Commerce, Inc.,* 507 F.Supp. 1128, 1135 (D.Nev.1980), and see *Roley v. New World* |
| 12 | *Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994)]. |
| 13 | Further, in *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 705–06 (9th Cir. |
| 14 | 2004), the Court ruled that not only is time accrued from when Plaintiff's discover the |
| 15 | infringement, but Plaintiff's can also recover damages that happen outside of the three year |
| 16 | window. |
| 17 | |
| 18 | **The Conspiracy & Suppression/Spoliation Claims Are Not Time Barred** |
| 19 | Conspiracy and Suppression of Evidence and/or Spoliation are not independent |
| 20 | causes of action in California. Rather, they are actionable doctrines; one, Conspiracy, |
| 21 | imposes liability on persons who, although not actually committing a tort themselves, share |
| 21 | with the immediate tortfeasors a common plan or design in its perpetration; the other, |
| 22 | Suppression/Spoliation, imposes liability on persons who assist in destroying evidence in |
| 23 | furtherance of another civil infraction or tort. |
| 24 | In California, like the federal courts, time accrues from the last known act of the |
| 25 | Conspiracy. The time limit is determined by the associated cause of action. |
| 26 | In this matter, currently, the last known act in the Defendants' conspiracy was the |
| 27 | closing and destroying of the TS social network, in November of 2014. This was done to |
| 28 | abet and conceal one or more breaches of contract. |

8

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

1     Therefore, the statute of limitations for the Plaintiff to take action on this conspiracy

2  would have expired in November 2018. The Plaintiff filed suit in August, 2018, several

3  months before the deadline.

4

5           **Opposition to Argument "B"** of TSP's motion to dismiss:

6  **B.** The Defendant Falsely claims **"The Doctrine of Collateral Estoppel Bars Each**

7          **and Every Claim For Relief"**

8     The Defense Counsel has seemingly wasted the Court's time to advances a hollow

9  argument that the Plaintiff's FAC is barred by the "*Collateral Estoppel*"—which is false, on

10 its face, as none of this matter's causes of action were either addressed or resolved in the

11 Prior Action's (*Briggs v Blomkamp*) judgment.

12    Cornell Law's Wex Legal Dictionary defines *Collateral Estoppel* as follows:

13

14         The doctrine of collateral estoppel, a common law legacy codified by

15    Ashe v. Swenson 397 U.S. 436 (1970), **protects** criminal **defendants from

      being tried for the same issue in more than one** criminal **trial**. In Ashe v.

16    Swenson, the Court ruled that the aegis of the Fifth Amendment's

      protections against double jeopardy are enforceable in state as well as

17    federal court through the Due Process Clause of the Fourteenth

18    Amendment as established by Benton v. Maryland 395 U.S. 784. This

      decision relies on the application of the Full Faith and Credit Clause of the

19    Constitution.

20         As a subgenre of res judicata, **collateral estoppel prevents

21    subsequent litigation of legal determinations of fact and law that have

      resulted in valid final judgments**. All litigants have a "full and fair"

21    opportunity to bring suit except where one party has brought effectively the

22    same suit as defined by the same substantive legal issue in another venue or

23    at another time against the same defendant.

24     The argument is clearly inapplicable as none of the causes for action in this matter

25 were addressed in the Prior Action, Briggs v Blomkamp, and both matters rely on separate

26 facts and allegations, and ten (10) of the 13 parties in this action are entirely new.

27     The charts on the following page are intended to help illustrate the vast differences

28 between the two cases.

9

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

| BRIGGS v BLOMKAMP | BRIGGS v SPACEY |
|---|---|
| **DEFENDANTS:**<br>**Neill Blomkamp**<br>**MRC**<br>**Sony Pictures Ent.**<br>TriStar<br>QED International | **DEFENDANTS:**<br>**Neill Blomkamp**   Mordecai Wiczyk<br>**MRC**     NBCUniversal<br>**Sony Pictures Ent.**   Ben Affleck<br>Kevin Spacey    Bill Block<br>Ari Emanuel    Asif Satchu<br>Matt Damon    Dana Brunetti |
| CAUSES OF ACTION:<br><br>1.  Copyright Infringement | CAUSES OF ACTION:<br>1.  Civil Conspiracy<br>2.  Breach Of Contract<br>3.  Fraud<br>4.  Fraudulent Deceit<br>5.  Fraudulent Concealment<br>6.  Negligence<br>7.  Gross Negligence<br>8.  Willful Suppression/Spoliation<br>9.  Infringing Exportation<br>10. Copyright Infringement<br>11. An Accounting |

Examining the most basic case facts confirms that no relationship exists between the two cases —expect for the mention, in *Briggs v Spacey*, of unlawful conduct that the Defendants engaged in during *Briggs v Blomkamp* (e.g., the Defendants' expert submitted a falsified expert report, then two years later boasted that he was/is a professional fixer), to secure a favorable judgment.

The only causes of action that even share a name are the copyright infringement cause(s). But examining these causes, one sees that these causes are wholly unrelated.

| ANALYSIS OF COPYRIGHT CLAIMS IN BRIGGS V BLOMKAMP: | ANALYSIS OF COPYRIGHT CLAIMS IN BRIGGS V SPACEY: |
|---|---|
| Plaintiff claimed **Neill Blomkamp** accessed and misappropriated his screenplay on TriggerStreet.com; then used the misappropriated work to make the film "Elysium." | Plaintiff claims **Kevin Spacey** and **Dana Brunetti,** without Plaintiff's consent, used the TS social network to market the Plaintiff's screenplay around the world, in violation of copyright law. |

1    Since none of the causes of action, issues, allegations and facts of his matter (Briggs

2  v Spacey et al) were addressed in Briggs v Blomkamp, and since none of them have ever

3  been brought to a valid final judgment, clearly then, none of the causes of action in Briggs v

4  Spacey et al are barred by collateral estoppel.

5

6           **Opposition to Argument "C"** of TSP's motion to dismiss:

7    **C.** The Defendant Falsely claims "Briggs Failed to Properly Plead His Fraud Claims**"**

8         The Plaintiff has properly pleaded his fraud claims.

9         *Stansfield v. Starkey* (1990) 220 Cal. App. 3d 59, 72-73, establishes that **Fraud**

10  (Intentional Misrepresentations) pleadings consist of five (5) elements:

11    1.  a representation, usually of fact, which is false;

12    2.  knowledge of its falsity;

13    3.  intent to defraud;

14    4.  justifiable reliance upon the misrepresentation;

15    5.  damage resulting from that justifiable reliance.

16         <u>All of these elements are present in the Plaintiff's pleading for Fraud</u>, as seen on

17  page 48 of the Complaint, beginning on paragraph 219, under the heading "**Third Claim**

18  **For Relief Fraud / Intentional Misrepresentations**":

19    "219. The Defendants made numerous false representations, as true; such as:

20       a. The Defendants falsely claimed TS was solely for use in the USA;
         b. The Defendants falsely claimed that TS employed "industry standard"
21          security.
         c. The Defendants falsely claimed that TS "encapsulates every aspect of the
21          user's desires and needs."
22       d. The TS "Security" page falsely stated: " When you submit information via
            the Site, your information is protected using secure data networks protected
23          by industry standard firewall and password protection systems. Our
            security practices and policies are periodically reviewed and updated as
24          necessary, and only authorized individuals have access to the information
25          provided by our users."
         e. The Defendants knowingly hired a "fixer," and knowingly submitted said
26          fixer's falsified expert report to the District Court.
27    220. The Defendants knew these claims were false.
      221. The Defendants intended for the Plaintiff to rely on these
28

11

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

| | |
|---|---|
| 1 | misrepresentations. |
| 2 | 222. The Plaintiff relied on the Defendants' claims. |
| | 223. The District Court relied on the false claims of the Defendants' expert. |
| 3 | 224. The Plaintiff was injured as as a direct, foreseeable and proximate |
| 4 | consequence of the Defendants' fraud and misrepresentations…" |

The pleading standards for **Fraudulent Deceit** are the same as standard Fraud:

1. a representation, usually of fact, which is false;

2. knowledge of its falsity;

3. intent to defraud;

4. justifiable reliance upon the misrepresentation;

5. damage resulting from that justifiable reliance.

All of these elements are present in the Plaintiff's pleading of Fraudulent Deceitt, as seen on page 49, beginning on paragraph 226, under the heading "**Fourth Claim For Relief Fraudulent Deceit**":

"226. The Defendants committed fraudulent deceit as defined under California Civ. Code §§ 1709 & 1710.
227. The Defendants' acts of deceit include, but are not limited to, such actions as:
   a. The Defendant encouraged/intimidated TS members into using false identities;
   b. The Defendants falsely claimed TS was solely for use in the USA, but then made TS available around the world, and Defs Spacey went to various foreign countries to recruit new members;
   c. The Defendants failed to disclose that the Defendants implemented counter security features on the TS social network, whereby all of a member's script's access history was erased when that member removed his/her script from the TS social network.
   d. The Defendants falsely claimed that TS employed "industry standard" security.
   e. The Defendants knowingly hired a fixer , and knowingly submitted said fixer's falsified expert report to the District Court.
   f. The Defendants' employee or agent, Simon Kinberg, stated under oath that he only polished Defendant Blomkamp's screenplay. But the record and evidence proves Kinberg did much more than polish Blomkamp's script and film.
228. The Defendants knew these claims were false—or knew that withholding the truth was unlawful, a breach of trust, a breach of obligation, and/or unethical.

12

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

229. The Defendants made these false statements and omissions to deceive the Plaintiff, with the intent that the Plaintiff rely on the misrepresentations and omissions as true.

230. The Plaintiff reasonably relied on the Defendants' representations, as true.

231. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' fraudulent deceit, including, but not limited to, such injuries as…"

The pleading requirements for **Concealment Fraud** in California are slightly different, established by such cases as *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248; and *Mosier v. Southern California Physicians Ins. Exchange* (1995) 63 Cal.App.4th 1022, 1045) Concealment Fraud requires that each of the following elements be proved:

1.   Defendant must have concealed or suppressed a material fact,

2.   Defendant must have been under a duty to disclose the fact to the plaintiff;

3.   Defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff;

4.   Plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact;

5.   Plaintiff must have sustained damage as a result of the concealment"

All of these elements are present in the Plaintiff's pleading of Fraudulent Concealment, as seen on page 50, beginning on paragraph 233, under the heading "**Fifth Claim For Relief Fraudulent Concealment**":

"233. The Defendants engaged in concealment as defined by California Civ. Code §§ 1709 & 1710, and as contemplated in California Civil Jury Instructions § 1901.

234. The Defendants willful and deliberate acts of concealment include, but are not limited to, such acts as:

a. The Defendants closed TS without sending a customary email notification to TS members (as the Defs did not want the Plaintiff to be aware of the closure).

b. To prevent Plaintiff from discovering the Defendant's misappropriations of his screenplay, the Defendants took the extraordinary step of refusing to allow Elysium actors to take the Elysium script home.

c. The Defendants did not inform TS members that Def Spacey (and/or Def Brunetti) went to various foreign countries to recruit new TS members.

13
PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

1
2
3
    d. The Defendants failed to disclose that the Defendants implemented counter security features on the TS social network, whereby all of a member's script's access history was erased when that member removed his/her script from the TS social network.

4
    e. In Briggs v Blomkamp , the Defendants would not permit their employee/agent, Lee Smith, to answer a central discovery interrogatory.

5
6
    235. The Plaintiff was injured as as a direct, foreseeable and proximate consequence of the Defendants' fraudulent concealment, including, but not limited to, such injuries as…"

7
<u>Particularity</u>

8      In addition to the elements required to plead Fraud, California also requires that the

9  facts constituting each element be alleged with particularity.  In addition, fraud pleadings

10  against a corporation must allege such facts as the names of the persons who made the

11  misrepresentations, to whom they spoke, what they said, and when it was said or written.

12  (Tarmann v. State Farm Mutual Automobile Insurance Co. (1991) 2 Cal.App.4th 153, 157.).

13      The Plaintiff's Complaint meets this demand as it identifies the actions that each key

14  Defendant  take  with  respect  to  Fraud  (e.g.,  Spacey  and  Brunetti  made  certain

15  representations to TS member, then went to Barcelona and said and did the opposite).

16      All of the Defendants' conduct is  fully outlined in the body of the Complaint. For

17  instance, forming the basis of the breach cause and portions of the fraud cause, the Plaintiff

18  explained in the body of the Complaint that Spacey and Brunetti were the executives and

19  creators of TS; thus they knew the Terms of Use page informed US users that TS was solely

20  for use in the USA; thus, when they travelled to Spain and London to recruit members they

21  understood they were engaged in breach and fraud. However, in respect for the Court's time,

21  in the Complaint's "Claims For Relief" section, the Plaintiff simply re-alleged all of the

22  preceding paragraphs, incorporating them by reference, to comply with the "particularity"

23  requirement, without having to rewrite the entire Complaint under each claim for relief.

24

25      **Opposition to Argument "D"** of TSP's motion to dismiss:

26  **D.** The Defendant Falsely claims "The Negligence Claims Fail to Allege a Valid Duty"

27      The Plaintiff did not fail to allege a valid duty.

28      As the Plaintiff understands the law, there is no such requirement to allege a valid

1   duty in a Negligence tort.  The Judicial Council of California Civil Jury Instructions (2017

2   edition) CACI No. 400. provides the following elements of a **negligence** claim:

3       [Name of plaintiff] claims that [he/she] was harmed by [name of
4       defendant]'s negligence. To establish this claim, [name of plaintiff] must
        prove all of the following:
5       1. That [name of defendant] was negligent;
6       2. That [name of plaintiff] was harmed; and
7       3. That [name of defendant]'s negligence was a substantial factor in
           causing [name of plaintiff]'s harm.
8

9       California Code of Civil Procedure 1714(a) (which is the foundation of any

10  California negligence action) states:

11      "**Everyone is responsible**, not only for the result of his or her willful acts,
12      but also for an injury occasioned to another by his or her want of ordinary
        care or skill in the management of his or her property or person, except so far
13      as the latter has, willfully or by want of ordinary care, brought the injury
14      upon himself or herself."

15      From this comes the concept that we all have a duty to employ ordinary care.

16  However, this is not for the Plaintiff to posit. Rather, from the facts and allegations, it is for

17  the Court to determine. The The Judicial Council of California Civil Jury Instructions (2017

18  edition) CACI No. 400 (Negligence) "Sources and Authority" section explains:

19      "[T]he concept of foreseeability of risk of harm in determining whether a
20      duty should be imposed is to be distinguished from the concept of "
        'foreseeability' in two more focused, fact-specific settings' to be resolved by
21      a trier of fact. 'First, the [trier of fact] may consider the likelihood or
        foreseeability of injury in determining whether, in fact, the particular
21      defendant's conduct was negligent in the first place. Second, foreseeability
22      may be relevant to the [trier of fact's] determination of whether the
        defendant's negligence was a proximate or legal cause of the plaintiff's
23      injury.' " (Burns v. Neiman Marcus Group, Inc. (2009) 173 Cal.App.4th 479,
24      488, fn. 8 [93 Cal.Rptr.3d 130], internal citation omitted.)

25      And…

26      While the court deciding duty assesses the foreseeability of injury from 'the
27      category of negligent conduct at issue,' if the defendant did owe the plaintiff
        a duty of ordinary care the jury 'may consider the likelihood or foreseeability
28      of injury in determining whether, in fact, the particular defendant's conduct

15
PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

1   was negligent in the first place.' (Cabral *v.* Ralphs Grocery Co., 51 Cal. 4th
2   764 (Cal. 2011)

3   **Opposition to Argument "E"** of TSP's motion to dismiss:

4   **E.**   The Defendant Falsely claims "Briggs Failed to Properly Plead His Infringement
5   Claims"

6   **The American Bar Association** lays out the necessary elements for an infringement
7   suit, in their article "An Overview of the Elements of a Copyright Infringement Cause of
8   Action - Part I: Introduction and Copying." Author Jason E. Sloan explains:

9   An action for copyright infringement may arise where a third party
10  violates one or more of the exclusive rights granted to copyright owners.  To
    establish infringement, the plaintiff must prove:  "(**1**) ownership of a valid
11  copyright, and (**2**) copying of constituent elements of the work that are
    original."[1]
12
    Ownership of a valid copyright consists of:  "(**1**) originality in the
13  author; (**2**) copyrightability of the subject matter; (**3**) a national point of
    attachment of the work, such as to permit a claim of copyright; (**4**)
14  compliance with applicable statutory formalities; and (**5**) (if the plaintiff is
    not the author) a transfer of rights or other relationship between the author
15  and the plaintiff so as to constitute the plaintiff as the valid copyright
    claimant."[2]  **A copyright registration certificate from the Copyright**
16  **Office serves as prima facie evidence of elements (1) through (4)**.  If the
17  defendant rebuts the plaintiff's prima facie evidence, then the above elements
    of valid copyright ownership become essential to the plaintiff's case.
18

19

20  The Plaintiff possesses a valid copyright registration for his work in question; thus,
21  he has met ALL of the requirements outlined in paragraph two.  The Plaintiff believes the
22  Court is aware that the Plaintiff possesses a valid copyright registration for his screenplay
23  *Butterfly Driver*, as it is part of the public record, as it was required to file the *Briggs v
24  Blomkamp* lawsuit (and attached as an exhibit to the complaint). The Defendant has also
    attached the Briggs v Blomkamp complaint to their motion, and asked for Judicial Notice.

25  In drafting the infringement claims in this current action, the Plaintiff explained the
26  necessary facts in the body of the Complaint, and re-alleged and incorporated them by
27  reference into his infringement claims (See Complaint, pp 55-57). Thus, the Plaintiff
28  believes he has properly pleaded his infringement claims, the details of which are

16
PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

1   exceedingly simple: Plaintiff placed his screenplay on a social network claiming to be solely

2   for use in the USA, but secretly the Defendants displayed the network (and the Plaintiff's

3   work) around the world. This was Infringing Exportation, a violation of the Plaintiff's

4   exclusive right to distribute his work, enforceable under FRCP 17 U.S.C. § 501.

5       If the Court requires a more detailed infringement pleading (à la Briggs v

6   Blomkamp) with the registration attached, the Plaintiff will seek leave to amend (hopeful

7   that the Court will permit the Plaintiff to postpone amending until all of the Defendants'

8   motions to dismiss are heard, to circumvent the need to seek further leave to amend).

9

10           **Opposition to Argument "F"** of TSP's motion to dismiss:

11     **F.**  The Defendant claims "Spoliation of Evidence Is Not a Valid Cause of Action"

12       Willful Suppression of Evidence and Spoliation are longer independent torts in

13   California. However, Willful Suppression of Evidence (and spoliation) is an actionable civil

14   infraction if it is done in furtherance of or the commission of an independent cause of

15   action. Therefore, as the Complaint explains on page 54, paragraph 246, under the heading

16   "**Eighth Claim For Relief Willful Suppression Of Evidence / Spoliation Of Evidence**,"

17   California has codified its Civil Jury Instructions Plaintiff to address this infraction:

18       246. **California Civil Jury Instructions (CACI) (2017) 204** makes willful
19       suppression of evidence unlawful; stating: "You may consider whether one
          party intentionally concealed or destroyed evidence. If you decide that a party
20       did so, you may decide that the evidence would have been unfavorable to that
21       party."

21       Additionally, the Defendants argument is not a basis for a Rule 12 motion.

22

23           **Opposition to Argument "G"** of TSP's motion to dismiss:

24   **G.**  The Defendant Needlessly claim "Civil Conspiracy Is Not an Independent Cause of

25     Action"

26       The Plaintiff, like the Court, understands that Conspiracy is not an independent

27   cause of action. **California Civil Jury Instructions (CACI) (2017) 3600** provides juries

28   detailed guidelines to identify civil conspiracies. But more importantly, CACI 3600 *Sources*

1  *and Authority* section also explains how and when a Plaintiff's complaint may include a

2  cause of action for Conspiracy:

3       "A complaint for civil conspiracy states a cause of action only when it alleges
the commission of a civil wrong that causes damage. Though conspiracy may
4       render additional parties liable for the wrong, the conspiracy itself is not
5       actionable without a wrong." (Okun v. Superior Court (1981) 29 Cal.3d 442,
     454 [175 Cal.Rptr. 157, 629 P.2d 1369].)
6

7       The Complaint's "Claims For Relief" section has dedicated a lengthy section (page

8  41 to 46) to cover the Conspiracy claims, and explain the five (5) separate conspiracies

9  committed by the Defendants.

10       The first conspiracy was to commit fraud.

11       The second conspiracy was to commit fraudulent concealment.

12       The third conspiracy was to commit Willful Suppression of Evidence.

13       The fourth conspiracy was to make Intentional Misrepresentations to the Court and

14  to Plaintiff, and to commit spoliation of evidence.

15       The fifth conspiracy was to engage in negligent enterprises.

16       The Complaint's *Conspiracy* section details the actors and their actions in each of

17  the five conspiracies. Although the Complaint does not specifically say "Conspiracy #1 was

18  executed to commit fraud," and so on, for each of the five conspiracies, if adding these

19  statements is helpful to the Court, the Plaintiff will amend.

20       Additionally, the Defendant's argument does not appear to be a Rule 12 motion basis.

21

21               **Opposition to Argument "H"** of TSP's motion to dismiss:

22  **H.** The Defendant claims "Briggs Cannot Cure His Complaint's Defects"

23       Should the Court find that any of the Defendant's arguments are meritorious, the

24  Plaintiff assures the Court he can, and will, cure the problem with leave of the Court to

25  amend.  If such leave is required, again, the Plaintiff hopes the Court will permit the

26  Plaintiff to delay the amending until all of the Defendants' motions to dismiss are heard, to

27  circumvent the possibility that the Plaintiff might seek further leave to amend again.

28

| | |
|---|---|
| 1 | **Objective Analysis** |
| 2 | The Defendant's motion to dismiss, like most motions to dismiss, endeavors to |
| 3 | persuade the Court that the Plaintiff's lawsuit is meritless. |
| 4 | The Plaintiff believes that perhaps the clearest and most conclusive evidence of the |
| 5 | meritoriousness of Plaintiff's lawsuit is what outside experts and attorneys say about the |
| 6 | case, upon thorough and careful consideration. The Plaintiff postulates that the attorneys |
| 7 | and experts that the Court should be most interested in hearing from, regarding this case, are |
| 8 | litigation financier/investors.** |
| 9 | Why? |
| 10 | Litigation financiers are willing to invest millions to finance the legal costs of the |
| 11 | meritorious lawsuits. Litigation financiers are very selective. Most litigation investment (or |
| 12 | financing) firms employ a team of lawyers to analyze the merits of each case they consider. |
| 13 | Typically, a litigation finance company will only finance cases that the analysts give at least |
| 14 | a 60% chance of success; which gives the financiers a substantial 60-40 advantage. |
| 15 | With that explained, 2-3 weeks after Related Case *Briggs v Universal* (2017) was |
| 16 | dismissed, Lee Jesberger, the CEO of *Easy Lawsuit Funds* (a well-known litigation |
| 17 | financing firm) contacted the Plaintiff to inform him that his company was interested in |
| 18 | funding the Plaintiff's action against the Defendants. (**See Exhibit A**). However, it was a bit |
| 19 | too late. (It should be noted Mr Jesberger contacted the Plaintiff several months after the |
| 20 | Plaintiff contacted him.) |
| 21 | But perhaps more telling of the absolute meritoriousness of this action is that a few |
| 21 | months later, without solicitation, on September 13, 2018, Steven Weisman, **LexShares'** |
| 22 | *Origination Analyst*, contacted the Plaintiff to express interest in financing the Plaintiff's |
| 23 | Prior related action, *Briggs v Universal*. (**See Exhibit B.**) (LexShares is one of the most |
| 24 | renowned litigation finance companies in the world). |
| 25 | The Plaintiff posits that these attorneys and investors wouldn't be interested in a |
| 26 | suit if it didn't have absolute merit. |
| 27 | |
| 28 | **The Plaintiff intends to use such a finance company to secure representation shortly after the case enters Discovery. |

1

**CONCLUSION**

2      For all of the foregoing reasons, the Plaintiff believes Trigger Street Productions

3  Inc's motion to dismiss should be denied.

4                          Respectfully submitted,

5

6  Dated:_ 11/19/2018 _          Signed:_ /s/  Steve Wilson Briggs _

7                                   Steve Wilson Briggs
                                     Plaintiff, In Propria Persona
8

9

10

11

12

13

14

15

16

17

18

19

20

21

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEF TRIGGER STREET'S MOTION TO DISMISS

# EXHIBIT A



Steve Wilson Briggs <snc.steve@gmail.com>

---

## Lawsuit Advance ??

**Easy Lawsuit Funds** <easylawsuitfunds@gmail.com>                   Tue, May 15, 2018 at 9:34 AM
To: Steve Wilson Briggs <snc.steve@gmail.com>

Hi Steve,

You came to us some time ago, looking for an advance against your lawsuit.  At that time, we were unable to help you, either because the case was too new, or we didn't have funding available for your case type.

As we have added various funding sources since that time, we're wondering if your case has been settled, and if not, are you still interested in pursuing funding.

Please give us a call or email us to advise.

Warmest regards,

Lee


Lee A. Jesberger
Senior Account Executive

*Easy Lawsuit Funds*

www.easylawsuitfunds.com
Join Us on FB and Twitter
Office:  (856) 340-6133
eFax:  (856) 741-1222

# EXHIBIT

# B



Steve Wilson Briggs <snc.steve@gmail.com>

---

## Steve Kenyatta Wilson Briggs v. Asgari Inc.

**Steven Weisman** <steven.weisman@lexshares.com>                    Thu, Sep 13, 2018 at 7:08 PM
To: snc.steve@gmail.com

Hi Steve,

While I know the above mentioned case is no longer active, it appears to be exceptionally fitting for our funding profile so I'm hoping that it might make sense to discuss other matters or general synergies.

For context, I represent LexShares. We're a unique litigation funder in that we'll finance matters as small as $1M in recovery value. This versatility has made us an unparalleled resource – allowing attorneys to take on cases they might have turned away or been urged to settle at a fraction of fair value.

Is there a good time this week to discuss in a bit more depth? Happy to discuss specific cases or just answer your questions.

Look forward to getting further introduced.

Best,

**Steven Weisman**
Origination Analyst
Lexshares
Direct: (646) 902-5996
Cell: (516) 220-9844
steven.weisman@lexshares.com

Unsubscribe

The information contained in this e-mail and any attached documents are privileged and confidential and for the intended recipient only. This email does not constitute an offer of, or the solicitation of an offer to buy or subscribe for, any securities to any person in any jurisdiction to whom or in which such offer or solicitation is unlawful. Any information contained herein is not sufficient for and should not be used as a basis for making any investment decision; nothing in this email constitutes investment advice. Information about any securities offering should not be considered complete and is qualified in the entirety by the full offering documents corresponding to such financing posted on www.LexShares.com.  The securities offered on www.LexShares.com may be sold only to Accredited Investors.  To the fullest extent permissible by law, neither LexShares, Inc. nor its executives, officer, employees or affiliates make any representation or warranty, express or implied, as to the accuracy, completeness or definitiveness of this information, and nothing contained herein shall be relied upon as a representation as to past or future performance. We are not a registered broker, dealer, investment advisor, investment manager or funding portal and do not undertake any activity which would require such registrations. Securities offered through WealthForge Securities, LLC, Member FINRA/SIPC.

IRS Circular 230 Disclosure: To ensure compliance wi h requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any tax penalty or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE WILSON BRIGGS, | Civ No: 18-cv-04952-VC |
| Plaintiff, | **[PROPOSED] ORDER** |
| vs | |
| KEVIN SPACEY et al, | Date:     December 13, 2018 |
| Defendants. | Courtroom:  4 |
| | Time:     10:00 a.m. |
| | Judge:   Hon. Vince Chhabria |

16

17       Having considered the Defendants motion to dismiss, entitled "Defendant Trigger

18  Street Productions, Inc.'s Notice Of Motion And Motion To Dismiss Complaint Pursuant To

19  Fed. R. Civ. P. 12(B)(6) And/Or 9(B); Memorandum Of Points And Autorities [sic] In

20  Support Thereof" and finding insufficient bases for such a motion, **IT IS HEREBY**

21  **ORDERED:**

21    1.  Trigger Street Productions Inc's motion to dismiss, entitled "Defendant Trigger

22        Street Productions, Inc.'s Notice Of Motion And Motion To Dismiss Complaint

23        Pursuant To Fed. R. Civ. P. 12(B)(6) And/Or 9(B); Memorandum Of Points And

24        Autorities [sic] In Support Thereof" is **DENIED**.

25

26  Dated:_____      Signed:_____

27                   The Honorable Vince Chhabria

28

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing document, captioned **"PLAINTIFF'S OPPOSITION TO DEFENDANT TRIGGER STREET PRODUCTIONS INC'S MOTION TO DISMISS,"** and "[**PROPOSED ORDER**]" by filing same with the Clerk of the Court for the United States District Court, Northern District Of California, San Francisco Division, by using the District's Pacer system on November 19, 2018.


Dated: November 19, 2018.          Signed: /s/ Steve Wilson Briggs          _
                                   STEVE WILSON BRIGGS
                                   Plaintiff, In Propria Persona

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
4  snc.steve@gmail.com
   PLAINTIFF In Propria Persona
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **NORTHERN DISTRICT OF CALIFORNIA**

10  | | Civ No: 18-cv-04952-VC |
    | --- | --- |
11  | STEVE WILSON BRIGGS | **DECLARATION OF  ZENA BRIGGS,** |
12  | Plaintiff, | **CONCERNING THE REFUSAL OF** |
    | | **SERVICE OF PROCESS BY** |
13  | vs | **DEFENDANTS SPACEY AND** |
    | | **BRUNETTI'S AGENCY FOR SERVICE** |
14  | KEVIN SPACEY;  et al | **OF PROCESS (ALTMAN,** |
15  | | **GREENFIELD & SELVAGGI)** |

16
17     **DECLARATION OF  ZENA BRIGGS, CONCERNING THE REFUSAL OF SERVICE**
       **OF PROCESS BY DEFENDANTS SPACEY AND BRUNETTI'S AGENCY FOR**
18        **SERVICE OF PROCESS (ALTMAN, GREENFIELD & SELVAGGI)**
19
20       My name is Zena Briggs, and I declare the following:
21            I am over 18, and not a party of this action.
21            I am a resident of Los Angeles County, where these events occurred.
22            My address is 962½ S Catalina St., Los Angeles, CA 90006 .
23            At approximately 910:15 a.m., on November 13, 2018, I arrived at 10960 Wilshire
24   Blvd, Los Angeles, CA 90024, intent to serve Summons and Complaint to the office of *Altman,*
25   *Greenfield & Selvaggi*, located in suite 1900, on the 19th floor of this address. I am a health and
26   human services case manager, and I had an appointment with a client at 10:00 a.m. (across town),
27   so I was in a bit of a rush when I entered the building.
28            I entered an elevator and went up with a group of people. I soon learned that exiting on

                              1
                       PROOF OF SERVICE

| | |
|---|---|
| 1 | the 19th floor required a special access (apparently reserved for employees only). Unable to stop |
| 2 | the elevator at the 19th floor, I exited at the 20th floor and got on the next elevator down (intent to |
| 3 | return to the lobby to seek help from the service desk). However, on my way back down, the |
| 4 | elevator happened to stop on the 19th floor. |
| 5 |       I exited and and walked to suite #1900. |
| 6 |       I pushed the intercom "buzzer" outside of the office. |
| 7 |       Someone inside the office "buzzed" the door open. |
| 8 |       I entered. |
| 9 |       Immediately after I entered a tall-ish man named Peter (with dark hair, and who |
| 10 | appeared as if he might be of Hispanic descent) approached and asked me how he could help me. |
| 11 |       Reading from a "queue card" that Plaintiff Steve Wilson Briggs prepared for me, I |
| 12 | informed Peter that I was there to serve Summons and Complaints for Kevin Spacey and Dana |
| 13 | Brunetti, in care of their agents for service of process—Frank Selvaggi or *Altman, Greenfield &* |
| 14 | *Selvaggi.* |
| 15 |       Peter asked me to wait a minute, and said he would be back with someone who could |
| 16 | help me. |
| 17 |       A few moments later Peter returned with a caucasian woman of average height and |
| 18 | build, perhaps in her mid 40s, with sandy blonde hair. I did not get the woman's name. The woman |
| 19 | asked how she could help me. |
| 20 |       Once again, I explained, using my "queue card" that I was there to serve Summons and |
| 21 | Complaints for Kevin Spacey and Dana Brunetti, in care of their agents for service of process, |
| 21 | Frank Selvaggi or *Altman, Greenfield & Selvaggi.* |
| 22 |       The woman told me that I was serving the wrong office. The woman explained that |
| 23 | Spacey and Brunetti were clients of the New York office. |
| 24 |       The woman then left the room, returning to what I assumed was her office. |
| 25 |       Rather than leaving, I hesitated in the office, somewhat confused —due to the fact that |
| 26 | the Plaintiff (Mr Briggs) assured me that numerous active California Secretary of State business |
| 27 | filings stated that Frank Selvaggi and *Altman, Greenfield & Selvaggi* were authorized to accept |
| 28 | service of process for Spacey and Brunetti. |

2
PROOF OF SERVICE

1        Another man emerged from a back office and approached me. The man was perhaps in

2   his early sixties, balding, dark hair, a bit shorter than average. The man promptly informed me that

3   he did not think Spacey and Brunetti were his clients.

4        I asked the man (to the best of my recollection), "Are you saying that Spacey and

5   Brunetti are not clients of this office?"

6        The man answered, "No, I'm saying I'm not sure if they are our clients at all."

7        I decided to call Mr Briggs (plaintiff) to get his advice.

8        I then informed Mr. Briggs (on the phone) that the man informed me that Spacey and

9   Brunetti may not be *Altman, Greenfield and Selvaggi* clients at all.

10       Over the phone, Mr Briggs asked me to ask the man for his name.

11       I asked the man his name.

12       The man replied David Altman.

13       I then looked at the queue card Mr. Briggs gave me, with the company name "Altman

14  Greenfield & Selvaggi" written on it. I then asked the man if his last name was spelled

15  A-L-T-M-A-N.

16       The man replied, "Yes."

17       At about this point the woman with sandy blonde hair returned. The woman said frankly

18  that Kevin Spacey was not their client.

19       I then asked, "What about Dana Brunetti?" Directing my question to Mr. Altman.

20       Mr. Altman answered, "I'm not sure."

21       The woman then insisted that both Spacey and Brunetti were not their clients, and

21  insisted that their company (Altman, Greenfield & Selvaggi) could not accept documents.

22       I then left, with the documents still in hand.

23       The proceeding facts and events are recounted to the very best of my recollection.

24       I declare under penalty of perjury under the laws of the United States of America that

25  the foregoing is true and correct.

26

27  Dated:   11/14/2018     Signed:   *Zena Briggs*

28                                    Zena Briggs

<center>3</center>
<center>PROOF OF SERVICE</center>

| 1 | Steve Wilson Briggs |
|---|---|
| 2 | 4322 Chico Ave., |
|   | Santa Rosa, CA 95407 |
| 3 | 510 200 3763 |
| 4 | snc.steve@gmail.com |
|   | PLAINTIFF In Propria Persona |
| 5 | |
| 6 | |
| 7 | |

8        **UNITED STATES DISTRICT COURT**

9       **NORTHERN DISTRICT OF CALIFORNIA**

| 10 | | Civ No: 18-cv-04952-VC |
|---|---|---|
| 11 | STEVE WILSON BRIGGS | **PROOF OF SERVICE** |
| 12 | Plaintiff, | **DECLARATION OF CECILE LUSBY, REGARDING 11/13/2018 SERVICE OF** |
| 13 | vs | **PROCESS TO DEFENDANTS KEVIN** |
| 14 | KEVIN SPACEY;  et al | **SPACEY AND DANA BRUNETTI VIA** |
| 15 | | **U.S.P.S CERTIFIED MAIL WITH RETURN RECEIPT AND** |
| 16 | | **ACKNOWLEDGMENT** |
| 17 | | **OF RECEIPT OF SUMMONS** |

18

19        **PROOF OF SERVICE DECLARATION OF CECILE LUSBY, REGARDING**

20     **11/13/2018 SERVICE OF PROCESS TO DEFENDANTS KEVIN SPACEY AND**
        **DANA BRUNETTI VIA U.S.P.S CERTIFIED MAIL WITH RETURN RECEIPT**

21        **AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS**

21

22        My name is Cecile Lusby, and I declare the following:

23            I am over 18, and not a party of this action.

24            I am a resident of Sonoma County, where the mailing took place.

25            My address is 4322 Chico Avenue, Santa Rosa, CA 95407.

26            On November 13, 2018, I served Summons, Complaint and other legal documents

27     on Kevin Spacey and Dana Brunetti via USPS first class certified mail, with return receipt

28     requested, and notice and Acknowledgment of Receipt of Summons, per CCP 415.30(b).

<div align="center">

1

PROOF OF SERVICE

</div>

1        I served served the document to Kevin Spacey at two (2) separate addresses, and

2   to Dana Brunetti a single address. The envelopes were addressed as follows:

3    1.    Kevin Spacey
4          % Altman, Greenfield & Selvaggi
            120 West 45th Street #3601
5         New York, New York 10036

6    2.    Kevin Spacey
7          % Frank Selvaggi
8         200 Park Avenue South, 8th Floor
9         New York, New York 10003

10   3.    Dana Brunetti
           % Frank Selvaggi
11         200 Park Avenue South, 8th Floor
12         New York, New York 10003

13       Each envelopes contained the following documents:

14     a.  **Summons** In A Civil Action (2)

15     b.  **Complaint**

16     c.  **Civil Cover Sheet**

17     d.  Notice Of Availability Of Magistrate Judge To Exercise Jurisdiction

18     e.  Consent Or Declination To Magistrate Judge Jurisdiction

19     f.  Welcome To The Oakland Divisional Office

20     g.  ECF Registration Handout

21     h.  Proposed Order Granting Motion For Permission For Electronic Case Filing

21     i.  Order Setting Initial Case Management And ADR Deadlines

22     j.  Standing Order General (SBA)

23     k.  Standing Order For All Judges OF The Northern District Of California

24     l.  Standing Order - General (SBA) Patent Case

25     m. Order Relating Cases (Hon. Judge Vince Chhabria)

26     n.  Reassigned Case - Notice of New Hearing Date -VC

27     o.  Related Case Order

28     p.  **2 copies Acknowledgment of Receipt of Summons** (per CCP 415.30(b))

2
**PROOF OF SERVICE**

1      q.  2 Notices (per CCP **415.30(b)**)

2      r.  Stamped self addressed envelope

3      I served the Summons, Complaint and other legal documents by placing three (3)

4 separate sets of documents in three (3) separate envelopes, addressed to the Defendants as

5 previously described. I then gave the three envelopes to a US postal clerk at the US Post

6 Office at 2585 Sebastopol Rd., Santa Rosa, California, and paid his for priority postage,

7 with certification and return receipt requested.

8      I declare under penalty of perjury under the laws of the United States of America that

9 the foregoing is true and correct.

10

11 Dated:_____11/14/2018_____   Signed:_____Cecile Lusby_____

12                             Cecile Lusby

13

14

15

16

17

18

19

20

21

21

22

23

24

25

26

27

28

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
4  snc.steve@gmail.com
   PLAINTIFF In Propria Persona
5
6
7
8              **UNITED STATES DISTRICT COURT**
9             **NORTHERN DISTRICT OF CALIFORNIA**

| 10 STEVE WILSON BRIGGS, | Civ No: 18-cv-04952-VC |
|---|---|
| 11    Plaintiff, | **STATUS REPORT (ADDENDUM),** |
| 12    vs | **REGARDING SERVICE OF PROCESS DEVELOPMENTS CONCERNING** |
| 13 KEVIN SPACEY et al, | **DEFS SPACEY AND BRUNETTI, AND THEIR AGENTS' FINAL EFFORTS TO** |
| 14    Defendants. | **EVADE AND REFUSE SERVICE** |
| 15 | Date:       November 13, 2018 |
| 16 | Judge:      Hon. Vince Chhabria |

17
18            **STATUS REPORT (ADDENDUM), RE SERVICE OF PROCESS**
19         On this final day of Plaintiff's 90 day service deadline (11/13/2018), Plaintiff
20  submits this service of process Status Report Addendum, to assist the Court.
21         Perhaps the most noteworthy detail contained this Addendum is that, on this day,
21  11/13/2018, the Plaintiff sent his process server (Zena Briggs) to serve Defendants (**Defs**)
22  Spacey and Brunetti through their registered agent (agency) at *Altman Greenfield &*
23  *Selvaggi* (**AGS**) in Los Angeles.  However, in the AGS office, more than one AGS agent,
24  including David Altman himself, refused to accept the Summons and Complaint—claiming,
25  first, that the Los Angeles office was the wrong office (they claimed NY was the proper
26  office), then claiming neither Spacey nor Brunetti were AGS clients.
27         Additionally, on this day, Plaintiff had another server (Cecile Lusby) serve Def
28  Spacey two more times (at two separate NY addresses, via certified mail with return

1
STATUS REPORT (ADDENDUM) RE SERVICE OF PROCESS

1 receipt requested, and with notice and Acknowledgment of Receipt of Summons, per CCP

2 415.30(b)).    Ms Lusby also made another service attempt of Defendant Brunetti (via

3 certified mail with return receipt requested, and with notice and Acknowledgment of

4 Receipt of Summons, per CCP 415.30(b)).

5      Plaintiff will submit the service declarations of Zena Briggs and Cecile Lusby

6 posthaste.

7

8 **Brief Details of Server Zena Briggs' Attempted Service of Process on Defs Spacey**

9 **and Brunetti through their Agent for Service of Process in Los Angeles,**

10 *Altman Greenfield & Selvaggi*, **on November 13, 2018:**

11      The morning of November 13, 2018, server Zena Briggs attempted to serve

12 Defendants Spacey and Brunetti at *Altman Greenfield & Selvaggi*, at 10960, Suite 1900,

13 Wilshire Blvd, Los Angeles, CA 90024. This address is the address used for the agent for

14 service of process in Dana Brunetti's current and active Business Entity Statement with the

15 California Secretary of State (for his business 18th Amendment, LLC, and Spartan 97,

16 LLC); Brunetti specifically identifies Frank Selvaggi as his agent in that filing. [**See Exhibit**

17 **A**].   Plaintiff also asked Zena Briggs to deliver a Summons and Complaint for Defendant

18 Spacey to this address because recently the Plaintiff learned (via his server, Nexus Assoon)

19 that Frank Selvaggi and *Altman Greenfield & Selvaggi* are no longer located at the address

20 on file with the California Secretary of State for Trigger Street Productions, Inc.  *Altman*

21 *Greenfield & Selvaggi* are identified as "*care of*" entities, with Frank Selvaggi identified as

21 the agent for service of process in California, in Trigger Street Productions' California

22 State business registration. [**See Exhibit B**].

23      However, David Altman (of *Altman Greenfield & Selvaggi*) and his subordinates

24 refused to accept the Summons and Complaints from Ms Briggs. Altman and his agents

25 claimed that Zena Briggs was delivering the packages to the wrong address (insisting that

26 the New York address was proper). He then claimed that *Altman Greenfield & Selvaggi*

27 no longer represented either Spacey or Brunetti.

28

2

STATUS REPORT (ADDENDUM) RE SERVICE OF PROCESS

| | |
|---|---|
| 1 | **Cecile Lusby's Final Service of Defs Spacey and Brunetti** |
| 2 | **via Certified Mail (11/13/2018)** |
| 3 | On November 13, 2018, the Plaintiff's process server, Cecile Lusby sent |
| 4 | Summons and Complaint certified mail with return receipt requested (and with |
| 5 | Acknowledgment of Receipt of Summons, per CCP 415.30(b)) to Defendant Kevin |
| 6 | Spacey to **two (2)** New York state addresses [1. Kevin Spacey % Altman Greenfield & |
| 7 | Selvaggi 120 West 45th St, #3601, New York, New York 90036; and 2. Kevin Spacey % |
| 8 | Frank Selvaggi 200 Park Ave South, 8th Floor, New York, New York 10003].  Ms Lusby |
| 9 | also sent a Summons and Complaint certified mail with return receipt requested (and with |
| 10 | Acknowledgment of Receipt of Summons, per CCP 415.30(b)) to Dana Brunetti, at 200 |
| 11 | Park Avenue South, 8th Floor, New York, New York, 10003. |
| 12 | |
| 13 | **CONCLUSION** |
| 14 | The Plaintiff hopes this Status Report Addendum is useful to the Court. |
| 15 | |
| 16 | Dated: November 13, 2018.                    Signed:   /s/ <u>Steve Wilson Briggs</u> |
| 17 | STEVE WILSON BRIGGS<br>Plaintiff, In Propria Persona |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

3

STATUS REPORT (ADDENDUM) RE SERVICE OF PROCESS

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

| LLC-12 |

18-A36440

# FILED

In the office of the Secretary of State
of the State of California

JAN 29, 2018

**This Space For Office Use Only**

**IMPORTANT —** Read instructions before completing this form.

**Filing Fee – $20.00**

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC.  If you registered in California using an alternate name, see instructions.)

18TH AMENDMENT, LLC, THE

| 2. 12-Digit Secretary of State File Number | 3.  State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201717110510 | DELAWARE |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>200 Park Avenue South, 8th Floor | New York | NY | 10003 |
| b. Mailing Address of LLC, **if different than item 4a**<br>200 Park Avenue South, 8th Floor | New York | NY | 10003 |
| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box<br>10960 Wilshire Blvd, Suite 1900 | Los Angeles | CA | 90024 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank).  If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank).  Note:  The LLC cannot serve as its own manager or member.  If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Dana | | Brunetti | |

b. Entity Name - Do not complete Item 5a

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 200 Park Avenue South, 8th Floor | New York | NY | 10003 |

**6. Service of Process** (Must provide either Individual OR Corporation )

**INDIVIDUAL** – Complete Items 6a and 6b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Frank | | Selvaggi | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10960 Wilshire Blvd, Suite 1900 | Los Angeles | CA | 90024 |

**CORPORATION** – Complete Item 6c only.  Only include the name of  he registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete  Item 6a or 6b

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company
Rental Property

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 01/29/2018 | Michael Cohen | Accountant | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from  he Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

LLC-12 (REV 01/2017)

Page 1 of 1

2017 California Secretary of State
www.sos.ca.gov/business/be

ER 168

**STATEMENT AND DESIGNATION
BY
FOREIGN CORPORATION**

**FILED**
In the office of the Secretary of State
of the State of California

**DEC 1 6 1997**

*Bill Jones*
BILL JONES, Secretary of State

_Trigger Street Productions, Inc._
(Name of Corporation)

_____, a corporation organized

and existing under the laws of _New York_, makes the following
(State or Place of Incorporation)

statements and designation:

1. The address of its principal executive office is _c/o Altman, Greenfield, & Selvaggi_
   _120 W. 45th St., STE 3601, New York, NY 10036_
   (Insert complete address of principal executive office wherever located.)
   **DO NOT USE POST OFFICE BOX**

2. The address of its principal office in the State of California is _c/o Altman, Greenfield, & Selvaggi_
   _11766 Wilshire BLVD, STE 1610, Los Angeles, CA 90025_
   (Insert complete address of principal office in California.)
   **DO NOT USE POST OFFICE BOX**

**DESIGNATION OF AGENT FOR SERVICE OF PROCESS IN THE STATE OF CALIFORNIA**
(Complete Either Item 3 or Item 4)

3. (Use this paragraph if the process **agent is** a natural **person.**)

   _Frank Selvaggi_

   a natural person residing in the State of California, whose complete address is

   _11766 Wilshire Blvd., STE 1610, Los Angeles, CA 90025_

   **DO NOT USE POST OFFICE BOX**

is designated as agent upon whom process directed to the undersigned corporation

may be served within the State of California, in the manner provided by law.

*Secretary of State Form*
*S&DC-GENERAL (2-96)*

Page 1 of 2

ER 169

4. (Use this paragraph if the process **agent is a corporation**.)

_____ , a corporation

organized and existing under the laws of _____, is designated as

agent upon whom process directed to the undersigned corporation may be served

within the State  of California, in the manner provided by law.

**NOTE:**   Before a corporation may be designated by any other corporation as an
agent for service of process, a corporate agent must have complied with
Section 1505, California Corporations Code.

5. The undersigned corporation hereby irrevocably consents to service of process

directed to it upon the agent designated above, and to service of process on the

Secretary of State of the State of California if the agent so designated or the agent's

successor is no longer authorized to act or cannot be found at the address given.

*Trigger Street Productions, Inc.*
(Name of Corporation)

_____
(Signature of Corporate Officer)

Kevin Spacey (President)
(Typed Name and Title of Officer Signing)

# State of New York
# Department of State

} ss:

I hereby certify, that the certificate of incorporation of *TRIGGER STREET PRODUCTIONS, INC.* was filed on *06/22/1993*, with perpetual duration, and that a diligent examination has been made of the index of corporation papers filed in this Department for a certificate, order, or record of a dissolution, and upon such examination, no such certificate, order or record has been found, and that so far as indicated by the records of this Department, such corporation is a subsisting corporation.

\*\*\*

*Witness my hand and the official seal of the Department of State at the City of Albany, this 26th day of November one thousand nine hundred and ninety-seven.*

*Special Deputy Secretary of State*

199711280116  59

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
10                                        Civ No: 18-cv-04952-VC
11  STEVE WILSON BRIGGS                   **DECLARATION OF MELVIN**
                                          **JACKSON, REGARDING SERVICE**
12               Plaintiff,               **OF PROCESS FOR DEFENDANTS**
                                          **MATT DAMON AND BEN AFFLECK,**
13                  vs                    **VIA THEIR AGENT FOR SERVICE**
14  KEVIN SPACEY;  et al                  **OF PROCESS, GARY KRESS**
15
16  **DECLARATION OF MELVIN JACKSON, REGARDING SERVICE OF PROCESS**
17  **FOR DEFENDANTS MATT DAMON AND BEN AFFLECK, VIA THEIR AGENT**
                      **FOR SERVICE OF PROCESS, GARY KRESS**
18
19         **My name is Melvin Jackson and I declare the following:**

20         I am over 18, and not a party of this action.

21         I am a resident of Los Angeles County, where the process service took place.

21         My address is 10998 Sampson Ave. Lynwood, CA. 90262

22         On **October 30th**, 2018, I served (2) total envelopes (one for Defendant Matt Damon and

23  one for Defendant Ben Affleck) to Gary Kress, who is the *Agent For Service Of Process* for two

24  of Defendant Matt Damon and Ben Affleck's personal businesses, namely Pearl Street

25  Productions, Inc., and Mad Post Productions, LLC. The Plaintiff in this matter, Steve Wilson

26  Briggs, informed me that according to the California Secretary of State's current and active

27  *business entity statement* for Mad Post Productions, LLC, the business's Principal Executive

28  Office address is 2401 Main Street, Santa Monica, CA 90405. The business entity statement also

                                         1
                              PROOF OF SERVICE

1   gave this same address as the personal address for Matt Damon, Ben Affleck and the company's

2   agent for service of process, Gary Kress.

3         The details of the service of Matt Damon and Ben Affleck, via their agent for service of

4   process, Gary Kress, are as follows.

5         At approximately 3:30 PM, on October 30th, 2018, I entered what appeared to be an

6   office building, at the address: 2401 Main Street Santa Monica, CA 90405. I was politely greeted

7   by a woman, whom I assume was the business's receptionist. I informed the woman that I was

8   there to serve Summons and Complaint FOR Matt Damon and Ben Affleck, TO registered agent

9   for service of process, Gary Kress.

10        The woman informed me that Mr Kress was in his office, in the back. The woman then

11  went to the back to get Mr Kress.

12        Mr Kress quickly emerged from his office. I explained, again, that I was there to serve him

13  Summons and Complaint for Matt Damon and Ben Affleck.

14        Mr Kress Politely accepted the documents for both Matt Damon and Ben Affleck.

15        The documents that I delivered to Mr Gary Kress, in two separate parcels for Ben Affleck

16  and Matt Damon, providing each defendant his own copy of each document, were:

17        a.  **Summons** In A Civil Action (2)

18        b.  **Complaint**

19        c.  **Civil Cover Sheet**

20        d.  Notice Of Availability Of Magistrate Judge To Exercise Jurisdiction

21        e.  Consent Or Declination To Magistrate Judge Jurisdiction

21        f.  Welcome To The Oakland Divisional Office

22        g.  ECF Registration Handout

23        h.  Proposed Order Granting Motion For Permission For Electronic Case Filing

24        i.  Order Setting Initial Case Management And ADR Deadlines

25        j.  Standing Order General (SBA)

26        k.  Standing Order For All Judges OF The Northern District Of California

27        l.  Standing Order - General (SBA) Patent Case

28        m.  Order Relating Cases (Hon. Judge Vincent Chhabria)

2
PROOF OF SERVICE

1          n.   Reassigned Case - Notice of New Hearing Date - VC

2          o.   Related Case Order

3

4      I am not a professional process server.

5      I declare under penalty of perjury under the laws of the United States of America that the

6   foregoing is true and correct.

7

8   Dated:    11/01/2018          Signed:

9                                         Melvin Jackson

10

11

12

13

14

15

16

17

18

19

20

21

21

22

23

24

25

26

27

28

3
PROOF OF SERVICE

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
4  snc.steve@gmail.com
   PLAINTIFF In Propria Persona
5

6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  STEVE WILSON BRIGGS                    Civ No: 18-cv-04952-VC

12              Plaintiff,            PROOF OF SERVICE DECLARATION
                                      OF NEXUS ASSOON, REGARDING
13              vs                     SERVICE OF PROCESS OF
                                              DEFENDANTS MRC
14  KEVIN SPACEY;  et al             (MRC II DISTRIBUTION COMPANY,
15                                    L.P.);  ASIF SATCHU; MORDECAI
                                                WICZYK
16

17

18      PROOF OF SERVICE DECLARATION OF NEXUS ASSOON, REGARDING

19      SERVICE OF PROCESS OF DEFENDANT MRC (MRC II DISTRIBUTION

20                        COMPANY, L.P.)

21

21      My name is Nexus Assoon, and I declare the following:

22          I am over 18, and not a party of this action.

23          I am a resident of Los Angeles County, where this service of process took place.

24          My address is 3007 4th Ave., Los Angeles, CA 90018.

25          On **October 26**, 2018, I served Summons, Complaint and other legal documents on

26  Defendants Media Rights Capital (MRC —whose proper identity, I have been informed, is **MRC**

27  **II Distribution Company, LP**), as well as serving Defendants Asif Satchu and Mordecai

28  Wiczyk, who I am told are co-CEO's of all MRC companies. I executed this service by

                              1
                      PROOF OF SERVICE

1  personally delivering Summons, Complaint and other legal documents to the Principal Address

2  claimed by MRC II Distribution Company, LP in their current and active California Secretary of

3  State's *business entity statement of information*, which is 9601 Wilshire Blvd (Suite #610),

4  Beverly Hills, CA 90210.  It should also be noted that Plaintiff, Steve Wilson Briggs, informed me

5  that MRC II Distribution Company, LP identified itself as the proper Defendant in *Briggs v*

6  *Blomkamp*, in its corporate disclosure.

7        Due to a few unusual statements made during this service, it is necessary to review a few

8  events from my October 19, 2018 service of MRC and the WME Defendants (Ari Emanuel, Matt

9  Damon, Ben Affleck, and Neill Blomkamp), before reviewing the details of the successful service

10  of MRC, Stachu and Wiczyk on 10/26/2018.

11        On October 19, 2018, I attempted to serve Media Rights Capital (MRC), unsuccessfully,

12  by first attempting to serve the documents to MRC's 9665 Wilshire Blvd, Beverly Hills address;

13  then, when I was informed that MRC was not in that building due to construction, by attempting to

14  serve the documents at the address listed on the current California Secretary of State's Business

15  Entity statement for "Media Rights Capital II", at 1800 Century Park East, (10th floor), which its

16  Business Entity report claimed as the Principal Address for both Media Rights Capital II, L.P., and

17  as the address for its registered agent (Scott Tenley). However, when I arrived at that address on

18  10/19/2018, I was told neither MRC or Scott Tenley were located at that address. Rather, I was

19  told that MRC moved back to the 9665 Wilshire address. I signed a statement for Mr. Briggs

20  concerning this service failure on October  20, 2018, which Mr. Briggs has submitted to the Court.

21        A couple days after this service failure, Mr. Briggs informed me that he did some research

21  and discovered that the Principal Address for MRC II Distribution Company, LP, listed in its

22  current and active California Secretary of State's *business entity statement*, was 9601 Wilshire

23  Blvd, Suite #610, Beverly Hills 90210. Mr. Briggs also informed me that this address information

24  has not changed or been updated in over 11 years —since 2007. This building is also the

25  headquarters of William Morris Endeavor (WME), and is the location where I successfully served

26  Ari Emanuel, Neill Blomkamp, Matt Damon and Ben Affleck a week earlier, on October 19,

27  2018.

28        With this new address, I agreed to attempt to serve MRC and its co-CEO's, Asif Satchu and

<div align="center">2<br>PROOF OF SERVICE</div>

1   Mordecai Wiczyk.

2       I attempted this third service of Defendants MRC (MRC II Distribution Company, L.P.),

3   Mr Satchu and Mr Wiczyk, on October 26, 2018. What follows are the service details.

4       At approximately 12:30pm, Friday, October 20, 2018, I entered the WME building, at

5   9601 Wilshire Blvd, in Beverly Hills. I walked to the *help desk* for assistance, however no one

6   was at the desk. As I waited, I noticed a tall caucasian man, about 6' 3", and about 65 years old

7   with short gray/white hair approaching me from the elevator. He politely asked if he could assist

8   me. The man had what sounded like an Australian accent.

9       I explained that I was there to serve summons and complaints to MRC II Distribution

10  Company, and Asif Satchu and Mordecai Wiczyk, in their office at this address, suite #610.

11      The man immediately said that **there was no suite #610 in the building**, but kindly offered

12  to escort me up to the sixth floor. We rode up together on the elevator.

13      On the sixth floor, we exited the elevator. The tall man led me down a few halls. I saw no

14  room #610. Soon we arrived to a door marked (to the best of my recollection): "WME

15  Mailroom." The tall man and I entered.

16      Entering the room, I observed about five mailroom employees working there. Two men sat

17  near the door, at a large desk with two computer monitors, while three others worked a bit further

18  back in the room, behind the service desk/counter. The tall Australian man introduced me to the

19  two men sitting at the desk, behind the computer monitors.

20      I explained to the men at the desk that I was there to serve Summons and Complaint to

21  MRC II Distribution Company, Asif Satchu and Mordecai Wiczyk.

21      As soon as I said that, a tall man with short blond-ish hair, wearing a brown shirt near the

22  center of the room, asked in a loud voice, "You that guy from last week?"

23      From the man's unfriendly facial expression and voice tone, I took his question to be an

24  attempt to intimidate me.

25      I assumed from the man's question that he was aware that I served documents for

26  Defendants Emanuel, Affleck, Damon and Blomkamp, downstairs in the WME basement

27  mailroom, the previous Friday, 10/19/2018.  I also assumed that there were some details in my

28  proof of service declaration of that failed service attempt (which Mr Briggs later filed with the

3
**PROOF OF SERVICE**

1   Court) that this man must have found out about, and clearly he did not like those details. I believe

2   this man was the mailroom supervisor, due to the way he took charge of matters while I was there,

3   and the way the other workers quietly deferred to him.

4            I decided that it was wisest to ignore this question and his aggressive manner. Rather, I

5   asked if he could accept the Summons and other documents.

6            The mailroom supervisor replied something like, "No. Keep me out of this." He then picked

7   up his phone and called a person in WME's legal department, and said something like, "There's a

8   guy up here serving legal documents for MRC Distribution and some other guys."

9            I then began waiting for someone from the legal team to arrive. While I was waiting, I placed

10  the three large envelopes I was carrying (containing the legal documents) on a counter in the

11  entry/service area of the room.

12           After about four minutes a caucasian man, whom I took to be an attorney, with medium

13  length brown hair, about 5' 7" tall, slender to medium build, and about 28-33 years in age, entered

14  the room. "You have something for me?" the attorney asked.

15           I told him I was there to serve Summons, Complaint and other legal documents to MRC II

16  Distribution Company, L.P., Asif Satchu and Mordecai Wiczyk.

17           The attorney said, "MRC is not even at this address."

18           I replied, "According to the California Secretary of State they are." I then held up the screen

19  of my phone, for him to see a PDF copy of the Secretary of State's *business entity statement* for

20  MRC II Distribution Company, L.P.

21           "I know the law!" The attorney replied, abruptly, then added, "**I refused to take those**."

21  The attorney pointed at the envelopes containing the Summons and Complaints.

22           I replied (as I recall), "That's OK. But I've been instructed not to leave here with them."

23           The attorney then raised his voice and turned his head to speak to the mailroom supervisor,

24  and said (to the best of my recollection), "Call the custodian and tell him to throw those in the

25  trash!" The attorney gestured toward the documents on the counter as he spoke.

26           Several of the mailroom employees found this amusing and began laughing, looking at me

27  as they did so.  I took their laughter to be an opportune attempt to intimidate me.

28           I then asked the attorney, "Can I have your name, please?"

<div align="center">

4

**PROOF OF SERVICE**

</div>

1    "No. I'm not giving them my name. I'm not involved in this!" The attorney answered, with

2    what sounded like anger in his voice.

3        The attorney and I then walked out of the mailroom to the elevator, neither of us speaking to

4    the other. We then shared an elevators down, in silence

5        According to the California Code of Civil Procedure 415.20(b):

6        (a) In lieu of personal delivery of a copy of the summons and complaint to the
     person to be served as specified in Section 416.10, 416.20, 416.30, 416.40, or
7    416.50, **a summons may be served by leaving a copy of the summons and
8    complaint during usual office hours in his or her office** or, if no physical address
     is known, at his or her usual mailing address, other than a United States Postal
9    Service post office box, **with the person who is apparently in charge thereof,
10   and by thereafter mailing a copy of the summons and complaint by first-class
     mail, postage prepaid to the person to be served at the place where a copy of
11   the summons and complaint were left.** When service is effected by leaving a copy
12   of the summons and complaint at a mailing address, it shall be left with a person at
     least 18 years of age, who shall be informed of the contents thereof. Service of a
13   summons in this manner is deemed complete on the 10th day after the mailing.

14       (b) If a copy of the summons and complaint cannot with reasonable diligence be
     personally delivered to the person to be served, as specified in Section 416.60,
15   416.70, 416.80, or 416.90, **a summons may be served by leaving a copy of the
16   summons and complaint at the person's** dwelling house, usual place of abode,
     **usual place of business,** or usual mailing address other than a United States Postal
17   Service post office box, **in the presence of a** competent member of the household
18   or a **person apparently in charge of his or her office,** place of business, or usual
     mailing address other than a United States Postal Service post office box, at least 18
19   years of age, **who shall be informed of the contents thereof, and by thereafter
20   mailing a copy of the summons and of the complaint by first-class mail,
     postage prepaid to the person to be served at the place where a copy of the
21   summons and complaint were left.** Service of a summons in this manner is
21   deemed complete on the 10th day after the mailing.

22   35.   In compliance with this law, on October 26, 2018, I left a copy of the summons and

23   complaint in MRC II Distribution Company, L.P.'s usual place of business, by delivering the

24   documents to the address that MRC II Distribution Company, L.P. has claimed on its California

25   Secretary of State *business entity statement of information* since 2007. Further in compliance

26   with CCP 415.20(b), I left the Summons and Complaint in the presence of a competent person

27   who was seemingly in charge of MRC's (MRC II Distribution Company, L.P.'s) usual mailing

28   address.

<div align="center">

5

**PROOF OF SERVICE**

</div>

1    I then completed the final step of service on MRC (MRC II Distribution Company, LP) on

2    November 1, 2018, by placing said Summons, Complaint and other legal documents in an

3    envelope, then addressing said envelope to the place where the documents were left, then

4    depositing the envelope (containing said documents) in a USPS mail drop-box, in Los Angeles

5    County. Therefore, service will officially be "complete" ten days after mailing: on Nov 11, 2018.

6    The three envelopes that I mailed to the defendants were addressed as follows:

7    1.

8        MRC II Distribution Company, L.P.
9        9601 Wilshire Blvd (Suite #610)
         Beverly Hills, CA 90210
10   2.

11       Asif Satchu
         (co-CEO of MRC & MRC II Distribution Company, L.P.)
12       9601 Wilshire Blvd (Suite #610)
13       Beverly Hills, CA 90210
14   3.

15       Mordecai Wiczyk
         (co-CEO of MRC & MRC II Distribution Company, L.P.)
16       9601 Wilshire Blvd (Suite #610)
17       Beverly Hills, CA 9021
18   The documents that I served upon MRC II Distribution Company, LP , by personally

19   delivering, then mailing them to the previously stated location, were:

20       a.   **Summons** In A Civil Action (2)

21       b.   **Complaint**

21       c.   **Civil Cover Sheet**

22       d.   Notice Of Availability Of Magistrate Judge To Exercise Jurisdiction

23       e.   Consent Or Declination To Magistrate Judge Jurisdiction

24       f.   Welcome To The Oakland Divisional Office

25       g.   ECF Registration Handout

26       h.   Proposed Order Granting Motion For Permission For Electronic Case Filing

27       i.   Order Setting Initial Case Management And ADR Deadlines

28       j.   Standing Order General (SBA)

6
PROOF OF SERVICE

1       k.   Standing Order For All Judges OF The Northern District Of California

2       l.   Standing Order - General (SBA) Patent Case

3       m.   Order Relating Cases (Hon. Judge Vincent Chhabria)

4       n.   Reassigned Case - Notice of New Hearing Date - VC

5       o.   Related Case Order

6       I am not a professional process server.

7       I declare under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.

9

10  Dated:___11/01/2018___        Signed:_____

11                                              Nexus Assoon

12

13

14

15

16

17

18

19

20

21

21

22

23

24

25

26

27

28

7
PROOF OF SERVICE

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
MICHAEL J. KUMP (SBN 100983)
  mkump@kwikalaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikalaw.com
KATE MANGELS (SBN 301811)
  kmangels@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Defendants
MRC II DISTRIBUTION COMPANY LP;
MORDECAI WICZYK; ASIF SATCHU;
SONY PICTURES ENTERTAINMENT
INC.; and ARIEL EMANUEL.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE WILSON BRIGGS, <br><br> Plaintiff, <br><br> vs. <br><br> KEVIN SPACEY; et al., <br><br> Defendants. | Case No. 3:18-cv-04952-VC <br><br> [Hon. Vince Chhabria] <br><br> **DECLARATION OF GREGORY KORN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) AND/OR 12(b)(1)** <br><br> [Motion to Dismiss and Request for Judicial Notice Filed Contemporaneously Herewith] <br><br> Date:    December 20, 2018 <br> Time:    10:00 a.m. <br> Crtrm.:  4 |

3:18-cv-04952-VC

DECLARATION OF GREGORY KORN

## DECLARATION OF GREGORY P. KORN

I, Gregory P. Korn, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner with Kinsella Weitzman Iser Kump & Aldisert LLP, attorneys of record for Defendants MRC II Distribution Company LP; Mordecai Wiczyk; Asif Satchu; Sony Pictures Entertainment Inc.; and Ariel Emanuel. If called as a witness, I could and would competently testify to all the facts within my personal knowledge except where stated upon information and belief.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the First Amended Complaint in the matter entitled *Steve Wilson Briggs v. Neill Blomkamp, et al.,* N.D. Cal. Case No. 13-cv-4679-PJH ("Infringement Action"). I was counsel for the defendants in that matter and am personally familiar with this First Amended Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed November 9, 2018, at Santa Monica, California.

Gregory P. Korn

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1
DECLARATION OF GREGORY KORN

1    Steve Wilson Briggs

2    681 Edna Way

3    San Mateo, CA 94402

4    510 200 3763

5    snc.steve@gmail.com

6    Pro Se **PLAINTIFF**

**FILED**

DEC 1 9 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

7

8                    **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10    STEVE WILSON BRIGGS       }   CASE NO:    CV 13 4679 PJH

11    Plaintiff,                    }

12           vs.              }

13    NEILL BLOMKAMP,         }

14    SONY PICTURES ENT., INC.,    }    **AMENDED COMPLAINT FOR**

15    TRISTAR PICTURES, INC.,     }    **COPYRIGHT INFRINGEMENT**

16    MEDIA RIGHTS CAPITAL,     }

17    QED INTERNATIONAL,       }

18    Defendants              }

19                          <u>**NATURE OF ACTION:**</u>

20       1.    Pursuant to 17 U.S.C. § 101, et seq, this is an action for copyright infringement of the

21    Plaintiff's copyright protected screenplay "Butterfly Driver" (originally "Uberopolis: City of

22    Light") written in 2005; W.G.A. reg. #1103287, 2005; U.S. Copyright Office reg. certificate #

23    PAu 3-683-232, June 21st, 2013. **[See Exhibit C].** The infringement commenced on August, 9th,

24    2013, when the Defendants distributed and publically displayed "Elysium", a film infringing on

25    the Plaintiff's work, including the heart of his story, plot, characters, settings, conflict, catalyst,

26    crisis, climax-twist, themes (immigration, healthcare...), hero's "affliction", "keepsake necklace",

27    and much more. The Plaintiff will show: 1) "Elysium" bears Substantial Similarity to his work; 2)

28    the Defendants had access to his work -although the Plaintiff believes the Court will find the

                                            1

                                       COMPLAINT

1     infringement rises to "Striking Similarity" (obviating access), marked by staggering similarities

2     beyond reason and probability, further confirmed by: 1) obvious attempts to give the appearance

3     of dissimilarity; 2) the Plaintiff's idiosyncracies present in the Defendants' work, OR; 3) the

4     Plaintiff's uniqueness, intricacy and complexity emulated in the Defendants' work.

5         2.     This Amended Complaint clarifies charges, and attends concerns with the Defendants'

6     Answer And Affirmative Defenses (11/27/13). Among these concerns is Paragraph 9, stating

7     Defendant, Media Rights Capital (MRC), is erroneously named in this suit, and naming MRC II

8     Distribution Company as the proper party. This is false, and seems an effort to mislead the Court.

9         3.     MRC was the first financier to join Blomkamp. MRC sold Elysium's rights to Sony

10    Pictures. MRC gave marketing interviews prior to the film's release. **[See Exhibit D].** MRC is

11    named Elysium's finacier, studio or co-producer by countless sources -including the credits of

12    "Elysium", and MRC's own website, stating: "MRC has been financing and producing films since

13    2006...Notable films include...Neill Blomkamp's second feature film, Elysium". **[See Exhibit E].**

14    Many notables will not work with MRC due to ethics concerns and their questionable ties to Ari

15    Emanuel, of WME (agent of Defendant, Blomkamp). **[See Exhibit F].** "MRC II Distributing

16    Company" is not listed on or linked to MRC's website. Online the Plaintiff found only a defunct

17    address for the company with MRC's phone, at: http://investing.businessweek.com. The Plaintiff

18    believes Defendant, MRC, seeks to extricate from this suit and rename the possibly fictitious

19    subsidiary due to MRC's current involvement with Trigger Street Productions

20    (TriggerStreet.com) on the TV series "House of Cards". The Plaintiff contends MRC is naming

21    the subsidiary to hide from the court its ties to Trigger Street, as TriggerStreet.com is later named

22    as the Defendants' access to the Plaintiff's work. MRC's claim is unconscionably false.

23        4.     The Plaintiff hopes the Court will find the Defense's false claim (that MRC is

24    erroneously named in this suit) deceptive, and hold MRC and the Defense to account.

25        5.     The Plaintiff has added a personal information section to this complaint to attend the

26    Defense's vague character insinuations in their Answer And Affirmative Defenses.

27                              **JURISDICTION**

28        6.    **Jurisdiction.** This court has subject matter jurisdiction over this complaint pursuant

<div align="center">2</div>

<div align="right">COMPLAINT</div>

1    to 28 U.S.C. §§ 1331 & 1338(a), as this action is for copyright infringement arising under the

2    copyright laws of the United States, and pursuant to 28 U.S.C. 1332(a)(2) as, upon information,

3    Defendant, Neill BlomKamp, is a citizen of Canada and South Africa; not a citizen of the U.S.A.

4       7.   **Venue.** Venue is proper, and this court has personal jurisdiction, pursuant to 28

5    U.S.C. § 1391(b)(2), as the events giving rise to this complaint occured in this district. It is also

6    the proper venue pursuant to 28 U.S.C. § 1391(d) by virtue of defendant's business transactions

7    with this district; and under 326 US 310, as all defendants meet minimum contact rule.

8       8.   **Intradistrict Assignment.** San Francisco is the proper division assignment as a

9    substantial part of the events and omissions giving rise to this lawsuit occurred in this district.

10                             **THE PARTIES**

11       9.   **The Plaintiff,** STEVE WILSON BRIGGS, is a resident of San Mateo, California. He

12    is the writer, producer and director of the independent feature film "The Amazing Mr. Excellent",

13    father, musician and a teacher's aide at Sequoia High School in Redwood City, California.

14       10.   **Defendant,** NEILL BLOMKAMP is a resident of Vancouver, Canada. He is

15    credited with writing, directing and co-producing the screenplay in question, "Elysium".

16       11.   **Defendant,** SONY PICTURES ENT., INC., is the TV and film production wing of

17    Sony. Sony Pictures, upon information, provided aid to produce Elysium, and purchased the film

18    rights from Defendant, MRC. Located at 10202 West Washington Blvd., Culver City, California.

19       12.   **Defendant,** TRISTAR PICTURES, INC., is a film production/distribution studio

20    (a property of Sony Pictures), and the distributor of "Elysium; located in Culver City California.

21       13.   **Defendant,** MEDIA RIGHTS CAPITAL, is a TV and film studio, founded by

22    Asif Satchu and Modi Wiczy, credited with financing "Elysium"; located at 9665 Wilshire Blvd,

23    2nd Floor, Beverly Hills, CA 90212. Media Rights Capital is properly named in the lawsuit.

24       14.   **Defendant,** QED INTERNATIONAL is a film production and financing company,

25    credited with producing Elysium; located at 1800 N Highland Ave, 5th Flr, L.A., CA 90028.

26                             **BACKGROUND**

27       15.   In May 2005, the Plaintiff completed the first draft of his screenplay "Uberopolis: City

28    of light", emailing it to family and friends. **[See Exhibit G** (the first 3 pages of 113]**.**

<div align="center">3</div>

<div align="right">COMPLAINT</div>

Case 4:18-cv-04073-JHD Document 53-1 Filed 11/09/18 Page 4 of 56

16. December 16th, 2005, the Plaintiff registered a revised version of "Uberopolis: City of Light" with the Writer's Guild of America (West); registration ID #: 1103287. **[See Exhibit H]**

17. In January, 2006, the Plaintiff began a 23 month campaign to market his script. Approximately January, 2007, the Plaitiff revised and renamed his script "Butterfly Driver". During this campaign, the Plaintiff sent dozens of query letters and emails to literary agents, and film companies. **[See Exhibit I** -a few of many letters and emails**]**. The Plaintiff posted loglines (very short synopses) on screenwriter websites; entered events like the Philadelphia Logline Festival **[See Exhibit J]**; entered private script competitions, like the 2006 Slamdance Screenplay Competition **[See Exhibit K];** posted loglines and synopses on Inktip.com -a private, secured screenwriter to industry professional website (with strict "Terms Of Use").**[See Exhibit L]**.

18. February, 2007, the Plaintiff posted the entire "Butterfly Driver"" script on Kevin Spacey's and Dana Brunetti's filmmaker-screenwriter website, "Trigger Street" (triggerstreet.com) -named one of the "50 best websites of 2004"; designed to link filmmakers and screenwriters with industry professionals, by allowing members to post screenplays, short films (10 minutes or less), and short stories to get feedback from peers and professionals. **[See Exhibit M]**

19. TriggerStreet had approximately 50,000 active members in 2007. Around 2011 the site was re-named "Trigger Street Labs" and moved to "labs.triggerstreet.com", allowing Spacey and Brunetti to use "triggerstreet.com" exclusively for their production company. But in 2007, when the Plaintiff's work was posted, there was one site: triggerstreet.com, known as "Trigger Street".

20. Trigger Street (now TriggerStreet Labs) is a private site. Anyone can become a member, free (anonomously, if they wish), by agreeing to "Terms of Use" (not to use, copy or share other members' expressions, ideas, work, etc.), then access thousands of screenplays and short films.

21. In 2007, like today, the majority of TriggerStreet members were short filmmakers and screenwriters. In 2007, Defendant, Neill Blomkamp was a short filmmaker, with only a few short films to his credit. Blomkamp wouldn't begin his first feature for another year. Defendant, MRC, was a struggling new film company with but 1 credit for 2007, "Couples", filmed for only $2,500.

22. Trigger Street is the ONLY place the Plaintiff ever posted a complete script of Butterfly Driver -and the only place he released a version of the script with the new "inciting

4

COMPLAINT

1   incident", the "keepsake necklace", and his hero's secret "character affliction".

2   23.   TriggerStreet.com is where the Defendants had access to the Plaintiff's script.

3   24.   From February to August of 2007, the Plaintiff posted "Butterfly Driver" on

4   TriggerStreet.com about 4 times, making script revisions, each time.

5   25.   During this time the Plaintiff communicated with TriggerStreet members, Thomas

6   Gilman, Jason Beck, and Bob Thielke **[Exhibit N, O, P]**, whose input helped improve his script.

7   26.   Late July, 2007, the Plaintiff posted to TriggerSteet the last revised version of "Butterfly

8   Driver", for a short while. **[See Exhibit A].** During this time, his script received more downloads

9   than usual. A person identifying himself as a writer or producer for the TV series "The Wire" or

10  "Homicide: Life On The Streets" contacted the plaintiff, through the site's message board, to

11  compliment the script. A young director (whose name escapes the Plaintiff) also praised the script

12  through the message board. The Plaintiff believes this director MAY have been Defendant, Neill

13  Blomkamp. Although Blomkamp, or any associate, may have accessed the work, without a word.

14  27.   In December, 2007, now intent to produce his own movies, the Plaintiff stopped

15  marketing his script; Butterfly Driver, intent to film it himself, someday.

16  28.   January 2008, The Plaintiff began production of his film "The Amazing Mr. Excellent".

17  29.   In 2009, the Plaintiff filmed an investment trailer for his screenplay "Sunflowers".

18  30.   In 2010, The Amazing Mr. Excellent won "Best Of Fest" at the Temecula Valley

19  International Film Festival; and was singled out at the 2011 Oakland International Film Festival.

20  31.   In the spring of 2012, the Plaintiff wrote and filmed an anti-bullying short film, "The

21  Space Nerd", with students of Sequoia High School, San Mateo, CA (viewable online).

22  32.   In 2012, the Plaintiff filmed investment trailers for two new scripts, "Sweeter Nectar

23  Cherries" and "Alfy and Darry" (both viewable online, A&D script unfinished). He also produced

24  two infomercials for "Sweeter Nectar Cherries", and ran a Kickstarter.com financing campaign

25  for the film (which failed), and opened the film's website: sweeternectarcherries.com.

26  33.   On May 27th, 2013, the Plaintiff went to see a movie with friend, Sequoia High School

27  teacher, Cameron Farris. Before the feature, the theater previewed a trailer for the film "Elysium",

28  which featured a plot, characters, settings seemingly misappropriated from Butterfly Driver.

<div align="center">5</div>

<div align="right">COMPLAINT</div>

34.     Later that evening, the Plaintiff read about Elysium online, at Wikipedia.com; and discovered Elysium's story structure closely conformed to his script.

35.     June 13th, 2013, the Plaintiff found and downloaded the Defendants' screenplay, "Elysium" (probably an unauthorized posting), at the web address: http://writetoreel.com/forum/showthread.php?1643-Elysium-Script-PDF . **[See Exhibit B]**

36.     The text of the script conformed to the trailer dialogue viewed on May 27th, 2013.

37.     On May 28th, 2013, Plaintiff began contacting attorneys for representation, including Defense counsel: Kinsella, Weitzman, Iser, Kump, and Aldisert, LLP, (KWIKA Law), on June 3rd, 2013.

38.     The Plaintiff found attorneys open to limited or hybrid contingencies, but none to commit through trial -without guaranteed money.

39.     On June 20th, 2013, while meeting in his San Francisco office, attorney, Vijay Toke informed the Plaintiff that in order to file an infringement complaint he would need to register his copyright first. The next day, June 21st, 2013, the Plaintiff registered Butterfly Driver, with the U.S. Copyright Office; registration effective 06/21/13, certificate number PAu 3-683-232).

**STATEMENT OF FACTS COMMON TO ALL CLAIMS FOR RELIEF:**

40.     On August 9th, 2013, the Defendants released, distributed and displayed publicly, "Elysium"in The USA and 11 other countries; marking the the commencement of infringement.

41.     On August 10th, 2013, the Plaintiff viewed the film, Elysium, at a local theater. This confirmed the script the Plaintiff found online was the Elysium script, but not the final draft.

42.     Upon viewing the Defendants' film, the Plaintiff concluded: the film and screenplay, Elysium, was a severe infringement on his copyright protected story "Butterfly Driver", as a whole, and on the parts; including his plot, characters, settings, conflicts, themes, catalyst, crisis, climax, inciting incident, his hero's "character affliction" and "keepsake necklace" and more.

**PRIMARY INCIDENTS OF COPYRIGHT INFRINGEMENT**

**1) PLOT INFRINGEMENT:**

43.     The basic plot of the Defendants' "Elysium" is almost identical to the basic plot of the plaintiff's "Butterfly Driver". Compare:

6

COMPLAINT

"Butterfly Driver" Plot :

44.    A poor man, living in the impoverished ruins of Earth (where police vehicles loom in the sky and brutalize the poor) pays his family's emmigration out of their dangerous "zone" city by doing a dangerous mission for a disabled transporter -only to learn his seven year old daughter will die within seven days without medicine found only on a satellite world for the super-rich (Uberopolis). But the hero is poor; and getting to the satellite requires big money and special identification. Impossible without help from an outlaw political network. The hero suffers sudden, short, excrutiating headaches -and carries secrets the World President ( who has been genetically "reprogrammed" to appear much younger than he is) will kill to suppress. The President deploys a special agent to apprehend the hero. The special agent doesn't want the assignment, so he negotiates for medical aid for his son. An important woman gives the hero a special "keepsake necklace". To gain access to the villain, Arlo threatens to detonate an explosive device. In the climatic final battle, when it looks as if the hero might prevail, he falls to his knees, clutches his head and screams with a terrible headache. Eventually the hero defeats the villain -but sustains a life threatenning injury. As the hero drifts off toward death, he has a dream-like vision about the "keepsake necklace". The vision saves the hero. In the end, the hero's action impacts the world: bringing a cheap energy source, and allowing people to vote in open elections.

"Elysium" Plot :

45.    A poor man, living in the impoverished ruins of Earth (where police vehicles loom in the sky and brutalize the poor) has less than a week to get to a satellite world for the super-rich (Elysium) to get medical care to save himself (and his girl-friend's dying six year old daughter). But the hero is poor; and getting to the satellite requires big money and special identification. Impossible without the help of an outlaw, disabled human trafficker -who requires that the hero do a dangerous mission in exchange for emmigration to the satellite. While downloading information into his brain, the hero acquires a condition of sudden, short, excrutiating headaches. In his brain, the hero now carries secrets that a powerful Elysium official (who has been genetically "re-atomized" to appear much younger than she is) will kill to possess. The official deploys a special agent to apprehend the hero. The special agent doesn't want the assignment,

7

COMPLAINT

1   so he negotiates for restored privileges and a mansion on Elysium. The hero carries a "keepsake

2   necklace", given to him by an important woman from his past. To gain access to the satellite

3   world, Max threatens to detonate an explosive device to his head. In the climatic final battle, just

4   when it looks as if the hero might finally prevail, the hero suddenly falls to his knees, clutches his

5   head and screams with a terrible headache. Somehow the hero defeats the villain. But the hero

6   must die to save much of the world. As he prepares to die the hero takes comfort in his "keepsake

7   necklace", in a dream-like montage. In the end, the hero's action brings medical aid, and perfect

8   health, to the world.

9                            SUMMARY: Plot Infringement

10     46.    The Plaintiff's plot features: **1)** a giant satellite world for the super-rich; **2)** a hero

11   prone to excrutiating headaches (which knock him to his knees); **3)** a villain who has been

12   genetically reprogrammed to appear much younger than he/she is; **4)** advanced medicine found

13   on the satellite world; **5)** a hero who must get to the satellite world for medicine (medical care);

14   **6)** a "plight of immigrant" theme; **7)** a sick girl, who will die without the hero's action; **8)** a hero

15   who is poor, and needs I.D. and transport to a satellite world; **9)** an "anguish of living without

16   healthcare" theme; **10)** a disabled transporter who helps the hero; **11)** an agent (sent by the villain

17   to apprehend the hero) who accepts the assignment after negotiating; **12)** a keepsake necklace,

18   carried by the hero, which factors into the stories conclusion; **13)** an overpopulated, impoverished

19   Earth, where police vehicles loom in the sky and brutalize the poor, ruled by a rich elite who live

20   on the satellite world; **14)** a hero who threatens the villain with detonating an explosive device...

21     47.    The unique collection of plot features, in paragraph 46, outline a crafted expression, the

22   plot of the Plaintiff's screenplay, Butterfly Driver; copyright of the plaintiff.

23     48.    "Elysium" uses each aspect of the Plaintiff's plot, listed in paragraph 46 (and much

24   more, delineated in the subsequent pages); infringing on the Plaintiff's copyright protect work.

25     49.    Further, the Defendants made obvious efforts to give the appearance of dissimilarity

26   by changing their medical technolgy's name from "reprogramming" to "re-atomizing"; changing

27   the hero's backstory; changing the villain's gender; making the sick girl the girl-friend's daughter,

28   rather than the hero's daughter (which weakens, slows and complicates the story).

<div align="center">8</div>

<div align="right">COMPLAINT</div>

### 2) CHARACTER INFRINGEMENT

50.     Several central characters (including the hero and villain) of the Defendants', "Elysium", infringe on copyright protected characters from the Plaintiff's "Butterfly Driver". Compare:

**THE HERO:** Arlo vs Max

51.     The heroes of both movies are tough, poor men, age 35-45 (Plaintiff's hero is 45, Defendants' script hero is "30s", played in film by Matt Damon at 41-42), who carry keepsake necklaces, and suffer a unique affliction: short, sudden, excrutiating headaches, which cause the hero to stumble, grab his head and scream. Both heroes have with the same goals:

52.     THE HERO'S GOAL (**Butterfly Driver**): the hero has less than a week to get from Earth to a satellite world for the rich, to get medicine to save his daughter.

53.     THE HERO'S GOAL, (**Elysium**): the hero has less than a week to get to a satellite world for the rich, to get medical care to save himself (and inevitably, his girl-friend's daughter).

### SUMMARY: Arlo Vs Max

54.     The Plaintiff's hero, Arlo Grainer: **1)** is a 35-45 year old male, living 100 plus years in the future; **2)** is poor, living in the overpopulated ruins of a largely impoverished Earth; **3)** has less than a week to get to a satellite world for the super rich; **4)** contacts underworld figures to get I.D. and transport to the satellite world; **5)** suffers from rare, brief, excrutiating headaches; **6)** suffers a headache, battling in the story's climax; **7)** must get medical aid or medicine to save his daughter; **8)** carries a keepsake necklace from a special woman from his past.

55.     The characteristics, context and conditions listed in paragraph 54 are the expression of the Plaintiff's copyrighted character, Arlo Grainer; from the Plaintiff's work "Butterfly Driver".

56.     All of the characteristics, context and conditions, listed in paragraph 54, apply to the Defendants' character "Max". Thus, the Defendants' "Max" infringes on the Plaintiff's copyright protected character, "Arlo", and his copyright protected work, Butterfly Driver.

57.     The Defendants made obvious efforts to conceal their infringement by changing their hero's job, backstory, parental status, and changing the hero's goal from: "going to a satellite world to save his 7 year old daughter"; to "going to a satellite world to save himself," then attaching a girl-friend's 6 year old daughter to the mission, to achieve the same effect.

9

COMPLAINT

**THE HERO'S "AFFLICTION"**

58.     The Plaintiff's hero, Arlo,  suffers rare (never before used in film) ophthalmodynia (ice picks) headaches, so excrutiating they feel as if the sufferer's brain has been stabbed by an ice-pick. Thus, Arlo occasionally: 1) falls to his knees; 2) clutches his head; 3) cries-out in pain. In the script's climax, Arlo suffers a headache while fighting the villain. **[Exhibit A pp. 23, 46, 105]**

59.     Elysium's hero, Max, displays the symptoms and reactions listed in paragraph 58 -even suffers a headache in battle, in the climax. **[Exhibit B pp. 62, 63, 77, 112].**

COMPARISON OF PLAINTIFF & DEFENDANTS' AFFLICTION "HEADACHES"

60.     NOTE: the script "Elysium" contains four headache, but the film shows only three. The Plaintiff's "Butterfly Driver" had three events -but the early WGA reg. version "Uberopolis: City of Light" had four. The extra event from that script [EVENT #2] was added, for comparison.

LEGEND:     Plaintiff's "Butterfly Driver" **(BD) - in bold print [Exhibit A]**;

Defendants' "Elysium" - in regular print **[Exhibit B]**

61.   FIRST EVENT:

**(BD):   Arlo suddenly falls to his knees, grabs his head, and growls in pain, "GRRRR." His eyes roll back as he fights his way back to his feet. [Exhibit A p. 9]**

(ELYSIUM):   Max tries to run, but he collapses. He clasps his head in pain... Max clasps his head like a migraine. The data creating an epileptic white static in his head. **[Exhibit B p. 62,]**

62.   SECOND EVENT:

**(BD):   Arlo stands up then unexpectedly drops to his knees in pain. ARLO: "GGGRRRR! Argh!" Arlo's eyes roll back behind his head, showing only the whites of his eyes for a moment. Arlo cries out. ARLO: "AAAHHHH!"** ["Uberopolis:City of Light" p. 33]

(ELYSIUM):   Suddenly another blast of static pain grates through Max's brain. He screams, holding his head. He staggers to his feet. **[Exhibit B p. 63]**

63.   THIRD EVENT:

**(BD):   He (Arlo) suddenly falls to one knee and grabs his head, stricken by an ice-pick headache. He growls. Eyes rolled back, Arlo rises to his feet, holding his temple, as if defying the pain to stop him. [Exhibit A p. 46]**

10

COMPLAINT

1   (ELYSIUM):   Suddenly he has a mini seizure. The searing white light. The migraine. His head

2   wants to explode. He collapses to the ground... (more) **[Exhibit B p. 77]**

3      64.    FOURTH EVENT:

4   **(BD):   Arlo releases his grip. Drexler slowly drops to his knees, blood dripping from his**

5   **face. ...As Arlo reaches for his gun a jolt of pain shoots through his head, driving him to**

6   **one knee. Arlo's eyes roll in their sockets as he groans and struggles to his feet. BANG! A**

7   **fist smashes Arlo in the face, knocking him to the ground. Arlo looks up to find Drexler**

8   **looming over him. DREXLER: "Bad time for a headache." [Exhibit A p. 109].**

9   (ELYSIUM):   Max starts to get the upperhand when- A white hot flash of cerebral pain... He

10   trips and stumbles over desks and terminals, holding his head. Manual grabs Max and pulls him

11   back toward spider...   Kruger rises, whips out a deadly throwing knife and wings it at Manuel.

12   Max uses every ounce of strength to will himself to his feet. **[Exhibit B p. 112]**

13                    SUMMARY: Hero's Affliction

14     65.    The unusual headaches (in paragraph 60-64) and the way they manifest in the Plaintiff's

15   character, Arlo (grabbing head, stumbling, crying-out), and the surprising way a headache occurs

16   in the story's climax, are the Plaintiff's unique expression and copyright.

17     66.    In adopting the symptoms and reactions of the Plaintiff's hero's affliction, and using

18   them similarly (including amid battle in the climax), the Defendants infringed on the Plaintiff's

19   copyright protected character, Arlo Grainer, and on his copyrighted script, "Butterfly Driver".

20     67.    As seen in paragraphs 60-64, the Defendants do not call these events "headaches";

21   rather, "migraines". But "migraine" is neurological disorder characterized by recurrent <u>headaches</u>.

22   The Defendants also, twice, call the events "seizures", and an "epileptic white static" -which

23   reveal the Defendants' misinformation of a serious disability, as epilepsy and epileptic seizures do

24   not cause sufferers to fall to their knees, screaming, clutching their heads. The Defendants also

25   call the event "A white hot flash of cerebral pain." But "cerebral pain" is a "headache".

26     68.    The Defendants' willful misuse of language, illustrated in paragraph 67, is a crude and

27   obvious effort to give an appearance of dissimilarity (e.g. using the terms "migraines", "seizures"

28   and "epileptic white static", to avoid the word "headache" -to appear to describe a different

<div align="center">11</div>

<div align="right">COMPLAINT</div>

1   "affliction", while describing an almost identical reaction -to pain in the head.

2                        Uniqueness And Intricacy

3       69.    Amid these headaches, the Defendants mirror the Plaintiff's hero's "will" to his feet (in

4   paragraph 63, Line 23, from the Plaintiff's work). "...**Arlo rises to his feet, holding his temple,**

5   **as if defying the pain to stop him**"[Exhibit A p. 46]; and paragraph 61, Line 12 **"as he fights**

6   **his way back to his feet" [Exhibit A p. 9].** Compare to Defendants' work, (paragraph 64, Line

7   8): "...Max uses every ounce of strength to will himself to his feet." **[Exhibit B p. 112]**.

8       70.    The example provided in paragraph 69 (as well as the general parity of the passages

9   comapred  in paragraph 61 and 64) shows more than just infringement -it shows replication of

10  uniqueness, intricacy and complexity of the similar sections: a poor man trying to get to a satellite

11  world, driven to his knees by a crushing headache, grabbing his head, willing himself to his feet.

12              **THE HERO'S "KEEPSAKE NECKLACE"**

13      71.    In the Plaintiff's, "Butterfly Driver", a character, "Benni", gives the hero, Arlo, a

14  keepsake necklace . As Arlo faces death, near the end of the screenplay, he sees the neclace in a

15  dream-like vision, which saves his life. The Plaintiff refers to the necklace as a "necklance" and a

16  "pendant". **[Exhibit A pp. 54, 55, 65, 113]**

17      72.    In  "Elysium" a nun gives Max a keepsake necklace. As Max faces death, near the end,

18  he looks at the necklace and remembers "Frey" (in a dream-like way). The Defendants refer to the

19  necklace as a "pendant", and a "necklace" (and once as a "locket"). **[Exhibit B pp. 29, 117, 120]**

20      73.    SUMMARY:  In using a keepsake necklace, in Elysium, as the Plaintiff used the

21  keepsake necklace in Butterfly Driver, the Defendants infringed on the Plaintiff's copyright.

22              **THE VILLAIN:**  Drexler Vs Delacourt (Rhodes)

23      74.    The Villains of both works (Drexler in Butterfly Driver; Delecourt/Rhodes in Elysium)

24  have been genetically "reprogrammed" (or "re-atomized") to appear much younger than they are

25  **[Exhibit A p. 3; Exhibit B p. 18];** both villains send agents to apprehend the hero due to

26  information he possesses; and both villains order mass killings of prisoners traveling in space

27  shuttles (to reveal the depth of the character's evil) **[Exhibit A p.105; Exhibit B pp. 12, 13];** and

28  both villains are seemingly evil, but committed to the belief that they are defending their elite ilk,

                                      12

                                                        COMPLAINT

1   **[Exhibit A pp. 93-96; Exhibit B p. 18].** Additionally, The villain of Butterfly Driver, Drexler,

2   is the World President, and used his media company to cheat himself into The Presidency. Once

3   again, following the Plaintiff's model, in the film, Elysium, the villain, Delacourt, devises an evil

4   plan to cheat herself into The Presidency.

5                    SUMMARY: Drexler Vs Delacourt (Rhodes)

6     75.    The plaintiff's character, "Drexler": 1) has been genetically *"reprogrammed" to appear

7   much younger than he is (Elysium calls this technology *"re-atomizing"); 2) is very rich; 3) lives

8   on a satellite world for the rich; 4) orders mass killings of people traveling in space shuttles; 5)

9   wants the hero apprehended for information he possesses; 6) sends a special agent to apprehend

10   the hero; 7) is evil, but believes his deeds serve his elite ilk; 8) cheats himself into the Presidency.

11     76.    The characteristics, actions, motivations and conditions listed in paragraph 75 are the

12   Plaintiff's unique expression; forming his copyright protected character "Drexler", from his

13   copyright protected work, "Butterfly Driver".

14     77.    By adopting all (or substantial aspects) of each attributes listed in paragraph 75, for

15   their villain, "Delacourt" ("Rhodes" in the original screenplay), the Defendants infringed on the

16   Plaintiff's copyright protected character, "Drexler", and his protected work "Butterfly Driver".

17     78.    In changing minor details about their character "Deleacourt" or "Rhodes" (gender, rank,

18   making the character intent to cheat her way into the Presidency, rather than having already

19   commited the deed), the Defendants made obvious efforts to disguise their infringement.

20         **SICK CHILD:** Franny Vs Matilda

21     79.    Franny" is Arlo's sick 7 year old daughter, who has a respiratory disease. She will die

22   in less than a week -without medicine found only on a satellite for the super rich. Her life

23   depends on the hero's actions. If he fails, she dies. Thus, she is central to the plot. Franny is saved

24   by the hero and seen, healthy, in the script's final minutes. She lives in a world where the rich live

25   on a giant satellite with great medical aid; and where the poor live on Earth.

26     80.    The unique role Franny plays in the plot, within the story's unique settings, are part of

27   her copyrightability. Han Solo would just be another guy in a vest, and Luke Skywalker another

28   guy in a Karate gi, if not for the unique world around them.

<div align="center">13</div>

<div align="right">COMPLAINT</div>

81.   Elysium's, "MATILDA" is Frey's (the hero's girl-friend's) sick 6 year old daughter. She is very sick with Leukemia. She will die in less than a week -without medical aid only found on a satellite for the super-rich. Her life depends on the hero's actions. If he fails, she dies. Thus, she is central to the plot. She is saved by the hero's action, and seen, healthy, in the story's final moments. Matilda lives in a world where the rich live on a giant satellite with great medical aid, and the poor live on Earth.

### SUMMARY: "Franny" Vs "Matilda"

82.   The Plaintiff's character, "Franny", has these characteristics and conditions: 1) she is a very sick little girl; 2) she has less than a week to live -without medicine or medical aid found on a satellite for the rich; 3) her life depends on the hero's actions; 4) she is saved by the hero and seen healthy in the final story's final moments; 5) she is a central to the plot; 6) she lives in a world where the rich live on a giant satellite with great medical aid; while the poor live on Earth.

83.   The unique collection of characteristics and circumstances, listed in paragraph 82 form an intricate, interdependant, copyrightable character structure, and are the Plaintiff's expression of his copyright protected character, "Franny", from his work, "Butterfly Driver".

84.   The unique role Franny plays in the plot, and the uniques settings around her, are part of her copyrightability. In today's world, Han Solo would just be a guy in a vest, and Luke Skywalker just a guy in a Karate gi. But in their story context and settings, they are copyrightable.

85.   The Defendant's, "Matilda", shares all attributes, listed in paragraph 82, thus, the Defendants' "Matilda" infringes on the Plaintiff's character, "Franny".

86.   In making nuanced changes to "Matilda" (e.g. changing her name, her age, her relationship to the hero) the Defendants made obvious efforts to disguise their infringement.

### 3) SETTING INFRINGEMENT:

87.   Perhaps the most unusual settings in film this year (2013), the two central settings of the Defendants' "Elysium" infringe on the two central settings of the Plaintiff's "Butterfly Driver".

### SETTING 1:  GIANT SATELLITE WORLD FOR THE RICH

88.   The Plaintiff's satellite is 3 miles in diameter **[Exhibit A p. 26].** The Defendants' script calls for a satellite 60 miles in diameter. But the film's satellite is 1 or 2 miles in diameter.

14

COMPLAINT

89.   The plaintiff's satellite world has many unusual aspects: 1) it is an enormous satellite man-made world, with forests and large aquatic features; 2) only the super-rich live in the satellite's pristine biosphere; 3) fantastic medical technologies are available there; 4) entering the satllite requires special identification; 5) it is home to the story's genetically reprogrammed villain; 6) it orbits an overpopulated, impoverished Earth; 7) it is where the final battle transpires; 8) there, prisoners in orange jumpsuits board shuttles for Earth. **[Exhibit A pp.3, 33; Exhibit B p. 5];** the satellite's capacity is 300,000, when complete, 150,000 currently. (Elysium's capacity is 251,200). **[Exhibit A p. 4; and SEE Elysium website: http://www.welcometoelysium.com/ ]**

SUMMARY:  Setting 1, Giant Satellite for the Rich

90.   The list of features, in paragraph 89, are a simplification of the Plaintiff's expression of his copyright protected satellite world, Uberopolis, featured in his work, "Butterfly Driver".

91.   The Defendants, "Elysium" uses all of characteristics listed in paragraph 89 for their satellite world. Thus, the Defendant's "Elysium" infringes on the Plaintiff's copyright.

92.   By never referring to Elysium as a "satellite" (to avoid the Plaintiff's language), and in making superficial changes to their satellite world (size, shape), the Defendants made obvious effort to give the appearance of dissimilarity.

SETTING 2:  DYSTOPIAN EARTH

93.   The other central setting of both screenplays is the impoverished overpopulated ruin of Earth. On this setting, in both scripts:: 1) the poor have little access to medical care; 2) the hero lives in a slum, overrun by thugs and crime; 3) police and military vehicles loom in the sky and brutalize the poor **[Exhibit A pp. 7, 16, 52, 53 ; Exhibit B pp. 6, 7];** 4) Army ships, full of "undesirables" are released into the slums **[Exhibit A p. 53; Exhibit B p. 5];** 5) the poor are brutalized by the governement of the satellite world (who also do a few kind things for the poor, such as provide supplies) **[Exhibit A p. 95; Exhibit B p. 17-18];** 6) rich businesses build manufacturing plants in the slums to take advantage of the cheap labor **[Exhibit A pp. 47, 95; Exhibit B pp.15, 16, 27, 28];** 7) people commonly travel by flying shuttles and flying cars, and commute to the giant satellite; 8) the poor live in the ruins of cities in decay. (NOTE: Elysium's script doesn't specify "ruins", but its synopsis does, and the film illustrates this state).

15

COMPLAINT

1           SUMMARY: Setting 2, Dystopian Earth

2    94.    The characteristics listed in paragraph 93 are the Plaintiff's expression of his dystopian

3  vision of a future Earth, and his copyright, from his copyright protected work, "Butterfly Driver".

4    95.    The Defendants','"Elysium", adopts (all, or significant aspects of) each of the

5  conditions listed in paragraph 93, infringing on the Plaintiff's copyright.

6    96.    In making superficial changes to their vision of Earth in "Elysium" (adding robots,

7  changing the year, etc.) the Defendants made obvious efforts to disguise their infringement.

8           CONJOINED SETTINGS: Rich Satellite World, Poor Dystopic Earth:

9    97.    The placement of the Plaintiffs two unique settings (the satellite for the super-rich,

10  orbiting the Plaintiff's dystopic future-Earth, paragraphs 87-96) are the Plaintiff's copyright.

11    98.    The Plaintiff is aware of no other story, prior to Butterfly Driver, featuring a gigantic

12  man-made super satellite with giant aquatic and forested areas, great medical technologies for the

13  rich, and the other aspects listed in paragraph 89. Nor is he aware of any stories, prior to his,

14  featuring his vision of a dystopic future-Earth, with all the the aspects listed in paragraph 93.

15    99.    The Star Trek (1969, TV) episode, "The Cloud Minder" is the nearest copyrightable

16  equivlent known. But "The Cloud Minders" did not feature a man-made orbiting giant satellite,

17  but a city that floated in the the clouds. The human-like alien beings there were not super-rich.

18  Rather, they were alien artists and intellectuals. There were no aquatic or forested features, nor

19  special medicine that compelled the other alien species, on the planet below, to the cloud city. On

20  the planet, the aliens all worked in mines, and was nothing like the Plaintiff's future-Earth.

21    100.    Butterfly Driver and Elysium are "Science Fiction" works, because they loosely adhere

22  to, or expand, understood science. The fact that The Cloud Minders features a city that floats in a

23  cloud (against all science), makes it a "Fantasy" genre story.

24  SETTING: YEAR

25    101.    Butterfly Driver is set in the year 2120. Elysium's original script says the movie is set in

26  2109 . But the actual film and official synopsis revise that year to 2154. However, In 2010, before

27  the Defendants had written their script, the Plaintiff posted an 80 word logline of his screenplay

28  (for investors), on his website (mrexcellentmovie.com) in which he changed the setting year of

<div align="center">16</div>

<div align="right">COMPLAINT</div>

1   Butterfly Driver to 2144 -ten years from Elysium's final setting. **[See Exhibit Q]** .

2   102.    In placing Elysium's setting year near the Plaintiff's setting year, the Defendants adhere

3   to and expand a pattern of infringement and similarity.

4                   4) <u>CENTRAL CONFLICT INFRINGEMENT</u>

5   103.    The "conflict" is/are the thing(s) that stands between the hero and his goal. The heroes

6   of both, the Plaintiff's, Butterfly Driver, and the Defendants', Elysium, have extremely similar

7   goals. Both heroes need to get to a satellite world to access medical technology. Both heroes must

8   overcome an almost identical conflict list:: 1) the hero is not a citizen of the satellite world; 2) the

9   hero is poor; 3) the hero needs fake I.D. and help to get to a satellite world; 4) a  powerful, evil,

10  official wants the hero stopped; 5) the hero suffers debiltating headaches which make reaching

11  his goal more difficult; 6) The evil, powerful official  sends a special agent to apprehend the hero.

12                  SUMMARY: Central Conflict

13  104.    All of the story conflicts, enumerated in paragraph 103, together, are an expression of

14  the Plaintiff's effort, from his screenplay, "Butterfly Driver", the Plaintiff's exclusive copyright.

15  105.    The Defendants infringed on the Plaintiff's copyright by adopting all of the Plaintiff's

16  central "conflicts", listed in paragraph 103, for their screenplay and film, "Elysium".

17  106.    Further, the Plaintiff charges that in making three minor changes to the "conflicts" in

18  "Elysium" (e.g. making the pursuing agent into an "evil" agent, and changing the gender and

19  office of the evil Official), the Defendants made willful efforts to disguise their infringement.

20                  5) <u>THEME(S) INFRINGEMENT</u>

21  107.    The Plaintiff's "Butterfly Driver" has at least five imperarive central themes:

22          1) <u>Survival without adequate healthcare is inhumane</u>

23          2) <u>the plight of immigrants is brutal</u>

24          3) <u>wealth corrupts and divides us</u> (literally -the poor on Earth, the rich on a satellite)

25          4) <u>Heroic Sacrifice</u>:  BUTTERFLY DRIVER: Arlo  risks everything for his daughter.

26                  ELYSIUM: Max gives up his life to save Matilda and mankind.

27          5) <u>Redemption comes from refusing to give up hope</u> (the spiritual theme of both movies).

28          BUTTERFLY DRIVER (spiritual theme): Arlo doesn't give up hope of saving his

                                            17
                                                            COMPLAINT

1    daughter. Thus, in the end, he finds redemption and liberates the world with free,

2    fair elections. (Butterfly Driver uses a rabbi, a cleric, a pastor and a necklace to

3    reinforce this theme).

4    ELYSIUM (spiritual theme): Max doesn't give up his dream of getting to Elysium;

5    thus, finds redemption -and liberates the world. (Elysium uses a nun and a necklace

6    to reinforce this theme).

7                      SUMMARY: Themes

8    108.    The five themes (listed in paragraph 107) are, in the context of his script, "Butterfly

9    Driver", or in any substantially similar story, the artful expression and copyright of the Plaintiff.

10   109.    The Defendants adopted all five of the Plaintiff's central themes for "Elysium", further

11   infringing on the Plaintiff's copyright.

12              6) CATALYST, CRISIS, CLIMAX (and twist) INFRINGEMENT

13   110.    Typically a screenplay has three imparitive "plot points": 1) catalyst, 2) crisis, 3) climax.

14   Elysium borrows all three from the Plaintiff's, "Butterfly Driver".

15   **CATALYST**

16   111.    The catalyst is the event that pushes the hero into action, and gives him his goal. The

17   catalyst usually marks then end of the first act and the beginning of second.

18   112.    BUTTERFLY DRIVER:  the hero learns his daughter has less than a week to live,

19   unless he can get to Uberopolis to get medicine to save her. **[Exhibit A p. 35]**

20   113.    ELYSIUM:  the hero learns he has only five days to live, unless he can get to Elysium

21   for medical care. *His girl-friend's dying daughter must get there, too. In the film Max has 5 days

22   to live. Elysium's script is inconsistent: "only a few days" or "20 days". **[Exhibit B pp 31, 72]**

23   **CRISIS**

24   114.    The crisis is the story's low point, when all hope seems lost.

25   115.    Usually the crisis occurs about halfway through the story. The Plaintiff's crisis occurs

26   near the third act, The Defendants also place their crisis near the end.  Compare:

27   116.    BUTTERFLY DRIVER:  after struggling to get to Uberopolis, Arlo learns the

28   medication his daughter needs is not on the satellite world. **[Exhibit A p. 83]**

                          18

                                         COMPLAINT

117.   ELYSIUM:  Arriving to Elysium, Max learns he can't be treated without wiping out the data in his head, and Matilda can't be treated because she's not a citizen. **[Exhibit B pp. 105, 106]**

**CLIMAX**

118.   The climax begins when the hero directly confronts the villain, until the resolution.

119.   The Plaintiff set his climax on the giant satellite for the effect: the great battle on the great satellite. Arlo initiates the climax by holding an explosive devise to his head to gain access to the villain.

120.   Conversely, the Defendants started their climax on Earth; where the battle could have ended. But the Defendants moved the dying child, her mother, the hero, and the villain, all to the satellite world, to conclude the battle; to emulate the effect of the Plaintiff's script. Max escalates the climax by holding a grenade to his head to gain entry into Elysium.

121.   Both works have identical CLIMAX TWISTS: The hero battles the villain on the giant satellite. They struggle. Finally the hero gains the advantage, then suddenly, the "twist": the hero has a massive headache. **[Exhibit A p. 109; Exhibit B p 112]**

SUMMARY: Catalyst, Crisis, Climax (and twist)

122.   The Plaintiff's catalysts, crisis, climax (and "climax twist") are, collectively the Plaintiff's unique expression, and the plaintiff's exclusive copyright.

123.   As shown in paragraph 110-122, the Defendants' catalyst, crisis and climax are all identical, or extremely similar to the Plaintiff's; and thus, infringe on the Plaintiff's copyright.

7)  <u>INCITING INCIDENT INFRINGEMENT</u>

124.   The inciting incident, as many writers and screenwriters know, is the event that takes the hero out of his normal routine world. It is sometimes, simply, the catalyst.

125.   The Plaintiff's inciting incident occurs midway through the first act. The Defendants' "Elysium" uses the Plaintiff's inciting incident as the first event of the second act. But in both works, oddly, the inciting incident is separate from the inciting incident.

126.   BUTTERFLY DRIVER'S INCITING INCIDENT: Arlo learns bounty hunters are closing in on him. He realizes he has to get his wife and kids out of their dangerous "zone" city and into the rich, safe "State". But he needs money to pay their transport and immigration

19

COMPLAINT

1  ("repatriation") fees. Arlo turns to his friend -a local underground transporter. <u>The transporter has</u>

2  <u>a disability: he is a missing arm</u>. The transporter arranges Arlo's wife and kids' transport and

3  immigration -BUT Arlo must do a VERY dangerous mission in exchange.

4     127.   ELYSIUM'S INCITING INCIDENT: Max learns he has radiation poisoning and has

5  only five days to live. His only hope is to get to the satellite city, Elysium, for medical care. With

6  no money to pay, Max asks his friend (a local underground transporter) to smuggle him to

7  Elysium. <u>The transporter has a disability: he has a paralyzed leg</u>. The transporter agrees to

8  transport Max -if Max does a VERY dangerous mission in exchange.

9                 SUMMARY: Inciting Incident

10     128.   The unusual structure of "paying emmigration transport, by doing a dangerous mission

11  for a disabled underworld transporter," is the Plaintiff's expression and copyright.

12     129.   As illustrated in paragraph 124-128, the Defendants "Elysium", adopts the Plaintiff's

13  inciting incident, and thus infringes on the Plaintiff's copyright.

14           8)  <u>IDIOSYNCRATIC & STYLE INFRINGEMENT</u>

15     130.   The Plaintiff use of two unusual words, one double naming of a prop, one word play,

16  and the omission of race and sex, can be considered idiosyncratic, or a style signature. The

17  Defendants','"Elysium", uses these same (or extremely similar) idiosyncrasies :

18     131.  **(A)**  BUTTERFLY DRIVER uses the very uncommon word "repatriate", in lieu of

19  the word "immigrate**". [Exhibit A pp. 12, 13, 34, 41 117].**

20     132.   ELYSIUM uses the word "repatriated" on page 5. **[Exhibit B p. 5]**

21     133.   "Repatriation" is usually used in association with war. The Plaintiff uses it to reference

22  immigration in a warlike state. The word departs from Blomkamp's simple story language.

23     134.  **(B)**  BUTTERFLY DRIVER uses the term genetic "reprogramming" for the act of

24  reversing the effects of disease, age, and physically improving a person. **[Exhibit A p. 3, 36, 90).**

25     135.   ELYSIUM uses a similar term "reatomizing" for the act of reversing the effects of

26  disease and age, and physically improving a person. **[Exhibit B pp. 2, 4, 104)**

27     136.  **(C)**  BUTTERFLY DRIVER refers to a key necklace as a "necklace" and a "pendant".

28  This is unusual because most screenwriters refer to each object by one name, to avoid confusing

                   20

                   COMPLAINT

1    the props department -who dissect the script to prepare props for each scene.

2              ELYSIUM also refers to their necklace as a "necklace" and a "pendant"

3    137.  **(D)**  BUTTERFLY DRIVER shows humans killed in space and their bodies left to

4    fall back to Earth. The Plaintiff uses the terms "disposal" and "litter" to show the dead bodies are

5    the new "trash" hazard. Playing with this motif, the villain, Drexler, orders a shuttle set for

6    "disposal" -meaning: dump all aboard into space. **[Exhibit A pp. 3, 31, 107, 105, 108]**

7    138.    ELYSIUM: Before Rhodes orders Kruger to destroy two shuttles full of immigrants

8    (to let their bodies to fall to Earth) she asks how many of the ships are a "debris danger" -playing

9    on the "trash" motif. **[Exhibit B pp. 10, 11]** (the "debri danger" line was cut out of the movie).

10   139.  **(E)**  BUTTERFLY DRIVER omits the racial identities of the central characters, to

11   reflect a less "racial' future. Omitting this information is unusual for a screenplay.

12   140.    ELYSIUM also omits any mention of the racial identity of its central characters.

13   141.  **(F)**  BUTTERFLY DRIVER, is somewhat unique in that there is an absence of sex in

14   the storyline (against Hollywood conventions). The Plaintiff made this unusual style decision to

15   maintain the integrity of his story and his central hero, and to add urgency to the story.

16   142.    ELYSIUM also follows the Plaintiff's model and permits no sexual contact.

17              SUMMARY: Idiosyncratic and Style Infringement

18   143.    The Plaintiff's idiosyncratic elements described in paragraphs 131-142, in the

19   context of Butterfly Driver, or any similar work, are the plaintiff's copyright. In taking these

20   idiosyncrasies for Elysium, the Defendants further infringed on the Plaintiff's copyright.

21              9) FUTURE TECHNOLOGICAL 'VISION" INFRINGEMENT

22   144.    **Butterfly Driver:** the Plaintiff's future vision is expressd in theree central technologies:

23   1) an advanced satellite world, 2) medical technology; 3) a future where the rich routinely

24   commute from Earth, to their homes on a satellite world, in private and public spacecraft.

25   **Elysium:** features the central technologies of: 1) a satellite world for the rich; 2)  medical

26   technology (identical to the Plaintiff's medical technology, "genetic reprogramming"); 3) shows

27   the rich routinely commute from Earth, to their homes on a satellite world, in private and public

28   spacecraft. **[Exhibit A p  33, 70, 73, 76; Exhibit B p 50, 51, 52 ].**

                                            21

                                                                    COMPLAINT

145.   SUMMARY: paragraph 144 illustrates the Defendants' technological "vision" infringes on the Plaintiff's technological "vision", and on his copyright protected work, Butterfly Driver.

### 10)  RESOLUTION SIMILARITY

146.   In both scripts, the heroes actions have unlikely global consequences. Compare:

147.   **"BUTTERFLY DRIVER" Global Impact Resolution**: The hero's actions topple the government, bringing much of the world free, open elections -as well as a new clean energy.

148.   **"ELYSIUM" Global Impact Resolution:** because of one hero's actions, the government of Elysium is toppled, and medical aid is sent out to cure all the people of the world.

149.   SUMMARY: The Defendants' resolution mirrors the nature, style and scale of the Plaintiff's resolution, and conforms to an expanding pattern of similarity and infringement.

### MOOD and PACING

150.   Mood is the pervading feel of a work; created by setting, tone and pace. The Defendants' mirror the mood of the Plaintiff's work, as; 1) The pacing of both works is similar: fast but not frenetic; (2) both works feature disabled characters, suggesting a brutal government; (3) both works are serious, with little humor in narrative, dialogue or action; (4) the settings and themes of both works are identical; (5) both works used similar scenes too darken the mood, such as unnecessary, casual police beatings of the heroes. **[See Exhibit A p. 30; See Exhibit B p. 8]**

151.   Again, both works feature the mood and pacing  aspects listed in paragraph 150, expanding the Defendants' pattern of infringement of the Plaintiff's work.

### SECONDARY INSTANCES OF COPYRIGHT INFRINGEMENT

### 1)  SECONDARY SCENE INFRINGEMENT

152.   The following scenes from the Plaintiff's work, were infringed on by "Elysium".

153.   **(A)** In Butterfly Driver, to gain direct access to the villain, Arlo, holds up an explosive "A-cell" and threatens to detonate it. In an uncertain moment with the villain, Arlo throws the A-cell out a window.  **[Exhibit A pp. 88, 97]**

154.   In Elysium, to get to Elysium, Max holds a grenade to his head and threatens to detonate it. In an uncertain moment villain, Max throws the grenade in a shuttle's cockpit. **[Exhibit B pp. 94-95]** (*Note: in the actual film, Max does not throw the grenade).

22

COMPLAINT

155. **(B)** In <u>Butterfly Driver</u>, hero, Arlo, is strap-locked in a doomed shuttle, and breaks free and struggles to saves his friend from his straps. **[Exhibit A p. 31]**

156. In <u>Elysium</u>, hero, Max, must struggle to free his friend, Frey, who is strap-locked in the seat of a doomed shuttle. **[Exhibit B p. 96-99]**

157. **(C)** In <u>Butterfly Driver</u>, Jerry negotiates with insurers for his son's life. **[Exhibit A p. 22]**

158. <u>Elysium</u>: Frey negotiates with hospital for her daughter's life.**[Exhibit B pp. 26, 27]**

159. **(D)** In <u>Butterfly Driver</u>, the villain, Drexler, is extremely strong because he was reprogrammed without myostatin **[Exhibit A p. 36]**. Drexler also refers to himself as "immortal", suggesting he feels superior to regular humans. **[Exhibit A p. 99]**

160. In <u>Elysium</u>, the villain, Kruger possesses "immense strength" **[Exhibit B p. 20]**, from re-atomizing. Kruger calls the humans on Earth "humans" and "peasants", suggesting he thinks he and Elysians are superior to regular humans. **[Exhibit B pp. 57, 67, 91]**

161. **(E)** In <u>BOTH</u> screenplays tech programmers must forge documents to get the heroes into Uberopolis and Elysium, respectively. **[Exhibit A pp. 57-58, Exhibit B pp. 44]**

162. **(F)** <u>Butterfly Driver</u>: Arlo has a tracker cut out of his neck.**[Exhibit A p. 33]**

163. <u>Elysium</u>: Kruger cuts an ID & tracking chip out of his wrist. **[Exhibit B p. 57]**

164. SUMMARY: Paragraphs 153-163 are further instances and evidence of the Defendants' "Elysium" infringing on the Plaintiff's copyright protected work, "Butterfly Driver".

<div align="center">

2) <u>SECONDARY CHARACTER INFRINGEMENT</u>

**(1) Rianna & Benni Vs Frey :**

</div>

165. Elysium's character FREY is a hybrid character based on the characters RIANNA & BENNI from the Plaintiff's copyright protected work, "Butterfly Driver". Compare:

166. <u>Butterfly Driver</u>: Rianna lives in an slum, but is an educated, devoted mother; while Benni is beautiful, hopeful, but disappointed with the men around her. **[Exhibit A p. 52]**.

167. <u>Elysium</u> : Frey lives in an uneducated slum, but is an educated, tough and devoted mother -also beautiful hopeful and disappointed with the men around her **[Exhibit B p. 75]**.

168. <u>Butterfly Driver</u>: the writer hints at an attraction between Benni and Arlo, but no romance occurs, as it would undermine the story's urgency. **[Exhibit A p. 52]**

<div align="center">23</div>

<div align="right">COMPLAINT</div>

169. <u>Elysium</u> : Max is attracted to Frey, but no romance occurs. **[Exhibit B pp. 15, 75]**

    **(2) Jerry Vs Kruger**:

170. Although Elysium's "KRUGER" is evil and Butterfly Driver's JERRY Matthiessen is good, they have a few important things in common:

171. **(A)** JERRY and KRUGER are both sent to apprehend the hero by a high ranking official.

172. **(B)** <u>Butterfly Driver</u>: when superiors ask agent Jerry Matthiessen to find Arlo, Jerry bargains for health care for his son, before accepting the mission. **[Exhibit A pp. 25, 45]**

173. <u>Elysium</u> : when his superior asks special agent Kruger to apprehend Max, Kruger bargains for a mansion and more, before accepting the mission. **[Exhibit B pp. 56, 57]**

174. **(C)** <u>Butterfly Driver</u>: Jerry works for government law enforcement, the OFI

175. <u>Elysium</u> : Kruger works for government law enforcement, the CCB.

    **(3) Dylan Vs Spider**:

176. The Defendants' character "SPIDER" bears a striking resemblance to the Plaintiff's character, "DYLAN". Compare:

177. In <u>Butterfly Driver</u>, "Dylan" runs an underground base with flight path monitors on the walls. He sometimes transports immigrants. <u>He is disabled: missing an arm</u>. **[Exhibit A p. 7]**

178. In <u>Elysium</u>, "Spider" runs an underground base, with flight path monitors on the walls. He transports immigrants. <u>He is disabled: a paralyzed leg</u>. **[Exhibit B p. 36]**

    **(4) Matty Vs Matilda:**

179. Elysium's character, "Matilda" (who infringes on Plaintiff's character, "Franny") also bears striking resemblance to the Plaintiff's character "MATTY". Compare:

180. <u>Butterfly Driver</u>: "Matty" is Jerry's sick 9 year old son. He is dying of a respiratory disease. He wants to be healthy and get out of his air chamber. **[Exhibit A  p. 44]**

181. <u>Elysium</u> : "Matilda" is 6 and dying of Leukemia. She is the daughter of Frey, Max's childhood sweatheart. Matilda wants to be healthy and get out of the hospital. **[Exhibit B p. 66]**

182. The fact that "Matilda" is the feminine form of "Matty" is also curious.

183. SUMMARY: Paragraphs 165-183 provide further examples and evidence of the Defendants' infringement of the Plaintiff's copyright, and expand a pattern of similarity.

24

COMPLAINT

MINOR SCRIPT INFRINGEMENT:

184. **(B)** <u>Butterfly Driver</u>: the final battle and chase on Uberopolis, Arlo runs through doors that take the fight under the metal city floor. **[Exhibit A p. 101]**

185. <u>Elysium</u> the final battle and chase on Elysium, Max goes through a hatch that takes the fight under the metal city floor. **[Exhibit B pp. 110-112]**

186. **(C)** <u>Butterfly Driver</u>, Arlo's friend is killed by a state bounty hunter. **[Exhibit A p. 10]**

187. In <u>Elysium</u> , Max's friend is killed by state assassin, Kruger. **[Exhibit B p. 64]**

188. **(D)** <u>Butterfly Driver</u>: uses Bush era, post 911 terms to reinforce points, such as: "I don't negotiate with State enemies," and tags like "embolden". **[Exhibit A pp. 51, 88]**

189. <u>Elysium</u> borrows this stroke with "Homeland Defense" ("Homeland Security" in the movie). **[Exhibit B p. 2, 100]**

190. **(A)** <u>Butterfly Driver</u>: A character named "VAN" reflects some current attitudes toward immigrants, when he comments about an immigrant woman's hard work, "She just repatriated. People from the state can't work like that." **[Exhibit A p. 41]**

191. <u>Elysium</u> : reflects some current attitudes toward immigrants when Rhodes says, "Jesus Christ. Yes, the real issue. The ungodly influx of immigrants..." **[Exhibit B p. 17]**

192. **(E)** <u>Butterfly Driver</u>: Drexler and leaders talk politics and P.R. **[Exhibit A p.75]**

193. In <u>Elysium</u> : Delacourt, and leaders discuss politics and P.R. **[Exhibit B pp. 17-18]**

194. **(F)** In <u>Butterfly Driver</u>:, the massive climax battle causes chaos among civilians, and causes security officers to evacuate as alarms blare. **[Exhibit A p. 105]**

195. In <u>Elysium</u> , the massive climax battle causes chaos among civilians, and causes security officers to evacuate as alarms blare. **[Exhibit B p. 110]**

196. **(G)** <u>Butterfly Driver</u>: remote cameras track Arlo. **[Exhibit A pp. 98, 103, 107]**

In <u>Elysium</u> : remote cameras track Max **[Exhibit B pp. 80, 90]**

197. **( H )** <u>Butterfly Driver</u>: Characters refer to Arlo as a LEGEND. **[Exhibit A pp. 14, 48]**

198. <u>Elysium</u> : Julio tells Max "... you used to be a LEGEND. **[Exhibit B p. 25]**

199. Paragraphs 184-199 provide further examples and evidence of the Defendants' infringement of the Plaintiff's copyright, and expand a pattern of similarity.

25

COMPLAINT

<u>INTERNET / MULTI-MEDIA INFRINGEMENT</u>

200. The Plaintiff, showed the science, social nd political history behind his world,. The Defendants eliminated the social and political history from their script and film, but included this information on the official Elysium website. These details further infringe on the Plaintiff's "Butterfly Driver"; listed below:

201. **(A)** In <u>Butterfly Driver:</u> the villain, Drexler, is directly responsible for creating Uberopolis. He is the richest man in the world and owner of the most profitable company ever - Drexler Industries. Drexler Industries makes it's fortunes from 3 enterprises: 1) HEALTH & MEDICAL; 2) REAL ESTATE (homes on Uberopolis); 3) its media company.

202. In <u>Elysium</u> the evil character Carlyle is directly responsible for creating Elysium. He is the CEO of Armadyne Corp. Armadyne is the most profitable company ever. Armadyne makes its fortune from 3 enterprises: 1) HEALTH & MEDICAL COMPANY;2) REAL ESTATE (Elysium); 3) his robotics products. (http://www.armadyne.net/company/leadership.php )

203. **(B)** <u>Butterfly Driver:</u> : When the second half of Uberopolis is completed it will support 200,000 to 300,000 citizens. **[Exhibit A p. 4]**

204. The official <u>Elysium</u> website says Elysium has a maximum capacity of 251,200 citizens -approximating Uberopolis's capacity. (http://www.welcometoelysium.com/)

205. **(C)** In <u>Butterfly Driver:</u>, immigration into the state costs tens of thousands of dollars. But only citizens who pass an intelligence test can vote. **[Exhibit A pp. 12, 84]** On the <u>Elysium</u> official website, it is revealed that legal immigration requires an IQ test. The website includes an IQ test site visitors can take. http://www.itsbetteruphere.com/

206. **(D)** In "<u>Butterfly Driver:</u>" the government of Uberopolis also governs Earth, from Uberopolis, and it is a corporate, business centered world government.

207. The official <u>Elysium</u> website establishes that the government of Elysium also governs the Earth. It is a business centered government, governed by The Elysium Corporate Authority. ( http://www.armadyne.net/#../company/about.php).

208. Paragraphs 200-207 provide further examples and evidence of the Defendants' infringement of the Plaintiff's copyright, and expand a pattern of similarity.

26

COMPLAINT

<div align="center">MARKETING INFRINGEMENT</div>

209.   The synopsis is a filmmaker's foremost marketing tool.  In 2010, the Plaintiff posted an updated Butterfly Driver investor synopsis online, **[See Exhibit Q]** archived Aug. 6th, 2010, at: http://web.archive.org/web/20100807072930/http://www.mrexcellentmovie.com/future.html The Defendants synopsis seems patterned after that synopsis written by the Plaintiff's. Compare:

210.   "**BUTTERFLY DRIVER:** In 2144 Earth is grossly overpopulated, with 95% of the population living in poverty, while the elite .01% live on the giant man made luxury satellite, Uberopolis. Against this backdrop, in some anonomous slum, legendary soldier -and world's most wanted fugitive, Arlo Grainer, learns the polluted atmosphere will kill his daughter unless she receives an extremely costly drug. For that medicine Arlo will go across the globe and into the heart of Uberopolis, pursued by every bounty hunter on Earth".

211.   **ELYSIUM** (Synopsis-Logline): "In the year 2154, two classes of people exist: the very wealthy, who live on a pristine man-made space station called Elysium, and the rest, who live on an overpopulated, ruined planet. The people of Earth are desperate to escape the crime and poverty that is now rampant throughout the land. The only man with the chance to bring equality to these worlds is Max (Matt Damon), an ordinary guy in desperate need to get to Elysium. With his life hanging in the balance, he reluctantly takes on a dangerous mission -- one that pits him against Elysium's Secretary Delacourt (Jodie Foster) and her hard-line forces -- but if he succeeds, he could save not only his own life, but millions of people on Earth as well."

<div align="center">SUMMARY: Marketing Infringement</div>

212.   The Defendants' synopsis only mentions aspects infringed on from the Plaintiff's work -no mention of robots, exoskeleton suits, or high-tech guns, as they are insubstantial, and added only to disguise the infringement.  The Defendants' synopsis follows the Plaintiff's synopsis structure. Mention, first, the year, then the class division, then the satellite world, followed by plot details. On IMDB's top 200 science fiction films, of the future-set non-time-travel films, only "Elysium" and "Children Of Men", include the setting year in their synopsis, just as the Plaintiff.

213.   Paragraph 209-212 illustrate the Defendants' "Elysium" marketing synopsis adheres to a pattern of infringement and  similarity.

<div align="center">27</div>

<div align="right">COMPLAINT</div>

**DEFENDANTS' ATTEMPT TO APPEAR DISSIMILAR:**

214.    Beyond the extensive copyright infringement outlined herein, (see in paragraphs 1-213) the Plaintiff believes the Defendants made obvious efforts to hide infringement and appear dissimilar from the Plaintiff's work (see paragraph 1-213). These efforts began long before the film was released. While making Elysium, the Defendants implemented measures of extreme secrecy -to keep the Plaintiff unaware his work was being misappropriated. In pre-production, the Defendants would not permit actors to see a script, or review their lines before auditioning. Cast and crew members were not permitted to reveal any story details, or take a script home. Legendary actress, Jody Foster, star of Silence of The Lambs (perhaps the film with the most surprise ending ever), says she had never seen such secrecy. **[See Exhibit R]**.

215.    Further evidence of the Defendants' efforts to hide their infringement is Jodie Foster's media statements that her character was originally written for a man. **[See Exhibit S]**.

216.    Late May 2013, the Plaintiff contacted about 40 attorneys (including the Defendants' Counsel, K.W.I.K.A. Law) providing, via email, many case details. **[See Exhibit T]**. A few attorneys declined due to a "conflict of interests". KWIKA Law did not respond.

217.    The plaintiff believes, in May or early June 2013, the Defendants were informed of the immanent suit, giving them two months to re-edit portions of the film. The Plaintiff suspects this because the Defendants' script calls for four headaches, yet the film shows only three. And the 3 surviving headaches were inexplicably short; and all missing the special effects described in the script. The "eplileptic white static", the "blast of static pain", the "searing white light", and the "white hot flash of cerebral pain..." are all missing, as if someone tried to edit out the headaches, but couldn't make the scene work without a pinch of the headache footage. Defendant, Neill Blomkamp, is a special effects master. Every special effect in his film is executed as described - except the headaches. The Plaintiff contends the Defendants removed one headache, and attempted to remove the others, but could not, due to  insufficient coverage film footage.

218.    The Plaintiff believes the enormity of infringement, outlined throughout this complaint, joined with the Defendants' efforts to appearance of dissimilar, surpass substantial similarity, and comfortably meet the Striking Similarity criteria.

28

COMPLAINT

**DEFENDANTS' PROFITS**

219.    As of December 16th, 2013, Elysium had earned over $286,000,000, worldwide, against a cost of 115,000,000; amounting to profits of $161,000,000 (not include online, TV, or DVD sales). The Plaintiff suspects the Defendants overstate losses in anticipation of this litigation, as the budget for Elysium was listed at $90,000,000 from late May to late July, 2013, all around the internet. Suddenly, in July 2013, months after production ended, the budget skyrocketed to $115 million. The Plaintiff believes this is "Hollywood acounting, at play, where expenses are inflated to make films appear to be losses."**[See Exhibit U]** See: (http://web.archive.org/web/20130629221705/http://en.wikipedia.org/wiki/Elysium_(film)

220.    The Plaintiff believes, upon learning of this litigation, June 2013, the Defendants began to grossly inflate their expenses. The Plaintiff believes the actual cost of Elysium is $90,000,000, and the global marketing expenses to be $40,000,000, based on the $35,000,000 marketing budget Sony gave "District 9", Blomkamp's first film in 2009 ($210,000,000 gross worldwide). The Plaintiff believes each Defendants' fees, royalties, salaries, or other "expenses" received for any service they provided in the infringement (including fees for writing, directing, producing, facilities, rights, etc.) must be deducted from costs and counted as profit.

DEFENDANTS' BUSINESS ETHICS CONCERN

221.    On May 14th, and June 11th 2013, billionaire investor, Daniel Loeb, CEO of Third Point, LLP, Sony's largest shareholder (7%), wrote an open letter to Sony's President, Kazuo Hirai, asking Hirai to make Sony Pictures Entertainment (Defendant) a partially publically traded company because it lacks transparency, accountability and discipline. **[See Exhibit V]**. Other articles criticize Sony picture for not implementing the same accounting methods for their film production as propounded in their investment business plans. Mr. Loeb's letter initiated an investor conference,  November 2013, and a budget slashing of $100,000,000 at Sony Pictures.

**PERSONAL DAMAGES AND INJURY**

222.    The Plaintiff's "Butterfly Driver" is a tight, thoughtful work, cultivated from the American experience of a native Californian, transplanted to an immigrant community in New York City (Inwood, Washington Heights) during the events of 911 (2001); forged from first-hand

29

COMPLAINT

1    perspective of the failures of the American healthcare system (then); and life-long witness

2    experience of the heart wrenching dichotomy engendered by America's immgration issues. Even

3    "Franny", the sick seven year old girl, was based of the Plaintiff's asthmatic seven year old son.

4        223.    Conversely, the Defendant(s)'s "Elysium" lacked any authenticity feel, is marred by

5    story flaws, such as the collision of thoughtful and absurd ideas, a lack of character depth, story

6    consistency -and basic science understanding (e.g., using turbine engines for space travel, etc.).

7            The Defendants' film promulgated conspicuously racist views; such as their vision of a

8    future where Latinos have amassed no wealth and (in the Defendants' eyes) have no work ethic

9    -as seemingly all Latinos in their film and script, wish to illegally enter a space world, where no

10   jobs are offered, so they can illegally live in mansions, get free health care, and not work. These

11   flaws and offensive views made Elysium one of Slate Magazine's Worst Movies of 2013.

12       224.    As a consequence of the Defendants' infringement, and their offensive views, the

13   Plaintiff's' reputation may be permanently damaged by the igniminious association with the

14   Defendants' infringing work. The Defendants' infringement makes it much harder for the Plaintiff

15   to approach the filmmaking establishment for support on future works, as Sony Pictures Ent., Inc.

16   also owns Columbia Pictures, and fellow Defendant, TriStar Pictures.

17       225.    The Defendant's infringement makes it impossible for the Plaintiff to market his

18   screenplay, as there is no room in the film market for two films about a poor man living in the

19   future ruins of an impoverished Earth, who needs to get to a satellite world for the super rich, etc.

20   As affirmed by  LEWIS GALOOB TOYS, INC.v. NINTENDO OF AMERICA, INC., 964

21   F.2d 965 (9th Cir. 1992) Judge FARRIS [Cite: The Supreme Court specifically affirmed finding

22   that the motion picture adaptation "impinged on the ability to market new versions of the story."

23   Stewart, 495 U.S. at 238]

24                                    **ACCESS NOTE**

25       226.    The Plaintiff is does not believe Kevin Spacey or Dana Brunetti were complicit in

26   the access of his work or the infringement. But the Plaintiff is certain one or more of the

27   Defendants, or an acquaintance, accessed the Plaintiff's work on TriggerStreet.com.

28       227.    Since Defendant, Blomkamp, is at least credited with writing Elysium, the Plaintiff

COMPLAINT

1  believes he is most likely the infringer. Since TriggerStreet (now Trigger Street Labs) is a website

2  for short filmmakers and screenwriter, and in 2007 Blomkamp was exclusively a short

3  filmmaker, and the Plaintiff a screenwriter, adds to the weight of evidence against Blomkamp.

4      228.    Defendant, MRC, has been invloved with Spacey's and Brunetti's Trigger Street

5  Productions since late 2010 or early 2011 concerning, "House of Cards" (six months to a year

6  before production of Elysium began).

7      229.    Defendant QED International and CEO, Bill Block, have had been in business

8  contact with Trigger Street Productions since 2009 or early 2010, on the film "Inseparable" -

9  almost two years before production of Elysium.

10     230.    Defendants Sony Pictures Entertainment and TriStar began work with Trigger Street

11 Productions in March of 2007, on the feature film "21" -a few months before the Plaintiff alleges

12 one or more of the Defendants accessed his script.

13     231.    In 2007 TriggerStreet.com ("Trigger Street") gave screenwriters access to critical

14 feedback from their peers -and a small hope of being noticed by a Hollywood insider. In 2004,

15 and again in 2007, Defendant Neill Blomkamp gained worldwide attention due to his knack for

16 using social media to create viral global interests in his short films.

17     232.    In 2007, the Plaintiff, was a screenwriter seeking feedback from his peers, and

18 Defendant, Blomkamp, was a short filmmaker, based in Los Angeles (home of Trigger Street).

19 Neill Blomkamp, at the time (2007), was perhaps the most social media savvy short filmmaker in

20 the world -and living in the screenwriting hub of the world. The idea that a viral short filmmaker

21 could be in Los Angeles in 2007 and not be aware of Trigger Street, seems implausible.

22     233.    In 2007, just as today, the majority of TriggerStreet members were short filmmakers

23 and screenwriters. In 2007, Neill Blomkamp was a short filmmaker, with only a few short films

24 (and no feature films) to his credit. Blomkamp would wouldn't start his first feature film,

25 "District 9", for another year, until June 2008; and wouldn't finish until 2009.

26                **DEFENSE'S CHARGE OF "PREVIOUSLY PUBLISHED"**

27     234.    In the Defense's Answer And Affirmative Defenses to the Plaintiff's original

28 Complaint, the Defense suggests that potions of the Plaintiffs work were previously published

COMPLAINT

1   (paragraph 201). This is mistaken. The Defense is suggesting the short (25-90 word)

2   logline/synopses the Plaintiff posted on his website and private and special interest, screenwriter

3   websites (with "Term of Use", etc., to attract investors, agents and filmmakers) constitutes

4   "publication".

5       235.    The Plaintiff contends the Defense's interpretation of "publishing" is wrong, and -were

6   that to become the precedent standard of "publication"- it would have a chilling effect on

7   innovation, as inventers and creators would be forced to secret away their wares from the very

8   entrepreneurs who would otherwise make their ideas real, for fear that even a simplified emailed

9   description of their work could be considered publication, and violate their protections.

10                                  **COPYRIGHT REGISTRATION**

11      236.    As stated earlier (paragraph 1, and 15-17) in this amended Complaint (and in the

12  previous Complaint), the Plaintiff finished the first draft of his screenplay, "Uberopolis:City of

13  Light", May, 2005. He continued to revise it, eventually renaming it, "Butterfly Driver", January

14  2007 (approx.). The Plaintiff revised the work until late July or early August 2007, to the

15  Plaintiff's recollection and evidence. If the Plaintiff had registered sepearate copyrights for each

16  of the earlier, verifiable, fixed versions of Uberopolis, or Butterfly Driver (several posted on

17  TriggerStreet.com) there would be substantially more infringement claims in this Complaint.

18  But this suit is only for the final revised version of "Butterfly Driver", registered June 21st, 2013.

19      237.    During the registration process, on the U.S. Copyright Office's website, the Plaintiff

20  was asked to provide any previous titles of the work. As stated, Butterfly Driver is a revision and

21  refinement of the Plaintiff's original, "Uberopolis: City of Light"; thus, the Plaintiff provided that

22  previous title **[As Seen in Exhibit C].** The Plaintiff was also asked, near that point to provide a

23  "Year of Completion". **[As Seen in Exhibit C].** The Plaintiff was uncertain if the Copyright

24  Office wanted the year of completion of the earliest, previous, title, from 2005, or the final

25  version, from 2007. Uncertain, the Plaintiff entered the year of the "previous title", 2005. But the

26  Pllaintiff uploaded and registered, for the U.S. Copyright Office archives, a digital PDF of his

27  2007 title, "Butterfly Driver". This suit is for the infringement of that uploaded and registered

28  screenplay: the last edited 2007 version of Butterfly Driver, attached as **Exhibit A.**

                                         32

**SERVICE NOTE**

238.    It should be noted that the Plaintiff's nephew, Vince Marchbanks, a graduate of USC's architecture department, 2007 (not a professional server), arrived to serve QED International at 1:50 pm, December 4th, 2013. A QED receptionist told Mr. Marchbanks the legal representative was at "lunch" and would be back in 20 minutes. After waiting an hour, and seeing no employees enter the building, Mr. Marchbanks asked the receptionist if the legal rep had returned. She said she would "check" his office. In a few minutes, she returned, saying the representative was now "busy", but he had directed the receptionist to take the documents.

239.    This was the second time Mr. Marchbanks attempted to served QED. The first time, on Tuesday, November 26th, 2013, the same receptionist received Mr. Marchbanks in the foyer and told him the other QED staff members were on vacation.

**THE PLAINTIFF'S IDENTITY AND PERSONAL HISTORY**

240.    Due to doubts posed by the Defense concerning the Plaintiff's identity, (line 5 of the Defense's Answers And Affirmative Defenses to the Plaintiff's original Complaint), and the vague character insinuations the Defense's intends, the Plaintif isf providing this section to assert his identity, hoping to spare the Court this effort.

241.    The Plaintiff has NO criminal history, and has worked with emotionally disturbed kids for 26 years, requiring routine Federal and State background checks and fingerprinting. Except for a custody suit, the Plaintiff has never sued (ot threatened to sue) another party. Nor has he ever collected unemployment, social assistance, etc.

PLAINTIFF"S IDENTITY

242.    The Plaintiff was born Steve Kenyatta Briggs, in San Francisco, California, September 24th, 1964. After his mother re-married to his step-father, Dennis Wilson, when the Plaintiff was 5 years old; the Plaintiff then took the name "Wilson". The name Wilson has been on his Social Security card as long as the Plaintiff can remember. The Plaintiff began to hyphenate his name, Steve Wilson-Briggs, around the time he was 16 years, or so, to the best of the Plaintiff's recollection. The Plaintiff, if memory serves, has been known as Steve Wilson-Briggs, or Steve Wilson Briggs (without hyphen), for about thirty years. In the late 1990's the Plaintiff began to

33

COMPLAINT

1    drop tthe hyphen when certain government and private agancies' (including certain airlines)

2    computers could not process a hyphen. These agencies would then manufacture convenient

3    names for the plaintiff, such as WilsonBriggs, or Wilsonbriggs (including the DMV) **[See**

4    **Exhibit W** -S.S. Card, License, bank cards, AAA, passport; IRS and DMV mail; assorted

5    travel documents**]**. While  other agencies drop the hyphen entirely, for "Wilson Briggs". Oddly,

6    the hyphen appears on the Plaintiff's Social Security card, but not on the Social Security mailings.

7    **[See Exhibit W]**

8        243.    The Plaintiff's banking, DMV, lIRS, emails, and everything else is in his life, is under

9    the last name "Wilson-Briggs", or "Wilson Briggs" . The name that appeared on his license

10   (expired in September 2013) was Wilson-Briggs. The name on his current licence is Wilson

11   Briggs. National airlines and railrways process the Plaintiff's name with and without hyphen.**[See**

12   **Exhibit W]**. The name that appears on his son's birth certificate is Steve K. Wilson Briggs.

13       244.    "Steve Kenyatta Wilson Briggs", "Steve Kenyatta Wilson-Briggs", or "Steve

14   Wilson Briggs", "Steve Wilson-Briggs", and "Steve Kenyatta Briggs" (or Steven);  all these

15   names refer, nationally, to one person, alone, the Plaintiff. Steve Wilson Briggs.

16       245.    The Plaintiff found nowhere in Copyright law or in the registration process, requiring

17   applicants use their birth name, or any specific name. If so, this would have a debilitatimg impact

18   on women's standing in intellectual property, as they often take their spouse's names. It would

19   have a similar effect on immigrants who's identities are valid, but often impossible to verify.

20                              PLAINTIFF"S RESIDENCE

21       246.    For the past 15 years the Plaintiff has lived only at these addresses: 4996 Broadway #

22   4G, NY, NY 10034 (1999-2007); 4322 Chico Ave. Santa Rosa, California 95407 (his family's

23   home for 42 years, 1971-the present); 681 Edna Way, San Mateo California, 94402 (2011 to

24   present); and for 4 months at a forgotten address in Elmhearst, Queens, NY (1998-1999).

25       247.    From 1999 to the 2007, the Plaintiif declared dual residency in California and New

26   York, using his family's home in Santa Rosa as his California residence -for reasons pertaining to

27   maintaining custodial ties to California regarding parenting arrangements of his son. During this

28   time the Plaintiff lived 8 to 9 monhs per year in New York and 3-4 months per year in California,

                                            34
                                                                    COMPLAINT

1    where he worked (exclusively) for Seneca Cente. This arrangement allowed the Plaintiff to live in

2    New York City, without working, which afforded the Plaintiff unlimited time to parent his son,

3    when he was in New York -without need for other Child Care -and unlimited time to write.

4    248.    When the Plaintiff moved back to California, in 2007, the Plaintiff returned to the

5    family address in Santa Rosa. He uses that address on his license, Social Security, IRS and for

6    some mail, as his home in San Mateo, is transitional.

7                            PLAINTIFF"S EMPLOYMENT

8    249.    For the past 15 years the Plaintiff has worked for Seneca Center (Northern California,

9    1993 to 2009); Pheonix House (NYC, 1999); and The Sequoia Union High School District,

10    (Redwood City, CA, 2010 to Present); all concurrent to his private writing, film and music

11    endeavors. The agencies above have been the Plaintiff's only employers over the past 15 years.

12                                  **COUNT ONE**

13           **Copyright Infringement Under 17 U.S.C. §§ 101 et seq.**

14    250.    The Plaintiff incorporates by reference all of the allegations of paragraphs 1

15    through 250, inclusive, as if fully set forth herein.

16    251.    The Plaintiff is the writer of his screenplay, Butterfly Driver. Butterfly Driver is an

17    original screenplay, copyrightable under the Copyright Act, The Plaintiff has a valid

18    Copyright to his work. As such, per Title 17 U.S.C. §§ 101. et seq., the Plaintiff has the exclusive

19    right to reproduce, distribute, perform, display, license, and to prepare derivative works based on

20    the copyrighted work.

21    252.    The Plaintiff alleges that the Defendants' screenplay and film Elysium are derived

22    from unauthorized misappropriation of the Plaintiff's work, Butterfly Driver; and infringe on the

23    Plaintiff's copyright; in violation of Title 17 U.S.C. §§ 101. et seq.

24    253.    Pursuant to 17 USC § 106, in making derivatives, reproducing, distributing and

25    displaying publicly their film, "Elysium" (based on their screenplay, Elysium), which infringes on

26    the Plaintiff copyright protected Butterfly Driver, the Defendants violated the Plaintiff's exclusive

27    rights of under Title 17 U.S.C. §§ 101. et seq.

28    254.    The Plaintiff alleges the Defendant's willfully committed the infringement of the

COMPLAINT

1   Plaintiff's work for purposes of commercial advantage and/or private financial gain.

2       255.    On information and belief, The Plaintiff alleges that, as a result of the Defendants'

3   infringement of the Plaintiff's copyright protected work, Butterfly Driver, the Defendants have

4   realized and continue to realize profits, rightfully belonging to the Plaintiff. As of October 1st,

5   2013, Elysium had earned over $286,000,000 million, against a cost of $90 to $115,000,000.

6   Earning profits in excess of $161,000,000, and growing.

7       256.    The Plaintiff asserts the Defendants' infringement has caused and is causing substantial,

8   irreparable damage to Plaintiff.

9       257.    The Plaintiff contends that the Defendant's screenplay and film, Elysium, bear

10  "Substantial Similarity" to the Plaintiff's screenplay, and believes the Court may agree that the

11  transgression rises to "Striking Similarity".

12      258.    The Plaintiff alleges each of the Defendants had discrete and convenient access to his

13  work via Trigger Street (triggerstreet.com). Trigger Street can be accessed, free, and

14  anonomously, anywhere there is internet connectivity.

15      259.    Beyond the vast similarity, the Plaintiff contends: 1) the Defendants made obvious

16  attempts to give the appearance of dissimilarity; 2) the plaintiff's work contains idiosyncratic

17  elements repeated or emulated in the Defendants work; 3) uniqueness, and intricacy of sections

18  of the Plaintiff's work are mirrored in the Defendants'; 4) the same mistakes occur in both works.

19      260.    The Plaintiff alleges the Defendants' screenplay and film specifically infringe on the

20  heart of the Plaintiff's story, Butterfly Driver, including the Plaintiff's plot, characters (hero,

21  villain, sick girl, more), settings (including the giant orbiting satellite city for the super-rich),

22  hero's affliction headache, hero's keepsake necklace, hero's goal, themes, central conflicts,

23  catalyst, crisis, nciting incident, climax-twist, idiosyncratic elements, resolution, future vision,

24  more.

25      261.    The Defendant's infringement is so extensive that when the Plaintiff's infringed

26  content is extracted from Elysium there is no story left to market -all that remains are robots, two

27  exoskeletons, some high-tech guns, and the hero's new backstory; all of which are simply "add-

28  ons", added to disguise infringement -not connected to the central story.

<div align="center">36</div>

<div align="right">COMPLAINT</div>

**PRAYERS FOR RELIEF**

FIRST CAUSE OF ACTION: COPYRIGHT INFRINGEMENT

262.    WHEREFORE, the Plaintiff asks the Court to enter judgment in his favor, and against Defendants, Neill Blomkamp, Sony Pictures Ent., Inc., TriStar Picture, Inc., Media Rights Capital, and Q.E.D. International, and grant the Plaintiff the following relief:

263.    A.) Declare that the Defendants' unauthorized conduct violates the Plaintiff's rights under the Federal Copyright Act;

264.    B.) Pursuant to Title 17 USC § 503(b) the Plaintiff requests The Court order the end of production and distribution, and the impounding and destruction of all original recordings and all copies of the Defendants' film "Elysium", in all formats (DVD, CD, film, digital, etc), and order the impounding and destruction of all derivatives (such as video games, soundtracks, etc.);

265.    D.) As per Title 17 USC § 504(a)(b) the Plaintiff seeks Actual Damages (the opportunity to make and market his film) and Lost Profits;

266.    E.) Such other and further relief as the Court deems just and proper;

267.    F.) Pursuant to Title 17 USC § 506(a)(1)(A), as the Defendants' actions were willful and for purposes of commercial advantage, the Plaintiff asks the Court to hold the Defendant(s) criminally accountable as provided under section 2319 of Title 18.

268.    G.) The Plaintiff also prays for the injunctive remedies of: ordering the stopping any further and future sales and distribution of the Defendants' infringing work, "Elysium" (by that name or any other name), in any form (digital, film, DVD, CD, online video, games, toys, etc.).

269.    The Plaintiff incorporates by reference all of the allegations of paragraphs 1 through 208, inclusive, as if fully set forth herein. Consistent with the guidelines for injunctive remedies: 1) the Plaintiff has established that he will suffer irreparable harm without the injunctive measures; 2) the Plaintiff has presented a solid complaint and evidence supporting his claim that he will prevail; 3) the Defendants will not be harmed by the injunction more than the Plaintiff will be harmed without them; 4) and consistent with theguidelines for injunctive remedies, it is in the public's interest to be protected from being sold media and content misappropriated from other artists.

37

COMPLAINT

1    270.    H.) Pursuant to 17 U.S.C. §§ 412, the Plaintiff's "Butterfly Driver" was preregistered

2    under section 408 (f) before the commencement of the infringement (and that has an effective

3    date of registration not later than the earlier of 3 months after the first publication of the work or

4    1 month after the copyright owner has learned of the infringement). Thus, the Plaintiff prays of

5    the Court for the remedy of reasonable fees for attorneys and disbursements. The Plaintiff's U.S.

6    Copyright Office registration effective date for his unpublished script, "Butterfly Driver", is June

7    21st, 2013, which is seven weeks before the Defendants released, distributed and displayed

8    publicly, "Elysium", in The USA and 11 other countries, on August 9th, 2013 (SEE:

9    http://www.imdb.com/title/tt1535108/releaseinfo); which marked the commencement of the

10   infringement -as any infringement before that date would be presumptively fair, non-profit

11   activity. [LEWIS GALOOB TOYS, INC. v. NINTENDO OF AMERICA, INC. (9th Cir., 1992)

12   (964 F.2d 965) "Game Genie users are engaged in a non-profit activity. Their use of the Game

13   Genie to create derivative works therefore is presumptively fair." The Court also ruled in this

14   case that, "a family's use of a Game Genie for private home enjoyment must be characterized as a

15   non-commercial, nonprofit activity."].

16

17   DATED:  December 19th, 2013

18   Respectfully submited,

19

20   By: _____

21   (Signature of Steve Wilson Briggs, Plaintiff)

22

23

24

25

26

27

28

38

COMPLAINT

EXA

**Butterfly Driver**

Written By

Steve Wilson Briggs

WGAw # 1103287
Steve Wilson Briggs

Steve Wilson Briggs

FADE IN:

EXT. FOGGY FIELD - NIGHT

Blinding rays of a parked car's headlights cut the night
fog, silhouetting five figures trudging through a sparsely
wooded field near a small country farmhouse.

The shadows move into view: a sturdy man in an overcoat (JERRY
Matthiessen, 45); a slender, neatly attired man (HOWARD Mann,
35); a portly FARMWOMAN (55); two barking dogs.

> HOWARD
> It makes me uncomfortable.

> JERRY
> Relax, Howard. All dogs put their
> noses there.

> FARMWOMAN
> Whatever made that hole made such a
> noise.  Got Bessie and Baxter to
> barking.  How'd you know it was here?

Jerry looks intermittently at a small multi-function
phone/computer/global positioning device (called an omni-
com) in his hand, to pinpoint a location.

> JERRY
> Friend at the observatory's echo-
> locators pegged it here.  You didn't
> call the police?

> FARMWOMAN
> Not if I don't have to. Y'all police,
> anyway. I seen him on TV.
> > (shining her
> >  flashlight at Jerry)
> Um...uh... Jerry Mathers!

> JERRY
> Matthiessen. We're not exactly police.
> But we wanna be sure it's not
> contaminated. Spores, or what not.

> FARMWOMAN
> Y-yes. Thank you.

The farmwoman stops near a crater, shining her flashlight
into a five foot in diameter by three foot deep hole.

Case 8:18-cv-00459-VCJHD Document 53-1 Filed 11/19/18 Page 42 of 56

2

                    FARMWOMAN (CONT'D)
          Got some kinda ooze in it. Is that
          spore?  The dogs was licking it.

Shining his flashlight in the crater, Jerry sees a blackish-
red "goo" lining the crater.

                    JERRY
          I won't know till tomorrow.

                    FARMWOMAN
          Chilly.  Mind if I go inside?

                    JERRY
          Sure.  G'night.

Howard smiles as the farmwoman turns to her house.

The men cover their airways with cotton air-masks.  Jerry
crouches at the mouth of the crater and puts on a pair of
latex gloves. Howard looks around nervously.

                    JERRY (CONT'D)
          Ten times more meteor sightings since
          they built Uberopolis.

                    HOWARD
          You think this fell from Sky Town?

                    JERRY
          A hypothesis... Looks organic.

Jerry grabs a short stick lying nearby and pokes the goo.

                    HOWARD
          Ah, the scientific "stick test"...
          Smells like ham. I read cannibals
          said cooked human tastes like pork.
          They called human meat "long pork";
          cause we're long when you roast us -
          not short like pigs...

As Howard continues, Jerry takes a small sample jar and a
scraper from the breast pocket of his overcoat, leans over,
scrapes a sample and wipes it into the jar.

                    HOWARD (CONT'D)
          Can you hurry? I hate being way out
          here without gun clearances.

Jerry seals the sample carefully, drops the jar into a clear
plastic bag, and tucks it in his pocket.

3

                    JERRY
          Let's go.

Howard nods. The two men head back toward their vehicle.
Against the headlights, their figures become shadows again.

The sound of closing car doors. A moment later, their vehicle
levitates straight up, arcs skyward and fades into the dark.


EXT. SPACE - NIGHT

A dead man, dressed in an orange jumpsuit, floats, silent,
in space. Beyond the corpse, a 3 mile wide satellite city,
Uberopolis, orbits 1000 miles above Earth's polluted skies.

The body is sucked into Earth's gravitational pull, faster
and faster, until the skin peels and burns from the heat of
re-entry. The body ignites and rockets downward.


EXT. CITY STREET - NIGHT

In an impoverished city, known as Zone 242, a teenage boy
(JOHN CARL, 15) jogs down a crowded street, carrying a small
bag, weaving through thugs, hustlers, hookers and homeless.

Overhead, a SHOOTING STAR streaks behind the patchy clouds.


INT. RIANNA'S HOUSE - BEDROOM - CONTINUOUS

In rundown single-family apartment house, situated above a
large garage, a woman, Rianna (40) looks out a bedroom window,
anxiously, seated by her daughter, Franny (7) who lies in
bed, looking rather gaunt.

On A BEDSIDE TV a cartoon is interrupted by a commercial.

ON THE TV:

A muscular, handsome man, President Peter DREXLER (50,
although he appears only 25) greets the viewers; behind him,
a photo of a satellite city, Uberopolis, floating on space.

                    DREXLER (on TV)
          Hi, I'm President Peter Drexler, and
          owner of Uberopolis. We have a lot
                    (MORE)

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/09/18 Page 44 of 156

4

> DREXLER (on TV) (CONT'D)
> to celebrate in the Global State.
> 100 percent employment, almost no
> crime, but with 15 billion people,
> pollution and congestion persist
> everywhere -except, Sky Town. I invite
> you to come enjoy our casinos, museums
> and golf courses, all orbiting 1000
> miles above the worries of Earth.
> Let the pure air heal your lungs and
> the low gravity heal your bones...

An elderly man jumps from a three story building, landing
unharmed on the Uberopolis street.

> DREXLER (CONT'D)
> Last year the first half of Uberopolis
> sold out in 6 months. The second
> half is under construction, to be
> opened next year. Reserve your home
> now. See why over 150,000 people
> like me call Sky Town home.

BACK TO SCENE

THROUGH THE WINDOW: Rianna sees her son, John Carl, running,
down the street for home, up the stairs, to the front door.

BEDROOM

John Carl rushes in the room and hands the bag to his mother.

> RIANNA
> Thank you.

Rianna pulls the cough medicine from the bag.

> FRANNY
> John Carl, I just saw a shooting
> star. I get another wish.

Rianna pours a capful of medicine. John Carl turns to Rianna.

> JOHN CARL
> Cool.
> (turning to Rianna)
> I'm going downstairs to see dad before
> he goes to work... Night, Franny.

Rianna nods, extending the cap to Franny's lips. Franny waves,
drinking down the medicine. John Carl exits.

Case 8:18-cv-00401-MEJJHD Document 53-1 Filed 11/09/18 Page 45 of 56

5

INT. GARAGE-REC CENTER - NIGHT (CONTINUOUS)

John Carl enters the large garage where his father (ARLO
GRAINER, 45) teaches a small group of kids self-defense.
Other kids play on a small pool table, paint on an easel and
play board games; a few parents watch from the periphery.

Arlo demonstrates a "take-down" move. The kids repeat the
move -except one little girl who fails to execute the move.
Arlo shows her again. She tries again, and fails.

                    LITTLE GIRL
          I can't get it.

                    ARLO
          Just keep trying. That's the secret.
          We'll get it tomorrow.

The girl nods, reassured, as Arlo shakes her hand. Glancing
at his watch, Arlo raises his voice to the rest of the garage.

                    ARLO (CONT'D)
          That's it guys! Goodnight!

Arlo moves toward a small office area within the garage,
shaking a few of the kids' hands as they disperse for home.

IN THE GARAGE OFFICE

Arlo enters the office, followed by John Carl, who takes a
seat on Arlo's desk. He picks up a photo of Arlo and another
man (RODDY, 45). Both men in the photo wear gray jackets
with black triangles over their hearts, beer mugs raised.

Arlo opens a door in the office and steps into his messy

BEDROOM

and takes a gun holster lying on his bed, puts it on, then
throws on a gray jacket with a triangle over the heart. From
the office John Carl comments on his father's messy room.

                    JOHN CARL
          You kept your room clean when you
          lived upstairs with mom.

                    ARLO
          Yeah, well, I'm a bachelor, now.
          Homework?

6

                         JOHN CARL
              Finished.

Arlo exits his bedroom and walks through

THE OFFICE and into

THE GARAGE-REC ROOM

followed by John Carl. Arlo walks to a small vehicle, called
a SKY-CYCLE (resembling a large motorcycle with a sidecar)
parked in the rear of the garage. As Arlo mounts the sky-
cycle, John Carl opens the garage door.


EXT. GARAGE - NIGHT (CONTINUOUS)

Arlo pushes the sky-cycle outside. Rain falls lightly.

                         JOHN CARL
              You patrolling with Roddy?

Arlo nods. John Carl steps out of the garage and closes the
garage door. Arlo pushes a button on the sky-cycle's dash; a
canopy covers the sky-cycle. He pushes another button; wings
extend from below the sky-cycle.

                         ARLO
              G'night.

                         JOHN CARL
              Night.

John Carl jogs upstairs and enters the house.

Arlo levitates the sky-cycle to the second floor and knocks
on Franny's window to get her attention.

THROUGH FRANNY'S WINDOW

Franny turns. Arlo blows her a kiss. Franny waves. Arlo turns
the sky-cycle skyward, and slips into the dark.


INT. WAREHOUSE - NIGHT

On the sky-cycle, Arlo glides through the port gate of a
large warehouse full of boxed supplies. He parks near a
loading dock where two large, worn, HOVER-JETS (flying cargo
trucks) warm their engines.

Case 3:18-cv-04990-WHO Document 53-1 Filed 11/09/18 Page 47 of 56

7

A rugged older man missing his right arm (DYLAN, 55) waves
off one of the hover-jets as it glides out the port gate.

Arlo and Dylan shake hands; their voices barely audible over
the warming hover-jet engine.

>               DYLAN
>       We got an emergency call about two
>       minutes ago, so I had to send Roddy
>       out with Isaac. I got enough M.T.'s.
>       You can line-ride, unless you wanna
>       do a butterfly run?

>               ARLO
>       We haven't had a butterfly in a year.

Dylan nods his head toward an attractive woman standing,
nervously, near the warehouse office. TAMARA GWYNN (30).

>               DYLAN
>       Tamara Gwynn. A driver from 186
>       dropped her off. State energy
>       researcher. Loaded. Needs to get to
>       L.A. by morning for a court trial.
>       She's offering 500 grand up front
>       and 500 after. That's 300 for you.

>               ARLO
>       I'd like to help, but I've got kids.

Dylan nods understandingly, and gestures toward the GRAY
hover-jet. A WORKER throws a bundle into the cargo hull and
latches the door.

>               DYLAN
>       Run this to 238. Take theirs to 246;
>       bring 246's jet here. It's in the
>       flight plan.

Arlo nods, hops in the hover-jet and glides through the gate.


INT/EXT HOVER-JET - NIGHT

Above barren badlands Arlo races his hover-jet. Approaching
another "zone" a police-jet drops behind Arlo and opens fires.

Arlo spins and returns fire. The police-jet swerves. Arlo
enters the city low to the ground and quickly loses the police-

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/09/18 Page 8 of 56

8

jet. Winding through the streets, Arlo disappears down a
ramp leading to an underground bunker.


INT. WAREHOUSE - NIGHT

Arlo brings a BLUE hover-jet to a stop. As Arlo exits Dylan
walk toward him to greet him.

"RING"! Arlo's omni-com (a multi-purpose communication device)
rings. He pulls it out as he dashes toward his sky-cycle...

                    ARLO
          That Roddy's distress signal!

Arlo jumps on his sky-cycle and races through one of the
dock gates, back into the night.


EXT. SKY ABOVE ZONE 242 - NIGHT

Above slum-like housing, Arlo streaks across a stormy sky,
looking at his omni-com's screen to track Roddy's location.
Below, he spots two sky-cycles, on top of an old three-story
office building. Arlo speaks into his omni-com.

                    ARLO
          Their cycles are on the roof of the
          old Beckler building.

                    DYLAN (on the phone)
          OK. Wait for Gomez and Drake...

Arlo ignores Dylan and glides down to the rooftop.


EXT. ABANDONED BUILDING - ROOF - NIGHT

Dismounting his sky-cycle, Arlo draws his gun and runs toward
the roof's "emergency exit", and enters.


INT. ABANDONED BUILDING - NIGHT (CONTINUOUS)

Arlo descends The dark stairway from the roof and clicks
'on' his gun-mounted flashlight. At the base of the stairs
he pushes open a door and steps into a long hall.

ER 231

9

IN THE HALL

A dozen office doors face the hall. The eerie silence is broken by the sound of leaking rain DRIPPING through the aging ceiling. The offices are littered with broken furniture and the worthless artifacts of squatters come and gone.

Arlo suddenly drops to his knees, grabs his head, and GROWLS in pain.

His eyes roll back as he fights his way to his feet. The pain subsides as streetlight through the office windows reveals a trickle of blood beneath his nose.

Arlo collects himself and continues down the hall, looking in each office door. His omni-com indicates Roddy is in an office just ahead. As Arlo steps

IN THE OFFICE

his flashlight reflects off the rear office window, blinding him for an instant, just as his foot breaks through the rotting office floor.

He SLAMS down violently, smacking his face against the dirty floor. Lying disoriented, water drips onto his face.

Adjusting his eyes, Arlo jolts back, discovering his face is only inches from the bloody face of a motionless man –also wearing a gray jacket. Arlo checks the man for a pulse. Nothing. A voice calls, weakly, from the corner.

                    VOICE
          Isaac's gone.

                    ARLO
          Roddy?

Arlo turns his gun-light toward the voice, to discover it's Roddy, slumped in a corner, looking in his omni-com at a digital photo of a woman holding a baby.

                    RODDY
          My son would be eighteen. That war
          killed some beautiful people.

Arlo pulls his foot out of the floor and crawls to Roddy. He opens Roddy's jacket to find Roddy's chest bloodied from several bullet holes.

                    ARLO
          We're gettin' out of here.

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/19/18 Page 550 of 156

10

>                RODDY
>      I only got a couple minutes left.

Arlo stands. Roddy coughs up a little blood. Arlo moves behind
Roddy and lifts.

>                ARLO
>           Who did this?

Roddy's heels drag behind as they move into the the hall.

IN THE HALL

>                RODDY
>           Bounty hunters set us up to find the
>           butterfly -Tamara. They beat us...
>           We couldn't give up the warehouse.
>           Isaac broke and told 'em you were
>           here. You got a bigger bounty than
>           Gwynn. They found your name in Ike's
>           omni-com. Won't be long before they
>           break his code and get your info.
>           Save your family.


EXT. ABANDONED BUILDING - ROOF - NIGHT (CONTINUOUS)

Arlo trips through the threshold, and falls hard to the wet
roof, with Roddy in his arms.

>                ARLO
>           Roddy...?

Roddy doesn't respond, his face vacant.

Two sky-cycles descend from the sky. Lying vulnerable, Arlo's
eyes grow alarmed. As the sky-cyclists land their sky-cycles
on the roof, one calls to Arlo in a familiar voice:

>                GOMEZ
>           Grainer!

>                ARLO
>           Gomez, bounty hunters killed Roddy.
>           Isaac's dead downstairs. They're
>           after me. I gotta get my family.

Arlo races to his sky cycle and hurls into the stormy sky.

Case 3:18-cv-04952-VC Document 53-1 Filed 11/09/18 Page 55 of 156

11

EXT. SKY OVER ZONE 242 - NIGHT

The rain pounds against the windshield as Arlo races home.
He pulls out his omni-com and pushes a button.

                    VOICE / RIANNA
          Arlo?

                    ARLO
          Blue Guard's coming. Get the kids
          and get out now!

Arlo hangs up and dives the sky-cycle down, landing in front
of his garage.


EXT. RIANNA'S APARTMENT - NIGHT (CONTINUOUS)

Hopping off the sky-cycle, Arlo reaches under the seat, grabs
a fuel canister, pulls out his gun, and races up the stairs.
As Arlo enters the apartment Rianna exits carrying the
respirator, while John Carl carries Franny.

                    ARLO
          I'll be right down.

Arlo runs in the apartment, Rianna, John Carl (with Franny)
rush down to the sky-cycle.


INT. RIANNA'S APARTMENT - NIGHT (CONTINUOUS)

Arlo enters the living-room, fuel can in hand, grabs a tall
coat rack by the door and empties it on the floor -except
one hat and one jacket.

Arlo pours fuel on the floor as he moves with the coat-rack
across the room. He places the fuel can on a windowsill behind
the long curtain then shoves the coat-rack and jacket behind
the curtain -in front of the fuel can.

Arlo pulls out his omni-com, turns on its video recorder and
places it in the jacket's breast pocket, on the coat rack;
leaving the curtain cracked and the video lens exposed.

Arlo turns off the light as he runs out of the apartment.

In the darkened living-room, streetlight through the window
transforms the coat-rack's silhouette into a man hiding behind
the curtain.

ER 234

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/09/18 Page 52 of 56

12

INT. SKY-CYCLE - NIGHT (CONTINUOUS)

Arlo jumps in the sky-cycle and speeds away. John Carl sits
behind Arlo, as Rianna holds Franny in the side-seat.

                    RIANNA
          We have no money. Where can we go?
          The kids have never been out of 242.

                    ARLO
          Maybe your mom's, in New York.
          Franny's gonna need State care.

                    RIANNA
          You can't go back to the State.

                    ARLO
          I'm not coming...

                    JOHN CARL
          But dad...

                    ARLO
          Not now.
                (turning to Rianna)
          You got ten grand there.

Arlo pulls a card from his jacket and hands it to Rianna.
Rianna takes the card and swipes it through her omni-com.

                    RIANNA
          That won't last a week in The State.
          And won't touch repatriation fees...
          What if she gets as bad as last month,
          and needs an air chamber?

Arlo pulls the sky-cycle into the warehouse.


INT. WAREHOUSE (OFFICE)- NIGHT

Arlo sits on the edge of Dylan's desk as Dylan talks on the
phone. On a small battered couch, Franny sleeps on Rianna's
lap; beside her, John Carl sits, stoically.

                    DYLAN
          OK... Three... Cheapest possible...

Case 8:13-cv-00449-VMC-JHD Document 63-1 Filed 12/19/12 Page 53 of 56

13

Arlo gestures to Rianna to pass him her omni-com. She
obliges. Arlo activates the video feed from the omni-com he
left on the coat-rack in Rianna's apartment.

IN THE OMNI-COM SCREEN

Arlo sees TWO BOUNTY HUNTERS, guns drawn, enter

RIANNA'S APARTMENT (LIVINGROOM)

guided by Arlo's omni-com signal. In the dark, the bounty
hunters mistake the coat-rack shadow (behind the curtains)
for Arlo's silhouette. They open fire. BANG! BANG! BANG!

"BOOM!" Their bullets hit the fuel can behind the coat-rack,
causing an explosion.

BACK TO SCENE

Arlo hands the omni-com back to Rianna. Dylan hangs up the
phone and turns to Arlo.

                    DYLAN (CONT'D)
          I got a guy who can get them into
          New York, legit, and start the
          repatriation for a hundred grand.

                    ARLO
        Where can I get a hundred grand?


INT. WAREHOUSE DOCK - HOVER-TRUCK - NIGHT

Arlo hands Franny's sleeping body to Rianna, who sits

IN THE REAR OF A HOVER-TRUCK

huddled with John Carl, among the boxes. Arlo hands Rianna a
money card.

                    ARLO
          Here's another 150 grand. She'll
          wire the rest when I get her to L.A.

Rianna takes the card, nervously.

John Carl keeps a brave face. Without proper words Arlo
strokes John Carl's face, the way only a proud father might.

The hover-jet pilot waves from the cockpit, "ready". Arlo
looks at his family through the cargo door.

Case 3:18-cv-04952-VC Document 53-1 Filed 12/10/18 Page 54 of 56

14

                          ARLO (CONT'D)
              Love you.

Arlo closes the hull door. As the hover-jet accelerates
through the gate, Arlo turns to find Dylan and Tamara
watching, a few yards away. Dylan makes the introductions:

                          DYLAN
              This is the butterfl -- Tamara Gwynn.
              That's Arlo Grainer.

Tamara and Arlo shake.

                          TAMARA
              Honored to meet the legend.

                          ARLO
              Ah, legends get better work hours.

Dylan scowls at the sky-cycle.

                          DYLAN
              Lemme see what I can do here.

Dylan grabs his toolbox and disappears under the sky-cycle.
Tamara turns to Arlo.

                          TAMARA
              I'm sorry about your friend.

Arlo nods and lowers his eyes, in evident anguish.

                          ARLO
              Why would they send bounty hunters?

                          TAMARA
              I want change -the natural enemy of
              The State... The war you fight here,
              I fought inside the system.

                          ARLO
                   (shaking his head)
              The war ended fourteen years ago. I
              just fight to feed my family, now.

                          TAMARA
              That's too bad. My father taught me,
              "A war isn't over if one soldier's
              still fighting." I always thought of
              you when he said it.

Case 3:18-cv-00495-MCJHD Document 53-1 Filed 11/09/18 Page 55 of 156

15

                    ARLO
          YOU can be that soldier.

                    TAMARA
          I'm prepared to be...

                    ARLO
          What's to fight for, anyway? I'm
          free of State control out here.

                    TAMARA
          You? What about the world?

                    ARLO
          I fought for them for a long time.
          They wouldn't fight for themselves.

Arlo moves to a locked cabinet and opens it, revealing that
it's full of guns. He takes a gun and clips it to his
belt.Arlo holds a gun up for Tamara. She shakes her head, to
decline, but seizes the moment to redirect their conversation.

                    TAMARA
          Those for religious riots?

                    ARLO
          Nah. The religious killed each other
          the first couple years the State
          dumped 'em here, but stopped when
          they got their own sectors. They're
          not dangerous if you keep them apart.

                    TAMARA
          Progress... So, you're religious?

                    ARLO
          Nah. Maybe there's a God, though...
          You religious?

                    TAMARA
               (shaking her head)
          Faith comes from our unreasonably
          hopeful nature. How we survive. I
          put unreasonable hopes in my A-Cell.

                    ARLO
          A-Cell?

                    TAMARA
          Antimatter cell... Traditional fuel
          pollution kills 130 million people
                    (MORE)

Case 3:18-cv-00449-MCJHD Document 53-1 Filed 11/09/18 Page 56 of 156

16

                    TAMARA (CONT'D)
          every year. The State calls that an
          acceptable environmental sacrifice.
          My father believed every problem has
          an absolute solution -without
          sacrifice. After 6 years, via atomic
          polarity reversal, we created our A-
          cells, isolating antimatter H2O in a
          neutral plasmic insulator. A teaspoon
          of water produces enough clean energy
          to power a sky-car for a week. They'll
          save over 100 million lives per year.

                    ARLO
          And you're honored to meet *me*?

Tamara smiles, noticing a digital world map on the wall with
700 yellow lights, representing "zone" cities, connected by
black lines -representing "trade lanes". Most of the world
is in RED territory. But the zones are in GRAY territory.

                    TAMARA
          I hear there are 700 zones now?

Arlo nods.

                    TAMARA (CONT'D)
          So, you transport exiles now?

                    ARLO
          First time. I'm a line rider and an
          M.T.

                    TAMARA
          M.T.?

                    ARLO
          Moving Target. Street slang for us
          volunteer cops. No tax base to pay
          us, so we split time 'line-riding'.

Tamara's scrunched brow confesses her ignorance.

                    ARLO (CONT'D)
          We run supplies between the zones on
          the outland. Ride outside the lanes
          or more than 100 feet from the
          surface, you trip the radar, signal
          the Blue Guard, and get shot down.

Case 3:18-cv-00495-MRJHD Document 53-1 Filed 11/09/18 Page 57 of 56

17

>                    TAMARA
>          A lot of slang in the zones... I
>          guess you call exiles "butterflies"
>          because we're weak, chased by the
>          wind from a thousand predators?

>                    ARLO
>               (shrugging)
>          Maybe it's cause you represent hope.

Tamara shrugs, satisfied with the alternative. Tamara
flinches, suddenly remembering something. Reaching in her
handbag she pulls out two cases, approximately 12" by 3"
each: one blue, one black. Tamara hands Arlo the BLUE CASE.

>                    TAMARA
>          Mr. Grainer, I need a place for the
>          A-cell.

Arlo opens it. The A-cell is a smooth, 9 inch long, phallic-
shaped glass cylinder, with rounded metal caps on the ends.
Inside the glass is liquid and high tech circuitry.

>                    TAMARA (CONT'D)
>          If we don't make it, it can't fall
>          into The State's hands. The research
>          is micro-chipped inside... But be
>          careful. If the shield breaks and
>          the antimatter touches regular matter,
>          the explosion will level a city block.

>                    ARLO
>          And you want to market this?

>                    TAMARA
>          It's a prototype. The production
>          models will use less antimatter.

>                    ARLO
>          What's in the black case?

>                    TAMARA
>          A worthless decoy -just in case.

>                    ARLO
>          It can't go with me either... Dylan!

Dylan looks up from under the sky-cycle. Arlo closes the
case and sets the A-cell on a counter.

Case 3:18-cv-00449-MCJHD Document 53-1 Filed 11/19/18 Page 58 of 156

18

                    ARLO (CONT'D)
          Send this to me, care of Tian, at
          the 115 Z.R. Center. Fragile.

                    DYLAN
          First thing in the morning.

Tamara looks shocked at Arlo's casual handling of her A-cell.

                    TAMARA
          Zone 115?

                    ARLO
          I'm going there after we're done.

Rising from under the Sky-cycle, Dylan tosses Arlo the keys.

                    DYLAN
          Better hurry...

Dylan and Arlo exchange a warm handshake.

                    ARLO, DYLAN
                  (simultaneously)
          Until then.

Arlo and Tamara hop on their sky-cycle, but before they can
exit, Drake and Gomez glide into the warehouse, using their
sky-cycle side cars to transport the dead bodies of Roddy
and Isaac.

Arlo takes a somber last look at Roddy's body.

The sky-cycle's canopy rises, the wings extend. Arlo tugs
the throttle and races into the outland.


INT/EXT SKY-CYCLE - NIGHT

Racing through the outland "trade lanes" to Los Angeles,
through the sky-cycle window Tamara sees a few small PIRATE
SKY-CYCLES force down a POSTAL HOVER-JET.

                    TAMARA
          Are they robbing that mail truck?

                    ARLO
          Pirates. It happens out here.

Perhaps to ease Tamara's nerves, Arlo offers a bit of
conversation.

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/09/18 Page 59 of 156

19

                          ARLO (CONT'D)
            So, why did The State chase you out?

                          TAMARA
            They wanted to buy the A-cell rights.
            But planned a slow transition to
            protect the energy industry. Too
            many lives would be lost. When we
            refused, they banned  A-cell
            production. So file suit. Dad was
            killed two days later. I went into
            hiding in the zones. After the trial
            starts, with the media attention,
            I'll be O.K.

Arlo contemplates Tamara's explanation.

                          TAMARA (CONT'D)
            And you never told me where you keep
            your "unreasonable" hope?

Arlo pauses as he drives.

                          ARLO
            My garage...

Tamara's face takes a confused twist.

                          ARLO (CONT'D)
            The kids in my neighborhood had to
            stay inside 'cause it wasn't safe to
            play outside... Same in all the zones.
            But after I turned my garage into a
            rec-center, they had a place to play.

A faint smile manifests on Arlo's face then dissipates,
perhaps at the realization that his garage is gone. Tamara's
expression softens at his explanation.

SUNRISE

The sprawling glow of beautiful city of LOS ANGELES comes
into view. Many large, heavily trafficked "skyways" (flight
paths) lead into the city.  Arlo gets into one of the skyways.

                          ARLO (CONT'D)
            We're about to enter State's airways.
            My sky-cycle's not State legal. Keep
            an eye out for the blue guard.

Case 4:13-cv-04095-PJH Document 53-1 Filed 11/09/18 Page 60 of 156

20

Arlo and Tamara proceed deeper into the vast, modern city.
The buildings grow thicker and taller as they fly. Tamara
points to a distant skyscraper with a giant "R" on the top.

                    TAMARA
          The court's next to the Riordan News
          Center.

IN THE REAR-VIEW MIRROR

Arlo sees a police sky-car descend behind them, SIREN on.

BACK TO SCENE

Arlo accelerates to escape.  The police car gives chase.
Arlo weaves through the skyscrapers, racing for downtown.

The police pull closer. At street level, Arlo weaves through
countless hovering vehicles.

Ahead, Arlo sees another police-jet headed straight for his
sky-cycle. With vehicles in all directions but down, Arlo
smashes the sky-cycle to the street to avoid the collision.

The sky-cycle scrapes along the street in a wake of sparks
and smoke, finally stopping amid a crowded street.


EXT. STREET OF LOS ANGELES - MORNING (CONTINUOUS)

Arlo leaps from the sky-cycle wreckage, forehead bleeding.
Tamara hops out. The police sky-car begins a U-turn.

                    ARLO
          We're a block away --

                    TAMARA
          Split up. I can make it from here.

                    ARLO
          I don't think...

                    TAMARA
          They're after you. Go! They're coming.

Tamara turns and disappears into the crowd.

A handgun emerges from the police sky-car and fires at Arlo.
"BANG!" People on the street duck, and dive for safety. Arlo
turns and runs toward the Riordan building, two blocks away.

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/19/18 Page 56 of 156

21

The police-jet quickly catches Arlo and runs him down. Arlo disappears under the sky-car.


INT/EXT POLICE SKY-CAR - CONTINUOUS

The POLICE DRIVER/PILOT looks in the rear-view mirror, but doesn't see Arlo's body emerge from under his sky-car.

Arlo desperately clings to the bottom of the sky-car, shoe heels dragging on the street.

The police driver looks forward to see he's on a collision course with the Riordan anchor room. He swerves up, narrowly avoiding the newsroom.

The centrifugal force of the sky-car's upward turn throws Arlo, sending him SLAMMING into the newsroom window.


INT/EXT ANCHOR ROOM - DAY (CONTINUOUS)

The set people turn their cameras toward the commotion. Through the window they see Arlo rise to his feet, grab a metal trashcan from the street corner and smash it against the anchor-room window, shattering it.

Arlo charges into the anchor-room, throws his arms behind his head and drops to his knees at the anchor desk.

                    ARLO
          I'm Arlo Grainer! Wanted for
          insurrection. I surrender...

Police officers rush into the room and shove their guns in Arlo's face, but with the cameras "on", they hold their fire.


INT. JERRY'S OFFICE - DAY

On the GLASS OFFICE DOOR reversed lettering reads: "OFFICE OF FEDERAL INQUIRIES, JERRY MATTHIESSEN, ESQ., SAN FRANCISCO".

Jerry sits at his desk, talking on his omni-com, looking out the window at the beautiful modern city of San Francisco.

                    JERRY
          Sure, I can hold...

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/09/18 Page 252 of 256

22

Jerry taps his fingers impatiently, "on hold", as a news report of Arlo's arrest plays on his computer monitor.

ON THE MONITOR: film footage of Arlo's apprehension, surrender, and arrest replays.

>                    REPORTER (V.O.)
>          Moments before Tamara Gwynn's court
>          appearance, Arlo Grainer brazenly
>          kidnapped the researcher, to access
>          her fortune to fund Z.R. terrorists.
>          Sadly, Gwynn was killed in a high
>          speed crash when The State attempted
>          to save her, moments before Grainer's
>          surrender...

BACK TO SCENE

Jerry resumes his phone conversation: ⌐

>                    JERRY
>          Yes... Yes... You've been very fair...
>          Right... But an oxygen chamber isn't
>          a luxury... How much time can I
>          get?... Three days?... Alright.

Jerry hangs up and drops his head dejectedly.

>                    REPORTER
>          -- 14 years ago after allied sanctions
>          forced the U.S. to join The State,
>          Grainer declared Stockton, California,
>          a 'zone' outside State authority.
>          Six hundred cities soon followed. To
>          evade arrest Grainer went into hiding --

Howard walks in, holding a coffee cup looking at his wrist-watch-TV (watching a replay of Arlo's arrest).

>                    HOWARD
>          You see Grainer's arrest?

>                    JERRY
>          Hundred times.

>                    HOWARD
>          Weren't you in the service together?

>                    JERRY
>          Flight school, for a year. He got
>          kicked out cause he got "ice-picks".

Case 3:18-cv-04952-VC HD Document 53-1 Filed 11/09/18 Page 53 of 356

23

Howard looks at Jerry, dumbstruck.

                    JERRY (CONT'D)
          Opthalmodynia. Short, terrible
          headaches. Like being stabbed in the
          brain with an ice pick... They said
          he was unsafe to fly and made him a
          flatfoot...

                    HOWARD
          Hmm. You think he kidnapped Gwynn?

                    JERRY
          I dunno. I'm about to fly to L.A. to
          do a DNA check on Arlo's sky-cycle.

                    HOWARD
          So, what'd you dig up on the crater?

Jerry pulls a piece of paper from his desk and reads it as
he stands and puts on his jacket.

                    JERRY
          DNA. Matched a prisoner named Leonard
          Lespi, arrested six months ago. Prison
          Commissioner Guerrero said Lespi
          lost his hand working on Sky Town
          and it fell to Earth in a heat
          resistant glove.

                    HOWARD
          A hand? Whatever made that crater
          weighed at least 150 pounds. And
          what glove?

                    JERRY
          You're surprised?... Guerrero granted
          me a call with Lespi -after The State
          response is released, in four months.

Howard rolls his eyes, familiar with State stalling tactics.

                    JERRY (CONT'D)
          I better get going... See yuh.

Howard nods. Jerry exits.

Case 8:18-cv-00481-JVHD Document 53-1 Filed 11/19/18 Page 64 of 156

24

INT. L.A. POLICE IMPOUND GARAGE - DAY

In a dark impound garage, Jerry walks with a POLICE ESCORT
to the stowed wreckage of Arlo's sky-cycle. The escort nods
to the wreckage without breaking his determined silence.

Jerry pokes his head in the sky-cycle. Looking around, he
sees no blood evidence. He produces a cotton swab, and swabs
samples from the steering wheel and both seats.

Dropping the swab in a small cup of a hand-held DNA analyzer,
Jerry produces a liquid solution from his pocket and pours a
few drops in the cup, then pushes the "start" button.

RING! Jerry answers his omni-com. State Secretary ANEESH
SHENKAR (50) appears in Jerry's eyepiece attachment, sitting
in his office.

INTERCUT TELEPHONE CONVERSATION - JERRY AND ANEESH:

                    JERRY
          Aneesh.

                    ANEESH
          Tampering with State evidence?

                    JERRY
          Naturally.

DING! The DNA analyzer sounds.

INSERT - DNA ANALYZER SCREEN

The analyzer screen reads: "IDENTITIES CONFIRMED: 1) ARLO
GRAINER, 2) TAMARA GWYNN."

BACK TO SCENE

                    ANEESH
          The case is airtight.

                    JERRY
          That's a first. How can I help you?

Jerry walks around the sky-cycle, examining it for evidence.

                    ANEESH
          We've had some riots in the zones
          since we arrested Grainer. We thought
          having you lead our investigation
          might calm things down.

Case 3:18-cv-00442-MCJHD Document 53-1 Filed 11/19/21/08 Page 55 of 56

25

> JERRY
> I'm supposed to watch you guys, not
> help you. I'm better suited for the
> defense.

The COP shrugs at Jerry, as if to ask, "Are you finished?"
Jerry nods affirmatively. Jerry and the cop begin walking
toward the exit.

> ANEESH
> Grainer won't accept a State rep...
> It's just a P.R. position, anyway.

Jerry purses his lips, unimpressed.

> ANEESH (CONT'D)
> We can always suspend O.F.I. funding.

> JERRY
> My son's filter room is about to be
> repossessed. I don't have time for
> your threats today.

> ANEESH
> Jerry, we're trying to avoid a hot
> war here. Get on board and I'll buy
> your kid's filter.

Jerry stops at the exit door, stunned by the offer.


INT. ANEESH'S OFFICE - DAY (CONTINUOUS)

Aneesh hangs up his omni-com and turns to COMMISSIONER
GUERRERO (50) who sits sits opposite to Aneesh's desk.

> ANEESH
> Matthiessen's on board.

> COMMISSIONER GUERRERO
> Good. Should I have the warden take
> Grainer out?

> ANEESH
> Why? Zone felons get 120 days on sky
> town, before trial. We'll handle him
> there, like all the rest.

Case 8:13-cv-0044-DMC-JHD Document 63-1 Filed 11/09/21 Page 66 of 156

26

INT. COURT ROOM -- FRIDAY

Arlo stands before a judge, face shaved, in a prison jumpsuit.

> JUDGE
> The prisoner refuses representation
> and plea. Charged with murder,
> conspiracy, kidnap, and insurrection.
> He's ordered to the Uberopolis work
> program until his trial date.

SMACK! The judge lowers his gavel.


INT/EXT PRISONER SHUTTLE - NIGHT

Arlo boards a shuttle with 50-100 other prisoners. The shuttle
launches, and disappears into the sky, en route to Uberopolis.


EXT. UBEROPOLIS - DAY

Uberopolis bustles with life: three miles in diameter,
enclosed in a transparent, spherical shield, with a flora-
sphere and aqua-sphere beneath the city floor.

The city is divided in half by a giant metal wall.

On one side of the wall is an ultra-modern city, replete
with casinos, golf courses, towering apartments and offices.
On the other side of the wall: a construction zone, where
thousands of prisoners toil to complete the city.

MONTAGE - ARLO ENTERS PRISON AND UBEROPOLIS

-- Arlo's body is scanned by an advanced MRI machine.

-- A doctor inserts a tracking chip behind Arlo's neck.

-- Arlo enters the construction zone, awed by it's enormity.

-- Arlo works hard welding a pipe joint.

-- Arlo, with his beard growing back, wipes his sweaty face.

-- Arlo helps hoist supplies up a building's scaffolding.

BACK TO SCENE

SUPERIMPOSE: "Uberopolis, Four Months Later."

Case 3:18-cv-00429-MCJHD Document 53-1 Filed 11/09/18 Page 57 of 56

27

In the construction zone, WEARING A SHORT BEARD, Arlo rivets
a vent. A hundred yards away, a shuttle sits atop the dividing
wall; another sits halfway up the wall, on a platform. As
Arlo works he watches a shuttle land at the foot of the wall.

A green-suited guard hands a neighboring prisoner a red
ticket, then calls to Arlo, yelling over Arlo's Rivet gun.
The neighboring prisoner listens to the name the guard calls:

<div align="center">GUARD SUPERVISOR</div>

 Grainer!... Arlo Grainer!...

Arlo turns to the guard. The guard hands Arlo a red ticket.

<div align="center">GUARD SUPERVISOR (CONT'D)</div>

 You're on the 6 PM Earth-bound
 shuttle, after work... Lunch break.

<div align="center">ARLO</div>

 Thanks.

Arlo drops his rivet gun and removes his lunch. The
neighboring prisoner (DAVID LEVINE, 35) approaches Arlo.

<div align="center">DAVID</div>

 You're Arlo Grainer.
  (extending his hand)
 David Levine, zone 319 outside of
 Boston. Honored.
  (shaking Arlo's hand)

<div align="center">ARLO</div>

 242, outside of Dallas.

David holds up his red ticket as he shakes Arlo's hand.

<div align="center">DAVID</div>

 Looks like we're going back together.
 Your trial start on Monday, too?

Arlo nods.

<div align="center">DAVID (CONT'D)</div>

 Hey, I gotta friend over here who'd
 love to meet you.

David gestures to an area 20 yards away. Arlo shrugs and
follows David to a machine with a pipe spigot extending from
its side, pouring clear water into a large hole in the floor,
covered by a metal bar grate.

Case 3:18-cv-04471-WHO Document 53-1 Filed 11/09/18 Page 68 of 56

                    DAVID (CONT'D)
          The dehumidifier recycles condensation
          back into the harbor, on the other
          side of that wall.

                    ARLO
          So, if we take this grate off, we
          can escape into the city?

                    DAVID
          It's capped from the other side.

David removes a sandwich from his lunch pouch and drops the
meat into the hole. A moment later a SCAR-NOSED dolphin
emerges beneath the grate to eat the meat.

                    DAVID (CONT'D)
          This is my friend, Spike.

David reaches through the bars to pet the dolphin's face.
Arlo dumps his sandwich meat to Spike, then bends to pat
Spike's scarred nose. Spike eats then happily swims away.

                    ARLO
          Incredible...

                    DAVID
          One of the last dolphin's left.

Arlo rises and turns his attention back to the shuttles.
David notices and turns toward the shuttles, too.

                    DAVID (CONT'D)
          You dig shuttles, too? I taught myself
          mechanical design by studying 'em. I
          know 'em inside out.

                    ARLO
          Their schedules don't add up...

Arlo points toward a shuttle, half way up the wall, where
brown suited workers load boxes marked 'DREXLERIN 2'.

                    ARLO (CONT'D)
          The medical shuttles load those boxes
          from the medical warehouse --

                    DAVID
          Not just boxes -Drexlerin 2. That
          stuff's gonna be gold on the black
          market. They started pulling it out
                    (MORE)

Case 3:18-cv-04952-VC-JHD Document 53-1 Filed 11/09/18 Page 56 of 156

29

                    DAVID (CONT'D)
          of the medical warehouse a couple
          weeks back.

Arlo looks at David startled at his awareness.

                    DAVID (CONT'D)
          You won't last in the zones, if you
          don't pay attention.

Arlo nods then continues. He points to a shuttle at the top
of the dividing wall, where  free citizens from the other
side of the wall board, easily.

                    ARLO
          The problem is: the hourly citizen
          commuter shuttle takes five hours -
          to Earth and back; but...

Arlo points to the shuttle on the construction zone floor.
Prisoners exit its hull.

                    ARLO (CONT'D)
          ...the inmate return shuttles only
          take two hours.

                    DAVID
          That doesn't make sense.

As David ponders, the supervisor calls from behind them.

                    GUARD SUPERVISOR
          Time to get back to work!

                    DAVID
          Guess I'll see you at boarding time.

Arlo nods. He and and David return to work.


EXT. PRISONER SHUTTLE PAD (UBEROPOLIS) - EVENING

SUPERIMPOSE: "Uberopolis, Prisoner Boarding Dock, 4 Hours
Later."

Arlo and 50 prisoners gather near a shuttle, surrounded by
guards.  A GUARD yells:

                    GUARD
             Line up!

Case 3:18-cv-04952-VC JHD Document 53-1 Filed 11/09/18 Page 70 of 156

30

Arlo and David find each other in the crowd and join the
other prisoners forming a line.

                    ARLO
          I got a bad feeling about this.

At the front of the line guards help prisoners into neck
collars and handcuffs attached to a cable. Arlo squints at
the cockpit -no pilots inside, or pilot loading platform.

                    ARLO (CONT'D)
          There are no pilots. No pilot loading
          platform.

Distracted, Arlo and David fail to notice that they've arrived
at the front of the line. A GUARD attempts to place the
restraints on Arlo. He reflexively pulls away.

The guard shocks Arlo with a stun gun. As Arlo convulses,
the guard slaps the restraints on him. Safe from retaliation,
the guard pounds Arlo in the ribs. Intimidated, David doesn't
resist the restraints. The cable pulls them away.


INT/EXT SHUTTLE - CARGO BAY - SAME

Arlo, David and the other prisoners are pulled to their seats.
The cable restraints pop off as new wrist and waist restraints
pop out of the seats. The shuttle doors close.

                    ARLO
          It only takes two hours round trip.
          That's too fast to get back. No pilots -
          no guilty consciences. We're getting
          dumped in space.

                    DAVID
          What? Dumped?... What can we do?

                    ARLO
          Get in the airlock. I flew in the
          Army. If we can get to the cockpit I
          can override the autopilot.

The shuttle autopilots into Uberopolis' outer shield airlock.
The rear airlock gate closes. The front gate opens. The
shuttle accelerates into space. David yells to the prisoners:

                    DAVID
          We're about to get dumped in space!
          Break free and get into the airlock!

Case 3:18-cv-00473-MCJHD Document 53-1 Filed 11/19/18 Page 7 of 56

31

                    PRISONER #1
            You're wanna get us sent back?!

Arlo and David struggle to break the wristbands. Blood
trickles from Arlo's wrist. "SNAP!" His right arm breaks
free. "SNAP!" His left.

Arlo pushes his legs against the front seat until his seat
snaps back, allowing him to scoot out of the chest harness.

Freed, Arlo quickly helps to free David, as he yells to the
other prisoners:

                    ARLO
            Get free or you're gonna die in here!

                    PRISONER #3
            Sit down and shut up!

Arlo and David rush into the airlock and seal the door.

IN THE AIRLOCK

                    ARLO
            There must be a cargo lock to keep
            the hull from opening.

A RED LIGHT FLASHES and an ALARM BLARES, as Arlo and David
frantically search for the switch, to keep the doors closed.

THROUGH THE AIRLOCK WINDOW, David and Arlo look

IN THE CARGO BAY

as the restraints pop off and the prisoners float from their
seats. The overhead cargo doors slowly open. The vacuum of
space sucks the life from the prisoners, in an instant; their
bodies trail behind the shuttle, like so much litter.

IN THE AIRLOCK

                    DAVID
            God. They're all dead!

                    ARLO
            We'll die, too, if this thing
            autopilots back to Sky Town.

Rushing into

32

THE COCKPIT

David and Arlo hop in the pilots' seats. Arlo pushes a few buttons then nose-dives the shuttle toward Earth. David jerks back violently and turns to Arlo, dismayed.

>           ARLO
>     Taking a direct course to New York,
>     before they blow us out of the sky.

ON THE RADAR MONITOR

David notices a missile icon, suddenly gaining from behind.

BACK TO SCENE

>           DAVID
>     A warhead...

David holds hid breat. Arlo races he engine. The warhead gains. Their faces shake, straining in the G-forces.

THROUGH THE WINDSHIELD: The State's beautiful New York City comes into view.

ON THE RADAR MONITOR

An instant from contact the warhead disarms and falls into the Hudson River.

BACK TO SCENE

Arlo and David exhale in relief.

>           ARLO
>     It must have been programmed to
>     disable over major State centers.

>           DAVID
>     We could've just ejected in the pod.

Arlo cuts a confused glance at David.

>           DAVID (CONT'D)
>     This cockpit's an escape pod

Processing the new data, Arlo looks around, then reaches up and flips a few promising buttons on an overhead panel.

Case 4:18-cv-04471-PJH Document 63-1  Filed 11/09/18  Page 73 of 156

33

EXT. SHUTTLE - EVENING

The cockpit pod disconnects from the shuttle, leaving the
fuselage to crash into the sea.


EXT. TRANSIT MALL PARKING LOT (JERSEY CITY) - EVENING

Arlo lands the small pod in a crowded commuter parking lot
near the transit mall. David and Arlo hop out and race through
the river of commuters, into the transit mall.


INT. TRANSIT MALL - SAME

Amid the transit mall crowd, Arlo notices some unattended
luggage.  He taps David to draw his attention to the bags.
Dressed liked baggage handlers in their orange jumpsuits
they seize the bags and rush to a restroom.

IN THE RESTROOM

Now wearing oversized white button-up shirts, Arlo and David
rifle through the contents of the suitcases.

                    DAVID
          Nothing.

Arlo pulls a razor from the luggage.

                    ARLO
          Perfect.

David bends over. Arlo cuts a tiny tracking device from the
back of his neck. Fingers bloody, Arlo drops the tracker in
the toilet, and hands David the razor. David hesitates.

                    ARLO (CONT'D)
          Just do it.

David nervously cuts the tracking device from Arlo's neck
and drops it in the toilet. Arlo stands upright.

                    DAVID
          Till then.

Arlo nods. David and Arlo charge out of the bathroom, into

THE TRANSIT MALL