No. 19-15128

# In the United States Court of Appeal for the Ninth Circuit

STEVE WILSON BRIGGS

*Appellant/Petitioner,*

*v.*

ARI EMANUEL, MATT DAMON, BEN AFFLECK, MRC, NEILL BLOMKAMP, NBCUNIVERSAL, ASIF SATCHU, BILL BLOCK, SONY PICTURES ENT, MORDECAI WICZYK, DANA BRUNETTI

*Appellees/Respondents.*

On Appeal from the U.S. District Court for Northern District of California
CASE NO. 3:18-CV-4952-VC
THE HONORABLE VINCE CHHABRIA

**APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 4 of 7
[PAGES 540 - 785]**

*Stephen G. Larson (SBN 145225)
Jonathan E. Phillips (SBN 233965)
A. Alexander Lowder (SBN 269362)
**Larson O'Brien LLP**
555 S. Flower Street, 44th Floor
Los Angeles, California 90071
Telephone:     (213) 436-4888
Facsimile:     (213) 623-2000
Email: Slarson@larsonobrienlaw.com

*Counsel For Appellee* Trigger Street
Productions, Inc.

Kelli L. Sager (SBN 120162)
Rochelle L. Wilcox (SBN 197790)
Brendan N. Charney (SBN 293378)
**Davis Wright Tremaine LLP**
865 S. Figueroa Street, Suite 2400
Los Angeles, California  90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899
Email:  Kellisager @dwt.com

*Counsel For Appellee* NBCUniversal Media, LLC

Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
Kate Mangels (SBN 301811)
**Kinsella Weitzman Iser Kump & Aldisert LLP**
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California  90401
Telephone: (310) 566-9800
Email:  Mkump@kwikalaw.com

*Counsel For Appellee* MRC II Distribution Company,
LP, Mordecai Wiczyk, Asif Satchu, Sony Pictures
Entertainment, Inc., and Ariel Emanuel

# TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 01/22/19 | [Dkt. 94] Order Denying (92) Motion for Leave to File Motion for Reconsideration, Motion to Alter Judgement filed by Plaintiff Steve Kenyatta Wilson Briggs | 1 | ER 1 |
| 12/22/18 | [Dkt. 91] Judgment Signed by Judge Vince Chhabria | 1 | ER 2 |
| 12/22/18 | [Dkt. 90] Order Granting Motions to Dismiss (Dkts. 27, 48, and 51) and Denying Motion to Declare Plaintiff a Vexatious Litigant | 1 | ER 3 |
| 01/22/19 | [Dkt. 95] Notice of Appeal to the 9th Circuit Court of Appeals filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 5 |
| 01/14/19 | [Dkt. 92] Motion for Leave to File Motion for Reconsideration, Motion to Alter Judgment filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 12 |
| 12/17/18 | [Dkt. 89] Errata by Plaintiff Steve Kenyatta Wilson Briggs (Certificate of Service) | 2 | ER 67 |
| 11/30/18 | [Dkt. 79] Reply re (51) Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk | 2 | ER 71 |
| 11/30/18 | [Dkt. 78] Reply re (48) Motion to Dismiss filed by NBCUniversal Media, LLC | 2 | ER 79 |
| 11/23/18 | [Dkt. 68] Opposition/Response re (48) NBCU Motion to Dismiss filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 94 |
| 11/21/18 | [Dkt. 67] Opposition/Response re (51) MRC Defendants' Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 106 |
| 11/20/18 | [Dkt. 66] Reply re (27) Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) filed by Trigger Street Productions | 2 | ER 118 |

## TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|---|---|---|---|
| 11/19/18 | [Dkt. 63] Opposition/Response re (27) Trigger Street Productions' Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and/or 9(B) filed by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 129 |
| 11/14/18 | [Dkt. 62] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Declaration of Zena Briggs, concerning the refusal of service of process by Defs. Spacey and Brunettis agency for service of process) (Altman, Greenfield & Selvaggi) | 2 | ER 159 |
| 11/14/18 | [Dkt. 61] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service by certified mail, with return receipt and Acknowledgment of Receipt of Summons, Declaration of Cecile Lusby) | 2 | ER 162 |
| 11/13/18 | [Dkt. 60] Status Report (Addendum) regarding Service of Process developments concerning Defs. Spacey and Brunetti, and their agents final efforts to evade and refuse service by Plaintiff Steve Kenyatta Wilson Briggs | 2 | ER 165 |
| 11/12/18 | [Dkt. 59] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Defs. Damon and Affleck, Declaration of Melvin Jackson) | 2 | ER 172 |
| 11/12/18 | [Dkt. 58] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service, Declaration of Nexus Asson, Re service of Defs. MRC, Satchu, Wiczyk) | 2 | ER 175 |
| 11/09/18 | [Dkt. 53] Declaration of Gregory Korn in Support of (51) Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk (358 pgs) (Part 1) ER 182-ER 256 | 2 | ER 182 |
| 11/09/18 | [Dkt. 53] Declaration of Gregory Korn in Support of (51) Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk (358 pgs) (Part 2) ER 257-ER 539 | 3 | ER 257 |

**TABLE OF CONTENTS**

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 11/09/18 | [Dkt. 52] Request for Judicial Notice in Support of Defendants' Motion to Dismiss First Amended Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk | 4 | ER 540 |
| 11/09/18 | [Dkt. 51] Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) and/or 12(b)(1) filed by Ari Emanuel, MRC, Asif Satchu, Sony Pictures Ent. Inc., Mordecai Wiczyk | 4 | ER 542 |
| 11/09/18 | [Dkt. 49] Request for Judicial Notice re (48) Motion to Dismiss filed by NBCUniversal Media, LLC | 4 | ER 562 |
| 11/09/18 | [Dkt. 48] Motion to Dismiss filed by NBCUniversal Media, LLC | 4 | ER 722 |
| 11/09/18 | [Dkt. 46] Order by Judge Vince Chhabria denying (39) Motion for Service by Publication, and Motion for Extension of Service Deadline | 4 | ER 749 |
| 11/08/18 | [Dkt. 45] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (temporary "illustrative" service statements) | 4 | ER 750 |
| 11/08/18 | [Dkt. 44] Second Motion for Service by Publication for Defs Spacey and Brunetti filed by Plaintiff Steve Kenyatta Wilson Briggs | 4 | ER 765 |
| 11/05/18 | [Dkt. 41] Clerk's Declination of Default as to Kevin Spacey and Dana Brunetti.  (Plaintiff has not submitted evidence satisfactory to the court establishing actual delivery to the persons to be served per CA CCP Section 417.20) | 4 | ER 785 |
| 11/05/18 | [Dkt. 40] Request for Judicial Notice filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 786 |
| 11/05/18 | [Dkt. 39] Motion for Service by Publication filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 886 |

# TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 11/05/18 | [Dkt. 38] Status Report Regarding Service of Process on All Defendants by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 893 |
| 11/05/18 | [Dkt. 37] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Service of Process of Summons and Complaint by U.S. mail, C. Lusby) | 5 | ER 903 |
| 11/05/18 | [Dkt. 36] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Service of Process of Summons and Complaint by U.S. mail 9/27/18) | 5 | ER 906 |
| 11/05/18 | [Dkt. 35] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Service of Process of Summons and Complaint by U.S. mail) | 5 | ER 909 |
| 11/05/18 | [Dkt. 34] Notice of Voluntary Dismissal of Sound Point Capital Management by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 912 |
| 10/31/18 | [Dkt. 33] Fourth Motion for Default Judgment by the Clerk as to Request for Entry of Default filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 914 |
| 10/31/18 | [Dkt. 32] Certificate of Service (correction) by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 946 |
| 10/31/18 | [Dkt. 31] Clerk's Declination of Default | 5 | ER 949 |
| 10/31/18 | [Dkt. 29] Joinder re (27) Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) by Sound Point Capital Management, LC | 5 | ER 950 |
| 10/29/18 | [Dkt. 28] Motion for Default Judgment by the Clerk as to Request for Entry of Default against Defs. Trigger Street Productions, and Sound Point filed by Plaintiff Steve Kenyatta Wilson Briggs | 5 | ER 953 |
| 10/29/18 | [Dkt. 27] Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) filed by Trigger Street Productions (Part 1) ER 982- ER 1019 | 5 | ER 982 |

# TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 10/29/18 | [Dkt. 27] Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(B)(6) and/or 9(B) filed by Trigger Street Productions (Part 2) ER 1020-ER 1190 | 6 | ER 1020 |
| 10/29/18 | [Dkt. 26] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs re (17) Certificate of Service, (16) Certificate of Service (Supplemental) proof of signed return receipts received for Defs. Trigger Street Productions, Inc. and Sound Point Capital Management, LC (09/17/18); and for Kevin Spacey, Dana Brunetti, (09/27/18) | 6 | ER 1191 |
| 10/26/18 | [Dkt. 25] Clerk's Declination of Default | 6 | ER 1212 |
| 10/25/18 | [Dkt. 24] Second Motion for Default Judgment by the Clerk as filed by Plaintiff Steve Kenyatta Wilson Briggs | 6 | ER 1213 |
| 10/22/18 | [Dkt. 23] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Declaration re service of process of Defs MRC, Satchu, and Wiczyk) | 6 | ER 1224 |
| 10/22/18 | [Dkt. 22] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Def. Sony Picture Entertainment, Inc.) | 6 | ER 1227 |
| 10/22/18 | [Dkt. 21] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Def. NBCUniversal) | 6 | ER 1230 |
| 10/22/18 | [Dkt. 20] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Proof of Service of Defs. Ari Emanuel, Neill Blomkamp, Matt Damon, and Ben Affleck) | 6 | ER 1232 |
| 10/22/18 | [Dkt. 19] Certificate of Service by Plaintiff Steve Kenyatta Wilson Briggs (Declaration re service of Spacey, Brunetti, and Trigger Street Productions) | 6 | ER 1235 |

## TABLE OF CONTENTS

| DATE | DESCRIPTION | VOL. | PAGE |
|------|-------------|------|------|
| 10/22/18 | [Dkt. 18] Request for Entry of Default Against Defendants Kevin Spacey, Dana Brunetti, and Trigger Street productions, Inc. filed by Plaintiff Steve Kenyatta Wilson Briggs | 6 | ER 1237 |
| 10/09/18 | [Dkt. 17] (Second) Proof of Service of Summons and Complaint; Declaration of Dr. Morgan Marchbanks by Plaintiff Steve Wilson Briggs | 6 | ER 1242 |
| 10/09/18 | [Dkt. 16] (First Proof of Service of Summons and Complaint; Declaration of Dr. Morgan Marchbanks by Steve Willson Briggs | 6 | ER 1245 |
| 10/04/18 | [Dkt. 11] Notice of Service of Process Issues by Steve Wilson Briggs | 6 | ER 1248 |
| 08/15/18 | [Dkt. 3] Summons Issued as to Ben Affleck, William Block, Neill Blomkamp, Dana Brunetti, Matt Damon, Ari Emanuel, MRC, NBCUniversal Media, LLC, Asif Satchu, Sony Pictures Ent., Inc., Sound Point Capital Management, LC, Kevin Spacey, Trigger Street Productions, Mordecai Wiczyk | 7 | ER 1287 |
| 08/15/18 | [Dkt. 1] Complaint against Ben Affleck, William Blcok, Neill Blomkamp, Dana Brunetti, Matt Damon, Ari Emanuel, MRC, NBCUniversal Media, LLC, Asif Satchu, Sony Pictures Ent., Inc., Sound Point Capital Management, LC, Kevin Spacey, Trigger Street Productions, Mordecai Wiczyk filed by Steve Wilson Briggs | 7 | ER 1288 |
| | Court Docket | 7 | ER 1528 |

1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
   MICHAEL J. KUMP (SBN 100983)
2     mkump@kwikalaw.com
   GREGORY P. KORN (SBN 205306)
3     gkorn@kwikalaw.com
   KATE MANGELS (SBN 301811)
4     kmangels@kwikalaw.com
   808 Wilshire Boulevard, 3rd Floor
5  Santa Monica, California 90401
   Telephone: 310.566.9800
6  Facsimile: 310.566.9850

7  Attorneys for Defendants
   MRC II DISTRIBUTION COMPANY LP;
8  MORDECAI WICZYK; ASIF SATCHU;
   SONY PICTURES ENTERTAINMENT INC.;
9  and ARIEL EMANUEL

10

11

12                    **UNITED STATES DISTRICT COURT**

13                 **NORTHERN DISTRICT OF CALIFORNIA**

14

15 STEVE WILSON BRIGGS,               Case No. 3:18-cv-04952-VC

16         Plaintiff,                 [Hon. Vince Chhabria]

17     vs.                           **REQUEST FOR JUDICIAL NOTICE IN
                                      SUPPORT OF DEFENDANTS' MOTION
18 KEVIN SPACEY, et al.,             TO DISMISS FIRST AMENDED
                                      COMPLAINT PURSUANT TO FED. R.
19         Defendants.               CIV. P. 12(b)(6) AND/OR 12(b)(1)**

20                                    Date:     December 20, 2018
                                      Time:     10:00 a.m.
21                                    Crtrm.:   4

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE

*Vertical left margin text:* KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1     In support of Defendants' Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P.

2  12(b)(6) and/or 12(b)(1), Defendants hereby request pursuant to Rule 201 of the Federal Rules of

3  Evidence that the Court additionally take judicial notice of the following facts and documents:

4     1.     The First Amended Complaint in the matter entitled *Briggs v. Blomkamp*, N.D. Cal.

5  Case No. 4:13-cv-04679-PJH (the "Infringement Action"), a true and correct copy of which is

6  attached to the Declaration of Gregory Korn as **Exhibit 1.**

7     2.     The October 3, 2014 decision of the Northern District of California in the

8  Infringement Action matter: *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155 (N.D. Cal. 2014).

9     3.     The March 1, 2018 opinion of the Ninth Circuit Court of Appeals affirming the

10  grant of summary judgment in the Infringement Action:  *Briggs v. Blomkamp*, 714 Fed. Appx. 712

11  (9th Cir. 2018).

12

13  DATED: November 9, 2018          Respectfully submitted,

14                                   KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

15

16                        By:        */s/ Gregory Korn*

17                                   Gregory Korn
                                     Attorneys for Defendants
18                                   MRC II DISTRIBUTION COMPANY LP;
                                     MORDECAI WICZYK; ASIF SATCHU;
19                                   SONY PICTURES ENTERTAINMENT INC.; and
                                     ARIEL EMANUEL
20
    10021.00024/605486.1
21

22

23

24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3ᴿᴰ FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
MICHAEL J. KUMP (SBN 100983)
  mkump@kwikalaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikalaw.com
KATE MANGELS (SBN 301811)
  kmangels@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Defendants
MRC II DISTRIBUTION COMPANY LP;
MORDECAI WICZYK; ASIF SATCHU;
SONY PICTURES ENTERTAINMENT INC.;
and ARIEL EMANUEL

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE WILSON BRIGGS,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN SPACEY; et al.,<br><br>Defendants. | Case No. 3:18-cv-04952-VC<br><br>[Hon. Vince Chhabria]<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) AND/OR 12(b)(1); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Request for Judicial Notice and Declaration of Gregory Korn Filed Contemporaneously Herewith]<br><br>Date:      December 20, 2018<br>Time:      10:00 a.m.<br>Crtrm.:    4 |

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MOTION TO DISMISS COMPLAINT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 20, 2018, at 10:00 a.m., or as soon thereafter as the matter can be heard in Courtroom No. 4 of the above entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Vincent Chhabria, Defendants MRC II Distribution Company LP (erroneously sued as "MRC"), Mordecai Wiczyk, Asif Satchu, Sony Pictures Entertainment Inc., and Ariel Emanuel ("Defendants") will appear and move to dismiss each and every cause of action against them in the Complaint—namely, the First, Third through Eighth, and Eleventh Causes of Action.

Defendants' motion is made pursuant to Rules 12(b)(1), 12(b)(6), and 8(a) of the Federal Rules of Civil Procedure and seeks dismissal on the bases: (1) that the Court lacks jurisdiction pursuant to the "collateral attack doctrine"; (2) that the claims against Defendants are barred by the doctrine of res judicata; and/or (3) that the Complaint fails to state a claim upon which relief can be granted in accordance with *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

This Motion is based upon this Notice, the attached Memorandum of Points and Authorities, the accompanying Request for Judicial Notice and Declaration of Gregory Korn, all papers and pleadings on file in this action, and on such other and further evidence and argument as the Court may lawfully consider in the exercise of its discretion.

DATED: November 9, 2018     Respectfully submitted,

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

By:     */s/ Gregory Korn*
Gregory Korn
Attorneys for Defendants
MRC II DISTRIBUTION COMPANY LP;
MORDECAI WICZYK; ASIF SATCHU;
SONY PICTURES ENTERTAINMENT INC.; and
ARIEL EMANUEL

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL AND PROCEDURAL HISTORY ................................................... 2

      A.    Plaintiff Lost His Copyright Claims In The Infringement Action ........................... 2

      B.    Plaintiff's Improper Collateral Attacks On The Prior Adverse Judgment ............... 2

III.  ARGUMENT ...................................................................................................... 4

      A.    The Complaint Is Barred By The "Collateral Attack" Doctrine ............................. 4

      B.    The Complaint Is Barred By The Doctrine Of Res Judicata ................................... 7

      C.    The Complaint Should Further Be Dismissed On The Basis That It Fails To
            State A Claim For Relief Against Defendants ......................................................... 8

            1.    The First Cause Of Action For Civil Conspiracy ......................................... 9

                  (a)    The First Conspiracy .......................................................................... 9

                  (b)    The "Second Conspiracy" ................................................................ 10

                  (c)    The "Third Conspiracy" ................................................................... 10

                  (d)    The "Fourth Conspiracy" ................................................................. 11

                  (e)    The "Fifth Conspiracy" .................................................................... 11

            2.    The Third Cause Of Action For Fraud ....................................................... 11

            3.    The Fourth Cause Of Action For Fraudulent Deceit .................................. 12

            4.    The Fifth Cause Of Action For Fraudulent Concealment .......................... 12

            5.    The Sixth Cause Of Action For Negligence ............................................... 12

            6.    The Seventh Cause Of Action For Gross Negligence ................................ 13

            7.    The Eighth Cause Of Action For Willful Suppression Of Evidence/
                  Spoliation Of Evidence .............................................................................. 13

            8.    The Eleventh Cause Of Action For An Accounting .................................... 14

IV.   CONCLUSION ................................................................................................ 15

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Advocare Intern., L.P. v. Scheckenbach*
    WL 2196449 (W.D. Wash. May 27, 2010)................................................ 5, 11, 14

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ............................................................................. passim

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544 (2007) ............................................................................. passim

*Briggs v. Blomkamp*
    70 F. Supp. 3d 1155 (N.D. Cal. 2014) ............................................................ 1, 2

*Briggs v. Sony Pictures Entm't, Inc.*
    714 F. App'x 712 (9th Cir. 2018) .................................................................. 1, 2

*Cedars-Sinai Med. Ctr. v. Superior Court*
    18 Cal. 4th 1 (1998) ................................................................................... 14

*Celotex Corp. v. Edwards*
    514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) ........................................ 4

*Chao v. A–One Med. Servs., Inc.*
    346 F.3d 908 (9th Cir.2003)........................................................................... 7

*Friedman v. Merck & Co.*
    107 Cal. App. 4th 454 (2003)....................................................................... 13

*Graham v. Bank of America, N.A.*
    226 Cal. App. 4th 594 (2014)....................................................................... 12

*Harris v. County of Orange*
    682 F.3d 1126 (9th Cir. 2012)........................................................................ 6

*Headwaters Inc. v. U.S. Forest Serv.*
    399 F.3d 1047 (9th Cir. 2005)........................................................................ 7

*In re Schimmels*
    127 F.3d 875 (9th Cir.1997)........................................................................... 7

*Lee v. City of Los Angeles*
    250 F.3d 668 (9th Cir. 2001)......................................................................... 6

*Mangindin v. Washington Mut. Bank*
    637 F. Supp. 2d 700 (N.D. Cal. 2009) ............................................................. 9

*Mpoyo v. Litton Electro-Optical Sys.*
    430 F.3d 985 (9th Cir. 2005).......................................................................7, 8

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Mullis v. U.S. Bankr. Ct., Dist. of Nev.*
   828 F.2d 1385(9th Cir. 1987)...................................................................... 5

*Owens v. Kaiser Foundation Health Plan, Inc.*
   244 F.3d 708 (9th Cir. 2001)...................................................................... 7

*Penney v. Wells Fargo Bank*
   WL 2071705 (C.D. Cal. June 8, 2012)..................................................... 14

*Rein v. Providian Fin. Corp.*
   270 F.3d 895 (9th Cir. 2001)...................................................................... 4

*Rinegard-Guirma v. Ocwen Loan Servicing, LLC*
   WL 4257765 (D. Or. Aug. 19, 2016) ........................................................ 5

*Shkolnikov v. JPMorgan Chase Bank*
   WL 6553988 (N.D. Cal. Dec. 14, 2012) ................................................. 15

*State Farm Mut. Auto Ins. Co. v. Industrial Pharmacy*
   WL 2448474 (D. Haw. Aug. 11, 2009)................................................. 5, 6

*Syverson v. Int'l Bus. Machines Corp.*
   472 F.3d 1072 (9th Cir. 2007).................................................................... 8

*United States v. Lowry*
   512 F.3d 1194 (9th Cir. 2008).................................................................... 6

*Uptergrove v. U.S.*
   WL 1035231 (E.D. Cal. Apr. 17, 2009)..................................................... 4

*Warden v. Cross*
   94 F. App'x 474 (9th Cir. 2004) .............................................................. 14

*Zella v. E.W. Scripps Co.*
   529 F. Supp. 2d 1124 (C.D. Cal. 2007)..................................................... 6


**STATUTES**

17 U.S.C. § 505 ............................................................................................... 4

Federal Rules of Civil Procedure 9(b)............................................... 11, 12

Federal Rules of Civil Procedure 12(b)................................................... 6

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

This is now the *third* frivolous lawsuit of a *pro se* vexatious litigant, plaintiff Steve Wilson Briggs ("Plaintiff"), who simply refuses to accept that his baseless claim of copyright infringement has been finally adjudicated adversely to him by the Northern District of California and the Ninth Circuit Court of Appeals. The genesis of this action is an October 2013 case filed *in pro per* by Plaintiff entitled *Steve Wilson Briggs v. Neill Blomkamp, et al.,* N.D. Cal. Case No. 13-cv-4679-PJH (the "Infringement Action"). The Infringement Action, which alleged that the motion picture *Elysium* (the "Film") infringed a screenplay Plaintiff had written, was filed against several of the same parties named as defendants here. The Honorable Phyllis J. Hamilton granted summary judgment of the Infringement Action on the basis that there was no evidence of access or substantial similarity, *see Briggs v. Blomkamp*, 70 F. Supp. 3d 1155 (N.D. Cal. 2014); the Ninth Circuit affirmed, *Briggs v. Sony Pictures Entm't, Inc.*, 714 F. App'x 712, 713 (9th Cir. 2018); and the Supreme Court denied certiorari. *Briggs v. Sony Pictures Entm't, Inc.*, 2018 WL 3391694, at *1 (U.S. Oct. 1, 2018).

The Complaint here, again filed *in pro per*, alleges a conspiracy perpetrated by several film studios, actors, producers, and talent agents that have some alleged connection to *Elysium*. Dkt. No. 1 ("Complaint"). Although the Complaint is largely unintelligible, it is nevertheless clear that its purpose is (1) to challenge Judge Hamilton's supposedly erroneous rulings, including her decision granting summary judgment, and (2) to seek the *same remedy* that Plaintiff sought on his copyright claim—*i.e.*, the disgorgement of profits on *Elysium*. In fact, the one and only harm Plaintiff alleges in the Complaint is that the defendants "won a favorable judgment in *Briggs v Blomkamp* by deceiving the court and falsifying documents, thereby cheating the judicial system, and cheating the Plaintiff out of his right to due process and a fair hearing, and to … rightful profits and damages." Compl. ¶ 267; *see also id.* ¶¶ 185, 251.

Plaintiff's claims effectively seek a "horizontal appeal" of the Infringement Action to another district judge, and they are manifestly barred by the "collateral attack" and res judicata doctrines. Further, the allegations in the Complaint are woefully deficient under Fed. R. Civ. P.

**KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP**
808 WILSHIRE BOULEVARD, 3ᴿᴰ FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   8(a) and the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

2   and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). For these and the additional reasons discussed herein,

3   Defendants MRC II Distribution Company LP (erroneously sued as "MRC"), Mordecai Wiczyk.

4   Asif Satchu, Sony Pictures Entertainment Inc., and Ariel Emanuel (collectively, the "Defendants")

5   respectfully request that the claims against them—the First, Third through Eighth, and Eleventh

6   Causes of Action of the Complaint—be dismissed with prejudice.

7   **II.   FACTUAL AND PROCEDURAL HISTORY**

8       **A.   Plaintiff Lost His Copyright Claims In The Infringement Action**

9       In 2013, Plaintiff filed an action for copyright infringement in this District entitled *Steve*

10  *Wilson Briggs v. Neill Blomkamp, et al.*, N.D. Cal. Case No. 13-CV-4679-PJH. *See* Request for

11  Judicial Notice ("RJN") ¶ 1; Declaration of Gregory Korn ("Korn Decl."), Ex. 1. Plaintiff alleged

12  that the feature film *Elysium* (starring Matt Damon) infringed a screenplay he wrote entitled

13  "Butterfly Driver." Korn Decl., Ex. 1 ¶ 1. The suit named, among others, Neill Blomkamp, the

14  writer and director of *Elysium* (*id.* ¶ 10); Sony Pictures, the distributor of *Elysium* (*id.* ¶ 11); and

15  "Media Rights Capital," the producer of *Elysium* (*id.* ¶ 13), sued here as "MRC." Plaintiff claimed

16  that these defendants must have accessed his screenplay "on Kevin Spacey's and Dana Brunetti's

17  filmmaker-screenwriter website, 'Trigger Street' (triggerstreet.com) … designed to link

18  filmmakers and screenwriters with industry professionals." *Id.* ¶ 18. The district court granted

19  summary judgment of the case in its entirety, finding no genuine issues of access or substantial

20  similarity. *See Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1165-1177. The Ninth Circuit affirmed,

21  agreeing that Plaintiff "failed to raise a genuine dispute of material fact as to whether defendants

22  accessed his screenplay Butterfly Driver, or whether Briggs's screenplay and defendants' film

23  Elysium are either strikingly or substantially similar." *See* RJN ¶ 2; *Briggs v. Sony Pictures*

24  *Entm't, Inc.*, 714 F. App'x 712, 713 (9th Cir. 2018), cert. denied, No. 18-63, 2018 WL 3391694

25  (U.S. Oct. 1, 2018). The Supreme Court recently denied certiorari. *See* RJN ¶ 3; *Briggs v. Sony*

26  *Pictures Entm't, Inc.*, 2018 WL 3391694, at *1 (U.S. Oct. 1, 2018).

27      **B.   Plaintiff's Improper Collateral Attacks On The Prior Adverse Judgment**

28      In 2017, Plaintiff filed a complaint that is essentially identical to the one filed herein, in the

---

2

MOTION TO DISMISS

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    matter entitled *Steve Wilson Briggs v. Universal Pictures, et al.*, N.D. Cal. Case No. 17-cv-06552-

2    VC (the "Second Action"). The Court eventually dismissed the action *without* prejudice for lack of

3    subject matter jurisdiction. Second Action, Dkt. No. 76. Plaintiff then commenced this action by

4    re-filing the complaint from the Second Action with immaterial changes to some of the named

5    defendants and causes of action. Dkt. No. 1.

6        While much of the Complaint is unintelligible in that it has nothing to do with Plaintiff or

7    any harm he claims to have suffered, it can be seen that Plaintiff is asserting three basic claims:

8        First, Plaintiff claims that he was wronged in the Infringement Action by various purported

9    misdeeds of the defendants. He contends that the defendants in that case "hired an 'expert,' who

10   falsified his report." Complaint p. 39 (heading); *see also* Compl. ¶ 3 (alleging the defendants

11   "hired Rovin to falsify (fix) his report, and cheat the judicial process" in the Infringement Action),

12   ¶ 182 ("Rovin's fraud was so extensive that the Plaintiff moved the court to exclude Rovin's

13   *expert* report"), ¶ 185 (alleging that defendants' "efforts to cheat the judicial process (hiring *fixer*,

14   etc.) in *Briggs v Blomkamp*, resulted in the Plaintiff losing substantial, rightful damages"), ¶ 200

15   (referring to "falsified expert report"). He also contends that the defendants in the Infringement

16   Action committed discovery abuses. *See, e.g., id.* ¶ 25 (alleging that defendants provided "false

17   statements and submitt[e]d falsified documents"), ¶ 37 (alleging that in the Infringement Action,

18   defendants "failed to make a central party available for discovery, in willful effort to suppress

19   evidence"), ¶ 157 (alleging a "Rule 37 violation" in the Infringement Action), ¶ 200 (alleging that

20   defendants "made false statements in their interrogatory answers").

21       Second, Plaintiff claims that the Court in the Infringement Action made erroneous rulings

22   in denying his motion to exclude defense expert Jeff Rovin and in granting summary judgment.

23   *See, e.g., id.* ¶ 3 ("Plaintiff moved to exclude Rovin's report due gross falsification. The Motion

24   was inexplicably denied."), *Id*. (alleging the Infringement Action "was apt to be remanded back to

25   the District Court because the District ruling relied on subordinate (reversed) law").

26       Third, Plaintiff claims that all defendants conspired to shut down the triggerstreet.com in

27   order to destroy evidence that his screenplay had been accessed there by Defendants. *See, e.g., id.*

28   ¶ 38 (alleging that "six days after Plaintiff filed his Notice of Appeal (*Briggs v. Blomkamp*), … the

3

MOTION TO DISMISS

1  Defs closed TS, after 12 years, to destroy incriminating evidence"), ¶ 200 ("Defendant conspired

2  to shut-down and destroy the TS social network -to destroy the place of access").

3       The harm to Plaintiff, according to the Complaint, is that Defendants "won a favorable

4  judgment in *Briggs v Blomkamp* by deceiving the court and falsifying documents, thereby

5  cheating the judicial system, and cheating the Plaintiff out of his right to due process and a fair

6  hearing, and to … rightful profits and damages." *Id.* ¶ 267; *see also id.* ¶ 185 ("Defendants' efforts

7  to cheat the judicial process in *Briggs v. Blomkamp*, resulted in the Plaintiff losing substantial,

8  rightful damages."); *id.* ¶ 251 ("wrongful judgment in the Defendants' favor"). The Complaint

9  seeks "the recovery from the Defendants, and for the Plaintiff, of all profits from the film Elysium

10  (DVD, video games, etc.), per 17 U.S.C. § 505." Compl. p. 58. These are the *same* damages for

11  copyright infringement that Plaintiff sought in the Infringement Action. *See* Korn Decl., Ex. 1, ¶

12  255 (alleging that Film earned profits "rightfully belonging to the Plaintiff").

13  **III.   ARGUMENT**

14       Defendants are named in each of the First Claim for Civil Conspiracy, the Third Claim for

15  Fraud, the Fourth Claim for Fraudulent Deceit, the Fifth Claim for Fraudulent Concealment, the

16  Sixth and Seventh Claims for Negligence and Gross Negligence, the Eight Claim for Willful

17  Suppression (Spoliation) of Evidence, and the Eleventh Claim for an Accounting. All of the

18  claims fail as a matter of law under the collateral attack and res judicata doctrines.

19       **A.   The Complaint Is Barred By The "Collateral Attack" Doctrine**

20       "The collateral attack doctrine precludes litigants from collaterally attacking the judgments

21  of other courts." *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 902 (9th Cir. 2001), citing *Celotex

22  Corp. v. Edwards*, 514 U.S. 300, 313, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)  ("We have made

23  clear that it is for the court of first instance to determine the question of the validity of the law, and

24  until its decision is reversed for error by orderly review, either by itself or by a higher court, its

25  orders based on its decisions are to be respected.") (internal quotation marks omitted); *see also

26  Uptergrove v. U.S.*, 2009 WL 1035231 at *3-4 (E.D. Cal. Apr. 17, 2009) ("Plaintiffs cannot use

27  this lawsuit to collaterally attack the judgment in *Uptergrove I*. While an appeal is pending, the

28  district court's judgment is the law of the case unless and until reversal by the Court of Appeals.");

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1     *State Farm Mut. Auto Ins. Co. v. Industrial Pharmacy*, 2009 WL 2448474 at \*4-5 (D. Haw. Aug.

2     11, 2009). Under the collateral attack doctrine, not only are challenges to the judgment in a prior

3     case prohibited, but so too is "[a]ny challenge to the admissibility of certain evidence" in that prior

4     proceeding. *Rinegard-Guirma v. Ocwen Loan Servicing, LLC*, 2016 WL 4257765 at \*2 (D. Or.

5     Aug. 19, 2016). Similarly, a claim that "false testimony led to a fraudulent verdict is an attack on

6     the merits of the prior proceeding" and violates the collateral attack doctrine. *Advocare Intern.,*

7     *L.P. v. Scheckenbach*, 2010 WL 2196449 at \*2 (W.D. Wash. May 27, 2010).

8        In dismissing a complaint as an improper collateral attack, the district court in *Rinegard-*

9     *Guirma* aptly summarized the doctrine, stating:

10        [T]his Court is without authority to revisit issues that were previously decided in
        another district court case. To question rulings made in Plaintiff's prior case
11        "would be to permit, in effect, a 'horizontal appeal' from one district court to
        another."
12

13     2016 WL 4257765 at \*3, quoting *Mullis v. U.S. Bankr. Ct., Dist. of Nev.*, 828 F.2d 1385, 1392-

14     1393 (9th Cir. 1987).

15        Plaintiff's Complaint here clearly violates the collateral attack doctrine. The body of the

16     Complaint is replete with attacks directed at Defendant's discovery conduct in the Infringement

17     Action and at the decisions of Judge Hamilton in the Infringement Action, including her

18     supposedly erroneous grant of summary judgment. *See supra* at 3-4. Likewise, the causes of action

19     themselves make clear that Plaintiff's "new" claims arise out of the Infringement Action and

20     Judge Hamilton's rulings there. *See*, *e.g.*, Compl. ¶ 200 (alleging in First Claim for conspiracy that

21     "Defendants devised a fourth conspiracy to prevent the Plaintiff from prevailing in his copyright

22     lawsuit"); *id.* ¶ 234 (alleging in Fifth Claim for fraudulent concealment that "in *Briggs v.*

23     *Blomkamp*, the Defendants would not permit their employee/agent, Lee Smith, to answer a central

24     discovery interrogatory"); *id.* ¶ 238 (alleging in Sixth Claim for negligence that Defendants "hired

25     'fixer,' Jeff Rovin, to falsify an expert report"); *id*. ¶ 267 (alleging in Eleventh Claim for an

26     accounting that "Defendants won a favorable judgment in *Briggs v Blomkamp* by deceiving the

27     court and falsifying documents, thereby cheating the judicial system, and cheating the Plaintiff out

28     of his right to due process and a fair hearing, and to … rightful profits and damages").

<div align="center">5</div>

<div align="center">MOTION TO DISMISS</div>

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    The only *harm* Plaintiff alleges in the Complaint is harm stemming from his loss of the

2  Infringement Action. In that regard, the Complaint contains a section entitled "Concerning Injury

3  & Damages" in which Plaintiff contends that he has suffered injury because (1) the defendants'

4  supposed wrongs "[]impede[] Plaintiff's ability to defend his copyright protected property, if the

5  U.S. Supreme Court remands *Briggs v. Blomkamp* for trial," and because (2) the "Defendants'

6  efforts to cheat the judicial process (hiring *fixer*, etc.) in *Briggs v. Blomkamp*, resulted in the

7  Plaintiff losing substantial, rightful damages." Compl. ¶ 185.

8    Finally, the requested relief is the disgorgement of the Film's profits pursuant to the

9  Copyright Act—a remedy that would *only* be available, if at all, on the copyright claim that

10  Plaintiff litigated and lost in the Infringement Action.

11    In short, irrespective of how he styles his causes of action, Plaintiff is attacking

12  Defendants' conduct in the underlying Infringement Action, he is attacking the rulings of Judge

13  Hamilton in that case, and he is seeking a form of damages he could recover only by prevailing on

14  his failed copyright claim. To find for Plaintiff on these claims would effectively reverse the final

15  judgment in the Infringement Action.

16    This Court may consider matters that are properly the subject of judicial notice on a Rule

17  12 motion. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (holding that on a

18  Rule 12(b)(6) motion the "court may take judicial notice of 'matters of public record'"); *Zella v.*

19  *E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128 (C.D. Cal. 2007). This includes pleadings and

20  opinions in prior litigation. *See Lee*, 250 F.3d at 690 (holding that court make "take[ ] judicial

21  notice of another court's opinion … for the existence of the opinion"); *Harris v. County of*

22  *Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). Accordingly, Defendants respectfully request that

23  the Court take judicial notice of Plaintiff's complaint in the Infringement Action and the district

24  court and Ninth Circuit opinions there, and that it find that Plaintiff's claims are an impermissible

25  collateral attack, such that the Court lacks jurisdiction and the Complaint should be dismissed

26  under Fed. R. Civ. P. 12(b)(1). *See State Farm*, 2009 WL 2448474 at *4 ("Collateral attack is a

27  jurisdictional issue that is properly addressed under a Rule 12(b)(1) motion.") (citing *United States*

28  *v. Lowry*, 512 F.3d 1194, 1203 (9th Cir. 2008)).

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**B.      The Complaint Is Barred By The Doctrine Of Res Judicata**

Plaintiff's claims are likewise barred by the doctrine of res judicata. "The doctrine of res judicata provides that a final judgment on the merits bars further claims by parties or their privies based on the same cause of action," and "is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdiction." *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051–52 (9th Cir. 2005), quoting *In re Schimmels*, 127 F.3d 875, 881 (9th Cir.1997) (internal quotation marks omitted). The elements of res judicata are: "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Id.*

There is no dispute that the Infringement Action resulted in a final judgment for res judicata purposes: the requirement of a final judgment "is satisfied by a summary judgment dismissal which is considered a decision on the merits for res judicata purposes." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 988 (9th Cir. 2005). There is also no dispute that there is an identity of parties, as Plaintiff is once again suing MRC, Sony, and Blomkamp.

The requirement of identity of claims is also met. Though Plaintiff does not style any of his causes of action as a claim for infringement of his screenplay by *Elysium*, the "identity of claims" requirement for res judicata does not necessitate that the plaintiff has pled identically-styled causes of action. *See Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 713-714 (9th Cir. 2001) (finding identity of claims despite that second action pled different causes of action than the first, where both cases were "predicated on racial discrimination and allege the same circumstances regarding Appellents' termination"); *see also Mpoyo*, 430 F.3d at 987. "Whether the two suits involve the same claim or cause of action requires [courts] to look at four criteria … (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions." *Id.* (quoting *Chao v. A–One Med. Servs., Inc.*, 346 F.3d 908, 921 (9th Cir.2003)).

Each of these factors demonstrates an identity of claims here. The two cases arise out of the "same transactional nucleus of facts"; they both involve Plaintiff's claims that his screenplay

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

7

1    was accessed and copied. The two cases "involve infringement of the same right"; indeed,

2    Plaintiff's claimed injury in Paragraph 185 of the Complaint is his loss in the Infringement Action.

3    *Accord Mpoyo*, 430 F.3d at 987 (stressing that the two cases "involve the same overall harms" in

4    finding identity of claims). The two cases would involve substantially the same evidence relating

5    to this alleged infringement, because Plaintiff cannot prevail on his claims and recover the Film's

6    profits without proving copyright infringement. Finally, the "rights or interests established" in the

7    Infringement Action would be "destroyed or impaired by prosecution of the second action." To

8    find for Plaintiff and award him the Film's profits would effectively nullify the judgment in the

9    Infringement Action finding no copyright infringement as a matter of law.

10       Simply put, the Complaint sets forth no set of facts under which Plaintiff could prevail

11   against Defendants and recover damages *without* proving copyright infringement. Plaintiff's

12   "new" causes of action are merely disguises for a rehashing of his failed copyright claim, and the

13   Complaint is therefore barred by res judicata.[1]

14       **C.    The Complaint Should Further Be Dismissed On The Basis That It Fails To**

15       **State A Claim For Relief Against Defendants**

16       Plaintiff's Complaint should likewise be dismissed on the basis that it fails to state a claim

17   upon which relief may be granted. Although Rule 8(a) requires only that a complaint contain a

18   "short and plain statement of the claim showing that the pleader is entitled to relief," this standard

19   "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556

20   U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions'

21   or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.*, quoting *Twombly*,

22   550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further

23   factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

24       "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

25   _____

26   [1] If the Court were to find that res judicata is not applicable to Defendants Wiczyk and
     Satchu, who were not parties to the Infringement Action, the doctrine of "nonmutual collateral
27   estoppel" would nevertheless apply to preclude Plaintiff from relitigating his failed copyright
     claim. *See Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1078 (9th Cir. 2007).

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550

2   U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows

3   the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

4   *Id.* The determination of whether a complaint asserts a "plausible" claim is a "context-specific task

5   that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

6   "But where the well-pleaded facts do not permit the court to infer more than the mere possibility

7   of misconduct, the complaint has alleged—but it has not 'show[n]—'that the pleader is entitled to

8   relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

9       The requirements of *Twombly* and *Iqbal* apply with particular force to allegations of

10  conspiracy. "[B]are assertion[s] of conspiracy will not suffice," *Twombly*, 550 U.S. at 556, nor

11  will a "conclusory allegation of agreement at some unidentified point." *Id.* at 557.

12      Here, the allegations of the Complaint are anything but "plausible," and they do not permit

13  the reasonable inference that Defendants are liable for anything.

**1.      The First Cause Of Action For Civil Conspiracy**

15      Plaintiff pleads a First Claim for Civil Conspiracy. "A conspiracy is not an independent

16  cause of action ...." *Mangindin v. Washington Mut. Bank*, 637 F. Supp. 2d 700, 708 (N.D. Cal.

17  2009). On this basis alone, the claim should be dismissed. Additionally, Plaintiff's pleading of this

18  "conspiracy" claims, which he divides into five separate conspiracies, is patently deficient under

19  Rule 8(a) and the *Twombly* and *Iqbal* opinions:

**(a)      The First Conspiracy**

21      Plaintiff alleges as his "First Conspiracy" that *all* Defendants conspired to create the

22  triggerstreet.com website, to mislead members about its security features, and to "erase evidence

23  of their access of the Plaintiff's script" on that site, Compl. ¶ 192. Yet, no facts are pled or could

24  be pled to support that Defendants had any involvement at all in the triggerstreet.com website

25  (which they did not) or were part of a conspiracy involving this website (which they were not).

26  Indeed, Plaintiff has admitted elsewhere in the Infringement Action and his Complaint here that

27  triggerstreet.com was operated by defendants Spacey and Brunetti alone. Plaintiff knows full well

28  that triggerstreet.com was a website owned and operated by actor Kevin Spacey and his producing

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

9

MOTION TO DISMISS

1  partner, Dana Brunetti—not the other defendants in this case—and his allegations elsewhere show

2  as much. *See* Korn Decl., Ex. 1 ¶ 18 (referring to triggerstreet.com as "Kevin Spacey's and Dana

3  Brunetti's … website"); Compl. ¶ 128 (referring to Spacey and Brunetti as "TS's and TSP's

4  founder and CEO").

5      Despite admitting that triggerstreet.com was a Spacey/Brunetti website, Plaintiff alleges

6  that he "suspects Def Asif Satchu . . . is likely TS's designer and coordinator" and that he

7  "believes TS was formed in a conspiracy most likely conceived by Defendant Ari Emanuel."

8  Complaint ¶¶ 45, 82. These "'naked assertion[s]' devoid of 'further factual enhancement'" are not

9  sufficient to state a claim. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also*

10  *Twombly*, 550 U.S. at 556 ("bare assertion of conspiracy [that] will not suffice").

11      Not only are there no facts pled supporting that the moving Defendants had any

12  involvement in triggerstreet.com, but this "First Conspiracy" claim is utterly devoid of any

13  specific allegations concerning what the moving Defendants are accused of doing *and how it*

14  *injured Plaintiff*. In fact, looking at the allegations under the heading "First Conspiracy," it is

15  impossible to discern how Plaintiff contends he was damaged. Thus, the moving Defendants are at

16  a loss as to what the claim against them is. For each of the reasons stated above, this "First

17  Conspiracy" claim fails as a matter of law.

18          **(b)      The "Second Conspiracy"**

19      Plaintiff alleges a "Second Conspiracy" in which Defendants "conspired to prevent the

20  Plaintiff from discovering the film *Elysium* was in production." Compl. ¶ 193. Here too, there is

21  no factual support of what Defendants are accused of doing and no allegations of how anything

22  alleged caused harm to Plaintiff. This "bare assertion of conspiracy will not suffice." *Twombly*,

23  550 U.S. at 556.

24          **(c)      The "Third Conspiracy"**

25      The "Third Conspiracy" alleges that Defendants conspired to conceal their infringement of

26  Plaintiff's screenplay by editing the film *Elysium* to remove features that were similar to

27  Plaintiff's work. Compl. ¶ 194-198. The Complaint pleads no facts to support this facially absurd

28  claim that Defendants edited the Film to thwart a copyright claim by Plaintiff, nor would this

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  constitute a violation of Plaintiff's rights even if it occurred. For these reasons, and because this is

2  an obvious collateral attack on the Infringement Action, the "Third Conspiracy" claim fails.

3  (d)      The "Fourth Conspiracy"

4  The "Fourth Conspiracy" subsumed within the First Claim alleges a supposed "conspiracy

5  to prevent the Plaintiff from prevailing in his copyright lawsuit." Complaint ¶¶ 199-200. Not only

6  does this claim clearly fail under the collateral attack and res judicata doctrines discussed above,

7  but it pleads *no facts* supporting with "facial plausibility" that Defendants are guilty of the conduct

8  alleged. *Iqbal*, 556 U.S. at 678.

9  (e)      The "Fifth Conspiracy"

10  The "Fifth Conspiracy" alleges a vague conspiracy "to break California business, labor and

11  ethics codes" in the production of *Elysium* and other business arrangements not involving

12  Plaintiff. Compl. ¶¶ 201-205. There is no indication of what Defendants supposedly did that was

13  wrongful and no indication of how Plaintiff was harmed as a result. This is an "unadorned, the-

14  defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

15  **2.      The Third Cause Of Action For Fraud**

16  Plaintiff's Third Claim for fraud offers little more than a "formulaic recitation of the

17  elements" of a fraud claim. *Iqbal*, 556 U.S. at 678. The Complaint alleges that "Defendants made

18  numerous false representations, as true." Compl. ¶ 219. Four of the five alleged false

19  misrepresentations concern triggerstreet.com. *Id.* ¶ 219(a)-(b). No facts are pled to support that

20  Defendants are responsible for these supposed misrepresentations, much less facts which meet the

21  pleading standard of Rule 9(b).

22  The only other alleged false misrepresentation in the Third Claim is that Defendants

23  "knowingly submitted [Rovin's] falsified expert report to the District Court" in the Infringement

24  Action. Compl. ¶ 219(e). Plaintiff claims he was harmed because the "District Court relied on the

25  false claims of the Defendants' expert." *Id.* ¶ 223. This claim is not pled with particularity as

26  required by Rule 9(b), and it clearly fails under the collateral attack and res judicata doctrines

27  discussed above. *See*, *e.g.*, *Advocare*, 2010 WL 2196449, at *2 (holding that a claim that "false

28  testimony led to a fraudulent verdict is an attack on the merits of the prior proceeding" and

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

11

1  violates the collateral attack doctrine).

2  **3.      The Fourth Cause Of Action For Fraudulent Deceit**

3  Plaintiff's Fourth Claim for Fraudulent Deceit fails for the same reasons as his Third Claim

4  for Fraud. Just as with his claim for fraud, this claim contains nothing more than vague,

5  conclusory allegations of misrepresentations involving triggerstreet.com and Defendant's actions

6  in the Infringement Action. Compl. ¶ 226. Plaintiff fails to plead with particularity facts

7  supporting that Defendants made knowingly false statements *to him*, that Plaintiff relied on those

8  statements, and that Plaintiff suffered cognizable harm as a result.

9  **4.      The Fifth Cause Of Action For Fraudulent Concealment**

10  The Fifth Claim alleges that Defendants engaged in fraudulent concealment of various

11  facts concerning triggerstreet.com and concerning the production of *Elysium. See* Compl. ¶ 234.

12  Besides violating the preclusive doctrines discussed above, the Fifth Claim fails to plead a

13  cognizable claim of fraudulent concealment. The elements of a claim of fraudulent concealment

14  are: (1) "concealment or suppression of a material fact"; (2) "by a defendant with a duty to

15  disclose the fact to the plaintiff"; (3) an intent to defraud the plaintiff; (4) the plaintiff's reliance on

16  the concealment; and (5) "plaintiff sustained damage as a result of the concealment or suppression

17  of the fact." *Graham v. Bank of America, N.A.*, 226 Cal. App. 4th 594, 606 (2014).

18  Here, Plaintiff fails to allege facts supporting that Defendants owed a *duty* to disclose

19  anything to him. Plaintiff fails to allege facts supporting that Defendants knowingly concealed

20  anything in order to induce his reliance, including that they concealed facts concerning a website

21  (triggerstreet.com) which they do not operate. Plaintiff further fails to allege facts supporting that

22  he relied on the supposedly concealed facts and was harmed as a result. Certainly, Plaintiff does

23  not come close to pleading any of these elements with particularity as required by Rule 9(b).

24  **5.      The Sixth Cause Of Action For Negligence**

25  Plaintiff pleads a Sixth Claim for negligence which is unintelligible. The Complaint states

26  that Defendants "engaged in a variety of negligent actions and practices" pertaining to their

27  businesses. For example, Plaintiff alleges:

28  The Defendants engaged in a brazenly negligent culture. (In 1999, Defs Universal

**Kinsella Weitzman Iser Kump & Aldisert LLP**
808 Wilshire Boulevard, 3ʀᴅ Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

12

**KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP**
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

and MRC hired Def Wiczyk to implement the unethical business structure contemplated in Wiczyk's "memo"—although Wiczyk's memo actually predicted that only a studio that was *suffering*, like Universal, would implement his scheme.)

Compl. ¶ 238(A). In similarly strange fashion, Plaintiff alleges some "secret and unethical relationships" between certain of Defendants and Sony in "forming the business (Screenbid)." *Id.* ¶ 238(B). Relating specifically to *Elysium* and the Infringement Action, Plaintiff pleads that Defendants were negligent because "Sony Pictures bought the rights to Elysium, without reading a script." *Id.* ¶ 238(D).

The negligence claim fails as a matter of law on each of its elements. To prove negligence, Plaintiff must plead and prove the existence of a duty, the breach of duty, legal cause, and damages suffered from the breach. *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 463 (2003). Here, Plaintiff fails to plead facts supporting that Defendants owed him any duty in how they operated their business or in how they developed the Film. Manifestly, Defendants owed no duty *to Plaintiff* to read a script for *Elysium* before they acquired the project. Further, the Complaint pleads no facts supporting that Defendants breached whatever duty might be owed to him, or that he was damaged as a result of Defendants' alleged conduct. The claim of negligence consists of "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### 6.   The Seventh Cause Of Action For Gross Negligence

The Seventh Claim for gross negligence fails for the same reasons as the Seventh Claim. Plaintiff merely incorporates the previous paragraph and defines gross negligence, adding no factual support for the claim. *See* Complaint ¶ ¶ 240-241.

### 7.   The Eighth Cause Of Action For Willful Suppression Of Evidence/ Spoliation Of Evidence

Plaintiff asserts an Eighth Cause of Action for willful suppression and spoliation of evidence pursuant to CACI 204. *See* Compl. p. 54. The CACI jury instructions do not provide a basis for a cause of action, and the California Supreme Court has declined to recognize intentional spoliation as a tort remedy to protect against the exact abuse that Plaintiff is attempting here.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  *Cedars-Sinai Med. Ctr. v. Superior Court*, 18 Cal. 4th 1, 8-11 (1998). Allowing for such a remedy

2  would "encourage a spiral of lawsuits," "would impermissibly burden, if not inundate, our justice

3  system," and could lead to "endless litigation, in which nothing was ever finally determined." *Id.*

4  at 9,10 (internal quotation marks omitted); *see also Warden v. Cross*, 94 F. App'x 474, 475–76

5  (9th Cir. 2004)("The California Supreme Court has recognized … that a tort remedy for spoilation

6  [sic] of evidence would produce an endless string of derivative actions."). On this basis alone, the

7  claim fails.

8  　　　　Even if a cause of action for suppression or spoliation of evidence was cognizable, no facts

9  are pled to support such a claim here. Plaintiff alleges the spoliation of evidence on

10  triggerstreet.com, but as with the First Claim, no facts are alleged to support that Defendants had

11  any involvement in triggerstreet.com or in the purported destruction of evidence on that site.

12  　　　　Plaintiff further alleges that Defendants suppressed evidence during the Infringement

13  Action by failing to answer interrogatories and by allegedly proffering a false statement from one

14  of the producers of *Elysium*. *See* Compl. ¶¶ 247(3)-(4). No facts are alleged to support the

15  existence of a "plausible" claim in this regard, *Iqbal*, 556 U.S. at 678, and moreover, these attacks

16  on the Infringement Action are clearly barred by the collateral attack doctrine. *See Advocare*, 2010

17  WL 2196449 at *2.

18  　　　　Additionally, as a matter of law, any suppression or spoliation of evidence—obviously,

19  there was none—is immaterial and not a cause of Plaintiff's alleged harm. Both Judge Hamilton

20  and the Ninth Circuit found that Plaintiff's screenplay and *Elysium* were not substantially similar

21  as a matter of law. *No evidence* that Plaintiff might have discovered could or would have changed

22  this result, since substantial similarity is assessed based on the works alone.

23  　　　　For each of these reasons, the Eighth Claim fails as a matter of law.

24  　　　　**8.　　The Eleventh Cause Of Action For An Accounting**

25  　　　　The Eleventh Claim for an accounting also must fail. A claim for accounting can be

26  alleged as a legal remedy or an equitable claim. *Penney v. Wells Fargo Bank*, NA, No. 2:11-CV-

27  05567-ODW, 2012 WL 2071705, at *13 (C.D. Cal. June 8, 2012). While Plaintiff sets forth his

28  accounting claim as a separate claim of relief, it is not clear whether he intends to assert a separate

<div align="center">14</div>
<div align="center">MOTION TO DISMISS</div>

1    claim or whether he is seeking accounting as a remedy. To the extent that Plaintiff is alleging

2    accounting as a legal remedy, it must fail because it is not "tethered to relevant actionable claims."

3    *Id*.  Plaintiff has failed to sufficiently state any actionable claim against Defendants, and therefore,

4    he is not entitled to accounting as a legal remedy. *Id*.

5         Plaintiff's equitable claim for accounting also fails. A cause of action for accounting may

6    only be maintained when "(1) a relationship exists between a plaintiff and defendant that requires

7    an accounting, and (2) some balance is due to the plaintiff that can only be ascertained by an

8    accounting." *Shkolnikov v. JPMorgan Chase Bank*, 2012 WL 6553988, at *23 (N.D. Cal. Dec. 14,

9    2012). Plaintiff has failed to allege any relationship between himself and Defendants that would

10   require an accounting. Further, even assuming that there is some balance due to Plaintiff, which

11   there is not, Plaintiff has not presented any evidence that the amount can only be ascertained by an

12   accounting. Compl. ¶¶ 263-266.

13        Moreover, Plaintiff yet again attempts to use this action to attack the District Court's

14   decision in the Infringement Action. The accounting claim alleges that "[t]he Defendants won a

15   favorable judgment in *Briggs v Blomkamp* by deceiving the court and falsifying documents,

16   thereby cheating the judicial system, and cheating the Plaintiff out of his right to due process and a

17   fair hearing, and to … rightful profits and damages." *Id.* ¶ 267. Clearly, then, this claim is an

18   attempt to re-litigate the prior adverse ruling and is impermissible.

19   **IV.    CONCLUSION**

20        For all the reasons set forth above, Defendants respectfully request that the Court grant

21   their Motion and dismiss the Complaint in its entirety.

22

23   DATED: November 9, 2018          KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

24

25                        By:     */s/ Gregory Korn*
                                  Gregory Korn
26                                Attorneys for Defendants MRC II DISTRIBUTION
                                  COMPANY LP; MORDECAI WICZYK; ASIF
27                                SATCHU; SONY PICTURES ENTERTAINMENT
                                  INC.; and ARIEL EMANUEL
28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

15

1    KELLI L. SAGER (State Bar No. 120162)
       kellisager@dwt.com
2    ROCHELLE L. WILCOX (State Bar No. 197790)
       rochellewilcox@dwt.com
3    BRENDAN N. CHARNEY (State Bar No. 293378)
       brendancharney@dwt.com
4    DAVIS WRIGHT TREMAINE LLP
     865 South Figueroa Street, Suite 2400
5    Los Angeles, California 90017
     Telephone:    (213) 633-6800
6    Facsimile:    (213) 633-6899

7    Attorneys for Defendant
     NBCUNIVERSAL MEDIA, LLC

8

9                    IN THE UNITED STATES DISTRICT COURT

10                   THE NORTHERN DISTRICT OF CALIFORNIA

11                         SAN FRANCISCO DIVISION

12

13   STEVE WILSON BRIGGS,                 Case No. 18-cv-4952

14            Plaintiff,                  [Hon. Vince Chhabria]

15       v.                              **NBCUNIVERSAL MEDIA, LLC'S**
                                         **REQUEST FOR JUDICIAL NOTICE**
16   KEVIN SPACEY; ARI (ARIEL) EMANUEL;
     MATT DAMON; BEN AFFLECK;
17   NBCUNIVERSAL MEDIA, LLC; SONY       (Motion to Dismiss; Proposed Order Filed
     PICTURES ENT. INC.; TRIGGER STREET  Concurrently)
18   PRODUCTIONS; NEILL BLOMKAMP; ASIF
     SATCHU; MORDECAI (MODI) WICZYK;     Date:        December 20, 2018
19   WILLIAM (BILL) BLOCK; DANA          Time:        10:00 a.m.
     BRUNETTI; SOUND POINT CAPITAL       Crtrm:       4
20   MANAGEMENT, LC; MRC (and all MRC
     entities and subs.),
21
22            Defendants.
23
24
25
26
27
28

DAVIS WRIGHT TREMAINE LLP

**I.   INTRODUCTION**

In connection with its concurrently-filed Motion to Dismiss the Complaint, NBCUniversal Media, LLC ("NBCU") hereby respectfully request that the Court take judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of documents from the court file in prior actions filed by Plaintiff:  Briggs v. Blomkamp, N.D. Cal. No 13-cv-04679, 9th Cir. No. 14-17175, Supreme Ct. No. 18-63; and Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552. Specifically, NBCU requests judicial notice of the following:

**Ex. A:**   Judgment, Briggs v. Blomkamp, N.D. Cal. No 13-cv-04679 (October 3, 2014) (ECF No. 87);

**Ex. B:**   Memorandum Opinion, Briggs v. Sony Pictures Ent., 9th Cir. No. 14-17175 (ECF No. 32-1) (filed March 1, 2018);

**Ex. C:**   Order, Briggs v. Sony Pictures Ent., 9th Cir. No. 14-17175 (ECF No. 34) (filed April 6, 2018);

**Ex. D:**   Order Denying Writ of Certiorari, Briggs v. Sony Pictures Ent., Supreme Ct. No. 18-63 (filed Oct 1, 2018);

**Ex. E:**   Complaint, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 1) (without exhibits);

**Ex. F:**   First Amended Complaint, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 21) (without exhibits);

**Ex. G:**   Motion to Dismiss First Amended Complaint, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 26);

**Ex. H:**   Response to Order to Show Cause, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 73); and,

**Ex. I:**   Order Dismissing Case, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 76).

**II.   MEMORANDUM OF POINTS AND AUTHORITIES**

Federal Rule of Evidence 201 gives the Court the power to take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot

DAVIS WRIGHT TREMAINE LLP

1

1    reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court "must take judicial notice if a

2    party requests it and the court is supplied with the necessary information." Fed. R. Evid.

3    201(c)(2). Judicial notice may be taken at any stage of the proceedings. Fed. R. Evid. 201(d).

4            Rule 201 allows the court to "take judicial notice of court filings and other matters of

5    public record." Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir.

6    2006); see also Harris v. Cty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012) (taking judicial

7    notice of documents on file in related action for purposes of evaluating claim preclusion); MGIC

8    Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986) (taking judicial notice of a motion

9    to dismiss together with a supporting memorandum filed in a separate matter). "[T]he court may

10   take judicial notice of and consider matters of public record without converting a Rule 12(b)(6)

11   motion to dismiss into a motion for summary judgment." Fountain v. JP Morgan Chase Bank,

12   N.A., 2017 WL 2272072, at *2 (D. Haw. May 24, 2017) (citing Lee v. City of Los Angeles, 250

13   F.3d 668, 688 (9th Cir. 2001)).

14           Here, each of the documents as to which Defendants request judicial notice appears in the

15   public record as part of court files in prior lawsuits filed by Plaintiff Steven Briggs. These

16   documents can be judicially noticed because they are public records, issued by or submitted to a

17   court, and their authenticity cannot be contested. The Court therefore should take judicial notice

18   of the requested documents.

19                                    **III. CONCLUSION**

20           For the reasons set forth in this Request for Judicial Notice, NBCU respectfully requests

21   that this Court take judicial notice of the documents listed above and attached hereto.

22   DATED: November 9, 2018              DAVIS WRIGHT TREMAINE LLP
                                          KELLI L. SAGER
23                                        ROCHELLE L. WILCOX
                                          BRENDAN N. CHARNEY
24

25                                        By: */s/ Rochelle L. Wilcox*
                                              Rochelle L. Wilcox
26

27                                        Attorneys for Defendants
                                          NBCUNIVERSAL MEDIA, LLC
28

DAVIS WRIGHT TREMAINE LLP

2

REQUEST FOR JUDICIAL NOTICE
Case No. 18-cv-04952
4844-8173-5034v.2 0020040-000144

ER 564

# Exhibit A



United States District Court
For the Northern District of California

1
2
3
4
5     UNITED STATES DISTRICT COURT
6     NORTHERN DISTRICT OF CALIFORNIA
7
8
9
10 STEVE WILSON BRIGGS,
11    Plaintiff,      No. C 13-4679 PJH
12    v.        **JUDGMENT**
13 NEILL BLOMKAMP, et al.,
14    Defendants.
15

16   The court having granted defendants' motion for summary judgment and denied

17 plaintiff's motion for summary judgment,

18   It is Ordered and Adjudged

19   that plaintiff Steve Wilson Briggs take nothing, and that the action be dismissed.

20

21 Dated: October 3, 2014

22              PHYLLIS J. HAMILTON
               United States District Judge
23
24
25
26
27
28

Exhibit B

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAR 1 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STEVE K. WILSON BRIGGS,<br><br>            Plaintiff-Appellant,<br><br>    v.<br><br>SONY PICTURES ENTERTAINMENT, INC.; TRISTAR PICTURES, INC.; MEDIA RIGHTS CAPITAL; QED INTERNATIONAL; NEILL BLOMKAMP,<br><br>            Defendants-Appellees. | No.    14-17175<br><br>D.C. No. 4:13-cv-04679-PJH<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief Judge, Presiding

Submitted February 28, 2018[**]

Before:    Thomas, Chief Judge, Trott and Silverman, Circuit Judges.

Steve K. Wilson Briggs appeals pro se from the district court's summary

judgment in his copyright action.  We have jurisdiction under 28 U.S.C. § 1291.

We review de novo, *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir.

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]    The panel unanimously concludes that this case is suitable for decision without oral argument.  *See* Fed. R. App. P. 34(a)(2).

2002), and we affirm.

The district court properly granted summary judgment on Briggs's copyright infringement claim because Briggs failed to raise a genuine dispute of material fact as to whether defendants accessed his screenplay *Butterfly Driver*, or whether Briggs's screenplay and defendants' film *Elysium* are either strikingly or substantially similar. *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012) (setting forth ways a plaintiff may prove access); *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987) ("Absent evidence of access, a 'striking similarity' between the works may give rise to a permissible inference of copying."); *see also Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624-25 (9th Cir. 2010) (setting forth the extrinsic test to assess substantial similarity between specific expressive elements of copyrighted works at issue, such as plot, sequence of events, theme, dialogue, mood, setting, pace, and characters).

We reject Briggs's unsupported contention that the district court applied the wrong standard for deciding whether the defendant has accessed the plaintiff's work. *L.A. Printex* did not overrule *Art Attacks Ink, LLC v. MGA Entertainment, Inc.*, 581 F.3d 1138 (9th Cir. 2009), or *Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000), by not expressly reiterating that speculation or conjecture fails to establish a reasonable probability of access. *See L.A. Printex,* 676 F.3d at 846 ("To prove access, a plaintiff must show a reasonable possibility, not merely a

14-17175

bare possibility, that an alleged infringer had the chance to view the protected

work."") (quoting *Art Attacks Ink*, 581 F.3d at 1143); *see also Nelson v. Pima

Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and

speculation do not create a factual dispute for purposes of summary judgment.").

This court in *Loomis v. Cornish* reaffirmed that access can be proved with

circumstantial evidence either by a chain of events linking the plaintiff's work and

the defendant's access, or by showing that the plaintiff's work has been widely

disseminated. *See Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016).

Summary judgment was proper because Briggs's speculations about access did not

raise a triable dispute.

The district court did not abuse its discretion by denying Briggs's motion to

amend his complaint after the deadline set forth in the pretrial scheduling order

because Briggs failed to show "good cause." *See Johnson v. Mammoth

Recreations, Inc.*, 975 F.2d 604, 607-09 (9th Cir. 1992) (setting forth standard of

review and the "good cause" requirement to modify a scheduling order).

The district court did not abuse its discretion by granting Briggs a shorter

discovery continuance than he had requested. *See Martel v. Cnty. of Los Angeles*,

56 F.3d 993, 995 (9th Cir. 1995) (en banc) ("[A] district court's decision to deny a

continuance sought for the purposes of obtaining discovery will be disturbed only

upon the clearest showing that denial of discovery results in actual and substantial

14-17175

ER 570

prejudice to the complaining litigant.") (citation and internal quotation marks omitted).

**AFFIRMED.**

Exhibit C

FILED

UNITED STATES COURT OF APPEALS

APR 06 2018

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STEVE K. WILSON BRIGGS, | No.    14-17175 |
| Plaintiff-Appellant, | |
| v. | D.C. No. 4:13-cv-04679-PJH<br>Northern District of California,<br>Oakland |
| SONY PICTURES ENTERTAINMENT, INC.; et al., | |
| Defendants-Appellees. | ORDER |

Before:  THOMAS, Chief Judge, and TROTT and SILVERMAN, Circuit Judges.

The panel has voted to deny Appellant's petition for rehearing and Chief Judge Thomas has voted to reject the petition for rehearing en banc and Judges Trott and Silverman so recommend.

The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc.  Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED.

ER 573

Exhibit D

Briggs v. Sony Pictures Entertainment, Inc., --- S.Ct. ---- (2018)

2018 WL 3391694
Only the Westlaw citation is currently available.
Supreme Court of the United States

BRIGGS, STEVE K. W. V. SONY PICTURES, ET AL.

No. 18-63.
|

Oct. 1, 2018.

**Opinion**

**\*1**  The petition for writ of certiorari is denied.

**All Citations**

--- S.Ct. ----, 2018 WL 3391694 (Mem)

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit E

CHAMBERS

| | |
|---|---|
| 1 | Steve Wilson Briggs |
| 2 | 4322 Chico Ave. |
| 3 | Santa Rosa, CA 95407 |
| 4 | 510 200 3763 |
| 5 | snc.steve@gmail.com |
| 6 | PLAINTIFF In Propria Persona |

ORIGINAL
F I L E D

NOV 13 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

LB

| | | | |
|---|---|---|---|
| 11 | STEVE WILSON BRIGGS | Civ No: | **CV 17 6552** |
| 12 | Plaintiff, | | |
| 13 | vs | **COMPLAINT FOR:** | |
| 14 | UNIVERSAL PICTURES; | 1. **CONSPIRACY** | |
| 15 | SONY PICTURES; | 2. **OBSTRUCTION OF JUSTICE** | |
| | NBCUNIVERSAL; | 3. **FALSE STATEMENTS** | |
| 16 | KEVIN SPACEY; | 4. **BREACH OF CONTRACT** | |
| 17 | ARIEL (ARI) EMANUEL; | 5. **FRAUD AND FALSE** | |
| | MATTHEW (MATT) DAMON; | **STATEMENTS** | |
| 18 | BEN AFFLECK; | 6. **DECEIT** | |
| 19 | NEILL BLOMKAMP; | 7. **NEGLIGENCE** | |
| | MORDECAI (MODI) WICZYK; | 8. **GROSS NEGLIGENCE** | |
| 20 | ASIF SATCHU; | 9. **VIOLATION OF CALIFORNIA** | |
| 21 | BILL BLOCK; | **LABOR CODE § 1700.39** | |
| | DANA BRUNETTI; | 10. **VIOLATION OF UNFAIR** | |
| 21 | MRC; | **BUSINESS PRACTICES ACT** | |
| 22 |   all MRC entities and subsidiaries: | **[CAL BUS & PROF CODE** | |
| | (MEDIA RIGHTS CAPITAL; MRC II LP; | **§ 17200, ET SEQ.]** | |
| 23 | MRC II DISTRIBUTION COMPANY LP; | 11. **PERJURY** | |
| 24 | MRC II HOLDINGS, L.P.; ASGARI INC.; | 12. **TAMPERING WITH EVIDENCE** | |
| | OAKTREE ENTERTAINMENT, INC.; | 13. **WITNESS TAMPERING** | |
| 25 | MRC I HEDGE CO, LLC;  MRC SUB GP, | 14. **SUBORNATION OF PERJURY** | |
| 26 | LLC; MRC II CAPITAL COMPANY, L.P.; | | |
| | MRC I PROJECT COMPANY, LLC) | | |
| 27 | | **DEMAND FOR JURY TRIAL** | |
| 28 | Defendants. | | |

COMPLAINT

1

| 1 | **NATURE OF ACTION:** |
|---|---|
| 2 | 1.    Pursuant to 28 U.S. Code § 1332 (as this matter involves Defendants who are not |
| 3 | American citizens, and concerns violations that cross US state and international borders) the |
| 4 | Plaintiff brings this lawsuit against the Defendants (**Defs**) for their willful violations of US |
| 5 | and California state laws, done for their personal enrichment and/or to gain unlawful |
| 6 | competitive advantage, through their participation in such actions and violations as: |
| 7 | 1.   Obstruction Of Justice: 6 days after Plaintiff filed his Notice of Appeal (in Briggs v |
| 8 | Blomkamp, C134679 PJH), the Defs closed their social network (TriggerStreet), to |
| 9 | destroy evidence and records, as this was their *access* point in Briggs v Blomkamp. |
| 10 | 2.   The Defs used Def Emanuel's influence with Universal Pictures to entice, persuade |
| 11 | or bribe the enlistment of other conspirators, and as leverage against business rivals. |
| 12 | 3.   The Defendants created a social network, "TriggerStreet.com" (**TS**) to secretly and |
| 13 | unlawfully access, appropriate and alter unsuspecting writers' work. The |
| 14 | Defendants financially profited from these activities, or received film acting roles |
| 15 | for themselves, or film production or distribution benefits; |
| 16 | 4.   Without informing TS members, the Defendants installed a secret counter-security |
| 17 | feature on TS, which erased all access records if a member deleted their work. |
| 18 | 5.   Breach: TS's "Terms of Use" stated the site was made **solely for use in the USA,** yet |
| 19 | Def Spacey went to London for a TS launch party and interviews, and went to Spain |
| 20 | for a TS recruitment speech, to tout TS's **"400,000 members around the world."** |
| 21 | 6.   Evidence will show Def Ari Emanuel, a talent agent, is also Hollywood's most |
| 21 | powerful film producer—against California labor & business codes § 1700.39, which |
| 22 | makes it unlawful for a talent agent to act as both agent and as an employer. |
| 23 | 7.   In a surreal move, in Briggs v Blomkamp, rather than hiring a copyright attorney, |
| 24 | the Defs hired fixer/conman **Jeff Rovin**—a high school-educated fantasy writer—as |
| 25 | their sole "expert" witness. Rovin provided falsified and fraudulent testimony to the |
| 26 | court (surely on the Defs orders). Two years after Briggs v Blomkamp went to |
| 27 | appeals, Rovin went on national TV, Fox News' "*The Sean Hannity Show*," Oct. 24, |
| 28 | 2016, to admit he was a professional "fixer" (someone hired to make problems go |

COMPLAINT

2

1   away by producing false documents and stories) for President Bill and Hillary

2   Clinton. June 12, 2014, Plaintiff moved to exclude Rovin's report due to its gross

3   fraud. Somehow the district court denied the Plaintiff's motion.

4   8.  Defs rendered contracts relying false statements, misrepresentations and omissions.

5   9.  Defs boasted TS had "industry standard" security, when, in fact, they removed all

6       security features to allow themselves constant anonymous access to writer's works.

7   10. Defs made wild false promises to entice new writers, such as: "Our team has been

8       extensively researching and designing TriggerStreet.com **to ensure that it**

9       **encapsulates every aspect of the user's desires and needs**".

10  11. The Defendants conflict of interest-ridden relationships (e.g. Defs Emanuel's and

11      Bill Block's secret co-ownership of Screenbid.com with Sony Picture's CEO M.

12      Lynton, and Def Emanuel's unlawful co-ownership of MRC with Defs Satchu and

13      Wiczyk) created a culture where the Defs neglected to do basic due diligence. Thus,

14      **before they ever read a script**, Sony and MRC agreed to buy the rights to Def

15      Blomkamp's screenplay "*Elysium*," which was misappropriated from the Plaintiff.

16  **JURISDICTION:**

17  2.  **Jurisdiction:** This court has subject matter jurisdiction per 28 USC § 1332(a)(2), as

18  one or more Defendant are foreign citizens, and (a)(2), as one is a citizen of a different State.

19  3.  **Venue:** venue is proper pursuant to 28 § 1391(b)(2) as events giving rise to this

20  complaint occurred in this district, and 28 § 1391(d), by virtue of the Defendants' business

21  transaction with this dist., and under 326 US 310 the Defs meet the minimum contact rule.

21  4.  **Intradistrict Assignment:** San Francisco is the proper intradistrict assignment as a

22  substantial part of the events and omissions, leading to this lawsuit, occurred in this district.

23  **THE PARTIES:**

24  5.  **Plaintiff,** Steve Wilson Briggs, is a filmmaker, screenwriter, author and musician.

25  6.  **Defendant** Universal Pictures is an American film studio; NBCUniversal subsidiary.

26  7.  **Defendant** Sony Pictures is a subsidiary of the Japanese multinational Sony Corp.

27  8.  **Def** NBCUniversal is a multinational media conglomerate & Comcast subsidiary.

28  9.  **Defendant** Kevin Spacey is an American actor, and one of the men purportedly

COMPLAINT

3

| | |
|---|---|
| 1 | responsible for creating the now defunct social network TriggerStreet (TS). |
| 2 | 10. **Defendant** Ariel (Ari) Emanuel is a talent agent and co-CEO of WME-IMG. |
| 3 | 11. **Defendant** Matt Damon is an American actor and screenwriter. |
| 4 | 12. **Defendant** Ben Affleck is an American actor and screenwriter. |
| 5 | 13. **Defendant** Neill Blomkamp is a South African-born film director. He is, on |
| 6 | information and belief, a Canadian or South African citizen. |
| 7 | 14. **Defendant** Mordecai Wiczyk is the co-CEO of Media Rights Capital (MRC); |
| 8 | 15. **Def** Asif Satchu is the co-CEO of MRC, and is believed to be a citizen of Canada. |
| 9 | 16. **Def** Bill Block is CEO of Miramax (a subsidiary of beIN Media Group—a Qatari |
| 10 | company, owned by Al Jazeera) and a co-owner of Screenbid with Def Emanuel. |
| 11 | 17. **Defendant** Dana Brunetti is credited with the conception of TriggerStreet. |
| 12 | 18. **Defendant** MRC is a diversified global media company. It has many subsidiaries |
| 13 | and alternate names, including: MRC; MRC II LP; MRC II Distribution Company LP. |
| 14 | **RELATED CASES:** |
| 15 | 19. This lawsuit is related to Briggs v. Blomkamp, et al, No. C134679 PJH, a copyright |
| 16 | case, currently in appeals. No aspect of this suit is contingent on the outcome of that matter. |
| 17 | Certain new events, related to Briggs v Blomkamp, informs this matter; such as: |
| 18 | 1. Six (6) days after Briggs v Blomkamp moved to appeals, the Defs destroyed |
| 19 | essential case evidence (closing and destroying the entire social network website |
| 20 | TriggerStreet, without explanation); hence, the obstruction charge. |
| 21 | 2. As Plaintiff researched the Obstruction Of Justice charges against Defs, he found |
| 21 | multiple reports of Def Spacey travelling to abroad to give speeches and host parties |
| 22 | to attract foreign member to TS, in violation of the website's "Terms of Use", stating |
| 23 | TS was made solely for use in the USA; contributing to the *breach* charges, herein. |
| 24 | 3. As Plaintiff prepared to draft this Complaint, **Jeff Rovin** (the Defendants "expert" |
| 25 | witness from Briggs v Blomkamp) admitted on *The Sean Hannity Show* that he was |
| 26 | a professional "fixer" (hired to produce false stories for tabloids). This revelation, |
| 27 | coupled with the fraud contained in Rovin's report (in Briggs v Blomkamp) shores a |
| 28 | portion of the Subornation Of Perjury claims against the Defendants. |

COMPLAINT

4

## STATEMENT OF FACTS & ALLEGATIONS:

### Brief Case Overview

20.   The Defendants conspired to create and operate (for 12 years) a social network for screenwriters and filmmakers, known as **TriggerStreet** (referred to as **TS** in this Complaint). TriggerStreet (**TS**) was located at www.triggerstreet.com from 11/2002 to 07/2011, and at www.labs.triggerstreet.com from 07/2011 to 11/2014. The Defendants used TS to fraudulently access and acquire original film ideas. By using TS's 400,000+ members to review, judge, and rank the best work, the Defendants were able to peruse the very best scripts at their leisure, alter them slightly, then produce and market them, as their own.

21.   To entice the best undiscovered writers into joining TS and submitting their screenplays, the Defs published and rendered a contract comprised of false claims, deception and concealments. TS's "Terms of Use", "About Us" and "Security" pages claimed to employ "industry standard" security, and boasted that TS "encapsulates every aspect of the user's desires and needs", when, in fact, TS's security features were effectively non-existent. (Said TS websites pages "Terms of Use", "About Us" and "Privacy" are attached, respectively, as **Exhibit A**, **Exhibit B**, **Exhibit C**, and are incorporated by reference as if fully set out herein.)  The Defs conspired to remove all security features on the website. Any member could download any script, without the writer knowing the downloader's ID. Only if an accessor chose to write a script review would the writer be informed of the accessor's ID —but only the accessor's pseudonym (fake name) ID, while others users who downloaded the script without leaving a review, left no trace at all.

22. More astounding, in 2007, the Defs added a new "counter-security" feature, **without informing members,** whereby if a member—concerned about security—deleted his script from TS, the deletion would trigger the erasure of all access records. This was done to conceal the Defs accessing the Plaintiff's work (only posted in 2007). In May 2016, in an Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95) a former TS member recalled that this **"memory dump"** feature was added in 2007. (Said forum is attached as **"Exhibit D"** and incorporated by reference as if fully set out herein; see last entry, page 4.) In 2014, as Briggs v Blomkamp proceeded through discovery, the

COMPLAINT
5

1  Plaintiff contacted TS to ask for their records of all the members who accessed his work.
2  (Said email is attached as "**Exhibit E**" and  incorporated by reference as if fully set out
3  herein). TS replied that when his work was removed, all access records were erased.  (Said
4  email is attached as "**Exhibit F**" and is incorporated by reference as if fully set out herein.)

5      23.  TS falsely assured members that the site was intended solely for use in the USA.
6  But Spacey and Brunetti secretly marketed TS all around the world.

7      24.  Through secret and private business co-ownerships with key CEOs, in businesses
8  like Screenbid and MRC, Def Emanuel cultivated unethical relationships with Universal
9  Pictures, Sony Pictures, MRC, QED, etc. Thus, these companies would finance and
10  distribute almost any project Emanuel asked, ignoring due diligence and best practices.

11      25.  The Defendants' final illegal action occurred on Nov 6th, 2014, 6 days after
12  Plaintiff filed his Notice Of Appeal (Briggs v Blomkamp), when the Defs surreptitiously
13  closed TS, to destroy incriminating evidence —understanding the district court based its
14  MFSJ ruling on vacated law, rather than prevailing law—cited by Plaintiff. Thus, the case
15  was apt to be remanded for trial, where the Plaintiff would subpoena all site access records.

16                              NOTE:

17      26.  This Complaint reveals Def Ari Emanuel lead a conspiracy to misappropriate ideas
18  using TS and ProjectGreenlight.com (**Project Greenlight**), to market these ideas to his
19  business partners at Sony Pictures, MRC, Universal Pictures, parent NBCUniversal, etc.
20  Relevant to this, Def Emanuel has represented Defs Ben Affleck and Matt Damon for most
21  of their careers. Curiously, like Spacey, Affleck and Damon ran a screenwriter/filmmaker
21  website, Project Greenlight, from 2000-05 and 2015-16. Curiously, both sites used peculiar
22  language like *peer-to-peer,* and used *peer reviews* to weed out bad scripts. And curiously,
23  Spacey, Damon and Affleck were the only celebrities with screenwriter websites from
24  2000-2014.    In 2005, writer Joel Lamontagne sued Project Greenlight and **Harvey**
25  **Weinstein's** *Miramax,* alleging the TV series *Project Runway* (2005-present) was stolen
26  from a treatment he submitted to Project Greenlight. The allegedly stolen work became the
27  property of Universal Pictures' parent, **NBCUniversal**. Def Emanuel's shadowy projects
28  eventually becoming the property of Universal is a recurring pattern in this Complaint.

**BACKGROUND FACTS:**

THE SIX (6) PRIMARY DEFENDANT ACTORS:

**ARI EMANUEL** (DEFENDANT)

27. Defendant Ari Emanuel is the co-CEO of William Morris Endeavor (WME, aka WME-IMG). Prior to this, Def Emanuel was the CEO of Endeavor Talent Agency (1995-2009), where his aggressive manner and unethical business practices became notorious, inspiring the character *Ari Gold* in the HBO TV series "Entourage". Under Def Emanuel Endeavor was sued by Sandra Epstein for sexual harassment in 2002. (Emanuel is a close associate of many of America's most notorious sexual harassers.) Epstein suit also accused Def Emanuel of making racist remarks, and in 2014 WME was found guilty at arbitration of racial discrimination. WME-IMG seems to attract clients who share Def Emanuel's values; thus WME-IMG disproportionately represents aging white clients and *difficult* clients that other agencies avoid (Charlie Sheen, Russell Crowe), and clients who are more conservative, or politically unaware, than the rest of Hollywood.

28. November 20th, 2016, Def Emanuel traveled to New Jersey to congratulate President-elect Trump. Emanuel is also President Trump's former talent agent. Predictably, *The Apprentice* (starring Trump) was broadcast on **NBCUniversal**. Recently, *The Hill* (and others) reported that it was Def Emanuel who helped get the accused serial sexual predator elected President, by sealing the Miss Universe tape archives, so no further tapes of candidate Trump sexually harassing beauty contestants would be released. (Said "The Hill" article is attached as **"Exhibit G"** and is incorporated by reference as if fully set out herein.)

**ASIF SATCHU (Defendant)**

29. Defendant Asif Satchu was born in Kenya but moved to **Canada** when he was 6 years old. Satchu, like Def Blomkamp, is believed to be a Canadian citizen. (Canadian connections are a recurring feature in this matter.) Def Satchu is a co-founder of MRC, with Wiczyk. Def Satchu is the brother of **Reza Satchu**, an enormously successful Canadian businessman. Def Satchu and Reza, both graduated from Canada's **McGill** University. Def Satchu is something of a business and business-technology genius. **In 1999 Satchu co-founded SupplierMarket.com with Jon Burgstone** (Reza Satchu was also a heavily

1   invested partner). SupplierMarket.com facilitated the **international sales and distribution**
2   of software, bolts, nuts, fasteners, rubber and glass products, corrugated packaging, and
3   probably anything else. **Only 18 months later, Aug. 2000, Satchu and his partners sold**
4   **SupplierMarket for $950,000,000.** Def Satchu graduated from Harvard (MBA) in 1999.
5        **MORDECAI (MODI) WICZYK (Defendant)**
6        30.    Defendant Modi Wiczyk is an American born business man, co-CEO and
7   co-founder of MRC (with Defendant Satchu). Wiczyk is the **visionary** of this conspiracy.
8        31.   Around 1995, fresh out of college, Defendant Wiczyk began working at Summit
9   Entertainment, LLC. That was the first year Summit began producing and financing films
10  (prior, Summit had exclusively sold US films abroad), surely the vision of Def Wiczyk.
11       32.   Only four years later, in 1999, when Wiczyk was only 27, Summit Entertainment
12  made Wiczyk their Senior Vice President of Production and Acquisitions. That same year,
13  1999, Wiczyk sent out his now famous **memo** (more about this later), **which would make**
14  **him one of the most influential and sought after men in Hollywood**. Within a year, in
15  2000, likely on the order of Def Ari Emanuel, Def Wiczyk was **hired by** <u>Universal</u>
16  <u>Pictures</u> as Vice President of Productions, where Wiczyk served for 2 years, until January
17  2002, when Def Ari Emanuel made Wiczyk a partner at Emanuel's Endeavor Talent
18  Agency.  Def Wiczyk graduated from Harvard (MBA) in 1999.
19       **KEVIN SPACEY (Defendant).**
20       33.   Defendant Kevin Spacey is an Academy Award winning actor. His career was
21  floundering and at its nadir in 2000 when the conspiracy(s) detailed herein began, and
21  when, purportedly, he and Def Brunetti conceived of TS. Def Spacey, who dropped out of
22  Juilliard School in his sophomore year, has no known web-design skills. Seemingly,
23  Spacey's only value to the TS social network was as a high-profile, semi-likeable celebrity,
24  whose promise of "industry access and exposure" would lure the best undiscovered writers
25  to the website, to unwittingly surrendering their wares to the Defendants.
26       **DANE BRUNETTI** (Defendant)
27       34.  Defendant Brunetti has no known college education. He joined the US coast guard
28  in 1992, at 18 or 19. Brunetti met Spacey around 1998, while Brunetti was selling cell

COMPLAINT
8

1 | phones in New York. Brunetti soon became Spacey's partner and personal assistant. It is
2 | purported around the internet (including on Wikipedia) that Brunetti was responsible for
3 | designing TriggerStreet.com. That is one operational assumptions of this complaint.
4 | However, there is no evidence that Brunetti possessed any of the skills required to design a
5 | social network. The Plaintiff suspects Def Asif Satchu (who founded the internet-based
6 | marketplace SupplierMarket.com) may be the website's true designer and talent coordinator.

7 | **MRC**

8 | 35. MRC is a television and film studio, founded by its co-CEOs Defs Asif Satchu and
9 | Modi Wiczyk. MRC was started in 2003 with money provided by Def Ari Emanuel
10 | (although MRC often reports it was started in 2006 or 2007). Def Emanuel is a silent
11 | partner in MRC. Unlike most ethical companies MRC operates under many names. Likely,
12 | only Defs Emanuel, Satchu and Wiczyk know what these companies do. But such LLC
13 | companies are a hallmark of money laundering networks (see Dept of Treasury's FinCEN
14 | report). The Plaintiff is aware of 11 MRC companies: **MRC, Media Rights Capital; MRC**
15 | **II LP; MRC II Distribution Company LP (foreign based); MRC II Holdings, LP;**
16 | **Oaktree Entertainment, Inc. (a foreign stock business); MRC I Hedge Co, LLC; MRC**
17 | **II Capital Company, LP; MRC Sub Gp, LLC; MRC I Project Company, LLC; Asgari**
18 | **Inc.** Plaintiff believes that most of these *companies* are "shell" companies (fronts for illegal
19 | activity), existing to launder money and other transactions. Working in conjunction with
20 | Def Bill Block (**Miramax** CEO) and *Al Jazeera or beIN Media Group* (Miramax's parent),
21 | and perhaps with Satchu's Kenyan-based family, these shells may also be responsible for:
21 |    a. producing and selling ideas taken from TS to foreign markets (not for US release);
22 |    b. financing foreign films that utilize ideas taken from TS (not for US release).
23 |
24 | **Def Ari Emanuel's Relationship With Defendant Spacey:**
25 | 36. Defendant Ari Emanuel likely first met Defendant Kevin Spacey between 1987 and
26 | 1989, when both men were at Creative Artist Agency (CAA). In 1987 Def Ari Emanuel was
27 | a new CAA talent agent, working in **TV** casting. In 1987 Def Kevin Spacey, represented by
28 | CAA, was working in Los Angeles, and appeared in 9 episodes of the **TV** series "Wiseguy".

COMPLAINT

9

**Def Emanuel's Notorious Connection to Def Wiczyk & Satchu:**

37.   Defendant Ari Emanuel is a quiet partner in MRC. Thus, by casting WME-IMG actors in MRC films, Def Emanuel profits both as an agent, and as a studio owner. This arrangement is a conflict of interest, in violation of CA Labor Code 1700.39.

38.   In 2007, The New York Times published an article called *"Tilting The Balance of Power Toward Talent Agency Clients"* (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients" is attached as "**Exhibit H**" and is incorporated by reference as if fully set out herein.) The article states:

> ....representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist."According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

39.   Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

> ...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.
>    "For us, financing opportunities are always exciting and interesting,"said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"
>    Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that **no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.**

COMPLAINT
10

| | |
|---|---|
| 1 | **BACKGROUND FACTS (CONTINUED)** |
| 2 | THE 4 MAJOR EVENTS THAT SET UP THE CONSPIRACY(S) |
| 3 | 40.  The seeds of the Defendants unlawful actions were planted about two decades ago, |
| 4 | by **4 events:** two of these events occurring in 1995, two occurring in 1999. |
| 5 | 1. **In 1995** Def Ari Emanuel started Endeavor Talent Agency. |
| 6 | 2. **In 1995** Edgar Bronfman Jr. (CEO of Seagram's) bought Universal Pictures. |
| 7 | 3. **In   1999,**   Jerrol   LeBaron   copyrighted   a   revolutionary   screenwriter-to- |
| 8 | Hollywood-film-industry-professional   website   **Writers' Script Network.com,** |
| 9 | which went online in March 2000, changing its name to **"InkTip"** (inktip.com) in |
| 10 | 2003. |
| 11 | 4. **In 1999** Defendant Modi Wiczyk wrote  a revolutionary **memo**, titled "Another New |
| 12 | Ball Game", which sent Hollywood's powerhouses scrambling. Wiczyk's memo |
| 13 | would be discussed in  magazines and lounges for years to come. |
| 14 | |
| 15 | 41. These 4 events, **each** require a brief explanation to understand how they set the stage |
| 16 | for the Defendants' conspiracy(s). |
| 17 | **(1) Def Ari Emanuel Comes To Power As CEO Of Endeavor Talent Agency, 1995** |
| 18 | 42.   In 1995, Def Ari Emanuel would start his own talent agency, Endeavor Talent |
| 19 | Agency. Endeavor would soon become the fastest growing talent agency in Hollywood. |
| 20 | **(2) Edgar Bronfman Jr. Comes To Power At Universal Pictures, 1995** |
| 21 | 43.   In 1995, Canadian based "Seagram's" (the giant beverage company) bought |
| 21 | controlling interest (80%) of Universal Pictures, and Edgar Bronfman Jr. (Seagram's heir; |
| 22 | **Canadian**, graduate of **McGill** College) became owner and CEO of Universal Pictures. |
| 23 | Bronfman remained CEO of Universal Pictures even after Vivendi bought Universal in |
| 24 | 2000.  He stepped down as chief of Universal in 2001, BUT remained Vice-Chairman of the |
| 25 | Board (likely to insure that Def Emanuel's relationship to Universal remained in place) until |
| 26 | December 2003; by then Def Emanuel's role with Universal Pictures was well established. |
| 27 | 44.   To pay for Universal Pictures, Bronfman Jr. sold Seagram's stake in Dupont (for |
| 28 | $9-billion). Most analysts and Seagram's investors considered this a terrible business move. |

1  To make matters worse, Bronfman knew little about the film business. **NOTE:** Bronfman
2  was convicted of insider trading, in France, in 2011, receiving a 15 months suspended
3  sentence, and a €5,000,000 fine.

4     45. In 1995, Bromfman and Def Ari Emanuel may have represented big changes in
5  Hollywood, but the biggest change in Hollywood in 1995 was the advent of the **DVD**.
6  DVDs represented huge new opportunities for producers and film companies
7  —opportunities that would make movies FAR more profitable than ever before, but more
8  profitable for producers, NOT talent agents (adding fuel to Emanuel's drive to become a
9  producer and a studio owner).

10     **(3)  The Advent Of Writers' Script Network.com (InkTip.com), 1999**

11     46. In 1999, Jerrol LeBaron copyrighted his brilliant website *Writers' Script*
12  *Network.com*, (writersscriptnetwork.com), going online, March 2000, and changing its
13  name to **InkTip**, and its location to inktip.com, in 2003. Unlike all other screenwriter
14  websites at that time (which either just posted screenwriter agents' addresses, or just
15  allowed screenwriters to post loglines or synopses, with no ability to bring the writers to
16  the agents and filmmakers), LeBarons website promised something new. Based in Los
17  Angeles County, LeBaron went out and told Hollywood agents and filmmakers about his
18  website, and invited them to join and peruse the works of thousands of undiscovered
19  screenwriters. The site had great safeguards, designed to protect both the writers and
20  industry professionals. Writers Script Network.com required all users to use their real
21  names. Writers could not read other writers' work, as that would only reduced the writers'
21  safety. However, after registering, the **industry professionals** could freely read any logline
22  (a short description, 60 words or less) on the website. If a professional wanted to read
23  more, they could click on a link to read a synopsis—and immediately the screenwriter
24  would receive notification of who had accessed his work, when, and from where. If the
25  professional wanted to read the entire script, he/she would then need to contact the writer
26  and request a script. Writers Script Network.com kept all records of access. **LeBarons's**
27  **site was the new online industry standard** (where there had been no standard, rules,
28  safety, or security for screenwriters ); flawless in conception, safety and transparency.

### (4) The Memo, 1999

47.   In 1999, only 27 years old, Def Mordecai (Modi) Wiczyk, the new Senior Vice President of Production and Acquisitions at Summit Entertainment, LLC, sent out a **memo** titled "Another New Ball Game". That memo sent the unethical Hollywood's establishment scrambling after massive new profits. Wiczyk's memo would be discussed in magazines and lounges for years. Within a year, in 2000 (likely at Def Ari Emanuel's bidding) **Universal Pictures** would steal Wiczyk away from Summit, making him VP of Productions. Two years later, Def Ari Emanuel made Wiczyk his **partner** at Endeavor Talent Agency.

48.   In 2007, *Slate* remembered "the memo", in an article called "How An Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate" article is attached as "**Exhibit 1**" and is incorporated by reference as if fully set out herein.). Writer Kim Masters wrote:

> ...The memo predicted the decline of the studios, with filmmaking talent as the beneficiary. He also predicted that a management company with a lot of big stars would start to produce and own films. "The most immediate and pressing challenge would be to get the studios to carry the product," he said. The likelihood of a studio boycott was remote, he said, because "whichever studio was suffering at the time would probably break ranks in the name of short-term self-preservation." Hmm.
>
> Michael Ovitz eventually tried to launch such a management company and failed. But Wiczyk's memo said the agencies could also carry the change. **"A similar structure could be created which complies with the conflict-of-interest laws,"** Wiczyk wrote. "If [a] fund was created as a stand-alone entity and the agency had an arms-length service contract, they could avoid conflict-of-interest violations... Admittedly this is a delicate issue and a tough deal to pull off, but it's certain someone would try it." Why? The potential for enhancing agency commission was "too rich to ignore." **In fact, he said, an agency could double its annual revenues.**

49.   Wiczyk's psychopathy is on full display in those final lines of the article, as he enthusiastically implies it is reasonable to behave without ethics —if the profits are "too rich to ignore." But Wiczyk's prediction that "...it's certain someone would try it" would soon prove correct.

50.   But who would want to wander with Wyczyk into such ethically questionable water?

## THE ENDEAVOR/UNIVERSAL/MRC DEFENDANTS:

### ARI EMANUEL AND HIS SECRET RELATIONSHIP WITH UNIVERSAL PICTURES; EMANUEL UNITES WITH ASIF SATCHU AND MODI WICZYK

51. In 1999, Def Ari Emanuel knew producers made the REAL money in Hollywood. But, as a talent agent, he couldn't get in the action—not legally (or not with his name on the product), due to California's conflict of interest laws.

52. But Def Emanuel saw an opportunity.

53. Defendant Ari Emanuel had a **distribution problem**. He represented many directors, writers and actors, who sometimes decided to make independent and experimental films, only to discover later that their films couldn't get national or global distribution because the distributors thought the films weren't marketable. Thus, many of these films died early deaths.

54. Bronfman Jr., on the other hand, had a **talent problem**. Bronfman Jr. knew the importance of getting marquee names on films. Big American studios crank out about 17 films a year. In this haste, sometimes the studios commit to bad screenplays that no big actors will commit to, thereby dooming the film. But just one or two big names attached to these *inferior* films could increase their returns by tens of millions of dollars.

55. Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it. Bronfman Jr. came to power in 1995 with Universal in 4th place among the big six studios (20 Century Fox, Disney, Paramount, Warner Bros., Sony Pictures, Universal Pictures). But only one year later, in 1996, Universal was in last place. And last again in 1997. And in 1998, even worse: last place, and Universal had one of its worst years ever, with only a 5.9% market share. Stockholders were restless. (See **Exhibit J.**)

56. In this tough time, Def Ari Emanuel approached Bronfman with a proposal.

57. Def Emanuel offered to put special effort into Universal Picture films, give Bronfman Jr. his best business advice, and ask his actors, writer and directors to give preference to Universal Pictures films. Emanuel also likely offered to take a reduced agent's fee. **In exchange** Def Ari Emanuel likely received a percentage of the films, and/or a generous share of Seagram's (Universal's parent) stock, but no film credit), and an

COMPLAINT
14

1   agreement that Universal Pictures would distribute, and/or provide production money for,
2   any reasonably viable film Def Emanuel brought to Universal Pictures.

3   58. The agreement was made late 1998.

4   59. In 1999 Universal pictures would have their best year since Bronfman arrived,
5   climbing to 3rd place, with a 12.7% market share. That was 1999 —the same year Def
6   Modi Wiczyk wrote his memo.

7   60. Def Ari Emanuel read the memo.

8   61. Bronfman Jr. surely read the memo. In fact, two years after Wiczyk wrote the memo,
9   in 2001, Bronfman's **Universal Pictures** made Def Wiczyk their vice President of
10  Productions. (An article about Universal hiring Wiczyk is attached as "**Exhibit K**" and is
11  incorporated by reference as if fully set out herein.)

12  62. And a year after that, in 2002, Def Emanuel would hire Def Wiczyk away from
13  Bronfman Jr., to make Wiczyk a **partner** at Endeavor Talent Agency.

14  •   63. But Wiczyk had been Vice President of **productions** at Summit Entertainment,
15  AND Vice President of **productions** at  Universal Pictures. Wiczyk was a **producer**. Why
16  would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel
17  was secretly going into the production business, with MRC and Universal Pictures.

18  64. When Def Ari Emanuel stole Wiczyk away from Universal Pictures there were no
19  hard feelings between Def Emanuel, Bronfman and Universal Pictures, and nothing
20  changed in their arrangement. Def Ari Emanuel continued to provide the same talent and
21  producorial services for both MRC and Universal Pictures. And although Bronfman left
21  Universal a year later (2003), Def Emanuel continues to do favors for Bronfman and his
22  Universal "family" to this very day (e.g. Def Emanuel and WME-IMG represent Bronfman
23  Jr's daughter, Hannah).

24                    **Wiczyk's Memo Inspires A Conspiracy**

25  65. The driving force behind Defs Emanuel's, Wiczyk's and Satchu's involvement in
26  this conspiracy was to create the film production system outlined in Wiczyk's **memo**, to
27  increase—maybe even **double**—profits. The conspiracy required maybe 4 players, with the
28  right talents. Def Emanuel had connections to all the studios, and access to huge stars; Asif

1  Satchu was a creative business force who specialized in distribution and networking; Modi
2  Wiczyk was a proven business, financing, and film production prodigy. They had almost
3  everything they needed—except good screenplays. But as a new "questionable" company,
4  established writers were not inclined to work with this unscrupulous band.

5      66.   A film production start with acquiring a screenplay, a "property". The Defendants
6  knew that. They also knew good screenplays are hard to find, cost good money, and are a
7  risky investment. A bad director could ruin a great script, and even the best writers
8  sometimes wrote bad scripts. In 2000 Def Wiczyk helped sell his brother's (Roce Wiczyk)
9  screenplay to his former employer (Summit Ent.). But the script was weak, thus never
10 developed, and Roee Wiczyk never sold another script. "Variety" reported on this script sale
11 in 2000. (Said article is attached as **Exhibit L**" and is incorporated by reference as if fully
12 set out herein.) As a business man, Wiczyk could sell anything —he sold his brother's script
13 idea without even having a script name. But now, operating as film producers and a *studio*,
14 without an **actual** *good* script, or some good ideas, they couldn't get any project started.

15     67.   The Defendants needed scripts, but they wanted  to reduce their risks.

16     68.   Defs Emanuel, Satchu and Wiczyk knew ideas are not copyrightable; only unique
17 arrangements of ideas are copyrightable. If the Defendants had a method to access good
18 writers' work, they could extract the best of those ideas, then pay their own writers to turn
19 them into "new" screenplays, then produce and market those derivatives, as their own.

20     69.   The L.A. based Defendants were aware of WritersScriptNetwork.com. As prominent
21 "industry" insiders, they had likely even received a call or email from Jerrol LeBaron. They
21 wanted something like WritersScriptNetwork.com, but **without** the good security features.

22

23              **THE TRIGGERSTREET DEFENDANTS**

24 SPACEY'S CAREER SPUTTERS; SPACEY MEETS BRUNETTI; CONCEPTION OF
25 THE TIGGERSTREET SOCIAL NETWORK; TRIGGERSTREET CONSPIRES W/ MRC

26     70.   In 1994 Def Spacey learned Warner Bros intended to make a movie  about the life of
27 Bobby Darin (eventually called "Beyond The Sea"). This was Spacey's secret dream role.
28 He offered to play the leading role, but the producers refused, believing Spacey was too old.

71.  In 1995, Def Spacey's career soared with *Usual Suspects* and *Seven*. But in 1996 and 1997 Def Spacey was back to NOT getting solid leading-man roles.

72.  This likely inspired Def Spacey to form his production company, "Trigger Street Productions", to make quality films with himself cast as the lead.  But for the next 7 years his production company floundered. The problem was getting a good screenplay.

73.  It is reported that around 1998 Def Spacey met Def Dana Brunetti, who soon became Spacey's personal assistant.

74.  Although in 1999 Def Spacey won an **Academy Award** for Best Actor (American Beauty), 1999 would mark the beginning of a very difficult period of Def Spacey's career (1999-2003). His production company would go 3 years without making a film (Jan 2000 to Jan 2003). And worse, for some reason Hollywood would not invest much money in any movie with **Kevin Spacey** in a leading role, **his films budgets were far below the Hollywood average** (the average Hollywood budget in 2000 was about $60 million): 1. American Beauty, 1999, **$15 million**; 2. The Big Kahuna, 1999, **$7 million**; 3. Ordinary Decent Criminal, 2000, **$12 million**; 4. Pay It Forward, 2000, **$40 million**.

75.  Def Spacey's difficulty consistently getting good roles, then, was likely due to his terrible reputation around Hollywood as something of a hustler. In 1999, actor Val Kilmer explained in a "Mr Showbiz" interview that in the 1970s Kevin Spacey, who was then a young college student, tricked Kilmer's father out of $18,000 for college tuition —but Spacey, according to Kilmer, kept the money, dropped out of school, and never repaid Kilmer's father. (Said "Mr. Showbiz" article is attached as "**Exhibit M**" and is incorporated by reference as if fully set out herein.)  Stories like Kilmer's, and a tabloid photo journal of Def Spacey participating in a public indiscretion, contributed to Def Spacey's trouble.

76.  But amid all of these struggles, somehow in 2000, Spacey was able to secure the film rights to his dream project -**Bobby Darin's life story**. But since Def Spacey had no production funding, he would have to wait almost 4 more years to make his movie.

77.  It's possible that during these tough times, Spacey and Brunetti looked around online for affordable scripts for Spacey's production company to film. And maybe then they stumbled upon *Writers Script Network.com*, which inspired them to create TS... Then, this

1   unlikely pair—a college dropout actor whose career was on life support, and a cellphone

2   salesman—teamed up to create a massive social network for screenwriters and filmmakers.

3   And soon Ari Emanuel learned about the site and asked Spacey to make some

4   modifications: relaxing security, and making access private and untraceable. That could be

5   how TS was created. It makes little difference to the conspiracy that followed.

6       78.   However, the Plaintiff believes TS was formed in a conspiracy conceived by Def

7   Ari Emanuel, to enrich himself and his conspirators. Elysium, alone, earned $286,000,000

8   worldwide theatrically, and should have earn another $570,000,000 in home entertainment

9   and TV, (typically, movies earn twice their theatrical total in home ent., TV, and auxiliary

10   sales), for a total of **$856,000,000** —almost a billion dollars. **This is why setting up TS**

11   **and Project Greenlight were so important to Def Ari Emanuel. One good script can**

12   **easily earn a billion dollars, and one big TV show can earn far more than that.**

13

14                **THE DEFENDANTS' CONSPIRACY BEGINS:**

15

16       79.   In 2000, shortly after Def Emanuel discovered Writers Script Network.com, Def

17   Emanuel planned his own screenwriter/filmmaker website, with minimal or no security

18   features. He would use his clients, Def Matt Damon and Ben Affleck, as website spokesmen

19   and alleged *conceivers*. In August 2000 Project Greenlight was born. (An Internet Archives

20   screenshot of projectgreenlight.com, showing the origin time of Project Greenlight, is

21   attached as "**Exhibit N**" and incorporated by reference as if fully set out herein.)

21       80.   Then misfortune struck Universal Pictures in 2000, and  Def Ari Emanuel seized

22   the occasion to launch a **second** website, allegedly conceived by Defs Spacey and Brunetti.

23       81.   In 2000, Universal Pictures was in a bind. They were just a few months away from

24   beginning to film "K-PAX" but they didn't have a leading actor (after Will Smith and others

25   dropped out). Smith, and other actors and directors (with integrity) were perhaps dropping

26   out due to rumours that Argentinian film director and screenwriter, Eliseo Subiela, learned

27   about writer Gene Brewer's 1995 book "K-PAX" and planned to sue Brewer and Universal

28   Pictures for copyright infringement of Subiela's 1986 film "Man Facing Southeast".

1    82. But Universal Pictures, not worried about a small director from Argentina suing,
2    decided to push forward, film, release, make a fortune, and fight Subiela in court later.

3    83. By mid 2000, with little time to find a leading man, Universal Pictures was
4    desperate enough to consider casting Def Kevin Spacey in the leading role.

5    84. Def Ari Emanuel could have just asked Spacey to take the leading role. Spacey
6    would have leaped at the chance. But Spacey wasn't an Endeavor client, so Def Emanuel
7    wouldn't receive his casting fee. Def Ari Emanuel was a businessman. As such, even
8    though he needed a favor from Spacey, he wasn't going to just give Spacey a leading role,
9    he wanted something in return. Def Ari Emanuel knew Def Spacey's career was in trouble.

10   85. Def Ari Emanuel approached Def Spacey to ask him about starting or endorsing, a
11   screenwriter/filmmaker social network; a social network with little or no security features.
12   The conversation likely started with Def Ari Emanuel asking how Spacey's career was
13   going. Def Spacey likely explained his recent career setbacks, and his hope to one day film
14   Bobby Darin's life story. He may have explained that he had recently secured the rights to
15   his Bobby Darin film (Beyond the Sea), but had no funding to shoot his dream film.

16                                   **Quid Pro Quo**

17   86. Upon hearing about Spacey's career troubles, Def Emanuel made Def Spacey and
18   Brunetti an offer: (1) he asked Defs Spacey and Brunetti to design a social network so that
19   ALL user could access ALL screenplays, anonymously, with few security safeguards (it is
20   possible/probable that Def Asif Satchu facilitated the website design); (2) Def Emanuel also
21   may have asked Spacey and Brunetti to include a counter-security feature whereby if a
21   screenplay was removed from the website all access history would also be erased (**although**
22   **the Defs seem to have added this second features in 2007, shortly before accessing the**
23   **Plaintiff's work**). The Plaintiff believes that in exchange for agreeing to operate such a
24   social network, Def Ari Emanuel promised Defs Spacey and Brunetti a few things in return:

25      1. Spacey would star in K-PAX, a film with a solid $68 million budget;
26      2. Def Ari Emanuel would finance Spacey's production company to make Def
27         Spacey's dream film, Beyond the Sea;
28      3. Def Emanuel would help Spacey's production company arrange financing and

1     distribution (as needed) for the life of the social network;

2     4. Def Emanuel would introduce Spacey and Brunetti to the financial and distribution

3        partners necessary for their production company to succeed;

4     5. Def Emanuel would try to find Spacey a very meaningful—maybe even a career

5        defining—role.

6

7     87.  The agreement was made.

8     88.  Thus, September 2000, only <u>one month after the birth of Project Greenlight</u>, **TriggerStreet.com (<u>TS</u>) was born.** (Internet Archives screenshot of projectgreenlight.com, showing the origin time of Project Greenlight is attached as **"Exhibit O"** and incorporated by reference as if fully set out herein.)

9     89.  But TS would remain a closed, private, and inactive site for 2 years, not having its official "launch" party until 2002. This was done to keep TriggerSteet from competing with Project Greenlight. This wait also allowed TS to learn from Project Greenlight's mistakes.

10     90.  In November 2000, as agreed, Spacey began filming KPAX. When the film was released it would be the first smoking gun in this conspiracy:

11     • 91.  KPAX was released Oct 2001. It would be the first time **Universal Pictures EVER** cast Kevin Spacey in a leading role (in fact, Universal had only ever cast Spacey in **one [1]** film, a **supporting** role, ten years prior, in 1990, in "Henry & June"). (*Spacey was most commonly cast in **Warner Bros** films and independent films.) <u>Casting Spacey to star in K-PAX, a $68 million film, at such a low point in Spacey's career, was almost inconceivable.</u> **Def Spacey wouldn't star in a film with a budget over $40 million for 5 more years** (Superman Returns). Spacey would only appear in one other Universal Pictures film, 2 years later, *The Life of David Gale*—originally a Warner Bros (Spacey's stable) property that Universal Pictures optioned. Spacey just came with the deal.

12     • 92.  A month after K-PAX was released, in November 2001, director/writer **Eliseo Subiela (via Jason Laskay) sued Universal Pictures**, Gene Brewer, et al, for plagiarizing his film *Man Facing Southeast*. The suit was eventually withdrawn when Subiela and Laskay could no longer afford to litigate against a giant corporation like Universal Pictures.

COMPLAINT
20

**TS LAUNCHES, NOVEMBER 2002**

93. After giving Project Greenlight two years to gain traction, November 2002, the Defendants prepared to launch TS. To attract the best undiscovered writers, the Defendants planned to generate "buzz" by throwing 3 huge TS "launch parties": one in New York, one in Los Angeles, and one in **London**. (A photo of Kevin Spacey at the TS London Launch party is attached as "**Exhibit P**" and is incorporated by reference as if fully set out herein.) While in Britain, Def Spacey did many interviews about TS. The Guardian featured a piece called "Cyber Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's well-rehearsed lines. (Said Guardian article in which Def Spacey went to London to discuss TS is attached as "**Exhibit Q**" and incorporated by reference as if fully set out herein.) Writer Sean Clarke wrote:

> Spacey tells an anecdote about the original idea for the site, which is essentially Brunetti's brainchild. He says they "came up with a sketchy plan, which at the time..." and chuckles wryly, on which cue Brunetti take up the story "... which at the time, we thought was great." They both shake their heads ruefully. Later, I watch as the pair address a press conference, they repeat the story, with exactly the same pauses, the same chuckle, the same interruptions. It's beat-perfect, like a Mamet script.

94. And to generate even more buzz, before the website was launched, Budweiser announced their corporate sponsorship of the TS social network.

95. Along with the sponsors, parties and interviews, to help repair Def Spacey's damaged reputation, the TS website posted a heartwarming story that Spacey started his new social network "to help undiscovered writers and filmmakers get industry access and exposure."

96. **TriggerStreet.com was "launched", and went online, November 2002**

- 97. Def Spacey held a New York TriggerStreet **launch party** on Nov 11th, 2002.
- 98. Def Spacey held a Los Angeles TS **launch party** on Nov 18th, 2002.
- 99. Def Spacey held a London TS **launch party** on Nov 26th, 2002.

**After Triggerstreet Officially Launched, Nov 11th, 2002,**

**The Following Events (Connecting The Defendants) Occurred:**

100.  Shortly after TS's official launch (November 2002), Def Spacey would receive three (3) huge payments from Defendants Ari Emanuel and Universal Pictures (Def Spacey would receive many other unlikely benefits—payments—during the subsequent 12 year lifespan of TS).

- 101.  In <u>February</u> 2003, 3 months after TS launched, <u>**Universal Pictures**</u> distributed Spacey's film "**The Life of David Gale**" (again, originally a property of Spacey's home studio, Warner Bros). This would be the last time Universal Pictures would be involved in a Spacey film (to the date of the filing of this Complaint). Thus, the only two Universal Pictures films featuring Spacey as a lead are *K-PAX*, and *The Life of David Gale*.

- 102. That same month, <u>**February of 2003**</u>, Spacey's production company would magically get money to release and distribute its first movie in 3 years: "United States of Leland". The film would only be released in 14 theaters, losing millions, and bringing in only $344,000. Likely, Universal Pictures wouldn't put their name on the film, because after two bad years, Universal was back in 5th place (second to last place), and they didn't want *United States of Leland* to move them into last place.

- 103.  That same month, again, <u>**February 2003**</u>, it was announced that Production for **Beyond the Sea** (<u>Spacey's</u> <u>dream</u> <u>film</u> <u>about</u> <u>Bobby</u> <u>Darin</u>) was being fast-tracked with Spacey as lead actor.

104.  Suddenly, in the nadir of Defendant Spacey's career, inexplicably Hollywood was showing Def Spacey tremendous love and support—when 4 of his previous 5 films were major money losers.

Footnotes:

105.  Shortly after TS launched, in **2003**, Ari Emanuel gave Asif Satchu and Mordecai Wiczyk financing to start MRC.

106. **December 17th, 2004**, *Beyond the Sea* was released. It would be Spacey's **greatest failure**; costing $25 million, but only earning $8.4 million; losing over $16,000,000.

COMPLAINT

22

## Additional Facts Regarding TS And The Defendants

- 107.  Spacey's production company made no films for 3 years, January 2000 to January 2003: Ordinary Decent Criminal (Jan 2000, direct to DVD in USA), and United States of Leland (Jan 2003, released in only 14 theaters).

- 108.  Since TS launched, Def Spacey's production company has made 22 films.

- 109.  May 2005, 2.5 years after TS launched, Project Greenlight was effectively dead (no new contests for filmmakers or screenwriters). Killed by the success of TS. Although, oddly, the Project Greenlight website remained open, but inactive —no new contests, no new submissions accepted; just an open, inactive website, until 2015.

- 110.  In 2006 Spacey held a TriggerStreet "RE-launch" party in Los Angeles.

- 111.  2007, Plaintiff's screenplay, Butterfly Driver, was posted and accessed on TS.

- 112.  2007-2009 TS secretly joined Bud.TV (Budweiser TV), without informing members or revising its Term of Use page. In a 2007 Anheuser-Busch announced it was launching Bud.TV with TriggerStreet.com providing programming. (Said Bud.TV news release is attached as "**Exhibit R**" and incorporated by reference as if fully set out herein.) Curiously, Bud.TV's Wikipedia page shows Defs Matt Damon and Ben Affleck (Project Greenlight), and Kevin Spacey (TS) all provided Bud.TV programming. (Said Wikipedia article is attached as "**Exhibit S**" and incorporated by reference as if fully set out herein.)

- 113.  Feb 2009, the BBC reported Def Spacey hosted the Mofilm Film Festival, in Spain, where he boasted of TS's **"400,000 members around the world."** (Said BBC article is attached as "**Exhibit T**" and is incorporated by reference as if fully set out herein.)

- 114.  On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency (ETA) merged with the William Morris Agency (WMA), creating William Morris Endeavor. **17 days later**, May 14th 2009, **after about 20 years** <u>with</u> <u>the</u> <u>William</u> <u>Morris</u> <u>Agency</u>, Def Spacey signed with CAA (Creative Artist Agency). Def Spacey did so to keep TS members (and any observing regulatory authorities) from becoming suspicious of his link to Def Ari Emanuel through TS. (A New York Times article about the April 2009 merger of WMA and Endeavor is attached as "**Exhibit U**" and is incorporated by reference as if fully set out herein.)  (A May 2009 Variety article about Def Spacey leaving WME is attached as

COMPLAINT
23

1  "Exhibit V" and is incorporated by reference as if fully set out herein.)

2  • 115.  May 2010, "Deadline Hollywood" reported Defendant **Universal Pictures**

3  and Defendant Media Rights Capital (MRC) announced a 20 picture, 5-year production and

4  distribution deal. (Said "Deadline Hollywood" article is attached as "**Exhibit W**" and is

5  incorporated by reference as if fully set out herein.) Thus, MRC's (a company co-owned by

6  Defendant Ari Emanuel) first mega-deal would be with **Universal Pictures**.

7  • 116.  On March 15th, 2011, **Netflix** and Def **MRC** (owned by Defs Emanuel,

8  Wiczyk and Satchu) announced their mega $100 million dollar 2-season deal to produce the

9  new series *House of Cards*, starring Def Kevin Spacey, in his career defining role. Quietly, a

10  few months later, in July 2011, with the role of a lifetime secured, Def Spacey would move

11  his social network, TS, to http//www.labs.triggerstreet.com, and begin to use the web

12  address TriggerStreet.com as his production company's site.

13  • 117.  August 2013, the film Elysium (an infringement on the Plaintiff's work) was

14  released internationally. The Plaintiff then filed his copyright infringement suit against the

15  Defendants, October 2013.

16  • 118.  November 6th, 2014, 6 days after the Plaintiff filed his Notice Of Motion of

17  appeal, Defs Spacey and Brunetti closed and destroyed the TS social network.

18  • 119.  In 2015, almost immediately after TS closed, Project Greenlight (which had

19  been **dead for 10 years**, came back to life, with a new HBO TV show, airing fall of 2015.

20  • 120.  July 2016, HBO announced the Project Greenlight TV show was cancelled.

21  • 121.  In 2016, with the cancellation of the TV show *Project Greenlight*, and with

22  the closing of TS—with no way to gain access to original screenplays to misappropriate—

23  ProjectGreenlight.**com** went active, again. **After 10 years of online inactivity**, Def Matt

24  Damon, Ben Affleck and ProjectGreenlight.com began seeking new screenplays again.

25  • 122.  In 2015, Def Dana Brunetti (former cellphone salesman and Spacey's personal

26  assistant) produced his **first** solo film, without Kevin Spacey, *50 Shades of Grey* —payment

27  for his involvement in the TS conspiracy. *50 Shades of Grey* was **Distributed** **by Universal**

28  **Pictures**. (A Wikipedia article showing the producers and distributors of 50 Shades of Grey

     is attached as "**Exhibit X**" and is incorporated by reference as if fully set out herein.)

COMPLAINT
24

**SONY PICTURES EMAIL LEAK EXPOSE DEF ARI EMANUEL'S SECRET UNIVERSAL PICTURES TIES,  HIS UNLAWFUL RELATIONSHIPS WITH SONY PICTURES' CEO (M. LYNTON), & HIS BULLYING, THUGGISH METHODS**

123.   Further confirming all allegation herein, in 2015 Wikileaks released thousands of Sony Pictures emails, which had been previously released in 2014, when North Korea hacked and published thousands of Sony's emails. Within days hundreds of respected news agencies carried the story —The NYTimes, LATimes, Hollywood Reporter, all reported the juicy details—and the juiciest story was the story of how Sony Pictures lost -or passed on- "Steve Jobs", the movie.

124.   All of the reports are similar: the emails provide an inside view of bunch of super-rich Hollywood producers, writers, and directors negotiating the production budget of the film "Steve Jobs", until the deal went bad and Sony gave up on the film. And right in the eye of the storm is Def Ari Emanuel. (An articles from "Mashable.com" about said "Steve Jobs" film emails is attached as "**Exhibit Y**"and is incorporated by reference as if fully set out herein.)

125.   A few of the celebrities captured on Sony Pictures email/text leak, at times, behaved poorly, but no one behaved worse than, Def Emanuel. Brazen and thuggish, we see Def Ari Emanuel berate Sony Pictures' Chairman Amy Pascal, with impunity. And when the other Sony execs learned of this, they only called Def Emanuel a *bully*—behind his back. No one dared to confront Def Emanuel. But more surprisingly, through a tiny sliver of Def Ari Emanuel's emails (just those going into, or out of, Sony Pictures) we learn:

1. Def Ari Emanuel is a major film producer —in conflict with his role as a talent agent, and in violating California labor law which forbids employers (a producer) from charging employees (his actors) fees to be hired—perhaps an even more significant conflict of interest than Def Emanuel's partnership in MRC II LP.

2. Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures CEO and Chairman) are secretly business partners: co-owners in the company *Screenbid*.

3. Ari Emanuel is also a film financier, or executive producer (a person who provides or finds money to make films).

4. Def Ari Emanuel also arranges peripheral services for Sony Pictures (and others), like making deals with Hasbro Toy Co. for Sony Pictures (for Spider-Man 2 & Minions action figures?).

5. Whenever necessary, **Universal Pictures** will distribute ANY film for Ari Emanuel.

### "STEVE JOBS" EMAILS CONFIRM DEF ARI EMANUEL
### IS SECRETLY A MAJOR FILM PRODUCER, AND THE TRUE
### PRODUCER OF "STEVE JOBS" —NOT SCOTT RUDIN

126. Through the Sony "Steve Jobs" email trail we see the "Steve Jobs" negotiation go on for about 8 months, then it begins to fall apart on October 16th, 2014, after Sony Pictures' President of Business Affairs, Andrew Gumpert, sends Sony Pictures Chairperson Amy Pascal, film producer Scott Rudin, Def Ari Emanuel, and WME co-CEO Patrick Whitesell a financing offer, which the filmmakers felt was too low. October 18th, 2014, two days after Gumpert's low offer, Scott Rudin, angrily responds:

> 2014-10-18 16:09:38  Re: wwbo bumps/jobs  From: Scott Rudin
> <sr@scottrudinproductions.com>  To: pascal, amy
> gumpert, andrew  aemanuel@wmeentertainment.com
> pwhitesell@wmeentertainment.com

**SCOTT RUDIN:**
> "You have NO risk in the movie but WE should have risk?
> You lay off every cent except what you choose to keep and WE
> should then also fund you --- that's how this should work?
>           I cannot believe you're serious. What idiot would make
> this deal? The presumption that five Oscar winners would be
> desperate enough to give up all value for their services and then
> also risk the baseline bargain-basement fees on top of it is beyond
> comprehension.
>           Every single movie like this that we have made for you
> has worked. And you think this is fair?"

127. At Rudin's words, Def Ari Emanuel, who purports to the world that he is just a talent agent, would then take over the email exchange —seemingly eager to bully a woman.

> On Oct 18, 2014, at 9:15 AM,  From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com>  To: pascal, amy

sr@scottrudinproductions.com   gumpert, andrew
pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
    "This offer is fucking bull shit. Give us the movie back. You you guys
    in the business. No other studio would even ask for this. Pass"

128.   Def Ari Emanuel immediately establishes and retains dominance and control of the matter for the remainder of the negotiation, and Scott Rudin would remain quiet and subordinate to Def Emanuel. But the key detail in this email is that Def Emanuel has the authority to say "Pass", meaning: we choose NOT to do business with you, we will find another partner. No mere talent agent can usurp that power from the producer. Scott Rudin put Ari Emanuel on that email chain because Ari Emanuel is the true producer.

129.   The exchange goes on. Amy Pascal writes:

On Oct 18, 2014, at 10:18 AM  From: Amy_Pascal@spe.sony.com
To: aemanuel@wmeentertainment.com
sr@scottrudinproductions.com gumpert, Andrew
pwhitesell@wmeentertainment.com

**AMY PASCAL:**
    "Can we please deal with this Monday
    Maybe we all get in a room and close it up"

130.   But Def Ari Emanuel will not be silenced by Ms Pascal's request to wait until Monday. He replies five minutes later::

On Oct 18, 2014, at 10:23 AM,  From: Ariel Emanuel
<AEmanuel@wmeentertainment.com> To: pascal,
amy sr@scottrudinproductions.com  gumpert,
andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
    "Whatever
    **You guys ask us to find financing. Scott, Patrick and myself get
    Modi and we still get no respect. Amy, this is not what you want to
    hear - but this NEVER happens and any other studio. In fact they
    then would go out of their way to make a proper deal.
    Even Harvey.
    Monday is fine."**

131.   With that statement **Def Ari Emanuel admitted he found film financiers for "Steve Jobs", which is a strictly a producer's, or an executive producer's job.** Def Ari

COMPLAINT

27

1  Emanuel also generously (and falsely) shares credit with Rudin and Whitsell for getting

2  Modi Wiczyk to help with financing, to make Rudin and Whitsell appear more significant to

3  the process. Again, Defs Modi Wiczyk and Ari Emanuel had been a business partners since

4  2002 (at Endeavor, as well as in MRC). Getting Def Modi Wiczyk involved was entirely

5  Def Ari Emanuel's doing. Amy Pascal responds to Def Emanuel's provocation:

6          On Oct 18, 2014, at 10:51 AM, From: Amy_Pascal@spe.sony.com
7                          To: aemanuel@wmeentertainment.com
                    sr@scottrudinproductions.com gumpert,Andrew
8                          pwhitesell@wmeentertainment.com
9      **AMY PASCAL:**
           "arithat is totally unnecessary we are in a negotiationwe have all
10         been doing this a long timewe want to make moneyyou want to
           make money for yourselves andyour clientsthis has nothing to do
11         with respect and to be fair and its a credit to the movie that scott
           put together there are more financing partners  than we know
12         what todo with here....thats not the issue...we are the only major
13         studio that even tries to make thesekind of movesdont make it
           harder than it isthe tone is really uncalled for  and unfairand
14         doesnt help get things doneamy"
15

16     132.    Through all of this, Scott Rudin never commented or told Def Ari Emanuel to

17  disengaged. That is not his place. Ari runs the show. Def Ari Emanuel replies:

18         2014-10-18 10:58:41  Re: wwbo bumps/jobs From: Ariel Emanuel
19              <AEmanuel@wmeentertainment.com>  To: pascal, amy
                       sr@scottrudinproductions.com   gumpert,
20                  andrew pwhitesell@wmeentertainment.com
21     **ARI EMANUEL:**
           "Ok not true. Other studios make these movies"
21

22     133.    Def Ari Emanuel was eluding to Universal Pictures, who would produce any film

23  Def Emanuel suggested. Texting stopped for 7 or 8 hours, until Def Ari Emanuel resumed.

24         2014-10-18 16:20:47 From: aemanuel@wmeentertainment.com
25              To: gumpert, andrew sr@scottrudinproductions.com,
                    pwhitesell@wmeentertainment.com,  pascal, amy
26     **ARI EMANUEL:**
           "In the real world when some one either risks something or gives something
27         up they get something in return. You guys seem to think we should be
28         honored just to be in business with you based on your offer. Why?"

134.   After this, the negotiation disintegrated over the next 4 weeks. The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:

> 2014-11-14 22:57:02 From: aemanuel@wmeentertainment.com
>                     To: pascal, amy
> **ARI EMANUEL:**
>        "Is business affairs calling me so I can take this to Fox
>        Searchlight officially?"

135.   With that statement Def Emanuel showed that, in addition to producing, he even arranges distribution. Def Emanuel is asking Amy Pascal if Sony Pictures' President of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants "Steve Jobs". Def Emanuel is bluffing that Fox Searchlight has agreed to take the film. He  never had a deal with Fox Searchlight. He was just playing hardball; trying to get a better offer out of Sony, AND keep them in the dark about his distribution relationship with **Universal Pictures.**

136.   As this deal dragged on over 8 months, 3 weeks before the previous exchange, Sony Pictures' Andrew Dumpert, spotted Def Emanuel's chicanery and bad motives. In an email to Sony execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

> 2014-10-18 16:59:16 From: Andrew Gumpert
>                     To: lynton, michael; pascal, amy; belgrad, doug
> **Andrew Gumpert:**
>        "The fact is there is only so much in the kitty. Unless the movie
>        massively breaks out they can never make real money, nor can we
>        and our investors.They have a 50pt pool with the best definition and
>        5m of box office bonuses. **Do they want to make MORE than the
>        equity? I think they do.** There is a huge philosophical gap (given
>        the rude and insolent responses from Ari and **Scott**)..."

137.   Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott Rudin weren't adhering to established guidelines.

138.   Although there have surely been occasions when Sony Pictures did cave-in to Def Emanuel's arm-twisting, this would not be one of those occasion. But oddly, Michael Lynton, CEO of Sony Pictures, responds to Gumpert only with silence—because Def Ari Emanuel is his close friend and secret business partner in Screenbid.

| | |
|---|---|
| 1 | **"Steve Jobs" Film's Not-So Surprising _Twist_ Ending:** |
| 2 | 139.   Fox Searchlight never touched "Steve Jobs". |
| 3 | 140.   Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the |
| 4 | price of the film above market value, to increase his profit margin. He didn't need Sony |
| 5 | Pictures to give him standard market value for "Steve Jobs", he could get standard value |
| 6 | from Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari |
| 7 | Emanuel took the film to the Studio that has distributed all of his films, since around 1999. |
| 8 | 141.   On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs", |
| 9 | after so much posturing and tumult, "Steve Jobs" was distributed by **Universal Pictures.** |
| 10 | |
| 11 | SONY PICTURES EMAILS SHOW DEFS EMANUEL & BILL BLOCK & SONY |
| 12 | PICTURES' CEO (M. LYNTON) MAINTAIN UNETHICAL RELATIONSHIPS, |
| 13 | AS THEY CO-OWN "SCREENBID" TOGETHER (CONFLICT OF INTERESTS) |
| 14 | 142.   The "Steve Jobs" emails reveal Defs Emanuel and Bill Block are in a co-ownership |
| 15 | business with Sony Pictures' then-CEO Michael Lynton. As we see Def Ari Emanuel write |
| 16 | Michael Lynton to ask Lynton to check on their co-owned business, _Screenbid._ |
| 17 | On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com |
| 18 | To: lynton, michael; |
| | **ARI EMANUEL:** |
| 19 | Michael - |
| 20 | What are we doing on Screenbid? We had success on our early tests, |
| | nothing since. You guys own a piece of this company, we've had |
| 21 | nothing since our early success. We have to keep the engines going. |
| 21 | 143.   In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of |
| 22 | Screenbid is confirmed by the repeated use of pronoun"we". Def Ari Emanuel asks "What |
| 23 | are _we_ doing..." Then he states "**We** had success on our early tests..." Then he reminds |
| 24 | Lynton that he (and some unknown party, or parties) also own shares of this company. Then, |
| 25 | implying Lynton has a responsibility, Def Emanuel says, "**You guys own a piece of this** |
| 26 | **company...**" Then Def Emanuel exhorts CEO Michael Lynton to take action, saying: "**We** |
| 27 | have to keep the engines going." |
| 28 | 144.   These are not the messages of quiet stockholders. These men are owners. |

145.   Sony Picture's CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his business partners a business report, pasted below his reply text. (Bill Block was the CEO of QED International, a Defendant in Briggs v Blomkamp.) Def Bill Block's reply email reads:

> 2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
> From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
>                        michael_lynton@spe.sony.com
>
> **BILL BLOCK:**
>     Going well gentlemen.
>     Bill
>     From: Jeffrey A. Dash [mailto:jdash@screenbid.com]
>     Sent: Monday, October 27, 2014 10:13 AM
>     To: Bill Block
>     Subject: SCREENBID AUCTION UPDATE
>     AUCTION UPDATE:
>
>     TRUE BLOOD: (HBO) We are winding down aftermarket sales and fulfillment and are on schedule to present audited reports to HBO accounting within 14 days.
>
>     SONS OF ANARCHY: (FOX) We visited the set on Friday 10/24/14 and met with the department heads for props, wardrobe, transportation and set decoration. They are scheduled to wrap next week and we will take delivery by 11/5/14, immediately inventory and shoot. Writing began about 2 weeks ago The auction is scheduled to go live on 12/01/14 and bidding will end on 12/10/14. Fulfillment time will be tight. In order to get everything shipped prior to XMAS we will have extra staff in place to facilitate…"

146.   In this unethical relationship, Sony Pictures' CEO Lynton, personally profited as Screenbid's owner, in such ways as directing Sony Pictures to give Screenbid millions in set furnishings to auction on Screenbid, where he and Def Emanuel profited as owners. Lynton's secret relationship with Def Emanuel is why Sony Pictures did not do due diligence to vet Def Blomkamp's Elysium script.

COMPLAINT
31

| 1 | SONY EMAILS SHOW DEF EMANUEL PERFORMS |
|---|---|
| 2 | PRODUCORIAL SERVICES:  CALLING SONY'S CEO & CHAIRMAN |
| 3 | TO ARRANGE A DEAL WITH HASBRO |

147.   On March 28, 2014, Def Ari Emanuel emailed/texted Sony's Pictures' CEO and Chairman to close an animation co-financing deal with Hasbro. Def Emanuel's email read:

> 2014-03-28  re: HASBRO Animation deal
> From: aemanuel@wmeentertainment.com
> To:amy_pascal@spe.sony.com;  michael_lynton@spe.sony.com
> **ARI EMANUEL:**
> "HASBRO Animation deal
> Amy & Michael -
> We have sent Ronni our proposal for the animation co-financing deal. Please take a look when you get a chance and lets lock this down.
> Ari

148.   Talent Agents don't arrange animation co-financing deals with Hasbro, producers and studios do. Curiously, after Billionaire Def Ari Emanuel recently purchased the UFC he arranged a UFC Hasbro deal. (An article where Def Emanuel discusses UFC and Hasbro is attached as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.)

**SONY EMAILS SHOW DEFENDANTS COMMITTED PERJURY REGARDING THEIR EFFORTS TO HIDE INFRINGEMENT IN BRIGGS V BLOMKAMP**

149.   The Defendants' fraud, conspiracy and routine deceit included committing perjury by lying on documents signed under oath.

150.   During the discovery phase of Briggs v Blomkamp, et al (C13 4679 PJH) the Plaintiff informed the district court that he suspected that writer/producer Simon Kinberg was hired to rewrite Def Blomkamp's poorly written screenplay. In response to Plaintiff's interrogatories to MRC II LP, the Defendants  made false statement, under oath, regarding a substantial matter in that case, which may impact the Plaintiff's ability to prevail in that lawsuit (currently in appeals). (Said Def MRC II LP's Interrogatory Responses from Briggs v Blomkamp are attached as "**Exhibit AA**"  and is incorporated by reference as if fully set out herein.)

COMPLAINT
32

1    151.    That deceit occurred when the Defs responded to interrogatory #17; believing
2    Simon Kinberg helped disguise Def Blomkamp's infringement, the Plaintiff asked:

3        **Plaintiff's Interrogatory:**
         INTERROGATORY #17:
4        "Simon Kinberg is a writer and "script doctor" (a writer who fixes scripts
5        that have serious problems). Simon Kinberg is listed as a producer of
         Elysium. Exactly what duties did Simon Kinberg play in the production and
6        script doctoring of the screenplay and film "Elysium"?"
7

8        **Defendants' Answer:**
9        "Defendant incorporates by reference the preliminary statement and
         general objections... Subject to and without waiving the foregoing
10       objections, Defendant responds as follows:
11               Simon Kinberg produced the Film. As producer, Mr. Kinberg also
         **assisted with a polish of the Film's screenplay** during the later stages of
12       writing."

13       **But The Leaked Sony Emails Reveal The Truth About Said Perjury:**

14   152.    The Defendants admitted that Simon Kinberg helped improve the weak screenplay,
15   BUT suggested that his help was just a "polish", which suggests merely dotting I's and
16   crossing T's, and maybe a dialogue suggestion here and there. But, in fact, Simon Kinberg
17   had to do exhaustive work to try to salvage Elysium's terrible screenplay.

18   153.    The gross underestimation and misrepresentation of all the work Simon Kinberg
19   had to do to repair Def Blomkamp's Elysium script is revealed in the 2015
20   Wikileaks're-posting of the Sony Pictures' hacked emails, in five (5) key email exchanges
21   between Defs **Modi Wiczyk, Simon Kinberg**, and Sony Pictures Chairperson **Amy Pascal**.
21   In the first email, Def Wiczyk explains Kinberg's role:

22       2014-10-27 13:36:12 Fwd: CHAPPIE NOTES
         From: mwiczyk@mrcstudios.com To: pascal, amy
23       **MODI WICZYK:**,
24       "hi!so i asked si to share all the notes hes wanted to do, in detail, for
25       weeks but hasnt been able to do.it lines up w what everyones saying.
         great detail and very specific.he also included rachels document and
26       merged it.**simon is a fixer and a logician** and i want him to trest this like
         hes been brought in to doctor it on some level, and he does too.  nb has
27       been ignoring him the past few weeks after listening to him up until then.
28       dont know why, dont care. its our turn now.i told doug that we should

COMPLAINT
33

leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

154.   Def Wiczyk, Simon Kinberg, and Amy Pascal continued to discuss the endless and unimaginable problems Kinberg was having helping director Def Blomkamp's save his film, *Chappie*; the executives discuss reshoots, dialogue rewrites, other huge changes, and how to protect Def Blomkamp's insecure ego. Yet, amid these massive problems, Kinberg comments that Def Blomkamp was handling Kinberg's executive ordered changes much better than he handled them on Elysium, where Kinberg explains Blomkamp **"shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once."** In this email to Amy Pascal, Simon Kinberg wrote:

2014-08-07 07:02:55   Re: Chappie   from:
sdkinberg@aol.com   to: pascal, amy

**SIMON KINBERG:**

"cool! neill has been really open throughout this process, and wants to get the audience all the way there. i think we're all feeling the same things now, so we can put it together and deliver to him, and he'll take it as an assignment not a judgement, and stay creative. **i saw him shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once. so i don't think he will now…"**

155.   In fact, the text/emails reveal Def Wiczyk and Amy Pascal were forced to hide from Def Blomkamp the fact that Simon Kinberg had to take over the film to finish it. This is revealed when Def Wiczyk wrote to Sony's Chairperson, Amy Pascal:

2014-10-27 13:42:22   Re: To discuss
From: mwiczyk@mrcstudios.com; To: pascal, amy

**MODI WICZYK:**

"not to oversimplify but i know simon has been biting his tongue for a month and all the sloppy stuff has been making him crazy. when i speak to him he seems to have a very clear view of what he wants to do. it lines up w what ur saying. i hink if we make them do it we will have a much much much better film that works. we just cant literally tell neill si is taking over….so its "our" notes"

156.   Additional evidence of the extreme measures that Defendants Simon Kinberg, Sony Pictures, MRC and Modi Wiczyk resorted to salvage Chappie. Can be seen in such

1  emails/texts as when Def Modi Wiczyk explains director Def Neill Blomkamp's inability to

2  even write or direct "basics". In an email text to Amy Pascal, Wiczyk wrote:

3      2014-10-27 13:52:57  Re: To discuss
       From: mwiczyk@mrcstudios.com, To: pascal, amy
4  **MODI WICZYK:**
5      "yes thats what i meanthe right version of this could be iconic and do 300
        and have a huge sequelwhat bugs me is how obvious and unpolished the
6      problems areall the hard stuff is great but all the basics are killing us"

7

8      157.    A week later, Def Modi Wiczyk emailed Amy Pascal to discuss BlomKamp's

9  insecurities, and how they were impacting production.

10      2014-11-03 04:31:07  Re:  From:
       mwiczyk@mrcstudios.com  To: pascal, amy
11  **MODI WICZYK:**
12      "dunno re simon. maybe insecure, maybe thinks simon is on "studio"
        side, which is juvenile. hes always mad at somebody. vacillates btwn
13      targets. i ignore it until it stops forward progress.
        re edgar i actually initiallygot nervous the music was too old to be
14      cool,but all my assistants say lots of these songs are in the collective
15      consciousness, played in bars and clubs. shows what i know....i dug the
        reel he did. and i loved the app w script and music."
16

17      158.   There are many more such emails that further reveal how inept and difficult Def

18  Blomkamp is. But from these select emails, we see that to revise Blomkamp's *Chappie*,

19  Kinberg took extraordinary measures, and that Blomkamp's inept, "insecure" and "juvenile"

20  conduct made Kinberg "crazy", forcing the executives to takeover the edit. Yet, Kinberg

21  implied these problems were mild compared to what he endured with Blomkamp revising

22  *Elysium*, where the problems were so extreme that Blomkamp **"shut down"** and **"didn't**

23  **have the answers"**. Clearly, the script work Kinberg did on Elysium was **exhaustive**, and

24  not a mere "polish" as Def MRC II LP stated under oath. This was a clear act of perjury.

25

26      **SONY EMAILS CONFIRM DEFS RULE 37 VIOLATION IN BRIGGS V**

27      **BLOMKAMP, SHOWING DEFS OMITTED TESTIMONY & EVIDENCE**

28      159.   On page 28 of the Plaintiff's First Amended Complaint in Briggs v Blomkamp, et

    al, the Plaintiff made a bold prediction: that sometime after May of 2013 (when Blomkamp

1  learned the details of Plaintiff's impending copyright lawsuit) Defendant Neill Blomkamp
2  went back into the editing room and tried to edit-out key headache scenes, which were
3  identical to the Plaintiff's work. The Plaintiff explained that Blomkamp did this to try to
4  cover-up his theft of the Plaintiff's intellectual property.

5      160.    Supporting this prediction, during the discovery phase of Briggs v Blomkamp, the
6  Plaintiff found a report on TheProvince.com (titled: "Elysium's ready as director Blomkamp
7  looks forward to next project" from February 2013) in which Def Blomkamp stated the film
8  was finished back in February 2013. (Said article from "The Province" is attached as
9  **"Exhibit BB"** and is incorporated by reference as if fully set out herein.) Then, proving the
10 Plaintiff's prediction, in sworn responses to Plaintiff's interrogatories, during discovery in
11 Briggs v Blomkamp, Def Blomkamp admitted film editing was finished "Sometime in or
12 about June 2013." (Said Defendant Blomkamp's Interrogatory Responses from Briggs v
13 Blomkamp are attached as **"Exhibit CC"** and are incorporated by reference, as if fully set
14 out herein.)

15     161.    The Plaintiff then filed a motion to compel documents, asking for all texts and
16 emails between Def Blomkamp and both *Elysium* film editors: Julian Clarke and Lee Smith
17 (Smith was the final editor—the editor who would have made these headache changes). The
18 Plaintiff made this motion to prove that Def Blomkamp resumed film editing after February
19 2013, to try to remove or alter the "headache" scenes. However, **the Defendants would not**
20 **provide a response from Lee Smith**, only from Clarke (Clarke stated that editing ended
21 well before June 2013—contradicting Blomkamp, who said editing ended June 2013). But
21 Lee Smith returned to the editing room to fix the headache scenes in May and June 2013.

22     162.    As well as doing the final edit of Elysium, the 2014 Sony email leak show that Lee
23 Smith also did the final edits for Blomkamp's next film, *Chappie* (although Smith isn't
24 credited on IMDB or Wikipedia).

25     163.    Lee Smith's final edit of Chappie is revealed in the Sony email leaks as Def Modi
26 Wiczyk writes to Amy Pascal:

27                        2014-08-12 00:13:30  saw it.  From:
28                        mwiczyk@mrcstudios.com  To:

1    amy_pascal@spe.sony.com
2    **MODI WICZYK:**
         "we are going to get there and have a big success with this one. **lee**
3        **smith** will be huge, **nb** is in GREAT frame of mind."

4        164.    Def Wiczyk knew Smith would be "huge" because of how Smith helped salvage

5    Elysium. A few months later Def Wiczyk told Amy Pascal about all the work Lee Smith

6    had left to do on the film, and the continued problems between Blomkamp and Kinberg.

7              2014-11-03 02:03:10 <u>Re:</u> From: mwiczyk@mrcstudios.com
                                       To; pascal, amy
8    **MODI WICZYK:**
9        "Hi!
         in terms of neill, totally ur call but...
10       i feel like <u>this coming week is critical</u> bc neill <u>has to really really let lee</u>
11       <u>in to **polish,** refine,</u> etc. alot of little indulgences are gonna have to go.
         so--- i was trying to be positive but also let him know theres real real
12       work yet to do. and in a short period of time.... i talked to lee for a
13       while today who says neills been very open so thats good...but hes
         been a dick to simon for whatever reason. so a long way of saying i
14       want to keep the pressure on him. because i agree it can be special.
15       make sense?"

16       165.    The Plaintiff filed his Motion to Compel (seeking a statement from Lee Smith)

17   three (3) weeks before the deadline for dispositive motions (liability), July 9th, 2013. But

18   the district court set the motion hearing for more than a week AFTER the deadline for

19   dispositive motions (Aug 7th, 2013).    Thus, the Plaintiff had to file his Motion For

20   Summary Judgment (**MFSJ**), without being able to inform the court of the Defendants'

21   **violation of Rule 37** (failure to cooperate to compel a discovery response); a violation that,

21   in this case, resulted in the omission of evidence of a cover-up (that cover-up being: Neill

22   Blomkamp returned to the editing room with Lee Smith, in June 2013, to ask Smith to try to

23   erase edit and remove the headaches from Elysium). Thus, during the teleconference

24   hearing with Magistrate Judge Laurel Beeler, the Plaintiff explained that the matter was

25   unresolved but was effectively "moot" because both parties' MFSJs had been filed, and the

26   Plaintiff had less than a week to file his Reply Brief (Magistrate Beeler thus ruled the issue

27   moot). (Note: the Defs also refused ALL of the Plaintiff's discovery requests for texts or

28   emails regarding ANY Elysium matters; expanding the Defendants' **Rule 37 violations**).

COMPLAINT
37

**MRC & SONY PICTURES NEGLECTED TO DO BASIC**
**DUE DILIGENCE, BUYING THE RIGHTS TO ELYSIUM**
**WITHOUT EVEN READING A SCREENPLAY**

166.   In 2008, Def Neill Blomkamp filmed *District 9* without a screenplay. District 9's star, Sharlto Copley, has given many interviews discussing the fact that he improvised every line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article with Sharlto Copley is attached as "**Exhibit DD**" and is incorporated by reference as if fully set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO Michael Lynton and Def Bill Block (of QED Int.), Emanuel was able to get QED and Sony Pictures' subsidiary *TriStar* to produce and distribute District 9, without a screenplay —using only Def Blomkamp's notes, which they referred to as a "script". Countless writers in online forums, have tried to find a copy of a District 9 script. All have failed.

167.   Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures bought the film and distribution rights to Elysium from Def Blomkamp, without ever reading a screenplay. Sony Pictures bought the rights to Elysium in a hasty meeting in 2008. In this well documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures agreed to buy the rights, immediately, never bothering to read the script. HollywoodReporter.com reported the details of the stunningly hasty meeting between Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011. MRC scheduled meetings with several other distributors that same day, but Sony Pictures was so rushed and eager to buy the film that MRC canceled all other distribution meetings scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that secured this deal, but never mentions a "screenplay" or a "script". (Said Hollywood Reporter article about Blomkamp, MRC closing the deal with Sony Pictures is attached as "**Exhibit EE**" and is incorporated by reference as if fully set out herein.)  This same meeting and concept art were also recounted in the book "Elysium: The Art of the Film" —a book primarily made up of interviews with Def Blomkamp, himself. On August 6th, 2013, Deep Focus Review (deepfocusreview.com) reviewed the book "Elysium: The Art of

1    the Film", reflecting on this meeting. (Said Deep Focus Review article is attached as

2    "**Exhibit FF**" and and is incorporated by reference as if fully set out herein.)  Upon

3    interviewing Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and

4    MRC staged 50-60 concept art paintings "and set them against the screenplay", explaining:

5            "On the strength of these images—not to mention the strength of his first
6            film, *District 9*—he garnered himself a $100 million budget and signed
             stars Matt Damon and Jodie Foster."
7

8        168.    The Defendants used the amazing artwork to strategically distract attention from

9    the flawed screenplay. Sony Pictures took the bait. Within an hour or so, a deal for about

10   $115 million was made, and no executive from Sony Pictures ever read a script. MRC

11   didn't do due diligence because Defendant Ari Emanuel was a co-owner of MRC and Def

12   Blomkamp's personal agent; thus, they stood to make millions from the deal. Sony Pictures

13   failed to do due diligence because CEO Michael Lynton had an improper, secret business

14   partnership with Def Emanuel (Screenbid.com), and wanted to maintain good relations with

15   Defs Emanuel and MRC—and make millions without regard for whose work they pirated.

16       169.    Def Blomkamp's script was so poorly executed and riddled with evidence of

17   misappropriation of the Plaintiff's work, that Defs Blomkamp, MRC and Sony Pictures took

18   extreme measures to protect the script during film production. The website Games Radar

19   (gamesradar.com) interviewed one of Elysium's stars, film icon **Jodie Foster**, who revealed

20   the producer's paranoia as she explained she wasn't allowed to possess a script.  (Said

21   Games Radar interview with Jodie Foster is attached as "**Exhibit GG**" and is incorporated

21   by reference as if fully set out herein.)  Foster said:

22           **"They won't even give me a screenplay. I've read it, but they won't
23           give me one to physically keep in my home 'cause they're so worried
             about everybody."**
24

25       170.  How Sony Pictures and MRC committed $115 million to a movie without reading a

26   screenplay, but invested millions to keep the screenplay secret defies reason. This was done

27   to keep the Plaintiff from learning details of the film's plot before it was released, to prevent

28   the Plaintiff from getting an injunction to stop  production.

COMPLAINT
39

171.   Had Sony Pictures behaved ethically, AND done their due diligence, they would have read Blomkamp's screenplay, then they would have seen Def Blomkamp's unfocused ideas, vast story weakness, and his poor literary skills. These shortcomings, juxtaposing concepts that were beyond such limited literary skills, should have raised red flags that Blomkamp's story may have been misappropriate, thus killing the deal. Hence, the Plaintiff would have filed no claims, including all claims herein.

172.   When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal. Wiczyk wrote:

> 2014-10-27 13:36:12  Fwd: CHAPPIE NOTES
> From: mwiczyk@mrcstudios.com To: pascal, amy
> **MODI WICZYK:**
> "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then</u>. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

173.   A company has a responsibility to do basic due diligence, to make sure their products are what they allege: original works. Having a CEO who is secret business partners with the CEO of a talent agency subcontractor, undermines due diligence. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" to hide evidence of misappropriation is not doing due diligence. Rather, these are the methods of corrupt, mob-like conspirators.

174.   Further, during discovery in Briggs v Blomkamp et al, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants failed to produced any such documentation.

ER 616

**Defendant Blomkamp Gets Caught Lying To The World About**

**His "Aliens" Script (Which Also Did Not Exist) , in 2017:**

175.   Just as Def Blomkamp (with Def Wiczyk's help) sold Elysium to Sony and MRC without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" film without a script—but this time he did it openly, online, for the world to see. Unfortunately, in the process he ensnared several other Hollywood notables in his' strange world of lies.

176.   On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his Twitter account, expressing hope of one day shooting the film. Soon dozens of Blomkamp fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, including in an article on Nerdist.com. (Said article from Nerdist.com is attached as "**Exhibit HH**" and is incorporated by reference as if fully set out herein.)

177.   By July **2016**, websites like ScreenRant.com were reporting Def Blomkamp had recruited actress Sigourney Weaver and director James Cameron to tell the world how great Blomkamp's script was. (Said ScreenRant article is attached as "**Exhibit II**" and is incorporated by reference as if fully set out herein.)  In ScreenRant Sigourney Weaver said:

> **"There is an incredible script by Neill. I didn't want to do a fifth one. I thought going to earth wouldn't be fun. I got this script that was amazing and gives fans everything they're looking for..."**

178.   And James Cameron also praised the script in the ScreenRant article:

> **Director James Cameron (*Avatar*) then went on to throw in his two cents, saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"**

179.   "Gangbusters."

180.   Then, in April 2017, ScreenCrush.com reported that director Ridley Scott, owner of the Aliens franchise, had announced there would be no *Aliens 5* movie.  Mr. Scott explained Defendant Blomkamp **never even had a script**. (Said Screen Crush article is attached as "**Exhibit JJ**" and incorporated by reference as if fully set out herein.)   Ridley Scott stated:

> **"I don't think it will ever see the light of day. There was never a script. Just an idea that evolved from a dozen or so pages."**

181.   This all caused the article writer to wonder who was lying: "We seem to find

1    ourselves in a bit of a '*he said, she and he said*' situation here," Monagle wrote.

2    182.   Remember, in 2000 Def Wiczyk helped sell his brother's script to Summit without

3    so much as a script name, and Sony Pictures was right there, negotiating for the rights to

4    that unwritten, nameless script—eager to please any good friend of Ari Emanuel's.

5    By 2016, with *Aliens 5*, the Defendants had grown so brazen that they let Def Blomkamp go

6    out and lie to the world for himself, believing they could throw a script together after the

7    contract was signed. Rubbing their hands in anticipation of all that money, none of them

8    expected Ridley Scott to do due diligence and insist on seeing a script, ruining their scheme.

9

10   **IN BRIGGS V BLOMKAMP THE DEFS HIRED A CONMAN, JEFF ROVIN**

11   **(WHO COMMITTED FRAUD UPON THE COURT & WENT ON FOX NEWS**

12   **TO ADMIT HE WAS A"FIXER" FOR BILL CLINTON) AS THEIR "EXPERT"**

13   183.   Not only does this case reveal how effortlessly seemingly everyone in Hollywood

14   lies, it reveals that when they get caught lying and stealing other people's work, they call on

15   world-class liars.

16   184.   In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of

17   thousands of California intellectual property attorneys as an expert witness, the Defs hired

18   Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the

19   same Jeff Rovin who confessed (two years <u>after</u> Briggs v Blomkamp went to MFSJ) to the

20   *National ENQUIRER (*October 19th, 2016), and confessed on **Fox News'** live telecast of

21   *The Sean Hannity Show* (Oct 24, 2016), that he was a professional "fixer" who

22   orchestrated false "smear" reports on people who disparaged President Bill and Hillary

23   Clinton—while Bill Clinton was President. Rovin claimed he then published these smear

24   articles in tabloid newspapers. Rovin's interview with Hannity can be seen at

25   https://www.youtube.com/watch?v=L3mzoKuFN5o. The story carried in countless other

26   publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit**

27   **KK**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER

28   article is attached as as "**Exhibit LL**" and is incorporated by reference as if fully set out

     herein.)

COMPLAINT

42

185.   **Rovin made these self-incriminating admissions on camera, in his own words.** Rovin admitted that he also bribed the victims of his smears to stay quiet. Shockingly, Rovin says the bribes were so effective that they rarely needed to resort to **other measures**. In Rovin's words, "**Most of the time** it was just money, it never had to be any threats." Witlessly, Rovin admitted threats, violence—or worse—might ensue if the money wasn't accepted.

186.   Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

187.   Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort."

188.   Rovin went on to explain he had worked as a "fixer" many times in the past.

189.   In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.

190.   In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff moved the the court to exclude Rovin's "expert" report, as Rovin had falsified dozens of citations and fabricated evidence to substantiate his own claims, including a lengthy "quote" in which he fraudulently omitted 42 words—that wholly countered what Rovin reported. (Said Motion to Exclude is attached as "**Exhibit MM**" and is incorporated by reference as if fully set out herein.)  Oddly, the court took no interest in the fraud contained in Rovin's report—which became the base of the district court's summary judgment opinion—and denied the motion.

191.   How the Defendants knew such a devious man's "expert" report would go unchallenged is a mystery. How the Defendants knew such a sinister man existed—at all—is stunning.  Rovin explained that he worked for President Clinton when Bill Clinton was in office (1991-2001). When asked how he came to be involved with the Clintons, Rovin explained that the Clintons became aware of Rovin because, in Rovin's words, he was **"fixing something for an actor who was in their** (the Clinton's) **inner circle."** Rovin does not identify who this cabinet member is, but during the time Rovin was involved with the Clintons (1991-1998), **Rahm Emanuel** worked as the senior adviser to President Clinton (1993-1998). Rahm Emanuel is Defendant Ari Emanuel's brother.

COMPLAINT

43

| 1 | **Defendants May Use Campaign Donation To Avoid Prosecution** |

2    192.   July 17, 2017, Observer.com reported that when Senator **Kamala Harris** was
3  California's Attorney General she ignored corporate lawbreakers who made max donations
4  to her campaign. (Said Observer article is attached as **"Exhibit NN"** and is incorporated by
5  reference, as if fully set out herein). CampaignMoney.com reported **Def Emanuel** made max
6  donations to Harris's campaign. (Said Campaign Money report is attached as **"Exhibit OO"**
7  and is incorporated by reference as if fully set out herein.) The L.A. Times also reported Def
8  Emanuel hosted a fundraiser for California's Lieutenant Governor Gavin Newsom. (Said LA
9  Times article is attached as **"Exhibit PP"** and incorporated by reference, as if fully set out
10 herein.) Emanuel likely made said donations to keep Harris, Newsom, and the Dept of Bus
11 Oversight from investigating his improper ties with Universal, MRC, Screenbid, Sony, etc.

12              **9TH CIRCUIT FILM RULING IRREGULARITIES & CONFLICTS**

13    193.   The district court's Briggs v Blomkamp summary ruling applied reversed law,
14 rather than the prevailing law (cited by the Plaintiff). Such irregularities seem common in
15 film industry cases in the 9th.  In 2014, the L.A. Times asked Chief Justice **Alex Kozinski**
16 about this and the 9th's relationship with the film industry. (Said article is attached as
17 **"Exhibit QQ"** and incorporated by reference as if fully set out herein.) Kozinsky explained:

> "He holds movie nights at the 9th Circuit courthouses in Pasadena, San
> Francisco and occasionally Seattle, where judges and lawyers pitch in for
> pizza and beer, **watch films and hear from scriptwriters and other
> industry insiders about the movies. Director George Lucas used to
> provide the court with films before they came out on DVDs…"**

21  194.  Many readers were stunned to learn that The Studios had such access to the very
22 judges trying their cases. The article quotes attorney Steven T. Lowe, who, implying bias in
23 the Ninth, said, "The studios and networks always win." In 2010, *The Los Angeles Lawyer*
24 published Lowe's article "Death of Copyright". (Said article is attached as **"Exhibit RR"**
25 and is incorporated by reference as if fully set out herein.)  In the article Lowe explains:

> "Of the **48** copyright infringement cases against studios or networks that resulted
> in a final judgment within the Second and **Ninth Circuits** (and the district courts
> within those circuits) **in the last two decades, the studios and networks
> prevailed in all of them** and nearly always on motions for summary judgment."

| | |
|---|---|
| 1 | **SUMMARY** |
| 2 | **Review Of Facts Regarding Defendants' Actions,** |
| 3 | **Resulting In Injury To Plaintiff:** |
| 4 | 195.   The Defendants are accountable for taking the following actions, which resulted in |
| 5 | injury to the Plaintiff: |
| 6 | **(1)** |
| 7 | 196.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 8 | Defendants, create a social network website, called Trigger Street, or TriggerStreet ("TS" |
| 9 | herein), located at triggerstreet.com from 2002 until 2011, and at labs.triggerstreet.com |
| 10 | from 2011 until 2014. |
| 11 | **(2)** |
| 12 | 197.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 13 | Defendants, published and rendered the TS "Terms of Use" contract page, which stated: |
| 14 | Unless otherwise specified, the materials on the Site and in the Services |
| 15 | are presented **solely for** the purpose of promoting the entertainment, information, and community resources and services available in, and other |
| 16 | uses in, **the United States of America.** We control and operate the Site and the Services from within the United States. We make no representation |
| 17 | that materials on the Site or the Services are appropriate or available for |
| 18 | use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose |
| 19 | to access the Site from other locations do so on their own initiative and are |
| 20 | responsible for compliance with local laws. |
| 21 | 198.   The previous statement from the TS "Terms of Use" page was deliberately false |
| 21 | and/or misleading, and intended to inform members (or suggest, imply or insinuate) that |
| 22 | TS was intended for use by and for, users in the USA. This was false, and WAS FRAUD, |
| 23 | A MISREPRESENTATION, A FALSE STATEMENT, AND A DECEIT. These false |
| 24 | statements were made to falsely assure informed, savvy writers that the website was safe |
| 25 | from foreign "bad actors', as there are many nations that do not, or cannot enforce the |
| 26 | Universal Copyright Convention, and often American copyright holders never learn that |
| 27 | their works were misappropriated by foreign infringers, because the stolen works are only |
| 28 | displayed in the infringers' nation. (TS also may have stated it was intended for US use to |

1   avoid paying taxes on the international earnings from its Budweiser endorsement deal.)

2   199.   In truth, unbeknownst to American users, from the outset TS was intended for

3   international use.

4   200.   The Defendants' action were also a violation of 18 U.S. Code § 1001 - Statements

5   or entries generally (a) (1), which makes it illegal to make any materially false, fictitious,

6   or fraudulent statement or representation.

7   **(3)**

8   201.   Defendant Kevin Spacey made numerous trips abroad, to London, Spain, etc., to

9   give speeches and interviews, and throw parties, intent to recruit new TS members. While in

10   Spain, in 2009, Spacey stated,  "I started the website about six years ago, and we now have

11   close to 400,000 members around the world."

12   202.   This was **BREACH OF CONTRACT**, as most (perhaps all) members in the USA

13   believed the website was solely for use in the USA.

14   **(4)**

15   203.   TS and the Defendants provided content and programming from TS to Bud.TV

16   from 2007 to 2009. Bud.TV also ran an international advertising campaign about this. This

17   international ad campaign advertised TS all around the world, as well as Bud.TV. Both,

18   advertising TS in Bud.TV promotions, AND advertising TS on Bud.TV itself, were

19   **BREACHES OF CONTRACT** of TS's Terms of Use contract page.

20   **(5)**

21   204.   The Defendant(s) made the TS website with effectively no security features, as

21   ALL members were allowed to ANONYMOUSLY read ALL screenplays. This, while TS

22   claimed to be industry standard, encapsulating all of the desires and needs of its users, and

23   touted its state of the art security. This was a violation of state and federal conspiracy,

24   negligence, gross negligence, fraud, deceit, misrepresentations, and false statements laws.

25   **(6)**

26   205.   Unlike a truly "industry standard" site like WritersScriptNetwork.com, all TS

27   members/users were encouraged and deceived into using and navigating the website with

28   false identities (even for writing reviews). Intent to protect the identities of misappropriating

1   conspirators, the Privacy page was written and designed to scare user/members into using

2   false identities. The TS Privacy page stated:

3

4       User Names and User Disclosure
    The user name you select or are provided with upon registration with the

5       Site is deemed non-personally identifiable information. Your user name
    may be published on the Site and may be disclosed to others, including,

6       without limitation, to the public, and to any third parties with whom we

7       elect to share such information. In addition, **if you include your name**
    **or any other personally identifying information** in any material

8       transmitted or posted on public areas of the Site or the Services

9       (including, without limitation, message boards, **reviews** and chat rooms),
    **such information will become public information and will be**

10      **published on the Site and will be disclosed to other users of the Site**

11      **and to other third parties who may have access to or otherwise see a**
    **display of such information.**

12

13     206.   These statements were made to encourage users to take risks they ordinarily would

14  not take, and should not take, as part of the Defendants efforts to persuade users/members to

15  make their wares accessible to the Defendants. This was CONSPIRACY and DECEIT.

16                                     (7)

17     207.   The TS Privacy page suggested that the website had a method to reveal the true

18  identity of all "accessors", if necessary.

19      Information Disclosure

20      We reserve the right to disclose information submitted by or concerning
    any user as we feel is necessary to protect our systems or business.

21      Specifically, but without limitation, we reserve the right to disclose such
    information when a visitor or member is in violation of our Terms of Use

21      or any other agreement with us, or engages (or is suspected of engaging)

22      in any harmful, infringing or illegal activity....

23     208.   However, there is no evidence to support that TS ever, truly, had any method of

24  retrieving any access records, or the accessor's true identity, etc. Nor is there any reason to

25  believe such a system ever existed on TS. Thus, the Defendants' action were in violation of

26  18 U.S. Code § 1001 - Statements or entries generally, which makes it illegal to make any

27  materially false, fictitious, or fraudulent statement or representation.

28

COMPLAINT

47

**(8)**

209.   The Defendant(s) made extraordinary and fraudulent claims about website security; doing so to lure in the best undiscovered writers, and eliminate any doubts or suspicions users might otherwise reasonably have. Such false and exceptional claims as:

a.   The TS "About Us" page stated:

> "Our team has been extensively researching and designing TriggerStreet.com to ensure that it **encapsulates <u>every</u> aspect of the user's <u>desires</u> and <u>needs</u>**."

210.   THIS WAS FRAUD. All reasonable screenwriter members would expect (from a website assuring that the website "**encapsulates <u>every</u> aspect of the user's <u>desires</u> and <u>needs</u>**") that records be preserved of all access of writers' work, identifying which members accessed which works, AND recorded by the accessor's true name —AND NOT erase all access history if the member removes his/her work because he/she worries his work may be unsafe on the website. Members would reasonably expect and *desire* this (from a site claiming to be industry standard) because other websites were already doing this (InkTip.com, perhaps others). Further, all reasonable members would **desire** and **need** a website to use accurate language, and behave in accordance with the implicit language of the Website's Terms of Use". And if the "Terms of Use" stated, suggested, implied—or used language that implied—that the website was solely for use in the USA, members should expect that site operators would act in accordance with that agreement, and not advertise or recruit abroad. This false claim was made to lure writers to an unsafe website.

211.   This was deceit. The Defendants' action were also in violation of <u>18 U.S. Code § 1001 - Statements or entries generally</u>, which makes it illegal to make any materially false, fictitious, or fraudulent statement or representation.

a.   On the TS Privacy page, the "Security" message stated:

> "Security
> When you <u>submit information</u> via the Site, your information is protected using secure data networks protected by **<u>industry standard firewall and password protection systems</u>**. Our security practices and policies are <u>periodically reviewed and updated</u> as necessary, and only authorized individuals have access to the information provided by our users."

1     212.   THIS WAS FRAUD. There was nothing "industry standard" about the TS

2 screenwriter website. The standard was set by Writers Script Network.com (InkTip.com).

3 InkTip kept all records of all access, even after members left. On Inktip.com, there was no

4 feature erasing all access records upon script removal. By implying all information was

5 protected and secure and industry standard, reasonable members would assume all

6 members' access activity would be recorded, stored, and protected —not erased.

7     213.  The Defendants' action were also a violation of <u>18 U.S. Code § 1001 - Statements</u>

8 <u>or entries generally (a) (1)</u>, which makes it illegal to make any materially false, fictitious,

9 or fraudulent statement or representation.

10         b.  The Defendant(s) and TS used Def Spacey's stardom to lure in writers, then

11             writers were **promised** "industry access and exposure"; using Spacey's fame

12             and Academy Award winning laurels to leverage a false promise. TS's

13             statement from its "About Us" page promised that:

14                 "Based on the principles of creative excellence, it (the TS website)

15                 provides **industry access and exposure** to help build the careers
of notable new filmmakers and screenwriters."

16

17     214.   THIS FALSE PROMISE, bolstered by the other fraudulent statements on the

18 "Terms of Use", "About Us", and "Privacy" pages, expanded a pattern of false statements,

19 misrepresentations, fraud and deceit. The Plaintiff did NOT expect to be *discovered*. But

20 he also did NOT expect to be cheated by these industry insiders.

21                                         **(9)**

21     215.   The Defendants added a new counter security feature, whereby if a member

22 removed his/her screenplays from the TS website because he/she worried that it might be

23 unsafe or the target of infringers or pirates, the moment the writer removed his script ALL

24 access records would be erased. The Plaintiff believes the Defs added this feature in 2007 to

25 access and steal the Plaintiff's work. But whether this extra hidden layer of counter-security

26 was added when the website was made, in 2002, or if it was added in 2007, the

27 Defendant(s) and TS did not inform members about this feature, and it was never mentioned

28 on the TS website. The Defendants' failure to inform members of this counter-security

ER 625

1  feature, and the risks it posed, was a deliberate omission of imperative information. The
2  Defendants actions were in violation of California Civ. Code § 1572, fraud by omission, and
3  constitute DECEIT in violation of California Civ. Code § 1709, and these actions and
4  inactions were in violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1),
5  which makes it illegal to conceal or cover up such facts.

6  (10)

7  216.    Corporations are expected to do due diligence in all substantial purchases,
8  transactions and deals (such as investing $120 million in a film). Due diligence means doing
9  **"a complete and appropriate review of documentation and facts by a potential buyer
10  or its agents before purchasing an asset or engaging in business with a prospect"** (from
11  the Law Offices of Stimmel, Stimmel & Smith); this definition goes on to require a
12  "...complete review using lawyers and CPAs to assist so that when one is done, one knows
13  all that one needs to know before engaging in business with or buying a company or other
14  asset or piece of property." The Defendants did not do due diligence —not even reading the
15  screenplay before buying its rights; thus, the Defendants engaged in **gross negligence.**

16  (11)

17  217.    The Defendants engaged in conflicts of interests that violated **CALIFORNIA
18  LABOR CODE SECTION 1700.39**, which states, "No talent agency shall divide fees with
19  an employer, an agent or other employee of an employer." Defendant Ari Emanuel was the
20  central talent agent in making the film Elysium, representing Elysium's star Def Matt
21  Damon, and its writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an
21  owner of MRC (the employer of Def Neill Blomkamp for the making of Elysium, and the
22  buyer of Elysium's film rights). Thus, Def Ari Emanuel divided fees as a talent agent and
23  employer. The Plaintiff was injured by this violation of California law.

24  (12)

25  218.    The Defendants engaged in VIOLATIONS OF CALIFORNIA BUSINESS &
26  PROFESSIONS CODE § 17200, ET SEQ., UNFAIR BUSINESS PRACTICES ACT. Sony
27  Pictures' (a publicly traded company), and its CEO Michael Lynton, violated California
28  Business & Professions Code  § 17200, ET SEQ., by engaging in improper and unethical

COMPLAINT
50

1   business relationship, whereby Michael Lynton, acting as an officer of Sony Pictures, hired

2   a subcontract, Screenbid, to sell numerous items of substantial value for Sony Pictures.

3   Thus, Def Lynton profited as Sony Pictures' CEO, and he and Def Ari Emanuel profited as

4   the owners of Screenbid, the subcontracted auction service. This was a conflict of interest.

5       219.    This improper relationship caused CEO Michael Lynton to encourage his

6   subordinates and peers NOT to scrutinize projects, clients or business entities associated

7   with his secret business partner Def Ari Emanuel. Thus, Sony Pictures agreed to distribute

8   Elysium without doing due diligence to read a screenplay to see to it that it was reasonably

9   executed. Had Sony Pictures employed a reasonable standard of due diligence, Elysium

10  would not have been made; thus, no injury would have come to the Plaintiff.

11                                   **(13)**

12      220.    The Defendants engaged in Obstruction Of Justice by closing and destroying the

13  TS website  6 days after the Plaintiff filed his Notice of Appeal to the Ninth Circuit Court of

14  Appeals. The Defendants did this to destroy incriminating evidence, because the district

15  court based its MFSJ ruling on reversed law, cited by the Defendants, rather than the

16  prevailing law, cited by Plaintiff. Thus, Briggs v Blomkamp, et al, is/was apt to be returned

17  to the lower court, where the Plaintiff will/would subpoena all website access records, to

18  confirm the Defendants used TS to access the Plaintiff's work, and confirm that TS

19  misrepresented its security and ID protection features, and had no such records or oversight

20  at all.

21                                   **(14)**

21      221.    By conspiring to hire an admitted "fixer", Jeff Rovin (who spent years of his life

22  preparing false smear stories for tabloid news), to prepare and submit a falsified "expert"

23  report to the court, the Defendants engaged in SUBORNATION OF PERJURY. This was

24  also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which

25  makes it illegal to knowingly and willfully: (1) falsify, conceal, or cover up by any trick,

26  scheme, or device a material fact; (2) make any materially false, fictitious, or fraudulent

27  statement or representation; or (3) make or uses any false writing or document knowing the

28  same to contain any materially false, fictitious, or fraudulent statement or entry.

<div align="center">(15)</div>

222.   By stating, in their answers to the Plaintiff's interrogatories, that Simon Kinberg only provided a "polish" to the Defendants script, "Elysium", when, in fact, he did exhaustive work to salvage the screenplay, the Defendant(s) committed **Perjury.** This was also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to conceal or cover up such facts.

<div align="center">(16)</div>

223.   In Briggs v Blomkamp, the Plaintiff stated that the Elysium film editor(s) would confirm that the Film's editing resumed in June, 2013 (after wrapping up originally in February 2013), after the Defendants learned of the Plaintiff's immanent lawsuit. The Plaintiff stated the editor(s) would also confirm that this final film editing was done to try to remove the the hero's headaches. But the Defendants refused to provide Plaintiff any access to Elysium's final editor, Lee Clarke. In doing so the Defendants **VIOLATED RULE 37** —a violation that may have changed the outcome of the case. In doing so, the Defendants endeavored to **conceal and cover** up their misappropriation of the Plaintiff's work; a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1).

<div align="center">

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### CONSPIRACY
Violating California Penal Code 182(a)(3),(4), and/or (5)
### (Against All Defendants)

</div>

224.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 223, as if fully set out herein.

California Penal Code 182 (a)(3)(4)(5) makes it unlawful:

   (a) If two or more persons conspire:
   (3) Falsely to move or maintain any suit, action, or proceeding.
   (4) To cheat and defraud any person of any property, by any means which
       arc in themselves criminal, or to obtain money or property by false pretenses
       or by false promises with fraudulent intent not to perform those promises.
   (5) To commit any act injurious to the public health, to public morals, or to
       pervert or obstruct justice, or the due administration of the laws.

<div align="center">

COMPLAINT

52

</div>

225.   The Defendants engaged in three (3) conspiracies, in violation of California Penal Code 182(a) (3)(4) and/or (5).  California Penal Code requires that one of the conspirators commit an **overt act** in the process. The Defendants committed many overt actions:

**First Conspiracy**

226.   To unlawfully enrich themselves, the Defendants conspired to create a social network for screenwriters and filmmakers, with little or no security features. The Defendants would then mislead screenwriters that the website was safe, then the Defendants could access and misappropriate these screenwriter's work.

227.   **Overt Act #1:** The Defendants conspired to create a social network website.

228.   **Overt Act #2:** The Defendants conspired to design the website with effectively no security features.

229.   **Overt Act #3:** The Defendants conspired to commit fraud and mislead website member/users that the website had reasonable security features, when it had none.

230.   **Overt Act #4:** The Defendants conspired to add a counter security feature that erased all access information if members removed their screenplays.

231.   **Overt Act #5:** The Defendants apparently conspired to add this feature (described in the previous paragraph) in 2007, to erase evidence of their access of the Plaintiff's script.

232.   **Overt Act #6:** The Defendants conspired to make the film Elysium (which may still be legally proven to be derived from the Plaintiff's work), careful not to leak any information about the project.

233.   **Overt Act #7:** The Defendants conspired to create website *Terms of Use* page that stated the website was intended solely for use in America, but the Defendants repeatedly sent Def Spacey around the globe to recruit members. The Defendants ALSO secretly advertised TS on international websites (like Bud.TV) and in other international publications. The Defendants knew what the Terms of Use rules stated, and they agreed amongst themselves that it was important to violate said rules, to get international members.

234.   **Overt Act #8:** While producing the film Elysium, the Defendants conspired to keep the Elysium script an absolute secret, not even allowing Hollywood giants like Jody Foster to take her script home.

COMPLAINT
53

1    235.   **Overt Act #9:** The Defendants (particularly Ari Emanuel, who profited the most

2  from these acts and arrangements) also had Def Matt Damon and Ben Affleck start a

3  screenwriter/filmmaker website, similar to TriggerStreet, called Project Greenlight. Affleck

4  and Damon have been Def Emanuel's clients (through Endeavor and WME-IMG) for most

5  of their careers. Both websites (TS and Project Greenlight) have been accused of being the

6  place of access in major film and TV copyright infringement suits. Both "stolen" film or TV

7  projects were eventually sold to companies with questionable relationships to Def Emanuel

8  (MRC and Universal Pictures -or their parents or subsidiaries). Both websites (TS and

9  Project Greenlight) used suspiciously similar language: "peer reviews," "peer-to-peer," etc.

10                                  **Second Conspiracy**

11    236.  Once the Plaintiff realized the Defendants misappropriated his work, he sued.

12    237.  In response, the Defendants designed a second conspiracy, to prevent the Plaintiff

13  from duly prevailing in his copyright lawsuit. This would require cheating the Plaintiff, and

14  cheating the US and California civil justice systems.

15    238.   **Overt Act #10:** Rather than hiring any one of of perhaps ten-thousand well

16  qualified California intellectual property attorneys for their expert witness in Briggs v

17  Blomkamp, et al, the Defendants opted to hire a New York conman named Jeff Rovin, who

18  admitted on Fox News "The Sean Hannity Show" that he was a professional "fixer" who

19  worked for President Bill Clinton's administration, and used his literary skill to create

20  "smear" stories for junk tabloid newspapers to attack Clinton critics. Rovin said he came to

21  work for Bill and Hillary Clinton because he was working for another "actor" in the Clinton

21  White House. The Plaintiff is certain that other actor is Rahm Emanuel, who was Senior

22  Advisor to the President (Clinton). Rahm Emanuel is Defendant Ari Emanuel's brother.

23  Rahm likely referred Def Ari Emanuel to hire Jeff Rovin to "fix" the expert report. Def Ari

24  Emanuel is a co-owner of MRC, Defs Blomkamp's agent, and business partner of Bill

25  Block (CEO of QED Int.), all of whom were named in Briggs v Blomkamp, et al.

26    239.   **Overt Act #11:** Defendants conspired to prevent the Plaintiff from speaking to

27  editor Lee Smith in Briggs v Blomkamp.

28    240.  **Overt Act #12:** The Defendants conspired to commit perjury, stating that Simon

1    Kinberg merely "polished" Def Blomkamp's script.

2    241. **Overt Act #13:** The Defendants conspired to shut-down and destroy the TS social

3    network 6 days after the Plaintiff filed his Notice Of Appeal, also obstructing justice.

4    <div align="center">**Third Conspiracy**</div>

5    242. To greatly increase and accelerate their rate of personal enrichment, the Defendants

6    conspired to break California business, labor and ethics codes. Breaking these business

7    labor and ethics codes caused a disintegration in the Defendants' business practices, causing

8    them to act recklessly, and negligently.

9    243. **Overt Act #14:** The Defendants conspired to commit to invest over $100,000,000

10    to make the film Elysium, without reading a script.

11    244. **Overt Act #15:** The Defendants conspired to create an arrangement where

12    Universal Pictures or its parent or its subsidiaries, will finance and/or distribute any project

13    Def Ari Emanuel brings Universal Pictures—even unlawfully acquired projects.

14    245. **Overt Act #16:** The Defendants conspired to engage in inappropriate business

15    relationships, such as Def Emanuel and Sony Pictures CEO Michael Lynton co-owning

16    Screenbid, and Defendant Emanuel co-owning MRC (violating Cal Labor Code 1700.39).

17    246. In the aforementioned actions, and others detailed in this Complaint, and perhaps

18    others to be revealed at trial, the Defendants willfully, maliciously, fraudulently, with

19    wrongful intent to harm the Plaintiff, with disregard for the Plaintiff's rights and welfare,

20    and with disregard for ethics and for the law, engaged in one or more conspiracies.

21    247. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

21    Defendants' actions, in an amount to be determined at trial.

22    <div align="center">**SECOND CLAIM FOR RELIEF**</div>
23    <div align="center">OBSTRUCTION OF JUSTICE & ANTICIPATORY OBSTRUCTION OF JUSTICE</div>
<div align="center">**Violating 18 U.S. Code § 1519**</div>
24    <div align="center">Destruction, Alteration, Or Falsification Of Records In A Federal Investigation</div>
25    <div align="center">**(Against All Defendants)**</div>

26    248. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

27    247, as if fully set out herein.

28    249. 18 U.S. Code § 1519 makes it unlawful to destroy evidence, etc., in anticipation or

<div align="center">COMPLAINT

55</div>

1  contemplation of a legal action; stating:

2      Whoever knowingly alters, destroys, mutilates, conceals, covers up,
3  falsifies, or makes a false entry in any record, document, or tangible object
   with the intent to impede, obstruct, or influence the investigation or proper
4  administration of any matter within the jurisdiction of any department or
   agency of the United States or any case filed under title 11, or in relation
5  to or **contemplation** of any such matter or case, shall be fined under this
6  title, imprisoned not more than 20 years, or both.

7      250.   The Defendants engaged in obstruction of justice (and/or anticipatory obstruction

8  of justice), violating 18 U.S. Code § 1519, by endeavoring to close and destroy their social

9  network TriggerStreet.com, as detailed throughout this Complaint. Although the Defendants

10  knew the website was the central access point of an ongoing legal case, they closed the site

11  6 days after the Plaintiff filed his Notice Of Appeal; doing so while the site was still

12  growing, without giving the website's perhaps 700,000 members an explanation.

13      251.   In these actions, detailed in this Complaint, and perhaps others to be revealed at

14  trial, the Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff, and

15  with disregard for the law, acted to violate the law and obstruct justice.

16      252.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

17  Defendants' actions, in an amount to be determined at trial, in addition to any other

18  remedies deemed necessary and appropriate by the court.

19            **THIRD CLAIM FOR RELIEF**
   <u>FRAUD AND FALSE STATEMENTS</u>
20  **Violating 18 U.S. Code § 1001** (Statements or entries generally)
21  **(Against All Defendants)**

21      253.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

22  252, as if fully set out herein.

23      254.   In their actions, detailed in this Complaint, the Defendants willfully, maliciously,

24  with wrongful intent to harm the Plaintiff and perhaps others, with disregard for the law,

25  committed numerous acts of fraud, misrepresentations, deceit, fraudulent omissions, false

26  statements, etc., in violation of 18 U.S. Code § 1001.

27      255.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

28  Defendants' actions, in an amount to be determined at trial.

COMPLAINT
56

| | |
|---|---|
| 1 | **FOURTH CLAIM FOR RELIEF** |
| 2 | BREACH OF CONTRACT<br>Violating California Code, Civil Code § 3294 |
| 3 | **(Against All Defendants)** |
| 4 | 256.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through |
| 5 | 255, as if fully set out herein. |
| 6 | 257.   In their actions detailed in this Complaint, and perhaps other actions to be revealed |
| 7 | at trial, the Defendants willfully and with disregard for ethics and law, committed numerous |
| 8 | acts of Breach Of Contract, in violation of California Civil Code § 3294. |
| 9 | 258.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the |
| 10 | Defendants' actions, in an amount to be determined at trial. |
| 11 | **FIFTH CLAIM FOR RELIEF** |
| 12 | FRAUD<br>Violating California Civ. Code § 1572 |
| 13 | **(Against All Defendants)** |
| 14 | 259.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through |
| 15 | 258, as if fully set out herein. |
| 16 | 260.   In their actions detailed in this Complaint, and perhaps other actions to be revealed |
| 17 | at trial, the Defendants willfully, maliciously, and with wrongful intent to harm the Plaintiff |
| 18 | and perhaps others, and with disregard for the law, committed numerous acts of fraud, |
| 19 | misrepresentation, deceit, fraudulent omissions, false statements, etc., in violation of |
| 20 | California Civ. Code § 1572. |
| 21 | 261.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the |
| 21 | Defendants' actions, in an amount to be determined at trial. |
| 22 | **SIXTH CLAIM FOR RELIEF** |
| 23 | DECEIT<br>Violating California Civ. Code § 1709 |
| 24 | **(Against All Defendants)** |
| 25 | 262.   The Plaintiff Hereby realleges and incorporates by reference paragraphs 1 through |
| 26 | 261, as if fully set out herein. |
| 27 | 263.   In their actions detailed in this Complaint, and perhaps other actions to be revealed |
| 28 | at trial, the Defendants willfully, maliciously, and with wrongful intent to harm the Plaintiff |

1    (and perhaps others), and with disregard for the law, committed numerous acts of deceit, in

2    violation of California Civ. Code § 1709.

3       264. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

4    Defendants' actions, in an amount to be determined at trial.

5

**SEVENTH CLAIM FOR RELIEF**
NEGLIGENCE

6    Violating 19 U.S. Code § 1592 (Penalties for fraud, gross negligence, and negligence)

7    **(Against All Defendants)**

8       265. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

9    264, as if fully set out herein.

10       266. In their actions, detailed in this Complaint, and perhaps other actions to be revealed

11    at trial, the Defendants, with wrongful intent to harm the Plaintiff (and perhaps others), with

12    disregard for ethics and the law, acted with negligence, in violation of 19 U.S. Code § 1592.

13       267. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

14    Defendants' actions, in an amount to be determined at trial.

15

**EIGHTH CLAIM FOR RELIEF**
GROSS NEGLIGENCE

16    **Violating 19 U.S. Code § 1592 (Penalties for fraud, gross negligence, and negligence)**

17    **(Against All Defendants)**

18       268. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

19    267, as if fully set out herein.

20       269. In their actions, detailed in this Complaint, and perhaps other actions to be

21    revealed at trial, the Defendants willfully, maliciously, with wrongful intent to harm the

21    Plaintiff (and perhaps others), with disregard for the Plaintiff, ethics, and the law, acted

22    with gross negligence, in violation of 19 U.S. Code § 1592.

23       270. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

24    Defendants' actions, in an amount to be determined at trial.

25

**NINTH CLAIM FOR RELIEF**
VIOLATING CALIFORNIA LABOR CODE § 1700.39

26    **(Against All Defendants)**

27

28       271. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

COMPLAINT
58

1  270, as if fully set out herein.

2  272.   In their actions, detailed in this Complaint, and perhaps other actions to be

3  revealed at trial, the Defendants willfully, with wrongful intent, and disregard for others,

4  ethics and the law, violated California Labor Code 1700.39.

5  273.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of

6  the Defendants' actions, in an amount to be determined at trial.

7  **TENTH CLAIM FOR RELIEF**
   VIOLATION OF UNFAIR BUSINESS PRACTICES ACT

8  [CAL BUS & PROF CODE§ 17200, ET SEO.]

9  **(Against All Defendants)**

10  274.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

11  273, as if fully set out herein.

12  275.   In their actions, detailed in this Complaint, and perhaps others to be revealed at

13  trial, the Defendants willfully, with wrongful intent, motivated to unlawfully enrich

14  themselves, with negligent disregard for the Plaintiff, others, ethics and the law, violated

15  the Unfair Business Practices Act [Cal Bus & Prof Code§ 17200, Et Seq., namely: officers

16  of separate but cooperating businesses, willfully entered a conflict of interest, by going into

17  a secret, private business partnership as co-owners of Screenbid, which the Defendants

18  used as a subcontractor for their separate businesses. These conflicts of interests eroded the

19  Defendants business standards and practices; creating the circumstances whereby the

20  Defendants were able to misappropriate the Plaintiff's intellectual property.

21  276.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

21  Defendants' actions, in an amount to be determined at trial.

22  **ELEVENTH CLAIM FOR RELIEF**
    PERJURY

23  **Violating 18 U.S. Code § 1621 (Perjury generally)**

24  **(Against All Defendants)**

25  277.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

26  276, as if fully set out herein.

27  278.   In their actions, detailed in this Complaint, and perhaps other actions to be

28  revealed at trial, the Defendants willfully, maliciously, with disregard for the law,

COMPLAINT
59

1  committed perjury, in violation of 18 U.S. Code § 1621.

2  279.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of

3  the Defendants' actions, in an amount to be determined at trial.

4  **TWELFTH CLAIM FOR RELIEF**
   TAMPERING WITH EVIDENCE
5  **Violating 18 U.S. Code § 1512(c)(1) (Tampering with a witness, victim, or informant)**
6  **(Against All Defendants)**

7  280.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

8  279, as if fully set out herein.

9  281.   In their actions, detailed in this Complaint, and perhaps other actions to be

10  revealed at trial, the Defendants willfully, maliciously, and with disregard for the law,

11  engaged in tampering with evidence, in violation of 18 U.S. Code § 1512(c)(1).

12  282.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of

13  the Defendants' actions, in an amount to be determined at trial.

14  **THIRTEENTH CLAIM FOR RELIEF**
   WITNESS TAMPERING
15  **Violating 18 U.S. Code § 1512(c)(2) (Tampering with a witness, victim, or informant)**
16  **(Against All Defendants)**

17  283.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

18  282, as if fully set out herein.

19  284.   In their actions, detailed in this Complaint, and perhaps other actions to be

20  revealed at trial, the Defendants willfully, and with disregard for the law, justice, and the

21  Plaintiff's rights, engaged in tampering with evidence, in violation of 18 U.S. Code §

21  1512(c)(1).

22  285.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

23  Defendants' actions, in an amount to be determined at trial.

24  **FOURTEENTH CLAIM FOR RELIEF**
   SUBORNATION OF PERJURY
25  **Violating 18 U.S. Code § 1622**
26  **(Against All Defendants Except The California Dept. Of Business Oversight)**

27  286.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1

28  through 285, as if fully set out herein.

COMPLAINT
60

287.   In their actions, detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully and maliciously violated the Plaintiff's rights and the law, to engage in subornation of perjury, in violation of 18 U.S. Code § 1622.

288.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**:

WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

1. For general damages in an amount according to proof at the time of trial;

2. For exemplary damages;

3. For special damages in an amount according to proof at trial;

4. For restitution and disgorgement of all profits (estimated at $850,000,000—which represents the total projected profits that the Defendants will realize from the misappropriation of the Plaintiff's work, see page 18, para 2) in favor of the Plaintiff, consistent with US copyright remedies (plus any exemplary damages for deceiving the district court);

5. For Plaintiff's cost of this lawsuit and reasonable attorney's fees;

6. For such injunctions and additional relief the Court may deem proper..

DATED: November 13th, 2017

Respectfully Submitted

By: _____

Steve Wilson Briggs, Plaintiff

COMPLAINT

61

Exhibit F

| | |
|---|---|
| 1 | Steve Wilson Briggs |
| 2 | 681 Edna Way, |
| 3 | San Mateo, CA 94402 |
| 4 | 510 200 3763 |
| 5 | snc.steve@gmail.com |
| 6 | PLAINTIFF In Propria Persona |
| 7 | |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE WILSON BRIGGS | Civ No: CV 17 6552 |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| vs | **FOR:** |
| UNIVERSAL CITY STUDIOS LLC;<br>NBCUNIVERSAL MEDIA, LLC;<br>SONY PICTURES ENT INC.;<br>KEVIN SPACEY;<br>ARI (ARIEL) EMANUEL;<br>MATT DAMON;<br>BEN AFFLECK;<br>NEILL BLOMKAMP;<br>MORDECAI (MODI) WICZYK;<br>ASIF SATCHU;<br>BILL BLOCK;<br>DANA BRUNETTI;<br>MRC II DISTRIBUTION COMPANY LP<br>(AKA MRC, Media Rights Capital, and<br>all other MRC entities and subsidiaries)<br><br>Defendants. | 1. CIVIL CONSPIRACY<br>2. SPOLIATION OF EVIDENCE<br>3. BREACH OF CONTRACT<br>4. FRAUD / INTENTIONAL<br>   MISREPRESENTATIONS<br>5. DECEIT<br>6. CONCEALMENT<br>7. NEGLIGENCE<br>8. GROSS NEGLIGENCE<br>9. VIOLATION OF CALIFORNIA<br>   LABOR CODE § 1700.39<br>10. VIOLATION OF UNFAIR<br>   BUSINESS PRACTICES ACT [CAL<br>   BUS & PROF CODE<br>   § 17200, ET SEQ.]<br>11. WITNESS TAMPERING<br>12. INFRINGING EXPORTATION<br>   (17 USC § 602, under 17 USC § 501)<br>13. COPYRIGHT INFRINGEMENT<br>   (17 U.S.C § 501)<br><br>**DEMAND FOR JURY TRIAL** |

| | |
|---|---|
| 1 | <u>**NATURE OF ACTION:**</u> |
| 2 | **1.** Pursuant to 28 U.S. Code § 1331 (as this matter involves violations of US federal |
| 3 | law) and 28 U.S. Code § 1367(a) (as this matter is substantially related to the prior action, |
| 4 | Briggs v Blomkamp, currently in appeals), Plaintiff brings this action against the Defendants |
| 5 | (**Defs**) for their violations of federal and state law.  In pursuit of personal enrichment and/or |
| 6 | to gain unlawful competitive advantage, the Defendants engaged in such violations as: |
| 7 | 1. Spoliation: 6 days after Plaintiff filed Notice of Appeal (in Briggs v Blomkamp, |
| 8 | C134679), the Defs closed their social network *TriggerStreet.com* (**TS**) to destroy |
| 9 | evidence and records, as this was their *access* point in Briggs v Blomkamp; Plaintiff |
| 10 | would subpoena these records if the 9th Circuit remands the matter for trial. |
| 11 | 2. Defs Spacey and Brunetti (likely acting at Def Emanuel's behest) created the social |
| 12 | network, TS, to secretly and unlawfully access, appropriate and alter the original |
| 13 | works of undiscovered writers. The Defs financially profited from these activities, |
| 14 | or received film acting roles, or film production or distribution benefits. |
| 15 | 3. **Breach:** TS's *Terms Of Use* stated the site was **solely for use in the USA,** yet |
| 16 | secretly the site operated around the world. Further, secretly and without consent |
| 17 | from US members, Spacey and Brunetti went to London (2002) and Spain (2009) to |
| 18 | recruit new members, touting TS's **"400,000 members <u>around the world</u>."** |
| 19 | 4. By making Plaintiff's work available in foreign markets, without Plaintiff's consent, |
| 20 | the Defs committed Infringing Exportation, infringing on the Plaintiff's copyright. |
| 21 | 5. Without informing TS members, the Defendants installed an anti-security feature on |
| 21 | TS, which erased all access records if a member deleted their work. |
| 22 | 6. In *Briggs v Blomkamp*, the Defs hired 'fixer' **Jeff Rovin** (a high school-educated |
| 23 | fantasy writer) as their sole "expert" witness. Rovin provided a falsified report to the |
| 24 | court. Two years after Briggs v Blomkamp went to appeals, on Oct. 24, 2016, Rovin |
| 25 | went on national TV, Fox News' *The Sean Hannity Show*, to admit he was a |
| 26 | professional "fixer" (someone who makes problems go away by producing false |
| 27 | stories and documents) for President Bill Clinton's administration. Clearly, the Defs |
| 28 | hired Rovin to "fix" his expert report, and violate the judicial process. In June 2014, |

COMPLAINT
2

| 1 | | the Plaintiff moved to exclude Rovin's report due to its gross fraud: Motion denied. |
|---|---|---|
| 2 | 7. | Evidence will show Def Ari Emanuel, a talent agent, is also Hollywood's most |
| 3 | | powerful film producer—against California labor & business codes § 1700.39, |
| 4 | | which makes it unlawful for a talent agent to act as both agent and as an employer. |
| 5 | 8. | Defs boasted TS had "industry standard" security, when, in fact, they removed all |
| 6 | | security features to allow themselves constant anonymous access to writer's works. |
| 7 | 9. | Defs made wild false promises to entice new writers to TS, such as: "Our team has |
| 8 | | been extensively researching and designing TriggerStreet.com **to ensure that it** |
| 9 | | **encapsulates every aspect of the user's desires and needs**". |
| 10 | 10. | The Defs used Def Emanuel's influence with Universal Pictures to entice, persuade |
| 11 | | or bribe the enlistment of other conspirators and as leverage against business rivals. |
| 12 | 11. | The Defs unlawful relationships (e.g. Defs Emanuel's and Block's co-ownership of |
| 13 | | Screenbid.com with Sony Picture's CEO M. Lynton; Emanuel's co-ownership of |
| 14 | | MRC with Defs Satchu and Wiczyk) created a culture where the Defs neglected to |
| 15 | | do due diligence. Thus, **before they ever read a script**, Sony Pictures and MRC |
| 16 | | bought the rights to the film *Elysium* (which was misappropriated from the Plaintiff). |

**JURISDICTION:**

| 18 | 2. **Jurisdiction:** This court has subject matter jurisdiction per 28 USC **§** 1331, as this |
|---|---|
| 19 | action involves violation of federal law; per 28 U.S. Code § 1367(a), as this matter is |
| 20 | substantially related to Plaintiff's prior federal action, Briggs v Blomkamp; and perhaps |
| 21 | partially under 28 USC **§** 1332(a)(2), as one or more Defendant is/are foreign citizens. |
| 21 | 3. **Venue:** venue is proper pursuant to 28 § 1391(b)(2) as events giving rise to this |
| 22 | complaint occurred in this district, and 28 § 1391(d), by virtue of the Defendants' business |
| 23 | transaction with this dist., and under 326 US 310 the Defs meet the minimum contact rule. |
| 24 | 4. **Intradistrict Assignment:** San Francisco is the proper intradistrict assignment as a |
| 25 | substantial part of the events and omissions, leading to this lawsuit, occurred in this district. |

**THE PARTIES:**

| 27 | 5. **Plaintiff,** Steve Wilson Briggs, is a filmmaker, screenwriter, author, musician and a |
|---|---|
| 28 | makerspace tinkerer/teacher at Cesar Chavez & Green Oaks Academy. |

1    6.   **Defendant** Universal Pictures is an American film studio; NBCUniversal subsidiary.

2    7.   **Defendant** Sony Pictures is a subsidiary of the Japanese multinational Sony Corp.

3    8.   **Def**  NBCUniversal is a multinational media conglomerate & Comcast subsidiary.

4    9.   **Defendant** Kevin Spacey is an American actor, and one of the men purportedly

5    responsible for creating the now defunct social network TriggerStreet (TS).

6    10.  **Defendant** Ariel (Ari) Emanuel is a talent agent and co-CEO of WME-IMG.

7    11.  **Defendant** Matt Damon is an American actor and screenwriter.

8    12.  **Defendant** Ben Affleck is an American actor and screenwriter.

9    13.   **Defendant** Neill Blomkamp is a South African-born film director. He is, on

10   information and belief, a Canadian or South African citizen.

11   14.  **Defendant** Mordecai Wiczyk is the co-CEO of Media Rights Capital (MRC);

12   15.  **Def** Asif Satchu is the co-CEO of MRC, and is believed to be a citizen of Canada.

13   16.   **Def** Bill Block is CEO of Miramax (a subsidiary of Qatari's beIN Media & Al

14   Jazeera).

15   17.  **Defendant** Dana Brunetti is credited with the conception of TriggerStreet.

16   18.   **Defendant** MRC is a diversified global media company, with many subsidiaries

17   and/or aliases, including: Media Rights Capital, MRC II LP; MRC II Distribution Company

18   LP; ; MRC II Holdings, L.P.; AsgarI Inc.; Oaktree Entertainment, Inc., and more.

19                                    NOTE:

20   19.  Some of the issues in this Complaint concern false statements made during discovery

21   and a falsified witness report submitted in Briggs v Blomkamp, C134679 PJH. Some of the

21   issues concern certain the Defendants destroying property/evidence related to Briggs v

22   Blomkamp, as that matter moved into appeals—actions which were unknown to the Plaintiff

23   until February 2016. Some of the issues involve the Defendants creating a business culture

24   that encouraged deceit and neglect, creating the conditions under which the Plaintiff's

25   property was violated. Some of the issues involve the Defendants writing and entering into

26   falsified contracts and/or breaching these contracts, which bound the Defendants and

27   Plaintiff until the contract terminated when TriggerStreet.com (or labs.triggerstreet.com)

28   went out of business, November 6th, 2016.

| | |
|---|---|
| 1 | **STATEMENT OF FACTS & ALLEGATIONS:** |
| 2 | **Brief Case Overview** |
| 3 | 20.  The Defendants conspired to create and operate (for 12 years) a social network for |
| 4 | screenwriters and filmmakers, known as **TriggerStreet** (referred to as **TS** in this |
| 5 | Complaint). TriggerStreet (**TS**) was located at www.triggerstreet.com from 11/2002 to |
| 6 | 07/2011, and at www.labs.triggerstreet.com from 07/2011 to 11/2014. The Defendants used |
| 7 | TS to fraudulently access and acquire original film ideas. By using TS's 400,000+ members |
| 8 | to review, judge, and rank the best work, the Defendants were able to peruse the very best |
| 9 | scripts at their leisure, alter them slightly, then produce and market them, as their own. |
| 10 | 21.  To entice the best undiscovered writers into joining TS and submitting their |
| 11 | screenplays, the Defs published and rendered a contract comprised of false claims, |
| 12 | deception and concealments. TS's "Terms of Use", "About Us" and "Security" pages |
| 13 | claimed to employ "industry standard" security, and boasted that TS "encapsulates every |
| 14 | aspect of the user's desires and needs", when, in fact, TS's security features were effectively |
| 15 | non-existent. (Said TS websites pages "Terms of Use", "About Us" and "Privacy" are |
| 16 | attached, respectively, as **Exhibit A**, **Exhibit B**, **Exhibit C**, and are incorporated by |
| 17 | reference as if fully set out herein.)  The Defs conspired to remove all security features on |
| 18 | the website. Any member could download any script, without the writer knowing the |
| 19 | downloader's ID. Only if an accessor chose to write a script review would the writer be |
| 20 | informed of the accessor's ID —but only the accessor's pseudonym (fake name) ID, while |
| 21 | others users who downloaded the script without leaving a review, left no trace at all. |
| 21 | 22.  More astounding, in 2007, the Defs added a new **anti**-security feature, **without** |
| 22 | **informing members,** whereby if a member—concerned about security—deleted his script |
| 23 | from TS, the deletion would trigger the erasure of all access records. This was done to |
| 24 | conceal the Defs accessing the Plaintiff's work (only posted in 2007). In May 2016, in an |
| 25 | Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95) a |
| 26 | former TS member recalled that this **"memory dump"** feature was added in 2007. (Said |
| 27 | forum is attached as "**Exhibit D**" and incorporated by reference as if fully set out herein; |
| 28 | see last entry, page 4.) In 2014, as Briggs v Blomkamp proceeded through discovery, the |

1  Plaintiff contacted TS to ask for their records of all the members who accessed his work.

2  (Said email is attached as "**Exhibit E**" and  incorporated by reference as if fully set out

3  herein). TS replied that when his work was removed, all access records were erased.  (Said

4  email is attached as "**Exhibit F**" and is incorporated by reference as if fully set out herein.)

5    23.  TS falsely assured members that the site was intended solely for use in the USA.

6  But Spacey and Brunetti secretly marketed TS all around the world.

7    24.  Through secret and private business co-ownerships with key CEOs, in businesses

8  like Screenbid and MRC, Def Emanuel cultivated unethical relationships with Universal

9  Pictures, Sony Pictures, MRC, QED, etc. Thus, these companies would finance and

10  distribute almost any project Emanuel asked, ignoring due diligence and best practices.

11    25.  The Defendants' final illegal action occurred on Nov 6th, 2014, 6 days after

12  Plaintiff filed his Notice Of Appeal (Briggs v Blomkamp), when the Defs surreptitiously

13  closed TS, to destroy incriminating evidence —understanding the district court based its

14  MFSJ ruling on vacated law, rather than prevailing law (cited by Plaintiff). Thus, the case

15  was apt to be remanded for trial, where the Plaintiff would subpoena all site access records.

16             NOTE:

17  26.  This Complaint reveals Def Ari Emanuel lead a conspiracy to misappropriate ideas

18  using TS and ProjectGreenlight.com (**Project Greenlight**), to market these ideas to his

19  business partners at Sony Pictures, MRC, Universal Pictures, NBCUniversal, etc.  Relevant

20  to this, Def Emanuel or WME has represented Defs Ben Affleck and Matt Damon for most

21  of their careers. Curiously, like Spacey, Affleck and Damon ran a screenwriter/filmmaker

21  website, *Project Greenlight,* from 2000-05 and 2015-16**.** Curiously, both sites used peculiar

22  language like *peer-to-peer,* and used *peer reviews* to weed out bad scripts. And curiously,

23  Spacey, Damon and Affleck were the only celebrities with screenwriter websites from

24  2000-2014.   In 2005, writer Joel Lamontagne sued Project Greenlight and **Harvey**

25  **Weinstein's** *Miramax,* alleging the TV series *Project Runway* (2005-present) was stolen

26  from a treatment he submitted to Project Greenlight. The allegedly stolen work became the

27  property of Universal Pictures' parent, **NBCUniversal**. Def Emanuel's shadowy projects

28  eventually becoming the property of Universal is a recurring pattern in this Complaint.

| | **BACKGROUND FACTS:** |
|---|---|
| 1 | |
| 2 | **(Understanding This Case Requires Knowledge Of Key Background Facts & Actors;** |
| 3 | **A Review Of Facts Directly Pertaining To The Defs Violations Begins On Page 18)** |
| 4 | THE SIX (6) PRIMARY DEFENDANT ACTORS: |
| 5 | **ARI EMANUEL** (DEFENDANT) |
| 6 | 27.  Defendant Ari Emanuel is the co-CEO of William Morris Endeavor (WME, aka |
| 7 | WME-IMG). Prior Emanuel was CEO of Endeavor Talent Agency (1995-2009), where his |
| 8 | aggressive, unethical business practices inspired the character *Ari Gold*, in the HBO TV |
| 9 | series *Entourage*. In 2002, Def Emanuel's *Endeavor* was sued for sexual harassment by |
| 10 | Sandra Epstein. Epstein also accused Def Emanuel of making racist remarks. In 2014 WME |
| 11 | was found guilty at arbitration of racial discrimination. Logically, WME-IMG attracts |
| 12 | clients who share Def Emanuel's values; thus, WME-IMG disproportionately represents |
| 13 | aging white clients and *difficult* clients that other agencies avoid (Charlie Sheen, Russell |
| 14 | Crowe), and clients who are politically conservative, or politically unaware or inactive. |
| 15 | 28.  November 20th, 2016, Def Emanuel traveled to New Jersey to congratulate |
| 16 | President-elect Trump. Emanuel is also President Trump's former talent agent. Predictably, |
| 17 | *The Apprentice* (starring Trump) was broadcast on **NBCUniversal**. Recently, *The Hill* (and |
| 18 | others) reported that it was Def Emanuel who helped seal the Miss Universe tape archives, |
| 19 | so no further tapes of candidate Trump sexually harassing beauty contestants would be |
| 20 | released. (Said "The Hill" article is attached as **"Exhibit G"** and is incorporated by |
| 21 | reference as if fully set out herein.) |
| 21 | **ASIF SATCHU (Defendant)** |
| 22 | 29.  Defendant Asif Satchu was born in Kenya but moved to **Canada** when he was 6 |
| 23 | years old. Satchu, like Def Blomkamp, is believed to be a Canadian citizen. (Canadian |
| 24 | connections are a recurring feature in this matter.)  Def Satchu is a co-founder of MRC, with |
| 25 | Wiczyk. Def Satchu is the brother of **Reza Satchu**, an enormously successful Canadian |
| 26 | businessman. Def Satchu and Reza, both graduated from Canada's **McGill** University. Def |
| 27 | Satchu is something of a business and business-technology genius.  **In 1999 Satchu** |
| 28 | **co-founded SupplierMarket.com** with Jon Burgstone (Reza Satchu was also a heavily |

1  invested partner). SupplierMarket.com facilitated the **international sales and distribution**
2  of software, bolts, nuts, fasteners, rubber and glass products, corrugated packaging, and
3  probably anything else. **Only 18 months later, Aug. 2000, Satchu and his partners sold**
4  **SupplierMarket for $950,000,000.** Def Satchu graduated from Harvard (MBA) in 1999.

5       **MORDECAI (MODI) WICZYK (Defendant)**

6       30.  Defendant Modi Wiczyk is an American born businessman, co-CEO and co-founder
7  of MRC (with Defendant Satchu). Wiczyk is the **visionary** of this conspiracy.

8       31.  Around 1995, fresh out of college, Defendant Wiczyk began working at Summit
9  Entertainment, LLC. That was the first year Summit began producing and financing films
10  (prior, Summit had exclusively sold US films abroad); surely the vision of Def Wiczyk.

11      32.  Only four years later, in 1999, when Wiczyk was only 27, Summit Entertainment
12  made Wiczyk their Senior Vice President of Production and Acquisitions. That same year,
13  1999, Wiczyk sent out his now famous **memo**, **which would make him one of the most**
14  **influential and sought after men in Hollywood**. Within a year, in 2000, likely on the order
15  of Def Ari Emanuel, Def Wiczyk was **hired by Universal Pictures** as Vice President of
16  Productions, where Wiczyk served for 2 years, until January 2002, when Def Ari Emanuel
17  made Wiczyk a partner at Emanuel's Endeavor Talent Agency.  Def Wiczyk graduated from
18  Harvard (MBA) in 1999.

19      **KEVIN SPACEY** (Defendant).

20      33.  Defendant Kevin Spacey is an Academy Award winning actor. His career was
21  floundering and at its nadir in 2000 when the conspiracy(s) detailed herein began, and when,
21  purportedly, he and Def Brunetti conceived of TS. Def Spacey, who dropped out of Juilliard
22  School in his sophomore year, has no known web-design skills. Seemingly, Spacey's only
23  value to the TS social network was as a high-profile, semi-likeable celebrity whose promise
24  of "industry access and exposure" would lure the best undiscovered writers to the website,
25  to unwittingly surrendering their wares to the Defendants.

26      **DANE BRUNETTI** (Defendant)

27      34.  Defendant Brunetti has no known college education. He joined the US coast guard in
28  1992, at 18 or 19. Brunetti met Spacey around 1998, while Brunetti was selling cell phones

COMPLAINT
8

1  in New York. Brunetti soon became Spacey's partner and personal assistant. It is purported

2  around the internet (including on Wikipedia) that Brunetti was responsible for designing

3  TriggerStreet.com. That is possible. However, there is no evidence that Brunetti possessed

4  any of the skills required to design a social network. The Plaintiff suspects Def Asif Satchu

5  (who founded the internet-based marketplace SupplierMarket.com) may be the website's

6  true designer and talent coordinator.

7      **MRC**

8    35.  MRC is a television and film studio, founded by its co-CEOs Defs Asif Satchu and

9  Modi Wiczyk. MRC was started in 2003 with money provided by Def Ari Emanuel

10  (although MRC often reports it was started in 2006 or 2007). Def Emanuel is a silent

11  partner in MRC. Unlike most ethical companies MRC operates under many names. Likely,

12  only Defs Emanuel, Satchu and Wiczyk know what these companies do. But such LLC

13  companies are a hallmark of money laundering networks (see Dept of Treasury's FinCEN

14  report). The Plaintiff is aware of 11 MRC companies: **MRC, Media Rights Capital; MRC**

15  **II LP; MRC II Distribution Company LP (foreign based); MRC II Holdings, LP;**

16  **Oaktree Entertainment, Inc. (a foreign stock business); MRC I Hedge Co, LLC; MRC**

17  **II Capital Company, LP; MRC Sub Gp, LLC; MRC I Project Company, LLC; Asgari**

18  **Inc.** Plaintiff believes that most of these *companies* are "shell" companies (fronts for illegal

19  activity), existing to launder money and other transactions. Working in conjunction with

20  Def Bill Block (**Miramax** CEO) and *Al Jazeera* or *beIN Media Group* (Miramax's parent),

21  and perhaps with Satchu's Kenyan-based family, these shells may also be responsible for:

21      a.  producing and selling ideas taken from TS to foreign markets (not for US release);

22      b.  financing foreign films that utilize ideas taken from TS (not for US release).

23

24              **Def Ari Emanuel's Relationship With Defendant Spacey:**

25    36.  Defendant Ari Emanuel likely first met Defendant Kevin Spacey between 1987 and

26  1989, when both men were at Creative Artist Agency (CAA). In 1987 Def Ari Emanuel was

27  a new CAA talent agent, working in **TV** casting. In 1987 Def Kevin Spacey, represented by

28  CAA, was working in Los Angeles and appeared in 9 episodes of the **TV** series "Wiseguy".

COMPLAINT
9

**Def Emanuel's Notorious Connection to Def Wiczyk & Satchu:**

37.   Defendant Ari Emanuel is a quiet partner in MRC. Thus, by casting WME-IMG actors in MRC films, Def Emanuel profits both as an agent and as a studio owner. This arrangement is a conflict of interest, in violation of CA Labor Code 1700.39.

38.   In 2007, The New York Times published an article called *"Tilting The Balance of Power Toward Talent Agency Clients"* (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients" is attached as "**Exhibit H**" and is incorporated by reference as if fully set out herein.) The article states:

....representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist."According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

39.   Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.

"For us, financing opportunities are always exciting and interesting,"said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"

Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that **no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.**

COMPLAINT
10

| | |
|---|---|
| 1 | **BACKGROUND FACTS** (CONTINUED) |
| 2 | THE 4 MAJOR EVENTS THAT SET UP THE CONSPIRACY(S) |
| 3 | **40.**   The seeds of the Defendants unlawful actions were planted about two decades ago, |
| 4 | by **4 events:** two of these events occurring in 1995, two occurring in 1999. |
| 5 |   1.  **In 1995** Def Ari Emanuel started Endeavor Talent Agency. |
| 6 |   2.  **In 1995** Edgar Bronfman Jr. (CEO of Seagram's) bought Universal Pictures. |
| 7 |   3.  **In  1999**,  Jerrol  LeBaron  copyrighted  a  revolutionary  screenwriter-to- |
| 8 |        Hollywood-film-industry-professional  website  **Writers'  Script  Network.com**, |
| 9 |        which went online in March 2000, changing its name to "**InkTip**" (inktip.com) in |
| 10 |        2003. |
| 11 |   4.  **In 1999** Defendant Modi Wiczyk wrote  a revolutionary **memo**, titled "Another New |
| 12 |        Ball  Game",  which  sent  Hollywood's  powerhouses  scrambling.  Wiczyk's  memo |
| 13 |        would be discussed in  magazines and lounges for years to come. |
| 14 | |
| 15 | **41.**  These 4 events, **each** require a brief explanation to understand how they set the stage |
| 16 | for the Defendants' conspiracy(s). |
| 17 |   **(1) Def Ari Emanuel Comes To Power As CEO Of Endeavor Talent Agency, 1995** |
| 18 | **42.**   In 1995 Def Ari Emanuel started Endeavor Talent Agency. Soon, his aggressive, |
| 19 | unethical practices would make Endeavor the fastest growing talent agency in Hollywood. |
| 20 |    **(2) Edgar Bronfman Jr. Comes To Power At Universal Pictures, 1995** |
| 21 | **43.**   In 1995, Canadian based "Seagram's" (the giant beverage company) bought |
| 21 | controlling interest (80%) of Universal Pictures, and Edgar Bronfman Jr. (Seagram's heir; |
| 22 | **Canadian**, graduate of **McGill** College) became owner and CEO of Universal Pictures. |
| 23 | Bronfman remained CEO of Universal Pictures even after Vivendi bought Universal in |
| 24 | 2000.  He stepped down as chief of Universal in 2001, BUT remained Vice-Chairman of the |
| 25 | Board (likely to insure that Def Emanuel's relationship to Universal remained in place) until |
| 26 | December 2003; by then Def Emanuel's role with Universal Pictures was well established. |
| 27 | **44.**  To pay for Universal Pictures, Bronfman Jr. sold Seagram's stake in Dupont (for |
| 28 | $9-billion). Most analysts and Seagram's investors considered this a terrible business move. |

1   To make matters worse, Bronfman knew little about the film business. **NOTE:** Bronfman

2   was convicted of insider trading, in France, in 2011, receiving a 15 months suspended

3   sentence, and a €5,000,000 fine.

4      45.  In 1995, Bromfman and Def Ari Emanuel represented big changes in Hollywood,

5   but <u>the biggest change in Hollywood in 1995 was the advent of the **DVD**</u>. DVDs

6   represented huge new opportunities for producers and film companies —opportunities that

7   would make movies FAR more profitable than ever before; but more profitable for

8   producers, NOT talent agents—adding fuel to Emanuel's drive to become a producer and a

9   studio owner.

10      **(3)  The Advent Of Writers' Script Network.com (InkTip.com), 1999**

11      46.  In 1999, Jerrol LeBaron copyrighted his brilliant website **Writers' Script**

12   **Network.com**,  (writersscriptnetwork.com), going online March 2000; changing its name

13   to **InkTip** and its location to inktip.com in 2003. Unlike all other screenwriter websites at

14   that time (which either just posted screenwriter agents' addresses, or just allowed

15   screenwriters to post loglines or synopses, with no ability to bring the writers to the agents

16   and filmmakers), LeBarons website promised something new. Based in Los Angeles

17   County, LeBaron went out and told Hollywood agents and filmmakers about his website,

18   and invited them to join and peruse the works of thousands of undiscovered screenwriters.

19   The site had great safeguards, designed to protect both the writers and industry

20   professionals. Writers' Script Network.com required all users to use their real names.

21   Writers could not read other writers' work, as that would only reduced the writers' safety.

21   However, after registering, the **industry professionals** could freely read any logline (a

22   short description, 60 words or less) on the website. If a professional wanted to read more,

23   they could click on a link to read a synopsis—and immediately the screenwriter would

24   receive notification of who had accessed his work, when, and from where. If the

25   professional wanted to read the entire script, he/she would then need to contact the writer

26   and request a script. Writers' Script Network.com kept all records of access. **LeBarons's**

27   **site was the new online industry <u>standard</u>** (where there had been no standard, rules,

28   safety, or security for screenwriters ); flawless in conception, safety and transparency.

**(4) The Memo, 1999**

47.   In 1999, only 27 years old, Def Mordecai (Modi) Wiczyk, the new Senior Vice President of Production and Acquisitions at Summit Entertainment, LLC, sent out a **memo** titled "Another New Ball Game". That memo sent Hollywood's unethical establishment scrambling after massive new profits. Wiczyk's memo would be discussed in magazines and lounges for years. Within a year, in 2000 (likely at Def Ari Emanuel's bidding) **Universal Pictures** would steal Wiczyk away from Summit, making him VP of Productions. Two years later, Def Ari Emanuel made Wiczyk his **partner** at Endeavor Talent Agency.

48.   In 2007, *Slate* remembered "the memo" in an article called "How An Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate" article is attached as "**Exhibit I**" and is incorporated by reference as if fully set out herein.). Writer Kim Masters wrote:

> ...The memo predicted the decline of the studios, with filmmaking talent as the beneficiary. He also predicted that a management company with a lot of big stars would start to produce and own films. "The most immediate and pressing challenge would be to get the studios to carry the product," he said. The likelihood of a studio boycott was remote, he said, because "whichever studio was suffering at the time would probably break ranks in the name of short-term self-preservation." Hmm.
>
> Michael Ovitz eventually tried to launch such a management company and failed. But Wiczyk's memo said the agencies could also carry out the change. **"A similar structure could be created which complies with the conflict-of-interest laws,"** Wiczyk wrote. "If [a] fund was created as a stand-alone entity and the agency had an arms-length service contract, they could avoid conflict-of-interest violations… Admittedly this is a delicate issue and a tough deal to pull off, but it's certain someone would **try it**." Why? The potential for enhancing agency commission was "too rich to ignore." **In fact, he said, an agency could double its annual revenues.**

49.   Wiczyk's psychopathy is on full display in those final lines of the article, as he enthusiastically implies it is reasonable to behave without ethics —if the profits are "too rich to ignore." But Wiczyk's prediction that "...it's certain someone would try it" would soon prove correct.

50.   But who would want to wander with Wyczyk into such ethically questionable water?

COMPLAINT
13

| | |
|---|---|
| 1 | **THE ENDEAVOR/UNIVERSAL/MRC DEFENDANTS:** |
| 2 | ARI EMANUEL AND  HIS SECRET RELATIONSHIP WITH UNIVERSAL |
| 3 | PICTURES; EMANUEL UNITES WITH ASIF SATCHU AND MODI WICZYK |
| 4 | 51.   In 1999, Def Ari Emanuel knew producers made the REAL money in Hollywood. |
| 5 | But, as a talent agent, he couldn't get in the action—not legally (or not with his name on the |
| 6 | product), due to California's conflict of interest laws. |
| 7 | 52.  But Def Emanuel saw an opportunity. |
| 8 | 53.  Defendant Ari Emanuel had a **distribution problem**. His talent agency (Endeavor) |
| 9 | represented many directors, writers and actors, who sometimes decided to make |
| 10 | independent and experimental films, only to discover, later, that their films couldn't get |
| 11 | national or global distribution because the distributors thought the films weren't marketable. |
| 12 | Thus, many of these films died early deaths. |
| 13 | 54.   Bronfman Jr., on the other hand, had a **talent problem**. Bronfman Jr. knew the |
| 14 | importance of getting marquee names on films. Big American studios crank out about 17 |
| 15 | films a year. In this haste, sometimes the studios commit to bad screenplays that no big |
| 16 | actors will commit to, thereby dooming the films. But just one or two big names attached to |
| 17 | these *inferior* films could increase their returns by tens of millions of dollars. |
| 18 | 55.   Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it. Bronfman Jr. |
| 19 | came to power in 1995 with Universal in 4th place among the big six studios (20 Century |
| 20 | Fox, Disney, Paramount, Warner Bros., Sony Pictures, Universal Pictures). But only one |
| 21 | year later, in 1996, Universal was in last place. And last again in 1997. And in 1998, even |
| 21 | worse: last place, and Universal had one of its worst years ever, with only a 5.9% market |
| 22 | share. Stockholders were restless. (See **Exhibit J**.) |
| 23 | 56.   In this tough time, Def Ari Emanuel approached Bronfman with a proposal. |
| 24 | 57.   Def Emanuel offered to put special effort into Universal Picture films, and ask his |
| 25 | actors, writers and directors to give preference to Universal Pictures films. Emanuel also |
| 26 | likely offered to take a reduced agent's fee. **In exchange** Def Ari Emanuel likely received a |
| 27 | percentage of the films, and/or a generous share of Seagram's (Universal's parent) stock, but |
| 28 | no film credit), and an agreement that Universal Pictures would distribute, and/or provide |

1   production money for, any reasonably viable film Def Emanuel brought to Universal
2   Pictures.

3      58.  The agreement was made late 1998.

4      59.  The next year, 1999, Universal pictures would have its best year since Bronfman
5   arrived, climbing to 3rd place, with a 12.7% market share. That was 1999 —the same year
6   Def Modi Wiczyk wrote his memo.

7      60.  Def Ari Emanuel read the memo.

8      61.  Bronfman Jr. surely read the memo. In fact, two years after Wiczyk wrote the memo,
9   in 2001, Bronfman's **Universal Pictures** made Def Wiczyk their vice President of
10  Productions. (An article about Universal hiring Wiczyk is attached as "**Exhibit K**" and is
11  incorporated by reference as if fully set out herein.)

12     62.  And a year after that, in 2002, Def Emanuel would hire Def Wiczyk away from
13  Bronfman Jr., to make Wiczyk a **partner** at Endeavor Talent Agency.

14   ●  63.  But Wiczyk had been Vice President of **productions** at Summit Entertainment,
15  AND Vice President of **productions** at  Universal Pictures. Wiczyk was a **producer**. Why
16  would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel
17  was secretly going into the production business with MRC and Universal Pictures.

18     64.  When Def Ari Emanuel stole Wiczyk away from Universal Pictures there were no
19  hard feelings between Def Emanuel, Bronfman and Universal Pictures, and nothing changed
20  in their arrangement. Def Ari Emanuel continued to provide the same talent and producorial
21  services for both MRC and Universal Pictures. And although Bronfman left Universal a
21  year later (2003), Def Emanuel continues to do favors for Bronfman and his Universal
22  "family" to this very day (e.g. Def Emanuel and WME-IMG represent Bronfman Jr's
23  daughter, Hannah).

24                 **Wiczyk's Memo Inspires A Conspiracy**

25     65.  The driving force behind Defs Emanuel's, Wiczyk's and Satchu's involvement in
26  this conspiracy was to create the film production system outlined in Wiczyk's **memo**, to
27  increase—maybe even **double**—profits. The conspiracy required only 3 or 4 players, with
28  the right talents. Def Emanuel had connections to all the studios, and access to huge stars;

1 Asif Satchu was a creative business force who specialized in distribution and networking;

2 Modi Wiczyk was a proven business, financing, and film production prodigy. They had

3 almost everything they needed—except good screenplays. But as a new "questionable"

4 company, established writers were not inclined to work with this unscrupulous band.

5    66.  A film production starts with acquiring a screenplay, a "property". The Defendants

6 knew that. They also knew good screenplays are hard to find, cost good money and are a

7 risky investment. A bad director could ruin a great script, and even the best writers

8 sometimes wrote bad scripts. In 2000 Def Wiczyk helped sell his brother's (Roee Wiczyk)

9 screenplay to his former employer (Summit Ent.). But the script was weak, thus never

10 developed, and Roee Wiczyk never sold another script. "Variety" reported on this script sale

11 in 2000. (Said article is attached as "**Exhibit L**" and is incorporated by reference as if fully

12 set out herein.) As a business man, Wiczyk could sell anything —he sold his brother's script

13 idea without even having a script name. But now, operating as film producers and a *studio*,

14 without an **actual** *good* script, or some good ideas, they couldn't get any project started.

15    67.  The Defendants needed scripts, but they wanted to reduce their risks.

16    68.  Defs Emanuel, Satchu and Wiczyk knew ideas are not copyrightable; only unique

17 arrangements of ideas are copyrightable. If the Defendants had a method to access good

18 writers' work, they could extract the best of those ideas, then pay their own writers to turn

19 them into "new" screenplays, then produce and market those derivatives as their own.

20    69.  The L.A. based Defendants were aware of Writers Script Network.com. As "industry

21 insiders" they had likely even received a call or email from Jerrol LeBaron. They wanted

21 something like Writers Script Network.com—but **without** the good security features.

22

23               **THE TRIGGERSTREET DEFENDANTS**

24         <u>SPACEY'S CAREER SPUTTERS; SPACEY MEETS BRUNETTI;</u>

25       <u>THE CONCEPTION OF THE TRIGGERSTREET SOCIAL NETWORK</u>

26    70.  In 1994 Def Spacey learned Warner Bros intended to make a movie about the life of

27 Bobby Darin (eventually called "Beyond The Sea"). This was Spacey's secret dream role.

28 He offered to play the leading role, but the producers refused, believing Spacey was too old.

1  71. In 1995, Def Spacey's career soared with *Usual Suspects* and *Seven*. But in 1996 and
2  1997 Def Spacey was back to NOT getting solid leading-man roles.

3  72. This likely inspired Def Spacey to form his production company, "Trigger Street
4  Productions", to make quality films with himself cast as the lead. But for the next 7 years
5  his production company floundered. The problem was getting a good screenplay.

6  73. It is reported that around 1998 Def Spacey met Def Dana Brunetti, who soon
7  became Spacey's personal assistant.

8  74. Although in 1999 Def Spacey won an **Academy Award** for Best Actor (American
9  Beauty), 1999 would mark the beginning of a very difficult period of Def Spacey's career
10 (1999-2003). His production company would go 3 years without making a film (Jan 2000 to
11 Jan 2003). And worse, for some reason Hollywood would not invest much money in any
12 movie with **Kevin Spacey** in a leading role, **his films budgets were far below the**
13 **Hollywood average** (the average Hollywood budget in 2000 was about $60 million):
14 1. American Beauty, 1999, **$15 million**; 2. The Big Kahuna, 1999, **$7 million**; 3. Ordinary
15 Decent Criminal, 2000, **$12 million**; 4. Pay It Forward, 2000, **$40 million**.

16 75. Def Spacey's difficulty consistently getting good roles, then, was likely due to his
17 terrible reputation around Hollywood as something of a hustler. In 1999, actor Val Kilmer
18 explained in a "Mr Showbiz" interview that in the 1970s Kevin Spacey, who was then a
19 young college student, tricked Kilmer's father out of $18,000 for college tuition —but
20 Spacey, according to Kilmer, kept the money, dropped out of school, and never repaid
21 Kilmer's father. (Said "Mr. Showbiz" article is attached as "**Exhibit M**" and is incorporated
21 by reference as if fully set out herein.) Stories like Kilmer's, and a tabloid photo journal of
22 Def Spacey participating in a public indiscretion, contributed to Def Spacey's trouble.

23 76. But amid all of these struggles, somehow in 2000, Spacey was able to secure the
24 film rights to his dream project **-Bobby Darin's life story**. But since Def Spacey had no
25 production funding, he would have to wait almost 4 more years to make his movie.

26 77. It's possible that during these tough times, Spacey and Brunetti looked around
27 online for affordable scripts for Spacey's production company to film. And maybe then they
28 stumbled upon *Writers Script Network.com*, which inspired them to create TS... Then, this

1   unlikely pair—a college dropout actor whose career was on life support, and a cellphone

2   salesman—teamed up to create a massive social network for screenwriters and filmmakers.

3   And soon Ari Emanuel learned about the site and asked Spacey to make some

4   modifications: relaxing security, and making access private and untraceable. That could be

5   how TS was created. It makes little difference to the conspiracy that followed.

6      78.   However, the Plaintiff believes TS was formed in a conspiracy conceived by Def

7   Ari Emanuel, to enrich himself and his conspirators. Elysium, alone, earned $286,000,000

8   worldwide theatrically, and should have earn another $570,000,000 in home entertainment

9   and TV, (typically, movies earn twice their theatrical total in home ent., TV, and auxiliary

10   sales), for a total of **$856,000,000** —almost a billion dollars. **This is why setting up TS and**

11   **Project Greenlight were so important to Def Ari Emanuel. One good script can easily**

12   **earn a billion dollars, and one big TV show can earn far more than that.**

13

14                **THE DEFENDANTS' CONSPIRACY BEGINS:**

15

16      79.   In 2000, shortly after Def Emanuel discovered Writers Script Network.com, Def

17   Emanuel planned his own screenwriter/filmmaker website, with minimal or no security

18   features. He would use his clients, Def Matt Damon and Ben Affleck, as the website's

19   spokesmen and its alleged *conceivers*. In August 2000 Project Greenlight was born. (An

20   Internet Archives screenshot of projectgreenlight.com—showing its origin time—is

21   attached as "**Exhibit N**" and is incorporated by reference as if fully set out herein.)

21      80.   Then misfortune struck Universal Pictures in 2000, and Def Ari Emanuel seized the

22   occasion to launch a **second** website, allegedly conceived by Defs Spacey and Brunetti.

23      81.   In 2000, Universal Pictures was in a bind. They were just a few months away from

24   beginning to film "K-PAX" but they didn't have a leading actor (after Will Smith and others

25   dropped out). Smith, and other actors and directors (with integrity) were perhaps dropping

26   out due to rumours that Argentinian film director and screenwriter, Eliseo Subiela, learned

27   about writer Gene Brewer's 1995 book "K-PAX" and planned to sue Brewer and Universal

28   Pictures for copyright infringement of Subiela's 1986 film "Man Facing Southeast".

82.   But Universal Pictures, not worried about a small director from Argentina suing, decided to push forward, film, release, make a fortune, and fight Subiela in court later.

83.   By mid 2000, with little time to find a leading man, Universal Pictures was desperate enough to consider casting Def Kevin Spacey in the leading role.

84.   Def Ari Emanuel could have just asked Spacey to take the leading role. Spacey would have leaped at the chance. But Spacey wasn't an Endeavor client, so Def Emanuel wouldn't receive his casting fee.  Def Ari Emanuel was a businessman. As such, even though he needed a favor from Spacey, he wasn't going to just give Spacey a leading role, he wanted something in return. Def Ari Emanuel knew Def Spacey's career was in trouble.

85.   Def Ari Emanuel approached Def Spacey to ask him about starting or endorsing, a screenwriter/filmmaker social network; a social network with little or no security features. The conversation likely started with Def Ari Emanuel asking how Spacey's career was going.  Def Spacey likely explained his recent career setbacks, and his hope to one day film Bobby Darin's life story. He may have explained that he had recently secured the rights to his Bobby Darin film (Beyond the Sea), but had no funding to shoot his dream film.

**Quid Pro Quo**

86.   Upon hearing about Spacey's career troubles, Def Emanuel made Def Spacey and Brunetti an offer: (1) he asked Defs Spacey and Brunetti to design a social network so that ALL user could access ALL screenplays, anonymously, with few security safeguards (it is possible/probable that Def Asif Satchu facilitated the website design); (2) Def Emanuel also may have asked Spacey and Brunetti to include a counter-security feature whereby if a screenplay was removed from the website all access history would also be erased (**although the Defs seem to have added this second features in 2007, shortly before accessing the Plaintiff's work**). The Plaintiff believes that in exchange for agreeing to operate such a social network, Def Ari Emanuel promised Defs Spacey and Brunetti a few things in return:

   **1.**  Spacey would star in K-PAX, a film with a solid $68 million budget;

   **2.**  Def Ari Emanuel would finance Spacey's production company to make Def Spacey's dream film, Beyond the Sea;

   **3.**  Def Emanuel would help Spacey's production company arrange financing and

COMPLAINT
19

1          distribution (as needed) for the life of the social network;

2      **4.** Def Emanuel would introduce Spacey and Brunetti to the financial and distribution

3          partners necessary for their production company to succeed;

4      **5.** Emanuel would try to find Spacey a meaningful, perhaps "career defining," role.

5      87.   The agreement was made.

6      88.   Thus, September 2000, only <u>one</u> <u>month</u> <u>after</u> <u>the</u> <u>birth</u> <u>of</u> <u>Project</u> <u>Greenlight</u>,

7  **TriggerStreet.com (<u>TS</u>) was born.** (Internet Archives screenshot of projectgreenlight.com,

8  showing the origin time of Project Greenlight is attached as "**Exhibit O**" and incorporated

9  by reference as if fully set out herein.) The probability that both of the world's only

10 screenwriter/filmmaker social websites (both of which also happened to be prominently

11 celebrity-endorsed) coincidentally starting only a month apart is infinitesimal.

12     89.   But TS would remain a closed and inactive site for 2 years, not having its official

13 "launch" party until 2002. This helped avert suspicion, kept TriggerStreet from competing

14 with Project Greenlight, and allowed TS to learn from Project Greenlight's mistakes.

15     90.   In November 2000, as agreed, Spacey began filming KPAX. When the film was

16 released it would be the first smoking gun in this conspiracy:

17     ●   91.   KPAX was released Oct 2001. It would be the first time **Universal Pictures**

18 **EVER** cast Kevin Spacey in a leading role (in fact, Universal had only ever cast Spacey in

19 **one [1]** film, a **supporting** role, ten years prior, in 1990, in "Henry & June"). (*Spacey was

20 most commonly cast in **Warner Bros** films and independent films.) <u>Casting</u> <u>Spacey</u> <u>to</u> <u>star</u>

21 <u>in</u> <u>K-PAX,</u> <u>a</u> <u>$68</u> <u>million</u> <u>film,</u> <u>at</u> <u>such</u> <u>a</u> <u>low</u> <u>point</u> <u>in</u> <u>Spacey's</u> <u>career,</u> <u>was</u> <u>almost</u>

21 <u>inconceivable</u>. **Def Spacey wouldn't star in a film with a budget over $40 million for 5**

22 **more years** (Superman Returns). Spacey would only appear in one other Universal Pictures

23 film, 2 years later, *The Life of David Gale*—originally a Warner Bros (Spacey's stable)

24 property that Universal Pictures optioned. Spacey just came with the deal.

25     ●   92.   A month after K-PAX was released, in November 2001, director/writer **Eliseo**

26 **Subiela (via Jason Laskay) sued Universal Pictures**, Gene Brewer, et al, for plagiarizing

27 his film *Man Facing Southeast*. The suit was eventually withdrawn when Subiela and

28 Laskay could no longer afford to litigate against a giant corporation like Universal Pictures.

COMPLAINT
20

**TS LAUNCHES, NOVEMBER 2002**

93.   After giving Project Greenlight two years to gain traction, November 2002, the Defendants prepared to launch TS. To attract the best undiscovered writers, the Defendants planned to generate "buzz" by throwing 3 huge TS "launch parties": one in New York, one in Los Angeles, and one in **London**. (A photo of Kevin Spacey at the TS London Launch party is attached as "**Exhibit P**" and is incorporated by reference as if fully set out herein.) While in Britain, Def Spacey did many interviews about TS. The Guardian featured a piece called "Cyber Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's well-rehearsed lines. (Said Guardian article in which Def Spacey went to London to discuss TS is attached as "**Exhibit Q"** and incorporated by reference as if fully set out herein.) Writer Sean Clarke wrote:

> Spacey tells an anecdote about the original idea for the site, which is essentially Brunetti's brainchild. He says they "came up with a sketchy plan, which at the time..." and chuckles wryly, on which cue Brunetti take up the story "... which at the time, we thought was great." They both shake their heads ruefully. Later, I watch as the pair address a press conference, they repeat the story, with exactly the same pauses, the same chuckle, the same interruptions. It's beat-perfect, like a Mamet script.

94.   And to generate even more buzz, before the website was launched, Budweiser announced their corporate sponsorship of the TS social network.

95.   Along with the sponsors, parties and interviews, to help repair Def Spacey's damaged reputation, the TS website posted a heartwarming story that Spacey started his new social network "to help undiscovered writers and filmmakers get industry access and exposure."

96.  **TriggerStreet.com was "launched", and went online, November 2002**

- 97.   Def Spacey held a New York TriggerStreet **launch party** on Nov 11th, 2002.
- 98.   Def Spacey held a Los Angeles TS **launch party** on Nov 18th, 2002.
- 99.   Def Spacey held a London TS **launch party** on Nov 26th, 2002.

COMPLAINT
21

**After TriggerStreet Officially Launched, Nov 11th, 2002,**

**The Following Events (Connecting The Defendants) Occurred:**

100. Within just a few months of TS's official launch (Nov 2002), Def Spacey would receive **3** huge payments from Defs Ari Emanuel and Universal Pictures (although Spacey would receive many other "benefits" during the 12 year lifespan of TS): **1)** Universal Pictures would distribute "The Life of David Gale"; **2)** Spacey's production company would receive distribution money for "United States of Leland"; **3)** after 3 long years, Spacey's production company would receive **$25,000,000** to produce "Beyond the Sea".

● 101. In **February** **2003**, 3 months after TS launched, **Universal Pictures** distributed Spacey's film "**The Life of David Gale**" (again, originally a property of Spacey's home studio, Warner Bros). This would be the last time Universal Pictures would be involved in a Spacey film (to the date of the filing of this Complaint). Thus, the only two Universal Pictures films featuring Spacey as a lead are *K-PAX*, and *The Life of David Gale*.

● 102. That same month, **February of 2003**, Spacey's production company would magically get money to release and distribute its first movie in 3 years: "United States of Leland". The film would only be released in 14 theaters, losing millions, and bringing in only $344,000. Likely, Universal Pictures wouldn't put their name on the film, because after two bad years, Universal was back in 5th place (second to last place), and they didn't want *United States of Leland* to move them into last place.

● 103. That same month, again, **February 2003**, it was announced that production of Spacey's Dream film, "Beyond the Sea," was being fast-tracked—directed by and starring Spacey and produced by Spacey's production company, with a $25,000,000 budget.

104. Suddenly, in the nadir of Spacey's career, inexplicably Hollywood was showing him tremendous support—when 4 of Spacey's previous 5 films were major money losers.

Footnotes:

105. Shortly after TS launched, in **2003**, Ari Emanuel gave Asif Satchu and Mordecai Wiczyk financing to start MRC.

106. **December 17th, 2004,** *Beyond the Sea* was released. It would be Spacey's **greatest failure**; costing $25 million, but only earning $8.4 million; losing over $16,000,000.

COMPLAINT

22

| | **Additional Facts Regarding TS And The Defendants** |
|---|---|
| 1 | |
| 2 | • 107. Spacey's production company made no films for 3 years, January 2000 to |
| 3 | January 2003: Ordinary Decent Criminal (Jan 2000, direct to DVD in USA), and United |
| 4 | States of Leland (Jan 2003, released in only 14 theaters). |
| 5 | • 108. Since TS launched, Def Spacey's production company has made 22 films. |
| 6 | • 109. May 2005, 2.5 years after TS launched, Project Greenlight was effectively |
| 7 | dead (no new contests for filmmakers or screenwriters); killed by the success of TS. |
| 8 | Although, oddly, the Project Greenlight website remained open, but inactive —no new |
| 9 | contests, no new submissions accepted; just an open, inactive website (until 2015). |
| 10 | • 110. In 2006 Spacey held a TriggerStreet "RE-launch" party in Los Angeles. |
| 11 | • 111. 2007, Plaintiff's screenplay, Butterfly Driver, was posted and accessed on TS. |
| 12 | • 112. 2007-2009 TS secretly joined Bud.TV (Budweiser TV), without informing |
| 13 | members or revising its Term of Use page. In a 2007 Anheuser-Busch announced it was |
| 14 | launching Bud.TV with TriggerStreet.com providing programming. (Said Bud.TV news |
| 15 | release is attached as "**Exhibit R**" and incorporated by reference as if fully set out herein.) |
| 16 | Curiously, Bud.TV's Wikipedia page shows Defs Matt Damon and Ben Affleck (Project |
| 17 | Greenlight), and Kevin Spacey (TS) all provided Bud.TV programming. (Said Wikipedia |
| 18 | article is attached as "**Exhibit S**" and incorporated by reference as if fully set out herein.) |
| 19 | • 113. Feb 2009, the BBC reported Def Spacey hosted the Mofilm Film Festival, in |
| 20 | Spain, where he boasted of TS's **"400,000 members around the world."** (Said BBC article |
| 21 | is attached as "**Exhibit T**" and is incorporated by reference as if fully set out herein.) |
| 21 | Willfully marketing TS outside of the USA violated the Plaintiff's copyrights. |
| 22 | • 114. On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency (ETA) |
| 23 | merged with the William Morris Agency (WMA), creating William Morris Endeavor. |
| 24 | **17 days later**, May 14th 2009, **after about 20 years <u>with</u> <u>the</u> <u>William</u> <u>Morris</u> <u>Agency</u>**, |
| 25 | Def Spacey signed with CAA (Creative Artist Agency). Def Spacey did so to keep TS |
| 26 | members (and any observing regulatory authorities) from becoming suspicious of his link to |
| 27 | Def Ari Emanuel through TS. (A New York Times article about the April 2009 merger of |
| 28 | WMA and Endeavor is attached as **"Exhibit U"** and is incorporated by reference as if fully |

1   set out herein.)  (A May 2009 Variety article about Def Spacey leaving WME is attached as

2   "**Exhibit V**" and is incorporated by reference as if fully set out herein.)

3   ● 115.   May 2010, "Deadline Hollywood" reported Defendant **Universal Pictures**

4   and Defendant Media Rights Capital (MRC) announced a 20 picture, 5-year production and

5   distribution deal. (Said "Deadline Hollywood" article is attached as "**Exhibit W**" and is

6   incorporated by reference as if fully set out herein.)  Thus, MRC's (a company co-owned by

7   Defendant Ari Emanuel) first mega-deal would be with **Universal Pictures**.

8   ● 116.   March 15th, 2011, **Netflix** and Def **MRC** (owned by Defs Emanuel, Wiczyk

9   and Satchu) announced their mega $100 million dollar 2-season deal to produce the new

10  series *House of Cards*, starring Def Kevin Spacey. Quietly, a few months later, July 2011,

11  **with the role of a lifetime secured**, Spacey moved TS to http//www.labs.triggerstreet.com,

12  and begin to use the web address triggerstreet.com as his production company's site.

13  ● 117.   August 2013, the film ***Elysium*** (infringing on the Plaintiff's work) was

14  released. The Plaintiff then sued for copyright infringement, October 2013.

15  ● 118.   November 6th, 2014, 6 days after the Plaintiff filed his Notice Of Motion of

16  appeal, Defs Spacey and Brunetti closed and destroyed the TS social network.

17  ● 119.   In 2015, almost immediately after TS closed, Project Greenlight (which had

18  been **dead for 10 years**, came back to life, with a new HBO TV show, airing fall of 2015.

19  ● 120.   July 2016, HBO announced the Project Greenlight TV show was cancelled.

20  ● 121.   In 2016, with the cancellation of the TV show *Project Greenlight*, and with

21  the closing of TS—with no way to gain access to original screenplays to misappropriate—

21  ProjectGreenlight**.com** went active, again. **After 10 years of online inactivity**, Def Matt

22  Damon, Ben Affleck and ProjectGreenlight.com began seeking new screenplays again.

23  ● 122.   In 2015, Def Dana Brunetti produced his **first** solo effort (without Kevin

24  Spacey or their *Trigger Street Production* company), *50 Shades of Grey*. *50 Shades of Grey*

25  was, of course, <u>distributed</u> by **Universal Pictures,** apparently the only major distributor that

26  will touch a Brunetti film (without Def Spacey or their *Trigger Street Productions* company

27  attached). (A Wikipedia article showing the producers and distributors of 50 Shades of Grey

28  is attached as "**Exhibit X**" and is incorporated by reference as if fully set out herein.)

**SONY PICTURES EMAIL LEAK EXPOSE DEF ARI EMANUEL'S SECRET UNIVERSAL PICTURES TIES, HIS UNLAWFUL RELATIONSHIPS WITH SONY PICTURES' CEO (M. LYNTON), & HIS BULLYING, THUGGISH METHODS**

123. Further confirming all allegation herein, in 2015 Wikileaks released thousands of Sony Pictures emails, which had been previously released in 2014, when North Korea hacked and published thousands of Sony's emails. Within days hundreds of respected news agencies carried the story —The NYTimes, LATimes, Hollywood Reporter, all reported the juicy details—and the juiciest story was the story of how Sony Pictures lost -or passed on- "Steve Jobs", the movie.

124. All of the reports are similar: the emails provide an inside view of bunch of super-rich Hollywood producers, writers, and directors negotiating the production budget of the film "Steve Jobs", until the deal went bad and Sony gave up on the film. And right in the eye of the storm is Def Ari Emanuel. (An articles from "Mashable.com" about said "Steve Jobs" film emails is attached as "**Exhibit Y**"and is incorporated by reference as if fully set out herein.)

125. A few of the celebrities captured on Sony Pictures email/text leak, at times, behaved poorly, but no one behaved worse than, Def Emanuel. Brazen and thuggish, we see Def Ari Emanuel berate Sony Pictures' Chairman Amy Pascal, with impunity. And when the other Sony execs learned of this, they only called Def Emanuel a *bully*—behind his back. No one dared to confront Def Emanuel. But more surprisingly, through a tiny sliver of Def Ari Emanuel's emails (just those going into, or out of, Sony Pictures) we learn:

1. Def Ari Emanuel is a major film producer —in conflict with his role as a talent agent, and in violating California labor law which forbids employers (a producer) from charging employees (his actors) fees to be hired—perhaps an even more significant conflict of interest than Def Emanuel's partnership in MRC II LP.

2. Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures CEO and Chairman) are secretly business partners: co-owners in the company *Screenbid*.

3. Ari Emanuel is also a film financier, or executive producer (a person who provides or finds money to make films).

4.  Def Ari Emanuel also arranges peripheral services for Sony Pictures (and others), like making deals with Hasbro Toy Co. for Sony Pictures  (for Spider-Man 2 & Minions  action figures?).

5.  <u>Whenever necessary, **Universal Pictures** will distribute ANY film for Ari Emanuel</u>.

<div align="center">

<u>"STEVE JOBS" EMAILS CONFIRM DEF ARI EMANUEL</u>

<u>IS SECRETLY A MAJOR FILM PRODUCER, AND THE TRUE</u>

<u>PRODUCER OF "STEVE JOBS" —NOT SCOTT RUDIN</u>

</div>

126.   Through the Sony "Steve Jobs" email trail we see the "Steve Jobs" negotiation go on for about 8 months, then it begins to fall apart on October 16th, 2014, after Sony Pictures' President of Business Affairs, Andrew Gumpert, sends Sony Pictures Chairperson Amy Pascal, film producer Scott Rudin, Def Ari Emanuel, and WME co-CEO Patrick Whitesell a financing offer, which the filmmakers felt was too low.  October 18th, 2014, two days after Gumpert's low offer, Scott Rudin, angrily responds:

> 2014-10-18 16:09:38  Re: wwbo bumps/jobs  From: Scott Rudin <sr@scottrudinproductions.com> To: pascal, amy gumpert, andrew  aemanuel@wmeentertainment.com pwhitesell@wmeentertainment.com
>
> **SCOTT RUDIN:**
>           "You have NO risk in the movie but WE should have risk? You lay off every cent except what you choose to keep and WE should then also fund you --- that's how this should work?
>           I cannot believe you're serious. What idiot would make this deal? The presumption that five Oscar winners would be desperate enough to give up all value for their services and then also risk the baseline bargain-basement fees on top of it is beyond comprehension.
>           Every single movie like this that we have made for you has worked. And you think this is fair?"

127.   At Rudin's words, Def Ari Emanuel, who purports to the world that he is just a talent agent, would then take over the email exchange —seemingly eager to bully a woman.

> On Oct 18, 2014, at 9:15 AM,  From: Ariel Emanuel <AEmanuel@wmeentertainment.com> To: pascal, amy

<div align="center">

COMPLAINT

26

</div>

1       sr@scottrudinproductions.com  gumpert, andrew
2       pwhitesell@wmeentertainment.com

**ARI EMANUEL:**

3      "This offer is fucking bull shit. Give us the movie back. You you guys
4      in the business. No other studio would even ask for this. Pass"

5    128.  Def Ari Emanuel immediately establishes and retains dominance and control of the

6  matter for the remainder of the negotiation, and Scott Rudin would remain quiet and

7  subordinate to Def Emanuel. But the key detail in this email is that Def Emanuel has the

8  authority to say "Pass", meaning: we choose NOT to do business with you, we will find

9  another partner. No mere talent agent can usurp that power from the producer. Scott Rudin

10  put Ari Emanuel on that email chain because Ari Emanuel is the true producer.

11    129.  The exchange goes on. Amy Pascal writes:

12      On Oct 18, 2014, at 10:18 AM From: Amy_Pascal@spe.sony.com
13      To: aemanuel@wmeentertainment.com
        sr@scottrudinproductions.com gumpert, Andrew
14      pwhitesell@wmeentertainment.com

**AMY PASCAL:**

15     "Can we please deal with this Monday
16     Maybe we all get in a room and close it up"

17    130.  But Def Ari Emanuel will not be silenced by Ms Pascal's request to wait until

18  Monday. He replies five minutes later::

19      On Oct 18, 2014, at 10:23 AM, From: Ariel Emanuel
20      &lt;AEmanuel@wmeentertainment.com&gt; To: pascal,
        amy sr@scottrudinproductions.com  gumpert,
21      andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**

21     "Whatever
22     **You guys ask us to find financing. Scott, Patrick and myself get**
23     **Modi** and we still get no respect. Amy, this is not what you want to
        hear - but this NEVER happens and any other studio. In fact they
24     then would go out of their way to make a proper deal.
25     Even Harvey.
        Monday is fine."
26

27    131.  With that statement **Def Ari Emanuel admitted he found film financiers for**

28  **"Steve Jobs", which is a strictly a producer's, or an executive producer's job.** Def Ari

1 Emanuel also generously (and falsely) shares credit with Rudin and Whitsell for getting

2 Modi Wiczyk to help with financing, to make Rudin and Whitsell appear more significant to

3 the process. Again, Defs Modi Wiczyk and Ari Emanuel had been a business partners since

4 2002 (at Endeavor, as well as in MRC). Getting Def Modi Wiczyk involved was entirely

5 Def Ari Emanuel's doing. Amy Pascal responds to Def Emanuel's provocation:

On Oct 18, 2014, at 10:51 AM, From: Amy_Pascal@spe.sony.com
To: aemanuel@wmeentertainment.com
sr@scottrudinproductions.com gumpert,Andrew
pwhitesell@wmeentertainment.com

**AMY PASCAL:**
"arithat is totally unnecessary we are in a negotiationwe have all
been doing this a long timewe want to make moneyyou want to
make money for yourselves andyour clientsthis has nothing to do
with respect and to be fair and its a credit to the movie that scott
put together there are more financing partners  than we know
what todo with here....thats not the issue...we are the only major
studio that even tries to make thesekind of movesdont make it
harder than it isthe tone is really uncalled for  and unfairand
doesnt help get things doneamy"

16 132.    Through all of this, Scott Rudin never commented or told Def Ari Emanuel to

17 disengaged. That is not his place. Ari runs the show. Def Ari Emanuel replies:

2014-10-18 10:58:41  <u>Re: wwbo bumps/jobs</u> From: Ariel Emanuel
<AEmanuel@wmeentertainment.com> To: pascal, amy
sr@scottrudinproductions.com  gumpert,
andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
"Ok not true. Other studios make these movies"

22 133.   Def Ari Emanuel was alluding to Universal Pictures, who would produce any film

23 Def Emanuel suggested. Texting stopped for 7 or 8 hours, until Def Ari Emanuel resumed.

2014-10-18 16:20:47 From: aemanuel@wmeentertainment.com
To: gumpert, andrew sr@scottrudinproductions.com,
pwhitesell@wmeentertainment.com,  pascal, amy

**ARI EMANUEL:**
"In the real world when some one either risks something or gives something
up they get something in return. You guys seem to think we should be
honored just to be in business with you based on your offer. Why?"

134.  After this, the negotiation disintegrated over the next 4 weeks. The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:

> 2014-11-14 22:57:02  From: aemanuel@wmeentertainment.com
>            To: pascal, amy
> **ARI EMANUEL:**
>       "Is business affairs calling me so I can take this to Fox
>       Searchlight officially?"

135.  <u>With that statement Def Emanuel showed that, in addition to producing, **he even arranges distribution**</u>. Def Emanuel is asking Amy Pascal if Sony Pictures' President of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants "Steve Jobs". Def Emanuel is bluffing that Fox Searchlight has agreed to take the film. He  never had a deal with Fox Searchlight. He was just playing hardball; trying to get a better offer out of Sony, AND keep them in the dark about his distribution relationship with **Universal Pictures.**

136.   As this deal dragged on over 8 months, 3 weeks before the previous exchange, Sony Pictures' Andrew Dumpert, spotted Def Emanuel's chicanery and bad motives. In an email to Sony execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

> 2014-10-18 16:59:16  From: Andrew Gumpert
>            To: lynton, michael; pascal, amy; belgrad, doug
> **Andrew Gumpert:**
>       "The fact is there is only so much in the kitty. Unless the movie
>       massively breaks out they can never make real money, nor can we
>       and our investors.They have a 50pt pool with the best definition and
>       5m of box office bonuses. **Do they want to make MORE than the
>       equity? I think they do.** There is a huge philosophical gap (given
>       the rude and insolent responses from Ari and **Scott**)..."

137.  Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott Rudin weren't adhering to established guidelines.

138.  Although there have surely been occasions when Sony Pictures did cave-in to Def Emanuel's arm-twisting, this would not be one of those occasion. But oddly, Michael Lynton, CEO of Sony Pictures, responds to Gumpert only with silence—because Def Ari Emanuel is his close friend and secret business partner in Screenbid.

**"Steve Jobs" Film's Not-So Surprising *Twist* Ending:**

139. Fox Searchlight never touched "Steve Jobs".

140. Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the price of the film above market value, to increase his profit margin. He didn't need Sony Pictures to give him standard market value for "Steve Jobs", he could get standard value from Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari Emanuel took the film to the Studio that has distributed all of his films, since around 1999.

141. On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs", after so much posturing and tumult, "Steve Jobs" was distributed by **Universal Pictures.**

SONY PICTURES EMAILS SHOW DEFS EMANUEL & BILL BLOCK & SONY
PICTURES' CEO  (M. LYNTON) MAINTAIN UNETHICAL RELATIONSHIPS,
AS THEY CO-OWN "SCREENBID" TOGETHER (CONFLICT OF INTERESTS)

142. The "Steve Jobs" emails reveal Defs Emanuel and Bill Block are in a co-ownership business with Sony Pictures' then-CEO Michael Lynton. As we see Def Ari Emanuel write Michael Lynton to ask Lynton to check on their co-owned business, *Screenbid.*

> On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com
> To: lynton, michael;
> **ARI EMANUEL:**
> Michael -
> What are we doing on Screenbid? We had success on our early tests,
> nothing since. You guys own a piece of this company, we've had
> nothing since our early success. We have to keep the engines going.

143. In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of Screenbid is confirmed by the repeated use of pronoun"we". Def Ari Emanuel asks "What are **we** doing..." Then he states "**We** had success on our early tests…" Then he reminds Lynton that he (and some unknown party, or parties) also own shares of this company. Then, implying Lynton has a responsibility, Def Emanuel says, "**You guys own a piece of this company…**" Then Def Emanuel exhorts CEO Michael Lynton to take action, saying: "**We** have to keep the engines going."

144. These are not the messages of quiet stockholders. These men are owners.

COMPLAINT
30

ER 668

145.   Sony Picture's CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his business partners a business report, pasted below his reply text. (Bill Block was the CEO of QED International, a Defendant in Briggs v Blomkamp.) Def Bill Block's reply email reads:

> 2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
> From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
> michael_lynton@spe.sony.com
>
> **BILL BLOCK:**
>     Going well gentlemen.
>     Bill
>     From: Jeffrey A. Dash [mailto:jdash@screenbid.com]
>     Sent: Monday, October 27, 2014 10:13 AM
>     To: Bill Block
>     Subject: SCREENBID AUCTION UPDATE
>     AUCTION UPDATE:
>
>     TRUE BLOOD: (HBO) We are winding down aftermarket sales and fulfillment and are on schedule to present audited reports to HBO accounting within 14 days.
>
>     SONS OF ANARCHY: (FOX) We visited the set on Friday 10/24/14 and met with the department heads for props, wardrobe, transportation and set decoration. They are scheduled to wrap next week and we will take delivery by 11/5/14, immediately inventory and shoot. Writing began about 2 weeks ago The auction is scheduled to go live on 12/01/14 and bidding will end on 12/10/14. Fulfillment time will be tight. In order to get everything shipped prior to XMAS  we will have extra staff in place to facilitate…"

146.   In this unethical relationship, Sony Pictures' CEO Lynton, personally profited as Screenbid's owner, in such ways as directing Sony Pictures to give Screenbid millions in set furnishings to auction on Screenbid, where he and Def Emanuel profited as owners. Lynton's secret relationship with Def Emanuel is why Sony Pictures did not do due diligence to vet Def Blomkamp's Elysium script.

| | |
|---|---|
| 1 | <div align="center">SONY EMAILS SHOW DEF EMANUEL PERFORMS</div> |
| 2 | <div align="center">PRODUCORIAL SERVICES:  CALLING SONY'S CEO & CHAIRMAN</div> |
| 3 | <div align="center">TO ARRANGE A DEAL WITH HASBRO</div> |
| 4 | 147.   On March 28, 2014, Def Ari Emanuel emailed/texted Sony's Pictures' CEO and |
| 5 | Chairman to close an animation co-financing deal with Hasbro. Def Emanuel's email read: |
| 6 | 2014-03-28  re: HASBRO Animation deal |
| 7 | From: aemanuel@wmeentertainment.com<br>To:amy_pascal@spe.sony.com;  michael_lynton@spe.sony.com |
| 8 | **ARI EMANUEL:** |
| 9 | "HASBRO Animation deal<br>Amy & Michael - |
| 10 | We have sent Ronni our proposal for the animation co-financing |
| 11 | deal. Please take a look when you get a chance and lets lock this<br>down. |
| 12 | Ari |
| 13 | 148.   Talent Agents don't arrange animation co-financing deals with Hasbro—producers |
| 14 | and studios do. Curiously, after Billionaire Def Ari Emanuel recently purchased the UFC he |
| 15 | arranged a UFC Hasbro deal. (An article where Def Emanuel discusses UFC and Hasbro is |
| 16 | attached as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.) |
| 17 | |
| 18 | **SONY EMAILS SHOW DEFENDANTS COMMITTED PERJURY REGARDING** |
| 19 | **THEIR EFFORTS TO HIDE INFRINGEMENT IN BRIGGS V BLOMKAMP** |
| 20 | 149.   The Defendants' fraud, conspiracy and routine deceit included committing perjury |
| 21 | by lying on documents signed under oath. |
| 21 | 150.   During the discovery phase of Briggs v Blomkamp, et al (C13 4679 PJH) the |
| 22 | Plaintiff informed the district court that he suspected that writer/producer Simon Kinberg |
| 23 | was hired to rewrite Def Blomkamp's poorly written screenplay. In response to Plaintiff's |
| 24 | interrogatories to MRC II LP, the Defendants  made false statement, under oath, regarding a |
| 25 | substantial matter in that case, which may impact the Plaintiff's ability to prevail in that |
| 26 | lawsuit (currently in appeals). (Said Def MRC II LP's Interrogatory Responses from Briggs |
| 27 | v Blomkamp are attached as "**Exhibit AA**"  and is incorporated by reference as if fully set |
| 28 | out herein.) |

151. That deceit occurred when the Defs responded to interrogatory #17; believing Simon Kinberg helped disguise Def Blomkamp's infringement, the Plaintiff asked:

> **Plaintiff's Interrogatory:**
> INTERROGATORY #17:
> "Simon Kinberg is a writer and "script doctor" (a writer who fixes scripts that have serious problems). Simon Kinberg is listed as a producer of Elysium. Exactly what duties did Simon Kinberg play in the production and script doctoring of the screenplay and film "Elysium"?"

> **Defendants' Answer:**
> "Defendant incorporates by reference the preliminary statement and general objections... Subject to and without waiving the foregoing objections, Defendant responds as follows:
>    Simon Kinberg produced the Film. As producer, Mr. Kinberg also **assisted with a polish of the Film's screenplay** during the later stages of writing."

> **But The Leaked Sony Emails Reveal The Truth About Said Perjury:**

152. The Defendants admitted that Simon Kinberg helped improve the weak screenplay, BUT suggested that his help was just a "polish", which suggests merely dotting I's and crossing T's, and maybe a dialogue suggestion here and there. But, in fact, Simon Kinberg had to do exhaustive work to try to salvage Elysium's terrible screenplay.

153. The gross underestimation and misrepresentation of all the work Simon Kinberg had to do to repair Def Blomkamp's Elysium script is revealed in the 2015 Wikileaks' re-posting of the Sony Pictures' hacked emails, in five (5) key email exchanges between Defs **Modi Wiczyk**, **Simon Kinberg**, and Sony Pictures Chairperson **Amy Pascal**. In the first email, Def Wiczyk explains Kinberg's role:

> 2014-10-27 13:36:12 Fwd: CHAPPIE NOTES
> From: mwiczyk@mrcstudios.com To: pascal, amy
> **MODI WICZYK:,**
> "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying. great detail and very specific.he also included rachels document and merged it.**simon is a fixer and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too. nb has been ignoring him the past few weeks after listening to him up until then. dont know why, dont care. its our turn now.i told doug that we should

leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

154.   Def Wiczyk, Simon Kinberg, and Amy Pascal continued to discuss the endless and unimaginable problems Kinberg was having helping director Def Blomkamp's save his film, *Chappie*; the executives discuss reshoots, dialogue rewrites, other huge changes, and how to protect Def Blomkamp's insecure ego. Yet, amid these massive problems, Kinberg comments that Def Blomkamp was handling Kinberg's executive ordered changes much better than he handled them on Elysium, where Kinberg explains Blomkamp **"shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once."** In this email to Amy Pascal, Simon Kinberg wrote:

2014-08-07 07:02:55  Re: Chappie  from: sdkinberg@aol.com  to: pascal, amy

**SIMON KINBERG:**

"cool! neill has been really open throughout this process, and wants to get the audience all the way there. i think we're all feeling the same things now, so we can put it together and deliver to him, and he'll take it as an assignment not a judgement, and stay creative. **i saw him shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once. so i don't think he will now…**"

155.   In fact, the text/emails reveal Def Wiczyk and Amy Pascal were forced to hide from Def Blomkamp the fact that Simon Kinberg had to take over the film to finish it. This is revealed when Def Wiczyk wrote to Sony's Chairperson, Amy Pascal:

2014-10-27 13:42:22  Re: To discuss
From: mwiczyk@mrcstudios.com; To: pascal, amy

**MODI WICZYK:**

"not to oversimplify but i know simon has been biting his tongue for a month and all the sloppy stuff has been making him **crazy.** when i speak to him he seems to have a very clear view of what he wants to do. it lines up w what ur saying. i hink if we make them do it we will have a much much much better film that works. we just cant literally tell neill **si is taking over....**so its "our" notes"

156.   Additional evidence of the extreme measures that Defendants Simon Kinberg, Sony Pictures, MRC and Modi Wiczyk resorted to salvage Chappie. Can be seen in such

1  emails/texts as when Def Modi Wiczyk explains director Def Neill Blomkamp's inability to

2  even write or direct "basics". In an email text to Amy Pascal, Wiczyk wrote:

3      2014-10-27 13:52:57  Re: To discuss
4          From: mwiczyk@mrcstudios.com, To: pascal, amy
    **MODI WICZYK:**
5          "yes thats what i meanthe right version of this could be iconic and do 300
6          and have a huge sequelwhat bugs me is how obvious and unpolished the
           problems areall the hard stuff is great but all the basics are killing us"
7

8      157.    A week later, Def Modi Wiczyk emailed Amy Pascal to discuss BlomKamp's

9  insecurities, and how they were impacting production.

10         2014-11-03 04:31:07  Re:  From:
11             mwiczyk@mrcstudios.com  To: pascal, amy
    **MODI WICZYK:**
12         "dunno re simon. maybe insecure, maybe thinks simon is on "studio"
           side, which is juvenile. hes always mad at somebody. vacillates btwn
13         targets. i ignore it until it stops forward progress.
           re edgar i actually initiallygot nervous the music was too old to be
14         cool,but all my assistants say lots of these songs are in the collective
15         consciousness, played in bars and clubs. shows what i know....i dug the
           reel he did. and i loved the app w script and music."
16

17    158.   There are many more such emails that further reveal how inept and difficult Def

18  Blomkamp is. But from these select emails, we see that to revise Blomkamp's *Chappie*,

19  Kinberg took extraordinary measures, and that Blomkamp's inept, "insecure" and "juvenile"

20  conduct made Kinberg "crazy", forcing the executives to takeover the edit. Yet, Kinberg

21  implied these problems were mild compared to what he endured with Blomkamp revising

21  *Elysium*, where the problems were so extreme that Blomkamp **"shut down"** and **"didn't**

22  **have the answers".** Thus, clearly the script work Kinberg did on Elysium was **exhaustive**,

23  and not a mere "polish" as Def MRC II LP stated under oath. This was a clear act of perjury.

24

25      **SONY EMAILS CONFIRM DEFS RULE 37 VIOLATION IN BRIGGS V**

26      **BLOMKAMP, SHOWING DEFS OMITTED TESTIMONY & EVIDENCE**

27    159.   On page 28 of the Plaintiff's First Amended Complaint in Briggs v Blomkamp, et

28  al, the Plaintiff made a bold prediction: that sometime after May of 2013 (when Blomkamp

COMPLAINT
35

1   learned the details of Plaintiff's impending copyright lawsuit) Defendant Neill Blomkamp

2   went back into the editing room and tried to edit-out key headache scenes, which were

3   identical to the Plaintiff's work. The Plaintiff explained that Blomkamp did this <u>to try to</u>

4   <u>cover-up his theft of the Plaintiff's intellectual property</u>.

5       160.   Supporting this prediction, during the discovery phase of Briggs v Blomkamp, the

6   Plaintiff found a report on TheProvince.com (titled: "Elysium's ready as director Blomkamp

7   looks forward to next project" from February 2013) in which Def Blomkamp stated the film

8   was finished back in February 2013. (Said article from "The Province" is attached as

9   "**Exhibit BB**" and is incorporated by reference as if fully set out herein.) Then, proving the

10  Plaintiff's prediction, in sworn responses to Plaintiff's interrogatories, during discovery in

11  Briggs v Blomkamp, Def Blomkamp admitted film editing was finished "Sometime in or

12  about June 2013." (Said Defendant Blomkamp's Interrogatory Responses from Briggs v

13  Blomkamp are attached as "**Exhibit CC**" and are incorporated by reference, as if fully set

14  out herein.)

15      161.   The Plaintiff then filed a motion to compel documents, asking for all texts and

16  emails between Def Blomkamp and both *Elysium* film editors: Julian Clarke and Lee Smith

17  (Smith was the final editor—the editor who would have made these headache changes). The

18  Plaintiff made this motion to prove that Def Blomkamp resumed film editing after February

19  2013, to try to remove or alter the "headache" scenes. However, **the Defendants would not**

20  **provide a response from Lee Smith**, only from Clarke (Clarke stated that editing ended

21  well before June 2013—contradicting Blomkamp, who said editing ended June 2013). But

21  Lee Smith returned to the editing room to fix the headache scenes in May and June 2013.

22      162.   As well as doing the final edit of Elysium, the 2014 Sony email leak show that Lee

23  Smith also did the final edits for Blomkamp's next film, *Chappie* (although Smith isn't

24  credited on IMDB or Wikipedia).

25      163.   Lee Smith's final edit of Chappie is revealed in the Sony email leaks as Def Modi

26  Wiczyk writes to Amy Pascal:

27                    2014-08-12 00:13:30  <u>saw it.</u>  From:
                      <u>mwiczyk@mrcstudios.com</u>  To:
28

| | |
|---|---|
| 1 | <div align="center">amy_pascal@spe.sony.com</div> |
| 2 | **MODI WICZYK:** |
| 3 | "we are going to get there and have a big success with this one. **lee smith** will be huge, **nb** is in GREAT frame of mind." |
| 4 | 164.   Def Wiczyk knew Smith would be "huge" because of how Smith helped salvage |
| 5 | Elysium. A few months later Def Wiczyk told Amy Pascal about all the work Lee Smith had |
| 6 | left to do on the film, and the continued problems between Blomkamp and Kinberg. |
| 7 | <div align="center">2014-11-03 02:03:10 <u>Re:</u>  From: <u>mwiczyk@mrcstudios.com</u></div> <div align="center">To; pascal, amy</div> |
| 8 | **MODI WICZYK:** |
| 9 | "Hi! |
| 10 | in terms of neill, totally ur call but... |
|  | i feel like <u>this</u> <u>coming</u> <u>week</u> <u>is</u> <u>critical</u> <u>bc</u> <u>neill</u> <u>has</u> <u>to</u> <u>really</u> <u>really</u> <u>let</u> <u>lee</u> |
| 11 | <u>in</u> <u>to</u> **polish,** <u>refine,</u> etc. alot of little indulgences are gonna have to go. |
| 12 | so--- i was trying to be positive but also let him know theres real real |
|  | work yet to do. and in a short period of time.... i talked to lee for a |
| 13 | while today who says neills been very open so thats good...but hes been |
| 14 | a dick to simon for whatever reason. so a long way of saying i want to |
|  | keep the pressure on him. because i agree it can be special. |
| 15 | make sense?" |
| 16 | 165.   The Plaintiff filed his Motion to Compel (seeking a statement from Lee Smith) |
| 17 | three (3) weeks before the deadline for dispositive motions (liability), July 9th, 2013. But |
| 18 | the district court set the motion hearing for more than a week AFTER the deadline for |
| 19 | dispositive motions (Aug 7th, 2013).   Thus, the Plaintiff had to file his Motion For |
| 20 | Summary Judgment (**MFSJ**), without being able to inform the court of the Defendants' |
| 21 | **violation of Rule 37** (failure to cooperate to compel a discovery response); a violation that, |
| 21 | in this case, resulted in the omission of evidence of a cover-up (that cover-up being: Neill |
| 22 | Blomkamp returned to the editing room with Lee Smith, in June 2013, to ask Smith to try to |
| 23 | erase edit and remove the headaches from Elysium). Thus, during the teleconference |
| 24 | hearing with Magistrate Judge Laurel Beeler, the Plaintiff explained that the matter was |
| 25 | unresolved but was effectively "moot" because both parties' MFSJs had been filed, and the |
| 26 | Plaintiff had less than a week to file his Reply Brief (Magistrate Beeler thus ruled the issue |
| 27 | moot). (Note: the Defs also refused ALL of the Plaintiff's discovery requests for texts or |
| 28 | emails regarding ANY Elysium matters; expanding the Defendants' **Rule 37 violations**). |

<div align="center">COMPLAINT</div>
<div align="center">37</div>

| 1 | **MRC & SONY PICTURES NEGLECTED TO DO BASIC** |
| 2 | **DUE DILIGENCE, BUYING THE RIGHTS TO ELYSIUM** |
| 3 | **WITHOUT EVEN READING A SCREENPLAY** |

166.   In 2008, Def Neill Blomkamp filmed *District 9* without a screenplay.  District 9's star, Sharlto Copley, has given many interviews discussing the fact that he improvised every line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article with Sharlto Copley is attached as "**Exhibit DD**" and is incorporated by reference as if fully set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO Michael Lynton and Def Bill Block (of QED Int.), Emanuel was able to get QED and Sony Pictures' subsidiary *TriStar* to produce and distribute District 9, without a screenplay —using only Def Blomkamp's notes, which they referred to as a "script". Countless writers and fans, in online forums, have tried to find a copy of a District 9 script. All have failed.

167.   Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures bought the film and distribution rights to Elysium from Def Blomkamp, without ever reading a screenplay. Sony Pictures bought the rights to Elysium in a hasty meeting in 2008. In this well documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures agreed to buy the rights, immediately, never bothering to read the script. HollywoodReporter.com reported the details of the stunningly hasty meeting between Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011. MRC scheduled meetings with several other distributors that same day, but Sony Pictures was so rushed and eager to buy the film that MRC canceled all other distribution meetings scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that secured this deal, but never mentions a "screenplay" or a "script".  (Said Hollywood Reporter article about Blomkamp, MRC closing the deal with Sony Pictures is attached as "**Exhibit EE**" and is incorporated by reference as if fully set out herein.)  This same meeting and concept art were also recounted in the book "Elysium: The Art of the Film" —a book primarily made up of interviews with Def Blomkamp, himself. On August 6th, 2013, Deep Focus Review (deepfocusreview.com) reviewed the book "Elysium: The Art of

1   the Film", reflecting on this meeting. (Said Deep Focus Review article is attached as

2   "**Exhibit FF**" and and is incorporated by reference as if fully set out herein.)   Upon

3   interviewing Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and

4   MRC staged 50-60 concept art paintings "and set them against the screenplay", explaining:

5           "On the strength of these images—not to mention the strength of his first
6           film, *District 9*—he garnered himself a $100 million budget and signed
            stars Matt Damon and Jodie Foster."
7

8       168.    The Defendants used the amazing artwork to strategically distract attention from

9   the flawed screenplay. Sony Pictures took the bait. Within an hour or so, a deal for about

10  $115 million was made, and no executive from Sony Pictures ever read a script. MRC didn't

11  do due diligence because Defendant Ari Emanuel was a co-owner of MRC and Def

12  Blomkamp's personal agent; thus, they stood to make millions from the deal. Sony Pictures

13  failed to do due diligence because CEO Michael Lynton had an improper, secret business

14  partnership with Def Emanuel (Screenbid.com), and wanted to maintain good relations with

15  Defs Emanuel and MRC—and make millions without regard for whose work they pirated.

16      169.    Def Blomkamp's script was so poorly executed and riddled with evidence of

17  misappropriation of the Plaintiff's work, that Defs Blomkamp, MRC and Sony Pictures took

18  extreme measures to protect the script during film production. The website Games Radar

19  (gamesradar.com) interviewed one of Elysium's stars, film icon **Jodie Foster**, who revealed

20  the producer's paranoia as she explained she wasn't allowed to possess a script.   (Said

21  Games Radar interview with Jodie Foster is attached as "**Exhibit GG**" and is incorporated

21  by reference as if fully set out herein.)  Foster said:

22          **"They won't even give me a screenplay. I've read it, but they won't
23          give me one to physically keep in my home 'cause they're so worried
            about everybody."**
24

25      170.   How Sony Pictures and MRC committed $115 million to a movie without reading a

26  screenplay, but invested millions to keep the screenplay secret defies reason. This was done

27  to keep the Plaintiff from learning details of the film's plot before it was released, to prevent

28  the Plaintiff from getting an injunction to stop  production.

COMPLAINT
39

171.   Had Sony Pictures behaved ethically, AND done their due diligence, they would have read Blomkamp's screenplay, then they would have seen Def Blomkamp's unfocused ideas, vast story weakness, and his poor literary skills. These shortcomings, juxtaposing concepts that were beyond such limited literary skills, should have raised red flags that Blomkamp's story may have been misappropriate, thus killing the deal. Hence, the Plaintiff would have filed no claims, including all claims herein.

172.   When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal.  Wiczyk wrote:

> 2014-10-27 13:36:12  Fwd: CHAPPIE NOTES
> From: mwiczyk@mrcstudios.com To: pascal, amy
> **MODI WICZYK:**
> "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then</u>. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

173.   A company has a responsibility to do basic due diligence, to make sure their products are what they allege: original works. Having a CEO who is secret business partners with the CEO of a talent agency subcontractor, undermines due diligence. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" to hide evidence of misappropriation is not doing due diligence. Rather, these are the methods of corrupt, mob-like conspirators.

174.   Further, during discovery in Briggs v Blomkamp et al, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants failed to produced any such documentation.

COMPLAINT
40

| |
|---|
| 1      **Defendant Blomkamp Gets Caught Lying To The World About** |
| 2      **His "Aliens" Script (Which Also Did Not Exist) , in 2017:** |
| 3    175.   Just as Def Blomkamp (with Def Wiczyk's help) sold Elysium to Sony and MRC |
| 4    without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" film |
| 5    without a script—but this time he did it openly, online, for the world to see. Unfortunately, |
| 6    in the process he ensnared several other Hollywood notables in his' strange world of lies. |
| 7    176.   On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his |
| 8    Twitter account, expressing hope of one day shooting the film. Soon dozens of Blomkamp |
| 9    fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, |
| 10   including in an article on Nerdist.com. (Said article from Nerdist.com is attached as |
| 11   "**Exhibit HH**" and is incorporated by reference as if fully set out herein.) |
| 12    177.   By July **2016,** websites like ScreenRant.com were reporting Def Blomkamp had |
| 13   recruited actress Sigourney Weaver and director James Cameron to tell the world how great |
| 14   Blomkamp's script was. (Said ScreenRant article is attached as "**Exhibit II**" and is |
| 15   incorporated by reference as if fully set out herein.) In ScreenRant Sigourney Weaver said: |
| 16       **"There is an incredible script by Neill. I didn't want to do a fifth one. I** |
| 17       **thought going to earth wouldn't be fun. I got this script that was** |
|        **amazing and gives fans everything they're looking for..."** |
| 18 |
| 19    178.   And James Cameron also praised the script in the ScreenRant article: |
| 20       **Director James Cameron (*Avatar*) then went on to throw in his two cents,** |
| 21       **saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"** |
| 21    179.  "Gangbusters." |
| 22    180.   Then, in April 2017, ScreenCrush.com reported that director Ridley Scott, owner of |
| 23   the Aliens franchise, had announced there would be no *Aliens 5* movie. Mr. Scott explained |
| 24   Defendant Blomkamp **never even had a script.** (Said Screen Crush article is attached as |
| 25   "**Exhibit JJ**" and incorporated by reference as if fully set out herein.) Ridley Scott stated: |
| 26       **"I don't think it will ever see the light of day. <u>There</u> <u>was</u> <u>never</u> <u>a</u> <u>script</u>.** |
| 27       **Just an idea that evolved from a dozen or so pages."** |
| 28    181.   This all caused the article writer to wonder who was lying: "We seem to find |

1   ourselves in a bit of a '*he said, she and he said*' situation here," Monagle wrote.

2      182.  Remember, in 2000 Def Wiczyk helped sell his brother's script to Summit without

3   so much as a script name, and Sony Pictures was right there, negotiating for the rights to

4   that unwritten, nameless script—eager to please any good friend of Ari Emanuel's.     By

5   2016, with *Aliens 5*, the Defendants had grown so brazen that they let Def Blomkamp go out

6   and lie to the world for himself, believing they could throw a script together after the

7   contract was signed. Rubbing their hands in anticipation of all that money —none of them

8   expected Ridley Scott to do due diligence and insist on seeing a script, ruining their scheme.

9

10      **IN BRIGGS V BLOMKAMP THE DEFS  HIRED A CONMAN, JEFF ROVIN**

11      **(WHO COMMITTED FRAUD UPON THE COURT & WENT ON FOX NEWS**

12      **TO ADMIT HE WAS A"FIXER" FOR BILL CLINTON) AS THEIR "EXPERT"**

13      183.  Not only does this case reveal how effortlessly seemingly everyone in Hollywood

14   lies, it reveals that when they get caught lying and stealing other people's work, they call on

15   world-class liars.

16      184.  In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of

17   thousands of California intellectual property attorneys as an expert witness, the Defs hired

18   Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the

19   same Jeff Rovin who confessed (two years <u>after</u> Briggs v Blomkamp went to MFSJ) to the

20   *National ENQUIRER (*October 19th, 2016), and confessed on **Fox News'** live telecast of

21   *The Sean Hannity Show* (Oct 24, 2016), that he was a professional "fixer" who

21   orchestrated false "smear" reports on people who disparaged President Bill and Hillary

22   Clinton—while Bill Clinton was President. Rovin claimed he then published these smear

23   articles in tabloid newspapers. Rovin's interview with Hannity can be seen at

24   <u>https://www.youtube.com/watch?v=L3mzoKuFN5o</u>. The story carried in countless other

25   publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit**

26   **KK**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER

27   article is attached as as **"Exhibit LL"** and is incorporated by reference as if fully set out

28   herein.)

COMPLAINT
42

185. **Rovin made these self-incriminating admissions on camera, in his own words.** Rovin admitted that he also bribed the victims of his smears to stay quiet. Shockingly, Rovin says the bribes were so effective that they rarely needed to resort to **other measures**. In Rovin's words, "**Most of the time** it was just money, it never had to be any threats." Witlessly, Rovin admitted threats, violence—or worse—might ensue if the money wasn't accepted.

186. Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

187. Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort."

188. Rovin went on to explain he had worked as a "fixer" many times in the past.

189. In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.

190. In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff moved the the court to exclude Rovin's "expert" report, as Rovin had falsified dozens of citations and fabricated evidence to substantiate his own claims, including a lengthy "quote" in which he fraudulently omitted 42 words—that wholly countered what Rovin reported. (Said Motion to Exclude is attached as "**Exhibit MM**" and is incorporated by reference as if fully set out herein.) Oddly, the court took no interest in the fraud contained in Rovin's report—which became the base of the district court's summary judgment opinion—and denied the motion.

191. How the Defendants knew such a devious man's "expert" report would meet no skepticism by the court is a mystery. How the Defendants knew such a sinister man existed—at all—is stunning. Rovin explained that he worked for President Clinton when Bill Clinton was in office (1991-2001). When asked how he came to be involved with the Clintons, Rovin explained that the Clintons became aware of Rovin because, in Rovin's words, he was **"fixing something for an actor who was in their** (the Clinton's) **inner circle."** Rovin does not identify who this cabinet member is, but during the time Rovin was involved with the Clintons (1991-1998), **Rahm Emanuel** worked as the senior adviser to President Clinton (1993-1998). Rahm Emanuel is Defendant Ari Emanuel's brother.

COMPLAINT
43

| | |
|---|---|
| 1 | **SUMMARY OF THE DEFENDANTS'** |
| 2 | **UNLAWFUL ACTIONS** |
| 3 | **Act 1** |
| 4 | 192.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 5 | Defendants, created a social network website called Trigger Street, or TriggerStreet ("TS" |
| 6 | herein), located at triggerstreet.com from 2002 until 2011, and at labs.triggerstreet.com from |
| 7 | 2011 until 2014. |
| 8 | 193.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 9 | Defendants, published and rendered the TS "Terms of Use" contract page, which stated: |
| 10 | Unless otherwise specified, the materials on the Site and in the Services are |
| 11 | presented **solely for** the purpose of promoting the entertainment, information, and community resources and services available in, and other |
| 12 | uses in, **the United States of America.** We control and operate the Site |
| 13 | and the Services from within the United States. We make no representation that materials on the Site or the Services are appropriate or available for |
| 14 | use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose |
| 15 | to access the Site from other locations do so on their own initiative and are |
| 16 | responsible for compliance with local laws. |
| 17 | 194.   The previous statement from the TS "Terms of Use" page was deliberately false |
| 18 | and/or misleading, and intended to inform members (or suggest, imply or insinuate) that |
| 19 | TS was intended for use by and for users in the USA. This was Fraud, Intentional |
| 20 | Misrepresentation, False Statements, and Deceit. These false statements were made to |
| 21 | falsely assure informed, savvy writers that the website was safe from foreign "bad actors', |
| 21 | as there are many nations that do not, or cannot enforce the Universal Copyright |
| 22 | Convention, and often American copyright holders never learn that their works were |
| 23 | misappropriated by foreign infringers, because the stolen works are only displayed in the |
| 24 | infringers' nation. (TS also may have stated it was intended for UAS use to avoid paying |
| 25 | taxes on the international earnings from its Budweiser endorsement deal.) |
| 26 | 195.  In truth, unbeknownst to American users who had been deceived by the Defendants, |
| 27 | from the outset TS was intended for international use. |
| 28 | 196.   The Defendants' action were also a violation of Cal Civ 1572, 3294, and 1709. |

| | |
|---|---|
| 1 | **Act 2** |
| 2 | 197.   Defendant Kevin Spacey made numerous trips abroad, to London, Spain, etc., to |
| 3 | give speeches and interviews, and throw parties, intent to recruit new TS members. While in |
| 4 | Spain, in 2009, Spacey stated,  "I started the website about six years ago, and we now have |
| 5 | close to 400,000 <u>members around the world</u>." |
| 6 | 198.   This was **BREACH OF CONTRACT**, as the Plaintiff—like most  members in the |
| 7 | USA (perhaps all US members)—believed the website was solely for use in the USA. |
| 8 | **Act 3** |
| 9 | 199.   TS and the Defendants provided content and programming from TS to Bud.TV |
| 10 | from 2007 to 2009.  Bud.TV also ran an international advertising campaign about TS. This |
| 11 | international ad campaign advertised TS (as well as Bud.TV) all around the world. In both, |
| 12 | advertising  TS  in  Bud.TV  promotions,  AND  advertising  TS  on  Bud.TV  itself,  the |
| 13 | Defendants **breached** the terms of TS's *Terms Of Use* contract page. |
| 14 | **Act 4** |
| 15 | 200.   The Defendant(s) made the TS website with effectively no security features, as |
| 16 | ALL members were allowed to ANONYMOUSLY read ALL screenplays. This, while TS |
| 17 | claimed to be industry standard, encapsulating all of the desires and needs of its users, and |
| 18 | touted its state of the art security. This was a violation of state and federal conspiracy, |
| 19 | negligence, gross negligence, fraud, deceit, misrepresentations, and false statements laws. |
| 20 | **Act 5** |
| 21 | 201.   Unlike a truly "industry standard" site like Writers Script Network.com, all TS |
| 21 | members/users were encouraged and deceived into using and navigating the website with |
| 22 | false  identities  (even  for  writing  reviews).  The  Defendants'  intent  was  to  protect  the |
| 23 | identities of their misappropriating conspirators, the Privacy page was written and designed |
| 24 | to scare user/members into using false identities. The TS Privacy page stated: |
| 25 | User Names and User Disclosure |
| 26 | The user name you select or are provided with upon registration with the Site is deemed non-personally  identifiable  information. Your user name |
| 27 | may  be  published  on  the  Site  and  may  be  disclosed  to  others,  including, |
| 28 | without limitation, to the public, and to any third parties with whom we |

elect to share such information. In addition, **if you include your name or any other personally identifying information** in any material transmitted or posted on public areas of the Site or the Services (including, without limitation, message boards, **reviews** and chat rooms), **such information will become public information and will be published on the Site and will be disclosed to other users of the Site and to other third parties who may have access to or otherwise see a display of such information**.

202.   These statements were made to encourage users to take risks they ordinarily would not take and should not take, as part of the Defendants efforts to persuade users/members to make their wares accessible to the Defendants. This was CONSPIRACY and DECEIT.

### Act 6

203.   The TS Privacy page suggested that the website had a method to reveal the true identity of all "accessors", if necessary.

Information Disclosure
We reserve the right to disclose information submitted by or concerning any user as we feel is necessary to protect our systems or business. Specifically, but without limitation, we reserve the right to disclose such information when a visitor or member is in violation of our Terms of Use or any other agreement with us, or engages (or is suspected of engaging) in any harmful, infringing or illegal activity....

204.   However, there is no evidence to support that TS ever, truly, had any method of retrieving any access records, or the accessor's true identity, etc. Nor is there any reason to believe such a system ever existed on TS. Thus, the Defendants' action were in violation of California Civ. Code § 1572, which makes it unlawful to make materially false, fictitious, deceitful, or fraudulent statement or representation.

### Act 7

205.   The Defendant(s) made extraordinary and fraudulent claims about website security; doing so to lure in the best undiscovered writers, and eliminate any doubts or suspicions users might otherwise reasonably have. TS made such false and exceptional claims as:

a.   The TS "About Us" page stated:

"Our team has been extensively researching and designing TriggerStreet.com to ensure that it **encapsulates every aspect of the user's desires and needs**."

COMPLAINT
46

206.   This was Fraud. All reasonable screenwriter members would expect (from a website assuring that the website "**encapsulates _every_ aspect of the user's _desires and needs_**") that records be preserved of all access of writers' work, identifying which members accessed which works, AND recorded by the accessor's true name —AND NOT erase all access history if the member removes his/her work because he/she worried his work may be unsafe on the website. Members would reasonably expect and *desire* this from a site claiming to be industry standard, because websites like InkTip.com were already doing this. Further, all reasonable members would **desire** and **need** a website to use accurate language, and behave in accordance with the implicit language of the website's *Terms Of Use*. And if these "Terms of Use" stated, suggested, implied that the website was solely for use in the USA, members should expect that site operators would act in accordance with that agreement, and not advertise or recruit abroad. This false claim was made to fraudulently lure writers to an unsafe website.

207.   This was deceit. The Defendants' actions were also in violation of California Civ. Code § 1572 - Statements or entries generally, which makes it unlawful to make any materially false, fictitious, or fraudulent statement or representation. On the TS "*Privacy*" page, the "Security" message stated:

> "Security
> When you submit information via the Site, your information is protected using secure data networks protected by **industry standard firewall and password protection systems**. Our security practices and policies are periodically reviewed and updated as necessary, and only authorized individuals have access to the information provided by our users."

208.   This was also Fraud. There was nothing "industry standard" about the TS screenwriter website. The standard was set by Writers Script Network.com (InkTip.com). InkTip kept all records of all access, even after members left. On Inktip.com, there was no feature erasing all access records upon script removal. By implying all information was protected and secure and industry standard, reasonable members would assume all members' access activity would be recorded, stored, and protected —not erased.

209.   The Defendant(s) and TS used Def Spacey's stardom to lure in writers. Then

1   writers were **promised** "industry access and exposure"—using Spacey's fame and
2   Academy Award winning laurels to leverage this false promise. TS's statement from its
3   "About Us" page promised that:

4       "Based on the principles of creative excellence, it (the TS website) provides
5       **industry access and exposure** to help build the careers of notable new
        filmmakers and screenwriters."

6

7   210.   This false promise, bolstered by the other fraudulent statements on the "Terms of
8   Use", "About Us", and "Privacy" pages, expanded a pattern of fraud, false statements,
9   false promises, concealment, intentional misrepresentations, and deceit.

10                                          **Act 8**

11   211.   The Defendants added a new anti-security feature, whereby if a member removed
12   his/her screenplays from the TS website because he/she worried that his/her work might be
13   unsafe or the target of infringers or pirates, the moment that writer removed his script from
14   the site ALL access records would be erased. The Plaintiff believes the Defs added this
15   feature in 2007 to access and steal the Plaintiff's work. Whether this extra hidden layer of
16   counter-security was added when the website was made, in 2002, or if it was added in 2007,
17   the Defendant(s) and TS did not inform members about this feature, and it was never
18   mentioned on the TS website. The Defendants' failure to inform members of this
19   anti-security feature, and the risks it posed, was a deliberate omission of imperative
20   information. The Defendants actions were in violation of California Civ. Code § 1572, fraud
21   by omission, and constitute DECEIT in violation of California Civ. Code § 1709.

21                                          **Act 9**

22   212.   Corporations are expected to do due diligence in all substantial purchases,
23   transactions and deals (such as investing $120 million in a film). Due diligence means doing
24   **"a complete and appropriate review of documentation and facts by a potential buyer**
25   **or its agents before purchasing an asset or engaging in business with a prospect"** (from
26   the Law Offices of Stimmel, Stimmel & Smith) This definition goes on to require a
27   "...complete review using lawyers and CPAs to assist so that when one is done, one knows
28   all that one needs to know before engaging in business with or buying a company or other

1 asset or piece of property." The Defendants did not do due diligence —failing to even read

2 the screenplay before buying its rights. Thus, the Defendants engaged in **gross negligence.**

3 **Act 10**

4    213.    The Defendants engaged in conflicts of interests that violated **CALIFORNIA**

5 **LABOR CODE SECTION 1700.39**, which states, "No talent agency shall divide fees with

6 an employer, an agent or other employee of an employer." Defendant Ari Emanuel was the

7 central talent agent in making the film Elysium, representing Elysium's star Def Matt

8 Damon and its writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an

9 owner of MRC (the employer of Def Neill Blomkamp for the making of Elysium, and the

10 buyer of Elysium's film rights). Thus, Def Ari Emanuel divided fees as a talent agent and

11 employer. The Plaintiff was injured by this violation of California law.

12 **Act 11**

13    214.    The Defendants engaged in **Violations Of California Business & Professions**

14 **Code § 17200, Et Seq., Unfair Business Practices Act.** Sony Pictures' (a publicly traded

15 company), and its CEO Michael Lynton, violated California Business & Professions Code

16 § 17200, ET SEQ., by engaging in improper and unethical business relationship, whereby

17 Michael Lynton, acting as an officer of Sony Pictures, hired a subcontractor (Screenbid) to

18 sell numerous items of substantial value for Sony Pictures. Thus, Def Lynton profited as

19 Sony Pictures' CEO, and he and Defs Ari Emanuel and Bill Block profited as the owners of

20 Screenbid, the subcontracted auction service. This was a conflict of interest.

21    215.    This improper relationship caused CEO Michael Lynton to encourage his

21 subordinates and peers NOT to scrutinize projects, clients or business entities associated

22 with his secret business partner Def Ari Emanuel. Thus, Sony Pictures agreed to distribute

23 Elysium without doing due diligence to read a screenplay to see to it that it was reasonably

24 executed. Had Sony Pictures employed a reasonable standard of due diligence, Elysium

25 would not have been made; thus, no injury would have come to the Plaintiff.

26 **Act 12**

27    216.    The Defendants engaged in Spoliation Of Evidence by closing and destroying the

28 TS website  6 days after the Plaintiff filed his Notice of Appeal to the Ninth Circuit Court of

1   Appeals. The Defendants did this to destroy unfavorable evidence, because the district court

2   based its MFSJ ruling on reversed law (cited by the Defendants), rather than the prevailing

3   law (cited by Plaintiff). Thus, Briggs v Blomkamp, et al, is/was apt to be returned to the

4   lower court, where the Plaintiff will/would subpoena all website access records, to confirm

5   the Defendants used TS to access the Plaintiff's work, and/or confirm that TS

6   misrepresented its security and ID protection features, and had no such records or oversight.

7                                         **Act 13**

8       217.   By conspiring to hire "fixer" Jeff Rovin (who spent years of his life writing false

9   "smear" stories for tabloid news) to submit a falsified "expert" report to the court, the

10  Defendants engaged in civil conspiracy, as well as fraud and deceit in violation of California

11  Civ. Code §§ 1572 and 1709. In these actions may also constitute Subornation Of Perjury

12                                        **Act 14**

13      218.   By stating, in their answers to the Plaintiff's interrogatories, that Simon Kinberg

14  only provided a "polish" to the Defendants script *Elysium* (when, in fact, Kinberg did

15  exhaustive work to salvage the screenplay) the Defendants engaged a conspiracy to commit

16  fraud and deceit, violating California Civ. Code §§ 1572 and 1709. Beyond these civil

17  infractions, the Defendants may have committed **Perjury,** violating 18 U.S. Code § 1001.

18                                        **Act 15**

19      219.   In the Briggs v Blomkamp Complaint, the Plaintiff stated that the *Elysium* film

20  editor(s) would confirm that Film editing resumed in June, 2013 (after initially wrapping up

21  in February 2013) —after the Defendants learned of the Plaintiff's impending lawsuit. The

21  Plaintiff predicted the editor(s) would confirm that this final editing was done to remove the

22  hero's headaches. But during discovery, the Defs gave Plaintiff only a statement from Julian

23  Clarke, refusing to provide a statement from final editor, Lee Clarke. Thus, the Defendants

24  **violated RULE 37** —a violation that may have changed the outcome of the case. **The**

25  **Defendants' actions violated Cal Civ 1572 and 1709** —and perhaps 18 U.S. Code § 1001.

26                                        **Act 16**

27      220.   Using the TS website, Defendants Spacey and Brunetti marketed the Plaintiff's

28  original screenplay in foreign markets all around the world, without informing the Plaintiff.

1   The TS social network website made representations that the website was solely for use in
2   the USA. The plaintiff relied on these claims. Unbeknownst to the Plaintiff, the Defendants
3   repeatedly travelled to foreign markets to invite foreign citizens to join TS, where they
4   could freely access the Plaintiff's screenplay ("Butterfly Driver", posted on TS in 2007). In
5   engaging in these actions, **the Defendant committed INFRINGING EXPORTATION of**
6   **the Plaintiff's copyright protected property,** under 17 USC § 602(a)(2), which makes it
7   unlawful to export copyrighted property from the USA, without the authority of the owner
8   of copyright, as this would infringe of the copyright owner's exclusive right to distribute,
9   under 17 USC § 106; actionable under sections 17 USC § 501.

10      221.    The Plaintiff was unaware of  Defendants Spacey's and Brunetti's infringing
11  exportation of his work until February of  2016, when the Plaintiff discovered a BBC article,
12  written in 2009, about Kevin Spacey travelling to Barcelona, Spain to tout TS's "400,000
13  members around the world." (See Exhibit T). **Immediately, upon discovering the article,**
14  **the Plaintiff notified the 9th Circuit Court of Appeals, via a court filing on February**
15  **29th, 2016.** Shortly after discovering the article, the Plaintiff discovered other articles about
16  Spacey travelling abroad to market TS, dating back to 2002. (See **Exhibit P and Q.**)
17  American users were never informed that TS was being marketed around the world.

18      222.    The 3 year statute of limitations to take legal action on this infringement started to
19  run in February 2016, when the Plaintiff learned of the Defendants' infringement.

20                                              **Act 17**

21      223.    Defendants Spacey's and Brunetti's actions (detailed in the 3 preceding paragraphs
21  under the heading "Act 16") infringed on the Plaintiff's exclusive copyrights of his
22  screenplay *Butterfly Driver*, posted on the TS website in 2007, as the Defendants' actions
23  violated the Plaintiff's exclusive right to distribute his work, under section 17 USC § 106.

24

25                                **STATEMENT OF INJURY**

26      224.  Among the injuries caused by the Defendants' actions were (1) the misappropriation
27  of Plaintiff's work; (2) the infringement of the Plaintiff's copyright —by a foreign actor
28  (Blomkamp); (3) a judgement against the Plaintiff in his effort to protect his copyright.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
CIVIL CONSPIRACY
**(Against All Defendants)**

225.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 224, as if fully set out herein.

226.    Judicial Council of California Civil Jury Instructions states that "A conspiracy is an agreement by two or more persons to commit a wrongful act. **Such an agreement may be made orally or in writing or may be implied by the conduct of the parties**." Keeping with standard, the Defendants engaged in three (3) conspiracies. While engaged in these conspiracies, the Defendants committed many clear, overt acts.

**First Conspiracy**

227.    To unlawfully enrich themselves, the Defendants conspired to create a social network for screenwriters and filmmakers, with little or no security features. The Defendants would then mislead screenwriters that the website was safe, then the Defendants could access and misappropriate the screenwriters' work. In the execution of this conspiracy the Defendants took the following overt actions:

1. The Defendants conspired to create a social network website (TS) for screenwriters and filmmakers, a website with effectively no security features.

2. The Defendants conspired to commit fraud and mislead TS member/users that the website had reasonable security features, when it had none.

3. The Defendants conspired to add a anti-security feature that erased all access information if members removed their screenplays.

4. The Defendants conspired to add the anti-security feature in 2007, to erase evidence of their access of the Plaintiff's script.

5. The Defendants conspired to make the film Elysium, careful not to leak any information about the project .

6. The Defendants conspired to create a *Terms of Use* page that stated the website was intended solely for use in America, but the Defendants repeatedly sent Def Spacey around the globe to recruit members, in violation of the *Terms of Use* agreement.

ER 690

7.  Also in violation of the Terms of Use agreement the Defendants secretly advertised TS on international websites like Bud.TV, and other international media outlets.

8.  While producing *Elysium*, the Defendants conspired to keep the script an absolute secret, not even allowing Hollywood giants like Jody Foster to take the script home.

9.  The Defendants (particularly Ari Emanuel, who profited the most from these acts and arrangements) had actors Def Damon and Affleck start a screenwriter/filmmaker website, similar to TS, called Project Greenlight. Not coincidentally, these two websites were created only a month apart; both websites used celebrity endorsers; both websites have been accused of being the *access* point in major film and TV copyright infringement suits; both of these "stolen" projects were eventually sold to companies with deep connections to Def Emanuel (MRC and Universal Pictures).

### Second Conspiracy

228.   Once the Plaintiff realized the Defendants misappropriated his work, he sued.

229.    In response, the Defendants devised a second conspiracy to prevent the Plaintiff from prevailing in his copyright lawsuit. Their plan involved cheating the Plaintiff and the US federal justice systems. In the execution of this second conspiracy the Defendants took the following actions:

1.  Rather than hiring an intellectual property attorneys as their expert witness in Briggs v Blomkamp, the Defendants opted to hire a con man named Jeff Rovin; who, two years later, admitted on Fox News' "The Sean Hannity Show" that he was a "fixer" who worked for President Bill Clinton, where he used his literary skill to create "smear" stories, to attack Clinton critics in tabloid newspapers. Rovin said he came to work for Bill and Hillary Clinton because he was working for another "actor" in the Clinton White House. This *actor* wss surely Rahm Emanuel, the Senior Advisor to the President (Clinton), who is also Defendant Ari Emanuel's brother;

2.  During discovery in Briggs v Blomkamp, the Defendants conspired to prevent editor Lee Smith from answering the Plaintiff's interrogatories;

3.  The Defendants made false statements in their interrogatory answers, as Simon Kinberg stated that he merely "polished" Def Blomkamp's script;

4.  The Defendants conspired to shut-down and destroy the TS social network 6 days after the Plaintiff filed his Notice Of Appeal;

**Third Conspiracy**

230.  To greatly increase their rate of personal enrichment, the Defendants conspired to break California business, labor and ethics codes. Breaking these codes caused an erosion in the Defendants' business practices, causing them to act recklessly and negligently. In the execution of this second conspiracy the Defendants took the following negligent actions:

1.  The Defendants conspired to commit to invest over $100,000,000 to make the film Elysium, without reading a script.

2.  The Defendants conspired to create an arrangement where Universal Pictures, or its parent or its subsidiaries, would finance and/or distribute any project Def Ari Emanuel brought to Universal Pictures—even unlawfully acquired projects.

3.  The Defendants conspired to engage in inappropriate business relationships, such as Def Emanuel and Sony Pictures CEO Michael Lynton co-owning Screenbid, and Defendant Emanuel co-owning MRC (violating Cal Labor Code 1700.39).

231.  In these actions the Defendants willfully, with disregard for the Plaintiff's rights, and with disregard for the law, engaged in one or more conspiracies.

232.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
SPOLIATION OF EVIDENCE
**(Against All Defendants)**

233.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 232, as if fully set out herein.

234.  California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression or destruction of evidence unlawful, stating: **"You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."** Similarly, 18 U.S. Code § 1519 makes it unlawful to destroy evidence —even in **anticipation or contemplation** of a legal action.

235.  The Defendants engaged in spoliation of evidence by closing and destroying their

COMPLAINT
54

1   social network, TS (TriggerStreet.com). Although the Defendants knew the website was the

2   central access point of an ongoing legal case, they closed the site 6 days after the Plaintiff

3   filed his Notice Of Appeal.

4   236.   The Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff,

5   and with disregard for the law, acted to violate the law and conceal and destroy evidence.

6   237.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

7   amount to be determined at trial, in accordance with prevailing compensatory and/or

8   punitive damages guideline.

9   **THIRD CLAIM FOR RELIEF**

10  BREACH OF CONTRACT
    Violating California Code, Civil Code § 3294

11  **(Against Defendants Kevin Spacey and Dana Brunetti)**

12  238.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

13  237, as if fully set out herein.

14  239.   In joining the TS (TriggerStreet) social network, the plaintiff entered into a contract

15  with Defendant Spacey and Brunetti. By repeatedly travelling abroad to places like London

16  and Barcelona to market TS, the Defendants breached the TS "Terms of Use" contract,

17  which stated the site was made **solely for use in the USA**. The Defendants furthered

18  breached this contract by secretly advertising the TS social network on various media

19  outlets, like Bud.TV.   In these actions the Defendants committed numerous contractual

20  breaches, in violation of California Civil Code § 3294.

21  240.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

21  amount to be determined at trial.

22  **FOURTH CLAIM FOR RELIEF**

23  FRAUD / INTENTIONAL MISREPRESENTATIONS
    Violating California Civ. Code § 1572

24  **(Against Defs Satchu, Wiczyk, MRC II Dist Co LP, Blomkamp, Spacey, Brunetti)**

25  241.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

26  240, as if fully set out herein.

27  242.   The Defendants produced contracts in which the Defendants made claims that they

28  purported as true. The Defendants knew these claims were false. The Defendants intended

1  for the Plaintiff, and others, to rely on their representations. The Plaintiff relied on the

2  Defendants' claims. The Plaintiff was harmed by the Defendants' false representations. The

3  Plaintiff's reliance on the Defendants' false representation was a substantial factor in the

4  Plaintiff's harm. In these actions, the Defendants committed fraud, intentional

5  misrepresentation, and fraudulent omission, in violation of Cal Civ. § 1572.

6      243.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

7  amount to be determined at trial.

8                    **FIFTH CLAIM FOR RELIEF**
                         DECEIT
9              Violating California Civ. Code §§ 1709 & 1710
10  **(Against Defs MRC II Dist Co LP, Blomkamp, Spacey, Brunetti, Wiczyk, and Satchu)**

11    244.   The Plaintiff hereby realleges and incorporates by reference paragraphs 1 through

12  243, as if fully set out herein.

13    245.    In their numerous acts of Deceit, detailed herein, the Defendants (1) suggested as

14  fact things that were not true and that they did not believe to be true; (2) asserted as fact,

15  that which was not true, which they had no reasonable ground for believing to be true; (3)

16  suppressed facts which they were bound to disclose it, and gave information of other facts

17  which were likely to mislead. In these actions the Defendants engaged in Deceit, in

18  violation of California Civ. Code §§ 1709 and 1710.

19      246.    The Plaintiff was injured as a consequence of the Defendants' actions, in an

20  amount to be determined at trial.

21                   **SIXTH CLAIM FOR RELIEF**
                        CONCEALMENT
21              Violating California Civ. Code § 1709
22  **(Against Defendants MRC II Distribution Company LP, Blomkamp, Spacey, Brunetti)**

23    247.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

24  246, as if fully set out herein.

25    248.   The Defendants engaged in numerous acts of Concealment (e.g. during discovery in

26  Briggs v Blomkamp, witnesses and agents for the Defendants intentionally failed to disclose

27  certain facts that were known only to them, which the Plaintiff could not have discovered),

28  in violation of California Civ. Code § 1709.

249.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
<u>NEGLIGENCE</u>
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

250.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 249, as if fully set out herein.

251.    The Defendants engaged in a variety of negligent business practices, in violation of Cal. Civ. Code § 1714(a). The Plaintiff was harmed by the Defendants' negligence. The Defendants' negligence was a substantial factor in causing the Plaintiff's harm.

252.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
<u>GROSS NEGLIGENCE</u>
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

253.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 252, as if fully set out herein.

254.    Through their actions as engaging in prohibited business relationships, and failing to read the screenplay before buying its rights, the Defendants engaged in grossly negligent business practices. The Plaintiff was harmed by the Defendants' gross negligence. The Defendants' gross negligence was a substantial factor in causing the Plaintiff's harm. The Defendants actions were in violation of Cal. Civ. Code § 1714(a).

255.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
<u>VIOLATING CALIFORNIA LABOR CODE § 1700.39</u>
(Against Emanuel, Block, MRC II Dist Co lp, Universal City Stu llc, Sony Pictures Ent Inc)

256.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 255, as if fully set out herein.

257.    The Defendants violated **CALIFORNIA LABOR CODE SECTION 1700.39**,

COMPLAINT
57

1   which states, "No talent agency shall divide fees with an employer, an agent or other

2   employee of an employer." Defendant Ari Emanuel represented *Elysium*'s star Def Matt

3   Damon, and represented writer/director Def Neill Blomkamp. Defendant Ari Emanuel is

4   also an owner of MRC (the employer of Defs Blomkamp and Damon for the making of

5   *Elysium*). Thus, Emanuel divided fees as an agent and employer. In so doing the

6   Defendants violated California Labor Code 1700.39.

7      258.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

8   amount to be determined at trial.

9                          **TENTH CLAIM FOR RELIEF**

10                    VIOLATION OF UNFAIR BUSINESS PRACTICES ACT
                           [CAL BUS & PROF CODE§ 17200, ET SEQ.]

11   **(Against Defendants Emanuel, Block, MRC II Dist Co LP, Sony Pictures Ent Inc)**

12     259.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

13   258, as if fully set out herein.

14     260.   Def Emanuel and Def Block, while acting as the CEOs of WME and Miramax,

15   respectively, secretly entered into  a private business partnership with Sony Pictures

16   Entertainment's CEO Michael Lynton, as co-owners of Screenbid, a business that said

17   Defendants then used as a subcontractor for WME, Miramax, and Sony Picture Ent. In

18   these actions the Defendants violated the California's Unfair Business Practices Act [Cal

19   Bus & Prof Code§ 17200, Et Seq.]. Further, these arrangements contributed to the negligent

20   culture that lead to the Defendants' misappropriation of the Plaintiff's work.

21     261.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

21   amount to be determined at trial.

22                        **ELEVENTH CLAIM FOR RELIEF**

23                              WITNESS TAMPERING
     **(Against Defs Emanuel, Block, Blomkamp, MRC II Dist Co lp,, Sony Pictures Ent Inc)**

24     262.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

25   261, as if fully set out herein.

26     263.   California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression of

27   of evidence unlawful; stating: **"You may consider whether one party intentionally <u>concealed</u> or**

28   **destroyed evidence. If you decide that a party did so, you may decide that the evidence would have**

1  **been unfavorable to that party.**"  In such actions as (1) hiring a professional "fixer" to provide

2  a falsified expert witness report, and (2) proffering a discovery statement from writer

3  Simon Kinberg stating that he merely "polished" Def Blomkamp's screenplay—when the

4  online film communication records show Kinberg performed a massive reworking of the

5  screenplay— the Defendants willfully engaged in witness tampering.

6      264.    The Plaintiff was injured as a consequence of the Defendants' actions, in an

7  amount to be determined at trial.

8                     **TWELFTH CLAIM FOR RELIEF**
9                     INFRINGING EXPORTATION
                      Violating  17 USC § 602(a)(2)
10               **(Against Defendants Spacey and Brunetti)**

11    265.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

12  264, as if fully set out herein.

13    266.    By marketing and making the Plaintiff's work available around the world on the TS

14  social network website, without the Plaintiff's consent, Defendants Spacey and Brunetti

15  committed Infringing Exportation of the Plaintiff's copyrighted work, under 17 USC §

16  602(a)(2); thereby violating the Plaintiff's exclusive right to distribute his copyrighted work

17  under 17 USC 106(3), enforceable under 17 USC § 501(a): Copyright Infringement.

18      267.    The Plaintiff was injured as a consequence of the Defendants' actions, in an

19  amount to be determined at trial.

20                  **THIRTEENTH CLAIM FOR RELIEF**
21                  COPYRIGHT INFRINGEMENT
                    Under 17 USC § 501(a)
21               **(Against Defendants Spacey and Brunetti)**

22      268.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

23  267, as if fully set out herein.

24    269.    By marketing and making the Plaintiff's work available around the world on the TS

25  social network website, without the Plaintiff's consent, Defs Spacey and Brunetti infringed

26  on the Plaintiff's exclusive right to distribute his work, violating 17 USC § 501(a).

27      270.  The Plaintiff was injured as a consequence of the Defendants' actions, in an amount

28  to be determined at trial.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

1. For general damages in an amount according to proof at the time of trial;

2. For exemplary damages;

3. For special damages in an amount according to proof at trial;

4. For restitution and disgorgement of all profits (estimated at $850,000,000—which represents all projected profits the Defendants will realize from the misappropriation of the Plaintiff's work; see p19, para 2) for the Plaintiff, consistent with US copyright remedies;

5. For Plaintiff's cost of this lawsuit and reasonable attorney's fees;

6. For such injunctions and additional relief the Court may deem proper.


DATED: January 2st, 2018


Respectfully Submitted,

By: _/s/ Steve Wilson Briggs_____

Steve Wilson Briggs

Plaintiff In Propria Persona

COMPLAINT
60

ER 698

Exhibit G

1  KELLI L. SAGER (State Bar No. 120162)
     kellisager@dwt.com
2  ROCHELLE L. WILCOX (State Bar No. 197790)
     rochellewilcox@dwt.com
3  BRENDAN N. CHARNEY (State Bar No. 293378)
     brendancharney@dwt.com
4  DAVIS WRIGHT TREMAINE LLP
   865 South Figueroa Street, Suite 2400
5  Los Angeles, California 90017
   Telephone:    (213) 633-6800
6  Facsimile:    (213) 633-6899

7  Attorneys for Defendants
   UNIVERSAL CITY STUDIOS LLC and
8  NBCUNIVERSAL MEDIA, LLC

9

10            IN THE UNITED STATES DISTRICT COURT

11          THE NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14  STEVE WILSON BRIGGS,                Case No. 17-cv-06552-VC

15              Plaintiff,              [Hon. Vince Chhabria]

16        v.                           **NOTICE OF MOTION AND MOTION
                                        TO DISMISS FIRST AMENDED
17  UNIVERSAL CITY STUDIOS LLC;         COMPLAINT; MEMORANDUM OF
    NBCUNIVERSAL MEDIA, LLC;            POINTS AND AUTHORITIES**
18  SONY PICTURES ENT INC.; KEVIN
    SPACEY; ARI (ARIEL) EMANUEL; MATT   (Proposed Order Filed Concurrently)
19  DAMON; BEN AFFLECK; NEILL
    BLOMKAMP; MORDECAI (MODI) WICZYK;   Date:      February 22, 2018
20  ASIF SATCHU; BILL BLOCK; DANA       Time:      10:00 a.m.
    BRUNETTI; MRC II DISTRIBUTION       Crtrm:     4
21  COMPANY LP (AKA MRC, Media Rights
    Capital, and all other MRC entities and
22  subsidiaries)

23              Defendants.

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

PLEASE TAKE NOTICE that on February 22, 2018, at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 4 of the above-entitled court, located at the Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Ave., San Francisco, California, 94102, the Honorable Vince Chhabria presiding, Defendants Universal City Studios LLC and NBCUniversal Media, LLC (collectively, "NBCU") will and hereby do move this Court to dismiss this action pursuant to Federal Rules of Civil Procedure 8(a)(2) and 41(b) and/or Federal Rule of Civil Procedure 12(b)(6). This Motion is brought on the following grounds:

1.      The First Amended Complaint ("FAC") violates the requirement set forth in Federal Rule of Civil Procedure 8(a)(2) that a pleading seeking relief contain a "short and plain statement of the claim" showing entitlement to relief, and is therefore subject to dismissal under Federal Rule of Civil Procedure 41(b);

2.      The FAC is an improper collateral attack on a previously-dismissed lawsuit brought by Plaintiff against some of the same defendants;

3.      The FAC fails to state a claim upon which relief can be granted against NBCU pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically:

a.      The FAC does not state any claim against NBCU that is plausible on its face, in violation of Ashcroft v. Iqbal, 556 U.S. 662 (2009). For this reason, Plaintiff's first, second, seventh, eighth and ninth claims for relief – which are the only claims for relief brought against NBCU – should be dismissed.

b.      Because California does not recognize a claim for conspiracy, Plaintiff's first claim for relief against NBCU should be dismissed for this independent reason.

c.      Because California does not recognize a claim for spoliation, Plaintiff's second claim for relief against NBCU should be dismissed for this independent reason.

DAVIS WRIGHT TREMAINE LLP

i

d.  Because the FAC does not allege any facts identifying any
purportedly negligent acts by NBCU, Plaintiff's seventh and
eighth claims for relief against NBCU should be dismissed for
this independent reason.

e.  Because the FAC does not allege any facts identifying any acts
by NBCU that could conceivably give rise to a claim for
violation of Cal. Labor Code § 1700.39, Plaintiff's ninth claim
for relief against NBCU should be dismissed.

This Motion is based on the attached Memorandum of Points and Authorities; the
pleadings, files and records in this action; and upon such other arguments as may be received by
this Court at the hearing on this Motion.

Respectfully submitted this 16th day of January, 2018

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ROCHELLE L. WILCOX
BRENDAN N. CHARNEY

By: */s/ Rochelle L. Wilcox*
Rochelle L. Wilcox

Attorneys for Defendants
UNIVERSAL CITY STUDIOS LLC and
NBCUNIVERSAL MEDIA, LLC

DAVIS WRIGHT TREMAINE LLP

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

ii

ER 702

**TABLE OF CONTENTS**

Page

I. SUMMARY OF ARGUMENT ................................................................. 1

II. SUMMARY OF FACTS ...................................................................... 2

III. THE FAC FAILS TO PROVIDE NOTICE OF THE BASIS FOR PLAINTIFF'S CLAIMS AGAINST NBCU. ............................................. 4

IV. THE FAC IS AN IMPROPER COLLATERAL ATTACK ON THE DISMISSAL OF PLAINTIFF'S PRIOR LAWSUIT. ............................... 4

V. THE FAC FAILS TO STATE A CLAIM. ............................................. 7

    A. The FAC Fails To State A Plausible Claim Against NBCU. .................... 7

    B. California Law Does Not Recognize A Claim For Conspiracy. .............. 8

    C. No Tort Claim Exists For Spoliation Under California Law. ................... 8

    D. The FAC Fails To Allege Any Conduct By NBCU That Supports A Negligence Claim. .................... 9

    E. The FAC Does Not Allege Any Conduct By NBCU Violating The Labor Code. ............................. 9

VI. CONCLUSION ............................................................................. 10

DAVIS WRIGHT TREMAINE LLP

iii

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Advocare Intern., L.P. v. Scheckenbach,
2010 WL 2196449 (W.D. Wash. May 27, 2010) .................................................... 6

Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,
7 Cal. 4th 503 (1994)............................................................................................... 8

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ......................................................................................... 1, 7, 9

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ............................................................................................. 7, 9

Brazil v. U.S. Dept. of Navy,
66 F.3d 193 (9th Cir. 1995)..................................................................................... 4

Briggs v. Blomkamp,
70 F. Supp. 3d 1155 (N.D. Cal. 2014) ................................................................ 1, 2

Briggs v. Blomkamp,
N.D. Cal. No 13-cv-04679 ............................................................................... passim

Briggs v. Sony Pictures Ent.,
9th Cir. No. 14-17175 (filed Oct. 8, 2013)............................................................. 2

Buckey v. County of Los Angeles,
968 F.2d 791 (9th Cir. 1992)................................................................................... 9

Cedars-Sinai Medical Center v. Superior Court,
18 Cal. 4th 1 (1998)................................................................................................. 8

Dydzak v. United States,
2017 WL 4922450 (N.D. Cal. Oct. 31, 2017) ........................................................ 5

Harper v. City of Monterey,
2012 WL 195040 (N.D. Cal. Jan. 23, 2012) .......................................................... 6

In re Braughton,
520 F.2d 765 (9th Cir. 1975)................................................................................... 5

Kenne v. Stennis,
230 Cal. App. 4th 953 (2014).................................................................................. 8

Liddell v. Smith,
345 F.2d 491 (7th Cir. 1965)................................................................................... 5

DAVIS WRIGHT TREMAINE LLP

Mangindin v. Washington Mut. Bank,
   637 F. Supp. 2d 700 (N.D. Cal. 2009) ....................................................................... 8

Mullis v. U.S. Bankr. Court for Dist. of Nevada,
   828 F.2d 1385 (9th Cir. 1987) ............................................................................ 5, 6

Nevijel v. North Coast Life Ins. Co.,
   651 F.2d 671 (9th Cir. 1981) .................................................................................. 4

Rein v. Providian Fin. Corp.,
   270 F.3d 895 (9th Cir. 2001) .................................................................................. 5

Ringard-Guirma v. Ocwen Loan Servicing, LLC,
   2016 WL 4257765 (D. Or. Aug. 19, 2016) ........................................................... 5, 6

San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.,
   568 F.3d 725 (9th Cir. 2009) .................................................................................. 6

Temple Cmty. Hosp. v. Superior Court,
   20 Cal. 4th 464 (1999) ........................................................................................ 5, 8

Uptergrove v. U.S.,
   2009 WL 1035231 (E.D. Cal. 2009) ....................................................................... 5

Warden v. Cross,
   94 Fed. Appx. 474 (9th Cir. 2004) .......................................................................... 8

Wawrzynski v. Byron Hibshman,
   2011 WL 1004822 (S.D. Cal. Mar. 18, 2011) .......................................................... 6

**Statutes**

California Labor Code § 1700.39 .................................................................. 2, 3, 9, 10

**Rules**

Federal Rule of Civil Procedure
   8(a) ....................................................................................................................... 3, 4
   8(a)(2) ..................................................................................................................... 1, 4
   8(e) ........................................................................................................................... 4
   11(c)(2) ...................................................................................................................... 3
   12(b)(6) ................................................................................................................. 1, 3, 7
   41(b) ......................................................................................................................... 4

DAVIS WRIGHT TREMAINE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**
**SUMMARY OF ARGUMENT**

Plaintiff's First Amended Complaint ("FAC") is a transparent attempt to re-litigate claims that already were rejected in an earlier lawsuit. That prior case, which claimed that the space-adventure film Elysium infringed Plaintiff's copyrighted screenplay, was dismissed with prejudice by the Honorable Phyllis J. Hamilton in 2014, and is the subject of an appeal to the Ninth Circuit. Briggs v. Blomkamp, 70 F. Supp. 3d 1155 (N.D. Cal. 2014). Apparently unsatisfied with the progress or likelihood of success of his appeal, Plaintiff has concocted a new lawsuit, which attempts to resurrect his copyright claim by wrapping it into pages of largely incomprehensible theories about some kind of industry-wide "conspiracy."

Despite two attempts, however, Plaintiff has not set out any facts that give rise to any cognizable claim against Defendants Universal City Studios LLC or NBCUniversal Media, LLC (collectively, "NBCU"), or that even identify the conduct that Plaintiff purports to believe was wrongful. Instead, the few direct references to NBCU assert only that it has been involved in entirely unrelated business deals with some of the other defendants, on projects that have nothing whatsoever to do with Plaintiff, his screenplay, or the film Elysium that he claims infringed his copyright. Because Plaintiff has failed to set forth an intelligible statement of facts showing entitlement to any relief against NBCU, his claims against these moving defendants must be dismissed. F.R.C.P. 8(a)(2). Section III, infra.

Independently, Plaintiff's claims should be dismissed as an improper attempt to collaterally attack the result in a prior lawsuit, where his claims were rejected. Basic principles of federal procedure prevent Plaintiff from engaging in this kind of "horizontal appeal." Plaintiff's only avenue for review of Judge Hamilton's order is his pending appeal to the Ninth Circuit; this lawsuit should be dismissed in its entirety. Section IV, infra.

Finally, despite his attempt to amend, the allegations in the FAC fail to meet the requirements of Federal Rule of Civil Procedure 12(b)(6), or the standard for plausibility of Ashcroft v. Iqbal, 556 U.S. 662 (2009). There are no facts pleaded against NBCU that explain

DAVIS WRIGHT TREMAINE LLP

1

1    the basis for any claims against it; there is no tort claim or statutory violation that arises from a

2    company doing business with someone against whom the Plaintiff has entirely <u>unrelated</u> claims.

3    Section V, <u>infra</u>.  Moreover, Plaintiff's First and Second Claims For Relief against NBCU

4    purport to assert causes of action for "conspiracy" and "spoliation" that do not exist under

5    California law.  Plaintiff's only other claims against the moving parties – his Seventh Claim for

6    Relief for "negligence," Eighth Claim for Relief for "gross negligence," and Ninth Claim for

7    Relief for alleged violation of Labor Code § 1700.39, are not supported by any facts whatsoever

8    concerning NBCU that could support these claims.  Section V, <u>infra</u>.

9         Because Plaintiff's FAC fails again to state any claims against NBCU, demonstrating that

10   further amendment would be futile, this Court should grant NBCU's motion in its entirety, with

11   prejudice.

**II.**
**SUMMARY OF FACTS**

14        In 2013, Plaintiff Steven Briggs sued Neill Blomkamp, Sony Pictures, Media Rights

15   Capital ("MRC"), and others, claiming that the film <u>Elysium</u> infringed Plaintiff's copyrighted

16   screenplay, "Butterfly Driver."  <u>Briggs v. Blomkamp</u>, N.D. Cal. No 13-cv-04679 (the "Prior

17   Lawsuit").  The District Court for the Northern District of California, the Honorable Phyllis J.

18   Hamilton presiding, granted summary judgment to defendants, rejecting Plaintiffs' copyright

19   claim in a thorough and carefully reasoned opinion.  <u>Briggs v. Blomkamp</u>, 70 F. Supp. 3d 1155

20   (N.D. Cal. 2014).  The Court dismissed Plaintiff's claims and entered judgment for Defendants.

21   Judgment, <u>Briggs v. Blomkamp</u>, N.D. Cal. No 13-cv-04679 (October 3, 2014) (ECF No. 87).

22   Plaintiff's appeal from that decision is currently pending in the Ninth Circuit.  <u>Briggs v. Sony</u>

23   <u>Pictures Ent.</u>, 9th Cir. No. 14-17175 (filed Oct. 8, 2013).

24        On December 7, 2017, Plaintiff brought this lawsuit against some[1] of the same

25   defendants sued in the Prior Lawsuit.  He also added 10 new defendants, including Universal

26   City Studios LLC and NBCUniversal Media, LLC.  Plaintiff's initial Complaint stated that it was

---

[1] Neill Blomkamp, Sony Pictures and MRC are named in both this case and Plaintiff's
Prior Lawsuit.

2

DAVIS WRIGHT TREMAINE LLP

1    "related" to the Prior Lawsuit and that "certain new events, related to [the Prior Lawsuit],

2    inform[] this matter" – principally, Plaintiff's allegation that all of the defendants were engaged

3    in some undefined "conspiracy" that Plaintiff believes was relevant to the Prior Lawsuit.  ECF

4    No. 1 at ¶ 19.

5            On December 28, 2017, NBCU joined a Motion to Dismiss filed by the other defendants

6    in this action, seeking dismissal of the Complaint for lack of subject matter jurisdiction, failure to

7    provide a short and plain statement of the claim under Rule 8(a), and failure to state a claim

8    under Rule 12(b)(6).  ECF Nos. 15, 17.  Five days later, Plaintiff filed the FAC (ECF No. 21),

9    adding copyright and infringing exportation claims that seem to be based on the same alleged

10   facts that gave rise to the Prior Lawsuit – purported infringement of his screenplay "Butterfly

11   Driver."  See FAC at Counts 12 and 13; see also FAC at ¶¶ 111, 117.[2]

12           Like the initial Complaint, the FAC is indecipherable.  See generally FAC. Through a

13   tangled web of allegations, relying heavily on innuendo and rote speculation, the FAC appears to

14   claim a decades-long conspiracy running rampant throughout Hollywood's major studios.  See

15   id.  As best can be discerned, Plaintiff appears to allege that NBCU conspired with competing

16   film studios and other prominent professionals in the film industry to somehow frustrate

17   Plaintiff's Prior Lawsuit and pending appeal.  See, e.g., FAC at ¶¶ 1, 149-152, 155, 158, 159-

18   161, 165, 174, 184, 190, 217, 219, 221, 224, 229, 235, 236.  At bottom, NBCU's alleged wrong

19   appears to be working with renowned talent agent Ari Emanuel, and producing motion pictures.

20           As to NBCU, although the FAC asserts claims for conspiracy, spoliation, negligence and

21   gross negligence against both defendants, and a claim for alleged violation of Labor Code

22   § 1700.39 against Universal City Studios, the FAC does not include a single factual allegation

23   tying his claims to alleged wrongs by NBCU.  FAC at ¶¶ 225-237, 250-258.

---

24           [2] Plaintiff also filed an Opposition to the now-moot Motion to Dismiss his initial
25   Complaint, arguing that the copyright and infringing exportation claims in the FAC confer
     federal-question jurisdiction.  See ECF No. 23 at 8.  In addition, Plaintiff filed a motion to
26   sanction defense counsel for filing the original Motion to Dismiss and Joinder, although he failed
     to provide the pre-filing notice required by Fed. R. Civ. Pro. 11(c)(2).  See ECF No. 24.  For the
27   reasons discussed in this Motion and in the previous Motion To Dismiss, Plaintiff's Complaint
     and FAC are subject to dismissal on multiple grounds, and his Motion for Sanctions is both
28   procedurally improper and patently baseless.

3

DAVIS WRIGHT TREMAINE LLP

**III.**
**THE FAC FAILS TO PROVIDE NOTICE OF THE**
**BASIS FOR PLAINTIFF'S CLAIMS AGAINST NBCU.**

To give a defendant fair notice of the nature of a lawsuit, Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A "complaint which fails to comply with rules 8(a) and 8(e) may be dismissed with prejudice pursuant to rule 41(b)." Nevijel v. North Coast Life Ins. Co., 651 F.2d 671, 673 (9th Cir. 1981) (dismissing with prejudice complaint that was "verbose, confusing and almost entirely conclusory"). Even pro se pleadings must "meet some minimum threshold in providing a defendant with notice of what it is that it allegedly did wrong." Brazil v. U.S. Dept. of Navy, 66 F.3d 193, 199 (9th Cir. 1995). Plaintiff has now twice failed to meet this threshold requirement.

The FAC, like the initial Complaint, is a perplexing pastiche of innuendo, non sequitur, guesses, and unsupported assumptions and conclusions, all loosely spun together with bizarre conspiratorial themes. See, e.g., FAC at ¶¶ 23, 28, 55-62, 179. It remains impossible to discern what conduct NBCU is alleged to have engaged in that was wrongful, or how NBCU's conduct purportedly caused harm to Plaintiff. There is no legal basis for Plaintiff to sue NBCU simply because it has done business with other companies or individuals with whom Plaintiff has a dispute. Because the FAC fails to meet the fundamental requirement of providing intelligible notice of the nature of and basis for Plaintiff's claims against NBCU, their Motion To Dismiss should be granted.

**IV.**
**THE FAC IS AN IMPROPER COLLATERAL ATTACK ON**
**THE DISMISSAL OF PLAINTIFF'S PRIOR LAWSUIT.**

In this sequel litigation, Plaintiff seeks to revive his Prior Lawsuit by alleging that competing film studios and other film professionals all conspired to engage in a constellation of purportedly improper conduct for the alleged purpose of hindering Plaintiff's Prior Lawsuit and pending appeal. See FAC at ¶¶ 1, 149-152, 155, 158, 159-161, 165, 174, 184, 190, 217, 219, 221, 224, 229, 235, 236. In other words, this case is a collateral attack on Judge Hamilton's order dismissing Plaintiff's Prior Lawsuit. Although Plaintiff is entitled to seek review of that

DAVIS WRIGHT TREMAINE LLP

4

1  order by appealing to the Ninth Circuit – which he has done – he cannot burden a district court

2  with this sort of "horizontal appeal."

3        "The collateral attack doctrine precludes litigants from collaterally attacking the

4  judgments of other courts." <u>Uptergrove v. U.S.</u>, No. 1:08-CV-01900-OWW SMS, 2009 WL

5  1035231, at *3 (E.D. Cal. Apr. l7, 2009) (citing <u>Rein v. Providian Fin. Corp.</u>, 270 F.3d 895, 902

6  (9th Cir. 2001)).  The principle is fundamental:  a losing party may not seek to nullify a district

7  court's decision by seeking relief from another district court.  <u>See</u>, <u>e.g.</u>, <u>Mullis v. U.S. Bankr.</u>

8  <u>Court for Dist. of Nevada</u>, 828 F.2d 1385, 1392-93 (9th Cir. 1987) (even where judicial

9  immunity did not apply, injunctive relief could not be ordered against bankruptcy judges and

10  clerks because "collateral attacks on the judgments, orders, decrees or decisions of federal courts

11  are improper"); <u>In re Braughton</u>, 520 F.2d 765, 766 (9th Cir. 1975) ("the second judge correctly

12  refused to entertain a 'horizontal' appeal from the warrant issued by the first judge"); <u>Dydzak v.</u>

13  <u>United States</u>, No. 17-cv-04360-EMC, 2017 WL 4922450, at *7 (N.D. Cal. Oct. 31, 2017) (a

14  litigant may raise alleged judicial error and litigation misconduct only through "the normal

15  appellate process," not a forbidden "horizontal appeal"), <u>appeal</u> <u>docketed</u>, <u>Dydzak v. U.S.A.</u>, 9th

16  Cir. No. 17-17401 (November 30, 2017); <u>Rinegard-Guirma v. Ocwen Loan Servicing, LLC</u>, No.

17  3:16-cv-01036-HZ, 2016 WL 4257765 at *3 (D. Or. Aug. 10, 2016) ("[T]his Court is without

18  authority to revisit issues that were previously decided in another district court case.").

19        The bar on horizontal appeals is supported by the same policy underlying the doctrine of

20  <u>res judicata</u>:  "the interest of the State that there should be an end to the litigation." <u>Liddell v.</u>

21  <u>Smith</u>, 345 F.2d 491, 493 (7th Cir. 1965).  Clever plaintiffs have attempted this tactic before, and

22  courts readily reject creating such an obvious loophole to finality in judgment.  In <u>Uptergrove</u>,

23  for instance, the court dismissed a complaint as an impermissible collateral attack because it

24  sought relief from an adverse judgment issued against the plaintiff in a prior case.  2009 WL

25  1035231 at *3.  Indeed, the Supreme Court of California has declined to recognize a tort remedy

26  for spoliation of evidence, recognizing that permitting such a claim would produce an "endless

27  spiral of lawsuits over litigation-related misconduct." <u>Temple Cmty. Hosp. v. Superior Court</u>, 20

28  Cal. 4th 464, 473 (1999); <u>see also</u> <u>Liddell</u>, 345 F.2d at 494 (affirming dismissal of previously-

DAVIS WRIGHT TREMAINE LLP

5

1    dismissed claims on grounds of res judicata, and dismissing perjury claim arising from prior

2    litigation on grounds that perjury does not give rise to a private cause of action).  Moreover, a

3    claim that "false testimony led to a fraudulent verdict is an attack on the merits of the prior

4    proceeding" and violates the collateral attack doctrine.  Advocare Intern., L.P. v. Scheckenbach,

5    No. C08-5332 RBL, 2010 WL 2196449 at *2 (W.D. Wash. May 27, 2010); see also Rinegard-

6    Guirma, 2016 WL 4257765 at *2 (a "challenge to the admissibility of certain evidence in either

7    the state or federal case cannot be raised" in a separate federal action).

8         Given its relationship to res judicata, it also is clear that a party that was not involved in a

9    prior lawsuit nonetheless may seek dismissal of a horizontal appeal of that suit, just as "res

10   judicata may be asserted against a party that was a party in the prior proceeding even if there are

11   new different parties in the later proceeding."  Wawrzynski v. Byron Hibshman, No. 10-CV-

12   2347-H (WMC), 2011 WL 1004822, at *3 (S.D. Cal. Mar. 18, 2011) (res judicata barred

13   plaintiff's second lawsuit, notwithstanding the addition of a new defendant), aff'd sub nom

14   Wawrzynski v. Hibsham, 490 F. App'x 70 (9th Cir. 2013).  As one court explained, "[u]nder

15   California claim preclusion rules, the only identity of parties required is the identity of the party

16   against whom preclusion is sought."  Harper v. City of Monterey, No. 11-cv-02903-LHK, 2012

17   WL 195040, at *4 (N.D. Cal. Jan. 23, 2012) (emphasis added), aff'd, 519 F. App'x 503 (9th Cir.

18   2013), citing San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys., 568 F.3d

19   725, 734 (9th Cir. 2009).

20        Likewise, courts do not hesitate to dismiss "horizontal appeals" when this improper tack

21   is challenged by a defendant who was not a party in the prior action.  See, e.g., Mullis, 828 F.2d

22   at 1386, 1392-93 (dismissing plaintiff's "horizontal appeal" of treatment of his bankruptcy

23   petition; defendants were not parties to bankruptcy petition).  For the same reasons, NBCU may

24   seek dismissal of this horizontal appeal, to avoid being drawn into an endless spiral of litigation

25   arising from Plaintiff's attempt to re-litigate his failed claims against others.  All of Plaintiff's

26   claims against NBCU depend on his claims against the other defendants – the purported

27   conspiracy is the thread that Plaintiff invokes to sue NBCU along with the other defendants –

28   and so all of his claims against NBCU must fall with his claims against those defendants.

DAVIS WRIGHT TREMAINE LLP

6

1    Here, the essence of the FAC is Plaintiff's grievance about the conduct of litigation in the

2    Prior Lawsuit and alleged impairment of his appeal from dismissal of that lawsuit. <u>See</u> FAC at

3    ¶¶ 1, 149-152, 155, 158, 159-161, 165, 174, 184, 190, 217, 219, 221, 224, 229, 235, 236.  After

4    failing to recover damages for alleged copyright infringement in the Prior Lawsuit, Plaintiffs'

5    allegations of spoliation and conspiracy seek essentially the same remedy as in the Prior Lawsuit:

6    millions of dollars of compensation for the claimed "misappropriation of the Plaintiff's work."

7    <u>See</u> FAC, Prayer for Relief at ¶ 4.  Indeed, Plaintiff seems to believe that his spoliation claim

8    will allow <u>this</u> court to review the treatment of evidence in the Prior Lawsuit and "decide that the

9    [concealed or destroyed] evidence would have been unfavorable to" the defendants in the <u>Prior</u>

10   Lawsuit.  FAC at ¶ 234.  This, however, is an impermissible collateral attack on the conduct of

11   the Prior Lawsuit.

12   Plaintiff is not entitled to a second bite at this apple in a different district court; review is

13   limited to the proper appellate channels, and this lawsuit should therefore be dismissed.

## V.    THE FAC FAILS TO STATE A CLAIM.

**A.    The FAC Fails To State A Plausible Claim Against NBCU.**

16   Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as

17   true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678

18   (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  The plausibility

19   standard requires "more than 'a sheer possibility that a defendant has acted unlawfully'; and is

20   met only when the plaintiff pleads facts that allow the court to "draw the reasonable inference

21   that the defendant is liable for the misconduct alleged."  <u>Id.</u> (citation and internal quotation

22   marks omitted).

23   Here, the FAC's allegations – concerted action by a host of competing film studios and

24   professionals to somehow facilitate wide-ranging copyright infringement and spoliation of

25   evidence through routine, widely-reported transactions and film deals – is inherently implausible.

26   Even putting that inherent implausibility aside, Plaintiff peppers the FAC with <u>possibilities</u>, not

27   allegations.  <u>See</u>, <u>e.g.</u>, FAC at ¶ 57 ("Emanuel likely received a percentage of the films"); ¶ 77

28

DAVIS WRIGHT TREMAINE LLP

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

ER 712

1   ("maybe…that could be"); ¶ 102 ("likely, Universal Pictures wouldn't put their name on the

2   film").  The FAC cannot meet the bare minimum pleading standard and must be dismissed.

3   **B.      California Law Does Not Recognize A Claim For Conspiracy.**

4          California does not recognize conspiracy as a freestanding cause of action.  Kenne v.

5   Stennis, 230 Cal. App. 4th 953, 968-69 (2014) (citing Applied Equipment Corp. v. Litton Saudi

6   Arabia Ltd., 7 Cal. 4th 503, 510–11 (1994)); see also Mangindin v. Washington Mut. Bank, 637

7   F. Supp. 2d 700, 708 (N.D. Cal. 2009) ("A conspiracy is not an independent cause of action

8   ….").  Rather, conspiracy is a "theory of liability" that depends on the commission of an

9   underlying tort.  Kenne, 230 Cal. 4th at 968-69.  As discussed below, Plaintiff's other

10  asserted bases for liability against NBCU fail.  Because the spoliation claim is non-existent, and

11  none of the factual allegations even approach supporting a negligence or Labor Code claim

12  against NBCU, the conspiracy claim must be dismissed.

13  **C.      No Tort Claim Exists For Spoliation Under California Law.**

14          As discussed above, "a tort cause of action does not lie against a person who has

15  intentionally destroyed or suppressed evidence relevant to a lawsuit."  Warden v. Cross, 94 Fed.

16  Appx. 474, 475 (9th Cir. 2004) (applying California law); see Cedars-Sinai Medical Center v.

17  Superior Court, 18 Cal. 4th 1, 17-18 (1998) (rejecting tort remedy for intentional spoliation of

18  evidence by a party to an action).  In Temple Cmty. Hosp., the California Supreme Court

19  rejected a claim for alleged spoliation by a third party.  20 Cal. 4th at 473.  As the Court

20  explained, its concerns about endless litigation fully apply to lawsuits against third parties:  "We

21  are reluctant to provide disappointed litigants a second opportunity to seek the compensation

22  they sought in the original lawsuit, even if they seek it against a party not involved in the original

23  lawsuit."  Id. at 472.  But even if spoliation claims were allowed under California law, Plaintiff's

24  claim against NBCU still fails because he has not alleged any facts to support such a claim.  The

25  spoliation claim must be dismissed.

26  / / /

27  / / /

28  / / /

DAVIS WRIGHT TREMAINE LLP

8

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

**D.     The FAC Fails To Allege Any Conduct By NBCU That Supports A Negligence Claim.**

The claims for negligence and gross negligence are not supported by any factual allegations concerning NBCU.  See FAC ¶¶ 250-255.  Plaintiff does not allege that NBCU had a duty to Plaintiff, nor that it was breached.  Rather, the only factual allegations in the FAC that refer to negligence (or "neglect") concern <u>other</u> defendants:  MRC and Sony Pictures.  See FAC ¶¶ 166-182.  Therefore, to the extent <u>any</u> allegations in the FAC are colorable as negligence, they do not relate to NBCU.  Because Plaintiff's negligence and gross negligence claims against NBCU consist of "'naked assertion[s]' devoid of 'further factual enhancement,'" <u>Iqbal</u>, 556 U.S. at 678, quoting <u>Twombly</u>, 550 U.S. at 557, they also must be dismissed as to NBCU.

**E.     The FAC Does Not Allege Any Conduct By NBCU Violating The Labor Code.**

As with the vague negligence claims, Plaintiff's claim under Cal. Labor Code § 1700.39 relates to other defendants, and is not supported by any factual allegations concerning Universal City Studios, LLC (the only NBCU entity named in this claim for relief).  FAC ¶¶ 256-258.  Specifically, the FAC includes the puzzling claim that Universal City Studios somehow ran afoul of the rule prohibiting a talent agency from dividing fees with an employer.  FAC ¶¶ 256-258.  Universal City Studios, however, is not a talent agency; the FAC does not allege otherwise, nor does the FAC allege that Universal City Studios divided any fees with a talent agency.  See <u>id.</u>; <u>see also</u>, generally, FAC.  Rather, Plaintiff claims that defendant <u>Emanuel</u> divided fees with defendant <u>MRC</u> while acting simultaneously as a talent agent and owner of MRC.  FAC ¶¶ 213, 257.  Plaintiff's conclusory and far-fetched allegations of conspiracy, see FAC ¶ 230, cannot suffice to impose liability on Universal City Studios for the alleged conduct of defendants Emanuel and MRC.  See, e.g., <u>Twombly</u>, 550 U.S. at 557 ("a conclusory allegation of agreement at some unidentified point" does not establish conspiracy); <u>Buckey v. County of Los Angeles</u>, 968 F.2d 791, 794 (9th Cir. 1992) (complaint must "allege specific facts to support the existence of a conspiracy among the defendants").  Nor does Plaintiff establish standing to complain of the alleged violation of Section 1700.39, as the FAC does not allege that Plaintiff was injured by the

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

DAVIS WRIGHT TREMAINE LLP

1 alleged fee-splitting, as, for example, a talent agent or client of a talent agency.  Therefore, the

2 Section 1700.39 claim must be dismissed as to NBCU.

3 **VI.**
**CONCLUSION**

4

5      The FAC, like the initial Complaint, does not come close to stating a viable claim against

6 NBCU.  Plaintiff asserts claims that do not exist, or that are bereft of supporting factual

7 allegations.  The only thing that is clear is that Plaintiff is seeking to re-litigate a lawsuit that

8 previously was dismissed, and currently is the subject of a pending appeal.   Dismissal with

9 prejudice is therefore warranted.

10

11 DATED: January 16, 2018          DAVIS WRIGHT TREMAINE LLP
                             KELLI L. SAGER

12                              ROCHELLE L. WILCOX
                             BRENDAN N. CHARNEY

13

14

15                         By: */s/ Rochelle L. Wilcox*
                            Rochelle L. Wilcox

16

17                         Attorneys for Defendants
                        UNIVERSAL CITY STUDIOS LLC and

18                         NBCUNIVERSAL MEDIA, LLC

19

20

21

22

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

Exhibit H

1  KELLI L. SAGER (State Bar No. 120162)
   kellisager@dwt.com
2  ROCHELLE L. WILCOX (State Bar No. 197790)
   rochellewilcox@dwt.com
3  BRENDAN N. CHARNEY (State Bar No. 293378)
   brendancharney@dwt.com
4  DAVIS WRIGHT TREMAINE LLP
   865 South Figueroa Street, Suite 2400
5  Los Angeles, California 90017
   Telephone:    (213) 633-6800
6  Facsimile:    (213) 633-6899

7  Attorneys for Defendants
   UNIVERSAL CITY STUDIOS LLC and
8  NBCUNIVERSAL MEDIA, LLC

9

10

11                IN THE UNITED STATES DISTRICT COURT

12              THE NORTHERN DISTRICT OF CALIFORNIA

13                     SAN FRANCISCO DIVISION

14  STEVE WILSON BRIGGS,                  Case No. 17-cv-06552-VC

15           Plaintiff,                   [Hon. Vince Chhabria]

16      v.                               **DEFENDANTS UNIVERSAL CITY
                                         STUDIOS LLC'S AND NBCUNIVERSAL
17  UNIVERSAL CITY STUDIOS LLC;          MEDIA, LLC'S RESPONSE TO ORDER
    NBCUNIVERSAL MEDIA, LLC;             TO SHOW CAUSE**
18  SONY PICTURES ENT INC.; KEVIN
    SPACEY; ARI (ARIEL) EMANUEL; MATT
19  DAMON; BEN AFFLECK; NEILL
    BLOMKAMP; MORDECAI (MODI) WICZYK;
20  ASIF SATCHU; BILL BLOCK; DANA
    BRUNETTI; MRC II DISTRIBUTION
21  COMPANY LP (AKA MRC, Media Rights
    Capital, and all other MRC entities and
22  subsidiaries)

23           Defendants.

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

Defendants Universal City Studios LLC and NBCUniversal Media, LLC (collectively, "NBCU") respectfully submit this Response to the Court's Order to Show Cause (ECF No. 71). NBCU respectfully requests that the Court address NBCU's fully briefed Motion to Dismiss (ECF No. 26), and dismiss the meritless claims against NBCU <u>with</u> prejudice, before turning to whether Defendants Kevin Spacey or Dana Brunetti were properly served, and if not, whether the case should be dismissed without prejudice for lack of subject-matter jurisdiction.

Regardless of whether the claims against Defendants Spacey or Brunetti are ultimately dismissed,[1] federal claims are currently pending and the Court therefore has jurisdiction to rule on NBCU's Motion to Dismiss. <u>See</u> <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 725 (1966) (supplemental jurisdiction "exists <u>whenever</u> there is a claim 'arising under' federal law (emphasis added)); <u>Dunton v. Suffolk Cty.</u>, 580 F. Supp. 974, 977 (E.D.N.Y. 1983) (holding exercise of supplemental jurisdiction proper because "[f]ederal claims against [a co party] were not dismissed until well into the trial stage of this action").

The parties have expended substantial effort on the fully-briefed Motion to Dismiss. If the claims are dismissed without prejudice because other defendants were not properly served, Plaintiff may simply re-file the case in another forum, forcing NBCU to expend more time and money defending against Plaintiff's frivolous claims. Because the Court already is familiar with the issues and claims asserted, NBCU respectfully requests that the Court rule on its Motion to Dismiss before resolving the service and jurisdictional issues in the Order to Show Cause.

Respectfully submitted this 28th day of March, 2018.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ROCHELLE L. WILCOX
BRENDAN N. CHARNEY

By: <u>*/s/Rochelle L. Wilcox*</u>
    Rochelle L. Wilcox

Attorneys for Defendants
    UNIVERSAL CITY STUDIOS LLC and
    NBCUNIVERSAL MEDIA, LLC

---

[1] NBCU is not in a position to assess whether agents or attorneys for these independent parties are authorized to accept service.

Exhibit I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE KENYATTA WILSON BRIGGS, | Case No. 17-cv-06552-VC |
| Plaintiff, | **ORDER DISMISSING CASE** |
| v. | Re: Dkt. No. 69 |
| UNIVERSAL PICTURES, et al., | |
| Defendants. | |

Steve Wilson Briggs has not met his burden of establishing that he properly served either Dana Brunetti or Kevin Spacey. He has provided no information to suggest that the purported agents he served – or at least attempted to serve – were in fact authorized either "by appointment or by law to receive service of process" for Spacey and Brunetti. Fed. R. Civ. P. 4(e)(2)(C). The fact that Todd Rubenstein of Morris Yorn Barnes Levine Krintzman Rubenstein Kohner & Gellman has represented Spacey in other actions is not evidence Rubenstein or Morris Yorn is authorized to accept service for Spacey. Likewise, the fact that Matt DelPiano of Creative Artists Agency is Dana Brunetti's talent agent does not suggest that DelPiano or Creative Artists Agency is authorized to accept service for Brunetti.

Moreover, even if Todd Rubenstein or Matt DelPiano were agents to Spacey or Brunetti, Briggs has not provided evidence to suggest that process was personally delivered to either DelPiano or Rubenstein, as would be required under either Federal Rule of Civil Procedure 4(e)(2)(C) or California law. *See* Dkt. Nos. 46-47. Nor has he provided evidence that Morris Yorn or Creative Artists Agency were properly served under either Federal Rule of Civil Procedure 4(h)(1)(B) or California law. *Id.*

Briggs has not shown good cause for his failure to properly serve Spacey and Brunetti. *See* Fed. R. Civ. P. 4(m).  Inadvertent failure to comply with Rule 4 does not constitute good cause.  *See Townsel v. Contra Costa County*, 820 F.2d 319, 320 (9th Cir. 1987).  Moreover, there is no indication that Spacey or Brunetti have actually learned of this suit.  *See Boudette v. Barnette*, 923 F.2d 754, 756 (9th Cir. 1991).  The Court declines to otherwise extend the time for service of process.  Thus, all counts against Brunetti and Spacey are dismissed without prejudice.

There are no federal claims asserted against any of the remaining defendants, and the Court declines to exercise supplemental jurisdiction on the state-law claims.  *See* 28 U.S.C. § 1367(c)(3).  Thus, these remaining claims are also dismissed without prejudice.

**IT IS SO ORDERED.**

Dated: April 25, 2018

_____
VINCE CHHABRIA
United States District Judge

2

1    KELLI L. SAGER (State Bar No. 120162)
        kellisager@dwt.com
2    ROCHELLE L. WILCOX (State Bar No. 197790)
        rochellewilcox@dwt.com
3    BRENDAN N. CHARNEY (State Bar No. 293378)
        brendancharney@dwt.com
4    DAVIS WRIGHT TREMAINE LLP
     865 South Figueroa Street, Suite 2400
5    Los Angeles, California 90017
     Telephone:    (213) 633-6800
6    Facsimile:    (213) 633-6899

7    Attorneys for Defendant
     NBCUNIVERSAL MEDIA, LLC
8

9                    IN THE UNITED STATES DISTRICT COURT
10
                THE NORTHERN DISTRICT OF CALIFORNIA
11
                        SAN FRANCISCO DIVISION
12

13   STEVE WILSON BRIGGS,                    Case No. 18-cv-4952
14
                  Plaintiff,                 [Hon. Vince Chhabria]
15
           v.                                NOTICE OF MOTION AND MOTION
16                                           TO DISMISS COMPLAINT;
     KEVIN SPACEY; ARI (ARIEL) EMANUEL;      MEMORANDUM OF POINTS AND
17   MATT DAMON; BEN AFFLECK;                AUTHORITIES
     NBCUNIVERSAL MEDIA, LLC; SONY
18   PICTURES ENT. INC.; TRIGGER STREET      (Proposed Order; Request For Judicial Notice
     PRODUCTIONS; NEILL BLOMKAMP; ASIF       With Exhibits A-I, Filed Concurrently)
19   SATCHU; MORDECAI (MODI) WICZYK;
     WILLIAM (BILL) BLOCK; DANA              Date:        December 20, 2018
20   BRUNETTI; SOUND POINT CAPITAL           Time:        10:00 a.m.
     MANAGEMENT, LC; MRC (and all MRC        Crtrm:       4
21   entities and subs.),

22                Defendants.

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

1    PLEASE TAKE NOTICE that on December 20, 2018, at 10:00 a.m., or as soon thereafter

2    as counsel may be heard, in Courtroom 4 of the above-entitled court, located at the Phillip

3    Burton Federal Building & United States Courthouse, 450 Golden Gate Ave., San Francisco,

4    California, 94102, the Honorable Vince Chhabria presiding, Defendant NBCUniversal Media,

5    LLC ( "NBCU") will and hereby does move this Court to dismiss this action pursuant to Federal

6    Rules of Civil Procedure 8(a)(2) and 41(b) and/or Federal Rule of Civil Procedure 12(b)(6).  This

7    Motion is brought on the following grounds:

8        1.    The Complaint violates the requirement set forth in Federal Rule of Civil

9    Procedure 8(a)(2) that a pleading seeking relief contain a "short and plain statement of

10    the claim" showing entitlement to relief, and is therefore subject to dismissal under

11    Federal Rule of Civil Procedure 41(b);

12        2.    The Complaint is an improper collateral attack on a previously-dismissed

13    lawsuit brought by Plaintiff against some of the same defendants;

14        3.    The Complaint fails to state a claim upon which relief can be granted

15    against NBCU pursuant to Federal Rule of Civil Procedure 12(b)(6).  Specifically:

16        a.    The Complaint does not state any claim against NBCU that is plausible on

17            its face, in violation of Ashcroft v. Iqbal, 556 U.S. 662 (2009).  For this

18            reason, Plaintiff's first, sixth, seventh, and eleventh claims for relief –

19            which are the only claims for relief brought against NBCU – should be

20            dismissed.

21        b.    The Complaint is time-barred under California Code of Civil Procedure

22            §§ 335.1, 339 and/or 17 U.S.C. § 507(b).

23        c.    Because California does not recognize a claim for conspiracy, and even if

24            it did, any such claim would be preempted by the Copyright Act,

25            Plaintiff's first claim for relief against NBCU should be dismissed for this

26            independent reason.

27

28

DAVIS WRIGHT TREMAINE LLP

i

d.    Because the Complaint does not allege any facts identifying any purportedly negligent acts by NBCU, Plaintiff's sixth and seventh claims for relief against NBCU should be dismissed for this independent reason.

e.    Because the Complaint does not plead a fiduciary or other relationship between Plaintiff and NBCU that would give rise to an obligation for an accounting, and because Plaintiff's underlying claims against NBCU do not justify the remedy of an accounting, Plaintiff's eleventh claim for relief against NBCU should be dismissed for this independent reason.

f.    Because the Complaint does not seek cognizable relief to the extent it seeks damages or an accounting purportedly arising out of alleged spoliation resulting in the dismissal of a Prior Blomkamp Action, Plaintiff's eleventh claim for relief against NBCU should be dismissed for this independent reason.

This Motion is based on the attached Memorandum of Points and Authorities; the concurrently-filed Request for Judicial Notice with Exhibits A-I; the pleadings, files and records in this action; and upon such other arguments as may be received by this Court at the hearing on this Motion.

Respectfully submitted this 9th day of November, 2018

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ROCHELLE L. WILCOX
BRENDAN N. CHARNEY


By: */s/ Rochelle L. Wilcox*
    Rochelle L. Wilcox

Attorneys for Defendants
NBCUNIVERSAL MEDIA, LLC

DAVIS WRIGHT TREMAINE LLP

ii

# TABLE OF CONTENTS

Page

I. SUMMARY OF ARGUMENT ................................................................................. 1

II. SUMMARY OF FACTS ...................................................................................... 3

III. THE COMPLAINT FAILS TO PROVIDE NOTICE OF THE  BASIS FOR PLAINTIFF'S CLAIMS AGAINST NBCU .................................... 5

IV. THE COMPLAINT IS AN IMPROPER COLLATERAL ATTACK ON  THE DISMISSAL OF THE PRIOR BLOMKAMP ACTION ...................................... 6

V. THE COMPLAINT FAILS TO STATE A CLAIM ............................................ 9

    A.   The Complaint Fails To State A Plausible Claim Against NBCU ............................ 9

    B.   The Complaint is Time-Barred. ............................................................... 10

    C.   California Law Does Not Recognize A Claim For Conspiracy, Which Would Be Preempted By The Copyright Act In Any Event. ..................... 12

    D.   The Complaint Fails To Allege Any Negligent Conduct By NBCU. ..................... 14

    E.   The Complaint Fails To State A Cause of Action For Accounting. ...................... 15

        1.   The Purported Claim For Accounting Requests A Remedy Unsupported By Any Underlying Claims ..................................... 15

        2.   No Damages Are Cognizable Concerning The Prior Blomkamp Lawsuit. ............................................................. 16

VI. CONCLUSION .................................................................................................. 17

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

DAVIS WRIGHT TREMAINE LLP

ER 725

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Advocare Intern., L.P. v. Scheckenbach,
    No. C08-5332 RBL, 2010 WL 2196449 (W.D. Wash. May 27, 2010) ................................... 8

Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,
    7 Cal. 4th 503 (1994) ...................................................................................................... 12

Arc Music, Inc. v. Henderson,
    No. CV 09-7967 DSF (CWX), 2010 WL 11597304 (C.D. Cal. Mar. 22, 2010) ................... 11

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) .................................................................................... 2, 9, 10, 14

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) ............................................................................................. 10, 14

Benke v. Departure Agency, Inc.,
    No. CV 11-397-VBF(VBKX), 2011 WL 13129964 (C.D. Cal. Aug. 11, 2011) ................... 13

Brazil v. U.S. Dept. of Navy,
    66 F.3d 193 (9th Cir. 1995) ................................................................................................ 5

Briggs v. Blomkamp,
    70 F. Supp. 3d 1155 (N.D. Cal. 2014) ............................................................... *passim*

Briggs v. Blomkamp,
    N.D. Cal. No 13-cv-04679 ............................................................................................... 3

Briggs v. Sony Pictures Ent.,
    9th Cir. No. 14-17175 (filed March 1, 2018) ............................................................ 1, 3

Briggs v. Sony Pictures Ent.,
    U.S. Supreme Ct. No. 18-63 (filed Oct 1, 2018) ........................................................... 1

Briggs v. Universal Pictures,
    N.D. Cal. No. 17-cv-6552 (filed November 13, 2017) ................................................ *passim*

Cedars-Sinai Med. Ctr. v. Superior Court,
    18 Cal. 4th 1 (1998) ..................................................................................................... 17

Cox v. United States,
    No. 2:17-CV-00121-SU, 2017 WL 3167417 (D. Or. June 13, 2017),
    report and recommendation adopted, No. 2:17-CV-00121-SU,
    2017 WL 3166728 (D. Or. July 24, 2017) ..................................................................... 7

DAVIS WRIGHT TREMAINE LLP

Dydzak v. United States,
    No. 17-cv-04360-EMC, 2017 WL 4922450 (N.D. Cal. Oct. 31, 2017),
    appeal dismissed No. 17-17401, 2018 WL 2539464 (9th Cir. Apr. 24, 2018) ........................ 7

Fleet v. Bank of Am. N.A.,
    229 Cal. App. 4th 1403 (2014) ............................................................................................. 15

Gabris v. Aurora Loan Servs. LLC,
    No. 2:14-CV-01759-JAM-KJN, 2015 WL 1021305 (E.D. Cal. Mar. 9, 2015) ..................... 15

Goldberg v. Cameron,
    No. C-05-03534 RMW, 2009 WL 2051370 (N.D. Cal. July 10, 2009) ................................. 11

Harper v. City of Monterey,
    No. 11-cv-02903-LHK, 2012 WL 195040 (N.D. Cal. Jan. 23, 2012),
    aff'd, 519 F. App'x 503 (9th Cir. 2013) ................................................................................ 8

In re Braughton,
    520 F.2d 765 (9th Cir. 1975) ................................................................................................. 7

Jackson v. AEG Live, Inc.,
    233 Cal. App. 4th 1156 (2015) ............................................................................................. 14

Kenne v. Stennis,
    230 Cal. App. 4th 953 (2014) ............................................................................................... 12

Liddell v. Smith,
    345 F.2d 491 (7th Cir. 1965) ............................................................................................ 7, 8

Maloney v. T3Media, Inc.,
    853 F.3d 1004 (9th Cir. 2017) ............................................................................................. 13

Mangindin v. Washington Mut. Bank,
    637 F. Supp. 2d 700 (N.D. Cal. 2009) ................................................................................. 12

Mcdaniel v. United States,
    No. 2:18-CV-2306 JAM DB PS, 2018 WL 5316161 (E.D. Cal. Oct. 26, 2018) ..................... 5

Millennium TGA, Inc. v. Doe,
    No. 11-2258 SC, 2011 WL 1812786 (N.D. Cal. May 12, 2011) ...................................... 13, 14

Mullis v. U.S. Bankr. Court,
    828 F.2d 1385 (9th Cir. 1987) ............................................................................................ 7, 8

Nat. Alternatives Int'l, Inc. v. Allmax Nutrition, Inc.,
    258 F. Supp. 3d 1170 (S.D. Cal. 2017) ................................................................................ 13

Nevijel v. North Coast Life Ins. Co.,
    651 F.2d 671 (9th Cir. 1981) ................................................................................................. 5

DAVIS WRIGHT TREMAINE LLP

v

DAVIS WRIGHT TREMAINE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Peckarsky v. ABC,
    603 F. Supp. 688 (D.D.C. 1984) ........................................................... 12

Petrella v. Metro-Goldwyn-Mayer, Inc.,
    572 U.S. 663 (2014) ............................................................................. 11

Rein v. Providian Fin. Corp.,
    270 F.3d 895 (9th Cir. 2001) ................................................................. 7

Rinegard-Guirma v. Ocwen Loan Servicing, LLC,
    No. 3:16-cv-01036-HZ, 2016 WL 4257765 (D. Or. Aug. 10, 2016) .................. 7, 8

Roley v. New World Pictures, Ltd.,
    19 F.3d 479 (9th Cir. 1994) ................................................................. 11

Rosales v. Wells Fargo Bank, N.A.,
    No. 13-CV-01316-BLF, 2014 WL 4770572 (N.D. Cal. Sept. 24, 2014) .............. 10

San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.,
    568 F.3d 725 (9th Cir. 2009) ................................................................. 8

Stafne v. Zilly,
    No. 2:17-CV-01692-MHS, 2018 WL 4871141 (W.D. Wash. Oct. 9, 2018) ........... 7

Temple Cmty. Hosp. v. Superior Court,
    20 Cal. 4th 464 (1999) ....................................................................... 8, 16

Teselle v. McLoughlin,
    173 Cal. App. 4th 156 (2009) .............................................................. 15

Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.,
    682 F.3d 292 (4th Cir. 2012) .............................................................. 14

Uptergrove v. U.S.,
    No. 1:08-CV-01800-OWW SMS, 2009 WL 1035231
    (E.D. Cal. Apr. 17, 2009) ...................................................................... 7

Warden v. Cross,
    94 Fed. Appx. 474 (9th Cir. 2004) ........................................................ 16

Wawrzynski v. Byron Hibshman,
    No. 10-CV-2347-H (WMC), 2011 WL 1004822 (S.D. Cal. Mar. 18, 2011),
    aff'd sub nom Wawrzynski v. Hibsham, 490 F. App'x 70 (9th Cir. 2013) ........... 8

**Statutes**

17 U.S.C.
    § 102(a) ............................................................................................ 13
    § 301(a) ............................................................................................ 12
    § 505 ................................................................................................. 9
    § 507(b) ............................................................................................ 11

vi

California Code of Civil Procedure
  § 335.1 ................................................................................................................. 10
  § 339 .................................................................................................................... 11

**Rules**

Federal Rule of Civil Procedure
  8(a) ................................................................................................................... 4, 5
  8(a)(2) ............................................................................................................... 1, 5
  8(e) ....................................................................................................................... 5
  12(b)(6) .......................................................................................................... 2, 4, 9
  41(b) ...................................................................................................................... 5

**Other Authorities**

Civil Jury Instructions (CACI) § 400 (2013) ........................................................... 14

H.R. Rep. No. 94-1476 (available at
  https://www.copyright.gov/history/law/clrev_94-1476.pdf) ................................... 12

DAVIS WRIGHT TREMAINE LLP

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

ER 729

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**
**SUMMARY OF ARGUMENT**

The Complaint in this action is Plaintiff's second transparent attempt to re-litigate claims that were rejected in an earlier lawsuit. Plaintiff's initial case claimed that the space-adventure film Elysium infringed Plaintiff's copyrighted screenplay; it was dismissed with prejudice by the Honorable Phyllis J. Hamilton in 2014. Briggs v. Blomkamp, 70 F. Supp. 3d 1155 (N.D. Cal. 2014) (the "Prior Blomkamp Action"). All avenues of appeal have been exhausted. The Ninth Circuit affirmed the district court[1] and denied Plaintiff's Motion for Rehearing,[2] and the U.S. Supreme Court denied Plaintiff's Petition for Certiorari.[3]

Plaintiff, however, refuses to let go. In 2017, he concocted a new lawsuit, which attempts to resurrect his copyright claim by wrapping it into incomprehensible theories about some kind of industry-wide "conspiracy." Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (filed November 13, 2017) (the "Prior Universal Action") (see RJN Ex. E (Complaint, filed Jan. 2, 2018)). The instant Complaint is nearly identical to the allegations in the Prior Universal Action. Despite serial attempts, however, Plaintiff has not set out any facts that give rise to any cognizable claim against Defendant NBCUniversal Media, LLC ("NBCU"), or that even identify the conduct that Plaintiff purports to believe was wrongful. Instead, the few direct references to NBCU assert only that it has been involved in entirely unrelated business deals with some of the other defendants, on projects that have nothing whatsoever to do with Plaintiff, his screenplay, or the film Elysium that he claims infringed his copyright. Because Plaintiff has failed to set forth an intelligible statement of facts showing entitlement to any relief against NBCU, his claims against NBCU must be dismissed. F.R.C.P. 8(a)(2). Section III, infra.

---

[1] See Request for Judicial Notice ("RJN") Ex. B (Memorandum Opinion, Briggs v. Sony Pictures Ent., 9th Cir. No. 14-17175 (ECF No. 32-1) (filed March 1, 2018)).

[2] See RJN Ex. C (Order, Briggs v. Sony Pictures Ent., 9th Cir. No. 14-17175 (ECF No. 34) (filed April 6, 2018)).

[3] See RJN Ex. D (Clerk's Notice of Denial of Petition of Certiorari, Briggs v. Sony Pictures Ent., U.S. Supreme Ct. No. 18-63 (filed Oct 1, 2018)).

1   Independently, Plaintiff's claims should be dismissed as an improper attempt to

2   collaterally attack the result in the Prior Blomkamp Action, where his claims were rejected.

3   Basic principles of federal procedure prevent Plaintiff from engaging in this kind of "horizontal

4   appeal."  Plaintiff's only avenue for review of Judge Hamilton's order were his failed appeals to

5   the Ninth Circuit and the U.S. Supreme Court; this lawsuit should be dismissed in its entirety.

6   Section IV, infra.

7   Despite having had three opportunities to amend his pleadings (including the two

8   pleadings filed in the Prior Universal Action), the allegations in the Complaint fail to meet the

9   requirements of Federal Rule of Civil Procedure 12(b)(6), or the standard for plausibility of

10  Ashcroft v. Iqbal, 556 U.S. 662 (2009).  There are no facts pleaded against NBCU that explain

11  the basis for any claims against it; there is no tort claim or statutory violation that arises from a

12  company doing business with someone against whom the Plaintiff has entirely unrelated claims.

13  Section V.A, infra.  Additionally, even if the Complaint were deemed to intelligibly allege

14  wrongful conduct, Plaintiff's claims against NBCU for negligence and an alleged conspiracy to

15  spoliate evidence are barred by the applicable statutes of limitation.  Section V.B, infra.

16  Finally, each claim fails on the merits.  Plaintiff's First Claim For Relief against NBCU

17  purports to assert a cause of action for "conspiracy" that does not exist under California law and

18  – to the extent it alleges conspiracy to infringe copyrights – is preempted by the Copyright Act.

19  Section V.C, infra.  Plaintiff's only attempts to allege claims against NBCU that may actually

20  exist – his Sixth Claim for Relief for "negligence" and Seventh Claim for Relief for "gross

21  negligence" – are not supported by any facts concerning NBCU that could support these claims.

22  Section V.D, infra.  His remaining claim for an "accounting" is simply a roundabout way of

23  requesting a damages remedy for the Complaint's absurd allegations of wrongdoing, but because

24  he cannot plausibly allege any wrongful acts by NBCU that entitle him to damages, this

25  purported cause of action also must be dismissed.  Section V.E.1, infra.  Indeed, to the extent

26  Plaintiff seeks damages arising from an alleged conspiracy to spoil evidence in the Original

27  Blompkamp Action, that relief is independently barred because California law does not provide a

28  tort remedy for alleged spoliation.  Section V.E.2, infra.

DAVIS WRIGHT TREMAINE LLP

2

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

1    Because the Complaint fails again to state any claims against NBCU, demonstrating that

2    further amendment would be futile – and Plaintiff already has failed in multiple attempts to

3    assert a claim against NBCU – this Court should grant NBCU's motion in its entirety, with

4    prejudice.

5

6    **II.**
     **SUMMARY OF FACTS**

7    In 2013, Plaintiff Steven Briggs sued Neill Blomkamp, Sony Pictures, Media Rights

8    Capital ("MRC"), and others, claiming that the film <u>Elysium</u> infringed Plaintiff's copyrighted

9    screenplay, "Butterfly Driver."  <u>Briggs v. Blomkamp</u>, N.D. Cal. No 13-cv-04679.  The District

10   Court for the Northern District of California, the Honorable Phyllis J. Hamilton presiding,

11   granted summary judgment to defendants, rejecting Plaintiffs' copyright claim in a thorough and

12   carefully reasoned opinion.  <u>Briggs v. Blomkamp</u>, 70 F. Supp. 3d 1155 (N.D. Cal. 2014).

13   The Court dismissed Plaintiff's claims and entered judgment for Defendants.  <u>See</u> RJN Ex. A

14   (Judgment, <u>Briggs v. Blomkamp</u>, N.D. Cal. No 13-cv-04679 (October 3, 2014) (ECF No. 87)).

15   On appeal, the Ninth Circuit affirmed the district court (<u>see</u> RJN Ex. B; Memorandum Opinion,

16   <u>Briggs v. Sony Pictures Ent</u>., 9th Cir. No. 14-17175 (ECF No. 32-1) (filed March 1, 2018)) and

17   denied Plaintiff's Motion for Rehearing (<u>see</u> RJN Ex. C; Order, <u>Briggs v. Sony Pictures Ent</u>., 9th

18   Cir. No. 14-17175 (ECF No. 34) (filed April 6, 2018)).  The U.S. Supreme Court denied

19   Plaintiff's Petition for Certiorari, fully extinguishing the Prior Blomkamp Action.  <u>See</u> RJN Ex.

20   D (<u>Briggs v. Sony Pictures Ent</u>., Supreme Ct. No. 18-63 (filed Oct 1, 2018)).

21   On November 13, 2017, Plaintiff filed the Prior Universal Action against some[4] of the

22   same defendants sued in the Prior Blomkamp Action.  <u>See</u> RJN Ex. E (Complaint, <u>Briggs v.</u>

23   <u>Universal Pictures</u>, N.D. Cal. No. 17-cv-6552).  He also added 10 new defendants, including

24   Universal City Studios LLC and NBCUniversal Media, LLC.  Plaintiff's initial Complaint stated

25   that it was "related" to the Prior Blomkamp Action and that "certain new events, related to [the

26   Prior Blomkamp Action], inform[] this matter" – principally, Plaintiff's allegation that all of the

27

28   _____
     [4] Neill Blomkamp, Sony Pictures and MRC are named in this case, the Prior Blomkamp
     Action, and the Prior Universal Action.

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

DAVIS WRIGHT TREMAINE LLP

1    defendants were engaged in some undefined "conspiracy" that Plaintiff believes was relevant to

2    the Prior Blomkamp Action.  Id. at ¶ 19.

3         NBCU joined a Motion to Dismiss filed by the other defendants in this action, seeking

4    dismissal of the Complaint for lack of subject matter jurisdiction, failure to provide a short and

5    plain statement of the claim under Rule 8(a), and failure to state a claim under Rule 12(b)(6).

6    N.D. Cal. No. 17-cv-6552, ECF Nos. 15, 17.  Five days later, Plaintiff filed the FAC (see RJN

7    Ex. F; N.D. Cal. No. 17-cv-6552, ECF No. 21), adding copyright and infringing exportation

8    claims that seem to be based on the same alleged facts that gave rise to the Prior Blomkamp

9    Action – purported infringement of his screenplay "Butterfly Driver."  See id. at Counts 12 and

10   13; see also id. at ¶¶ 111, 117.  NBCU then filed a Motion to Dismiss the FAC for failure to

11   provide a short and plain statement of the claim under Rule 8(a), for the FAC's improper

12   collateral attack on the Prior Blomkamp Action, and failure to state a claim under Rule 12(b)(6).

13   See RJN Ex. G ("Motion to Dismiss First Amended Complaint," N.D. Cal. No. 17-cv-6552, ECF

14   No. 26) and later asked the Court to exercise supplemental jurisdiction over Plaintiff's state

15   claims and dismiss those claims with prejudice to prevent future abuse of the judicial system (see

16   RJN Ex. H ("Response to Order to Show Cause," N.D. Cal. No. 17-cv-6552, ECF No. 73)).  The

17   Prior Universal Action ultimately was dismissed without prejudice because Plaintiff failed to

18   show good cause for his failure to serve the parties against whom federal claims were asserted,

19   and the Court declined to exercise supplemental jurisdiction over the remaining claims.  See RJN

20   Ex. I ("Order Dismissing Case," N.D. Cal. No. 17-cv-6552, ECF No. 76).

21        Plaintiff filed this action on August 15, 2018, noting that the instant Complaint is

22   "similar" to the Prior Universal Action and includes "many of the same parties, and many of the

23   same causes of action", and that this lawsuit "refiles" those claims.  Complaint, ECF No. 1 at ¶ 1.

24   The Complaint also concedes that "some aspects of this matter are connected to previously

25   undisclosed events in prior action Briggs v. Blomkamp, 4:13-cf-04679 PJH".  Id. at ¶ 2.  NBCU

26   was served with the Complaint on October 19, 2018.

27        The Complaint, like the pleadings in the Prior Universal Action, is indecipherable.  See

28   generally Complaint.  Through a tangled web of allegations, relying heavily on innuendo and

DAVIS WRIGHT TREMAINE LLP

1    rote speculation, the Complaint appears to claim a decades-long conspiracy running rampant

2    throughout Hollywood's major studios.  See id.  As best can be discerned, Plaintiff appears to

3    allege that NBCU conspired with competing film studios and other prominent professionals in

4    the film industry to somehow facilitate copyright infringement, and frustrate the Prior Blomkamp

5    Action and appeal therefrom.  See, e.g., Complaint at ¶¶ 3, 119, 126, 131, 138-141, 147-148,

6    184, 192, 201, 238, 243.  At bottom, NBCU's alleged wrong appears to be working with

7    renowned talent agent Ari Emanuel, and producing motion pictures.  See id.

8         As to NBCU, although the Complaint asserts claims for conspiracy, negligence, gross

9    negligence, and an accounting against NBCU, the Complaint does not include a single factual

10   allegation tying his claims to alleged wrongs by NBCU.  Complaint at ¶¶ 192, 201, 238, 243.

11                                        **III.**
12            **THE COMPLAINT FAILS TO PROVIDE NOTICE OF THE
                BASIS FOR PLAINTIFF'S CLAIMS AGAINST NBCU**

13        To give a defendant fair notice of the nature of a lawsuit, Federal Rule of Civil Procedure

14   8(a) requires that a complaint contain a "short and plain statement of the claim showing that the

15   pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A "complaint which fails to comply with

16   rules 8(a) and 8(e) may be dismissed with prejudice pursuant to rule 41(b)."  Nevijel v. North

17   Coast Life Ins. Co., 651 F.2d 671, 673-74 (9th Cir. 1981) (dismissing with prejudice complaint

18   that was "verbose, confusing and almost entirely conclusory").  Even pro se pleadings "must

19   meet some minimum threshold in providing a defendant with notice of what it is that it allegedly

20   did wrong."  Brazil v. U.S. Dept. of Navy, 66 F.3d 193, 199 (9th Cir. 1995); see also Mcdaniel v.

21   United States, No. 2:18-CV-2306 JAM DB PS, 2018 WL 5316161, at *2 (E.D. Cal. Oct. 26,

22   2018) (dismissing pro se complaint under Rule 8, holding that "plaintiff's complaint fails to

23   contain a short and plain statement of a claim showing that plaintiff is entitled to relief. Instead,

24   the complaint is comprised of vague and conclusory allegations.").

25        Here, Plaintiff has now thrice failed to meet this threshold requirement.  The Complaint,

26   like the two iterations in the Prior Universal Action, is a perplexing pastiche of innuendo, non

27   sequitur, guesses, and unsupported assumptions and conclusions, all loosely spun together with

28   bizarre conspiratorial themes.  See, e.g., Complaint at ¶¶ 3, 119, 126, 131, 138-141, 147-148,

DAVIS WRIGHT TREMAINE LLP

5

1    184, 192, 201, 238, 243.  It remains impossible to discern what conduct NBCU is alleged to have

2    engaged in that was wrongful, or how NBCU's conduct purportedly caused harm to Plaintiff.

3    Indeed, NBCU is not even included among the "primary defendant actors" who are alleged to

4    have acted wrongfully.  See Complaint at ¶¶ 40-49. Even if the disjointed alleged "conspiracy"

5    could be understood, the alleged ties between NBCU and the other defendants are premised on

6    explicit conjecture that these ties were "likely."  See Complaint at ¶¶ 87-94, 184.  Stripped of

7    Plaintiff's conjecture and arcane conspiracy theories, the Complaint simply recounts well-known

8    business deals and film releases over the past two decades.  See, e.g., Complaint at ¶¶ 54, 58, 66-

9    68, 98, 108, 148.  But there is no legal basis for Plaintiff to sue NBCU simply because it has

10   done business with other companies or individuals with whom Plaintiff has a dispute.  Because

11   the Complaint fails to meet the fundamental requirement of providing intelligible notice of the

12   nature of and basis for Plaintiff's claims against NBCU, the Motion to Dismiss should be

13   granted.

**IV.**
**THE COMPLAINT IS AN IMPROPER COLLATERAL ATTACK ON**
**THE DISMISSAL OF THE PRIOR BLOMKAMP ACTION**

16            In this sequel litigation, Plaintiff seeks to revive his Prior Blomkamp Action by alleging

17   that competing film studios and other film professionals all conspired to engage in a constellation

18   of purportedly improper conduct for the alleged purpose of hindering the Prior Blomkamp

19   Action and pending appeal.  See Complaint at ¶¶ 3, 24, 30, 34-38, 177-183, 263-264, 268.

20   The Complaint also attempts to revive the copyright claims rejected in the Prior Blomkamp

21   Action by recasting them as a wide-ranging conspiracy, even while admitting that these

22   conspiracy allegations are "connected to previously undisclosed events in prior action Briggs v.

23   Blomkamp."  Complaint at ¶ 2; see also id. at ¶¶ 3, 33, 265, 267.  In other words, this case is a

24   collateral attack on Judge Hamilton's order dismissing the Prior Blomkamp Action.  Although

25   Plaintiff was entitled to seek review of that order by appealing to the Ninth Circuit, and

26   ultimately the U.S. Supreme Court – which he did, without prevailing – he cannot burden a

27   district court with this sort of "horizontal appeal."

28

DAVIS WRIGHT TREMAINE LLP

6

1    "The collateral attack doctrine precludes litigants from collaterally attacking the

2    judgments of other courts."  Uptergrove v. U.S., No. 1:08-CV-01800-OWW SMS, 2009 WL

3    1035231, at *3 (E.D. Cal. Apr. 17, 2009) (quoting Rein v. Providian Fin. Corp., 270 F.3d 895,

4    902 (9th Cir. 2001)).  The principle is fundamental:  a losing party may not seek to nullify a

5    district court's decision by seeking relief from another district court.  See, e.g., Mullis v. U.S.

6    Bankr. Court, 828 F.2d 1385, 1392-93 (9th Cir. 1987) (even where judicial immunity did not

7    apply, injunctive relief could not be ordered against bankruptcy judges and clerks because

8    "collateral attacks on the judgments, orders, decrees or decisions of federal courts are

9    improper"); Stafne v. Zilly, No. 2:17-CV-01692-MHS, 2018 WL 4871141, at *6 (W.D. Wash.

10   Oct. 9, 2018) (quoting Mullis); In re Braughton, 520 F.2d 765, 766 (9th Cir. 1975) ("the second

11   judge correctly refused to entertain a 'horizontal' appeal from the warrant issued by the first

12   judge"); Dydzak v. United States, No. 17-cv-04360-EMC, 2017 WL 4922450, at *7 (N.D. Cal.

13   Oct. 31, 2017) (a litigant may raise alleged judicial error and litigation misconduct only through

14   "the normal appellate process," not a forbidden "horizontal appeal"), appeal dismissed No. 17-

15   17401, 2018 WL 2539464 (9th Cir. Apr. 24, 2018); Rinegard-Guirma v. Ocwen Loan Servicing,

16   LLC, No. 3:16-cv-01036-HZ, 2016 WL 4257765 at *3 (D. Or. Aug. 10, 2016) ("[T]his Court is

17   without authority to revisit issues that were previously decided in another district court case.");

18   Cox v. United States, No. 2:17-CV-00121-SU, 2017 WL 3167417, at *5 (D. Or. June 13, 2017),

19   report and recommendation adopted, No. 2:17-CV-00121-SU, 2017 WL 3166728 (D. Or. July

20   24, 2017) ("Plaintiff may not use this action to collaterally attack an issue that was already

21   decided before another court in an earlier proceeding").

22       The bar on horizontal appeals is supported by the same policy underlying the doctrine of

23   res judicata:  "the interest of the State that there should be an end to the litigation."  Liddell v.

24   Smith, 345 F.2d 491, 493 (7th Cir. 1965).  Clever plaintiffs have attempted this tactic before, and

25   courts readily reject creating such an obvious loophole to finality in judgment.  In Uptergrove,

26   for instance, the court dismissed a complaint as an impermissible collateral attack because it

27   sought relief from an adverse judgment issued against the plaintiff in a prior case.  2009 WL

28   1035231 at *3-4.  Indeed, the Supreme Court of California has declined to recognize a tort

<div style="text-align:center">7</div>

DAVIS WRIGHT TREMAINE LLP

1   remedy for spoliation of evidence, recognizing that permitting such a claim would produce an

2   "endless spiral of lawsuits over litigation-related misconduct." Temple Cmty. Hosp. v. Superior

3   Court, 20 Cal. 4th 464, 473 (1999); see also Liddell, 345 F.2d at 494 (affirming dismissal of

4   previously-dismissed claims on grounds of res judicata, and dismissing perjury claim arising

5   from prior litigation on grounds that perjury does not give rise to a private cause of action).

6   Moreover, a claim that "false testimony led to a fraudulent verdict is an attack on the merits of

7   the prior proceeding" and violates the collateral attack doctrine. Advocare Intern., L.P. v.

8   Scheckenbach, No. C08-5332 RBL, 2010 WL 2196449 at *2 (W.D. Wash. May 27, 2010); see

9   also Rinegard-Guirma, 2016 WL 4257765 at *2 (a "challenge to the admissibility of certain

10  evidence in either the state or federal case cannot be raised" in a separate federal action).

11      Given its relationship to res judicata, it also is clear that a party that was not involved in a

12  prior lawsuit also may seek dismissal of a horizontal appeal of that suit, just as "res judicata may

13  be asserted against a party that was a party in the prior proceeding even if there are new different

14  parties in the later proceeding." Wawrzynski v. Byron Hibshman, No. 10-CV-2347-H (WMC),

15  2011 WL 1004822, at *3 (S.D. Cal. Mar. 18, 2011) (res judicata barred plaintiff's second

16  lawsuit, notwithstanding the addition of a new defendant), aff'd sub nom Wawrzynski v.

17  Hibsham, 490 F. App'x 70 (9th Cir. 2013). As one court explained, "[u]nder California claim

18  preclusion rules, the only identity of parties required is the identity of the party against whom

19  preclusion is sought." Harper v. City of Monterey, No. 11-cv-02903-LHK, 2012 WL 195040, at

20  *4 (N.D. Cal. Jan. 23, 2012) (emphasis added), aff'd, 519 F. App'x 503 (9th Cir. 2013), citing

21  San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys., 568 F.3d 725, 734 (9th

22  Cir. 2009).

23      Courts do not hesitate to dismiss "horizontal appeals" when this improper tactic is

24  challenged by a defendant who was not a party in the prior action. See, e.g., Mullis, 828 F.2d at

25  1386, 1392-93 (dismissing plaintiff's "horizontal appeal" of treatment of his bankruptcy petition;

26  defendants were not parties to bankruptcy petition). For the same reasons, NBCU may seek

27  dismissal of this horizontal appeal, to avoid being drawn into an endless spiral of litigation

28  arising from Plaintiff's attempt to re-litigate his failed claims against others. All of Plaintiff's

DAVIS WRIGHT TREMAINE LLP

8

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

1   claims against NBCU depend on his claims against the other defendants – the purported

2   conspiracy is the thread that Plaintiff invokes to sue NBCU along with the other defendants –

3   and so all of his claims against NBCU must fall with his claims against those defendants.

4        Here, the essence of the Complaint is Plaintiff's grievance about the conduct of litigation

5   in the Prior Blomkamp Action and alleged impairment of his appeal from dismissal of that

6   lawsuit, along with Plaintiff's rehashed claims of copyright infringement arising from the same

7   film at issue in the Prior Blomkamp Action.  See Complaint at ¶¶ 3, 24, 30, 33-38, 177-183, 185,

8   263-265, 267-268.  After failing to recover damages for alleged copyright infringement in the

9   Prior Blomkamp Action, Plaintiffs' allegations of spoliation and conspiracy seek essentially the

10  same remedy as in the Prior Blomkamp Action:

11      • damages for "spoliation of evidence" that allegedly "[]impedes Plaintiff's ability to

12        defend his copyright protected property", efforts to "cheat the judicial process … in

13        Briggs v. Blomkamp [which] resulted in the Plaintiff losing substantial, rightful

14        damages," and damages for "infringing exportation" arising from the

15        "misappropriat[ion]" of "Plaintiff's work" (Complaint at ¶ 185);

16      • an accounting of revenue from the defendants' alleged sale of "derivatives of [the

17        Plaintiff's] work" (Complaint at ¶ 265); and

18      • "all profits from the film Elysium" under the Copyright Act, 17 USC § 505 (Complaint,

19        Prayer for Relief at ¶ 4).

20       This, however, is an impermissible collateral attack on the conduct of the Prior

21  Blomkamp Action.  Plaintiff is not entitled to a second bite at this apple in a different district

22  court; review is limited to the proper appellate channels, which have been exhausted.  This

23  lawsuit should therefore be dismissed.

24
                                          **V.**
25                    **THE COMPLAINT FAILS TO STATE A CLAIM**

26      **A.   The Complaint Fails To State A Plausible Claim Against NBCU.**

27       Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as

28  true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678

DAVIS WRIGHT TREMAINE LLP

9

1   (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility

2   standard requires "more than 'a sheer possibility that a defendant has acted unlawfully"; and is

3   met only when the plaintiff pleads facts that allow the court to "draw the reasonable inference

4   that the defendant is liable for the misconduct alleged."  Id.

5          Here, the FAC's allegations – concerted action by a host of competing film studios and

6   professionals to somehow facilitate wide-ranging copyright infringement and spoliation of

7   evidence through routine, widely-reported transactions and film deals – is inherently implausible.

8   Even putting that inherent implausibility aside, Plaintiff's allegations against NBCU are replete

9   with – and depend upon – possibilities, not allegations.  See, e.g., Complaint at ¶ 66 ("Emanuel

10  likely received a percentage of the films … and an agreement that Universal Pictures would

11  distribute or provide production money for any reasonably viable film Def Emanuel brought to

12  Universal"); ¶ 108 ("likely, Universal Pictures wouldn't distribute the film"); ¶ 185 ("it is

13  possible that Plaintiff's work may have been misappropriated in countless foreign markets").

14  The Complaint cannot meet the bare minimum pleading standard and must be dismissed.

15         **B.     The Complaint is Time-Barred.**

16         While Plaintiff's Complaint is difficult to understand, the only cognizable claims against

17  NBCU appear to sound in negligence and gross negligence resulting in purported financial injury

18  (Causes of Action 6 and 7, Complaint at ¶¶ 236-244).  These claims are governed by the two-

19  year statute of limitations set forth in California Code of Civil Procedure § 335.1, which applies

20  to "[a]n action for … injury to … an individual caused by the wrongful act or neglect of

21  another."  See Rosales v. Wells Fargo Bank, N.A., No. 13-CV-01316-BLF, 2014 WL 4770572,

22  at *5-6 (N.D. Cal. Sept. 24, 2014) (dismissing claim for financial negligence as outside of

23  Section 335.1 limitations period).  To the extent NBCU is even implicated by Plaintiff's

24  negligence and gross negligence claims, the claim against NBCU appears to be premised on

25  NBCU's hiring of Mordecai Wiczyk almost twenty years ago in 1999 (Complaint ¶¶ 238.A,

26  243.B), which is plainly beyond the limitations period.[5]

---

[5] The cause of action for negligence also refers to other time-barred events that do not involve
NBCU, including abstruse allegations concerning the business dealings of Screenbid in 2014 (id.
at ¶¶ 149-156, 238.B, 243.A); litigation conduct in the Prior Blomkamp Action, which was

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1    Plaintiff's cause of action for conspiracy against NBCU appears to sound in claims of

2  litigation misconduct by the other defendants who were parties to the Prior Blomkamp Action, as

3  well as the copyright infringement claims that Plaintiff brings against other defendants.  Any

4  such claims would be barred by the two-year statute of limitations set forth in California Code of

5  Civil Procedure § 339 (action upon a contract, obligation, or liability not founded in writing) or

6  the Copyright Act's three-year statute of limitations, 17 U.S.C. §507(b).[6]

7    Like the negligence claim, the conspiracy claim is premised on events that took place

8  outside of the limitations period.  These events include, in addition to the time-barred events

9  raised in the negligence claim:

10    • Universal Pictures' casting of Kevin Spacey in K-PAX in 2001 (Complaint at ¶ 192.3);

11  dismissed in 2014 (id. at ¶¶ 238.D, 243.C, H); the purchase of film rights to Elysium prior to its

12  release in 2013 (id. at ¶¶ 121, 238.D, 243.D); and the operation of TriggerStreet before it was
   closed in November, 2014 (id. at ¶¶ 122, 238.E-H; 243.E-G).

13  [6] Although NBCU had no involvement in producing or distributing Elysium, even if NBCU had
14  played a role in the alleged conspiracy, its alleged acts ended many years ago, barring any
   copyright claim against it.  "Under the Act's three-year provision, an infringement is actionable
15  within three years, and only three years, of its occurrence."  Petrella v. Metro-Goldwyn-Mayer,
   Inc., 572 U.S. 663, 671 (2014); see also Roley v. New World Pictures, Ltd., 19 F.3d 479, 482
16  (9th Cir. 1994) (granting summary judgment, holding copyright claim was barred where
   plaintiff's "assertions rely on naked allegations and speculation" and thus "fail[ ] to produce any
17  evidence that appellees engaged in actionable conduct" within the limitations period).  Even if
   NBCU's participation in the alleged conspiracy that Plaintiff theorizes could be deemed direct
18  infringement, these alleged acts occurred no later than 2013.  Complaint at ¶ 192.12.  A direct
   infringement action is barred if the alleged infringer's actions occurred outside of the limitations
19  period, even if continuing infringement allegedly is occurring through the actions of others.
20  Goldberg v. Cameron, No. C-05-03534 RMW, 2009 WL 2051370, at *4 (N.D. Cal. July 10,
   2009) (holding that direct infringement claim was barred where plaintiff did not claim
21  defendants "themselves committed any acts of direct infringement" during the limitations
   period).  To the extent Plaintiff's conspiracy theory casts NBCU as a vicarious or contributory
22  infringer, a timely copyright claim against NBCU cannot accrue from ongoing distribution or
   performance of Elysium because "additional direct infringements do not result in additional
23  contributory infringements arising from an earlier contributory act and the start of additional
   limitations periods in which to file suit.  The contributory infringement occurs, and the statute of
24  limitations period begins to run, when there has been:  (1) an act inducing or materially
   contributing to (2) an act of direct infringement.  Later direct infringements do not restart the
25  statute of limitations for an action based upon contributory infringement."  Goldberg, 2009 WL
26  2051370 at *8.  See also Arc Music, Inc. v. Henderson, No. CV 09-7967 DSF (CWX), 2010 WL
   11597304, at *3 (C.D. Cal. Mar. 22, 2010) (citing Goldberg, holding copyright claims barred
27  under statute of limitations where defendant's alleged acts of direct, contributory, and vicarious
28  infringement occurred more than three years prior to filing suit).

11

1    • Universal Pictures' purchase of film rights to 50 Shades of Grey and hiring of Dana

2       Brunetti in 2013 (id. at ¶ 192.12).

3    Because all of the underlying events occurred well outside the applicable limitations

4  periods, Plaintiff cannot state a claim against NBCU and his claims should be dismissed.

5       **C.      California Law Does Not Recognize A Claim For Conspiracy,**

6              **Which Would Be Preempted By The Copyright Act In Any Event.**

7    California does not recognize conspiracy as a freestanding cause of action.  Kenne v.

8  Stennis, 230 Cal. App. 4th 953, 968-69 (2014) (citing Applied Equipment Corp. v. Litton Saudi

9  Arabia Ltd., 7 Cal. 4th 503, 510–11 (1994)); see also Mangindin v. Washington Mut. Bank, 637

10 F. Supp. 2d 700, 708 (N.D. Cal. 2009) ("A conspiracy is not an independent cause of action

11 ….").  Rather, conspiracy is a "theory of liability" that depends on the commission of an

12 underlying tort.  Kenne, 230 Cal. 4th at 968-69.  As discussed below, Plaintiff's asserted

13 bases for liability against NBCU fail.  Section D, infra.  Because none of the allegations come

14 close to supporting a negligence claim against NBCU, the conspiracy claim must be dismissed.

15    In addition, to the extent that Plaintiff's disjointed conspiracy claim seeks to impose

16 vicarious liability on NBCU for alleged copyright infringement by other defendants, it is

17 preempted by the federal Copyright Act and must be dismissed with prejudice.  The Copyright

18 Act of 1976 expressly preempts all state law claims that are "equivalent to" rights under

19 copyright law.  17 U.S.C. § 301(a).  By enacting Section 301, Congress sought "to avoid the

20 development of any vague borderline areas between State and Federal protection" in the area of

21 copyrights.  H.R. Rep. No. 94-1476 at 130 (available at

22 https://www.copyright.gov/history/law/clrev_94-1476.pdf).  This "broad statutory preemption

23 scheme" promotes uniformity and ensures that state-law claims are not used as an end-run

24 around the strictures of the federal Copyright Act.  See, e.g., Peckarsky v. ABC, 603 F. Supp.

25 688, 695 (D.D.C. 1984) (holding state-law unfair-competition and unfair-trade-practices claims

26 preempted by Copyright Act).

27    A claim is preempted if it (i) falls within the general subject matter of copyright; and

28 (ii) involves state law rights that are "equivalent" to any of the exclusive rights within the scope

DAVIS WRIGHT TREMAINE LLP

12

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

1    of federal copyright protection.  Maloney v. T3Media, Inc., 853 F.3d 1004, 1010 (9th Cir. 2017).

2    A claim falls within the general subject matter of copyright if it arises from or relates to a work

3    subject to copyright protection, i.e., "original works of authorship fixed in any tangible medium

4    of expression."  Id. at 1011(citing 17 U.S.C. § 102(a).  As to the second part, "[t]o survive

5    preemption, the state cause of action must protect rights which are qualitatively different from

6    the copyright rights."  Id. at 1019 (emphasis added; citation omitted).  In Maloney, for example,

7    the Ninth Circuit held that the Copyright Act preempted athletes' right-of-publicity and unfair-

8    competition claims concerning unauthorized use of their likenesses, despite the fact that both

9    claims involve different elements than a copyright claim.  Id. at 1019.  The court reasoned that

10   these state-law claims were "equivalent" to copyright claims because "Plaintiffs … do not

11   identify any use of their likenesses independent of the display, reproduction, and distribution of

12   the copyrighted material in which they are depicted … under those circumstances, none of

13   plaintiffs' claims is qualitatively different from a copyright claim."  Id. (original emphasis).

14          Here, Plaintiff imagines a conspiracy aimed at "access[ing] and acquir[ing] original film

15   ideas" in order to "misappropriat[e] them."  Complaint at ¶ 22.  Thus, while the factual basis for

16   Plaintiff's conspiracy claim is muddled, it is clear that he seeks to hold NBCU vicariously liable

17   for "misappropriat[ing]" his screenplay (id. at ¶ 192) and hopes thereby to recover the "lost

18   profits" he believes would have flowed from his screenplay (id. at ¶ 205).  This attempt to use

19   state law to impose vicarious liability for alleged misappropriation" of his copyrighted work

20   indisputably falls within the subject matter of copyright and is equivalent to a copyright claim.

21          Indeed, courts repeatedly have held that a claim of "conspiracy to infringe a copyright

22   claim is preempted by the Copyright Act."  Benke v. Departure Agency, Inc., No. CV 11-397-

23   VBF(VBKX), 2011 WL 13129964, at *2 (C.D. Cal. Aug. 11, 2011) (dismissing "conspiracy to

24   infringe claim" with prejudice, holding amendment would be futile; collecting cases); Nat.

25   Alternatives Int'l, Inc. v. Allmax Nutrition, Inc., 258 F. Supp. 3d 1170, 1187 (S.D. Cal. 2017) ("a

26   copyright-based civil conspiracy claim … fail[s] as a matter of law because [it is] preempted by

27   federal law"); Millennium TGA, Inc. v. Doe, No. 11-2258 SC, 2011 WL 1812786, at *2 (N.D.

28   Cal. May 12, 2011) (holding that common law civil conspiracy claim for copyright infringement

DAVIS WRIGHT TREMAINE LLP

13

1    could not survive a motion to dismiss).[7]

2        Thus, even if California recognized a conspiracy claim, it would be preempted as a matter

3    of law to the extent it seeks to recover for alleged infringement or "misappropriation" by

4    defendants.  Plaintiff's baseless conspiracy claim must be dismissed with prejudice.

5        **D.    The Complaint Fails To Allege Any Negligent Conduct By NBCU.**

6        The claims for negligence and gross negligence contain only cursory references to

7    NBCU, none of which even purport to show conduct by NBCU that was negligent, or that caused

8    any harm to Plaintiff.  See Complaint at ¶¶ 238, 243.  Indeed, the only purportedly negligent

9    conduct alleged against NBCU is hiring Mordecai Wiczyk.  Complaint at ¶¶ 238.A, 243.B.

10   Plaintiff does not allege that NBCU had a duty to Plaintiff, nor that it was breached, nor explain

11   how NBCU's hiring of Mr. Wiczyk caused harm to Plaintiff.  Judicial Council of California,

12   Negligence – Essential Factual Elements, Civil Jury Instructions (CACI) § 400 (2013).  In

13   particular, "the existence of a legal duty in a given factual situation is a question of law for the

14   courts to determine."  Jackson v. AEG Live, Inc., 233 Cal.App.4th 1156, 1173, (2015).  As a

15   matter of law, NBCU had no duty to prevent alleged spoliation by parties to the Prior Blomkamp

16   Action – in which NBCU was not involved – nor to prevent alleged copyright infringement in

17   connection with the film Elysium – which NBCU did not distribute.

18       Plaintiff's unintelligible Complaint does not provide any facts that could give rise to a

19   duty on NBCU's part.  Because Plaintiff's negligence and gross negligence claims against

20   NBCU consist of "'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S.

21   at 678 (quoting Twombly, 550 U.S. at 557 (alteration in original)) they also must be dismissed as

22   to NBCU.

23

24   _____

     [7] The fact that a state-law conspiracy claim requires a showing of concerted action does not

25   forestall preemption because "the core of the claim for conspiracy to infringe copyrights is
     identical to that under the Copyright Act, and the extra element of agreement or combination

26   does not make it otherwise."  Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber
     Co., 682 F.3d 292, 312 (4th Cir. 2012); see also Millennium TGA, Inc., 2011 WL 1812786, at *2

27   (reasoning that "[i]n California, a civil conspiracy cause of action 'is merely a mechanism for
     imposing vicarious liability; is not itself a substantive basis for liability'" and "Federal copyright

28   law has its own doctrine of vicarious liability" (internal citations omitted)).

_____

14

DAVIS WRIGHT TREMAINE LLP

**E.      The Complaint Fails To State A Cause of Action For Accounting.**

      **1.      The Purported Claim For Accounting Requests A Remedy
Unsupported By Any Underlying Claims.**

      "A cause of action for an accounting requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an accounting." Teselle v. McLoughlin, 173 Cal. App. 4th 156, 179 (2009).  In other words, the party seeking an accounting generally must have had some business or financial dealings with the party from whom he seeks an accounting. See id.  Here, the Complaint contains no allegation – nor could it – that NBCU has ever had any relationship to Plaintiff, let alone one of fiduciary or business relationship. See, generally, Complaint.  Indeed, Plaintiffs' accounting claim is premised on his desire to account and recover funds related to alleged "spoliation", "cheat[ing] the judicial process" (Complaint at ¶ 185.a-b), and "destr[uction] and suppress[ion of] evidence" (id. at ¶ 264) in the Prior Blomkamp Action in which NBCU was not a party; as well as from purported misappropriation (id. at ¶ 185.c) and sale of "derivatives of his work" (id. at ¶ 265) in connection with the film Elysium, which NBCU had no role in producing or distributing (id. at ¶ 184).

      Even if an accounting could be demanded in the absence of a relationship among the parties, there is no balance due from NBCU to Plaintiff, so there is nothing to be ascertained by an accounting.  An accounting is "more aptly described as a remedy rather than a stand-alone cause of action." Gabris v. Aurora Loan Servs. LLC, No. 2:14-CV-01759-JAM-KJN, 2015 WL 1021305, at *5 (E.D. Cal. Mar. 9, 2015); see also Fleet v. Bank of Am. N.A., 229 Cal. App. 4th 1403, 1414 (2014) (dismissing claim for accounting where subject of accounting "will constitute an element of their damage" and so "can be folded into" the underlying causes of action).  As discussed above, Plaintiff's only claims against NBCU that are even arguably cognizable are negligence claims, and they are bereft of any factual support or even a plausible theory.  And Plaintiffs' conspiracy claim – putting aside the fact that it is not legally cognizable – is inherently implausible, supported only by conjecture, and preempted.  When Plaintiff's absurd allegations of conspiracy are disregarded, it is clear that no accounting could be conducted as to NBCU

15

MOTION TO DISMISS
Case No. 17-cv-4952-VC
4812-3202-2649v.12 0020040-000144

DAVIS WRIGHT TREMAINE LLP

1  concerning the profits from <u>Elysium</u> because – as the Complaint acknowledges – NBCU did not

2  produce or distribute that film.  <u>See</u> Complaint ¶ 184.

3        **2.    No Damages Are Cognizable Concerning The Prior Blomkamp**
4              **Lawsuit.**

5        To the extent Plaintiff's request for accounting is premised on ascertaining the damages

6  flowing from alleged spoliation in the Prior Blomkamp Action, it is independently barred

7  because "a tort cause of action does not lie against a person who has intentionally destroyed or

8  suppressed evidence relevant to a lawsuit."  <u>Warden v. Cross</u>, 94 Fed. Appx. 474, 475 (9th Cir.

9  2004) (applying California law).  In <u>Temple Cmty. Hosp.</u>, the California Supreme Court rejected

10  a claim for alleged spoliation by a third party.  20 Cal. 4th at 473.  As the Court explained, its

11  concerns about endless litigation fully apply to lawsuits against third parties:  "We are reluctant

12  to provide disappointed litigants a second opportunity to seek the compensation they sought in

13  the original lawsuit, even if they seek it against a party not involved in the original lawsuit."

14  <u>Id.</u> at 472.  Thus, even if spoliation claims were allowed under California law, Plaintiff's claim

15  against NBCU still would fail because he has not alleged any facts to support such a claim.

16  Because California refuses to recognize a cause of action for spoliation — and, as discussed

17  above, the negligence and conspiracy allegations against NBCU fail — no underlying claim

18  justifies the remedy of an accounting.

19        Finally, the accounting of spoliation damages that Plaintiff seeks also would be too

20  uncertain.  In refusing to recognize a spoliation cause of action, the California Supreme Court

21  reasoned that:

22        Another consideration weighing against recognition of a tort remedy for
        intentional first party spoliation is the **uncertainty of the fact of harm in**
23        **spoliation cases**.  It seems likely that in a substantial proportion of spoliation
        cases the fact of harm will be irreducibly uncertain.  In such cases, even if the jury
24        infers from the act of spoliation that the spoliated evidence was somehow
        unfavorable to the spoliator, **there will typically be no way of telling what**
25        **precisely the evidence would have shown and how much it would have**
        **weighed in the spoliation victim's favor**.  Without knowing the content and
26        weight of the spoliated evidence, it would be impossible for the jury to
        meaningfully assess what role the missing evidence would have played in the
27        determination of the underlying action.  The jury could only speculate as to what
        the nature of the spoliated evidence was and what effect it might have had on the
28        outcome of the underlying litigation.

16

DAVIS WRIGHT TREMAINE LLP

1  Cedars-Sinai Med. Ctr. v. Superior Court, 18 Cal. 4th 1, 13-14 (1998) (emphasis added).

2  Therefore, not only is Plaintiff's request for an accounting unjustified by any underlying claims,

3  it would be incurably futile and uncertain.  The accounting claim should be dismissed along with

4  the rest of the Complaint.

**VI.**
**CONCLUSION**

5

6          The Complaint, like Plaintiff's two pleadings in the Prior Universal Action, does not

7  come close to stating a viable claim against NBCU.  Plaintiff asserts claims that do not exist, or

8  that are bereft of supporting factual allegations.  The only thing that is clear is that Plaintiff is

9  seeking to re-litigate a lawsuit that has been dismissed, and for which all appeals have been

10  exhausted.  Dismissal with prejudice is therefore warranted.

11  DATED: November 9, 2018                    DAVIS WRIGHT TREMAINE LLP
                                               KELLI L. SAGER
12                                             ROCHELLE L. WILCOX
                                               BRENDAN N. CHARNEY
13

14                                             By: */s/ Rochelle L. Wilcox*
                                                    Rochelle L. Wilcox
15                                             Attorneys for Defendant
                                               NBCUNIVERSAL MEDIA, LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

17

KELLI L. SAGER (State Bar No. 120162)
  kellisager@dwt.com
ROCHELLE L. WILCOX (State Bar No. 197790)
  rochellewilcox@dwt.com
BRENDAN N. CHARNEY (State Bar No. 293378)
  brendancharney@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
Telephone:     (213) 633-6800
Facsimile:      (213) 633-6899

Attorneys for Defendants
NBCUNIVERSAL MEDIA, LLC

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVE WILSON BRIGGS,<br><br>                    Plaintiff,<br><br>          v.<br><br>KEVIN SPACEY; ARI (ARIEL) EMANUEL; MATT DAMON; BEN AFFLECK; NBCUNIVERSAL MEDIA, LLC; SONY PICTURES ENT. INC.; TRIGGER STREET PRODUCTIONS; NEILL BLOMKAMP; ASIF SATCHU; MORDECAI (MODI) WICZYK; WILLIAM (BILL) BLOCK; DANA BRUNETTI; SOUND POINT CAPITAL MANAGEMENT, LC; MRC (and all MRC entities and subs.),<br><br>                    Defendants. | Case No. 3:18-cv-04952-VC<br><br>[Hon. Vince Chhabria]<br><br>**[PROPOSED] ORDER GRANTING MOTION TO DISMISS COMPLAINT**<br><br>(Notice of Motion and Motion to Dismiss Complaint; Request For Judicial Notice With Exhibits A-I, Filed Concurrently)<br><br>Date:          December 20, 2018<br>Time:          10:00 a.m.<br>Crtrm:          4 |

DAVIS WRIGHT TREMAINE LLP

1

1    On December 20, 2018, a hearing was held on Defendant NBCUniversal

2  Media, LLC's Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rules

3  of Civil Procedure 41(b) and 12(b)(6).

4    Having considered the Motion to Dismiss, responsive briefing, and the

5  arguments of the parties at the hearing on this matter, and for good cause shown,

6  the Court GRANTS the Motion to Dismiss. The Court dismisses with prejudice

7  Plaintiff's Complaint, with each party to bear its own costs, expenses, and fees.

8    The clerk is directed to close Case No. 3:18-cv-04952-VC.

9

10    IT IS SO ORDERED.

11

12  Dated: _____, 2018          By: _____

13                                        THE HONORABLE VINCE CHHABRIA
                                          UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

2

[PROPOSED] ORDER GRANTING MOTION TO DISMISS
Case No. 17-cv-06552-VC
4837-0933-2346v.1 0020040-000144

ER 748

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE KENYATTA WILSON BRIGGS, | Case No.  18-cv-04952-VC |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION FOR SERVICE BY PUBLICATION AND MOTION FOR EXTENSION OF SERVICE DEADLINE** |
| KEVIN SPACEY, et al., | |
| Defendants. | Re: Dkt. No. 39 |

Briggs's motion to serve defendant William Block by publication is denied. Federal Rule of Civil Procedure 4(e) allows a plaintiff to use the rules of the state to serve process and California Code of Civil Procedure section 415.50 permits service by publication. But service by publication is appropriate only as a last resort. *Board of Trustees of Leland Stanford Junior Univ. v. Ham*, 216 Cal. App. 4th 330, 338 (2013). Briggs must convince the Court that he cannot with "reasonable diligence" serve Block in another way specified by the California rules. Cal. Civ. Proc. Code § 415.50(a). Reasonable diligence requires "a thorough, systematic investigation and inquiry conducted in good faith." *Board of Trustees*, 216 Cal. App. 4th at 338. Because he tried to serve Block at only one location, Briggs has not shown that he attempted with reasonable diligence to serve Block in another way.

Briggs's request for an anticipatory extension of the service deadline is denied.

**IT IS SO ORDERED.**

Dated: November 9, 2018

_____

VINCE CHHABRIA
United States District Judge

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5
6
7
8                           UNITED STATES DISTRICT COURT
9                        NORTHERN DISTRICT OF CALIFORNIA
10
11  STEVE WILSON BRIGGS,                    Civ No: 18-cv-04952-VC
                    Plaintiff,
12                                          TEMPORARY "ILLUSTRATIVE"
                    vs                      PROOFS OF SERVICE OF SUMMONS
13                                          DECLARATIONS OF NEXUS ASSOON,
    KEVIN SPACEY;  ARI EMANUEL;             AND MELVIN JACKSON, REGARDING:
14  MATT DAMON;  BEN AFFLECK;               1.  NEXUS ASSON'S SERVICE OF
    NBCUNIVERSAL MEDIA, LLC;                    PROCESS OF DEFENDANTS MRC,
15  SONY PICTURES ENT INC.;                     ASIF SATCHU, AND MORDECAI
    TRIGGER STREET PRODUCTIONS;                 WICZYK (WHICH OUTLINES AN
16  NEILL BLOMKAMP;  ASIF SATCHU;               INCIDENT OF INTIMIDATION
17  MORDECAI WICZYK; WILLIAM                    DISPLAYED BY DEFS' EMPLOYEES
    (BILL) BLOCK; DANA BRUNETTI;               TOWARD PLAINTIFF'S PROCESS
18  MRC (and all MRC entities and subs.),      SERVER);
19                                          2.  MELVIN JACKSON'S SERVICE OF
                    Defendants.                 PROCESS OF MATT DAMON AND
20                                              BEN AFFLECK, VIA GARY KRESS;
21                                          3.  NEXUS ASSON'S UNSUCCESSFUL
                                               SERVICE ATTEMPT OF WILLIAM
21                                             (BILL) BLOCK; AND MATT
22                                             DAMON AND BEN AFFLECK, VIA
                                               GARY KRESS
23
24
25
26
27
28

                                    1
          TEMPORARY "ILLUSTRATIVE" PROOFS OF SERVICE OF SUMMONS

<div align="center">

**TEMPORARY "ILLUSTRATIVE" PROOF OF SERVICE OF SUMMONS**

**DECLARATION OF NEXUS ASSOON**

</div>

Attached to this document, the Court will find three (3) temporary "illustrative" proof-of-service declarations from the Plaintiff's process servers, Nexus Assoon and Melvin Jackson. The attachments cannot serve as the final proof of service declaration, as the originals, which the Plaintiff hoped to copy and file with the Court by now, seem to have been lost in the mail, from the servers (who happen to be cousins) to the Plaintiff.  Therefore, the attachments, herein, are made from PDFs of the final signed "signing page" of the original declarations, and from a PDFs of the "Google Doc" of each separate service statement, shared between Plaintiff and his process servers. Therefore, the Plaintiff will soon travel to Los Angeles to have his process servers sign the declarations, again. The Plaintiff will then file the newly signed documents on or before Tuesday, November 13, 2018.

The first attachment is Nexus Assoon's declaration regarding his service of process of Summons and Complaint to MRC, Asif Satchu, and Mordecai Wiczyk. This declaration is very detailed, because during this service Mr. Asson believes one or more employees of Ari Emanuel's (and assumably MRC's, Satchu's, and Wiczyk's) attempted to intimidate him. (**See Exhibit A**.)

The second attachment is Melvin Jackson's declaration concerning service of process of Matt Damon and Ben Affleck. (**See Exhibit B**.)

The third attachment is Nexus Assoon declaration concerning (1) his unsuccessful attempt to serve William (Bill) Block at Miramax—which is no longer located at the address on the CA Sec of State Business Entity Statement; and (2) Mr. Assoon's unsuccessful effort to serve Matt Damon and  Ben Affleck, via their company's (GDS, LLC, and Mad Post Productions, LLC) agent for service of process, Gary Kress. (**See Exhibit C**)

These attachments are intended only to assure the court that service has been made, and that the proper service of process declarations (made from a single PDF source) will be filed soon.


Dated: November 8, 2018.               Signed:  /s/ Steve Wilson Briggs_____

                                       STEVE WILSON BRIGGS
                                       Plaintiff, In Propria Persona

<div align="center">

2

TEMPORARY "ILLUSTRATIVE" PROOFS OF SERVICE OF SUMMONS

</div>

1    Steve Wilson Briggs
2    4322 Chico Ave.,
     Santa Rosa, CA 95407
3    510 200 3763
     snc.steve@gmail.com
4    PLAINTIFF In Propria Persona
5
6
7
8                **UNITED STATES DISTRICT COURT**
9            **NORTHERN DISTRICT OF CALIFORNIA**
10
11    STEVE WILSON BRIGGS        Civ No: 18-cv-04952-VC
12           Plaintiff,       **PROOF OF SERVICE DECLARATION**
                                  **OF NEXUS ASSOON, REGARDING**
13           vs            **SERVICE OF PROCESS OF**
                                    **DEFENDANTS MRC**
14    KEVIN SPACEY;  et al      **(MRC II DISTRIBUTION COMPANY,**
15                                 **L.P.);  ASIF SATCHU; MORDECAI**
16                                     **WICZYK**
17
18        **PROOF OF SERVICE DECLARATION OF NEXUS ASSOON, REGARDING**
19      **SERVICE OF PROCESS OF DEFENDANT MRC (MRC II DISTRIBUTION**
20                        **COMPANY, L.P.)**
21
21      My name is Nexus Assoon, and I declare the following:
22       I am over 18, and not a party of this action.
23       I am a resident of Los Angeles County, where this service of process took place.
24       My address is 3007 4th Ave., Los Angeles, CA 90018.
25      On **October 26**, 2018, I served Summons, Complaint and other legal documents on
26 Defendants **Media Rights Capital (MRC** —whose proper identity, I have been informed, is
27 **MRC II Distribution Company, LP)**, as well as serving Defendants Asif Satchu and
28 Mordecai Wiczyk, who I am told are co-CEO's of all MRC companies. **I executed this**

ER 752

1    service by personally delivering Summons, Complaint and other legal documents to the
2    Principal Address claimed by MRC II Distribution Company, LP in their current and active
3    California Secretary of State's *business entity statement of information*, which is 9601
4    Wilshire Blvd (Suite #610), Beverly Hills, CA 90210. It should also be noted that Plaintiff,
5    Steve Wilson Briggs, informed me that MRC II Distribution Company, LP identified itself
6    as the proper Defendant in *Briggs v Blomkamp*, in its corporate disclosure.

7         Due to a few unusual statements made during this service, it is necessary to review a
8    few events from my October 19, 2018 service of MRC and the WME Defendants (Ari
9    Emanuel, Matt Damon, Ben Affleck, and Neill Blomkamp), before reviewing the details of
10   the successful service of MRC, Stachu and Wiczyk on 10/26/2018.

11        On October 19, 2018, I attempted to serve Media Rights Capital (MRC),
12   unsuccessfully, by first attempting to serve the documents to MRC's 9665 Wilshire Blvd,
13   Beverly Hills address; then, when I was informed that MRC was not in that building due to
14   construction, by attempting to serve the documents at the address listed on the current
15   California Secretary of State's Business Entity statement for "Media Rights Capital II", at
16   1800 Century Park East, (10th floor), which its Business Entity report claimed as the
17   Principal Address for both Media Rights Capital II, L.P., and as the address for its registered
18   agent (Scott Tenley). However, when I arrived at that address on 10/19/2018, I was told
19   neither MRC or Scott Tenley were located at that address. Rather, I was told that MRC
20   moved back to the 9665 Wilshire address. I signed a statement for Mr. Briggs concerning
21   this service failure on October  20, 2018, which Mr. Briggs has submitted to the Court.

21        A couple days after this service failure, Mr. Briggs informed me that he did some
22   research and discovered that the Principal Address for MRC II Distribution Company, LP,
23   listed in its current and active California Secretary of State's *business entity statement*, was
24   9601 Wilshire Blvd, Suite #610, Beverly Hills 90210. Mr. Briggs also informed me that this
25   address information has not changed or been updated in over 11 years —since 2007. This
26   building is also the headquarters of William Morris Endeavor (WME), and is the location
27   where I successfully served Ari Emanuel, Neill Blomkamp, Matt Damon and Ben Affleck a
28   week earlier, on October 19, 2018.

2
PROOF OF SERVICE

1    With this new address, I agreed to attempt to serve MRC and its co-CEO's, Asif Satchu

2 and

3 Mordecai Wiczyk.

4    I attempted this third service of Defendants MRC (MRC II Distribution Company,

5 L.P.), Mr Satchu and Mr Wiczyk, on October 26, 2018. What follows are the service details.

6    At approximately 12:30pm, Friday, October 20, 2018, I entered the WME building, at

7 9601 Wilshire Blvd, in Beverly Hills. I walked to the *help desk* for assistance, however no

8 one was at the desk. As I waited, I noticed a tall caucasian man, about 6' 3", and about 65

9 years old with short gray/white hair approaching me from the elevator. He politely asked if

10 he could assist me. The man had what sounded like an Australian accent.

11    I explained that I was there to serve summons and complaints to MRC II Distribution

12 Company, and Asif Satchu and Mordecai Wiczyk, in their office at this address, suite #610.

13    The man immediately said that **there was no suite #610 in the building**, but kindly

14 offered to escort me up to the sixth floor. We rode up together on the elevator.

15    On the sixth floor, we exited the elevator. The tall man led me down a few halls. I saw

16 no room #610. Soon we arrived to a door marked (to the best of my recollection): "WME

17 Mailroom." The tall man and I entered.

18    Entering the room, I observed about five mailroom employees working there. Two

19 men sat near the door, at a large desk with two computer monitors, while three others

20 worked a bit further back in the room, behind the service desk/counter. The tall Australian

21 man introduced me to the two men sitting at the desk, behind the computer monitors.

21    I explained to the men at the desk that I was there to serve Summons and Complaint to

22 MRC II Distribution Company, Asif Satchu and Mordecai Wiczyk.

23    As soon as I said that, a tall man with short blond-ish hair, wearing a brown shirt near

24 the center of the room, asked in a loud voice, "You that guy from last week?"

25    From the man's unfriendly facial expression and voice tone, I took his question to be an

26 attempt to intimidate me.

27    I assumed from the man's question that he was aware that I served documents for

28 Defendants Emanuel, Affleck, Damon and Blomkamp, downstairs in the WME basement

3
PROOF OF SERVICE

1   mailroom, the previous Friday, 10/19/2018.  I also assumed that there were some details in

2   my proof of service declaration of that failed service attempt (which Mr Briggs later filed

3   with the Court) that this man must have found out about, and clearly he did not like those

4   details. I believe this man was the mailroom supervisor, due to the way he took charge of

5   matters while I was there, and the way the other workers quietly deferred to him.

6       I decided that it was wisest to ignore this question and his aggressive manner. Rather,

7   I asked if he could accept the Summons and other documents.

8       The mailroom supervisor replied something like, "No. Keep me out of this."  He then

9   picked up his phone and called a person in WME's legal department, and said something

10  like, "There's a guy up here serving legal documents for MRC Distribution and some other

11  guys."

12      I then began waiting for someone from the legal team to arrive. While I was waiting, I

13  placed the three large envelopes I was carrying (containing the legal documents) on a

14  counter in the entry/service area of the room.

15      After about four minutes a caucasian man, whom I took to be an attorney, with

16  medium length brown hair, about 5' 7" tall, slender to medium build, and about 28-33 years

17  in age, entered the room. "You have something for me?" the attorney asked.

18      I told him I was there to serve Summons, Complaint and other legal documents to

19  MRC II Distribution Company, L.P., Asif Satchu and Mordecai Wiczyk.

20      The attorney said, "MRC is not even at this address."

21      I replied, "According to the California Secretary of State they are." I then held up the

21  screen of my phone, for him to see a PDF copy of the Secretary of State's *business entity*

22  *statement* for MRC II Distribution Company, L.P.

23      "I know the law!" The attorney replied, abruptly, then added, "**I refused to take**

24  **those**." The attorney pointed at the envelopes containing the Summons and Complaints.

25      I replied (as I recall), "That's OK. But I've been instructed not to leave here with

26  them."

27      The attorney then raised his voice and turned his head to speak to the mailroom

28  supervisor, and said (to the best of my recollection), "Call the custodian and tell him to

4
PROOF OF SERVICE

1  throw those in the trash!" The attorney gestured toward the documents on the counter as he

2  spoke.

3       Several of the mailroom employees found this amusing and began laughing, looking

4  at me

5  as they did so.  I took their laughter to be an opportune attempt to intimidate me.

6       I then asked the attorney, "Can I have your name, please?"

7       "No. I'm not giving them my name. I'm not involved in this!" The attorney answered,

8  with

9  what sounded like anger in his voice.

10      The attorney and I then walked out of the mailroom to the elevator, neither of us

11  speaking to the other. We then shared an elevators down, in silence

12      According to the California Code of Civil Procedure 415.20(b):

13    (a) In lieu of personal delivery of a copy of the summons and complaint to
14    the person to be served as specified in Section 416.10, 416.20, 416.30, 416.40,
      or 416.50, **a summons may be served by leaving a copy of the summons**
15    **and complaint during usual office hours in his or her office** or, if no
16    physical address is known, at his or her usual mailing address, other than a
      United States Postal Service post office box, **with the person who is**
17    **apparently in charge thereof, and by thereafter mailing a copy of the**
      **summons and complaint by first-class mail**, postage prepaid to the person
18    **to be served at the place where a copy of the summons and complaint were**
19    **left.** When service is effected by leaving a copy of the summons and complaint
      at a mailing address, it shall be left with a person at least 18 years of age, who
20    shall be informed of the contents thereof. Service of a summons in this manner
21    is deemed complete on the 10th day after the mailing.

21         (b) If a copy of the summons and complaint cannot with reasonable
22    diligence be personally delivered to the person to be served, as specified in
      Section 416.60, 416.70, 416.80, or 416.90, **a summons may be served by**
23    **leaving a copy of the summons and complaint at the person's** dwelling
      house, usual place of abode, **usual place of business**, or usual mailing address
24    other than a United States Postal Service post office box, **in the presence of a**
      competent member of the household or a **person apparently in charge of his**
25    **or her office,** place of business, or usual mailing address other than a United
26    States Postal Service post office box, at least 18 years of age, **who shall be**
      **informed of the contents thereof, and by thereafter mailing a copy of the**
27    **summons and of the complaint by first-class mail, postage prepaid to the**
28    **person to be served at the place where a copy of the summons and**

5
PROOF OF SERVICE

1   **complaint were left.** Service of a summons in this manner is deemed complete
2   on the 10th day after the mailing.

3   35.   In compliance with this law, on October 26, 2018, I left a copy of the summons and
4   complaint in MRC II Distribution Company, L.P.'s usual place of business, by delivering the
5   documents to the address that MRC II Distribution Company, L.P. has claimed on its
6   California Secretary of State *business entity statement of information* since 2007. Further in
7   compliance with CCP 415.20(b), I left the Summons and Complaint in the presence of a
8   competent person who was seemingly in charge of MRC's (MRC II Distribution Company,
9   L.P.'s) usual mailing address.

10   I then completed the final step of service on MRC (MRC II Distribution Company,
11   LP) on November 1, 2018, by placing said Summons, Complaint and other legal documents
12   in an envelope, then addressing said envelope to the place where the documents were left,
13   then depositing the envelope (containing said documents) in a USPS mail drop-box, in Los
14   Angeles County. Therefore, service will officially be "complete" ten days after mailing: on
15   Nov 11, 2018.

16   The three envelopes that I mailed to the defendants were addressed as follows:

17   1.
18   MRC II Distribution Company, L.P.
19   9601 Wilshire Blvd (Suite #610)
     Beverly Hills, CA 90210
20   2.
21   Asif Satchu
21   (co-CEO of MRC & MRC II Distribution Company, L.P.)
     9601 Wilshire Blvd (Suite #610)
22   Beverly Hills, CA 90210
23   3.
24   Mordecai Wiczyk
     (co-CEO of MRC & MRC II Distribution Company, L.P.)
25   9601 Wilshire Blvd (Suite #610)
26   Beverly Hills, CA 9021

27   The documents that I served upon MRC II Distribution Company, LP , by personally
28   delivering, then mailing them to the previously stated location, were:

6
PROOF OF SERVICE

ER 757

| 1 | | a. | **Summons** In A Civil Action (2) |
|---|---|---|---|
| 2 | | b. | **Complaint** |
| 3 | | c. | **Civil Cover Sheet** |
| 4 | | d. | Notice Of Availability Of Magistrate Judge To Exercise Jurisdiction |
| 5 | | e. | Consent Or Declination To Magistrate Judge Jurisdiction |
| 6 | | f. | Welcome To The Oakland Divisional Office |
| 7 | | g. | ECF Registration Handout |
| 8 | | h. | Proposed Order Granting Motion For Permission For Electronic Case Filing |
| 9 | | i. | Order Setting Initial Case Management And ADR Deadlines |
| 10 | | j. | Standing Order General (SBA) |
| 11 | | k. | Standing Order For All Judges OF The Northern District Of California |
| 12 | | l. | Standing Order - General (SBA) Patent Case |
| 13 | | m. | Order Relating Cases (Hon. Judge Vincent Chhabria) |
| 14 | | n. | Reassigned Case - Notice of New Hearing Date -VC |
| 15 | | o. | Related Case Order |

16  I am not a professional process server.

17  I declare under penalty of perjury under the laws of the United States of America that

18  the foregoing is true and correct.

19

20  Dated:____11/01/2018____   Signed:_____

21  Nexus Assoon

21

22

23

24

25

26

27

28

PROOF OF SERVICE

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10                                        Civ No: 18-cv-04952-VC

11   STEVE WILSON BRIGGS              **DECLARATION OF MELVIN
                                      JACKSON, REGARDING SERVICE
12              Plaintiff,            OF PROCESS FOR DEFENDANTS
                                      MATT DAMON AND BEN AFFLECK,
13                vs                  VIA THEIR AGENT FOR SERVICE
                                      OF PROCESS, GARY KRESS**
14   KEVIN SPACEY;  et al

15

16   **DECLARATION OF MELVIN JACKSON, REGARDING SERVICE OF PROCESS
17   FOR DEFENDANTS MATT DAMON AND BEN AFFLECK, VIA THEIR AGENT
                    FOR SERVICE OF PROCESS, GARY KRESS**
18

19       My name is Melvin Jackson and I declare the following:

20       I am over 18, and not a party of this action.

21       I am a resident of Los Angeles County, where the process service took place.

21       My address is 10998 Sampson Ave. Lynwood, CA. 90262

22       On **October 30th**, 2018, I served (2) total envelopes (one for Defendant Matt Damon

23   and one for Defendant Ben Affleck) to Gary Kress, who is the *Agent For Service Of Process*

24   for two of Defendant Matt Damon and Ben Affleck's personal businesses, namely Pearl

25   Street Productions, Inc., and Mad Post Productions, LLC. The Plaintiff in this matter, Steve

26   Wilson Briggs, informed me that according to the California Secretary of State's current and

27   active *business entity statement* for Mad Post Productions, LLC, the business's Principal

28   Executive Office address is 2401 Main Street, Santa Monica, CA 90405. The business entity

                                    1
                            PROOF OF SERVICE

1  statement also gave this same address as the personal address for Matt Damon, Ben Affleck

2  and the company's agent for service of process, Gary Kress.

3      The details of the service of Matt Damon and Ben Affleck, via their agent for service

4  of process, Gary Kress, are as follows.

5      At approximately 3:30 PM, on October 30th, 2018, I entered what appeared to be an

6  office building, at the address: 2401 Main Street Santa Monica, CA 90405. I was politely

7  greeted by a woman, whom I assume was the business's receptionist. I informed the woman

8  that I was there to serve Summons and Complaint FOR Matt Damon and Ben Affleck, TO

9  registered agent for service of process, Gary Kress.

10      The woman informed me that Mr Kress was in his office, in the back. The woman

11  then went to the back to get Mr Kress.

12      Mr Kress quickly emerged from his office. I explained, again, that I was there to serve

13  him Summons and Complaint for Matt Damon and Ben Affleck.

14      Mr Kress Politely accepted the documents for both Matt Damon and Ben Affleck.

15      The documents that I delivered to Mr Gary Kress, in two separate parcels for Ben

16  Affleck and Matt Damon, providing each defendant his own copy of each document, were:

17      a. **Summons** In A Civil Action (2)

18      b. **Complaint**

19      c. **Civil Cover Sheet**

20      d. Notice Of Availability Of Magistrate Judge To Exercise Jurisdiction

21      e. Consent Or Declination To Magistrate Judge Jurisdiction

21      f. Welcome To The Oakland Divisional Office

22      g. ECF Registration Handout

23      h. Proposed Order Granting Motion For Permission For Electronic Case Filing

24      i. Order Setting Initial Case Management And ADR Deadlines

25      j. Standing Order General (SBA)

26      k. Standing Order For All Judges OF The Northern District Of California

27      l. Standing Order - General (SBA) Patent Case

28      m. Order Relating Cases (Hon. Judge Vincent Chhabria)

2
PROOF OF SERVICE

1      n.  Reassigned Case - Notice of New Hearing Date -VC

2      o.  Related Case Order

3

4      I am not a professional process server.

5      I declare under penalty of perjury under the laws of the United States of America that

6  the foregoing is true and correct.

7

8  Dated:_____11/01/2018_____    Signed:_____

9                         Melvin Jackson

10

11

12

13

14

15

16

17

18

19

20

21

21

22

23

24

25

26

27

28

3
PROOF OF SERVICE

1    Steve Wilson Briggs
2    4322 Chico Ave.,
     Santa Rosa, CA 95407
3    510 200 3763
4    snc.steve@gmail.com
     PLAINTIFF In Propria Persona
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
10
11   STEVE WILSON BRIGGS               Civ No: 18-cv-04952-VC
12              Plaintiff,           **DECLARATION OF NEXUS**
                                     **ASSOON, REGARDING THE**
13              vs                   **UNSUCCESSFUL SERVICE OF**
                                     **PROCESS OF DEFENDANT**
14   KEVIN SPACEY;  et al            **WILLIAM (BILL) BLOCK; MATT**
15                                   **DAMON; BEN AFFLECK**
16
17
18
19   **DECLARATION OF NEXUS ASSOON, REGARDING THE UNSUCCESSFUL**
20    **SERVICE OF PROCESS OF DEFENDANT WILLIAM (BILL) BLOCK; MATT**
                        **DAMON; BEN AFFLECK**
21

21       My name is Nexus Assoon, and I declare the following:

22       I am over 18, and not a party of this action.

23       I am a resident of Los Angeles County, where this service of process took place.

24       My address is 3007 4th Ave., Los Angeles, CA 90018.

25       On October 26, 2018, I attempted to serve Summons and Complaint and other legal

26   documents on Defendant William (Bill) Block (individually, at Miramax's principal office),

27   and to Matt Damon and Ben Affleck (together, via the agent for service of process of two of

28   their joint businesses).

                CERTIFICATION OF SERVICE & REQUEST FOR ENTRY OF DEFAULT

1                             **Attempted Service of Bill Block**

2       At approximately 1:15 pm, 10/16/18, I attempted to serve Bil Block at Miramax.

3   William (Bill) Block is the CEO of Miramax, LLC (a very well known film company).

4   Plaintiff Steve Wilson Briggs directed me to serve Mr. Block at the current and active

5   address listed on Miramax's business entity statement, on file with the California Secretary

6   of State's office. This address is **2450 Colorado Ave Ste 100 East Tower, Los Angeles CA**

7   **90404**.

8       I entered the building at 2450 Colorado and went to the help desk. At the "help dsk" I

9   was informed by a dark skinned man, of African decent, that Miramax moved to 1901

10   Avenue of the Stars about a year ago. Due to Mr Briggs belief that Mr Block and the other

11   Defendants were trying to avoid being served by him, I was only authorized to attempt to

12   serve the Defendants at addresses that were their verifiable places of business, or verifiable

13   home addresses. Since the address that the Help Desk worker gave me was unverified, I

14   ended my effort to serve Bill Block.

15

16                        **Attempted Service of Matt Damon & Ben Affleck**

17       Mr. Briggs informed me that the California Secretary of State's business entity

18   statement of *Mad Post Productions, LLC* states that the business' agent for service of

19   process is Gary Kress, and further states that the business' Principal Address is 2401 Main

20   Street, Santa Monica, CA, 90405. The business entity statement also declared that the

21   business address was also Gary Kress's, Matt Damon, and Ben Affleck's address.

21       I entered  2401 Main Street at approximately 2:15 pm. I explained to an older woman

22   named Joetta Bradford (or Bradson), who seemed to be an office assistant, that I was there

23   to serve Summons and Complaint for Matt Damon and Ben Affleck—care of their

24   registered agent, Gary Kress. Joetta explained hat Gary Kress is rarely in the office, but

25   explained she expected him to be there the coming Tuesday, 10/30/18, but only in the

26   afternoon. Thus, I left empty handed.

27       I declare under penalty of perjury under the laws of the United States of America that

28   the foregoing is true and correct.

CERTIFICATION OF SERVICE & REQUEST FOR ENTRY OF DEFAULT

1
2    Dated:____11/01/2018_____    Signed:_____
3                                              Nexus Assoon
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
21
22
23
24
25
26
27
28

3
CERTIFICATION OF SERVICE & REQUEST FOR ENTRY OF DEFAULT

1   Steve Wilson Briggs
2   4322 Chico Ave.,
    Santa Rosa, CA 95407
3   510 200 3763
    snc.steve@gmail.com
4   PLAINTIFF In Propria Persona
5
6
7
8                  **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**

10  STEVE WILSON BRIGGS,              Civ No: 18-cv-04952-VC
11          Plaintiff,            **PLAINTIFF'S MOTION FOR SERVICE
                                  OF PROCESS BY PUBLICATION FOR
12          vs                    DEFENDANTS KEVIN SPACEY, AND
                                  DANA BRUNETTI; AND TO EXTEND
13  KEVIN SPACEY et al,           SERVICE DEADLINES**
14          Defendants.           Date:       December 13, 2018
15                                Courtroom: 4
                                  Time:       10:00 a.m.
16                                Judge:      Hon. Vince Chhabria
17

18                  **NOTICE OF MOTION AND MOTION**
19      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:
20          PLEASE TAKE NOTICE that on December 13, 2018, at 10:00 a.m., or as soon
21  thereafter as the matter can be heard, in Courtroom No. 4 of the United States District Court,
21  Northern District Of California, at 450 Golden Gate Avenue, San Francisco, CA 94102, before
22  the Honorable Vince Chhabria, Plaintiff Steve Wilson Briggs will, and hereby does, move this
23  Court for an Order granting Plaintiff permission to serve Summons and Complaint on Defendants
24  Kevin Spacey and Dana Brunetti **by publication**, and to extend service deadlines, as necessary.
25          This motion is made pursuant to **California Code of Civil Procedure § 415.50(a)**, and
26  to **Federal Rules of Civil Procedure, Rule 4(e)(1)**."
27          This motion is based on the notice of motion, the following memorandum of points and
28  authorities, and the attached proposed order.

                                    1
            MOTION TO SERVE DEFS SPACEY & BRUNETTI BY PUBLICATION

1  |  ### MEMORANDUM OF POINTS AND AUTHORITIES

2  |  ### IN SUPPORT OF PLAINTIFF'S MOTION FOR SERVICE BY PUBLICATION

3

4      **California Code of Civil Procedure § 415.50(a)** states: "A summons may be served by

5  publication if upon affidavit it appears to the satisfaction of the court in which the action is pending

6  that the party to be served cannot with reasonable diligence be served in another manner specified

7  in this article and that either: (1) <u>A cause of action exists against the party upon whom service is to</u>

8  <u>be made or he or she is a necessary or proper party to the action.</u>"

9      **Federal Rules of Civil Procedure, Rule 4(e)(1)**, which states: "A summons may be

10  served by publication if upon affidavit it appears to the satisfaction of the court in which the action

11  is pending that the party to be served cannot with reasonable diligence be served in another

12  manner specified in this article and that either: (1) A cause of action exists against the party upon

13  whom service is to be made or he or she is a necessary or proper party to the action..."

14

15  |  ### WHY THE NEED FOR SERVICE BY PUBLICATION

16      Based on events in prior and related case *Briggs v Universal*, 11/13/2017 (which ended

17  when it was determined that the Plaintiff had not properly served Defendants Spacey and Brunetti),

18  the Plaintiff expected the New York based Defendants (Spacey, Brunetti) to be even more service

19  evasive in this new lawsuit.   However, the Plaintiff, who had served many of the remaining

20  California based Defendants numerous time, expected the California based Defendants to be as

21  service-agreeable as ever.   Thus, the Plaintiff sent all ten (10) of the California based Defendants a

21  *Notice of Lawsuit and Request to Waive Service of Summons* on September 13, 2018.   But

22  when all ten of these Defendants failed to respond the Plaintiff suspected that all of the Defendants

23  had coordinated a strategy to evade service and deny proper service to the bitter end.

24      To counter this strategy, Plaintiff resolved to serve the Defendants (**Defs**) at irrefutable

25  locations, supported by business entity statements on file with the Secretary of State. This Motion

26  for Service by Publication is based on the Defs' refusal to cooperate, and falsified, fraudulent, and

27  neglected records on file with the California Secretary of State, and diametrical conflicts between

28  Defs' filings with the California Secretary of State and the New York State Department of State.

1    **VAST CONFLICTS BETWEEN CALIFORNIA SECRETARY OF STATE**

2    **AND THE NEW YORK SECRETARY OF STATE**

3    In recent days, as the 90 day time limit to serve the Defendants approached, the Plaintiff,

4    who believed (and still believes) he had properly served all parties properly (except Bill Block,

5    who's Miramax CA Sec of State Statement page was out of date and not compliant with CA law),

6    became concerned that the Defendants might try to evade service due to some archaic technicality,

7    so the Plaintiff resolved to serve the Defendants one final time.

8    Since Spacey and Brunetti (and Relativity Media, who allegedly purchased Trigger Street

9    Productions in 2016) had not updated their information for Trigger Street Productions, Inc (**TSP**)

10   with the California Secretary of State for over 15 years, the Plaintiff turned to the New York State

11   Department of State's office to see what information New York had on file for TSP.  In doing so

12   the Plaintiff learned that information on file for Trigger Street Productions' with the New York

13   Department of State is entirely in conflict with the information of file with the California Secretary of

14   State. **Setting up a situation where the Defendants can deny any service of process**

15   **attempts**.

16   TSP's current, active business entity statement, on-file with the California Secretary of

17   State is attached to this motion. (**See Exhibit A**).

18   TSP's current, active business entity statement, on-file with the New York Department of

19   State is also attached to this motion. (**See Exhibit B**).

20   These two documents confirm that the Defendants Spacey, Brunetti and Trigger Street

21   Productions (**TSP**) have falsified business statements in effort to commit fraud (as private

21   businesses, by definition, are intended to make profit).

22   On the following page the Court will find a side-by-side comparison of the business entity

23   information of file for the Defendants with the New York State Department of State, and with the

24   California Secretary of State's office, which shows these drastic discrepancies; discrepancies

25   which make it virtually impossible for a California based Plaintiff to serve these Defendants, since if

26   a plaintiff serves one address, the Defendants will simply claim that the other address was the

27   proper address to serve.

28

3

MOTION TO SERVE DEFS SPACEY & BRUNETTI BY PUBLICATION

| | Trigger Street Productions' Bus Statement **NEW YORK DEPARTMENT OF STATE** | Trigger Street Productions' Bus Statement **CALIFORNIA SECRETARY OF STATE** |
|---|---|---|
| | Principal Executive Office Address:<br><br>120 WEST 45TH ST #3601<br>NEW YORK, NEW YORK, 10036 | Principal Executive Office Address:<br><br>200 Park Avenue South (8th Floor)<br>New York, New York, 10003 |
| | Chief Executive Officer:<br><br>Kevin Spacey<br>% Altman Greenfield & Selvaggi<br>120 West 45th St #3601<br>New York, New York, 10036 | Chief Executive Officer:<br><br>Kevin Fowler<br>200 Park Avenue South (8th Floor)<br>New York, New York, 10003 |
| | Register Agent (Agent for Service of Process):<br><br>None | Registered Agent (Agent for Service of Process):<br><br>Frank Selvaggi<br>11766 Wilshire Blvd (#1610)<br>Los Angeles, CA 10025 (**address defunct**) |

None of the above information is consistent between States.

The New York records and California records claim entirely different Principal Executive Office addresses. However, the Plaintiff did send packages address to Kevin Spacey and Trigger Street Productions to both of these addresses.

The New York records and California records claim entirely different Principal Executive **Officers**. Kevin Spacey uses his stage name (Kevin Spacey) in the New York records, but uses his given name (Kevin Fowler) in the California record. Plaintiff has no idea which name is legal (another loophole the Defendants may hope to jump through).

In the New York records, the Defendants claim to have no registered agent (agent for service of process). Also a concern: *Altman, Greenfield and Selvaggi* claim an address that is not on file with the national registry of tax preparers.

In the California information, beyond the fact that the agent's address is no longer valid, Frank Selvaggi claims to reside in California, although that claim is false.

These central conflicts make it impossible to serve the Defendants, conventionally. Therefore service by publication (at the expense of Trigger Street Productions, Inc.) is necessary.

1    **PLAINTIFF MADE NUMEROUS EFFORTS TO SERVE THE DEFENDANTS**

2    **Plaintiff Attempted to Serve Defendants Three Times in NYC (Spacey 4 Times)**

3    The Plaintiff found what he believed were irrefutable addresses for the Defendants and

4    their company—Trigger Street Productions—on the California Secretary of State's online business

5    entity database. Using the address obtained there, the Plaintiff set out to serve Defs Spacey,

6    Brunetti and Trigger Street Productions.

7    Since most of the Plaintiff's research indicated the Defendants were located in New York

8    City, the Plaintiff decided to serve the Defendants in New York. Therefore the Plaintiff sent the

9    Summons and Complaint to Defs Spacey, Brunetti, and TSP, addressed separately, to 200 Park

10   Avenue South, 8th Floor New York NY 10003, first class, USPS certified mail, with return

11   receipt requested.

12   Ten days later, the Plaintiff sent three more copies of the Summons and Complaint to all

13   three Defendants, separately, to 200 Park Avenue South, 8th Floor New York NY 10003, first

14   class, USPS certified mail, care of the Defendants' agent Frank Selvaggi, return receipt requested.

15   Two of Defendant Brunetti's personal businesses also claim the business entity address and mailing

16   address of 200 Park Avenue South, 8th Floor New York NY 10003. Brunetti also claims this

17   address as his personal address in these business Statements.

18   At this same time, Plaintiff also sent packages, addressed to Spacey and TSP to 120 West

19   45th St #3601 New York, New York, 10036  (which is the address on file with the NY Dept of

20   State.

21   From these three rounds of service, only the return receipts for the packages addressed to

21   Frank Selvaggi were returned, signed (but the person who signed is—strategically—not Selvaggi).

22   **FOURTH Attempt: Plaintiff Attempted Service On Defendants in Los Angeles;**

23   **Defendants' California Sec State Address Is Invalid**

24   Although the Plaintiff believes he had already satisfied California's service by mail

25   requirements, he decided to show the court his good faith and resolve by serving Spacey, TSP and

26   Brunetti by other means, as well. Thus, Plaintiff sent his process server to serve Spacey, Brunetti

27   and TSP's Principal Business Office in California: 11766 Wilshire Blvd, Los Angeles CA, 90025.

28   However, the process server learned the Defs and Selvaggi left this address 4-5 years earlier.

5
MOTION TO SERVE DEFS SPACEY & BRUNETTI BY PUBLICATION

**If Possible, Plaintiff Intends to Serve Defendants Again**

1

2     The Plaintiff has perhaps enough time to attempt one more service attempt. However since

3     all of the information of file for the Defendants is contradicted by other information, the Plaintiff is

4     certain the Defendants will claim, somehow, something was wrong with the service of process.

5     This somewhat sad strategy is required because the Defendants have no valid answer to the facts

6     contained in the Complaint.

7     However, the Plaintiff has demonstrated that he has made numerous, good faith attempts

8     to serve the Defendants. Therefore, he should not lose his right to bring the Defendants to account

9     to the Court—due to the Defendants deliberate failure to maintain accurate records (in two

10    separate states), their failure to inform the state of California of their business's changes of address,

11    their willingness to deceive and ignore USPS mail service, or some last resort "circle the wagons"

12    collective denial of service of process strategy.

**Additional Issues**

13

14    In the waning days of prior and related case *Briggs v Universal* (2017), several of the

15    Defendants (including Spacey and Brunetti) apparently revoked their attorneys authorization to

16    accept service of process for them. We must assume this is currently the case is this mater now (as

17    none of the Defendants attorneys accepted the Plaintiff's request to waive service). This further

18    frustrates the Plaintiff's ability to serve the Defendants. A situation frustrated, further still, by the

19    fact that because of recent public disclosures concerning a litany of horrible indiscretions allegedly

20    committed by Defendant Spacey, his agent, his talent agency and others have abandoned Spacey;

21    leaving virtually no means to serve the Defendant. (**See Exhibit C**.)

**CONCLUSION:**

21

22    For the foregoing reasons the Plaintiff asks the Court to approve service of process by

23    publication for Defendants Spacey and Brunetti (at the expense of Defendant Trigger Street

24    Productions), and to extend service deadlines as necessary to accomplish proper service by

25    publication.

26

27    Dated: November 8, 2018.          Signed: /s/ Steve Wilson Briggs
                                                        STEVE WILSON BRIGGS
28                                                      Plaintiff, In Propria Persona

MOTION TO SERVE DEFS SPACEY & BRUNETTI BY PUBLICATION

03-401427

## State of California
### Kevin Shelley
### Secretary of State





**STATEMENT OF INFORMATION**
(Foreign Corporation)

IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

1. CORPORATE NAME: (Please do not alter if name is preprinted.)

C2063350   DUE DATE 12-31-03 OO776F
TRIGGER STREET PRODUCTIONS, INC.
120 WEST 45TH ST STE 3601
NEW YORK NY 10036

**FILED**
In the office of the Secretary of State
of the State of California

OCT 1 4 2003

*Kevin Shelley*
KEVIN SHELLEY, SECRETARY OF STATE

This Space For Filing Use Only

CALIFORNIA CORPORATE DISCLOSURE ACT (Corporations Code Section 2117)

2. ☐ CHECK HERE IF THE CORPORATION IS PUBLICLY TRADED.   IF PUBLICLY TRADED, COMPLETE THIS STATEMENT OF INFORMATION AND THE CORPORATE DISCLOSURE STATEMENT (FORM SI-PTSUPP). **SEE ITEM 2 OF INSTRUCTIONS.**

NO CHANGE STATEMENT

3. ☐ IF THERE HAS BEEN NO CHANGE IN ANY OF THE INFORMATION CONTAINED IN THE LAST STATEMENT OF INFORMATION FILED WITH THE SECRETARY OF STATE, INCLUDING ANY INFORMATION CONTAINED IN FORM SI-PTSUPP, CHECK THE BOX AND PROCEED **TO ITEM 13.**
   IF THERE HAVE BEEN ANY CHANGES TO THE INFORMATION CONTAINED IN EITHER FORM, BOTH FORMS MUST BE COMPLETED IN THEIR ENTIRETY.

COMPLETE ADDRESSES FOR THE FOLLOWING   (Do not abbreviate the name of the city.  Items 4 and 5 cannot be PO Boxes.)

4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE — CITY AND STATE — ZIP CODE
   200 PARK AVE SOUTH 8th FL.   NEW YORK, NY   10003

5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY — CITY — STATE — ZIP CODE
   11766 WILSHIRE BLVD #1610  LOS ANGELES   CA 90025

MAILING ADDRESS — CITY AND STATE — ZIP CODE
200 PARK AVE SOUTH 8th FL.   NEW YORK, NY   10003

NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS   (The corporation must have these three officers.  A comparable title for the specific officer may be added; however, please do not alter the preprinted title on this statement.)

7. CHIEF EXECUTIVE OFFICER/ — ADDRESS — CITY AND STATE — ZIP CODE
   KEVIN FOWLER 200 PARK AVE SO  8th FL. NEW YORK, NY   10003

8. SECRETARY/ — ADDRESS — CITY AND STATE — ZIP CODE
   KEVIN FOWLER 200 PARK AVE SO  8th FL. NEW YORK, NY   10003

9. CHIEF FINANCIAL OFFICER/ — ADDRESS — CITY AND STATE — ZIP CODE
   KEVIN FOWLER 200 PARK AVE SO  8th FL. NEW YORK, NY   10003

LIST THE AGENT FOR SERVICE OF PROCESS (If an individual, the person named as agent must be a resident of California.)

10. CHECK THE APPROPRIATE PROVISION BELOW AND NAME THE AGENT FOR SERVICE OF PROCESS.
    ☒ AN INDIVIDUAL RESIDING IN CALIFORNIA.
    [ ] A CORPORATION WHICH HAS FILED A CERTIFICATE PURSUANT TO CALIFORNIA CORPORATIONS CODE SECTION 1505.

    AGENT'S NAME   FRANK SELVAGGI

11. ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL — CITY — STATE — ZIP CODE
    11766 WILSHIRE BLVD #1610   LOS ANGELES   CA   90025

12. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
    PRODUCTION SERVICES

13. THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT   ☒ YES

FRANK SELVAGGI — *(signature)* — AGENT — 9/30/03
TYPE OR PRINT NAME OF OFFICER OR AGENT — SIGNATURE — TITLE — DATE

SI-350 (REV 01/2003)

ER 771

# NYS Department of State

## Division of Corporations

## Entity Information

The information contained in this database is current through November 6, 2018.

---

Selected Entity Name: TRIGGER STREET PRODUCTIONS, INC.
Selected Entity Status Information

**Current Entity Name:** TRIGGER STREET PRODUCTIONS, INC.

**DOS ID #:** 1736418

**Initial DOS Filing Date:** JUNE 22, 1993

**County:** NEW YORK

**Jurisdiction:** NEW YORK

**Entity Type:** DOMESTIC BUSINESS CORPORATION

**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
ALTMAN GREENFIELD & SELVAGGI
120 WEST 45TH ST #3601
NEW YORK, NEW YORK, 10036

**Chief Executive Officer**

KEVIN SPACEY
C/OALTMAN GREENFIELD &SELVAGGI
120 WEST 45TH ST #3601
NEW YORK, NEW YORK, 10036

**Principal Executive Office**

KEVIN SPACEY
C/OALTMAN GREENFIELD &SELVAGGI

120 WEST 45TH ST #3601
NEW YORK, NEW YORK, 10036

### Registered Agent

NONE

This office does not record information regarding the
names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include the
name(s) and address(es) of the initial officers, directors,
and shareholders in the initial certificate of incorporation,
however this information is not recorded and only
available by viewing the certificate.

### *Stock Information

### # of Shares  Type of Stock  $ Value per Share

200          No Par Value

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 22, 1993 | Actual | TRIGGER STREET PRODUCTIONS, INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York
State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS
Homepage   |   Contact Us



**BUSINESS**

# Kevin Spacey Fallout: CAA And Publicist Staci Wolfe Part Ways With Actor

by Anita Busch

- November 2, 2017 6:06pm



**EXCLUSIVE:** Kevin Spacey, who has been accused of sexual harassment with an under-aged Anthony Rapp (*Star Trek: Discovery*) with subsequent accusations from other men as well, is no longer repped by talent agency CAA. The actor had been at the agency for the past eight years. Staci Wolfe his publicist at Polaris has also parted ways with the actor.

> **RELATED**
> 'Gladiator' & 'Shadowlands' Writer Bill Nicholson On "Hope Gap", His "Most Intense And Loving" Movie…

This comes after Netflix suspended indefinitely the Spacey starring *House of Cards* and, as we reported here today, they and Media Rights Capital both said there was at least one investigated incident with the Oscar winner on the set of the political drama. It was in Season 6. Polaris' Wolfe released a statement just last night that the disgraced actor "is taking the time necessary to seek evaluation and treatment."

ADVERTISEMENT

After Rapp came forward with the allegation of sexual assault, Spacey's response was to come out as homosexual as he issued an apology to the actor while saying he didn't remember the incident.

Right after that, GLAAD's president Sarah Kate Ellis Tweeted out what

many had been thinking: "Coming out stories should not be used to deflect from allegations of sexual assault." and "This isn't a coming out story about Spacey, but a story of survivorship by Anthony Rapp & those who speak out about unwanted sexual advances."

London's venerable Old Vic Theater London's theater where Spacey served as an artistic director from 2004-2015 then came forward to say it was "deeply dismayed" and asked for anyone who felt that they were unable to raise a complaint to please come forward.

Filmmaker and actor Tony Montana, who is best known for 2003 documentary *Overnight*, and Mexican actor Roberto Cavazos who worked with Spacey at the Old Vic both came forward with stories of sexual misconduct or assault by Spacey. One allegation, which Spacey denies, came anonymously from a 48 year-old man who said the sexual assault by the actor happened at the time with the man was only 14.

*Subscribe to Deadline Breaking News Alerts and keep your inbox happy*

 39

## 39 Comments

• on Nov 2, 2017 6:09 pm

and when are we going to hear about the agents in 5K suits and how they tease the young boys with acting gigs?? So many creepy agents...

realitycheck • on Nov 3, 2017 3:55 pm

THIS needs to happen. The Agents next please!

BritGeek • on Nov 2, 2017 6:15 pm

He's done. Another amazing fall from grace. But again, not surprising. Being a young actor in London at the time of Spacey's stewardship of the Old Vic it was common knowledge to steer clear. I remember

being amazed when I began to visit America and my new friends were surprised even to find out he was gay. Let alone all of the other stuff. Young male actors used to share their Spacey stories at auditions. Always with a familiar narrative. Farewell Kevin. Talented actor but an unashamed predator. Fuck you for blaming it on being drunk and then echoing the awful talking points that equate homosexuality with paedophilia. Good riddance.

---

**bankonit** • on Nov 2, 2017 8:35 pm

@britgeek

+1000000000
perfect articulating of it.

---

**SteveHC** • on Nov 3, 2017 1:17 am

Oh, I'd say he's ashamed…

---

• on Nov 3, 2017 8:31 am

Well said, BritGeek. The net positive is others able to avoid being preyed upon by this asshole.

---

**CA** • on Nov 2, 2017 6:35 pm

The rats scatter…

---

**Ed** • on Nov 3, 2017 8:21 am

Exactly. Only now does CAA jump off the Spacey train? He's been acting like this for thirty years.

---

**Scandal** • on Nov 2, 2017 6:53 pm

CAA and Staci HAD to of known about all this. Only now that it's out do they speak up. Cowards.

---

• on Nov 2, 2017 9:34 pm

The agents and publicists are complicit. They all new but only NOW are the taking a stand. #repugnant

• on Nov 3, 2017 4:47 am

But..but..the commissions.

---

• on Nov 2, 2017 6:57 pm

so dumb. incident happened 30 years ago. Why doesn't USA cut of Japan and German ASAP for what happened back in 40's

---

**Sam** • on Nov 2, 2017 8:19 pm

CNN just came out with an article about at least ten of the set crew members were grabbed and harassed. Eeeeeeehhhhh.

---

• on Nov 2, 2017 9:00 pm

I bet. Now everyone he ever loooked at was harassed or raped give me a break. Zero proof of any of this being pushed out there

---

• on Nov 3, 2017 7:51 am

Says the guy who's done it himself and gets nervous every time some one else gets caught

---

**bankonit** • on Nov 2, 2017 8:34 pm

lol you're in an idiot. 8 new accusers have come forward. more come, probably recent as this year.

times have changed, grandpa.

---

**Deppa** • on Nov 2, 2017 10:28 pm

Between this and Weinstein, I just dont understand how almost NONE of the victims didn't say a word earlier? People in the entertainment industry are not shy (at all). It just seems like everyone now wants to jump on the bandwagon and say a pat on the head felt like they were being raped.

---

ER 777

**Hey Deppa** • on Nov 3, 2017 9:20 am

People keep their mouths shut so they can get money and fame. And/or they were paid off.

> • on Nov 3, 2017 12:53 pm
>
> I doubt the crew is looking for money and fame. I bet they were simply looking to keep their jobs and be able to pay their rent by not pissing off the star of the show.

• on Nov 2, 2017 10:36 pm

My sentiments exactly. If Rapp was so traumatised why wait 31 years to do say something. There is another motive behind this for sure.

**Chendall Maybbe** • on Nov 2, 2017 7:39 pm

Is entertainment lawyer Todd Rubenstein going to part ways as well?

• on Nov 2, 2017 7:46 pm

it's over for him, he choose the boys over the craft.

• on Nov 2, 2017 8:21 pm

One look at that face and you'd never guess that he was a serial child abusing predator.

• on Nov 2, 2017 9:03 pm

They all know. The agents, the managers, the publicists, the personal assistants, etc..

These actors MAKE THEM MONEY … nobody wants to kill the golden goose.

They're all guilty.

Get your heads out of your asses.

• on Nov 3, 2017 8:06 am

Well said. Follow the money trail and you'll usually find the answers.

---

• on Nov 2, 2017 10:34 pm

What amazes me in this scenario is why no one is asking what Rapp was doing in Spacey's bedroom in the first place. Also what a 14 year old was doing at a showbiz party unchaperoned.
No one goes around with an age label stuck on their forehead. And....why wait 31 years to come forward with an accusation.

---

• on Nov 3, 2017 7:37 am

Rapp hasn't been silent about this incident at all. In fact, he's been dining out on it (to the point of bragging) at dinner parties for decades. Don't believe his "traumatized" shit.

---

**Victoria Parker** • on Nov 2, 2017 10:49 pm

Spacey is toast! And all without the bother of any stupid trials or legal process!

So much faster – and more fun – to destroy high-profile people this way!

A few accusations. No time wasted presenting evidence, cross-examining witnesses. Consideration by a jury. Just straight to the verdict, condemnation and execution!

Gosh Trial by Twitter and mob hysteria witch hunt is so much more enjoyable!!!

---

**jerry vitello** • on Nov 3, 2017 7:28 am

I don't disagree… Trial by twitter is not okay, but Spacey is a scumbag, predator and a downright nasty man who abused his power and preyed upon young gay and straight men. Relentless in his pursuit of every young man he thought to be weaker than him. This isn't a trial by twitter, this is a guy who is getting outed for messing with people's minds and destroying the creative pursuits of young artists who had every right to dream being one.

---

• on Nov 3, 2017 12:56 pm

Very well said, yes.

---

**jedijones77** • on Nov 2, 2017 11:14 pm

Kind of hilarious how these allegations are super-snowballing against so many people because actors are

ER 779

so attention-starved that they need to come out with their abuse story to get the attention back on them and away from the last person. This was just a dam waiting to burst.

---

• on Nov 3, 2017 7:39 am

Yep. Next year's Oscars are going to be interesting. I hear the venue has been moved to an elevator because that how many people will be in attendance after every abuser in Hollywood is exposed and shunned.

---

• on Nov 3, 2017 4:11 pm

Instead of #oscarssowhite it'll be #oscarsorapist.

---

**K.** • on Nov 2, 2017 11:38 pm

His Richard III was so brilliant. Alas, do the crime pay the time.

---

**Lucy** • on Nov 2, 2017 11:43 pm

i wasn't devastated by the news about Weinstein, not just because it has been commonly known about him, but because it was commonly known that many "suits" throughout the history of film preyed on the vulnerable creatives of the industry. So it hurts more when creatives prey on one another. They, above others, should understand and sympathize with others of their kind.

---

**Zack** • on Nov 3, 2017 2:07 pm

Sorry if it hurts you more, but last I checked, these are all human beings being preyed upon. No need for a caste system here.

---

**Eddie** • on Nov 3, 2017 6:50 am

Keep it coming people. Tear this entire garbage heap down. Expose everyone and all the bullshit. Like The Joker said in the first Batman movie "This town needs an enema!"

---

**Delilah** • on Nov 3, 2017 8:33 am

Like rats abandoning a sinking ship.

**Spotgirl** • on Nov 3, 2017 8:40 am

I might respect an admission, from Spacey or any of these bastards, that they were wrong and at fault. But no, it's a parade of "I was drunk," "I apologize but I don't remember," and the requisite so-and-so is going to rehab/undergoing counseling. Face it, your careers are effectively over. Admit responsibility and take your punishment. Power corrupts, but I hope this abuse scandal topples all the high-and-mighty who are guilty.



*Will Angelina's 'Survivor' mistake come back to haunt her? 'I...*



*American Horror Story: Apocalypse Recap: So That's How the World...*



*Report: The number of people who are fine with paying app...*



*5 Affordable Alternatives to The Iconic Birkin Bag*



*Ian MacKaye's New Group With Fugazi, Evens Members to Debut This...*

About Us  |  Advertise  |  Terms of Use  |  Privacy Policy  |  Your Privacy Rights
|  Ad Choices  |  Privacy Preferences  |  Google+

The Power of Content

Copyright © 2018 Penske Business Media, LLC. All rights reserved.

HOLLYWOOD™ & Design © 2018 Hollywood Chamber of Commerce. The Hollywood Sign is a trademark and intellectual property of Hollywood Chamber of Commerce. All Rights Reserved.

Powered by WordPress.com VIP

ER 782

1  Steve Wilson Briggs
2  4322 Chico Ave.,
   Santa Rosa, CA 95407
3  510 200 3763
   snc.steve@gmail.com
4  PLAINTIFF In Propria Persona
5
6
7
8                  **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**

10  STEVE WILSON BRIGGS,                    Civ No: 18-cv-04952-VC
11              Plaintiff,
12                 vs                       **[PROPOSED] ORDER
                                            GRANTING PLAINTIFF'S**
13  KEVIN SPACEY et al,                     **MOTION TO SERVE DEFENDANTS
                                            SPACEY AND BRUNETTI**
14              Defendants.                 **BY PUBLICATION**
15
16                                          Date:      December 13, 2018
                                            Courtroom: 4
17                                          Time:      10:00 a.m.
                                            Judge:     Hon. Vince Chhabria
18
19
20                          PROPOSED ORDER
21      Having considered the Plaintiff's motion, captioned "Plaintiff's Motion For Service Of
21  Process By Publication For Defendants Kevin Spacey, Dana Brunetti; And To Extend Service
22  Deadlines," and finding the Plaintiff's arguments to be sound, **IT IS HEREBY ORDERED:**
23      1.  That service of process of the plaintiff's Summons and Complaint upon Defendants Kevin
24          Spacey and Dana Brunetti will be executed by publication.
25      2.  Defendant Trigger Street Productions will pay all costs of said service by publication.
26
27  Dated:_____         Signed:_____
28                                        The Honorable Vince Chhabria

                                   1
                            [PROPOSED] ORDER

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing **"PLAINTIFF'S MOTION FOR SERVICE OF PROCESS BY PUBLICATION FOR DEFENDANTS KEVIN SPACEY, AND DANA BRUNETTI; AND TO EXTEND SERVICE DEADLINES,"** and "**[Proposed] Order**", and filed same with the Clerk of the Court for the United States District Court, Northern District Of California, San Francisco Division, by using the District's Pacer system on November 8, 2018.

Dated: November 8, 2018.              Signed: /s/ Steve Wilson Briggs_____
                                                          STEVE WILSON BRIGGS
                                                          Plaintiff, In Propria Persona

ER 784

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Avenue
San Francisco, CA 94102
_____
www.cand.uscourts.gov

Susan Y. Soong                                                General Court Number
Clerk of Court                                                     415-522-2000

November 5, 2018

RE:  Briggs v. Spacey
        18-cv-04952-VC

Default is declined as to Kevin Spacey and Dana Brunetti on November 5, 2018.

Susan Y. Soong, Clerk

by:  Felicia Brown
Case Systems Administrator
415-522-2000